GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
    jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
    jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
    smader@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 2:19-cv-1150<br><br>**COMPLAINT FOR MALICIOUS PROSECUTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff P6 LA MF Holdings SPE, LLC ("AEW" or "Investor Member") hereby alleges:

## NATURE OF THE ACTION

1.      Defendant NMS Capital Partners I, LLC ("NMS"), with the assistance of Defendants Brentwood Legal Services, Steven Zelig, WLA Legal Services, Inc., Miller Barondess LLP, Louis R. Miller, James Goldman, Alexander Frid, Jason Tokoro, Genga & Associates, P.C., and John Genga ("the NMS Counsel Defendants"), wrongfully initiated, and for more than three years continued to prosecute, a lawsuit against Plaintiff P6 LA MF Holdings SPE, LLC ("AEW" or "Plaintiff") that Defendants knew was based on a forgery and false allegations. *See Lincoln Studios, LLC, et al. v. DLA, et al.*, Case No. BC551551 (the "*Lincoln Studios* Litigation"). And in order to keep their malicious and frivolous lawsuit against AEW alive, Defendants knowingly submitted to the trial court even more forgeries, and perjury, and oversaw one of the most far-reaching and brazen acts of evidence spoliation that any court has ever seen. After an eight-day evidentiary hearing, the trial court issued terminating sanctions against NMS for its misconduct, expressly finding that NMS had submitted no fewer than three forged agreements to the court, and had engaged in perjury and massive evidence spoliation, in violation of multiple court orders. A copy of the trial court's Terminating Sanctions Order is attached hereto, and incorporated by reference, as Exhibit 1. The trial court found that NMS' conduct was not just in violation of its orders, but constituted a "***fraud on the whole [judicial] system***." The trial court separately found that NMS' claims lacked merit as a matter of law, and, therefore, also sustained demurrers to NMS' claims; Defendants did not even bother to defend at least 25 of the 31 claims alleged by NMS against AEW, and never appealed the dismissal of any of those claims, even though they had represented 80% of the claims NMS had alleged, and had been outlined in hundreds of pages of allegations in both NMS' First Amended Complaint ("FAC") and NMS' Second Amended Complaint ("SAC") in the *Lincoln Studios* Litigation. As a result of its Terminating Sanctions Order, the trial

court dismissed all of NMS' claims, with prejudice, and entered judgment against NMS both on NMS' complaint against AEW and on AEW's cross-complaint against NMS.  The judgments against NMS are attached hereto, and incorporated by reference, as Exhibits 2 and 3.

2.    NMS then pursued an appeal from the judgments entered against it, again with the assistance of the NMS Counsel Defendants, even though NMS did not challenge a single finding the trial court had made, including the many findings of forgery, perjury, and evidence spoliation.  Defendants also submitted to the Court of Appeal, and relied on in their briefing, declarations that the trial court had already ruled constituted perjury, even though they were not challenging those findings on appeal.  California's Second District Court of Appeal subsequently affirmed the trial court's Terminating Sanctions Order and the judgments entered against NMS, finding:

> According to the trial court, there "is no way to effect compliance with civil discovery or the Court's Orders, since [Appellants] have already destroyed countless materials relevant to this case. And there is no way to know the full extent of the damage done." Appellants' "widespread misconduct infects the entirety of these proceedings," such that the "coordinated[,] intentional[,] widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony [they] may intend to offer. We find no error in the imposition of terminating sanctions.

A copy of the Court of Appeal's decisions are attached hereto, and incorporated by reference, as Exhibits 4 and 5.

3.    NMS, with the assistance of the NMS Counsel Defendants, then filed a Petition for Rehearing with the Court of Appeal, which was denied, and subsequently filed a Petition for Review with the California Supreme Court, which was also denied. Thus, the judgments on the merits against NMS are now final.

4.    Defendants filed, and continued to pursue, the *Lincoln Studios* Litigation against AEW for an improper purpose: to enrich themselves, wrongfully, at AEW's expense.  NMS and AEW had entered into a Joint Venture Agreement ("JVA") in September 2010 in order to acquire and develop residential and mixed use buildings in West Los Angeles, and eventually developed nine properties ("the JV Properties"),

collectively worth hundreds of millions of dollars.  The value of the JV Properties appreciated far more, and far faster, than NMS had originally anticipated, and NMS, therefore, forged a version of the JVA by replacing the five-year Buy/Sell provision in Article 11 of the JVA with a three-year Buy/Sell provision in the forged JVA, which NMS called "Version 2" of the JVA.

5.     NMS did this by using pdf over-writing software called Adobe Acrobat, and replaced the number "5" and the word "five" in Article 11 of a pdf of the JVA with the number "3" and the word "three" in its forged "Version 2."  NMS also used, as the "baseline" for its forgery, an earlier copy of the JVA, before numerous important amendments had been made; this included amendments related to "Specified Properties" that allocated capital contributions for most JV Properties as 90% AEW/10% NMS, rather than the 70% AEW/30% NMS included in the original executed JVA in September 2010, on which NMS' forgery was based.  By doing this, NMS hoped not only to force AEW to sell its interest in the Joint Venture to NMS, but also to do so in less than five years, and at a wildly reduced price.

6.     NMS' lawsuit was based on the forged "Version 2."  NMS falsely alleged in its lawsuit that the "5 year" Buy/Sell provision contained in the executed JVA was merely a "typo" and should have read "3 years," and further falsely alleged that AEW had agreed in September 2010 that it was a typo and had sent NMS the revised JVA ("Version 2") that same month.  Of course, NMS knew that was all a lie.  In actuality, NMS forged "Version 2" in July 2013.

7.     There was no typo in Article 11 of the JVA.  NMS had specifically requested a 5-year Buy/Sell provision during the negotiations.  The 5-year Buy/Sell was contained in every draft circulated among the parties and their respective counsel after NMS' request.  The 5-year Buy/Sell was contained in the executed JVA in September 2010 (NMS called this copy of the JVA "Version 1").  And the 5-year Buy/Sell was contained in every copy of the JVA exchanged and circulated by the parties, despite at least thirteen separate amendments made to the JVA.  There was not

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

a single document, let alone a single draft of the JVA, in which the 3-year Buy/Sell language contained in the forged "Version 2" ever appeared, or was even requested by NMS.

8.     NMS also had the audacity to falsely allege in its lawsuit that the "Specified Properties" language contained in the amended JVA, which NMS called "Version 3" of the JVA, was forged by AEW and never agreed to, even though that language had been negotiated and agreed to by NMS and its counsel in early January 2011, and that it was agreed to at NMS' request.  NMS could not afford to fund 30% of the capital for JV Properties and needed to reduce its commitment to 10%.  AEW agreed to the change to accommodate NMS.  NMS also certified the amended JVA with the Specified Properties language to the Joint Venture's lenders.  NMS also certified the validity of the JVA with the Specified Properties language in numerous executed amendments to the JVA (at least five of which also included the "Specified Properties" language in the amendment separately executed by NMS).  NMS had also called capital from AEW on a 90/10 basis for years before it wrongfully made these false allegations in the *Lincoln Studios* Litigation.  Indeed, not only was what NMS called "Version 3" the only copy of the JVA maintained by and relied on by NMS' in-house counsel, but NMS' deal counsel expressly informed NMS, before it ever filed its lawsuit, that "Version 3" was the operative JVA, and had been since January 11, 2011.

9.     NMS knew that its lawsuit had no merit, and that it was based on both a forgery and patently false allegations.  NMS' forgeries, perjury and evidence destruction were designed to keep the lawsuit alive long enough to force the Joint Venture Properties into default on the senior loans and prevent AEW from either re-financing the JV Properties or selling them, leaving AEW no choice, NMS hoped, but to give in to NMS' extortionate demands.

10.     The NMS Counsel Defendants were aware of NMS' wrongdoing, and the improper purpose for which the *Lincoln Studios* Litigation had been filed, and for which it was pursued, and/or acted with reckless disregard for the truth.  There was

literally no evidence to support NMS' absurd allegations or its forgery, and there was overwhelming evidence to the contrary.  The NMS Counsel Defendants were in possession of irrefutable evidence of the falsity of the claims they pursued on NMS' behalf, yet they filed and pursued the action for years.  Indeed, on June 16, 2015, the NMS Counsel Defendants were provided copies of the specific July 2010 request made by NMS, in writing, demanding a 5-year Buy/Sell in Article 11 of the JVA. The NMS Counsel Defendants also attended the September 2015 depositions of NMS' former President and deal counsel, as well as the depositions of AEW's deal counsel, who all confirmed that NMS expressly requested a 5-year Buy/Sell in Article 11, and that there was no "typo" in Article 11 of the executed JVA with respect to the 5-year Buy/Sell or otherwise.

11.     The NMS Counsel Defendants also made numerous false statements to the trial court about the forgeries and NMS' misconduct, hid evidence of NMS' misconduct from AEW and the trial court, even though the trial court had ordered that evidence be produced, and the NMS Counsel Defendants knowingly submitted NMS' perjured testimony to the trial court, and actively and knowingly assisted NMS in its fraudulent and malicious scheme.  The NMS Counsel Defendants even went so far as to repeat NMS' allegations, that they knew to be false, to AEW's investors, to lenders for the JV Properties, and to title insurance companies and potential buyers, all with the intent to help NMS carry out its fraudulent scheme and to enrich itself in the process.  The NMS Counsel Defendants not only pursued the *Lincoln Studios* Litigation on behalf of NMS, knowing it was frivolous, but also filed copycat lawsuits for NMS, repeating the same false allegations, against AEW, AEW's affiliates, and even against AEW's counsel, only to abandon such copycat lawsuits both before and after demurrers were sustained.   Thus, the NMS Counsel Defendants were knowing and willing participants in the fraud and misconduct.

12.     AEW now brings this action against Defendants for malicious prosecution to seek redress for the harm caused by their misconduct.

# THE PARTIES

## A.    Plaintiff

13.    AEW is a Delaware limited liability company with one member, AEW Partners VI, L.P.  AEW Partners VI, L.P. is a Delaware limited partnership whose only general partner is AEW VI, L.P.  AEW VI, L.P. is a Delaware limited partnership whose only general partner is AEW Partners VI, Inc.  AEW Partners VI, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.  Therefore, AEW is a citizen of the States of Delaware and Massachusetts.

## B.    Defendants

14.    NMS is a limited liability company organized under the laws of California and with its principal place of business in Los Angeles County.  NMS' sole member is Neil Shekhter, an individual domiciled in Los Angeles County, California.  Therefore, NMS is a citizen of California.

15.    Defendant BRENTWOOD LEGAL SERVICES, PLC is a professional corporation organized under the laws of California and with its principal place of business in Santa Monica, California, and is therefore a citizen of the State of California.

16.    Defendant STEVEN ZELIG is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.

17.    Defendant WLA LEGAL SERVICES, INC. is a corporation organized under the laws of California and with its principal place of business in Los Angeles, California, and is therefore a citizen of the State of California.

18.    Defendant GENGA & ASSOCIATES, P.C. is a professional corporation organized under the laws of California, and with its principal place of business in Sherman Oaks, California, and is therefore a citizen of the State of California.

19.    Defendant JOHN GENGA is an individual domiciled in Los Angeles County, California, and is therefore a citizen of the State of California.  On information

1    and belief, at all relevant times, Defendant Genga was acting individually and on

2    behalf of Defendant Genga & Associates, P.C.

3         20.     Defendant MILLER BARONDESS LLP is a California limited liability

4    partnership.  All partners of the firm—Louis R. Miller, Jim M. Miller, Alexander Frid,

5    Brian Procel, Dan Miller, J. Mira Hashmall, Amnon Siegel, James, Goldman,

6    Benazeer Roshan, Jason Tokoro, Christopher Beatty, Jay Rakow, and Mark

7    Barondess—are domiciled in Los Angeles County, California.  Miller Barondess LLP

8    is therefore a citizen of the State of California.

9         21.     Defendant LOUIS R. MILLER is an individual domiciled in Los Angeles

10   County, California, and is therefore a citizen of the State of California.  On information

11   and belief, at all relevant times, Defendant Miller was acting individually and on

12   behalf of Defendant Miller Barondess.

13        22.     Defendant JAMES GOLDMAN is an individual domiciled in Los

14   Angeles County, California, and is therefore a citizen of the State of California.  On

15   information and belief, at all relevant times, Defendant Miller was acting individually

16   and on behalf of Defendant Miller Barondess.

17        23.     Defendant ALEXANDER FRID is an individual domiciled in Los

18   Angeles County, California, and is therefore a citizen of the State of California.  On

19   information and belief, at all relevant times, Defendant Frid was acting individually

20   and on behalf of Defendant Miller Barondess.

21        24.     Defendant JASON TOKORO is an individual domiciled in Los Angeles

22   County, California, and is therefore a citizen of the State of California.  On information

23   and belief, at all relevant times, Defendant Tokoro was acting individually and on

24   behalf of Defendant Miller Barondess.

25        25.     The true names and capacities, whether corporate, associate, individual, or

26   otherwise of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff,

27   which therefore sues said Defendants by such fictitious names.  Plaintiff is informed

28   and believes and thereupon alleges that each Defendant designated herein as Doe is

responsible in some manner for the events and happenings referred to herein and proximately caused damages to Plaintiff as alleged herein, either by such Doe Defendant's own conduct or through the conduct of his, her or its agents, servants, employees, representatives, associates, partners, joint venturers, co-conspirators, or alter egos.  Plaintiff will amend this Complaint to allege their true names and capacities when the same have been ascertained.

## SUBJECT MATTER JURISDICTION AND VENUE

26.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants are domiciled and transact their affairs in this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## PERSONAL JURISDICTION

28.     Exercise of jurisdiction over Defendant NMS is reasonable and proper in this District because NMS is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over NMS Capital is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

29.     Exercise of jurisdiction over Defendant BRENTWOOD LEGAL SERVICES, LLC is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over BRENTWOOD LEGAL SERVICES is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

30.     Exercise of jurisdiction over Defendant STEVEN ZELIG is reasonable and proper in this District because ZELIG is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over ZELIG is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

31.     Exercise of jurisdiction over Defendant GENGA & ASSOCIATES, P.C. is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over GENGA & ASSOCIATES, P.C. is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

32.     Exercise of jurisdiction over Defendant JOHN GENGA is reasonable and proper in this District because GENGA is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over GENGA is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

33.     Exercise of jurisdiction over Defendant MILLER BARONDESS LLP is reasonable and proper in this District because it is based in the State of California, is organized under the laws of the State of California, and has its principal place of business in the State of California.  Exercise of jurisdiction over MILLER BARONDESS LLP is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

34.     Exercise of jurisdiction over Defendant LOUIS R. MILLER is reasonable and proper in this District because MILLER is an individual who is domiciled and practices law in this District.  Exercise of jurisdiction over MILLER is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure,  and California Code of Civil Procedure § 410.10.

35.     Exercise of jurisdiction over Defendant JAMES GOLDMAN is reasonable and proper in this District because GOLDMAN is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over GOLDMAN is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

36.     Exercise of jurisdiction over Defendant ALEXANDER FRID is reasonable and proper in this District because FRID is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over FRID is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

37.     Exercise of jurisdiction over Defendant JASON TOKORO is reasonable and proper in this District because TOKORO is an individual who is domiciled and does business in this District.  Exercise of jurisdiction over TOKORO is proper pursuant to the United States Constitution, the Federal Rules of Civil Procedure, and California Code of Civil Procedure § 410.10.

## FACTUAL BASIS FOR CLAIMS

### A.     The Negotiations That Lead To The 5-Year Buy/Sell in Article 11

38.     On May 26, 2010, AEW and NMS executed a non-binding term sheet with respect to what was then only a potential joint venture to develop apartment and mixed use buildings in West Los Angeles.  The fact that the term sheet was non-binding was never in dispute.  NMS' head, Neil Shekhter, who executed the term sheet on behalf of NMS, even confirmed in the cover correspondence attaching his signature on it that the term sheet was non-binding.

39.     At the time the parties were contemplating such a joint venture, the real estate market was dismal, and affiliates of NMS owned four properties that were then each worth less than their respective outstanding loans and most, if not all, were either already in default on their loans or soon would be.  NMS was looking to avoid a total loss and needed an investment to save it from disaster; AEW was looking for an

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

opportunity to invest and develop properties in that marketplace.  The non-binding term sheet suggested that AEW would invest tens of millions of dollars in the joint venture if it were created.  It also contained a potential Buy/Sell provision.  A Buy/Sell provision is a mechanism by which either party, at the agreed upon time, can trigger a sale process by offering to buy the other party's interest or to sell its own interest at a particular stated price.  Until the process was over, neither side would know in advance whether they will be a buyer or a seller.  The Buy/Sell provision contained in the May 26, 2010 non-binding term sheet was a formula : the later of one of two events (a) three years from the acquisition of the property or (b) "stabilization" of that property, which meant that the property would by then be 95% leased up.  At the time of the term sheet's execution, in fact, the Buy/Sell was actually directed toward specific properties that might be acquired, rather than interests in the potential joint venture. The term sheet stated that either party would be able to "trigger a Buy/Sell for individual properties at *__the later of__* (i) three years from the acquisition of the property for which the Buy/Sell is being triggered or (ii) *__the stabilization of the property__* for which the Buy/Sell is being triggered."  To understand how different the originally contemplated Buy/Sell provision was from the forged "3-year" Buy/Sell provision in "Version 2," the properties were not "stabilized" until almost *__seven years__* after execution of the JVA – far later than even the 5-year Buy/Sell provision the parties eventually agreed to when they executed the JVA.  There was never any term sheet or draft term sheet containing a straight 3-year Buy/Sell like the one contained in NMS' forgery.

40.    The parties subsequently negotiated the JVA, with each represented by independent counsel.  DLA Piper, LLC ("DLA") represented AEW and Sheldon Chernove ("Chernove") and Schultz & Wright, LLP ("S&W") represented NMS.  Both the parties and their respective counsel communicated regarding the drafts of the JVA almost exclusively in writing.

41.     On or about July 7, 2010, DLA circulated the first draft of the joint venture agreement to the parties and their counsel (the "July 7 Draft").  The July 7 Draft included a Buy/Sell provision in Article 11 that contained a slightly revised version of the formula that the parties had been discussing, specifically, that "[a]t any time after the later to occur of (i) twelve (12) months after the expiration of the Investment Period, and (ii) the last Property purchased by the Company or any Subsidiary Company [of the Joint Venture] prior to the end of the Investment Period has achieved a stabilized occupancy of 95%, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice."  Twelve months after the Investment Period was equal to three years based on the two-year Investment Period that was contemplated in the July 7 Draft, and "stabilization" was defined as 95% occupancy at the last Property acquired by the Joint Venture.  The Buy/Sell Provision was defined in the draft JVA, and ultimately in the executed JVA, as "***the*** Buy Out Rights."

42.     On or about July 28, 2010, Chernove, one of the **deal counsel for NMS**, provided extensive comments and edits to the July 7 Draft of the JVA.  In his comments to Article 11, Chernove stated that the Buy/Sell Provision should not be activated at any time before ***five years***:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

**Plaintiffs' Requested The 5-Year Buy/Sell Provision In 2010**

From: Sheldon Chernove [mailto:schernove@chernovelaw.com]
Sent: Wednesday, July 28, 2010 2:50 PM
To: Jim
Subject: NMS - AEW

Here is the agreement marked with the changes in "track changes" to promote easy reading.

**Sheldon B. Chernove, Esq.**
Chernove & Associates, Inc.
16027 Ventura Boulevard, Suite 660
Encino, CA 91436
Phone: (818) 377-8102 (direct)
Fax: (818) 377-9132
schernove@chernovelaw.com

**ARTICLE 11.**

**Buy/Sell**

**11.1   Buy/Sell**.[THIS ENTIRE SECTION NEEDS FURTHER DISCUSSION BUT IT SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD WHEN THE TARGET DISTRIBUTION IS TO BE ACHIEVED]

**ARTICLE 11.**

**BUY/SELL**

**Buy/Sell**

11.1   Buy/Sell.

(a)   **Buy/Sell Offer Notice**. The operation of this *Section 11.1* may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:

(i)   At any time after ~~the later to occur of (i) twelve (12) months after the expiration of the Investment Period, and (ii) the last Property purchased by the Company or any Subsidiary Company prior to the end of the Investment Period has achieved a stabilized occupancy of 95%~~five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided, however, that in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event. In addition to the foregoing, if at any time an Event of Default, Removal Event or Incentive Loss Event occurs, the Investor Member may give a Buy/Sell Offer Notice. Notwithstanding the foregoing, neither Member may give a Buy/Sell Offer Notice while any Property is under a contract for sale and the consummation of such sale is pending.

43.    Thus, NMS' deal counsel expressly advised NMS to request a change in the Buy/Sell provision in Article 11 from the formula to a straight 5-year Buy/Sell. NMS then expressly made that same request to AEW.  Specifically, on July 28, 2010, Jim Andersen, then the Chief Operating Officer of NMS, forwarded Chernove's email and the attached copy of the Chernove mark-up, to AEW's Eric Samek, copying Neil Shekhter on the email to Samek.  Thus, not only was it NMS that specifically asked AEW to agree to a 5-year Buy/Sell in Article 11, but the decision to make that request was made at the highest levels of NMS based on the advice of NMS' own counsel.

44.    NMS made this request for a simple 5-year Buy/Sell provision in Article 11, rather than the formula they had been discussing, at least ***twice***.  Around the same

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

1    time that NMS' Anderson sent the Chernove mark-up to AEW's Samek on July 28,

2    2010, Andersen, the primary negotiator for NMS, also separately called AEW's

3    Jonathan Watson to request that the formula in the July 7 draft be changed to a 5-year

4    Buy/Sell provision.  Anderson explained to Watson that NMS was requesting this

5    change because NMS did not believe it would have the financial resources to compete

6    with AEW in any Buy/Sell scenario before the end of the 5th year of the Joint Venture.

7    Watson documented this conversation contemporaneously.

8        45.    AEW agreed to NMS' multiple requests to include a 5-year Buy/Sell

9    Provision in Article 11.  On or about August 11, 2010, DLA, counsel for AEW,

10   circulated the next draft of the joint venture agreement (the "August 11 Draft").  The

11   August 11 Draft inserted (in redline) the five-year Buy/Sell provision that NMS had

12   requested:  "At any time after five (5) years from the date hereof, either the Operating

13   Member or the Investor Member may give a Buy/Sell Offer Notice."



23       46.    DLA included both NMS' deal counsel and NMS' most senior officers—

24   Shekhter and Andersen—on its email attaching the redline change to Article 11 to a 5-

25   year Buy/Sell.  Countless  drafts of the JVA were subsequently circulated between the

26   parties and their respective counsel, and every single one contained the 5-year Buy/Sell

27   in Article 11 that NMS had requested.

28

47.    AEW even noted the change to a 5-year Buy/Sell in an August 30, 2010 memo to its investors:



**B.    The Parties Executed The JVA With the 5-Year Buy/Sell Provision**

48.    The parties executed the JVA on or about September 10, 2010.  The executed JVA, which was circulated to all counsel and parties, included the same 5-year Buy/Sell language in Article 11 that had been included in every draft circulated among the parties and their counsel since the August 11 Draft:

> **11.1    Buy/Sell**.
>
> (a)    **Buy/Sell Offer Notice**.  The operation of this Section 11.1 may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:
>
> (i)    At any time after five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided,

Article 11 of the JVA contained the only mechanism by which either party to the Joint Venture could "buy out" the interest of the other, defined in Article 11 as "*the* Buy Out Rights."

49.    The executed JVA also contained several other provisions that ultimately became relevant to the *Lincoln Studios* Litigation.  First, the JVA contained provision related to contributions of capital to the Joint Venture.  Specifically, the JVA provided that AEW would contribute 70% of the capital, and NMS would contribute 30% of the capital. Second, the JVA provided, in Article 6, the order in which distributions would be made from the JVA to members of the JVA, though the decision to make any such distribution was left entirely up to AEW, in its sole discretion, in Article 8.1.  Article

8.1 also provided that the decision to sell or re-finance any Joint Venture Property was up to AEW in its sole discretion.  Article 6 also provided for the possibility that AEW's return on its investment would be "capped" at a certain amount, if AEW received every distribution from the Joint Venture set forth in Article 6 before the fifth-year anniversary of the executed JVA, for example, if a sale of the Joint Venture Properties before the end of the 5th year provided enough money for all of the distributions to AEW identified in Article 6 and AEW elected to make/take all such distributions, and assuming that NMS was not in default under the JVA.  There was no possibility of such a "cap" after the 5th year anniversary.  AEW, of course, was in complete control over all such decisions pursuant to Article 8.1, so it was entirely within AEW's discretion as to whether or not it would ultimately agree to cap its own return.

## C.   The Parties Amended The JVA Thirteen Times But Never Amended The 5-Year Buy/Sell Provision in Article 11

50.    The JVA was amended by agreement thirteen times after September 10, 2010.  The first three amendments were by "slip-sheet" pages agreed to by the parties and their counsel; the ten other amendments were effectuated by separately documented stand-alone amendments, executed by both AEW and NMS.  The last of the "slip sheet" amendments was agreed to, in writing, on January 11, 2011.  By that time, NMS alerted AEW that it did not have enough money to fund 30% of the capital required after the first Joint Venture Property was acquired.  NMS requested that the capital contribution requirements be amended so that AEW would fund 90% of the required capital, and NMS would fund only 10% of the capital.  That would substantially increase both the cost and the risk of the Joint Venture to AEW, but it also would expand substantially the amount of return AEW could earn from the Joint Venture given that the return was tied to the amount of capital invested.  AEW agreed, and the concept of "Specified Properties" was incorporated throughout the JVA in the

Gibson, Dunn &
Crutcher LLP

form of slip sheet pages.  For "Specified Properties," the parties were free to fund capital on a basis other than the originally agreed to 70/30 split.

51.     The ten stand-alone amendments executed by NMS' Shekhter in 2011 and 2012 all affirmed the validity of the JVA, including with both the 5-year Buy/Sell language in Article 11 and the Specified Property language; indeed, at least five of the separately executed amendments also specifically referenced "Specified Properties," and also included specific capital contribution allocations on a 90/10 basis for a number of the Joint Venture Properties.  Despite thirteen amendments to the JVA in 2010, 2011 and 2012, however, no amendment was ever made to the 5-year Buy/Sell language in Article 11; nor was one ever requested.

52.     The amended JVA, with the Specified Properties language and the 5-year Buy/Sell provision, was submitted to the Joint Venture's lenders and certified by NMS as authentic and valid.  NMS also called capital for the Joint Venture on a 90/10 basis for years after the Specified Properties amendment was agreed to.

**D.     In June 2013, NMS Asks AEW to "Consider" Selling Its Interest**

53.     By June 2013, the Joint Venture owned nine properties through subsidiary companies, and the real estate market had rebounded.  Indeed, the real estate turnaround was so remarkable that the Joint Venture Properties were now worth hundreds of millions of dollars.  NMS wanted to take advantage of this unexpected good fortune by engineering a sale of AEW's interest in the Joint Venture to NMS in 2013, far earlier than the 5th year anniversary of the JVA; specifically, NMS hoped AEW would voluntarily agree to cap its investment return by selling its interest within five years.  The JVA left such a decision entirely to AEW, as NMS confirmed in a June 2013 letter in which it asked AEW merely to "consider" selling its interest, and amending the JVA in order to make such a sale possible.  AEW declined the request.

**E.     NMS Forges A Copy Of The JVA – "Version 2"**

54.     Recognizing that AEW was not going to voluntarily sell its interest to NMS and forgo the huge return to which it was entitled, NMS set out to forge a

version of the JVA to include a "3-year" Buy/Sell provision in Article 11. NMS' hope, apparently, was that AEW would feel compelled to sell its interest to NMS and do so at a time when its return would be "capped," thereby reducing the price NMS would have to pay. But NMS' greed knew no bounds, so it also sought to forge a version without the "Specified Properties" language in it, so that it could also claim a right to a 30% capital contribution, even though it only put in 10%, and AEW would only be able to recover a portion of its 90% investment and a portion of the return to which it was entitled.

55.    On July 12, 2013, NMS' Neil Shekhter forwarded to his son, Adam Shekhter, a September 10, 2010 email attaching a pdf copy of the September 2010 executed JVA before the Specified Properties language had been added. That weekend, Neil Shekhter and his son Adam used the September 10, 2010 pdf as the basis for the forgery NMS created on July 15, 2013, which NMS later called "Version 2." Using pdf overwriting software, they deleted the number "5" and the word "five" in Article 11 and replaced them with the number "3" and the word "three." They then circulated copies of the forgeries to others, both in and outside of NMS, so that the forgery would enjoy large circulation.

F.    **NMS' Own Counsel Confirms "Version 3," Not The Forged "Version 2" Is The Operative JVA**

56.    On July 19, 2013, in an apparent attempt to provide cover for the sudden appearance of a 3-year Buy/Sell provision when the executed JVA, always relied upon by the Joint Venture, contained a 5-year Buy/Sell provision, NMS' Shekhter emailed a number of NMS employees, including NMS' General Counsel, Steve Williford. In one email, Shekhter cut-and-pasted the language from the May 26, 2010 non-binding term sheet, four months before the JVA was executed, that discussed the concept of a Buy/Sell formula -- the later of three years or stabilization – 95% leased up. Shekhter knew that this non-binding formula had been abandoned in July 2010 at the express

Gibson, Dunn & Crutcher LLP

request of NMS, and replaced with the 5-year Buy/Sell provision that was included in almost every draft of the JVA and executed JVA in September 2010.

57.    Williford knew that Version 2 was not genuine and that the January 11, 2011 copy of the JVA with the Specified Property language and the 5-year Buy/Sell was the operative JVA.  The January 11, 2011 amended JVA, what NMS later misleadingly called "Version 3," was the ***only*** copy of the JVA that Williford maintained, and he kept it literally on his desk.  In response to Shekhter's email that identified the 3-year Buy/Sell plus 95% stabilization formula from the non-binding term sheet, Williford stated the obvious:  "***This concept did not make it into the actual LLC agreement***."  Yet NMS pressed ahead with its fraud and ultimate lawsuit based on its fraud and forgery.  Mere hours after confirming that there was no 3-year Buy/Sell provision in the JVA, Williford emailed AEW's counsel attaching a copy of the forged "Version 2"  (labeled "P6 LA MF Holdings I LLC v.2.pdf"), and describing it as the "last version of the LLC Agreement that was approved by Neil [Shekhter], which was sent hard copy to our offices in September 2010 – with the buy-sell permitted after 3 years, which is consistent with the executed term sheet and the conversations of NMS and AEW over the last three years."  This was a knowing lie. Williford would later testify that Neil Shekhter, the head of NMS, "ghost wrote" that email.

58.    NMS' Williford also sent a copy of the forged "Version 2" to Tom Johnston, of S&W, who had been one of NMS' lead deal counsel in 2010 and subsequently with the various amendments.  Williford asked Johnston if he had seen "Version 2" before.  Johnson obviously had not.  In his response email in August 2013, Johnson confirmed that the operative JVA was what NMS called "Version 3," and not the "Version 2" forged by Shekhter.  Johnston stated: "On or about January 21, 2011 the 'Change Pages' regarding 'Specified Properties' were substituted into the PA LA MF Holding I LLC Agreement and presented to [a Joint Venture Lender] as ***the true and correct copy*** of the P6 LA MF Holding I LLC Agreement.  ***Since January 21,***

*__2011, the P6 LA MF Holding I LLC Agreement with the 'Change Pages' has been treated as the P6 LA MF Holding I LLC Agreement and presented as so on all transactions after January 21, 2011__* . . . *__NMS has consistently certified that the P6 LA MF Holding I LLC Agreement with the 'Change Pages' is the P6 LA MF Holding I LLC Agreement on transactions after January 11, 2011__*."  In other words, as early as August 2013—almost two years before NMS and the NMS Counsel Defendants filed the *Lincoln Studios* Litigation—NMS' deal counsel made clear to NMS, including to NMS' General Counsel and Shekhter, the head of NMS, that "Version 3," not the forged "Version 2" created by NMS, is and has been the operative JVA, certified by NMS and relied upon by lenders, since January 11, 2011.  Of course, NMS already knew this to be true, contrary to the allegations it would later make in the *Lincoln Studios* Litigation.

59.    A few months later, in December 2013, NMS' General Counsel again asked NMS' outside deal counsel Johnston to provide his "files for [the] AEW [matter]."  Of course, the JVA forgery created by NMS in July 2013 was not in Johnston's files.  Johnston's response attached the operative JVA as amended on January 6, 2011 with the approved slip-sheeted pages, along with all ten standalone amendments to the JVA, thereby confirming once again that the JVA always had a 5-year Buy/Sell term, not the 3-year term that NMS would later falsely allege in the *Lincoln Studios* Litigation.

**G.    NMS And The NMS Counsel Defendants File The Lincoln Studios Litigation**

60.    In the summer of 2014, NMS filed the *Lincoln Studios* Litigation, after first filing a different lawsuit against its former deal counsel for negligence, for purportedly "not" including a 3-year Buy/Sell provision in the JVA.  Meanwhile, the initial defendants in the *Lincoln Studios* Litigation were AEW's former deal counsel, including DLA, alleging that, like NMS' own former counsel, AEW's deal counsel failed to include a 3-year Buy/Sell in the JVA.

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

61.     In April 2015, NMS and the NMS Counsel Defendants filed their FAC in *Lincoln Studios*, adding as defendants AEW and its employees and affiliates, alleging for the first time that "Version 2" was the operative JVA (although NMS denied that there was any valid JVA), setting forth the bogus story that the 5-year Buy/Sell provision contained in the executed September 10, 2010 copy of the JVA was a "typo" that AEW agreed to "fix" and delivered "Version 2" to NMS in September 2010, and that "Version 3" with the Specified Properties language was an unauthorized forgery created by AEW.  In a separate document served by the NMS Counsel Defendants on behalf of NMS, NMS alleged that it was seeking $12 billion in compensatory and punitive damages, even though NMS alleged that the entire Joint Venture Properties portfolio was worth no more than $400 million.

## H.     The June 15, 2015 Discovery Conference And Subsequent Forgeries

62.     On June 15, 2015, counsel for AEW met with the NMS Counsel Defendants for a court-ordered and court-reported discovery conference.  At the conference, the NMS Counsel Defendants were handed copies of the July 2010 email from NMS' deal counsel, Chernove, forwarded to AEW, demanding that Article 11 include a 5-year Buy/Sell.  The NMS Counsel Defendants were told, expressly, that the evidence proved the "typo" story was a lie and that "Version 2" was a forgery.  The NMS Counsel Defendants said they would look into it.

63.     Rather than withdraw as counsel, however, the NMS Counsel Defendants continued representing NMS in the *Lincoln Studios* Litigation.  They did not even retain an expert to opine that "Version 2" was a genuine document from September 2010, as NMS claimed.

64.     NMS, for its part, not only pursued its fraudulent claims, but indeed created and submitted to the trial court two more forgeries, in an attempt to keep its baseless case alive.

65.     On June 21, 2015, only days after the discovery conference in which NMS' fraud was undeniably exposed to the NMS Counsel Defendants, NMS, and, in

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

particular, NMS' Neil Shekhter, created a forged "Cover Letter" from AEW to NMS dated September 14, 2010 that purported to state that it enclosed "Version 2" and expressly referenced the "3-year Buy/Sell."  Shekhter forged that document by cutting and pasting text, and the signature block, from an earlier, genuine letter from AEW. NMS' Shekhter also set back the clock on his computer from June 21, 2015 to September 21, 2010, and then loaded a pdf of the forged "Cover Letter" onto his computer in order to attach "metadata" to the document that would make it appear as if the document had been on his computer since September 21, 2010.  One of the many mistakes NMS and Shekhter made in creating this forgery, however, was that the pdf software from Adobe that NMS used to create it did not exist until December 2014, making the metadata date impossible.  Notwithstanding the fact that NMS created this forgery in June 2015, however, NMS and the NMS Counsel Defendants kept it hidden, and neither produced it nor even referenced it until what they thought was an opportune time in September 2015.

66.    On June 21, 2015, NMS and, in particular, NMS' Shekhter, forged yet another document, a copy of a Property Management Agreement ("PMA") for the Joint Venture's La Cienega Property.  NMS knew it was about to lose a preliminary injunction motion in a related case, forcing its affiliate NMS Properties off of all the Joint Venture Properties because AEW had exercised its right, on behalf of the Joint Venture, to terminate all of the PMAs with NMS. So it forged a copy of the La Cienega PMA with a longer notice provision in order to avoid being forced off the Properties.  NMS' Shekhter used an older PMA from another Joint Venture Property as the base for this third forgery.

67.    NMS' Shekhter, however, mistakenly sent a botched version of the forged La Cienega PMA to the NMS Counsel Defendants, in which he inadvertently identified as the owner of the La Cienega Property the subsidiary company owner of a different property that was listed on the older PMA on which the forgery was based. NMS' Shekhter realized his mistake later in the evening on June 25, 2015, and sent a

Gibson, Dunn & Crutcher LLP

"fixed" version of the forgery to the NMS Counsel Defendants, who submitted the forgery to the court in the related action, and later submitted to the trial court in the *Lincoln Studios* Litigation.  The mere possession of the botched forgery, however, is sufficient to confirm that the NMS Counsel Defendants knew that the La Cienega PMA they submitted to the trial court was a forgery.

68.     In September 2015, the NMS Counsel Defendants introduced the forged Cover Letter as an exhibit at the deposition of NMS' Samek, but all they wanted to know was whether Samek recognized the signature, not whether it was genuine, whether it was sent, or whether Shekhter's story of a typo was true.  Indeed, Samek was not asked at all about NMS' allegations of a typo.  Samek, however, expressly stated that the Cover Letter and "Version 2" were forgeries.

## I.      The September 2015 Depositions

69.     In September 2015, the depositions of AEW's former deal counsel, NMS' former deal counsel, Chernove, and NMS' former President, Andersen, took place. Every single witness testified under oath that NMS requested the 5-year Buy/Sell provision and that there was no typo in Article 11 of the JVA.

70.     Notwithstanding that NMS' own witnesses confirmed the falsity of the "typo" story underling the forged "Version 2" and NMS' entire *Lincoln Studios* Litigation, NMS and the NMS Counsel Defendants pressed ahead with their malicious prosecution of frivolous claims against AEW and its affiliates.

## J.      The Trial Court's Forensic Preservation and Production Orders

71.     In September and October 2015, AEW brought the forgeries to the attention of the trial court, and filed motions seeking forensic preservation and production orders.  AEW's motions were backed by declarations from forensics experts that left almost no doubt that "Version 2" was a forgery. NMS and the NMS Counsel Defendants, however, affirmed the alleged genuineness of the forgeries to the trial court, including under oath, repeated the false story of the "typo," including under

oath, and expressly told the court that all documents were being preserved.  These were all lies.

72.     The trial court entered an order in September 2015 ordering NMS to freeze all of its computers and electronic devices, to produce a list of every device on which forged "Version 2,"  "Cover Letter" and La Cienega PMA had ever appeared, and to produce all electronic versions of such documents.  In October 2015, the trial court ordered that all NMS devices and documents, including all originals and copies of the JVA, Cover Letter and the La Cienega PMA, be produced to AEW's experts for forensic examination.

**K.     NMS Engages In Massive Evidence Spoliation**

73.     Rather than identify all devices it had been ordered to produce, the NMS Counsel Defendants identified only a single device.   The evidence proved that dozens of devices and computers should have been identified and preserved.

74.     NMS, however, panicked that its forgeries would be uncovered, began engaging in widespread document and device manipulation, destruction and suppression, all with the aid of the NMS Counsel Defendants, who should have made sure such identification and preservation was taking place, not only pursuant to their ethical obligations, but because they had made express representations to the trial court that such devices and documents would be identified and preserved.

75.     In October 2015, NMS' Neil Shekhter and his son Alan Shekhter engaged in text messages with each other in which they discussed NMS' plan to swap out the hard drive on Shekhter's computer – texts they deleted after the trial court's preservation order:

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn &
Crutcher LLP

1

2          Take it and have it done today                                    I know
3          I'll call u                                                       I'll do that later
           10/15/2015 12:05:00 PM                                            10/15/2015 04:46:41 PM
4      Okay want me to get the new drive                                     As long as I change the date before
       10/15/2015 12:06:07 PM                                                10/15/2015 04:47:48 PM
5
       I have the drive and a new computer,
6      Best Buy on pico wouldn't have it                              I'll show you what to do it should be
       done today but maybe the valley                                fine
       would calling now                                              10/15/2015 04:48:14 PM
7      10/15/2015 03:46:00 PM

8          Maybe some other shop in the area?
           10/15/2015 03:50:02 PM
9
           Maybe pay them extra?
10         10/15/2015 03:56:41 PM

11

12        76.     NMS carried out that plan and more.  Shekhter and his son swapped out

13   the hard drive, back-dated the clock on the new hard drive and then loaded tens of

14   thousands of files on the new drive to make it look like the drive, and the documents,

15   were older.  Shekhter, his son and other NMS employees performed Google searches

16   looking for ways to avoid being caught by the forensic examination:

17
18   

19

20

21

22

23        77.     NMS hid Shekhter's older computer from 2012, hid the hard drive that

24   was replaced in the newer (2013) computer, hid the Seagate back-up drive on which

25   the files from the older drive were saved, hid dozens of other devices, took Adam

26   Shekhter's computer offline and removed it during the forensics examination, deleted

27   files related to the forgeries and the Joint Venture, back-dated the clock on Shekhter's

28   computer dozens of times and loaded hundreds of thousands of files onto the computer

while it was back-dated, re-named Joint Venture files to make them harder to find, replaced the operating software on Shekhter's computer to eliminate still more evidence, used data wiping software on NMS devices, and more.  NMS took these actions after the trial court issued its preservation and production orders, and despite repeated statements by NMS and the NMS Counsel Defendants to the trial court that all documents and devices were being preserved and produced.

78.     Notwithstanding this unseemly and illegal effort, AEW's experts were able to piece together enough evidence to establish all of NMS' wrongdoing.

## L.     In An Effort To Avoid Having The Frivolous Case Dismissed, Defendants File A Third Amended Complaint Switching To A Bogus Article 6 Theory

79.     AEW had filed a demurrer to NMS' FAC, and in response NMS was required to amend.  NMS filed its SAC that repeated spanning hundreds of pages the same false allegations that were in its FAC.  AEW demurred to the SAC, in response to which NMS did not bother to even defend the vast majority of the claims it had alleged.  This alone shows such claims lacked probable cause.  The claims Defendants abandoned included: causes of action numbers: 2–Negligent Misrepresentation; 3–Statutory Violations (Sections 496 and 484 of the Penal Code); 4–Estoppel (Promissory and Equitable); 7–Cancellation of Instruments and Transfers; 8 –Reformation; 9–Statutory Violations (Revenue and Tax Code); 10–Breach of Contract (Breach of Agreement re Acquisition); 14–23 Breach of Contract (Breach of the First through Tenth Amendments to the JVA); 24–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Entities that own Broadway); 25–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Lincoln); 26–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of Washington); 27–Breach of Contract (Breach of Oral and Implied Agreement Relating to the Sale of La Cienega); 28–Breach of Contract (Breach of Oral and Implied Agreement Relating to contribution of $1.5 million); 29–Negligence/Gross Negligence; and 30–Unjust Enrichment.  These claims had been alleged over hundreds

of pages and represented almost 80% of all claims alleged in the SAC.  NMS also subsequently dropped its 31st claim for declaratory relief.  NMS did not even appeal from the dismissal of any of these claims.

80.     NMS filed a Third Amended Complaint ("TAC") in early January 2016, switching theories.  The TAC continued to falsely assert that "Version 2" was genuine and that the "typo" story was true, but knowing that "Version 2" would soon be shown to be a forgery, Defendants advanced a new theory that did not rely on Article 11 and its Buy/Sell provision.

81.     The new theory, just as frivolous as the old, also depended on knowingly false allegations, including, among many others, the false allegations that "Version 3" was an unauthorized forgery, that NMS never agreed to the Specified Property amendments, and that NMS had "exercised its right" under Article 6 to "buy out" AEW's interest in the Summer 2013 when it sent AEW a letter asking it to "consider" selling its interest – a letter that itself undermined the new claims and included a request to amend the JVA.  Nobody could genuinely believe that a letter asking AEW to "consider" amending the JVA and selling its interest to NMS was the exercise of a "right," and nobody could reasonably believe that Article 6, which had nothing to do with buying out another's interests, provided a "buy out" right.

**M.     AEW Files Its Motion for Terminating Sanctions**

82.     In late January 2016, AEW filed its motion for terminating sanctions against NMS, supported by irrefutable evidence, in the form of contemporaneous documents, deposition testimony and expert declarations, which established beyond any reasonable doubt that "Version 2," the "Cover Letter" and the La Cienega PMA were all forgeries created by NMS, on July 15, 2013, June 21, 2015, and June 24, 2015, respectively, and that NMS had engaged in widespread destruction of evidence. There could be no doubt that NMS had forged the documents and destroyed evidence based on review of the supporting evidence, notwithstanding the numerous false

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

1  statements to the contrary that NMS and the NMS Counsel Defendants had made to

2  the trial court before then, often under oath.

3          83.    Rather than dismiss its case, NMS pushed ahead with its frivolous case,

4  reaffirming the alleged authenticity of the known forgeries and submitting still more

5  perjury.  And rather than withdrawing as counsel, the NMS Counsel Defendants

6  continued to represent NMS in its malicious prosecution of the *Lincoln Studios*

7  Litigation, submitted what they had to know was more perjury by NMS witnesses, and

8  retained experts to try to mislead the trial court rather than retain experts that could in

9  any way support NMS' claims that the documents were genuine and from the time

10 period that NMS had claimed.

11 **N.    AEW Also Files A Demurrer To NMS' TAC**

12         84.    In addition to filing its motion for terminating sanctions, in late January

13 2016, AEW also filed a demurrer to NMS' TAC.  In its demurrer, AEW explained  that

14 Article 6 of the JVA had nothing to do with the acquisition of one member's interest in

15 the Joint Venture by another, and makes no mention of it.  Instead, Article 6 related

16 solely to the order of distributions of money by the Joint Venture to members of the

17 Joint Venture, and distributions are within the sole discretion of AEW under Article

18 8.1 of the JVA.  Article 11(g) also defined the Buy/Sell provisions contained in Article

19 11.1 of the JVA as "***the*** Buy Out Rights," leaving no room for NMS' new argument.

20 AEW also pointed out that the June 2013 letter attached to the TAC actually

21 undermined the new claim, rather than supported it, because: (1) it asked for AEW to

22 "***conside***r" selling its interest to NMS, thus it was not the "exercise" of a "right"; and

23 (2) the letter expressly acknowledged that the JVA would have to be "***amended***" in

24 order for any such acquisition to be effective.

25 **O.    The Trial Court Sustains The Demurrer**

26         85.    In June 2016, the trial court dismissed NMS' TAC, with prejudice.

27 Among other findings, the trial court found that NMS' theory that it had a right to

28 "buy-out" AEW's interest in the Joint Venture pursuant to Article 6 of the JVA was

contrary to the terms of the JVA and not a reasonable interpretation of the JVA. The trial court found, just as Article 6 itself provided, that Article 6 related only to the distribution of money by the Joint Venture to the members of the Joint Venture (something AEW controlled in its sole discretion pursuant to Article 8.l of the JVA), and had nothing to do with one member acquiring the interest of another.

**P.    The Trial Court's July 29, 2016 Sanctions Order**

86.    On July 29, 2016, the trial court issued an order granting, at least in part, AEW's motion for terminating sanctions, but setting an evidentiary hearing to take place before determining the full extent of the sanctions to be issued and the complete grounds for such sanctions.  In its July 29, 2016 Order, the trial court held in part:

(a)    "***This Order hereby sets forth the purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED. These violations are on a grand scale and the motion for sanctions is granted***."

(b)    "***By his own admission, Shekhter violated the Court's discovery orders by failing to produce his personal computer for examination, deleting files from his personal computer, changing the hard drive of his personal computer, and/or failing to transfer all of the files to the new hard drive, all with the admitted intention of preventing the forensic expert(s) from discovering deleted files***."

**Q.    The October 2016 Evidentiary Hearing**

87.    The trial court held an eight-day evidentiary hearing in October 2016. The trial court had expressly stated, in advance, that it wanted to hear from every witness who submitted a declaration or deposition testimony, Defendants made the decision not to produce Neil Shekhter, even though he was literally the only witness to have claimed there was a "typo" in Article 11 of the originally executed JVA, the only

Gibson, Dunn & Crutcher LLP

person to have claimed to have received "Version 2" and the "Cover Letter" in September 2010, and to have "found" them later, and the only person to have claimed that "Version 2," the "Cover Letter" and the La Cienega PMA were genuine; Shekhter had also already admitted in NMS' opposition to have texted with his son, Alan, in October 2015 about swapping out the hard drive in his computer, deleted the texts (among other documents) and actually swapped out his hard drive in violation of the court's Orders. Defendants also chose not to produce: Alan Shekhter, who they admitted to swapping out the hard drive: Adam Shekhter, who claimed only to have "scanned" "Version 2" in July 2013 rather than help forge it; or Enrique Sanchez or Eddie Valentine, each of whom had been caught, like Neil Shekhter, deleting and wiping various files from NMS' devices.

88.     Defendants did not claim that any of these witnesses were unavailable to testify during the eight days of testimony that took place over a three-week period; and, indeed, the NMS Counsel Defendants had expressly agreed to the hearing dates. Nor did Defendants ever offer any explanation for this glaring omission, and the only logical explanation is that Defendants knew their lies would be exposed on cross-examination.

89.     The testimony of the two "fact" witnesses that Defendants did put on showed them to be both untruthful and without any relevant information related to the key forgeries, perjury and document destruction at issue. Indeed, one witness testified he did not even know there was a Buy/Sell provision in the JVA. And the other witness, Brian Bowis, admitted on the stand that the declaration prepared by the NMS Counsel Defendants, and that he had signed, was false; while the declaration had stated that he had not deleted any joint venture records, in fact he had done so, and NMS' IT Director, Enrique Sanchez, had helped him to do it.

90.     NMS also failed to present a single expert who testified that any of the three documents at issue were genuine documents from the time period NMS had claimed to have received them. Indeed, NMS' key document expert admitted that

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

"Version 2" was printed at NMS' offices in July 2013, and was not sent to NMS in September 2010.  Worse still for Defendants, NMS' expert testified that neither NMS nor the NMS Counsel Defendants had ever told him that NMS was claiming in the *Lincoln Studios* Litigation that "Version 2" was an original document from September 2013.

91.     The NMS Counsel Defendants tried to change NMS' story to argue, without evidence, that "Version 2" may just be a "copy" of the original made in July 2013.   This argument, however, was not only contrary to all of the evidence, but it was also contrary to repeated statements by NMS and by the NMS Counsel Defendants to the trial court, sometimes under oath, that "Version 2" was the "original" document received by NMS in September 2010.  And Defendants failed to explain what allegedly happened to the "original" if this was a copy, after spending years lying to the trial court stating that it was the "original."

92.     AEW's experts also explained that the new argument was just as false as the argument that it was an original.  "Version 2," they explained, was an original forgery created by NMS, and in particular NMS' Neil Shekhter and his son, Adam Shekhter, on July 15, 2013 at NMS' offices.  They further explained in painstaking detail how and where NMS had created it, what document it had been based it on, and how NMS had destroyed the evidence to try cover it up.  Gerry LaPorte, for example, who had been trained by the secret service, explained because NMS had used pdf over-writing software to edit a pdf of the JVA to create the forgery, rather than using a Word document and Word software, the forgery did not re-justify on the right hand side.  The result is that because the word "three" is longer than the word "five," when NMS switched the words in Article 11 it caused that sentence to hang over the right margin by a single letter, creating a "hanging g:"

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

## Changing "five" to "three" Causes A Single Overhanging Letter



93.     Mr. LaPorte demonstrated that this one line in Article 11 was the only line in the entire document where that had occurred.  Mr. LaPorte also explained that the CPS Code found on "Version 2" established that it had been printed on NMS' Xerox copier on July 15, 2013 between 3 and 4 p.m. PST.  It was not delivered to NMS in September 2010, as NMS had claimed.  The CPS Code, Mr. LaPorte explained, is an anti-counterfeiting technology, in which color printers identify when and where a color document is printed:

**The CPS Code Found On "Version 2"**
**Confirms It Was Printed On July 15, 2013 At NMS' Offices**

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

94.   Mr. LaPorte explained that "Version 2" was an original forgery from July 15, 2013, not a copy.  He also explained the CPS Code appeared on the back of every page of "Version 2" except one; the 79th page of "Version 2," the AEW signature page, which had been switched out and replaced with an older copy in attempt to make the signature page appear older.

95.   Mr. LaPorte also explained that the 2 other copies of "Version 2" produced by Defendants in the Lincoln Studios Litigation were actually copies of the original forgery, "Version 2."  For example, he identified original ink marks that appeared on "Version 2" that also appeared, in lighter form, on the two other copies, making it clear that they were merely copies of the original forgery NMS called "Version 2."

96.   Mr. LaPorte also explained how he had established that both the Cover Letter and the La Cienega PMA were forgeries.  He explained, for example, that the entire signature block on the so-called "Cover Letter" had been cut-and-pasted from an older genuine document and for that reason they matched perfectly.  He also explained how the La Cienega PMA had been based on an older PMA from another property, and for that reason it included a number of typographical errors and anomalies that had long since been fixed before the La Cienega PMA was actually drafted and circulated among the parties, and that did not contain such errors and anomalies.

97.   Mr. Rubin addressed not only the origins of the various forgeries, but also how NMS had withheld and destroyed evidence, and lied about it, to cover up the forgeries.  He explained how they had recovered the deleted text exchange between Neil and Alan Shekhter in which they agreed to swap out Neil Shekhter's hard drive, and how they had actually carried it out.  He also established that Shekhter had backed up his hard drive first using a Seagate back-up drive, and that the Seagate back-up drive had remained in use on NMS devices at least through December 2, 2015, yet had never been produced.  He also explained that Neil Shekhter had another computer that he had used to create the forgeries, which was still in use through at least late

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

September 2015, after the trial court's forensic freeze order, yet it also was never produced.  He further testified that NMS had failed to produce the hard drive that had been swapped out, the back-up hard Seagate drive and at least 21 other electronic devices.  Moreover, he explained that NMS continued to delete records, including files that matched the forgeries, long after the forensic preservation and production orders, that NMS had renamed a file from AEW to just "W," and that NMS and Shekhter had backdated Shekhter's computer at least seventeen times just between October and December 2015, had loaded tens of thousands of new files onto the computer while it was backdated, and had even replaced his operating software, all in an effort to inhibit the forensic examination.

98.     Indeed, not only did Mr. Rubin testify that NMS and Shekhter continue to backdate Shekhter's computer and load more than 60,000 new files onto the computer mere minutes before the forensics examination took place on December 2, 2015, but NMS' own expert testified that at that exact time, when the NMS Counsel Defendants were also supposed to be there, Neil Shekhter, Alan Shekhter and NMS' IT Director, Enrique Sanchez, were all with that very computer, making it clear that this misconduct was not only company-wide, but also almost certain that the NMS Counsel Defendants were actively engaged in the same misconduct.

99.     With respect to the creation of "Version 2," Mr. Rubin testified that NMS created that forgery through a complex, multi-step process that AEW's experts were later able to reconstruct through a detailed forensic examination of the few NMS devices and electronic data that NMS did not hide, alter or destroy.  Specifically, on July 12, 2013, Shekhter, the head of NMS, sent an email to his son Adam Shekhter, who was, at that time, working as a research analyst intern at NMS; this email attached a PDF version of the original executed JVA with the 5-year Buy/Sell Provision (before many important amendments were made to the JVA) in an electronic file named "P6 LA MF Holdings I LLC.pdf."  It was this PDF file that was used as the basis for the forgery of the JVA.

100.   On July 14, 2013, the electronic version of the forged JVA was created. At 9:46 p.m., Neil Shekhter, who conducted his NMS business largely on his "home computer" opened a file on his home computer named "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf"—a title identical to that of the PDF that Shekhter forwarded to Adam Shekhter two days earlier, but for the appended language "clean NS 123 PRINT."  Notably, the inclusion of "NS," Shekhter's initials, in the document title confirmed that Shekhter created the PDF, as he commonly added his initials to documents he created for NMS.  The file was opened by Neil Shekhter on his home computer, called "DELLNEIL2012-PC," and edited with an Adobe Acrobat application to change the "five (5)" language in Section 11.1(a)(i) to read "three (3)." This alteration caused the single line of text—the line containing the fabricated term— to hang over the right-hand justification that exists in every other line of the page and on every other page in the JVA.

101.   On July 15, 2013, at 1:24 p.m., the electronic "clean NS 123 PRINT" forgery was transferred from the "DELLNEIL2012-PC" computer to a USB flash drive (which was also never produced by NMS or its attorneys, despite the Court order requiring its production) and subsequently opened on Adam Shekhter's NMS desktop computer at 3:51 p.m.  The forgery was then printed by Adam Shekhter at NMS' offices on NMS' Xerox WorkCenter 7775 printer, Serial Number RFX001896.  After it was printed, the forgery was scanned by Adam Shekhter to Adam Shekhter's NMS' email account shortly after 4:00 p.m., eliminating all metadata that would have been associated with the PDF file (to conceal the origins of the forgery).

102.   After scanning the forgery and saving it as a PDF, Mr. Rubin explained that Adam Shekhter emailed this "CLEAN" file to his father, Neil Shekhter, at 4:51 p.m. all part of NMS' fraudulent scheme. After he received the PDF of the forgery from his son, Shekhter, on behalf of NMS, began circulating the forgery internally at NMS to make it appear that others had always had a copy of the forgery.  A review of

Gibson, Dunn & Crutcher LLP

NMS' electronic server and devices, however, showed that no electronic copy of the forgery ever existed on any NMS server or device before July 15, 2013.

**R.      The November 22, 2016 Terminating Sanctions Order**

103.   On November 22, 2016, the trial court issued its Terminating Sanctions Order, finding NMS had engaged in wide-spread forgery, perjury and destruction of evidence.  Among other findings, the trial court concluded:

(a)      "***Plaintiffs' coordinated, intentional, widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony Plaintiffs may intend to offer***."

(b)      "***Plaintiffs fabricated evidence, submitted perjury about the same, and destroyed evidence, while simultaneously representing to the Court that they were proffering authentic documents and that they had preserved evidence***."

(c)      "***Indeed, the level of document and evidence destruction here is so shocking, intentional, and pervasive that violations of prior court orders are not even required for the imposition of such sanctions—although such violations do exist here and justify terminating sanctions***."

(d)      "At the Evidentiary Hearing, Plaintiffs did not call several witnesses to testify, including NMS principal Neil Shekhter and NMS employees Adam Shekhter, Alan Shekhter, Enrique Sanchez (NMS' IT Administrator), and Eddie Valentin (Neil Shekhter's assistant), all of whom submitted declarations in opposition to Defendants' Motion.  Plaintiffs did not explain why these witnesses were not called.  The failure to call these witnesses despite an opportunity to do so undermines all of their credibility."

(e)      "There can be no question that Plaintiffs' failure to call these key witnesses, as well as Plaintiffs' willful destruction of evidence and document

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn &
Crutcher LLP

destruction, leads to the inference that Plaintiffs are guilty of the forgery, perjury, and spoliation Defendants claim.  After hearing all of the evidence, the Court has no doubt this is the case."

(f)      "***Terminating and monetary sanctions are appropriate in light of the extensive evidence that Plaintiffs forged several pieces of evidence—at least "Version 2," the "La Cienega PMA," and the "Cover Letter."  This by itself constitutes a fraud on the court, the unlawful spoliation of evidence, and attempts to undermine the judicial system***."

(g)      "***The Court also finds ample evidence that Plaintiffs—in particular Neil Shekhter—have provided false testimony under oath in order to mislead the Court and cover up their own misconduct***."

(h)      "Among the many actions, including those discussed above, Plaintiffs fraudulently altered and modified Neil's New Home Computer, destroying evidence in the process; lied about and have failed to produce Neil's 2012 Home Computer; intentionally deleted relevant materials provided by a witness; intentionally downloaded and installed updates that destroyed evidence; downloaded and installed data sweeping software that destroyed evidence; altered and attempted to backdate key files; failed to produce at least four key devices with critical evidence and at least 21 devices in total; by their own admission, intentionally destroyed key hard drives and a backup; and deleted specific files relating to the forgeries in this case."

(i)      "Plaintiffs' misconduct was knowing and intentional, in plain violation of this Court's September 8 and October 6, 2015 Orders.  Intentional, willful, coordinated destruction of evidence certainly justifies terminating sanctions, especially here where many of those actions were in plain violation of the Court's Orders."

Gibson, Dunn & Crutcher LLP

(j)     "***Plaintiffs forged at least one key document—the JVA their claims relied upon—in 2013.  This was followed by additional forgeries, perjury, and the coordinated and widespread spoliation and concealment of evidence in this case***.  There is no way to effect compliance with civil discovery or the Court's Orders, since Plaintiffs have already destroyed countless materials relevant to this case.  And there is no way to know the full extent of the damage done.  Plaintiffs' actions, particularly those since the Court entered its Orders, were willful and show a history of abuse that continues to this day, and nothing less than terminating sanctions would produce compliance with this Court's Orders."

(k)     "***Version 2" is not an authentic document.  It is a forgery***."

(l)     "***Two versions of the "La Cienega PMA" were created on June 24, 2015, and both were fabrications***."

(m)     "***The 'La Cienega PMA' is a forgery***."

(n)     "***The 'Cover Letter' is a forgery***."

(o)     "In total, there are at least 21 devices that have been plugged into Neil's New Home Computer alone that have not been produced by Plaintiffs.  Plaintiffs offered no evidence to credibly refute this evidence."

(p)      "***Neil Shekhter's testimony was knowingly false***."

(q)     "Plaintiffs also offered no explanation regarding the provenance of the three alleged forgeries, two of which were allegedly created during the pendency of this action.  Plaintiffs have not proffered anyone, including Plaintiffs' own principal Neil Shekhter, to explain why the three documents are not forgeries, or to explain the discrepancies in the sworn statements of NMS' employees and the briefs submitted by NMS' counsel.  ***Nor have Plaintiffs proffered any***

***testimony or explanation to rebut Defendants' showing that Plaintiffs failed to produce documents related to the alleged forgeries in the normal course of discovery even though this material was in Plaintiffs' and Plaintiffs' counsel's possession***."

(r)   "***Terminating and monetary sanctions are also appropriate in light of Plaintiffs' perjury regarding the authenticity of and circumstances surrounding all of the forged documents.  This misconduct is also reprehensible***."

(s)   "Terminating and monetary sanctions are also appropriate here in this case, with respect to both Plaintiffs' claims and Cross-Complainant's Cross-Complaint, given Plaintiffs' massive, intentional, coordinated effort to destroy evidence, especially in light of, and in plain violation of, the specific September 8, 2015 Order of this Court directing them to preserve and not alter evidence and the October 2015 Order requiring them to produce evidence for forensic examination."

(t)   "Plaintiffs, like the plaintiff in *R.S. Creative*, brought this case based upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries (which related to Plaintiffs' original claims and Cross-Complainant's Cross-Complaint claims).  It does not remedy the situation that Plaintiffs' claims based upon the forgery have been dismissed; rather, their widespread misconduct infects the entirety of these proceedings."

(u)   "Additionally, the Court considers the fact that, despite their actions being front and center in Defendants' Motion, Plaintiffs did not call as witnesses at the Evidentiary Hearing (despite more than ample opportunity to do so) Neil Shekhter (who engaged in the outrageous actions of spoliation, perjury, and

forgery presented to the Court), Adam Shekhter (who participated with Neil Shekhter in creating the forgery of "Version 2"), and Alan Shekhter (who assisted Neil Shekhter with the hard drive swap discussed above).  Plaintiffs likewise failed to present testimony from Enrique Sanchez and Eddie Valentin at the Evidentiary Hearing.  The absence of any live testimony from these individuals was stunning."

(v)     "The home computer Neil Shekhter used in 2014-2015 . . . is indisputably a critical piece of evidence.  On it, Neil Shekhter conducted [the NMS Plaintiffs'] business during much of the time period in this litigation . . .  Despite this computer's obvious relevance, [the NMS Parties] set out on a scheme to destroy and alter its contents."

(w)     "Neil Shekhter [and his son] initiated and executed a plan to: (i) remove a hard drive from Neil's New Home Computer; (ii) replace it with a new hard drive that looked similar to the old one; (iii) manipulate and alter the computer by artificially backdating the computer's clock to make the files appear older than they were; and then (iv) flood the new hard drive with more than 75,000 backdated files and folders."

(x)     "While [the NMS Parties] state that they 'discarded' both the old hard drive [of Neil's New Home Computer] and the Seagate device on which they backed up the old hard drive, forensic evidence shows that the Seagate device was connected to Neil's computer as late as December 2, 2015 . . . [but] [n]either the old hard drive nor the back-up [Seagate] drive was ever produced, in violation of this Court's Orders."

(y)     "Like Neil's New Home Computer, the home computer that Neil Shekhter used in the summer of 2013 when allegedly receiving the scan of [the Joint Venture Agreement] . . . is another critical piece of evidence. . . .  Neil Shekhter

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

testified . . . simply that he 'threw [this device] away' by 'put[ting] it in the trash,'" but in reality, forensic analysis confirms the computer "was in use as late as September 19, 2015, after this Court issued its [Freeze Order]."

**S.     The December 1 and 2, 2016 Judgments Against NMS**

104.   On December 1, 2016, the trial court entered judgment against NMS on all of its affirmative claims.

105.   Also, on both December 1 and December 2, 2016, the trial court heard further evidence from AEW in support of the relief AEW sought in its cross-complaint against NMS.  After hearing the evidence, the court noted "I appreciate the fact that the fraud was revealed because it's not just this court's order, it's the whole system, the fraud on the whole system."  The Court entered a default judgment against NMS and in favor of AEW on its cross-complaint on December 2, 2016.  The default judgment, entered only after a two-day prove-up hearing, confirmed, among other things, that NMS had already committed misconduct and was in breach of the JVA before it ever filed the frivolous *Lincoln Studios* Litigation.  Among other findings included in the default judgment against NMS, the Court found the following:

(a) **"The document referred to as "Version 2" of the JVA in NMS' First and Second Amended Complaints (and referenced in Paragraph 40 of AEW's Cross-Complaint) is a fabrication and forgery created by NMS and its affiliates. Specifically, NMS and its affiliates changed the Buy/Sell provision in Section 11.1(a)(i) of the JVA from a five-year term to a three-year term that was never agreed upon by the parties."**  (¶ 4.)

(b) **"NMS breached the JVA in the following respects:"**

- "Fraud, Misrepresentation, and Forgery.  As the Court found in its November 22, 2016 Order Granting Defendants' and Cross-Complainant's Motion for Terminating and Other Sanctions, NMS committed a broad variety of fraudulent conduct [and] misrepresentations."  (¶ 6.a)

- "In particular, as explained above in Paragraph 4, the Court found that 'Version 2' of the JVA in NMS' First and Second Amended Complaints (and referenced

Gibson, Dunn & Crutcher LLP

in Paragraph 40 of AEW's Cross-Complaint) is a fabrication and forgery created by NMS and its affiliates."   (¶ 6.a)

- "The Court also found that a cover letter dated September 14, 2010 from Eric Samek and Neil Shekhter, which NMS and its affiliates first proffered in September 2015 and claimed accompanied the alleged hard copy of "Version 2" of the JVA, is a fabrication and a forgery created by NMS and its affiliates."   (¶ 6.a)

- "The Court further found that the property management agreement ("PMA") for the Luxe La Cienega Property ("La Cienega PMA") that was first proffered by NMS and its affiliates in June 2015 and contained a 60-day termination provision in Section 12.1, as opposed to a 30-day termination provision in all other PMAs for the Properties, is a fabrication and a forgery created by NMS and its affiliates."   (¶ 6.a)

- "Moreover, the Court found that NMS and its affiliates made numerous misrepresentations and false statements in connection with these forgeries, including such statements to AEW and this Court."   (¶ 6.a)

- "NMS and its affiliates also committed several violations of the PMAs, including but not limited to NMS' related entity, NMS Properties, Inc.'s ("NMS Properties"), refusal to recognize the valid termination of the PMAs, failure to vacate the Properties (with the exception of the Luxe Washington Property), failure to return the books and records of the Properties to AEW and the Subsidiary Companies, and failure to otherwise cooperate with the transition of management to a new property manager."   (¶ 6.a)

- "Furthermore, NMS failed to disclose any of the multiple, pending litigations in which NMS' principal, Neil Shekhter, was involved when the JVA was executed;" (¶ 6.a)

- "The conduct set forth in Paragraph 6(a) constitutes breaches of Sections 2.3, 4.1, 8.1, 8.4, 8.9, 10.1(a), and 10.1(q) of the JVA;" (¶ 6.b)

- "Misappropriation and Mishandling of Joint Venture Funds.  NMS has misappropriated funds from the Joint Venture by refusing to comply with AEW's instruction on July 31, 2015 to NMS and its related entity NMS Properties to transfer all cash funds of the Joint Venture and the Subsidiary Companies to designated accounts and by denying AEW access to such funds. NMS Properties also refused to comply with AEW and the Subsidiary Companies' instructions to seek AEW approval before making expenditures and provide a weekly summary of expenses to be paid along with invoices and back-

up for such expenses.  NMS also failed to fund its share of capital calls after AEW gave notice requiring such capital calls on July 15, 2015;"  (¶ 6.c)

- "The conduct set forth in Paragraph 6(c) constitutes breaches of Sections 3.2, 4.1(b), and 8.1 of the JVA;"  (¶ 6.d)

- "<u>Misappropriation and Mishandling of Joint Venture Records</u>.  NMS has misappropriated and mishandled the Joint Venture records in several respects. NMS has not maintained the books and records of the Joint Venture and the Properties as required by the JVA.  NMS also failed to provide AEW with access to the Yardi Systems, Inc. ("Yardi") records relating to the Properties, including information for the Luxe La Cienega Property by removing AEW from the weekly Yardi distribution list for Luxe La Cienega." (¶ 6.e)

- "NMS further failed to provide AEW's retained accountant, Grobstein Teeple LLP, the required access to the books and records of the Joint Venture as requested by AEW, by failing to provide AEW with relevant information for the Luxe La Cienega Property, and by abruptly removing AEW from the weekly distribution list for such information in July 2015."  (¶ 6.e)

- "NMS further commingled documentation, records, and funds of the Joint Venture's Properties with unrelated documentation, records, and funds. Moreover, NMS and NMS Properties refused to provide AEW with a final accounting concerning the Properties upon the termination of NMS Properties as property manager, despite AEW's repeated demands;" (¶ 6.e)

- "The conduct set forth in Paragraph 6(e) constitutes breaches of Sections 4.1(a), 4.7, and 8.18 of the JVA;" (¶ 6.f)

- "<u>Other Breaches</u>.  NMS has committed several other breaches of the JVA.  NMS filed the First Amended Complaint in the above-captioned lawsuit and by naming as defendants the Joint Venture, and other entities and individuals— including Eric Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.—all of which are indirect owners of or affiliated with AEW, in violation of several provisions of the JVA, and seeking to dissolve the Joint Venture, and asserting claims in this action against AEW for breach of fiduciary duty;" (¶ 6.g)

- "The conduct set forth in Paragraph 6(g) is a breach of Sections 8.4(t), 8.17, 15.11, and 15.17 of the JVA;" (¶ 6.h)

- "NMS also entered into two unauthorized agreements with related parties of NMS without AEW's approval, which also involved the misappropriation of

Gibson, Dunn & Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

Joint Venture funds and the wrongful attempt to increase NMS's own profits and stake in the Joint Venture;"  (¶ 6.i)

- "The conduct set forth in Paragraph 6(i) constitutes a breach of Sections 8.4 and 8.9 of the JVA;"  (¶ 6.j)

- "NMS has committed Events of Default pursuant to Sections 10.1(a), (d), (o), and (q) of the JVA."  (¶ 7.a)

**T.    The Terminating Sanctions and Judgments Against NMS Are Affirmed On Appeal**

106.   Defendants appealed from the judgments against NMS, though did not challenge any of the trial court's findings of forgery, perjury or destruction of evidence on appeal.  On June 20, 2018, the Court of Appeal affirmed the Terminating Sanctions Order, and affirmed both the December 1, 2016 and December 2, 2016 judgments against NMS.  The Court of Appeal held, in part:

(a)    "We affirm the judgment as to the Cross-Complaint because we find that appellants' acts of intentional destruction and suppression of evidence and perjury constitute discovery abuse that is egregious and intolerable and infects the entire proceedings."

(b)    "The trial court found pervasive, massive destruction of documents and files directly relating to the Joint Venture, that caused the "permanent loss of untold evidence and metadata" on Shekhter's computer, including the manipulation and deletion of files, backdating the computer more than 17 times which affected more than 800,000 files and folders and failing to identify and produce at least 21 devices that had access to the documents in question. All of this misconduct irreparably damaged respondents' ability to defend the litigation and pursue crossclaims, even those unrelated to the take-out or buy out of respondents' interest under either Article 6 or 11."

(c)    "The misconduct here was extensive, intentional and in violation of court orders designed to prevent the very abuse which occurred."

(d)    "According to the trial court, there "is no way to effect compliance with civil discovery or the Court's Orders, since [Appellants] have already destroyed countless materials relevant to this case. And there is no way to know the full extent of the damage done." Appellants' "widespread misconduct infects the entirety of these proceedings," such that the "coordinated[,] intentional[,] widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony [they] may intend to offer." We find no error in the imposition of terminating sanctions."

(e)    "Appellants do not challenge the trial court's findings that the misconduct here included willful tampering with computers and documents and the failure to produce devices, all of which constituted multiple violations of two court orders. They do not deny that they misused the discovery process."

**U.    The Court of Appeal Also Rejects NMS' New Article 6 Claim**

107.    In addition to affirming the judgments against NMS as a result of the trial court's Terminating Sanctions Order, in a separate opinion the Court of Appeal also rejected NMS' new Article 6 theory on the pleadings, affirming the trial court's order sustaining AEW's demurrer to NMS' Article 6 claim without leave to amend.  The Court of Appeal confirmed that NMS' argument was contrary to the express terms of Article 6 of the JVA, which says nothing about acquiring another member's interest in the Joint Venture, and affirming the trial court's finding that JVA was not reasonably susceptible to NMS' suggested interpretation.  The Court of Appeal also noted that rather than support NMS' argument, the extrinsic evidence undermined its claim:

They offer extrinsic evidence to explain the essential contractual terms they contend "were understood by the parties but would otherwise be

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn & Crutcher LLP

unintelligible to others." (Sterling v. Taylor (2007) 40 Cal.4th 757, 767.)
They offer Samek's May 19, 2010 email to Shekhter indicating that AEW
agreed to a "minimum equity multiple of 1.75x" and that if AEW's
investment is "monetize[d]" within five years "then NMS will keep all
proceeds above AEW's 24% annual return." This email states nothing
about acquiring the other party's interest, much less about acquiring it for
1.75 times its investment. It simply describes how profits are distributed
and interests are to be "monetized." ***In fact, other extrinsic evidence not
mentioned by appellants suggests appellants do not interpret Article 6 to
include the right to acquire the other party's interest upon
"monetization" that they now advocate here***. Shekhter's June 2013, letter
to AEW attached as Exhibit D to the TAC, acknowledges that the JVA
needs to be amended both "to provide for the withdrawal of the Investor
Member from the Company once its economic interest becomes zero" and
"to allow the Operating Member to use outside funds to get the Investor
Member to an IRR of 24% and 1.75 multiple." Accordingly, the trial
court's finding that appellant's interpretation was not one to which the
language of Article 6 was susceptible is not error. Because the contract is
not susceptible to that interpretation, leave to amend was properly denied
as to this cause of action.

## V.   The Judgments Against NMS Are Now Final

108.   After NMS lost in the Court of Appeal, Defendants filed a Petition for Re-
Hearing, which was denied. Defendants then filed a Petition for Review with the
California Supreme Court, and that too was denied. Thus, the judgments against NMS
are now final.

Gibson, Dunn &
Crutcher LLP

# FIRST CLAIM FOR RELIEF

## (For Malicious Prosecution Against NMS)

109.   Plaintiff incorporates by reference paragraphs 1 through 108 above, and 117 through 136 below, and reassert those allegations as if set forth in full herein.

110.   The *Lincoln Studios* Litigation was initiated and prosecuted against Plaintiff by and at the direction of NMS.

111.   The *Lincoln Studios* Litigation was continued and prosecuted against Plaintiff by and at the direction of NMS to a legal termination on the merits in favor of Plaintiff and against NMS.  On December 1 and 2, 2016, the trial court entered final judgments in favor of Plaintiff and against NMS.  On June 20, 2018, the Court of Appeal affirmed the entry of judgment against NMS and in favor of Plaintiff.  The judgments against NMS became final in November 2018.

112.   NMS did not have probable cause to file or pursue the *Lincoln Studios* Litigation.  NMS knew its claims were utterly and completely without merit, and that they were based on a forgery and false allegations.  NMS submitted additional forgeries to the Court, submitted testimony it knew constituted perjury, and engaged in widespread evidence spoliation in order to conceal its misconduct and to keep alive a lawsuit it knew to have no merit.

113.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, NMS acted for purposes other than succeeding on the merits.  NMS knew it could not succeed on the merits on its claims because its claims were based on forgeries and perjury.  NMS' improper purposes included forcing a sale of AEW's interest in the Joint Venture to NMS and at a fraction of what it was worth.  Indeed, in an August 2016 letter to AEW, NMS' Shekhter expressly warned that "[o]ne way or another, I intend to pay-back and/or buy-out AEW and get AEW and its AEW Fund VI investors out of this portfolio," and that ***"[y]our [AEW's] best case scenario is years of litigation before there is any finality or resolution*.**"

Gibson, Dunn & Crutcher LLP

114.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, NMS acted with oppression, fraud, and malice, including, but not limited to, acting with intent to cause injury to Plaintiff, and engaging in a systematic concealment of the truth in order to advance NMS' baseless claims against Plaintiff.  As such, NMS willfully and consciously disregarded Plaintiff's rights.  No reasonable party would have filed, let alone pursued for more than three years, NMS' lawsuit against AEW.

115.   As a direct and proximate cause of NMS' conduct, Plaintiff was forced to expend enormous time and resources, and to incur millions of dollars in legal fees and costs, defending itself and its affiliates and vendors against the meritless claims asserted by NMS in the *Lincoln Studios* Litigation.  Furthermore, Plaintiff suffered harm to its reputation and business interests.  The conduct of NMS was a substantial factor and proximate cause of the harm to Plaintiff.

## SECOND CLAIM FOR RELIEF

### (For Malicious Prosecution Against the NMS Counsel Defendants)

116.   Plaintiff incorporates by reference paragraphs 1 through 115 above and reasserts those allegations as if set forth in full herein.

117.   The *Lincoln Studios* Litigation was initiated and prosecuted against Plaintiff by or at the direction of the NMS Counsel Defendants, and the Lincoln Studios Litigation resulted in a final judgment on the merits against NMS and in favor of AEW.

118.   The NMS Counsel Defendants did not have probable cause to file or pursue the *Lincoln Studios* Litigation against AEW.  The NMS Counsel Defendants were aware, and/or acted with reckless disregard of the truth that NMS' lawsuit against AEW lacked merit, that "Version 2" on which it was based was a forgery, that the story of a "typo" in Article 11 of the JVA was false, and that "Version 3," as Defendants called it, was actually the operative JVA that had been used by the parties to the Joint Venture, including NMS, since January 11, 2011, and that it was not, as Defendants alleged, a forgery created by AEW without the knowledge or consent of

NMS.  All the NMS Counsel Defendants had to do was review the contemporaneous records or interview NMS' former President, Andersen, or interview NMS' deal counsel, and the forgery and fraud would have been obvious.  There was no evidence supporting the forgery or fraudulent allegations.  So the NMS Counsel Defendants either did such basic work and knew that the lawsuit had no merit, or they willfully refused to do any investigation at all before filing a complaint based on a forgery and patently false allegations, alleging fraud and breach of contract claims over hundreds of pages, and seeking "billions" of dollars in damages.  In other words, the NMS Counsel Defendants filed the FAC knowing it had no merit and/or acted with reckless disregard of the truth.

119.   In any event, on June 16, 2015, the NMS Counsel Defendants were provided copies of the specific July 2010 request made by NMS, in writing, demanding a 5-year Buy/Sell in Article 11 of the JVA. The NMS Counsel Defendants also attended the September 2015 depositions of NMS' former President, Andersen, and deal counsel, Chernove, as well as the depositions of AEW's deal counsel, all of whom confirmed that NMS had expressly requested a 5-year Buy/Sell in Article 11, and that there was no "typo" in Article 11 of the executed JVA, with respect to the 5-year Buy/Sell or otherwise.  Yet they continued to wrongfully and maliciously pursue the Lincoln Studios Litigation against AEW based on the forged "Version 2" and NMS' false allegations.

120.   Also in September 2015 the NMS Counsel Defendants were in possession of AEW's forensic examination motion, backed by expert testimony, demonstrating that "Version 2" was in all likelihood a forgery created by pdf overwriting software by NMS, and in January 2016 the NMS Counsel Defendants were in possession of AEW's Motion for Terminating Sanctions, backed by expert testimony, conclusively establishing that "Version 2" – a document that NMS and the NMS Counsel Defendants had assured the trial court, including under oath, was an original and genuine document delivered by AEW to NMS in September 2010, was actually a

forgery created by the head of NMS, Neil Shekhter, and his son, Adam Shekhter, on July 15, 2013.  The CPS Code contained on "Version 2" was alone sufficient to establish that "Version 2" was a forgery created on NMS' devices in July 2013, and not a genuine document prepared and delivered by AEW in September 2010.  But AEW's experts also provided extensive additional evidence that "Version 2" was a forgery created by NMS.

121.   AEW's Motion for Terminating Sanctions served on NMS and the NMS Counsel Defendants also contained irrefutable evidence that the "Cover Letter" NMS and the NMS Counsel Defendants had assured the trial court was a genuine original document received by NMS in September 2010 was actually a forgery created by NMS' Neil Shekhter in June 2016 after the discovery conference in which the NMS Counsel Defendants were provided evidence that "Version 2" was a forgery and that the "typo" story was a lie.  Among other evidence identified, AEW's experts identified the earlier document from which the signature block of the forged "Cover Letter" was cut-and-pasted, they identified earlier electronic versions of the same forgery created by NMS on the same day in June 2015 that NMS and the NMS Counsel Defendants were ordered to produce and that they did not produce, they identified NMS emails from Shekhter to himself and from Shekhter to others at NMS discussing the earlier versions of the forged "Cover Letter" that NMS and the NMS Counsel Defendants were ordered to produce and that they did not produce, and they identified that version of Adobe Acrobat that was used to create the hidden, earlier versions of the forged "Cover Letter."  AEW's experts explained that NMS, and Shekhter in particular, used a version of Adobe Acrobat that did not exist until December 2014, even though the metadata associated with the first hidden, earlier version of the "Cover Letter" suggested it was created in September 2010, and they explained that NMS/Shekhter created the document in June 2015 after backdating Shekhter's home computer.  The hidden emails identified by AEW's experts included emails from Shekhter asking

other NMS employees if they could tell when the version of the "Cover Letter" he emailed them was created.

122.   AEW's experts also provided irrefutable evidence that the La Cienega PMA that NMS and the NMS Counsel Defendants had assured the trial court was an original and genuine document from 2012 was in fact a forgery create by NMS, and by Shekhter in particular, in June 2015 after NMS believed its affiliate was about to lose a preliminary injunction motion in another case.  Not only did AEW's experts identify the earlier draft Property Management Agreement related to another JV Property that NMS, and Shekhter in particular, used as the basis for this particular forgery, but they identified the emails sent from closed NMS accounts attaching the older draft to Shekhter just before the forgery was based, all of which had been ordered by the trial court to be produced by NMS and the NMS Counsel Defendants and that were hidden instead.  AEW's experts also identified the NMS word document created by NMS' Shekhter with a name matching that of the forgery created at the time the forgery first appeared, which NMS and the NMS Counsel Defendants not only failed to produce, in violation of the trial court's order, but which was actually deleted from Shekhter's computer.  And perhaps the most damning evidence of all, AEW's experts identified a botched version of the forged La Cienega PMA that was sent by NMS' Shekhter to the NMS Counsel Defendants the night before the NMS Counsel Defendants first submitted the forged La Cienega PMA to the trial court attached to a perjurious declaration claiming it to be authentic. The botched version of the forgery identified the *wrong owner* of the La Cienega Property; in other words, it was a document that could not have been genuine.  Not only did NMS and the NMS Counsel Defendants fail to explain how they could have been in possession of such a document, but they also failed to explain why they never produced it despite multiple court orders that they do so.  The only explanation is that the NMS Counsel Defendants knowingly hid from AEW and the trial court both the botched forgery and the emails they were

1 | ordered to produce in order to help NMS perpetuate a fraud on the trial court and

2 | AEW.

3 |        123.   AEW's experts also identified explicit and incontrovertible evidence that

4 | NMS and the NMS Defendants made false and misleading statements about the

5 | number and identity of NMS electronic devices that had been ordered by the trial court

6 | to be produced, that dozens of such devices had been hidden from AEW and the trial

7 | court, that NMS' Shekhter and his son had texted each other a detailed plan to swap

8 | out the hard drive and replace it with a new one and backdate the computer so that the

9 | files they loaded onto the new drive appeared older than they were.  AEW's experts

10 | also identified uncontroverted evidence that NMS/Shekhter deleted those text

11 | exchanges and carried out their despicable plan.

12 |        124.   Yet the NMS Counsel Defendants continued to prosecute the *Lincoln*

13 | *Studios* Litigation.  They did so after the June 2015 discovery conference.  They did so

14 | after the September 2015 depositions of the former NMS President and deal counsel.

15 | They did so after the expert declarations of likely forgery in September 2015.  They

16 | did so after receiving AEW's Motion for Terminating Sanctions in January 2016 (with

17 | the exception of Defendant Genga, who quietly stopped working on the case in late

18 | December 2015 without explanation, after making (and never correcting) numerous

19 | false statements to the trial court about the genuineness of NMS' forgeries and about

20 | NMS' alleged preservation of evidence).  They did so through the eight-day

21 | evidentiary hearing in October 2016, even though they never retained, let alone

22 | presented, a single expert who opined that the forgeries NMS advanced in the *Lincoln*

23 | *Studios* Litigation were genuine documents from 2010, as NMS had claimed.  Indeed,

24 | the key expert retained and presented by the NMS Counsel Defendants at the October

25 | 2016 evidentiary hearing testified that the so-called "Version 2" was created by NMS

26 | at its offices in July 2013, and that he had never even been told by the NMS Counsel

27 | Defendants that NMS was claiming that it was an original document from AEW in

28 | September 2010.

125.   The NMS Counsel Defendants also failed to present any of the key NMS witnesses to the forgery and document destruction at the evidentiary hearing, even though the trial court expressly said it wished to evaluate their credibility and they never made any claim of unavailability of any such witnesses.  They did not present Neil Shekhter, Adam Shekhter, Alan Shekhter, Enrique Sanchez, or Eddie Valentine. They did present Brian Bowes, but his testimony actually confirmed that the declaration the NMS Counsel Defendants had prepared for him before the evidentiary hearing was perjurious because he admitted, contrary to the declaration he signed, that he and others at NMS had deleted joint venture records from NMS' devices.

126.   The NMS Counsel Defendants continued to represent NMS in pursuing NMS' appeal from the Terminating Sanctions Order, even though they did not contest any of the trial court's findings of forgery, perjury and destruction of evidence. Despite not challenging such findings, the NMS Counsel Defendants submitted to the Court of Appeal, and relied on, the declarations that the trial court held were perjurious.

127.   Before the Terminating Sanctions Order was issued by the trial court, the NMS Counsel Defendants also made numerous false statements to counsel for AEW and the trial court about the forgeries in an effort to hide NMS' misconduct and advance NMS' fraudulent scheme.  For example, in a September 28, 2015 brief they submitted to the Court they asserted that "the original [Version 2] has remained in Shekhter's possession until recently, when he turned it over to NMS' counsel for handling and maintaining in accordance with the September 8, 2015 order of this Court."  The NMS Counsel Defendants also stated in the same brief that "plaintiffs have assembled the original hard copies of the agreements for holding in escrow by a third party . . . They produced for copying by AEW the original hard copies of the JVA Version 2 and the La Cienega PMA."  These statements were false and the NMS Counsel Defendants knew them to be false and/or acted with reckless disregard to the truth.  The NMS Counsel Defendants also submitted to the Court a perjured

declaration from NMS' Neil Shekhter on September 28, 2015 in which Shekhter testified, under oath: "Since my receipt of the documentation . . . in mid-September 2010, I have carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it."  These statements were false and the NMS Counsel Defendants knew them to be false and/or acted with reckless disregard to the truth.  The NMS Counsel Defendants also submitted deposition testimony to the trial court in which NMS' Shekhter said with regard to "Version 2": "This document, sir, is the document that was sent to our office [in September 2010], that is correct." This testimony was false and the NMS Counsel Defendants knew it to be false and/or acted with reckless disregard to the truth.  Even after the trial court found that the testimony was false, the NMS Counsel Defendants submitted it and relied on it before the Court of Appeal.

128.   The NMS Counsel Defendants also made false statements to the trial court about NMS' document preservation and production, and submitted testimony from NMS' Shekhter, that they knew to be false and/or they acted with reckless disregard to the truth.  For example, they submitted a declaration from NMS' Shekhter in which he stated: "***I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other files***." The NMS Counsel Defendants also represented to the trial court in a brief: "For their part, plaintiffs have taken appropriate steps to preserve electronic and other evidence in their possession.  ***They unilaterally implemented an internal 'litigation hold' around the beginning of the case so that documents and emails would not be deleted***.  They have begun to take forensic images of all of approximately a dozen devices that they have identified as possible sources of electronic evidence in this case.  As such, ***plaintiffs have preserved their records fully for examination***, and have nothing to hide."  The NMS Counsel Defendants also represented to the trial court at oral argument: "But a litigation hold was implemented in this case at the very beginning by Mr. Shekhter.  ***Systems were set up so that emails couldn't be deleted, files could not***

Gibson, Dunn & Crutcher LLP

1   **_be deleted_** . . . ." (emphasis added.) All of these statements were false.  They knew

2   them to be false and/or they acted with reckless disregard to the truth.  None were ever

3   corrected by the NMS Counsel Defendants.

4       129.   The NMS Counsel Defendants also knew that eventually Version 2 would

5   be proven to be a forgery but rather than withdraw they cooked up a scheme to falsely

6   accuse AEW of switching out the document for another before conducting the forensic

7   examination.  For example, on October 16, 2015, the NMS Counsel Defendants sent an

8   email to AEW's counsel stating: "If you take the letter, and it ends up being dated at

9   any time other than in 2010, it will be our position that you have altered or substituted

10  the document."  The only reason this wrongful scheme failed is because the CPS Code

11  and the electronic evidence proved that the document was created at NMS' offices on

12  July 15, 2013, making it impossible for the NMS Counsel Defendants to falsely accuse

13  AEW or its counsel, as they had planned.

14      130.   The NMS Counsel Defendants also repeated NMS' allegations, that they

15  knew to be false, to AEW's investors, to lenders for the JV Properties, and to title

16  insurance companies and potential buyers, all with the intent to help NMS carry out its

17  fraudulent scheme and to enrich themselves in the process.  The NMS Counsel

18  Defendants not only pursued the *Lincoln Studios* Litigation on behalf of NMS,

19  knowing it was frivolous, but also filed copycat lawsuits for NMS, repeating the same

20  false allegations, against AEW, AEW's affiliates, and even against AEW's counsel,

21  only to abandon such copycat lawsuits both before and after demurrers were sustained.

22  Thus, the NMS Counsel Defendants were knowing and willing participants in the fraud

23  and misconduct.

24      131.   The NMS Counsel Defendants did not have probable cause to file NMS'

25  lawsuit against AEW, did not have probable cause to assert that "Version 2" was

26  genuine, did not have probable cause to assert that "Version 3" was a forgery, did not

27  have probable cause to assert that Article 11 or Article 6 had been breached by AEW,

28  or probable cause for filing or pursuing any claim in the *Lincoln Studios* Litigation.

132.   The NMS Counsel Defendants did not even bother to defend at least 25 of the 31 claims alleged by NMS against AEW, and never appealed the dismissal of any of those claims, even though they had represented 80% of the claims NMS had alleged, and had been outlined in hundreds of pages of allegations in both NMS' FAC and NMS' SAC.

133.   The NMS Counsel Defendants knew that NMS' claims against AEW were utterly and completely without merit at the time they filed the FAC, and at every time thereafter.  The NMS Counsel Defendants willfully and consciously disregarded Plaintiff's rights.  No reasonable attorney would have filed NMS' lawsuit, let alone pursued it for more than three years.

134.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, the NMS Counsel Defendants acted for purposes other than succeeding on the merits. The NMS Counsel Defendants knew NMS could not succeed on the merits on its claims because its claims were based on forgeries and perjury.  The NMS Counsel Defendants improper purposes included assisting NMS in its fraudulent scheme to force AEW to sell its interest in the Joint Venture to NMS, and to be paid millions of dollars in fees they would not otherwise have earned had they not filed and pursued litigation they knew to be frivolous.

135.   In initiating and continuing to prosecute the *Lincoln Studios* Litigation, the NMS Counsel Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with intent to cause injury to Plaintiff, and engaging in a systematic concealment of the truth in order to advance NMS' baseless claims against Plaintiff.  As such, the NMS Counsel Defendants willfully and consciously disregarded Plaintiff's rights.

136.   As a direct and proximate cause of the NMS Counsel Defendants, Plaintiff was forced to expend enormous time and resources, and to incur millions of dollars in legal fees and costs, defending itself against the meritless claims asserted by NMS in the *Lincoln Studios* Litigation.  Furthermore, Plaintiff suffered harm to its

reputation and business interests as a result of the misconduct of the NMS Counsel Defendants in filing and pursuing the *Lincoln Studios* Litigation.  The conduct of the NMS Counsel Defendants was a substantial factor and proximate cause of the harm to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as set forth below:

1.     For special damages, including attorneys' fees and other costs incurred in defense of the *Lincoln Studios* Litigation, damage to reputation and harm to business interests, in an amount to be proven at trial but which exceeds $75,000;

2.     For general damages according to proof at trial;

3.     For punitive damages in such amount as the Court may deem appropriate to penalize Defendants for their intentional and malicious misconduct;

4.     For prejudgment interest; and

5.     For costs of suit and such other relief as this Court deems just and proper.

Dated:  February _, 2019                     GIBSON, DUNN & CRUTCHER LLP


By: _____/s/ James P. Fogelman___
                                             James P. Fogelman

                                             Attorneys for Plaintiff
                                             P6 LA MF Holdings SPE, LLC

Gibson, Dunn &
Crutcher LLP

COMPLAINT FOR MALICIOUS PROSECUTION

1

**<u>DEMAND FOR JURY TRIAL</u>**

2       Plaintiff hereby demands a trial by jury in the above-captioned action, pursuant

3 to Federal Rule of Civil Procedure 38(b) and L.R. 38-1.

4

5 Dated:  February 14, 2019       GIBSON, DUNN & CRUTCHER LLP

6

7                 By: _____ /s/ James P. Fogelman

8                    James P. Fogelman

9               Attorneys for Plaintiff

10             P6 LA MF Holdings SPE, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR MALICIOUS PROSECUTION

Gibson, Dunn &
Crutcher LLP