# EXHIBIT 1

1

2

3

4

5

6

7

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

NOV 2 2 2016

Sherri R. Carter, Executive Officer/Clerk
By: R. Inostroza, Deputy

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF LOS ANGELES

10

| | |
|---|---|
| LINCOLN STUDIOS, LLC, et al., | CASE NO. BC551551 |
| Plaintiffs, | *[Related Case Nebraska Studios, LLC et. al v. Chernove, et al., Case No. BC550227]* |
| v. | **ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS** |
| DLA, et al., | |
| Defendants. | ASSIGNED FOR ALL PURPOSES TO: |
| | HON. SUZANNE G. BRUGUERA |
| | DEPARTMENT 71 |
| P6 LA MF HOLDINGS SPE, LLC, | |
| Cross-Complainant, | |
| v. | |
| NMS CAPITAL PARTNERS I, LLC | |
| Cross-Defendant. | |

25

26    Defendants' and Cross-Complainant's Motion for Terminating and Other Sanctions

27  Against Plaintiffs for Spoliation of Evidence ("Motion" or "Spoliation Motion") and Plaintiffs'

28  Motion to Strike AEW's Terminating Sanctions Motion and Supporting Evidence ("MTS")

1

Exhibit 1
60

came on for hearing on June 13, 2016 at 10:00 a.m., before the Honorable Suzanne G. Bruguera in Department 71 of the above-entitled court. Appearances of counsel were made on behalf of Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC ("Cross-Complainant"), AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC (collectively, "Defendants"), as well as Lincoln Studios, LLC, Neil Shekhter, Margot Shekhter, The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC ("Cross-Defendant"), NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC (collectively, "Plaintiffs"). On July 29, 2016, the Court issued an Order granting the Motion, subject to a later-ordered Evidentiary Hearing to "determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed." (Exhibit A [July 29, 2016 Order], p. 4.) The Evidentiary Hearing commenced on October 14, 2016, and concluded on October 28, 2016, with live testimony of twelve witnesses taking place over eight court days for the purpose of the Court assessing credibility of the witnesses. Both Plaintiffs and Defendants participated. After consideration of the briefs and supporting papers, witness testimony, exhibits, the arguments of counsel, and for good cause appearing, the Court hereby **GRANTS** Defendants' Motion in its entirety, and **ORDERS** the following:

Evidentiary Objections

The Court hereby *overrules* Plaintiffs' Objections to the Declarations of Gerald M. La Porte and Samuel S. Rubin in their entirety.

The Court hereby *overrules* Defendants' Objections to the Declarations of Adam Shekhter, Alan Shekhter, Brian Bowis, Eddie Valentin, Enrique Sanchez, Kathleen Annunziata Nicolaides, Neil Shekhter, Rod Saunders, Sasha Frid, Scott Cooper, Skip Miller, Valery Aginsky, and William Flynn in their entirety.

Exhibit 1
61

2

The Court sustained certain objections at the Evidentiary Hearing.  To the extent the Court's rulings at the Evidentiary Hearing conflicts with this Order, those rulings control.

The Court hereby *denies* Plaintiffs' Request for Judicial Notice.

For the reasons stated at the Evidentiary Hearing, the Court hereby *denies* Plaintiffs' "Motion *in Limine* to Exclude Samuel S. Rubin and Gerald M. LaPorte From Testifying At The October 13, 2015 Hearing Or, Alternatively, Continuing The Hearing To Permit Plaintiffs To Conduct Discovery."

The Court's Authority

The Court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose "a monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct. . . . If a monetary sanction is authorized . . . the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust."  (Code Civ. Proc., § 2023.030(a).)

The Court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose "a terminating sanction by one of the following orders":

"An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process."

3

Exhibit 1
62

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

"An order dismissing the action, or any part of the action, of that party."

"An order rendering a judgment by default against that party."

(Code Civ. Proc., §§ 2023.030(d)(1), (2), and (4).)

Misuses of the discovery process include, but are not limited to, "[f]ailing to respond or to submit to an authorized method of discovery," "[m]aking an evasive response to discovery," "[d]isobeying a court order to provide discovery," and "[m]aking or opposing, unsuccessfully and without substantial justification, a motion to compel or to limit discovery." (Code Civ. Proc., §§ 2023.010(d), (f), (g), and (h).)

It is also within the Court's inherent power to issue terminating sanctions for misuses of the courts or the discovery process. (*Stephen Slesinger, Inc. v. Walt Disney, Co.* (2007) 155 Cal.App.4th 736, 740; *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 391.) Terminating sanctions may be appropriate in the first instance. (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 497.) As the court in *R.S. Creative* stated, "We recognize that terminating sanctions are to be used sparingly, only when the trial court concludes that lesser sanctions would not bring about the compliance of the offending party." (*Id.* at p. 496.) Where "[t]he record demonstrates repeated violations of stipulations and court orders, a forged document offered as true, and deliberate destruction of evidence pertinent to exposing that fact" terminating sanctions are appropriate. (*Ibid.*)

The California Code of Judicial Ethics states in Canon 3D(2): "Whenever a judge ... concludes in a judicial decision, that a lawyer has committed misconduct or has violated any

4

Exhibit 1
63

provision of the Rules of Professional conduct, the judge shall take appropriate corrective action, which may include reporting the violation to the appropriate authority."

Further, Business & Professions Code section 6086.7 requires the Court to notify the State Bar of "[t]he imposition of any judicial sanctions against an attorney except for failure to make discovery or monetary sanctions of less than one thousand dollars."

A "[j]udge who learns in court proceedings that a witness has engaged in criminal activity," such as perjury, may inform law enforcement authorities. Canons 2A, 3A." Cal. Judges Ass'n, *Judicial Ethics Update*, February 2010, section C1.

The Court's Prior Orders

On September 8, 2015, the Court ordered Plaintiffs to "immediately take steps to freeze all of their electronic documents so that they cannot be modified or deleted." (Declaration of Jay P. Srinivasan in Support of Defendants' Motion for Terminating and Other Sanctions Against Plaintiffs for Spoliation of Evidence ("Srinivasan Decl."), Exh. Y, at p. 1.)

On October 6, 2015, the Court ordered a forensic examination of all of Plaintiffs' relevant electronic media, and ordered Plaintiffs to produce for forensic imaging all of Plaintiffs' and Plaintiffs' affiliates' devices that "could have ever sent, received modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including 'Version 2'), Exhibit 41 [the cover letter], and all Property Management Agreements (including the Luxe La Cienega PMA), as well as Neil Shekhter's home and office computers (the 'Devices')." (Srinivasan Decl., Exh. Z, at p. 2; see also Plaintiffs' Evidentiary Hearing Exhibits ("Plfs.' Hr. Exhs."), Exh. 26, at p. 2.) The Court also ordered

Plaintiffs to produce a list of all such relevant devices. (Srinivasan Decl., Exh. Z, at p. 2; see also Plfs.' Hr. Exhs., Exh. 26, at p. 2.)

On July 29, 2016, the Court issued an Order granting Defendants' and Cross-Complainant's Motion subject to an Evidentiary Hearing to resolve the allegedly conflicting testimony submitted in support of or in opposition to the Motion, a true and correct copy of which is attached hereto as **Exhibit A**. (Exh. A [July 29, 2016 Order].) The Order detailed the "purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED." (*Id*., at p. 4.) The Order determined that "Plaintiffs' own evidence and/or undisputed facts establish violations of the Court's 9/8/2015 and 10/6/2015 discovery orders." (*Id.*, at p. 3.) For instance, the Court found that Neil Shekhter admitted to deleting files from his personal computer, replacing the hard drive of his computer with a new one, altering files, and failing to transfer all files to the new hard drive. (*Ibid.*) The Court also found that Neil Shekhter admitted to deleting a zip file from a former AEW employee, Daniel Lennon, containing Joint Venture related documents, and that the IT Administrator for NMS Properties, Inc. admitted to using a program called "eraser Portable" to delete files from another NMS employee's computer. (*Ibid.*)

Recognizing the severity of terminating sanctions, on September 14, 2016, the Court ordered that an Evidentiary Hearing would be held to resolve the alleged conflicts in the testimony submitted by Defendants in support of the Motion as compared to the testimony submitted by Plaintiffs in opposition to the Motion, and to assess each of the witness' credibility. The Court invited counsel for both Plaintiffs and Defendants to present live testimony from any witness whose declaration or deposition testimony had been submitted in support of or in opposition to the Motion.

Exhibit 1
65

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

The Evidentiary Hearing took place on October 14, October 17, October 18, October 19, October 20, October 24, October 25, and October 28, 2016.

Defendants presented for direct and cross-examination the following percipient witnesses: Michelle McClure, Steven Fein, Jonathan Watson, and Eric Samek.  Defendants also presented for direct and cross-examination the following expert witnesses: Gerald LaPorte and Samuel Rubin.

Plaintiffs presented for direct and cross-examination the following percipient witnesses: Daniel Lennon and Brian Bowis.  Plaintiffs also presented for direct and cross-examination the following expert witnesses: Valery Aginsky, Scott Cooper, William Flynn, and Kathleen Nicolaides.

Factual Findings

*The Joint Venture Agreement as Executed and Amended*

On or about September 8, 2010 the parties entered into a Limited Liability Company Agreement for P6 LA MF Holdings I LLC (hereinafter the "JVA") to acquire, finance, hold, develop, construct, operate, maintain, renovate, lease, market, sell, and otherwise deal with multi-unit residential apartment buildings in Los Angeles.  (See Srinivasan Decl., Exh. E; see also Defendants' Evidentiary Hearing Exhibits ("Defs.' Hr. Exhs."), Exh. 1.)

Throughout this litigation, Plaintiffs have advanced and continue to rely on what they refer to as "Version 2" of the JVA.  (See, e.g. Third Am. Compl. ("TAC"), ¶ 22(b); Declaration of Neil Shekhter In Support of Plaintiffs' Motion for Forensic Examination, filed on January 19, 2016, ¶¶ 11-14; Sec. Am. Compl. ("SAC"), ¶ 291, First Am Compl. ("FAC"), ¶¶ 40-41, 67.B,

Exhibit 1
66

168, 171.) "Version 2" is the only "version" of the JVA alleged to be effective by Plaintiffs. (TAC, ¶ 22(b).) Plaintiffs have previously taken the position that the question of whether "Version 2" is authentic is at the core of this case. (Srinivasan Decl., Exh. O, at 8:7-9:2 [Plaintiffs' counsel stating that the disagreement over different "versions" of the JVA is "really at the heart of the case" and equating the "buy/sell arrangement" with the right to "buy out AEW"]; *id.*, Exh. P, at p. 5 [explaining that the alleged Buy/Sell right was "critical to the deal insofar as Shekhter was concerned."].)

Plaintiffs' attempt to walk away from these claims now not only ignores Plaintiffs' past pleadings, but also violates the sham pleading doctrine, as the Court already found in its order granting Defendants' demurrer to the TAC. (*Cont'l Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 [Plaintiffs cannot "discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading."] [internal marks and citations omitted]; June 8, 2016 Order Sustaining Defendants' Demurrers to Plaintiffs' Third Amended Complaint, at pp. 5-7 [rejecting as a sham pleading Plaintiffs' allegations in the TAC for the first time that the three-year Buy/Sell provision in Section 11.1 is irrelevant].) Even Plaintiffs' Opposition claims that "Version 2" is the only version of the JVA that could be effective. (See Plaintiffs' Opposition To Defendants' Motion For Terminating And Other Sanctions ("Opp.") at pp. 4-6; Declaration of Neil Shekhter In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Shekhter Decl. ISO Sanctions Opp."), ¶¶ 26-33.)

In 2010, Neil Shekhter of NMS Capital Partners I, LLC ("NMS") and Eric Samek of P6 LA MF Holdings SPE, LLC ("AEW") initiated discussions regarding a potential real estate joint venture. Both parties were represented by skilled and able counsel (AEW being

8

Exhibit 1
67

represented by DLA Piper, LLC, and NMS being represented by Sheldon Chernove and then Schultz & Wright, LLP), and all aspects of the joint venture agreement were heavily negotiated in arm's-length discussions. (Srinivasan Decl., Exh. B, at 39:18-25 [deposition of Jim Andersen].)

Article 11.1 of the JVA contains the Buy/Sell provision, whereby either party could have the opportunity to buy or sell the other member's interest in the joint venture at a certain price, assuming certain conditions are met. "Version 1"—what Plaintiffs call the as-executed JVA— contains a 5-year Buy/Sell provision ("At any time after five (5) years from the date hereof"). (Id., Exh. E at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 1.) "Version 2" contains a 3-year Buy/Sell ("At any time after three (3) years from the date hereof"). (Id., Exh. K, at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 3.) "Version 3"—what Plaintiffs call the as-amended operative JVA—contains the same 5-year Buy/Sell provision contained in the executed JVA. (Defs.' Hr. Exhs., Exh. 2, at Art 11.1.)

The parties negotiated and agreed to a 5-year Buy/Sell provision in Article 11.1, and Neil Shekhter was aware of this. Initially, as reflected in the May 2010 term sheet that was "not a legally binding commitment by either party," AEW and NMS considered a buy/sell right that could be triggered "for individual properties at the later of (i) three years from the acquisition of the property for which the buy/sell is being triggered or (ii) the stabilization of the property for which the buy/sell is being triggered." (Srinivasan Decl., Exh. A; see also Defs.' Hr. Exhs., Exh. 6.) On July 28, 2010, Sheldon Chernove, NMS' deal counsel, requested in edits to the draft agreement that the Buy/Sell term not be available until after five years, writing regarding Article 11.1 to a draft joint venture agreement: "SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD." (Srinivasan

9

Exhibit 1
68

Decl., Exh. D at Art. 11.1 [capitalization in original]; see also Defs.' Hr. Exhs., Exh. 7.) NMS (i.e., Neil Shekhter) received a copy of these redlines. (Id.) This email and draft from Mr. Chernove was a request by NMS to change the Buy/Sell term from the later of three years or stabilization to a 5-year Buy/Sell term. (See Oct. 24, 2016 Hr. Tr., at 11:2-14:16 [testimony of Eric Samek].)

Around the same time, then-Chief Operating Officer and later NMS President Jim Andersen also requested a 5-year Buy/Sell term instead of the later of three years or stabilization by calling Jonathan Watson at AEW and directly asking for this term. (Oct. 20, 2016 Hr. Tr., at 10:8-13:3; 14:1-15:9.) Mr. Watson testified credibly at the Evidentiary Hearing that NMS requested a 5-year Buy/Sell term because "he was concerned that NMS may not have the financial capacity to compete with AEW in a buy-sell situation within three years" and that NMS' request was accepted by AEW, incorporated into the JVA, and never altered thereafter. (Srinivasan Decl., Exh. E, at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 1.) Plaintiffs have provided no evidence to the contrary. In fact, at the Evidentiary Hearing, Plaintiffs introduced a contemporaneous AEW memorandum dated August 30, 2010, which affirms that the Buy/Sell "can now be triggered after five years only," a change from the "the later of 3 years or stabilization." (Plfs.' Hr. Exhs., Exh. 81.)

Plaintiffs have provided no evidence that during the negotiations, before the JVA was executed, the parties contemplated a Buy/Sell provision that could be triggered after 3 years alone, and ample testimony from Defendants' witnesses supports the fact that a "straight" 3-year Buy/Sell has never appeared in any draft or final JVA. (See, e.g., Oct. 19, 2016 Hr. Tr., at 141:4-8 and 159:24-160:13 [testimony of Steven Fein]; Oct. 14, 2016 PM Hr. Tr., at

Exhibit 1
69

27:12-17 [testimony of Michelle McClure].)  Plaintiffs' only support is to cite two emails that predate months of negotiations as well as the execution of the JVA.  (See Opp. at p. 15.)

NMS' counsel testified at his deposition that the inclusion of the 5-year term reflected AEW's acceptance of NMS' request for a longer Buy/Sell provision (Srinivasan Decl., Exh. F at 129:18-130:8), and NMS repeatedly provided third parties with copies of this agreement containing the 5-year provision (see, e.g., id., Exhs. G, H).  NMS' General Counsel also confirmed, in July 2013, that the three-year "concept" "didn't make it into the actual LLC Agreement."  (Srinivasan Decl., Exh. I; see also Defs.' Hr. Exhs., Exh. 47.)  Plaintiffs have provided no evidence to the contrary.

The 5-year Buy/Sell language was included in the executed JVA.  (See, e.g., Oct. 14, 2016 AM Hr. Tr., at 17:16-19:22 [testimony of Michelle McClure]; Oct. 24, 2016 Hr. Tr., at 14:13-16 [testimony of Eric Samek].)  In fact, Plaintiffs concede this point.  (Oct. 28, 2016 Hr. Tr., at 178:2-9.)

The JVA was amended numerous times after it was executed, by both standalone, separately executed amendments and by slipsheet or substitute pages.  (See, e.g., Oct. 14, 2016 PM Hr. Tr., at 30:6-33:3 [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 16:4-32:1 [testimony of Jonathan Watson].)

First, as multiple witnesses have testified, these included amendments by slipsheet pages in January 2011 to include the concept of "Specified Properties," a term that continued to be included and affirmed in later standalone Amendments including at least the Third, Sixth, Eighth, Ninth, and Tenth Amendments to the JVA.  (See, e.g., Oct. 14, 2016 PM Hr. Tr., at 30:6-33:3 [testimony of Michelle McClure]; Oct. 19,

Exhibit 1
70

2016 Hr. Tr. at 134:10-139:23 [testimony of Steven Fein]; Oct. 20, 2016 Hr. Tr., at 16:4-32:1 [testimony of Jonathan Watson]; see also Defs.' Hr. Exhs., Exhs. 11-15.) Email communications confirm that the as-amended JVA including these January 2011 "Specified Property" amendments was approved by and consistently relied upon by all parties going forward. (Defs.' Hr. Exhs., Exhs. 9, 17.) Plaintiffs failed to present any testimony other than Neil Shekhter's self-serving declaration undermining the well-supported position that the operative JVA as amended by the parties contained the "Specified Properties" concept.

As "Version 2" does not contain this concept, this is yet another reason "Version 2" cannot have been the JVA relied upon by the parties for five years, and Neil Shekhter's claims to the contrary are not credible in light of this evidence. Jonathan Watson and others testified that NMS' practice of making and requesting capital contributions on a basis other than 70% from the Investor Member and 30% from the Operating Member would be inconsistent with a JVA without the "Specified Property" term. (See, e.g., Oct. 20, 2016 Hr. Tr., at 27:28-28:21 [testimony of Jonathan Watson]; Oct. 19, 2016 Hr. Tr., at 134:11-137:21 [testimony of Steven Fein].) Plaintiffs have not provided any credible testimony contradicting the extensive evidence that all parties used and relied upon the JVA as amended with the "Specified Properties" concept, and the 5-year Buy/Sell provision.

Second, every subsequent amendment of the JVA is well documented, whether through contemporaneous email communication or a standalone executed amendment, and every subsequent amendment involved the participation of counsel. (See Defs.' Hr. Exhs., Exhs. 9, 11-15, 17.) By contrast, Plaintiffs have

12

Exhibit 1
71

presented no contemporaneous written evidence of the alleged "typo" which

purportedly resulted in the creation of "Version 2" as alleged by Neil Shekhter except

for the September 14, 2010 "Cover Letter."  As discussed further below, this single

communication is itself a forgery and lends no support to Plaintiffs' claims.

Both the incorporation of the 5-year Buy/Sell term and the January 2011 "Specified

Properties" amendments also were affirmed by Tom Johnston, NMS' counsel, repeatedly in

writing.  (See Defs.' Hr. Exhs., Exhs. 10, 17 ["NMS has consistently certified that the [JVA]

with the 'Change Pages] is the [JVA] on transaction [sic] after January 21, 2011."].)

*"Version 2" of the JVA*

"Version 2" first appeared on NMS' devices on July 15, 2013.  (Rubin Decl., ¶ 24.)  Plaintiffs

do not dispute this.  (Declaration of Scott Cooper In Support Of Plaintiffs' Opposition To

AEW's Motion For Terminating And Other Sanctions ("Cooper Decl."), ¶¶ 17-19; Defs.' Hr.

Exhs., Exh. 31.)  "Version 2" contains a 3-year Buy/Sell term, not the 5-year term negotiated

and confirmed by NMS' lawyers.  (Srinivasan Decl., Exh. K, at Exh. 5, at Art. 11.1; see also

Defs.' Hr. Exhs., Exh. 3.)  According to Neil Shekhter's sworn testimony, he received

"Version 2" in hard copy from Eric Samek in 2010, after claiming that the original version of

the agreement's inclusion of a 5-year Buy/Sell provision was a "typo," and that it should

have been three years instead.  (Srinivasan Decl., Exh. J at 47:10-14; 52:24-53:1; Exh. K, ¶

13.)

According to Neil Shekhter's testimony, the 5-year Buy/Sell term contained in the executed

JVA was a "typo" that Mr. Samek agreed to "fix . . . by changing Section 11's Buy/Sell from

a 5-year term to a 3-year term."  (Shekhter Decl. ISO Sanctions Opp., ¶ 26; Srinivasan

13

Exhibit 1
72

1 Decl., Exh. J [Deposition of Neil Shekhter], at 52:24-53:1.)  This allegedly led to Mr. Samek

2 sending a hard copy of "Version 2" to Neil Shekhter along with the September 14, 2010

3 "Cover Letter" in September 2010.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 28-31.)  Aside

4 from Neil Shekhter's testimony, which lacks credibility, there is no testimony that the 5-year

5
6 Buy/Sell language was ever changed after the JVA was executed.  AEW presented

7 extensive testimony to the contrary, including deposition testimony by ex-NMS executive

8 Jim Andersen and NMS' own deal counsel at the time the JVA was negotiated.  (See, e.g.,

9 Srinivasan Decl., Exh. F [Deposition of Sheldon Chernove], at 131:9-13:5; id., Exh. B

10
11 [deposition of Jim Andersen], at 120:18-121:22; Oct. 14, 2016 AM Hr. Tr., at 19:2-22

12 [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 14:24-28 [testimony of Jonathan

13 Watson]; Oct. 19, 2016 Hr. Tr., at 133:21-134:9 [testimony of Steven Fein]; Oct. 24, 2016

14 Hr. Tr., at 18:14-20:7 [testimony of Eric Samek].)

15

16 Neil Shekhter testified that he has "carefully maintained" the original document since

17 receiving it from Mr. Samek, even keeping it in his safe.  (Srinivasan Decl., Exh. K, ¶ 14; see

18 also id., Exh. J [Sept. 22, 2015 Deposition of Neil Shekhter], at 59:20-60:5; Defs.' Hr. Exhs.,

19 Exh. 40.)  According to Plaintiffs, no hard copies of "Version 2" have been destroyed.

20
21 (Srinivasan Decl., Exh. N [Dec. 10, 2015 Deposition of Neil Shekhter], at 291:9-12.)

22 Plaintiffs and their counsel have repeatedly verified their story about "Version 2" under oath.

23 (See, e.g., Srinivasan Decl., Exh. K, ¶ 13; see also Defs.' Hr. Exhs., Exh. 40; Srinivasan

24 Decl., Exh. L, ¶ 12; id., Exh. M, ¶ 3 ["At least on Plaintiffs' end, there has been no document

25
26 alteration, spoliation or fabrication . . . ."].)

27       Plaintiffs were ordered to produce the "original hard copy" of "Version 2" in the

28       Court's October 6, 2015 Order Granting Defendants' Motion for Forensic

14

Exhibit 1
73

Examination (the "October 6, 2015 Order"), and repeatedly assured the Court that they had complied with this Order.

Plaintiffs have repeatedly alleged that "Version 2" is the "only version" of the Joint Venture Agreement that they agreed to, and have repeatedly asserted that the document they provided to Defendants on September 22, 2015 is the "original" "Version 2" that was allegedly delivered to Neil Shekhter in September 2010.  (See, e.g., Srinivasan Decl., Exh. J, at 15:3-16:11; 22:10-25 ["This document, sir, is the document that was sent to our office, that is correct."]; *id.*, Exh. K at ¶ 14 ["Since my receipt of the documentation in the preceding paragraph in mid-September 2010, I have carefully maintained the original hard copies of Version 2 and Mr. Samek's September 14, 2010 cover letter for it.  Pursuant to the Court's September 8, 2015 order in this case, I recently turned them over to my counsel, Steven Zelig."]; *id.*, Exh. P, at pp. 5, 11-12 ["[T]he original has remained in Shekhter's possession until recently, when he turned it over to NMS counsel for handling and maintaining in accordance with the September 8, 2015 order of this Court."; "[P]laintiffs have assembled original hard copies of the agreements for holding in escrow . . . [and] produced for copying by AEW the original hard copies of JVA Version 2 and the La Cienega PMA." ]; Supplemental Declaration of Jay P. Srinivasan In Support Of Reply To Motion For Terminating And Other Sanctions Against Plaintiffs For Spoliation Of Evidence ("Supp. Srinivasan Decl."), Exh. E ["Please understand that it is our position that this letter and version 2 was received in 2010.  Once again, if you take the only copy of the letter and subsequent testing demonstrates that the age of

Exhibit 1
74

the paper is after 2010, it will be our position that there has been an alteration."]; see also Defs.' Hr. Exhs., Exh. 40.)

"Version 2" was not created and sent to NMS from AEW in September 2010. It was printed at the NMS offices on July 15, 2013. (Declaration of Gerald M. LaPorte In Support Of Motion For Terminating And Other Sanctions Against Plaintiffs And Plaintiffs' Counsel ("LaPorte Decl."), ¶ 116; see also *id.*, ¶¶ 38-45; Plfs.' Hr. Exhs., Exh. 14.) Plaintiffs' own expert William Flynn admitted this fact. (Oct. 28, 2016 Hr. Tr. at 62:25-63:14; 70:11-15; 71:19-25; 76:23-77:11.) Plaintiffs' counsel did not argue to the contrary at the Evidentiary Hearing.

Gerald LaPorte, the Director of the Office of Investigative and Forensic Sciences at the National Institute of Justice, a division of the United States Department of Justice, who is a nationally recognized expert trained by the Secret Service, examined the actual document Neil Shekhter claims he received in 2010 and kept in his safe. (LaPorte Decl., ¶¶ 3, 15; see also Plfs.' Hr. Exhs., Exh. 14.) Based on Mr. LaPorte's findings, "Version 2" is not authentic. (LaPorte Decl., ¶ 116; see also Plfs.' Hr. Exhs., Exh. 14.) It is conclusive from examining the "CPS" code of the document—an anti-counterfeiting code that is created by some office printers—that "Version 2" was first printed on a Xerox WorkCenter 7775 multifunction office machine at Plaintiffs' offices on July 15, 2013 —not at AEW's offices in September 2010. (*Id.,* ¶ 116; see also *id.*, ¶¶ 38-45; Plfs.' Hr. Exhs., Exh. 14.) Mr. LaPorte confirmed these findings in credible and unrebutted testimony before this Court. (See Oct. 14, 2016 PM Hr. Tr., at 51:27-52:9; 64:9-28 ["I am a hundred percent

16

Exhibit 1
75

certain that [the] Q-1 Version 2 document was printed in July of 2013. It was not

produced in September of 2010."].)

> None of Plaintiffs' forensic experts dispute Mr. LaPorte's finding that, per
>
> the CPS code reflected on the original "Version 2," it was printed on July
>
> 15, 2013 on a machine located in NMS' offices. (See, e.g., Oct. 17, 2016
>
> Hr. Tr., at 55:12-58:4 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr.,
>
> at 62:27-63:22; 66:10-15 [testimony of William Flynn]; Oct. 28, 2016 Hr.
>
> Tr., at 105:8-22 [testimony of Kathleen Nicolaides].) In fact, Mr. Flynn
>
> testified that it would be "inauthentic" to represent the original "Version 2"
>
> document produced by Plaintiffs as a document from September 2010.
>
> (Oct. 28, 2016 Hr. Tr., at 71:18-28; 72:11-77:11.)

In the face of Mr. LaPorte's un-contradicted findings that the "original Version 2" was

printed in July 2013 from an NMS printer, and despite Plaintiffs' repeated sworn

representations that the "Version 2" in their possession was the "original" they

received in 2010, Plaintiffs' response is to claim that the "Version 2" produced for

forensic examination is not an original at all and in fact is merely a copy of the

original document. However, Mr. LaPorte credibly and thoroughly testified that the

"Version 2" produced by Plaintiffs is not a photocopy of any "original" that they

received. It is a first generation iteration of the document, sent from a computer

directly to a printer. (LaPorte Decl., ¶¶ 18, 48-49; see also Oct. 14, 2016 PM Hr. Tr.,

at 62:3-63:15; Plfs.' Hr. Exhs., Exh. 14.) Plaintiffs' evidence to the contrary is not

credible as Mr. Flynn does not provide a "reasoned explanation of why the

underlying facts lead to the ultimate conclusion" that he believes the original

17

Exhibit 1
76

"Version 2" was "a copy or scanned version of the document that was subsequently printed." (*Bushling v. Fremont Med. Ctr.* (2004) 117 Cal.App.4th 493, 510; Cooper Decl., ¶ 40.)  Mr. Flynn, Plaintiffs' expert, conceded that the document NMS produced was printed on July 15, 2013, not in September 2010.  (Oct. 28, 2016 Hr. Tr. at 62:25-63:2.)

"Version 2" also contains a CPS code on every page, but for one page—Mr. Samek's signature page, which differs from the rest of the document in other ways as well.  (LaPorte Decl., ¶¶ 46-53; see also Plfs.' Hr. Exhs., Exh. 14.)  This means that Mr. Samek's signature page on "Version 2" was removed or taken from another source and substituted into the document after it was first printed on July 15, 2013. (*Id.*, see also *id.*, ¶ 16.)  Again, Plaintiffs do not dispute this.  (Flynn Decl., ¶ 44; see also Defs.' Hr. Exhs., Exh. 32.)

Finally, Mr. LaPorte examined all other copies of "Version 2" produced by Plaintiffs (as Plaintiffs testified that no copies of "Version 2" have been destroyed). (Srinivasan Decl., Exh. N, at 291:9-12 [deposition testimony of Neil Shekhter].) Based upon examining these other documents and their various imperfections and trash marks, these other copies are copies of the July 2013 "Version 2" produced by Plaintiffs, not the other way around.  (LaPorte Decl., ¶¶ 17, 54-67; see also Plfs.' Hr. Exhs., Exh. 14.)  Plaintiffs do not dispute this.  (Flynn Decl., ¶¶ 46-47; see also Defs.' Hr. Exhs., Exh. 32; Oct. 28, 2016 Hr. Tr., at 68:5-69:14.)

"Version 2" was created by Neil Shekhter and his son Adam Shekhter in July 2013.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Samuel S. Rubin, Managing Director of Digital Forensics at Stroz Friedberg, was able to tie the creation of "Version 2" to Neil Shekhter's and Adam Shekhter's computers. Mr. Rubin's findings indicate that on July 12, 2013, Neil Shekhter emailed his son Adam a PDF of the original, executed agreement with the 5-year Buy/Sell provision—in an electronic file called "P6 LA MF Holdings I LLC." (Declaration of Samuel S. Rubin In Support Of Motion For Terminating And Other Sanctions Against Plaintiffs For Spoliation Of Evidence ("Rubin Decl."), ¶ 27(a); see also Plfs.' Hr. Exhs., Exh. 7.) Then, on the night of Sunday, July 14, 2013, at 9:46 p.m., an unknown computer not produced for forensic examination opened and modified a file called "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf"—a title identical to the PDF of the original agreement forwarded to Adam Shekhter, but for the appended language "clean NS 123 PRINT." (Rubin Decl., ¶ 27(b); see also Plfs.' Hr. Exhs., Exh. 7.)

The next day, on July 15, 2013 at 1:24 p.m., this same file was then transferred to a USB flash drive (which Plaintiffs have not produced to Defendants), from the unknown computer, and opened on Adam Shekhter's NMS desktop computer at 3:51 p.m. (Rubin Decl., ¶¶ 27(c)-(d); see also Plfs.' Hr. Exhs., Exh. 7.) The file was then printed—matching perfectly with the timing of the printing seen on the CPS code discovered by Mr. LaPorte. (See LaPorte Decl., ¶¶ 15, 39 ["[Version 2] was printed between 1500 and 1600 hours, or 3:00 p.m.– 4:00 p.m. PST on July 15, 2013"]; see also Plfs.' Hr. Exhs., Exh. 14.) Then, just after 4 p.m. and after "Version 2" was printed, it was scanned (eliminating all metadata), and then emailed at 4:51 p.m., by Adam to his father. (Rubin Decl., ¶¶ 27(f)-(h); see also Plfs.' Hr. Exhs.,

Exhibit 1
78

Exh. 7.)  Further, there is no forensic record or discussion of "Version 2" at all in NMS' files until it was created in July 2013.  (Rubin Decl., ¶ 5(a); see also Plfs.' Hr. Exhs., Exh. 7.)

Plaintiffs' arguments to the contrary are not convincing or credible.  (See Opp. at pp. 13-14; Cooper Decl., ¶¶ 17-28; see also Defs.' Hr. Exhs., Exh. 31.)  In fact, other than the contents of the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" file, Plaintiffs' expert Scott Cooper testifies that he does not dispute any element of Mr. Rubin's timeline as described above, including the fact that Neil Shekhter sent PDF copies of "Version 1" and "Version 3" to Adam Shekhter on July 12, 2013, and the fact that the file was copied to a USB flash drive which was connected to and opened on Adam Shekhter's computer just moments before the "Scan/Adam" folder was created and Adam emailed the electronic version of "Version 2" to Neil.  (See Oct. 25, 2016 Hr. Tr., at 106:16-108:17.)  However, the fact that Defendants are unable to detail what was contained in the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" file is due to Plaintiffs' deletion and/or withholding of the file, and does not entitle Plaintiffs to an inference in their favor.  (See Cooper Decl., ¶¶ 23-27; see also Defs.' Hr. Exhs., Exh. 31.)  Plaintiffs have not provided any evidence that this file is not the original forged PDF version of "Version 2."  The fact that Defendants cannot analyze this file is due to Plaintiffs' destruction of evidence, and will not excuse Plaintiffs' misconduct.  (*Reeves v. MV Transp., Inc.* (2010) 186 Cal.App.4th 666, 681.)  Plaintiffs maintained this frivolous position during the Evidentiary Hearing, and none of Plaintiffs' witnesses were able to provide any credible alternative explanation as to the contents of the "P6 LA MF Holdings I LLC clean NS

Exhibit 1
79

123 PRINT.pdf" document. The fact that Plaintiffs chose not to have either Neil or Adam Shekhter testify at the Evidentiary Hearing only confirms that there is no viable alternative explanation.

Significantly, Mr. Cooper did not make any forensic findings affirmatively establishing that "Version 2" with the 3-year Buy/Sell provision was first created in September 2010 or confirming Neil Shekhter's story about "Version 2." (Oct. 25, 2016 Hr. Tr., at 42:3-16.) Neither did Dr. Aginsky, Mr. Flynn, or Ms. Nicolaides. (Oct. 17, 2016 Hr. Tr., at 55:4-58:2 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr., at 62:27-63:22; 66:10-15 [testimony of William Flynn]; Oct. 28, 2016 Hr. Tr., at 105:8-22 [testimony of Kathleen Nicolaides].)

"Version 2" is not an authentic document. It is a forgery.

The Court adopts and is persuaded by with Mr. LaPorte's and Mr. Rubin's conclusions, based on extensive evidence, that "Version 2" is a forgery, that it was not created and delivered in 2010 by AEW, and that it was fabricated and printed by Plaintiffs at their own offices in 2013. (LaPorte Decl., ¶ 116 ["it is my unequivocal opinion that ["Version 2"] is not authentic."]; Rubin Decl., ¶ 15 ["Forensic evidence on the NMS Devices establishes that 'Version 2' of the JV Agreement is a forgery."]; see also Plfs.' Hr. Exhs., Exh. 7 & 14.) The Court also notes the extensive contemporaneous documentary evidence supporting the incorporation of the 5-year Buy/Sell term, the fact that this term was never changed, even when the January 2011 "Specified Property" amendments were agreed to, as well as the extensive, consistent, and credible testimony of multiple witnesses. There was no testimony to

21

Exhibit 1
80

the contrary, whether by declaration or live testimony, except for the declarations of Neil Shekhter, whose testimony the Court finds not to be credible, and who failed to appear for live testimony. (See Pen. Code, § 470(c) ["(c) Every person who, with the intent to defraud, alters, corrupts, or falsifies any record of any will, codicil, conveyance, or other instrument, the record of which is by law evidence ... is guilty of forgery."], *id.*, § 470(d) ["(d) Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: . . . contract for money or other property, [or] contract."]; *id.*, § 471 ["Every person who, with intent to defraud another, makes, forges, or alters ... any instrument purporting to be any record ... specified in Section 470, is guilty of forgery."].)

*The "La Cienega Property Management Agreement"*

Plaintiffs have represented to the Court that the "La Cienega Property Management Agreement" is not a forgery. (Srinivasan Decl., Exh. K, ¶¶ 22-23; see also Defs.' Hr. Exhs., Exh. 5.) Plaintiffs produced the purported original hard copy "La Cienega PMA" for forensic examination. (LaPorte Decl., ¶ 10.b; Srinivasan Decl., Exh. K, ¶¶ 23-24; see also Plfs.' Hr. Exhs., Exh. 14; Defs.' Hr. Exhs., Exh. 5.)

The "La Cienega PMA" was first submitted in the matter of *P6 LA MF Holdings I LLC, et al. v. NMS Properties, Inc.*, BC 584878 (Los Angeles Superior Court, filed June 11, 2015) (the "*P6* Action"), in which AEW sought the removal of Plaintiff-affiliate NMS Properties, Inc. as property manager of the various properties associated with the joint venture. (See generally

Srinivasan Decl., Exh. Q.)   NMS Properties, Inc. is represented by the same counsel as Plaintiffs in this matter and is an affiliate of Plaintiffs and Neil Shekhter, who is also CEO. (See generally Srinivasan Decl., Exh. R; Shekhter Decl. ISO Sanctions Opp., ¶ 1; see also Defs.' Hr. Exhs., Exh. 4.)   On June 23, 2015, the Court conducted a lengthy hearing on AEW's request for a preliminary injunction—a request that had been extensively briefed over the previous two weeks.  At the hearing on that motion and in connection with the briefing, Plaintiffs submitted only a single Property Management Agreement ("PMA")—for 1410 5th Street—which contained a 30-day notice of termination provision, as did all other PMA versions and copies.  (Srinivasan Decl., Exh. R, ¶¶ 25, 25.1 & Exh. F; see also Defs.' Hr. Exhs., Exh. 4.)   Neil Shekhter represented that this was the only PMA he was able to locate. (Srinivasan Decl., Exh. T [Supplemental Declaration of Neil Shekhter], ¶ 3.)  The next day, on June 24, 2015, the Court granted AEW's motion for a preliminary injunction removing NMS Properties, Inc. based upon the 30-day notice provision and NMS Properties gave *ex parte* notice that it would move for reconsideration.  (*Id.*, Exh. S, at 5-6 of 9.)  **The next day** NMS Properties moved *ex parte* to have the ruling reversed based on Neil Shekhter's sudden discovery of a supposed 2012 PMA for a property on La Cienega—"the La Cienega PMA"—that purported to include a **60-day** termination provision, as opposed to the 30-day termination provision in the form PMA used for all of the properties.  (*Id.*, Exh. T at Section 12.1; see also Defs.' Hr. Exhs., Exh. 4.)  The presentation of this forgery and the breach of the actual La Cienega PMA are the subject of the Cross-Complaint in this action.

Two versions of the "La Cienega PMA" were created on June 24, 2015, and both were fabrications.

Exhibit 1
82

On June 24, 2015, beginning sometime between 7:00 a.m. and 7:30 a.m., Neil Shekhter received multiple emails from the email accounts of then-former NMS employees containing Word and PDF versions of PMAs for various properties, all of which contained the 30-day provision, despite the fact that the parties had already finished briefing and arguing the preliminary injunction motion. (See Rubin Decl., ¶ 48(a); see also Plfs.' Hr. Exhs., Exh. 7.) Shortly thereafter, around 7:40 a.m., the Court (Dept. 82) notified the parties that it had granted AEW's request for a preliminary injunction. (Srinivasan Decl., Exh. S.)

A Microsoft Word file titled "Property Management-375 ns.doc" was created minutes after the Court's Order on June 24, 2015 at 7:55 a.m. It was modified at 8:48 a.m. (Supplemental Declaration of Samuel S. Rubin In Support Of Defendants' And Cross Complainant's Motion For Terminating And Other Sanctions Against Plaintiffs For Spoliation Of Evidence ("Supp. Rubin Decl."), ¶¶ 45-46; see also Plfs.' Hr. Exhs., Exh. 9.) This document was later wiped or deleted from Neil Shekhter's computer hard drive. (Supp. Rubin Decl., ¶ 31; see also Plfs.' Hr. Exhs., Exh. 9.) It was never produced.

Then, on or around 9:00 a.m. on June 24, 2015, Neil Shekhter scanned one copy of what appeared to be the executed "La Cienega PMA" at his home. (Rubin Decl., ¶ 48(b); see also Plfs.' Hr. Exhs., Exh. 7.) The scan occurred in two parts, with the break in the two scans occurring at the exact page where the termination provision appears—the first and only termination provision anywhere in the record that specifies a 60-day term. (Rubin Decl., ¶ 48(b); see also Plfs.' Hr. Exhs., Exh. 7.) But this scan, while purporting to be for the "La Cienega PMA" with a never-before-

24

Exhibit 1
83

seen 60-day termination provision, **contained a cover page showing that this PMA was for a different property** (for which Neil Shekhter had received the PMA earlier that morning)—**not the La Cienega property**.  (Rubin Decl., ¶ 48(c); see also Plfs.' Hr. Exhs., Exh. 7.)

According to Neil Shekhter's own declaration, this botched PMA was emailed to his counsel on June 24, 2015.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 165-168.) However, it was not produced or disclosed despite being clear evidence of the forgery and fabrication of evidence, and despite being ordered produced by this Court.  (See Oct. 18, 2016 PM Hr. Tr., at 40:23-42:22 [testimony of Samuel Rubin].)

Later that same day, but after Plaintiffs provided *ex parte* notice based upon this botched forgery, Neil Shekhter apparently realized his oversight and emailed himself a corrected version of the "La Cienega PMA" at 11:22 p.m., this time with the corrected owner listed on the face page ("Luxe La Cienega, LLC" instead of "1410 5th Street LLC").  (Rubin Decl., ¶ 48(d); see also Plfs.' Hr. Exhs., Exh. 7; Defs.' Hr. Exhs., Exh. 4.)  This corrected PMA—not the botched one circulated to his counsel earlier that day and which formed the basis for NMS' *ex parte* notice—was the version submitted with Neil Shekhter's declaration less than 10 hours later in support of NMS' *ex parte* application.  There, Neil Shekhter swears that he suddenly found this "La Cienega PMA" **after** the Court's hearing somewhere he had not previously looked and that it had been "misfiled."  (Srinivasan Decl., Exh. T, ¶¶ 3, 4; see also Defs.' Hr. Exhs., Exh. 4.)  Neil Shekhter also testified that he found the "La Cienega PMA" in his office.  (Srinivasan Decl. Exh. N., at 390:15-20.)  It makes no sense— and Plaintiffs have proffered no explanation—why Neil Shekhter would take the

Exhibit 1
84

document from his office and then bring it home to scan.  Again, none of these documents were produced.

Neil Shekhter's testimony that he "noticed that the PMA had a second cover" so he "re-scanned the agreement" is not a credible explanation for the botched PMA.  Neil Shekhter provides no details explaining why he performed multiple scans, including one with a face page listing a different property.  (See Shekhter Decl. ISO Sanctions Opp., ¶ 134.)  Neil Shekhter did not provide any live testimony to bolster this claim. Nor was any credible explanation offered for the very existence of this document.

Neil Shekhter's testimony that it "makes perfect sense" that he received PMAs by email the morning of June 24, 2015 is also not credible.  He does not explain why the emails came from the email accounts of **then-former** NMS employees and why he was receiving them **after** the preliminary injunction had been briefed and argued. (See Shekhter Decl. ISO Sanctions Opp., ¶ 133.)  Again, Neil Shekhter did not provide any live testimony to bolster this claim.

Mr. Cooper, Plaintiffs' forensic expert, did not affirmatively establish that the "La Cienega PMA" proffered by Plaintiffs with a 60-day no cause termination period was created in March 2012 as it purports.  (Oct. 25, 2016 Hr. Tr., at 42:17-43:2.) There is extensive other evidence that the parties did not agree to the "La Cienega PMA" presented by Neil Shekhter.

The JVA mandates that any PMA for the Joint Venture properties ("Properties") include, among other terms, a provision allowing for no-cause termination upon 30

Exhibit 1
85

days' notice to the Property Manager. (See Defs.' Hr. Exhs., Exhs. 1 & 2 at Art. 1 [defining "Property Management Agreement"]; Oct. 14, 2016 AM Hr. Tr., at 30:5-31:5. [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 33:18-34:5 [testimony of Jonathan Watson].)

Each of the Properties was managed pursuant to a PMA, and each PMA was expected to conform in substance to a "form" PMA including a 30-day no cause termination clause as well as an immediate termination clause. (See Oct. 20. 2016 Hr. Tr., at 33:9-34:26 [testimony of Jonathan Watson].) Defendants presented substantial evidence and live witness testimony that the JVA mandated a 30-day no cause termination clause, that the parties agreed to a "form" PMA with a 30-day no cause termination clause and an immediate termination clause, and that no 60-day termination provision was ever contemplated, negotiated, or agreed to. (See, e.g., Oct. 24, 2016 Hr. Tr., at 21:23-24:17 [testimony of Eric Samek]; Oct. 20, 2016 Hr. Tr, at 33:7-46:5 [testimony of Jonathan Watson]; Defs.' Hr. Exhs., Exhs. 18 & 19; Srinivasan Decl., Exhs. U, V, W; see also Defs.' Hr. Exhs., Exhs. 20, 21, 22.)

Consistent with the "form" PMA, a draft La Cienega PMA with a 30-day term was approved by Plaintiffs and circulated with their knowledge and consent to a lender. (Srinivasan Decl., Exhs. U, V, W; see also Defs.' Hr. Exhs., Exhs. 20, 21, 22.) Ms. McClure testified extensively and credibly that the draft La Cienega PMA was based on the "form," that it was circulated among the parties including NMS' counsel as well as a third party, and that the PMAs were required to have a 30-day no cause termination provision. (See Oct. 14, 2016 AM Hr. Tr., at 28:6-37:21.)

There is no evidence or electronic record at all of any PMA with a 60-day termination provision until it appears on June 24, 2015, over three years after the draft La Cienega PMA was negotiated, and only after AEW's preliminary injunction removing NMS Properties, Inc. had been granted. (Rubin Decl., ¶¶ 41-43; see also Plfs.' Hr. Exhs., Exh. 7.)

Furthermore, the "La Cienega PMA" that Plaintiffs purport is the "final" version is textually different from the actual draft La Cienega agreements. It is, however, consistent in formatting, textual anomalies, and other characteristics with two earlier executed PMAs—both of which were emailed to Neil Shekhter the morning that he created the forgery. (LaPorte Decl., ¶¶ 22, 106-115; Rubin Decl., ¶¶ 48(a)-(c); see also Plfs.' Hr. Exhs., Exh. 7, 14.) Plaintiffs do not dispute this, and in fact assert that the "La Cienega PMA" was most likely created "by editing a digital copy" of one of the agreements Neil Shekhter received the morning of June 24, 2015. (See Declaration of Kathleen Annunziata Nicolaides In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Nicolaides Decl."), ¶ 34.) Plaintiffs do not provide any affirmative evidence to explain why the "La Cienega PMA" is inconsistent with the formatting of the draft La Cienega agreements, or why it is based on a much earlier format that does not fall logically within the timeline of other PMAs, or why it contains certain typographical errors that had already been fixed long before the draft La Cienega PMA was circulated and approved.

Aside from Neil Shekhter's declaration to the contrary, Plaintiffs provide no evidence, whether by declaration or live testimony, that the 60-day termination provision (or any of the other changes in the "La Cienega PMA" inconsistent with the "form" PMA) were ever

28

Exhibit 1

87

discussed, let alone approved.  None of Plaintiffs' expert witnesses opine that the "La Cienega PMA" is a genuine or authentic document from March 2012 as it purports and as Neil Shekhter claims.  (See, e.g., Oct. 17, 2016 Hr. Tr., at 65:19-28 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr., at 51:12-22 (testimony of William Flynn); Oct. 28, 2016 Hr. Tr., at 109:24-28 [testimony of Kathleen Nicolaides].)  In addition, Brian Bowis, former Vice President of Finance at NMS, confirmed on cross-examination that the parties used a "form" PMA with a 30-day no cause termination provision.  (Oct. 25, 2016 Hr. Tr., at 174:22-176:13.)

Finally, Plaintiffs did not dispute and the Court finds that at least one individual within NMS manually deleted electronic evidence of the "La Cienega PMA."  (Rubin Decl., ¶ 93; see also Plfs.' Hr. Exhs., Exh. 7.)  (Cooper Decl., ¶ 92; see also Defs.' Hr. Exhs., Exh. 31.)  Further, Mr. Cooper confirms Mr. Rubin's finding that there is no longer a single Microsoft Word version of the La Cienega PMA on the NMS systems but that the Microsoft Word document called "Property Management-375 ns.doc"—the document created and modified on the day the "La Cienega PMA" first appeared—was deleted and does not exist anywhere else.  (Oct. 25, 2016 Hr. Tr., at 79:11-80:7.)

The "La Cienega PMA" is a forgery."

*The "Cover Letter"*

Plaintiffs proffered an alleged "Cover Letter" dated September 14, 2010 from Eric Samek to Neil Shekhter for the very first time on September 21, 2015 at Mr. Samek's deposition, after Defendants had spent months questioning the legitimacy of "Version 2" and over a year after this litigation was initially filed.  Plaintiffs claim this "Cover Letter" was delivered by Mr.

29

Exhibit 1
88

Samek to Plaintiffs in 2010, accompanying the alleged hard copy of "Version 2." (Srinivasan Decl., Exh. K, ¶ 13; see also Defs.' Hr. Exhs., Exh. 40.) The "Re" line of the "Cover Letter" reads: "JV AGREEMENT (3 YEAR BUY/SELL)." (Srinivasan Decl., Exh. X; see also Defs.' Hr. Exhs., Exh. 5 [Ex. 4].) Plaintiffs claim to have produced the original "Cover Letter" for examination. (See Srinivasan Decl., Exh. K, ¶¶ 13-14; see also Defs.' Hr. Exhs., Exh. 40.) Neil Shekhter claims that he has "carefully maintained the original hard cop[y]" of the letter since his receipt of it in 2010. (Srinivasan Decl., Exh. K at ¶ 14; see also Defs.' Hr. Exhs., Exh. 40.)

The "Cover Letter" is not an original document from September 14, 2010.

> Plaintiffs proffer only the declaration of Neil Shekhter to support the authenticity of the "Cover Letter." However, Defendants provided extensive testimony, including live testimony, regarding the invalidity of a 3-year Buy/Sell term (as detailed above), as well as sworn testimony on the witness stand that Mr. Eric Samek did not send or cause to be sent the "Cover Letter." (See Oct. 24, 2016 Hr. Tr., at 20:8-21:22 [testimony of Eric Samek that he "did not" write this letter or cause it to be written, and that the letter is "another forgery."].)

> In addition, Plaintiffs misleadingly argued that "the forgery allegations have been refuted by AEW's own employee," Daniel Lennon, and that "Lennon confirmed that he received Version 2, [and] the Cover Letter." (Opp., at p. 8.) This is completely undermined by Mr. Lennon's testimony before this Court under oath: Mr. Lennon does not remember receiving the letter and, in fact, he does not even know if the JVA contains a Buy/Sell provision *at all*. (Oct. 25, 2016 Hr. Tr., at 143:9-147:2;

Exhibit 1
89

157:3-19.)  Aside from rendering the remainder of his testimony not credible, Mr. Lennon did not provide any support for the authenticity of the "Cover Letter," contrary to Plaintiffs' characterizations.

The "Cover Letter" is a low-quality document, indicating "it is not a first generation document or it is a document composed from multiple sources." (LaPorte Decl., ¶¶ 21, 78-81; see also Plfs.' Hr. Exhs., Exh. 14.)  Moreover, "the signature and surrounding text block [of Mr. Samek's alleged letter], including the text above, below, and adjacent to the signature, is a reproduction of the exact same signature and surrounding text block from another source." (LaPorte Decl., ¶¶ 20, 82-91; see also Plfs.' Hr. Exhs., Exh. 14.)  Specifically, it is identical to the Term Sheet that Neil Shekhter possessed in Microsoft Word format. (LaPorte Decl., ¶¶ 20, 82-91; see also Plfs.' Hr. Exhs., Exh. 14.)  During his live testimony, Mr. LaPorte credibly affirmed his findings that the "Cover Letter" is not authentic, including based on the fact that it refers to "Version 2," which did not exist as of the date of the letter, the inferior print resolution and extremely faint CPS codes of the document, and the fact that the entire signature block including all adjacent text was duplicated exactly from another source. (Oct. 17, 2016 Hr. Tr., at 69:21-74:2.)  Neither Dr. Aginsky nor Ms. Nicolaides disputed Mr. LaPorte's conclusions or provided evidence of the "Cover Letter's" authenticity. (See Oct. 17, 2016 Hr. Tr., at 58:5-60:9; Oct. 28, 2016 Hr. Tr. at 105:8-22.)  Mr. Flynn admitted that he did not opine that the "Cover Letter" is authentic as to its purported September 14, 2010 creation date, nor did he corroborate Neil Shekhter's story that the letter is from September 2010. (See Oct. 28, 2016 Hr. Tr., at 78:10-79:9.)

31

Exhibit 1
90

Furthermore, Mr. LaPorte conducted a chemical comparison of the black toner used on the original "La Cienega PMA" and the original "Cover Letter," finding that the black toner in these documents had a connection and were consistent with each other. (Oct. 14, 2016 PM Hr. Tr., at 78:18-78:9.) This was uncontested, and Dr. Aginsky confirmed that the "Cover Letter" and "La Cienega PMA" could have been printed at the same time in 2015. (Oct. 17, 2016 Hr. Tr., at 67:3-68:15.)

The "Cover Letter" was created by Plaintiffs in 2015, not sent by Mr. Samek to NMS in September 2010.

On June 21, 2015, Neil Shekhter emailed himself a copy of the "Cover Letter" (which is the first date it ever appears anywhere in any of Plaintiffs' devices) in PDF form. (Rubin Decl., ¶ 34; see also Plfs.' Hr. Exhs., Exh. 7.) The PDF has metadata indicating it was created on September 21, 2010. (Rubin Decl., ¶ 34; see also Plfs.' Hr. Exhs., Exh. 7.) However, the PDF was created with a version of Adobe Acrobat not even available until December 2014, demonstrating that the document was artificially backdated by Neil Shekhter "turning back" his computer clock when he created the letter. (Rubin Decl., ¶ 35; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' evidence to the contrary is not credible, as Mr. Cooper proffers no evidence to explain the artificial backdating, and merely proposes a hypothetical software "bug" that is not based on the facts. (Cooper Decl., ¶¶ 34-35; see also Defs.' Hr. Exhs., Exh. 31.) During his live testimony, Mr. Cooper admitted that he had no evidence that the particular version installed on Neil Shekhter's computer exhibited any software "bug." (Oct. 25, 2016 Hr. Tr., at 119:20-120:8.) He also conceded that no

Exhibit 1
91

bug he could identify changed the date of creation.  (Oct. 25, 2016 Hr. Tr., at 119:26-120:11.)

Neil Shekhter then created two more versions, also backdating them through a computer clock change, but this time using an older version of Adobe.  (Rubin Decl., ¶¶ 36, 37; see also Plfs.' Hr. Exhs., Exh. 7.)  After this Court issued its September 8, 2015 preservation Order (the "September 8, 2015 Order"), Neil Shekhter then emailed two of these versions to colleagues, asking if they could tell when those files were created.  (Rubin Decl., ¶¶ 39(a)-(b); see also Plfs.' Hr. Exhs., Exh. 7.)  Plaintiffs' evidence that there are two electronic versions of the "Cover Letter" letter dated September 14, 2010 is not credible.  Among other things, the evidence shows that Neil Shekhter emailed these two versions to two NMS employees, asking one to look at the metadata and the other if she can tell "when the original was taken or scanned."  (Rubin Decl., ¶ 39; see also Plfs.' Hr. Exhs., Exh. 7.)  One employee responded with a link to a program capable of removing embedded metadata. (Rubin Decl., ¶ 39; see also Plfs.' Hr. Exhs., Exh. 7.)  Plaintiffs provide no testimony or evidence to explain Neil Shekhter's requests that employees tell him "if you can tell when the original was taken or scanned" and "take a look at metadata" of a document Neil Shekhter supposedly received *and scanned* in 2010.  (Rubin Decl., ¶ 39 & Ex. 13; see also Plfs.' Hr. Exhs., Exh. 7; Shekhter Decl. ISO Sanctions Opp., ¶ 30.)  Neil Shekhter did not testify about why or how he created the various versions of the "Cover Letter" or why he sent them to his employees before producing them at Eric Samek's deposition.  Mr. Cooper provided only conclusory

33

Exhibit 1
92

testimony that such conduct is "completely normal" and "exactly a normal progression of events."  (Oct. 25, 2016 Hr. Tr., at 5:26-6:17.)

None of the above-referenced emails or versions of the "Cover Letter were produced to Defendants, through general discovery or pursuant to the Court's October 6, 2015 Order.  (Rubin Decl., ¶¶ 32-33; see also Plfs.' Hr. Exhs., Exh. 7.)  Plaintiffs appear to concede this troubling fact.

There is absolutely no electronic record or evidence of this "Cover Letter"—allegedly delivered in September 2010—in any of Plaintiffs' files or materials, until June 2015. (Rubin Decl., ¶¶ 32-37; see also Plfs.' Hr. Exhs., Exh. 7.)  Nor is there any explanation from Plaintiffs as to how this purportedly controlling cover letter—which Plaintiffs' counsel claimed was "fatal" to Defendants' arguments (Srinivasan Decl., Exh. M, ¶ 4; see also Defs.' Hr. Exhs., Exh. 38)—was not produced or even alluded to until September 21, 2015, over five years after it was allegedly received by Neil Shekhter and months into discovery.  Neil Shekhter's refusal to testify at the Evidentiary Hearing regarding these matters confirms there is no credible explanation other than forgery.

The "Cover Letter" is a forgery.

*Spoliation of Evidence*

Plaintiffs and their counsel repeatedly confirmed that they had taken concrete steps to preserve all files and devices. (Srinivasan Decl., Exh. K, ¶ 25 ["I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion

Exhibit 1
93

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

of emails and other files."]; Declaration of John Genga in Opposition to Defendants' Motion for Forensic Examination, filed September 28, 2015, ¶ 4 ["The media have been identified as all possible sources of any information pertaining to the NMS-AEW venture, and would include NMS's full electronic record of all drafts and versions of the joint venture agreement and all property management agreements involving the venture."]; Srinivasan Decl., Exh. P, at 7 [Plaintiffs "unilaterally implemented an internal 'litigation hold' around the beginning of the case so that documents and emails would not be deleted . . . . plaintiffs have preserved their records fully for examination, and have nothing to hide."]; *id.*, Exh. M, ¶ 3 ["At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication."]; Srinivasan Supp. Decl., Exh. C, at 76:16-19 ["But a litigation hold was implemented in this case at the very beginning by Neil Shekhter. Systems were set up so that emails couldn't be deleted, files could not be deleted, according to him . . ."]; see also Defs.' Hr. Exhs., Exhs. 5, 38.) These statements have proven to be false. Neither Plaintiffs nor their counsel provided any evidence to the contrary or explanation in their Opposition or at the Evidentiary Hearing.

The home computer Neil Shekhter used in 2014-2015 ("Neil's New Home Computer") is indisputably a critical piece of evidence. On it, Neil Shekhter communicated and conducted NMS business during much of the time period of this litigation, and Neil Shekhter purported to produce this computer for forensic imaging in recognition of its importance. (See Declaration of A. Sasha Frid In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Frid Decl."), Exh. 11.) Despite this computer's obvious relevance, Plaintiffs, through Neil Shekhter and his son, Alan—after the Court had issued its hold order and immediately in advance of the Court-ordered forensic analysis—set out on a scheme to destroy and alter its contents.

Exhibit 1
94

Neil Shekhter's actions were entirely intentional and done while Plaintiffs were fully represented by counsel. This spoliation constitutes a flagrant disregard for and violation of the Court's September 8 and October 6, 2015 Orders, counsel's ethical obligations to ensure that relevant information is preserved, and contradicts sworn statements made to this Court by Plaintiffs.

On the morning of October 15, 2015, the day before the court-ordered forensic examination was originally scheduled to take place, Neil Shekhter's son, Alan Shekhter, ran a series of Google searches indicating his interest in deleting evidence and escaping forensic detection: "secure wipe hard drive," "backdated secure wipe," "Los Angele[s] anti-computer forensics," and "how to avoid computer forensics." (Rubin Decl., ¶ 6(a) & fig. 10; Oct. 25, 2016 Hr. Tr., at 99:17-100:3 [testimony of Scott Cooper]; see also Plfs.' Hr. Exhs., Exh. 7.) Neil Shekhter and his son engaged in a text message exchange (which Neil Shekhter then deleted—a sanctionable act of spoliation on its own) in advance of the Court-ordered inspection. Among other things, the text message exchange, which Mr. Rubin was able to recover, outlines in excruciating detail Neil and Alan Shekhter's plan to remove Neil Shekhter's old hard drive from Neil's New Home Computer, replace it, and then backdate the computer and load it with files. (See Mot., Exh. A; Rubin Decl., ¶ 51 & fig. 7; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' expert witness, Scott Cooper, did not dispute these findings. (Oct. 25, 2016 Hr. Tr., at 100:1-3; *id.* at 46:11-19.) In fact, Mr. Cooper testified at the Evidentiary Hearing that these actions were "dumb" and a "horrendous idea." (*Id.* at 46:20-25; *id.* at 58:16-23.) The forensic evidence confirms that Neil and Alan Shekhter went through with the plan described in the

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

deleted text messages.  On October 15, 2015—one day before Plaintiffs'

compliance with the October 6, 2015 Order for a forensic examination was due—

Neil and Alan Shekhter initiated and executed a plan to: (i) remove a hard drive from

Neil's New Home Computer; (ii) replace it with a new hard drive that looked similar

to the old one; (iii) manipulate and alter the computer by artificially backdating the

computer's clock to make the files appear older than they were; and then (iv) flood

the new hard drive with more than 75,000 backdated files and folders.  (Rubin Decl.,

¶¶ 54-56; see also Plfs.' Hr. Exhs., Exh. 7.)  They accomplished each of these tasks,

causing the permanent loss of untold evidence and metadata, all in violation of the

Court's October 6, 2015 Order.  (Rubin Decl., ¶¶ 54-58; see also Plfs.' Hr. Exhs.,

Exh. 7; Oct. 25, 2016 Hr. Tr., at 48:4-8 ["Q. You don't dispute that Alan and Neil

Shekhter engaged in a process by where they took documents off of or removed

files from the old hard drive, correct? A. [Mr. Cooper] Correct."].)

Neither Neil Shekhter nor Alan Shekhter disputes the fact that they conspired to

replace an entire hard drive on a computer subject to the Court's Order in order to

conceal and spoliate evidence.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 148-151;

Declaration of Alan Shekhter In Support Of Plaintiffs' Opposition To AEW's Motion

For Terminating Sanctions ("Alan Shekhter Decl."), ¶¶ 4-6; see also Exh. A [July 29,

2016 Order], at pp. 3-4.)  Plaintiffs' brief admits to further spoliation of evidence—

claiming the old hard drive and the external drive used to create a backup of the old

drive were discarded.  (Opp. at 18.)

> While Plaintiffs state that they "discarded" both the old hard drive and the
>
> Seagate device on which they backed up the old hard drive, forensic

Exhibit 1
96

evidence shows that the Seagate device was connected to Neil's computer as late as December 2, 2015, after Plaintiffs' lost their writ application and approximately 48 hours before the forensic examination took place.  (Rubin Decl. ¶¶ 50-51; see also Plfs.' Hr. Exhs., Exh. 7.)  Neither the old hard drive nor the back-up drive was ever produced, in violation of this Court's Orders.  Yet, it has not been produced or has been destroyed—both in plain violation of this Court's Orders.  Plaintiffs offered no evidence to refute this finding.

In his live testimony, Mr. Rubin confirmed that the Seagate drive and the old hard drive were not produced by Plaintiffs for forensic imaging.  (Oct. 17, 2016 Hr. Tr., at 109:24-110:2.)  However, forensic evidence demonstrates that the Seagate back-up drive was connected to Neil Shekhter's computer as recently as December 2, 2015—two days before the forensic imaging took place. (Id. at 110:2-16.)  Plaintiffs offered no evidence to explain why these devices had not been produced, nor did Plaintiffs' forensic expert, Mr. Cooper, credibly address these findings.

There is no justification for the willful violation of a Court Order.  By Neil Shekhter's own admission, he replaced his hard drive in order to conceal it from the Court-ordered forensic examination.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 149, 151.)  Plaintiffs have provided no evidentiary support for their alleged fear that any personal "photographs" from their devices would "end up in the wrong hands" and no evidence that such "photographs" ever existed; it would not excuse a willful violation of this Court's Orders in any event.  (Id. ¶ 148.)

Exhibit 1
97

1       Contrary to the declarations of Neil and Alan Shekhter, material documents

2       at the core of this case were never transferred to the new hard drive,

3       including copies of the Joint Venture Agreement and a document titled

4       "Property Management-375 ns.doc," and were therefore lost from Neil's

5
     New Home Computer as a result of Plaintiffs' actions.  (Supp. Rubin Decl.
6

7       ¶¶ 39-47; see also Plfs.' Hr. Exhs., Exh. 9.)  Plaintiffs' expert witness

8       admitted that a file by this name no longer exists on Neil Shekhter's

9       computer or any of the NMS devices produced for examination.  (Oct. 25,

10      2016 Hr. Tr., at 75:8-12.)  The Court finds Mr. Cooper's purported

11
     explanation that a file could have been "renamed" as not credible.  (See *id.*
12

13      at 75:13-17.)  Regardless, renaming a relevant file would also violate the

14      Court's September 8 and October 6, 2015 Orders.

15

16 Like Neil's New Home Computer, the home computer that Neil Shekhter used in the

17 summer of 2013 when allegedly receiving the scan of "Version 2" and sending "Version 2" to

18 Defendants ("Neil's 2012 Home Computer") is another critical piece of evidence.  It appears

19
to be the "unknown computer" that opened and created the forged document "Version 2."
20

21 (Rubin Decl., ¶¶ 27, 28; see also Plfs.' Hr. Exhs., Exh. 7.)  As a result, Defendants

22 aggressively sought access to this computer for forensic examination.  (Srinivasan Decl., ¶

23 6.)  Plaintiffs, however, refused to provide this device to Defendants' experts.  (Oct. 17,

24 2016 Hr. Tr., at 102:15-17 ["Q. This computer, the 2012 computer, was never turned over to

25
you; is that right? Mr. Rubin: That's right.].)  Instead, Neil Shekhter testified at his December
26

27 10, 2015 deposition simply that he "threw [this device] away" by "put[ting] it in the trash"

28

Exhibit 1
98

(Srinivasan Decl., Exh. N at 206:18-25; 207:18-208:17), despite his obvious obligation to preserve evidence relevant to a pending lawsuit.

This alone, if true, would be sanctionable discovery misconduct. Plaintiffs have concealed and potentially destroyed this evidence and have failed to produce it, all in violation of the Court's September 8 and October 6, 2015 Orders.

Moreover, despite Neil Shekhter's testimony, credible forensic evidence offered by Mr. Rubin demonstrates that Neil's 2012 Home Computer was in use as late as September 19, 2015, after this Court issued its September 8, 2015 Order. (Rubin Decl., ¶ 50; Oct. 18, 2016 AM Hr. Tr., at 16:16-28; *id.* 17:16-20 [Mr. Rubin: "I looked at other information on the NMS Devices that I did have available to me for inspection and what I found was two primary types of information that demonstrate that th[e] old computer was in use at least until September of 2015."]; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' expert, Mr. Cooper, did not credibly refute this testimony.

Plaintiffs and their affiliates engaged in an extensive plan to alter, conceal, destroy, or manipulate evidence in violation of the Court's September 8 and October 6, 2015 Orders.

In attempting to artificially backdate the new hard drive that Neil and Alan Shekhter had purchased to alter and conceal the contents of Neil's New Home Computer, Neil Shekhter picked the backdating date of January 10, 2015. (Rubin Decl., ¶ 56; see also Plfs.' Hr. Exhs., Exh. 7.) This was no accident, as the date coincided with Neil Shekhter's later false testimony as to when he "threw away" his 2012 Home Computer and allegedly "copied information from [his] old computer to the new one."

Exhibit 1
99

(Srinivasan Decl., Exh. N at 212:1-12; see also *id.*, at 208:5-13; 213:3-7; Rubin Decl. ¶¶ 49, 50 ["Despite Mr. Shekhter's testimony that he threw away the computer he used in 2013, there is evidence that a Dell computer with the name "DELLNEIL2012-PC" was in use until at least September 19, 2015, but was not made available . . . for examination."]; see also Plfs.' Hr. Exhs., Exh. 7.)  In other words, Plaintiffs not only lied about the availability of Neil's 2012 Home Computer (which was still in use as of September 2015 and not "thrown away" in January 2015), but then—in altering Neil's New Home Computer by removing a hard drive from that computer, replacing it, and backdating it—they tried to make it appear that the lie that Neil Shekhter would later tell about Neil's 2012 Home Computer was true.  This is evidence of both the destruction and fabrication of evidence and of Neil Shekhter's perjury.

On December 2, 2015, two days before the Court-ordered imaging of Plaintiffs' computers was to occur, Plaintiffs manually and volitionally installed a new Operating System on Neil's New Home Computer. (Rubin Decl., ¶ 66; Plfs.' Hr. Exhs., Exh. 7.)  As set forth in the declaration and live testimony of Mr. Rubin, the installation was not one that would occur automatically, and it instead required an affirmative, manual upload. (Rubin Decl., ¶ 66; Supp. Rubin Decl., ¶¶ 54-55; see also Plfs.' Hr. Exhs., Exhs. 7, 9; Oct. 18, 2016 AM Hr. Tr., at 35:1-20.)  This installation of a new operating system made thousands of changes to the file system metadata on the computer, which makes the forensic examination of what existed on the computer prior to the installation much more difficult. (Rubin Decl., ¶ 67; Plfs.' Hr. Exhs., Exh. 7; see also Oct. 18, 2016 AM Hr. Tr., at 35:21-36:10.)  Mr.

Exhibit 1
100

Cooper's testimony that the installation of the new Operating System was automatic is not credible. (See Oct. 25, 2016 Hr. Tr., at 21:12-22:20.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

On or after December 2, 2015, a folder called "AEW" was renamed and certain files and folders were deleted from Neil's New Home Computer. (Rubin Decl., ¶ 63; Supp. Rubin Decl. ¶ 48; see also Plfs.' Hr. Exhs., Exhs. 7, 9.) This clearly related to the matters at issue in this case, and the subfolder in particular related to the forged "Cover Letter." (Rubin Decl. ¶ 63; see also Plfs.' Hr. Exhs., Exh. 7.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

> Mr. Cooper admitted that certain subfolders no longer exist in the renamed "W" folder. (Oct. 25, 2016 Hr. Tr., at 83:18-84:6.) The Court finds that Mr. Cooper's purported explanation that those files could have been "renamed elsewhere" as lacking credibility and pure speculation. Mr. Cooper admitted that he did not, on his own, even attempt to locate such files. (*Id.* at 87:4-7 ["Q. Do you have any evidence, any affirmative forensic evidence, that they were moved or renamed to a different location? A. No."].) Regardless, renaming and moving folders in December 2015 is, on its own, a violation of the Court's September 8 and October 6, 2015 Orders.

Exhibit 1
101

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Numerous USB external storage devices used on Neil's New Home Computer were withheld and/or destroyed. (Rubin Decl., ¶ 70; see also Plfs.' Hr. Exhs., Exh. 7.) While of particular note is the Seagate external hard drive that was plugged in on October 15, 2015, and that "backed up" the existing hard drive before it was swapped out for the "new" drive (as well as the old drive itself), at least 21 devices were connected to Neil's New Home Computer that have never been produced. (Rubin Decl., ¶ 69 & fig. 9; Plfs.' Hr. Exhs., Exh. 7.) The Seagate was accessed after the hard drive swap, on December 2, 2015. (Supp. Rubin Decl. ¶ 51; see also Plfs.' Hr. Exhs., Exh. 9.) All of this constitutes intentional concealment of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

> Mr. Cooper testified that it "wasn't [his] job" to request these devices from NMS. (Oct. 25, 2016 Hr. Tr., at 90:8-12.) Regardless, Mr. Cooper testified that he understands that the devices do not exist. (*Id*. at 89:19-90:3.)

Between the period of October 4, 2015 and December 4, 2015, the computer clock on Neil's New Home Computer was also manually changed seventeen times, making forensic examination many times more difficult than it otherwise would have been. (Rubin Decl., ¶ 59; see also Plfs.' Hr. Exhs., Exh. 7.) In the aggregate, during the periods when the clock was changed, over 800,000 files and folders were affected. (Rubin Decl., ¶ 61; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs offered no credible evidence to dispute these findings. (Oct. 25, 2016 Hr. Tr., at 49:5-17; 50:26-51:3; 52:25-53:2.) This conduct constitutes concealment and manipulation of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

Exhibit 1
102

Plaintiffs' contention that the manual backdating of Neil's New Home Computer did not prejudice Defendants is not credible.  (Cooper Decl., ¶ 66; see also Defs.' Hr. Exhs., Exh. 31.)  They do not dispute that the backdating fraudulently alters the file system metadata for all file copies when the device clock is set back.  (Supp. Rubin Decl., ¶¶ 40, 41; see also Plfs.' Hr. Exhs., Exh. 9.)  In fact, the evidence demonstrates that on December 4, 2015, the day of the forensic collection, between approximately 6:00 p.m. and 7:20 p.m., the computer clock on Neil's New Home Computer was backdated and over 60,000 files were loaded onto his computer. (Oct. 18, 2016 AM Hr. Tr., at 29:15-31:11.)  This occurred just ten minutes before Mr. Rubin arrived to conduct the forensic collection, (id.), and constitutes another shocking violation of the Court's September 8 and October 6, 2015 Orders.  The fact that Neil and Alan Shekhter, NMS' IT Administrator, Enrique Sanchez, and NMS' own forensic expert, Scott Cooper, were all present at NMS' offices when this took place and none of them offered any explanation at the Evidentiary Hearing is, quite frankly, shocking.

Sometime between November 25, 2015 and December 4, 2015, a zip file emailed to Neil Shekhter from Daniel Lennon purporting to contain files related to AEW and NMS was deleted by Neil Shekhter.  (Rubin Decl., ¶ 64; Plfs.' Hr. Exhs., Exh. 7.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders.  Plaintiffs do not dispute this, and in fact admit that the zip file contained "Joint Venture related documents."  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 153-155.)  Plaintiffs also admit to willfully deleting and spoliating this evidence for the express purpose of avoiding detection in a court-ordered

forensic examination. (*Id.*) Moreover, Plaintiffs' expert witness, Scott Cooper, agreed in his live testimony that this evidence was deleted. (Oct. 25, 2016 Hr. Tr., at 87:20-28.)

Other employees within NMS participated in the widespread deletion and alteration of evidence as well.

For example, in December 2015, just days before Defendants were to conduct their forensic imaging of Plaintiffs' computers, Enrique Sanchez, the IT Administrator at NMS, searched for "file deletion utility windows 7," and "free SSD secure erase." (Rubin Decl., ¶ 6(a) & fig. 11; Oct. 25, 2016 Hr. Tr., at 100:25-101:8 [testimony of Scott Cooper]; see also Plfs.' Hr. Exhs., Exh. 7.) He then downloaded an application called "Eraser Portable," which is a computer data destruction and wiping application, and on December 4, 2015, the application was copied to the NMS corporate file server. (Rubin Decl., ¶ 90; see also Plfs.' Hr. Exhs., Exh. 7.) This data wiping utility was used by another NMS employee, Brian Bowis (Vice President of Finance at NMS), the day the court-ordered imaging was to occur. (Rubin Decl., ¶¶ 90, 91; see also Plfs.' Hr. Exhs., Exh. 7.) The use of this data wiping utility was in violation of the Court's September 8 and October 6, 2015 Orders. Plaintiffs do not dispute that the data wiping utility was obtained and used. (Declaration of Brian Bowis In Support Of Opposition to AEW's Motion For Terminating And Other Sanctions ("Bowis Decl."), ¶ 4; Declaration of Enrique Sanchez In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Sanchez Decl."), ¶¶ 42-45; see also Plfs.' Hr. Exhs., Exh. 100.)

Exhibit 1
104

Mr. Cooper did not dispute that files were deleted from Brian Bowis' computer on December 4, 2015, the same day Defendants' experts were scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices. (Oct. 25, 2016 Hr. Tr., at 95:3-10.)

Mr. Bowis admitted that he instructed Mr. Sanchez to delete the files so that no one would have access to the file and so that they would never be retrieved. (Oct. 25, 2016 Hr. Tr., at 166:6-168:11.) Contrary to his sworn declaration and direct testimony, Mr. Bowis admitted under cross-examination that among the files deleted were joint venture records and not "personal" files as he had claimed. (Id. at 170:6-25.)

These searches were not unique; after the Court had ordered preservation, Mr. Sanchez searched for "wipe multiple hard drives simultaneously," "hard drive destruction service," and "hard drive destruction service Los Angeles." (Rubin Decl., fig. 11; see also Plfs.' Hr. Exhs., Exh. 7.)  Mr. Sanchez's proffered explanation for such searches is not credible, and Plaintiffs' decision not to offer any live testimony of Mr. Sanchez at the Evidentiary Hearing only confirms the lack of his credibility.

Mr. Sanchez had also searched for "Adobe Acrobat removal tool" on November 13, 2015, and Adobe Acrobat was deleted sometime after October 2, 2015 from Adam Shekhter's computer, which had been the host of one of the forged copies of "Version 2." (Rubin Dec., ¶ 80; see also Plfs.' Hr. Exhs., Exh. 7.) This conduct was in violation of the Court's September 8 and October 6, 2015 Orders.

Exhibit 1
105

On December 3, 2015, Eddie Valentin, who counsel for NMS described as Neil Shekhter's assistant of "many years," deleted a copy of the forged "La Cienega PMA" from his desktop computer.  (Srinivasan Decl., Exh. AA, at 71:25-72:2; Rubin Decl., ¶ 93; see also Plfs.' Hr. Exhs., Exh. 7.)  This conduct was in violation of the Court's September 8 and October 6, 2015 Orders.

And finally, on December 4, 2015, the day Defendants were to conduct the imaging, Mr. Sanchez ran the search: "does eraser work on ssd?"  (Rubin Decl., fig. 11; see also Plfs.' Hr. Exhs., Exh. 7.)  "Eraser" here referring to the wiping utility he had downloaded, and "SSD" referring to any of the data drives falling into that category.

Plaintiffs' contention that these internet searches are not relevant to the improper spoliation of evidence is not credible in light of the context and circumstances surrounding the searches, as well as the other evidence of their spoliation. (See Opp. at 20.)

In addition to all of the foregoing, Plaintiffs have unabashedly violated the Court's October 6, 2015 Order in still more respects:

There are no less than four critical data sources that Plaintiffs have still yet to produce:  (i) Neil's 2012 Home Computer; (ii) the hard drive that was removed from Neil's New Home Computer; (iii) the Seagate backup that was taken of Neil's New Home Computer; and (iv) the USB drive containing the "original Version 2" that was taken from an "unknown computer" (likely Neil's 2012 Home Computer) and inserted into Adam's computer to distribute the forged "Version 2."  These items—the last three of which were never even listed by Plaintiffs when purporting to comply with

47

Exhibit 1
106

the Court's Forensic Examination Order—are either being knowingly concealed or were destroyed by Plaintiffs. Indeed, Plaintiffs claim that items (ii) and (iii) were intentionally destroyed to avoid full compliance with this Court's orders. In total, there are at least 21 devices that have been plugged into Neil's New Home Computer alone that have not been produced by Plaintiffs. (Rubin Decl., ¶ 71 & fig. 9; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs offered no evidence to credibly refute this evidence. The failure to preserve and produce these devices violates the Court's September 8 and October 6, 2015 Orders, and Plaintiffs' assertion that Neil Shekhter likes to "give away" such devices is no excuse for violating this Court's Orders. (See Shekhter Decl. ISO Sanctions Opp., ¶¶ 162-164.)

Plaintiffs refused to comply with the Court's October 6, 2015 Order that they list all devices responsive to the Court's Order, simply reassuring AEW that it would receive "everything." (Srinivasan Decl., Exh. AA, at 105:23 ["We intend to give you everything."].) Instead, Plaintiffs only "adopted" the list created by Defendants' experts once they had the chance to conduct a forensic investigation. This list did not include a number of items, such as the Seagate backup, and Plaintiffs never corrected that list.

Plaintiffs repeatedly informed Defendants that they had made available all of Adam Shekhter's computers. But Defendants' experts discovered that a Dell Latitude E6520 desktop computer belonging to Adam, with a host name ADAM-S-PC, had not been provided by Plaintiffs. This is the same PC that was used to load the forged "Version 2" and email that document, and the computer from which Adobe Acrobat was removed after October 2, 2015. (Rubin Decl., ¶¶ 76, 79-80; see also

Plfs.' Hr. Exhs., Exh. 7.) Once AEW actually did obtain the device (along with 13 additional computers Plaintiffs had not previously provided), Plaintiffs' efforts to hide Adam's computer became clear. (Rubin Decl., ¶¶ 77-78; see also Plfs.' Hr. Exhs., Exh. 7.) The computer regularly accessed the NMS network, and it was frequently used at the NMS offices, from as early as 2013 until as recently as December 3, 2015 at 7:26 p.m., merely 24 hours before Defendants began their forensic imaging. (Rubin Decl., ¶ 78; see also Plfs.' Hr. Exhs., Exh. 7.) The computer was then taken offline while the imaging and forensic analysis occurred, and it was not used again until December 21, 2015, after most of the imaging had concluded. (*Id.*) Plaintiffs offered no credible evidence to refute these findings. The failure to timely produce this device violated the Court's October 6, 2015 Order. Neither Plaintiffs nor their counsel provided any explanation for this misconduct.

*Perjury*

The Court also finds ample evidence that Plaintiffs—in particular Neil Shekhter—have provided false testimony under oath in order to mislead the Court and cover up their own misconduct. Some of the most egregious examples include the following:

> Neil Shekhter testified that, in connection with his alteration, removal, and destruction of the hard drive from his computer in October 2015, "No information on the hard drive was deleted or altered. The files containing the personal information are the only files that do not exist on the new hard drive." (Shekhter Decl. ISO Sanctions Opp., ¶ 151.) However, Mr. Rubin's testimony demonstrates that in fact, many files were deleted and lost as a

49

Exhibit 1
108

result of this process, including ones clearly relevant to the issues in this lawsuit and explicitly ordered preserved and produced by the Court. (Supp. Rubin Decl., ¶¶ 44-47; see also Plfs.' Hr. Exhs., Exh. 9.) This includes a Word document titled "Property Management-375 ns.doc," which was created on June 24, 2015 at 7:55 a.m. (Supp. Rubin Decl.¶¶ 45-46; see also Plfs.' Hr. Exhs., Exh. 9.) Thus, Neil Shekhter's testimony was knowingly false.

For the same reasons, the Court finds Alan Shekhter's statements that "I did not delete or alter any information on the hard drive" to be false testimony. (Alan Shekhter Decl., ¶ 6.)

Neil Shekhter testified that "I eventually threw away the old computer . . . before there was any litigation with AEW" (Shekhter Decl. ISO Sanctions Opp., ¶¶ 144-145), when the evidence demonstrates that Neil's 2012 Home Computer was active and functioning as late as September 19, 2015. (Rubin Decl., ¶ 51; Supp. Rubin Decl., ¶¶ 34-38; see also Plfs.' Hr. Exhs., Exhs. 7, 9.) Thus, again, Neil Shekhter's testimony was false.

Neil Shekhter also testified that "I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other files." (Srinivasan Decl., Exh. K, at ¶ 25; see also Defs.' Hr. Exhs., Exh. 5.) However, it is clear that at least Neil Shekhter, Mr. Bowis, and Mr. Valentin deleted information from their computers in October 2015—over a year after the litigation first began—

50

Exhibit 1
109

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

and Mr. Sanchez at the very least assisted in this. (Shekhter Decl. ISO Sanctions Opp., ¶¶ 148, 151-152, 155; Bowis Decl., ¶¶ 3-5; Declaration of Eddie Valentin In Support Of Opposition to AEW's Motion For Terminating And Other Sanctions ("Valentin Decl."), ¶¶ 2-6; Sanchez Decl., ¶ 42; Rubin Decl., ¶¶ 63-65, 80, 88-93; see also Plfs.' Hr. Exhs., Exhs. 9, 100.) Both the forensic evidence and Neil Shekhter's own subsequent testimony proved this to have been knowingly false testimony. Moreover, contrary to Neil Shekhter's sworn statements, Mr. Bowis, a then-high ranking executive at NMS, testified that he was never informed that a litigation hold was in place. (Oct. 25, 2016 Hr. Tr., at 166:6-19.)

*Findings With Respect To Plaintiffs' Experts*

Scott Cooper

Plaintiffs' expert, Scott Cooper, opined that "AEW has been given access to all relevant data and information. Plaintiffs have not engaged in efforts to withhold, destroy, and alter evidence. To the contrary, Plaintiffs went above and beyond the Court's Order and made all devices in their possession available to AEW and its experts." (Cooper Decl., ¶ 10; see also Defs.' Hr. Exhs., Exh. 31.) Mr. Cooper reiterated his opinion while testifying before the Court, stating that "AEW had access to all of the relevant information and data that they needed for this case." (Oct. 24, 2016 Hr. Tr., at 83:10-12.) Given the evidence of spoliation of documents, data, and other materials by Plaintiffs, as discussed in greater detail below, the Court finds that Mr. Cooper's opinion that Plaintiffs had provided "all relevant data and information"

51

Exhibit 1
110

and had gone "above and beyond" the Court's orders defies the record and establishes, along with other testimony, that he was not a credible witness.

Mr. Cooper admitted that he did not affirmatively establish that any of the alleged forgeries were, in fact, authentic.

> Mr. Cooper admitted that he did not affirmatively establish that "Version 2" of the JVA was first created in September 2010. (Oct. 25, 2016 Hr. Tr., at 42:3-8; 111:3-8.)

> Mr. Cooper admitted that he did not affirmatively establish that the "Cover Letter" was first created in September 2010. (Oct. 25, 2016 Hr. Tr., at 43:3-19.)

> Mr. Cooper admitted that he did not affirmatively establish that the "La Cienega PMA" was first created in March 2012. (Oct. 25, 2016 Hr. Tr., at 42:3-43:2.)

Mr. Cooper did not dispute several aspects of evidence spoliation committed by Plaintiffs and their affiliates, and he admitted that he did not conduct his own forensic examination to refute that any of this had occurred.

> Mr. Cooper did not dispute that Neil and Alan Shekhter engaged in a text message conversation on October 15, 2015 regarding swapping out a hard drive from Neil's New Home Computer and backdating the clock on that computer, and that this text message conversation was deleted from Neil Shekhter's phone. (Oct. 25, 2016 Hr. Tr., at 45:19-46:19.)

Exhibit 1
111

Mr. Cooper did not dispute that one of the hard drives from Neil's New Home Computer was removed and replaced with a new hard drive of the exact same size. (Oct. 25, 2016 Hr. Tr., at 47:26-48:3.)

Mr. Cooper did not dispute that Alan and Neil Shekhter removed documents from the old hard drive from Neil's New Home Computer. (Oct. 25, 2016 Hr. Tr., at 48:4-8.)

Mr. Cooper did not dispute that the clock on Neil's New Home Computer was backdated at least 17 times between October 4 and December 4, 2015, and that during one of these times, the clock was backdated to January 2015 for approximately 14 hours. (Oct. 25, 2016 Hr. Tr., 49:5-17; 50:26-51:3; 52:25-53:2.) Mr. Cooper also did not dispute that the clock on Neil's New Home Computer was backdated on December 4, 2015 between 6:00 p.m. and 7:20 p.m., just minutes before Defendants' expert was scheduled to arrive at NMS' offices to conduct a forensic examination of Plaintiffs' devices. (Oct. 25, 2016 Hr. Tr., at 53:3-14; see also Oct. 18, 2016 AM Hr. Tr., at 29:27-30:18 [testimony of Samuel Rubin].) Moreover, over 60,000 new files were loaded onto Neil's New Home Computer while it was backdated the night of the forensic examination. Mr. Cooper did not dispute that either. (Oct. 18, 2016 AM Hr. Tr., at 30:19-31:11 [testimony of Samuel Rubin].)

Mr. Cooper did not conduct his own examination to determine the 800 files that Defendants' expert Samuel Rubin found were missing from the new

53

Exhibit 1
112

hard drive on Neil's New Home Computer, but were present on either the old hard drive or the external hard drive used to copy files.  (Oct. 25, 2016 Hr. Tr., at 65:10-67:24.)

Mr. Cooper admitted that the deleted file "Property management-375 ns.doc" was not provided for forensic examination.  (Oct. 25, 2016 Hr. Tr., at 79:28-80:5.)

Mr. Cooper admitted that a folder on Neil's New Home Computer called "AEW" was renamed to "W" on December 4, 2015, the same day Defendants' experts were scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices, and that subfolders within the "W" folder were no longer in the "W" folder when it was produced.  (Oct. 25, 2016 Hr. Tr., at 82:28-83:11; 86:22-87:7.)

Mr. Cooper did not dispute that a zip file obtained from former AEW employee Daniel Lennon was deleted from Neil's New Home Computer. (Oct. 25, 2016 Hr. Tr., at 87:20-88:6.)

Mr. Cooper admitted that there were 21 devices that were connected to Neil's New Home Computer, but he did not try to locate these devices because "it wasn't my job."  (Oct. 25, 2016 Hr. Tr., at 90:8-12.)

Mr. Cooper did not dispute that files were deleted from Brian Bowis' computer on December 4, 2015, the same day Defendants' experts were

Exhibit 1
113

scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices.  (Oct. 25, 2016 Hr. Tr., at 95:3-10.)

Mr. Cooper did not dispute that NMS employees conducted Google searches such as "how to avoid computer forensics," "Los Angeles anti-computer forensics," and "backdated secure wipe."  (Oct. 25, 2016 Hr. Tr., at 99:17-100:3.)

As set forth above, the Court finds Mr. Cooper lacks credibility because Mr. Cooper continued to insist that Defendants had been given access to all relevant information and that Plaintiffs had gone above and beyond the Court's Order, despite making these various concessions.

Mr. Cooper's credibility was further compromised because he refused to make any concession that Plaintiffs withheld relevant evidence despite making the following admissions:

Mr. Cooper admitted that it was "dumb" and a "bad idea" to delete the text message conversation between Neil and Alan Shekhter regarding swapping out hard drives and backdating the clock on Neil Shekhter's computer.  (Oct. 25, 2016 Hr. Tr., at 45:19-46:19.)

Mr. Cooper admitted that it was a "horrendous idea" to advise a client to swap out a hard drive, backdate a computer, and load files back onto the hard drive while subject to court orders to preserve all documents and to submit to a forensic examination.  (Oct. 25, 2016 Hr. Tr., at 58:16-23.)

55

Exhibit 1
114

Mr. Cooper admitted that it was a "stupid thing" for Neil Shekhter to delete text messages, swap out a hard drive, backdate a computer, and load files back onto the new hard drive, and that Mr. Cooper "wouldn't have recommended" this conduct to his clients. (Oct. 25, 2016 Hr. Tr., at 60:20-23.)

Mr. Cooper admitted that he would not advise a client and that it was a "bad idea" to delete files from a computer even if there is an earlier image of the computer with the deleted files. (Oct. 25, 2016 Hr. Tr., at 97:12-98:12.)

Mr. Cooper admitted that Plaintiffs did "some stupid things" in responding to the Court's October 6, 2015 Order. (Oct. 25, 2016 Hr. Tr., at 102:11-15.)

The Court also finds Mr. Cooper lacks credibility due to his failure to answer questions directly, which forced the Court to admonish him several times. (See, e.g., Oct. 25, 2016 Hr. Tr., at 49:18-27 [THE COURT: "Would you please just listen to the question and answer it. You are an expert. You are in court. Please. Go ahead."]; 92:23-94:6 [THE COURT: [In response to Mr. Cooper refusing to answer a question after the Court overruled Plaintiffs' counsel's objection] "You're overrul[ing] my ruling? . . . So listen. It's your job to listen to the question and answer it. If there's an objection, I'll make the ruling. It is your job to answer the question and not comment on my ruling."].)

Dr. Valery Aginsky

Exhibit 1
115

Plaintiffs' expert, Dr. Valery Aginsky, testified that he was not offering any opinion regarding the authenticity of "Version 2" of the JVA, the "Cover Letter," or the "La Cienega PMA." (Oct. 17, 2016 Hr. Tr., at 55:9-19; 59:18-21; 65:19-28.)

Dr. Aginsky opined on the limited topic that the black toner from the "La Cienega PMA" is not consistent with the black toner from the "Cover Letter" dated September 14, 2010, but Dr. Aginsky admitted that his methodology to test the rate and extent of extraction of toner in the "La Cienega PMA" and the "Cover Letter" is not a generally accepted method, nor is such a methodology disclosed in any publications. (Oct. 17, 2016 Hr. Tr., at 72:2-18.)

The Court finds that Dr. Aginsky's complaints that a portion of Mr. LaPorte's examination of questioned documents was done outside his presence are without merit. Mr. LaPorte was not required by this Court's Orders to examine the questioned documents only in the presence of Dr. Aginsky. (See Srinivasan Decl., Exh. Z at pp. 3-4; see also Plfs.' Hr. Exhs., Exh. 26.) The Court's Orders were limited to the physical testing of such documents that may have impacted the documents, not visual examination, including under high powered microscopes. (See Srinivasan Decl., Exh. Z at pp. 3-4; see also Plfs.' Hr. Exhs., Exh. 26.) Dr. Aginsky also admitted that he was not prejudiced by Mr. LaPorte's examination. (Oct. 17, 2016 Hr. Tr., at 75:15-19.) Dr. Aginsky also admitted that he conducted his own chemical testing of the questioned documents outside the presence of Mr. LaPorte and that there is "nothing forensically improper" about conducting examinations alone. (Oct. 17, 2016 Hr. Tr., at 76:11-77:5.)

Exhibit 1
116

The Court also finds Dr. Aginsky's credibility was undermined due to his refusals on several occasions to answer questions directly, resulting in the Court's admonishment of Dr. Aginsky. (See, e.g., Oct. 17, 2016 Hr. Tr., at 16:4-16 [THE COURT: "You don't want to be an advocate. You want me to see you as a witness that's telling the truth without advocating for one side, right?"]; 63:21-64:3 [THE COURT: "I want you to know that I'm trying to assess credibility. So that's what I'm trying to do is assess your credibility. And there are many elements to that. And one of the elements is not fighting with the person asking you questions."]; 70:15-71:7 [THE COURT: "So listen. I'm trying to assess credibility. One of the ways to assess credibility is how you answer the question. You're a very smart man. And I want to listen and understand your answers so you don't want to be evasive when I'm trying to assess your credibility. So I suggest you listen to the question and you answer the question that's asked. It's not a jury."].) Dr. Aginsky even claimed at one point during cross-examination that he was not fluent in English, even though he testified in English without complaint or difficulty during his direct examination and confirmed he has testified as an expert witness in both state and federal courts in the United States. (Oct. 17, 2016 Hr. Tr., at 8:22-28; 59:5-17.)

William Flynn

Plaintiffs' expert, William Flynn, did not affirmatively find that "Version 2" of the JVA was genuine or that it was created in September 2010. (Oct. 28, 2016 Hr. Tr., at 60:22-26.) He also *agreed* with Mr. LaPorte that "Version 2" of the JVA was printed or copied on July 15, 2013, and not in September 2010. (Oct. 28, 2016 Hr. Tr., at 62:25-63:14; 70:11-15; 71:19-25; 76:23-77:11.)

Exhibit 1
117

1  Mr. Flynn also agreed that if "Version 2" of the JVA was not printed in September
2  2010, then the "Cover Letter" dated September 14, 2010 also could not be from
3  September 2010 as purported by Plaintiffs.  (Oct. 28, 2016 Hr. Tr., at 78:20-79:1.)

4

5  The Court does not find that the remainder of Mr. Flynn's testimony, which was
6  limited and based on limited instructions and evidence, undermines Mr. LaPorte's
7  testimony.

8

9  Kathleen Nicolaides

10

11  Plaintiffs' expert, Kathleen Nicolaides, testified that she did not have sufficient
12  information to determine whether the "La Cienega PMA" is an authentic document
13  created on or about March 1, 2012.  (Oct. 28, 2016 Hr. Tr., at 109:24-28.)

14

15  Ms. Nicolaides also confirmed that the "La Cienega PMA" is the only PMA that has a
16  60-day notice period in Article 12.1, as opposed to a 30-day notice period in all other
17  examined property management agreements.  (Oct. 28, 2016 Hr. Tr., at 108:9-17.)

18

19  Ms. Nicolaides further confirmed that the "La Cienega PMA" was formatted
20  differently than the draft La Cienega PMAs, including the draft La Cienega PMA that
21  was attached to emails in early 2012.  (Oct. 28, 2016 Hr. Tr., at 85:1-22; 100:3-17.)
22

23  The Court does not find that the remainder of Ms. Nicolaides' testimony, which was
24  limited and based on limited instructions and evidence, undermines Mr. LaPorte's
25  testimony.  The fact that Ms. Nicolaides admitted she was not qualified to opine on
26  some of the bases of Mr. LaPorte's opinions also calls into question her own
27  testimony.  (Oct. 28, 2016 Hr. Tr., at 105:25-106:18.)
28

Exhibit 1
118

*Findings Regarding Failure of NMS Witnesses To Appear At Evidentiary Hearing*

At the Evidentiary Hearing, Plaintiffs did not call several witnesses to testify, including NMS principal Neil Shekhter and NMS employees Adam Shekhter, Alan Shekhter, Enrique Sanchez (NMS' IT Administrator), and Eddie Valentin (Neil Shekhter's assistant), all of whom submitted declarations in opposition to Defendants' Motion. Plaintiffs did not explain why these witnesses were not called. The failure to call these witnesses despite an opportunity to do so undermines all of their credibility.

The Court finds that Plaintiffs' failure to call these witnesses to testify at the Evidentiary Hearing means that the testimony these witnesses would have offered would have been harmful to Plaintiffs. (See Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a part, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."].)

Plaintiffs also offered no explanation regarding the provenance of the three alleged forgeries, two of which were allegedly created during the pendency of this action. Plaintiffs have not proffered anyone, including Plaintiffs' own principal Neil Shekhter, to explain why the three documents are not forgeries, or to explain the discrepancies in the sworn statements of NMS' employees and the briefs submitted by NMS' counsel. Nor have Plaintiffs proffered any testimony or explanation to rebut Defendants' showing that Plaintiffs failed to produce documents related to the alleged forgeries in the normal course of discovery even though this material was in Plaintiffs' and Plaintiffs' counsel's possession. In

particular, Plaintiffs' own expert confirmed that "Version 2," identified by Plaintiffs and their counsel as an "original" from September 2010, was actually printed on July 15, 2013. (Oct. 28, 2016 Hr. Tr., at 60:22-26 [testimony of William Flynn].) Neither Plaintiffs nor their counsel offered any credible explanation or testimony regarding the production of a July 15, 2013 document rather than the September 2010 document they claimed it to be.

Terminating And Monetary Sanctions

"The [court's] power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action. Only two facts are absolutely prerequisite to imposition of the sanction: (1) there must be a failure to comply . . . and (2) the failure must be willful. . . ." (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 496 [citations omitted].) Moreover, Code of Civil Procedure "Section 2023 authorizes terminating sanctions in the first instance in egregious cases such as this one." (*Id.* at p. 497; see *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223.) Where conduct is "illustrat[ive] [of] a kind of discovery abuse that is intolerable in civil litigation," an award of terminating sanctions and fees and costs is appropriate. (*R.S. Creative*, *supra*, 75 Cal.App.4th at pp. 486, 488 [affirming the lower court's granting of terminating sanctions and fees and costs against a plaintiff who relied upon a forged contract in her pleadings, provided false testimony about the nature of that contract, and altered or deleted data on her own computer and potentially destroyed some floppy discs].)

Terminating and monetary sanctions are appropriate in light of the extensive evidence that Plaintiffs forged several pieces of evidence—at least "Version 2," the "La Cienega PMA," and the "Cover Letter." (*R.S. Creative*, *supra*, 75 Cal.App.4th at pp. 487-488.) This by itself

Exhibit 1
120

constitutes a fraud on the court, the unlawful spoliation of evidence, and attempts to undermine the judicial system. (*Williams*, *supra*, 167 Cal.App.4th at p. 1223 ["Spoliation of evidence means the destruction or *significant alteration* of evidence or the failure to preserve evidence for another's use in pending or future litigation"] [emphasis added]; see also *Stephen Slesinger, supra,* 155 Cal.App.4th at p. 758 ["California courts possess [the] power" to dismiss an action "when faced with pervasive litigation abuse"]; *Aoude v. Mobil Oil Corp* (1st Cir. 1989) 892 F.2d 1115, 1118-1119 [affirming terminating sanctions because plaintiff pled a case based upon a forged document and such constituted fraud on the court].)

Terminating and monetary sanctions are also appropriate in light of Plaintiffs' perjury regarding the authenticity of and circumstances surrounding all of the forged documents. (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 487-488, 490.) This misconduct is also reprehensible. (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 9 ["Perjury, like spoliation, undermines the search for truth and fairness by creating a false picture of the evidence before the trier of fact"]; *Michaely v. Michaely* (2007) 150 Cal.App.4th 802, 806 [affirming award of sanctions due to sanctioned party's "consistent evasion, coupled with responses which were blatant untruths and not credible, amount[ing] to an egregious abuse of the discovery process."].)

In addition to the examples described, *supra*, Plaintiffs' perjury includes, for example, first swearing that their copy of "Version 2" was the actual one delivered in 2010, and then later swearing it may be a "copy." (Compare Srinivasan Decl., Exh. K, ¶ 14 & Exh. J, at 59:20-60:5, with Opp. at 13; see also Defs.' Hr. Exhs., Exh. 5.) Lead plaintiff Neil Shekhter also created an entirely fabricated story about "throwing

away" his computer in early 2015 (Srinivasan Decl., Ex. N, at 206:18-208:20), which

itself would have been an act of spoliation, but it was later discovered that this

computer still existed as late as September 19, 2015.  (See Pen. Code §§ 118(a),

118a; Rubin Decl., ¶ 50; see also Plfs.' Hr. Exhs., Exh. 5.)

Neil Shekhter also swore under oath that he carefully maintained the "original hard

copies" of the "Cover Letter" and "Version 2" that he purportedly received in 2010,

but later contradicted himself by testifying that it may be a copy.  (Srinivasan Decl.,

Exh. K, ¶ 14; Opp. at 13; see also Defs.' Hr. Exhs., Exh. 5.)  This was false.

Neil Shekhter made no mention of the "Cover Letter" until his deposition on

September 22, 2015, in which he testified: "I didn't independently remember this

letter." (Srinivasan Decl., Exh. J, at 72:4-6.)  At the same time, he claims the letter

was delivered to his office in 2010 with "Version 2," and that he "carefully maintained

the original hard copies" until 2015.  (Srinivasan Decl., Exh. K, ¶¶ 13, 14; see also

Defs.' Hr. Exhs., Exh. 5.)  This too was false.

Even in opposing Defendants' Spoliation Motion, Neil Shekhter made inconsistent

and demonstrably false statements in his declaration.  (Compare Shekhter Decl. ISO

Sanctions Opp., ¶ 152 ["I did not delete any information that had anything to do with

this case."] with *id*. at ¶¶ 153, 155 ["I received a *zip file* from former AEW employee

Daniel Lennon containing Joint Venture related documents . . . . I deleted the zip file

before turning my computer over for the forensic examination"].)

Plaintiffs also misled the Court when they stated that everything had been—and

would be—preserved and produced.  (Srinivasan Decl., Exh. K, ¶ 25 ("I also

63

Exhibit 1
122

instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other file"); *id.*, Exh. M at ¶ 3 ("At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication."); Supp. Srinivasan Decl., Exh. C, at 76:16-19 ("But a litigation hold was implemented in this case at the very beginning by Mr. Shekhter. Systems were set up so that emails couldn't be deleted, files could not be deleted . . . ."); see also Defs.' Hr. Exhs., Exh. 5.) (See Pen. Code § 125 ["An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false."].)

Terminating and monetary sanctions are also appropriate here in this case, with respect to both Plaintiffs' claims and Cross-Complainant's Cross-Complaint, given Plaintiffs' massive, intentional, coordinated effort to destroy evidence, especially in light of, and in plain violation of, the specific September 8, 2015 Order of this Court directing them to preserve and not alter evidence and the October 2015 Order requiring them to produce evidence for forensic examination. (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 487-488.)

These actions of spoliation and evidence destruction justify terminating and monetary sanctions on their own, even without Plaintiffs' fabrication and perjury. <u>To be clear, if it was only these actions at issue, the Court would still impose terminating and monetary sanctions.</u>

Under California law, these actions of document destruction and manipulation in violation of this Court's Orders provide a firm basis for terminating sanctions. (*Cedars Sinai*, *supra*, 18 Cal.4th at p. 12 ["[d]estroying evidence . . . [is] surely . . . a misuse of discovery within the

64

Exhibit 1
123

meaning of section 2023" subject to terminating sanctions]; *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1518 [affirming terminating sanctions where party "fail[ed] to obey a court order to provide discovery"]; *Los Defensores, supra,* 223 Cal.App.4th at p. 391 [affirming terminating sanctions where there was "sufficient evidence that [defendants] willfully failed to comply with the [court's orders]" by willfully concealing or destroying materials]; *Electronic Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1183-1184 [affirming award of terminating sanctions on account of defendant's running data-wiping software prior to turning over computers for court-ordered inspection]; Code Civ. Proc., § 2023.010, subd. (g) [violation of court order, such as the court's preservation and production order, provides grounds for sanctions].)  Indeed, the level of document and evidence destruction here is so shocking, intentional, and pervasive that violations of prior court orders are not even required for the imposition of such sanctions—although such violations do exist here and justify terminating sanctions. (*Williams*, *supra*, 167 Cal.App.4th at pp. 1219, 1223 [affirming award of terminating sanctions without a violation of prior court order for intentional destruction of evidence].)

> Among the many actions, including those discussed above, Plaintiffs fraudulently altered and modified Neil's New Home Computer, destroying evidence in the process; lied about and have failed to produce Neil's 2012 Home Computer; intentionally deleted relevant materials provided by a witness; intentionally downloaded and installed updates that destroyed evidence; downloaded and installed data sweeping software that destroyed evidence; altered and attempted to backdate key files; failed to produce at least four key devices with critical evidence and at least 21 devices in total; by their own admission, intentionally destroyed key

Exhibit 1
124

hard drives and a backup; and deleted specific files relating to the forgeries in this case.

Plaintiffs' misconduct was knowing and intentional, in plain violation of this Court's September 8 and October 6, 2015 Orders. Intentional, willful, coordinated destruction of evidence certainly justifies terminating sanctions, especially here where many of those actions were in plain violation of the Court's Orders. (See *Williams*, *supra*, 167 Cal.App.4th at pp. 1219, 1223 [affirming the granting of terminating sanctions due to plaintiff's failure to pay fees on a storage unit, which then led to the loss of the items in that unit]; *Los Defensores, supra,* 223 Cal.App.4th at p. 391 [affirming terminating sanctions for defendants' failure to produce documents ordered by the court for production]; *Electronic Funds*, *supra*, 134 Cal.App.4th at pp. 1183-1184 [affirming award of terminating sanctions on account of defendant's destruction of evidence ordered to be produced].)

Terminating sanctions are also appropriate because the violation is "willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules." (*Doppes v. Bentley Motors, Inc*. (2009) 174 Cal.App.4th 967, 992 [citations omitted].) Plaintiffs forged at least one key document—the JVA their claims relied upon—in 2013. This was followed by additional forgeries, perjury, and the coordinated and widespread spoliation and concealment of evidence in this case. There is no way to effect compliance with civil discovery or the Court's Orders, since Plaintiffs have already destroyed countless materials relevant to this case. And there is no way to know the full extent of the damage done. Plaintiffs' actions, particularly those since the Court entered its Orders, were willful and show a history of abuse that continues to this

66

Exhibit 1
125

day, and nothing less than terminating sanctions would produce compliance with this Court's Orders.

Because of Plaintiffs' actions and the substantial showing by Defendants and Cross-Complainant, the burden was on Plaintiffs to demonstrate any alleged lack of prejudice to Defendants from Plaintiffs' actions. Plaintiffs failed to meet this burden. In *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1227, the court held that when the party moving for discovery sanctions based on the spoliation of evidence makes an initial prima facie showing that the responding party in fact destroyed evidence that had a substantial probability of damaging the moving party's ability to establish an essential element of its claims or defenses—under principles derived from Evidence Code section 500 and case law interpreting that section—the burden shifts to the spoliating party to "disprov[e] prejudice," such as by demonstrating all of the destroyed evidence remains available from another source. Here, Defendants have easily met this prima facie showing, with respect to both their defenses to Plaintiffs' claims and also Cross-Complainant's Cross-Complaint. Among many other things, Defendants have demonstrated that the very computer used by Neil Shekhter has been forever corrupted and a untold amount of evidence has been hidden or destroyed; Plaintiffs intentionally and purposefully hid or "discarded" the backup that was taken of that computer prior to the hard drive swap, as well as the hard drive that had previously been on the computer; Plaintiffs have also destroyed or intentionally withheld Neil Shekhter's 2012 Computer; Plaintiffs have destroyed or intentionally withheld the very files and drives upon which the forgeries that they attempted to perpetrate on Defendants (and the Court) were created (such as the drive containing forged "Version 2"); and files from alleged witnesses (such as Daniel Lennon) have been intentionally destroyed by Plaintiffs. These are just but

Exhibit 1
126

a few of the actions taken by Plaintiffs that have resulted in prejudice to Defendants' ability to present their defenses and evidence in support of the cross-claims. The volume of relevant materials that has been concealed, destroyed, or altered in violation of this Court's Orders undeniably prejudices Defendants' ability to defend itself and to pursue cross-claims. (See Rubin Decl., ¶¶ 61, 63, 88, 91-93; see also Plaintiffs' Evidentiary Hearing Exhibits ("Plfs.' Hr. Exhs."), Exh. 7.) This constitutes prejudice of the highest magnitude. (*Williams*, *supra,* 167 Cal.App.4th at p. 1227; see also *Cedars-Sinai, supra,* 18 Cal.4th at p. 14).

With the burden having shifted to Plaintiffs as a result of their widespread misconduct, they had to "disprov[e] prejudice." (*Williams*, *supra*, 167 Cal.App.4th at p. 1227.) This is something Plaintiffs simply have not done, and cannot do. Plaintiffs cannot dispute that there is extensive evidence—such as that on Neil's New Home Computer prior to his hard drive swap, that on the back-up used as part of that hard drive swap, the materials provided by Daniel Lennon, and the materials that exist on all of the USB and other drives that have been withheld—that Defendants will never have access to. (*Williams*, *supra*, 167 Cal.App.4th at p. 1227 [finding spoliating party failed to meet burden because he could not show that destroyed files were available from another source].)

Plaintiffs' argument that Defendants have not "proven" exactly what was destroyed or its impact on the case misses the point. Plaintiffs' coordinated, intentional, widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony Plaintiffs may intend to offer. As the court aptly stated in *Electric Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1184: "[D]efendants' actions have made it virtually impossible to determine what defendants destroyed. The mere fact that plaintiffs' forensic consultant

68

Exhibit 1
127

recovered some of the data does not mean none was lost." And the court there rejected the very argument Plaintiffs make here that the moving party was required to show more prejudice than it already had based upon the spoliating party's running data-wiping software on computers: "[D]efendants' own actions [of intentional document destruction] make that showing difficult, if not impossible." (*Ibid.*) The same is true here; yet, there is no question that Defendants and Cross-Complainant have been immensely prejudiced by Plaintiffs' actions in this case. (See also *Williams*, *supra*, 167 Cal.App.4th at p. 1227 [where the spoliating party fails to identify precisely what was destroyed, "it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action"].)

Additionally, the Court considers the fact that, despite their actions being front and center in Defendants' Motion, Plaintiffs did not call as witnesses at the Evidentiary Hearing (despite more than ample opportunity to do so) Neil Shekhter (who engaged in the outrageous actions of spoliation, perjury, and forgery presented to the Court), Adam Shekhter (who participated with Neil Shekhter in creating the forgery of "Version 2"), and Alan Shekhter (who assisted Neil Shekhter with the hard drive swap discussed above). Plaintiffs likewise failed to present testimony from Enrique Sanchez and Eddie Valentin at the Evidentiary Hearing. The absence of any live testimony from these individuals was stunning.

California Evidence Code section 413 provides that "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his

Exhibit 1
128

testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."

Here, there can be no question that Plaintiffs' failure to call these key witnesses, as well as Plaintiffs' willful destruction of evidence and document destruction, leads to the inference that Plaintiffs are guilty of the forgery, perjury, and spoliation Defendants claim.  (See *California Fair Employment and Housing Com'n v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1022 [proper to infer the missing testimony would have supported the opposing party].)  After hearing all of the evidence, the Court has no doubt this is the case.

As the Supreme Court has said, "[t]he intentional destruction of evidence is a grave affront to the cause of justice and deserves our unqualified condemnation," as it "can destroy fairness and justice,  . . . increases the risk of an erroneous decision, [and] . . . increase[s] the costs of litigation." (*Cedars-Sinai, supra,* 18 Cal.4th at pp. 4, 8.)  All of that is present here.  Terminating sanctions are necessary.

Indeed, this case involves circumstances far worse than those at issue in numerous other cases in which terminating sanctions have been issued and affirmed.

In *R.S. Creative*, an officer of R.S. Creative brought a breach of contract action against a company called Creative Cotton, and the contract attached to the complaint was alleged by the Defendant to be a forgery. (See *R.S. Creative, supra*, 75 Cal.App.4th at p. 488.)  Defendants demanded all copies, including electronic copies, be produced as well as the plaintiffs' computer. (*Id.* at p. 489.) The plaintiff agreed not to use her computer until the defendants' expert could conduct a forensic examination. (*Id.* at p. 490.) But before that

70

Exhibit 1
129

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

examination took place, the plaintiff deleted files from the hard drive or replaced the hard drive with a new one.  The plaintiff then tried to amend the complaint to rely on a new, non-forged version of the contract and brought in a new lead lawyer.  (*Id.* at p. 492.)  The court issued terminating sanctions for the misconduct and the decision was affirmed on appeal. (*Id.* at pp. 488, 496.)  The court also rejected plaintiffs' claim that terminating sanctions constituted a due process violation.  (*Id.* at p. 497.)  "On the record we have summarized, we find no due process violation.  RSC and Ms. Sebastian had ample opportunities to comply with discovery orders, but failed to do so.  Section 2023 authorizes terminating sanctions in the first instance in egregious cases such as this one."  (*Ibid.*)  *Ceglia v. Zuckerberg* (W.D.N.Y. Mar. 26, 2013) 2013 WL 1208558, involved similar facts as well—a forged document and spoliation about the forgery—and the court there also easily granted terminating sanctions.

A similar result occurred in *Williams v. Russ* (2008) 167 Cal.App.4th 1215, in much less egregious circumstances than those here.  In *Williams*, the plaintiff had demanded its client file be returned from its former attorney after filing suit against him, and then let the contract for the storage locker expire during the litigation so the files were destroyed.  (*Id.* at p. 1222).  The trial court rejected the plaintiff's excuses and speculation that the defendant had not been prejudiced, and issued terminating sanctions.  The Court of Appeal affirmed the termination sanctions that were issued by the trial court, noting, "[w]hile there is no tort cause of action for the intentional destruction of evidence after litigation has commenced, it is a misuse of the discovery process that is subject to a broad range of punishment, including . . . terminating sanctions."  (*Id.* at p. 1223 [internal citations omitted].)

Exhibit 1
130

*Electronic Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, is also instructive. There, the trial court ordered the defendants to produce computers upon which defendants conducted business that defendants claimed had been corrupted by a computer virus, warning of terminating sanctions if they failed to do so. (*Id.* at p. 1669.) Upon receiving the computers, plaintiffs' expert was able to determine that the computers produced by defendants "had their hard drives 'wiped' by 'Data Eraser' software between the time the court ordered their production and [the plaintiffs'] inspection." (*Ibid.*) In facts eerily similar to those here, the plaintiffs' expert further "surmised that data had been copied from the hard drives, the drives wiped, and selected data reinstalled." (*Ibid.*) The Court of Appeal affirmed the trial court's granting of plaintiffs' motion for terminating sanctions, striking defendants' answer, and ordering defendants' default entered, as the trial court "could have reasonably concluded a lesser sanction would not have been sufficient to compel compliance and that terminating sanctions were necessary to provide plaintiffs' with the due process to which they were equally entitled." (*Id.* at p. 1184.)

*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, is also on point. There, the Court of Appeal affirmed an order entering terminating sanctions against the defendants— striking their answers and entering default against them—for failing to produce certain documents (such as call logs) defendants had testified to during their depositions. (*Id.* at pp. 391-392.) The Court of Appeal found terminating sanctions were appropriate, as the evidence revealed "willful noncompliance" by defendants of the court's orders. (*Id.* at p. 391.) The "appellants willfully concealed or destroyed" the written documents they testified to. (*Ibid.*)

Exhibit 1
131

Finally, the decision in *Peal v. Lee* (2010) 403 Ill.App.3d 197, is instructive. "During the course of discovery, plaintiff deliberately deleted thousands of files from his personal computer, using multiple programs with names like File Shredder and Privacy Eraser Pro." (*Id.* at p. 198.) The trial court dismissed his complaint as a sanction "for the profligacy of his electronic spoliation of evidence." (*Ibid.*) The Appellate Court of Illinois, First District, Fifth Division, affirmed. "[Plaintiff] argues that because he has denied authoring the 2004 Documents, defendants cannot claim surprise that the documents sought were not found on his computer . . . the real surprise is that a litigant would have the audacity to discard his old hard drive and delete tens of thousands of electronic files with sophisticated data-wiping programs and then cry foul that his opponents should not be surprised. This sounds like the story of the children who murdered their parents and then pled for sympathy as orphans." (*Id.* at p. 205.)

The actions of Plaintiffs here were far worse than those in any of the cases cited above. Defendants have made a prima facie showing that the spoliation by Plaintiffs has impaired their ability to defend against Plaintiffs' claims and pursue Cross-Complainant's Cross-Complaint. Plaintiffs have not and cannot disprove prejudice to Defendants and Cross-Complainant. Terminating sanctions are justified.

In response to these compelling facts, Plaintiffs have asserted a series of arguments over the course of the proceedings before this Court. These arguments are not well taken.

First, Plaintiffs, citing *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, argue that a jury should decide the issues presented by Defendants' motion

73

Exhibit 1
132

because Plaintiffs claim there are disputes of fact.  This is not the law; it is a serious misreading of *New Albertsons*; and it is a misstatement of the facts found here.

The statute itself authorizes "*the court*, after notice to any affected party, person, or attorney, and after opportunity for hearing" to impose terminating sanctions.  (Code Civ. Proc., §§ 2023.030(d)(1), (2), and (4) [emphasis added].)  And each of the cases discussed by the Court above involved disputes of fact in some form; that did not prevent the court from entering terminating sanctions and from the Court of Appeal affirming. (See, e.g., *Williams*, *supra,* 167 Cal.App.4th at p. 1224 ["[w]hen the *conflicting evidence* is viewed through [the abuse of discretion] standard, it is more than sufficient to affirm the trial court's findings"] [emphasis added]; *Los Defensores*, *supra*, 223 Cal.App.4th at p. 391-392 [awarding terminating sanctions against defendants for failure to produce documents defendants claimed in sworn declarations never existed].)  In fact, in *Tucker v. Pac. Bell Mobile Services* (2010) 186 Cal.App.4th 1548, the court stated that "[i]t is the *exclusive* function of the trial court to weigh[] the evidence, resolve conflicts and determine the credibility of witnesses" when ruling on a sanctions motion.  (*Id.* at p. 1562 [emphasis added].)  This makes sense too; otherwise, as another court has stated, it "would be to permit a plaintiff who is perpetrating a fraud on the court to run roughshod over the court's integrity."  (*Ceglia*, *supra*, 2013 WL 1208558 at *11.)

The quote that Plaintiffs rely upon from *New Albertsons*, meanwhile, simply stands for the unremarkable proposition that "[r]ather than decide the facts

74

Exhibit 1

133

with respect to the intentional destruction of evidence and impose a nonmonetary sanction on a pretrial motion *in circumstances not contemplated by the discovery statutes*"—i.e., where sanctions are not authorized by the Code of Civil Procedure or under the court's inherent authority—"we believe that in most cases of purported spoliation the facts should be decided and any appropriate inference should be made by the trier of fact after a full hearing at trial." (*New Albertsons*, *supra*, 168 Cal.App.4th at p. 1431 [emphasis added].)  Of course, sanctions are authorized here by the discovery statutes and the court's inherent authority, as discussed above.  *New Albertsons*—which involved the innocent destruction of an irrelevant videotape that the moving party had waived its right to—does not hold that a jury should hear a sanctions motion simply because there are alleged "disputes of fact"; quite the contrary, the cases *New Albertsons* cites demonstrate it is for the court to decide these issues.  (*Id.* at pp. 1424-1426, 1431-1434 [citing multiple cases].)  And this is the way it must be—a jury could not be tasked with enforcing a court's discovery orders or enforcing a court's inherent authority; nor could a jury be asked to sanction counsel, for instance.

Plaintiffs also failed to identify any genuine material "disputes of fact."  As discussed above, there are no genuine disputes regarding the core material facts relating to Plaintiffs' misconduct.

Second, Plaintiffs have argued that the relief Defendants and Cross-Complainant seek through their motion would constitute an unlawful "forfeiture" or unconstitutional

Exhibit 1
134

"takings," but have not provided any support for this proposition. Plaintiffs sued Defendants in this case; one Defendant (P6 LA MF Holdings SPE, LLC) has filed a Cross-Complaint. The parties were facing off in litigation against each other. Plaintiffs then took actions that were in violation of this Court's orders, undermined the judicial process, and resulted in immense and untold prejudice to Defendants and Cross-Complainant. As a result, terminating sanctions are justified under both the Code of Civil Procedure and the Court's inherent authority (Code Civ. Proc. §§ 2023.030; *Stephen Slesinger, supra*, 155 Cal.App.4th at p. 740), and this includes the authority—specifically identified in the Code of Civil Procedure—for the Court to strike Cross-Defendant's answer to the Cross-Complaint and enter judgment against Cross-Defendant as to the Cross-Complaint. (Code Civ. Proc. §§ 2023.030(d)(1), (2), and (4).) That the consequences of this may ultimately end up being high for Plaintiffs does not affect whether the relief should be granted; rather, it simply shows the risk that Plaintiffs knowingly undertook when they intentionally violated the Court's Orders and destroyed evidence relevant to this dispute. Indeed, courts in circumstances far less egregious than this have stricken parties' pleadings and entered default judgment against them. (See, e.g., *Los Defensores, supra,* 223 Cal.App.4th at p. 391; *Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1184.) There is no reason that the result should be any different here. Moreover, Plaintiffs ignore the fact that the default on its own is authorized by the Code; the *remedy* to which Cross-Complainant will actually be entitled on the Cross-Complaint will be set pursuant to a separate prove-up hearing. Those remedies are nothing more than one party to a contract obtaining default judgment

Exhibit 1
135

on its contractual claims pursuant to specific contractual provisions, and enforcing its contractual rights. (See Oct. 28, 2016 Hr. Tr., at 167:15-21.)

Nor is the case that Plaintiffs cited to during argument for their "forfeiture" point, *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300, at all applicable here. There, the court issued terminating sanctions against defendant on account of the defendant's alleged failure to fully answer *an interrogatory*, which the court found was an issue that could be remedied by taking the facts requested in the interrogatory as conceded. (*Id.* at pp. 303, 305.) There was simply no need for any default in this case after the evidentiary sanction had been imposed. This case is very different.

Third, Plaintiffs claim that an order granting terminating sanctions would violate their due process rights. This argument repackages Plaintiffs' "takings" and "forfeiture" arguments and fails for the same reasons. Additionally, the Court of Appeal has rejected this very argument from a spoliating party in facts less egregious than those here. (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 497.) Indeed, as the *Electronic Funds* court pointed out, it is Defendants—if anyone—who have had their due process rights violated here as a result of Plaintiffs' misconduct. (*Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1184 ["terminating sanctions were necessary to provide [the moving party] with the due process to which they were equally entitled"].)

Similarly, Plaintiffs' claim that their due process rights were violated by their failure to take the deposition of Defendants' experts is not persuasive. Plaintiffs had no such right, and Plaintiffs' cross-examination of these very

same experts over many hours at the Evidentiary Hearing moots their argument in any event.

The Court similarly rejects Plaintiffs' other "due process" argument that their later-filed motions should have been decided before the instant Motion, which Defendants filed before Plaintiffs' motions. (Plaintiffs' Objection to Terminating Sanctions; and Legal Brief For October 13 Evidentiary Hearing ("NMS Objections"), at pp. 5, 7, 23-24.) These motions which seek sanctions against Defendants for filing the instant now-granted Motion, and disqualification of Gibson Dunn, have no bearing on the instant Motion and Plaintiffs' own misconduct.

Fourth, Plaintiffs have advanced a series of merits-related arguments as to what they claim are the rights and obligations under the parties' JVA, as well as to the merits of the Cross-Complaint, including whether Defendants have a right to sell the Joint Venture properties, the status of NMS as the Operating Member of the Joint Venture, and the status of NMS' affiliate as the Property Manager of the Joint Venture Properties. (NMS Objections, at pp. 3, 4, 15-19, 21-22.) Though virtually every aspect of these arguments is incorrect, belied by the evidence, and constitute arguments that the Court has already rejected in its demurrer rulings, none of it is relevant to the instant Motion, which is concerned solely with whether Plaintiffs' substantial misconduct warrants terminating sanctions. Plaintiffs actually admit this point, conceding in their Objection that "[n]one of these issues have [sic] anything to do with spoliation of evidence or alleged forgeries." (*Id.* at p. 18.) If anything, Plaintiffs' merits-related arguments confirm that virtually every key issue in this case

78

Exhibit 1
137

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

centers on the JVA, which is the focus of Plaintiffs' discovery misconduct, only further demonstrating that terminating sanctions should be issued.

Plaintiffs' claim that terminating sanctions would also somehow result in a "windfall" to Defendants is inapt. Any remedies Cross-Complainant receives from the Cross-Complaint will be determined during a prove-up hearing, and at any rate the Court of Appeal has rejected similar "windfall" arguments by parties engaged in intentional spoliation: "Defendants argue plaintiffs were required to show prejudice from the deletion of data. Otherwise, they contend, terminating sanctions bestow a windfall to plaintiffs. But defendants' own actions make that showing difficult, if not impossible." (*Electronic Funds, supra,* 134 Cal.App.4th at p. 1184 [], citation omitted.)

Plaintiffs' similar claim that sanctions should not be issued because the Court dismissed their claims on demurrer based upon the forged "Version 2" fails to recognize the gravity of their misconduct. Plaintiffs, like the plaintiff in *R.S. Creative*, brought this case based upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries (which related to Plaintiffs' original claims and Cross-Complainant's Cross-Complaint claims). It does not remedy the situation that Plaintiffs' claims based upon the forgery have been dismissed; rather, their widespread misconduct infects the entirety of these proceedings.

Exhibit 1
138

Monetary sanctions in the form of attorney's fees, expert fees, and costs against both Plaintiffs are appropriate here.

> Monetary sanctions are mandatory where the responding party has no justification as to why imposition of the sanction would be unjust. (Code Civ. Proc., § 2023.030, subd. (a) ["If a monetary sanction is authorized by any provision of this title, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust"].) Plaintiffs cannot demonstrate that sanctions for extensive spoliation of evidence, fabrication of key evidence, and perjury about the same would be unjust.

> Plaintiffs fabricated evidence, submitted perjury about the same, and destroyed evidence, while simultaneously representing to the Court that they were proffering authentic documents and that they had preserved evidence.  In light of these facts, fees and costs should—and indeed must—be awarded against Plaintiffs.  (*Cedars-Sinai*, *supra*, 18 Cal.4th at p. 12 [recognizing that spoliating party may be forced to incur "monetary sanctions"]; *Kravitz v. Superior Court*  (2001) 91 Cal.App.4th 1015, 1016 ["Under the Civil Discovery Act of 1986, the trial court must impose monetary sanctions against anyone engaging in conduct that is a misuse of the discovery process, and must order the abuser to pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct."].)

Plaintiffs' Motion to Strike

Exhibit 1
139

*Plaintiffs' MTS Was Filed in Violation of Section 1005, This Court's Local Rules, and This Court's Order*

Plaintiffs' Motion to Strike ("MTS") is untimely. Plaintiffs filed their MTS on February 23, 2016, serving it by overnight delivery and listing a hearing date of March 7, 2016 on the face page of their memorandum. Section 1005 of the Code of Civil Procedure requires that a moving party serve and file its moving and supporting papers "at least 16 court days before the hearing." (Code Civ. Proc., § 1005, subd. (b).) This notice period is extended by two calendar days where, as here, a party serves notice "by facsimile transmission, express mail, or another method of delivery providing for overnight delivery." (*Ibid.*) The statutory deadline for Plaintiffs' MTS fell on February 10, 2016 for service by personal delivery, or February 8, 2016 for service by overnight delivery. Thus, Plaintiffs' filing came fifteen days after the statutory deadline.

Plaintiffs also failed to properly reserve a hearing date for their MTS (see Dept. 71 Rules, at p. 2), and instead misappropriated the hearing date of March 7, 2016 *after* this Court had denied their *ex parte* application to advance the hearing date on the MTS. (See Order Denying Plaintiffs' *Ex Parte* Application, Feb. 8, 2016.)

> The Reservation ID Number on the face page of Plaintiffs' MTS corresponds to a March 16, 2016 hearing date for a discovery motion, not to a March 7, 2016 hearing on a motion to strike. Plaintiffs' filing would be untimely even for the March 16, 2016 hearing date, however, because Plaintiffs served the MTS by overnight delivery. (See Code Civ. Proc., § 1005.)

Because Plaintiffs' MTS is untimely and filed in violation of Section 1005, the local rules, and this Court's Order, Plaintiffs' MTS is denied.

*Plaintiffs Failed to File a Noticed Motion*

Plaintiffs failed to include a notice of motion with their MTS specifying the nature of the order sought, the grounds upon which the motion would be made and the papers upon which it was to be based, as required under Section 1010 of the Code of Civil Procedure and Rules 3.1110(a) and 3.1112(a) of the California Rules of Court. "A court cannot grant different relief, or relief on different grounds, than stated in the notice of motion." (Weil & Brown, Cal. Practice Guide: Civ. Proc. Before Trial (The Rutter Group 2015) ¶ 9:38, citing *People v. Am. Sur. Ins. Co.* (1999) 75 Cal.App.4th 719, 726; *Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1124.) Defects in the Notice of Motion, to say nothing of a party's failure altogether to supply a Notice of Motion, are grounds for denying the motion. (*Galleria Plus, Inc. v. Hanmi Bank* (2009) 179 Cal.App.4th 535, 536-537 [reversing order granting sanctions for frivolous filing based on violation of Section 1010 of the Code of Civil Procedure].) Accordingly, Plaintiffs' MTS is denied for failure to include a proper notice of motion.

*There is No Legal Basis for Plaintiffs' MTS*

Plaintiffs identify no law authorizing Plaintiffs' motion to strike an opposing party's motion and have proceeded under the wrong statutes. Section 436 permits a party to file a motion to strike any "pleading." (Code Civ. Proc., § 436 [permitting a motion to "[s]trike out all or any part of any pleading"].) The statute specifically defines the term "pleading" to mean "a demurrer, answer, complaint, or cross-complaint." (Code Civ. Proc., § 435,

Exhibit 1
141

subd. (a)(2).)  Because Defendants' Spoliation Motion is not a "pleading," Plaintiffs may not bring a statutory motion to strike the Spoliation Motion.  (Code Civ. Proc., §§ 435, 436.)

> Plaintiffs have failed to comply with the procedural requirements governing motions to strike pleadings.  Section 436 of the Code of Civil Procedure permits the Court to strike a pleading "upon a motion made pursuant to Section 435, or at any time in its discretion."  (Code Civ. Proc., § 436.)  However, Section 435, in turn, requires a party bringing a motion to strike to "serve and file a notice of motion," to serve and file the motion "within the time allowed to respond to a pleading," and to "specify a hearing date set in accordance with Section 1005."  (Code Civ. Proc., § 435, subds. (b)(1) & (2).)  Plaintiffs have failed to fulfill any of these requirements, therefore their MTS must be denied.

Neither the Court's inherent authority, nor the statutory grant of discretion in Section 436, permits Plaintiffs to circumvent the procedural requirements for motions to strike, set forth in Sections 435 and 436 of the Code of Civil Procedure.  (See *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096 [court's inherent authority to reconsider its orders did not excuse a party from complying with Code of Civil Procedure sections 437 and 1008].)  Accepting Plaintiffs' contrary argument would entirely obviate the procedural requirements attaching to motions to strike.  (See *Clements v. T.R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 ["every word, phrase and provision employed in a statute is intended to have meaning and to perform a useful function and it is not to be supposed that the Legislature used language in a sense which would . . . render nugatory an important provision . . . ."].)

Exhibit 1
142

*Defendants Fully Complied with the Court's October 6, 2015 Order*

Defendants did not violate the provisions in this Court's October 6, 2015 Order requiring

the Forensic Experts to submit Forensics Reports to the parties and the Court.

Defendants' submission of expert declarations in support of the Spoliation Motion,

filed January 29, 2016, did not violate the October 6, 2015 Order.  The October 6,

2015 Order requires the Forensic Experts to submit a Forensic Report to the

parties and the Court "[w]ithin twenty-one days of the completion of the forensics

investigation." (Srinivasan Decl., Exh. Z, at 3:12.)  Nothing in the October 6 Order

prevented the Forensic Experts from submitting declarations prior to the

expiration of the twenty-one day period following conclusion of the forensic

investigation.

Plaintiffs' proffered interpretation of the October 6, 2015 Order—that it

"required the experts to complete their examination, prepare a Report and

provide it to the Court and both parties" and only then permitted

Defendants to "go to the Court and make [their] 'forgery' argument" (MTS

3:19-23)—is not supported by the language of the Order and is incorrect.

As Plaintiffs concede (MTS 4:8-9), the declarations submitted in support of the

Spoliation Motion were substantively identical and equivalent to expert reports.

As required by the October 6, 2015 Order, the declarations "provide[d] [a]

summary of its findings concerning 'Version 2,' Exhibit 41, and any Property

Management Agreements" (Srinivasan Decl., Exh. Z,, at 3:15-16), as well as the

Forensic Experts' findings regarding spoliation of evidence.  There is no claim by

Plaintiffs or any evidence showing that these reports were not timely filed. Accordingly, the submission of declarations fully complied with the October 6, 2015 Order.

Plaintiffs' assertions of misconduct by AEW and Gibson Dunn, and intimations of bias by the Forensic Experts, are not supported by citations to accompanying declarations or affidavits and, therefore, are not properly before the Court.  (See MTS 3-23-4:1.)

Further, Plaintiffs' assertions of misconduct are contradicted by the evidence. This Court specifically approved the Forensic Experts, by name, in the October 6, 2015 Order.  Plaintiffs did not oppose the experts' qualifications.  Plaintiffs have not presented any evidence to call into question the Forensic Experts' independence, objectivity, or expertise.  On the contrary, the Forensic Experts conducted fully independent and objective investigations and properly reported the results of their investigation to the parties and the Court.

Defendants did not breach the confidentiality provisions of the October 6, 2015 Order.

Nothing in the October 6 Order prohibits disclosure of the outcome of the forensic examination to the parties, their counsel, and the Court, together with the documents and exhibits on which the Forensic Experts' conclusions were based. That is all that was disclosed here. The Forensic Experts (Stroz Friedberg) conducted an independent investigation and then provided their conclusions to Defendants and Defendants' counsel, together with the supporting documentation, on the eve of filing the same with the Court and serving the same

Exhibit 1
144

on Plaintiffs.  This approach fully complied with the confidentiality requirements of the October 6, 2015 Order.

Plaintiffs provide no evidence that confidential information was disclosed in violation of the Court's October 6, 2015 Order.  (See Frid Decl., ¶¶ 79-86.)

> Statements by Defendants' counsel to the effect Defendants intended to file a motion for sanctions based on forgery and spoliation do not establish that any confidential information was disclosed in violation of the October 6, 2015 Order.  (See Frid Decl., ¶¶ 80-82.)

> Similarly, the statement by Defendants' counsel that "a shocking level of spoliation and/or concealment of critical evidence" had occurred does not establish that any confidential information had been disclosed.  (Frid Decl., ¶ 84.)

Several of Plaintiffs' examples of supposedly improper disclosures in fact involve wrongdoing by Plaintiffs.

> As purported examples of the supposed improper disclosure of their confidential information, Plaintiffs point to Defendants' discoveries that:  (i) Plaintiffs had withheld a device named "ADAM-S-PC" from production (Frid Decl., ¶ 83); (ii) Plaintiff Neil Shekhter had upgraded his operating system, resulting in data loss (id., ¶ 85); and (iii) Plaintiffs had concealed an email server from disclosure (id., ¶ 86).

Exhibit 1
145

However, these examples offer instances in which the Forensic Experts properly disclosed omissions from the production of materials required by the October 6, 2015 Order.

Each of these examples admits a clear violation of the October 6 Order by Plaintiffs.  That Order required Plaintiffs to produce "all of Plaintiffs' and Plaintiffs' affiliates' computers and other devices that could have ever sent, received, modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including 'Version 2'), Exhibit 41, and all Property Management Agreements (including the Luxe La Cienega PMA), as well as Mr. Shekhter's home and office computers (the 'Devices')."  (See Srinivasan Decl., Exh. Z, at 2:14-17.)  As Plaintiffs admit, Plaintiffs violated this provision by failing to disclose critical devices.

Defendants provided appropriate notice of all forensic testing.

Defendants' expert, Gerald LaPorte, properly conducted all forensic testing of the documents subject to the October 6, 2015 Order in the presence of Plaintiffs' witness, Valery Aginsky, after providing notice compliant with the October 6, 2015 Order.

Mr. LaPorte's non-invasive examination and observation of documents outside of the presence of Plaintiffs' expert witness did not violate the October 6, 2015 Order

Exhibit 1
146

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

and did not threaten the integrity of the examination and analysis LaPorte performed.

Defendants' expert did not disclose privileged communications.

The attorney-client privilege does not attach to non-privileged materials simply because the materials are transmitted to an attorney. (*San Francisco Unified Sch. Dist. v. Sup. Ct. for the City and Cnty. of S.F.* (1961) 55 Cal.2d 451, 457 ["We hold that the forwarding to counsel of non-privileged records, in the guise of reports, will not create a privilege with respect to such records and their contents where none existed theretofore."].)

In paragraph 48.b of his Declaration, Defendants' expert Samuel Rubin disclosed that Plaintiff Neil Shekhter transmitted two attachments in an email and briefly described the attachments, as well as the date and time the email was sent.

Mr. Rubin did not disclose any information regarding the content of the email itself, nor the identity of the recipient.

No privilege attached to the email attachments described in paragraph 48.b of Rubin's Declaration. (*San Francisco Unified Sch. Dist. v. Sup. Ct. for the City and Cnty. of S.F.* (1961) 55 Cal.2d 451, 457.) Accordingly, the description of those attachments did not disclose privileged information in violation of the October 6, 2015 Order.

Mr. Rubin's disclosure of the date and time the attachments were sent, and the name of the sender, did not disclose privileged information in violation

88

Exhibit 1
147

of the October 6, 2015 Order. To the contrary, this is exactly the type of information required for a privilege log. (See *Catalina Island Yacht Club v. Sup. Ct.* (2015) 242 Cal.App.4th 1116, 1129-1130 ["[A] privilege log typically should provide the identity and capacity of all individuals who authored, sent, or received each allegedly privileged document, the document's date, a brief description of the document and its contents or subject matter sufficient to determine whether the privilege applies, and the precise privilege or protection asserted."].)

> To the extent that either the attachments or the information regarding the sender, date and time of the email were privileged, any such privilege was lost pursuant to the crime/fraud exception. (*State Farm Fire & Cas. Co. v. Sup. Ct.* (1997) 54 Cal.App.4th 625, 648-649.)

In their MTS, Plaintiffs disclose that the email described in Paragraph 48.b of Rubin's declaration was transmitted by Shekhter to his litigation counsel. (MTS 5:23-6:4.) When non-privileged materials are transmitted to an attorney, the fact of their transmission may be privileged. (See *Mitchell v. Sup. Ct.* (1984) 37 Cal.3d 591, 600.) However, Plaintiffs waived any such privilege by voluntarily disclosing that the non-privileged attachments were forwarded to their litigation counsel. (See Evid. Code, § 912.)

> Although the content of the email attaching the documents described in paragraph 48.b of Mr. Rubin's declaration was not disclosed to

Exhibit 1
148

Defendants, and is not at issue in any of the pending motions, any privilege

over the content of the underlying email has been lost pursuant to the

crime-fraud exception to the attorney-client privilege. (*State Farm Fire & Cas. Co.*, *supra*, 54 Cal.App.4th at pp. 648-649.)

Plaintiffs' Motion *in Limine*

One week before the Court began the Evidentiary Hearing in this case, Plaintiffs filed a Motion *in Limine* to Exclude Samuel S. Rubin and Gerald M. LaPorte From Testifying At The October 13, 2016 Hearing, Or, Alternatively, Continuing The Hearing TO Permit Plaintiffs To Conduct Discovery. The Motion *in Limine* is denied.

First, motions *in limine* are made "for the purpose of precluding the mention or display of inadmissible and prejudicial matter *in the presence of the jury*." (Cal. R. Ct. 3.57 [emphasis added].) Plaintiffs' motion was not directed at a trial, let alone at evidence presented to a jury, since Messrs. LaPorte and Rubin testified before the Court with no jury present during an Evidentiary Hearing.

The Motion *in Limine* is further denied because Plaintiffs have no right to obtain deposition testimony from Messrs. Rubin and LaPorte. Neither of these witnesses have been designated as an expert witness subject to deposition notice pursuant to the Code of Civil Procedure. (Code Civ. Proc. § 2034.010 *et seq.*) The Court previously quashed Plaintiffs' subpoena on Mr. Rubin and his firm Stroz Friedberg in September 2016 on this very basis, finding that the prior subpoena was "an improper attempt to obtain premature expert discovery" and sanctioning Plaintiffs $5,000. Plaintiffs cite no authority supporting their right to issue deposition notices to witnesses not yet designated by the parties.

Exhibit 1
149

(Declaration of Michael Lee In Support of Opposition to Plaintiffs' Motion *in Limine*, Ex. G.)

Furthermore, Plaintiffs have not demonstrated any prejudice in allowing Messrs. Rubin and LaPorte to testify.  Plaintiffs submitted four rebuttal expert witness declarations in opposition to Messrs. Rubin and LaPorte, and had the opportunity to cross examine both at the Evidentiary Hearing.

The Court ordered live testimony of the parties' witnesses for the purpose of judging credibility.  Plaintiffs' Motion *in Limine* provides no authority for excluding the very evidence the Court ordered produced.

Jurisdiction

The Court retains jurisdiction over affirmative claims in this action and has authority to dismiss Plaintiffs' Third Amended Complaint on additional grounds beyond the grounds outlined in the Court's June 7, 2016 Order sustaining Defendants' demurrer to the Third Amended Complaint without leave to amend.  No judgment has been entered in this action, and Plaintiffs' "appeal" of the June 7, 2016 Order is an improper attempt to divest this Court of jurisdiction, given that the instant Motion was pending and the Court was considering the extent of additional misconduct Plaintiffs committed and additional sanctions to be imposed.  (See *Griset v. Fair Political Practices Comm'n* (2001) 25 Cal.4th 688, 697; *Horton v. Jones* (1972) 26 Cal.App.3d 952, 957-959; see also *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396.)

Because the Court retains jurisdiction to hear the instant Motion, the Court has the
authority to enter and will enter a second ground for dismissal of Plaintiffs' Third
Amended Complaint by granting Defendants' Motion and issuing terminating sanctions
against Plaintiffs.

The Court finds that Cross-Complainant's Cross-Complaint sets forth a basis for breach
of the JVA relating to the property management agreements pursuant to the JVA.  As a
result, even if there are pending claims in the *P6* Action in Department 56 before the
Hon. Michael Johnson, any claim related to the property management agreements are
still at issue in the Cross-Complaint in this action.  The Court rejects Plaintiffs' argument
that Department 56 in the *P6* Action has exclusive jurisdiction over claims relating to the
property management agreements.

The Court rejects Plaintiffs' argument that Department 56's denial of a motion for
terminating and other sanctions in the *P6* Action is binding on this Court.  That motion
was decided on a different record and, as stated in the Notice of Ruling, was denied
*without prejudice* and in deference to this Court's ultimate ruling on this Motion.
(Defendants' Objection and Response to Plaintiffs' "Hearing Setting Conference Brief,"
Filed Sept. 13, 2016, Exh. B [July 5, 2016 Hr. Tr. (*P6* Action)], at 13:6-19; Plaintiffs'
Hearing Setting Conference Brief, Filed Sept. 9, 2016, Exh. A [". . . the Court said that
either party could come back to this Court in the event the Honorable Suzanne G.
Bruguera issued an order on the sanctions motion pending in the *Lincoln Studios, LLC,
et al. v. DLA, et al.* matter."].)

Relief

Exhibit 1
151

Plaintiffs' Third Amended Complaint is hereby **DISMISSED with prejudice** in its entirety for the reasons set forth above (and in the attached July 29, 2016 Order), which are independent of and in addition to the grounds for dismissal with prejudice set forth in the Court's April 5, 2016 Ruling sustaining Defendants' demurrers to the Third Amended Complaint without leave to amend and the Court's June 7, 2016 Order Sustaining Defendants' Demurrers to Plaintiffs' Third Amended Complaint Without Leave to Amend;

Cross-Defendant NMS Capital Partners I, LLC's Answer to Cross-Complainant P6 LA MF Holdings SPE, LLC's Cross-Complaint is hereby **STRICKEN**;

The Cross-Complaint contains claims for breach of contract, declaratory relief, and injunctive relief. A default is hereby entered in Cross-Complainant P6 LA MF Holdings SPE, LLC's favor on all claims in the Cross-Complaint.

A prove-up hearing regarding all of the specific relief to which Cross-Complainant is entitled is scheduled for December 1, 2016 at 10:30 a.m. in Department 71. Cross-Complainant is ordered to submit the necessary documentation establishing that it is entitled to the relief it seeks in the Cross-Complaint except for unspecified monetary damages, as well as all other authorized relief. In light of the default, no further showing of liability is required. (See Code Civ. Proc., § 585, subd. (b).) Cross-Defendant, having been defaulted, does not have a right to participate in the prove-up hearing. (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 385 ["The entry of a default terminates a defendant's rights to take any further affirmative steps in the litigation until either its default is set aside or a default judgment is entered"].) Following this prove-up hearing, a default judgment will be entered on all relief the Court finds the Cross-Complainant is entitled to.

Exhibit 1
152

All Plaintiffs shall be jointly and severally liable for monetary sanctions to include all attorney's fees, expert fees, court reporter fees, and costs incurred by Defendants and Cross-Complainant on and after September 8, 2015, the date of this Court's freeze Order, including but not limited to fees and costs incurred in briefing and discovery related to the spoliation and forgery of evidence.  (See Code Civ. Proc., § 2023.030(a) [authorizing "monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct"].)

With respect to the Cross-Complainant, the specific amount of attorney's fees, expert fees, and related costs, along with any memoranda or other supporting materials, shall be submitted by Cross-Complainant in advance of the prove-up hearing as part of the documentation supporting Cross-Complainant's request for entry of default judgment.

With respect to all Defendants, the specific amount of attorney's fees, expert fees, and related costs shall be identified and submitted in the context of a post-judgment motion such as one brought under California Code of Civil Procedure section 1032, *et seq.*

**IT IS SO ORDERED.**

Dated:  Nov. 22, 2016

SUZANNE G. BRUGUERA

HONORABLE SUZANNE G. BRUGUERA
JUDGE OF THE SUPERIOR COURT OF
CALIFORNIA

Exhibit 1
153

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

SGB/jjs
Lincoln Studios v. DLA
Order Granting Defendants'
And Cross-Complaint's
Motion for Terminating
and Other Sanctions.
11-21-16

21
22
23
24
25
26
27
28

Exhibit 1
154

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

EXHIBIT A

Exhibit 1
155



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

**DEPARTMENT 71**

RULING ON SUBMITTED MATTER

| LINCOLN STUDIOS, LLC, et al., | Case No.: BC551551 |
|---|---|
| | (Related to Case No.: BC550227) |
| vs. | |
| DLA, et al. | |

**Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC's and Cross-Complainant P6 LA MF Holdings SPE, LLC's motion for sanctions is granted as follows:**

Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC (collectively "Defendants") and Cross-Complainant P6 LA MF Holdings SPE, LLC ("Cross-Complainant") move for an order imposing sanctions, including the following: (1) dismissing Plaintiffs Lincoln Studios, LLC, Neil Shekhter, individually and as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), Margot Shekhter, individually and as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC, NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC's (collectively "Plaintiffs") third amended complaint with prejudice and entering judgment as to Plaintiffs' claims in Defendants' favor; (2) striking the answer of Cross-Defendant NMS Capital Partners I, LLC as to the cross-complaint of P6 LA MF Holdings SPE, LLC, and entering judgment in favor of Cross-Complainant; and (3) issuing monetary sanctions against Plaintiffs and their counsel of record for all attorneys' fees, expert fees, and costs incurred by Defendants in this matter. (Notice of Motion, pgs. 1-2).

Exhibit 1
156

The Court may, after notice to any affected party, person, or attorney, and after opportunity for hearing, impose monetary, issue, evidentiary, and/or terminating sanctions against anyone engaging in conduct that is a misuse of the discovery process. See C.C.P. §2023.030(a)-(d). Misuses of the discovery process include failing to respond or submit to an authorized method of discovery and disobeying a court order to provide discovery. C.C.P. §2023.010(d) and (g).

The Court has inherent power to impose a terminating sanction when a party's "deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial." *Slesinger, Inc. v. The Walt Disney Company* (2007) 155 Cal.App.4th 736, 740.

On September 8, 2015, the Court issued the following orders:

(1) *Plaintiffs are required to immediately take steps to freeze all of their electronic documents so they cannot be modified or deleted until further order of the Court on Defendants' request for a forensic examination;*
(2) All original agreements and original copies of agreements will be placed in escrow with a neutral third party document vendor awaiting a ruling by the Court on Defendants' request for a forensic examination.

Court's 9/8/15 Order (Emphasis Added).

On October 6, 2015, the Court issued an order granting Defendants' motion for forensic examination. See Court's 10/6/15 Order. The Court ordered Plaintiffs to produce the following for testing by October 16, 2015:

(1) the original hard copy, and all copies made, of any Joint Venture Agreement in their or their affiliates' custody or control, including what Plaintiffs refer to as "Version 2;"
(2) the original hard copy, and all copies made, of the September 14, 2010 letter marked as Exhibit 41 in the deposition of Eric Samek ("Exhibit 41");
(3) the boxes used, including the original contents thereof, to store "Version 2" and Exhibit 41;
(4) ten additional pages of other hard copy documents stored in similar conditions in the same location as where Exhibit 41 and Version 2 were allegedly discovered;

2

Exhibit 1
157

(5) the original hard copy, and all copies made, of any Property Management Agreement in their or their affiliates' custody or control, including the Luxe La Cienega Property Management Agreement;

(6) all electronic (native) files of Exhibit 41;

(7) all electronic (native) files of any Joint Venture Agreement in their or their affiliates' custody and control, including what Plaintiffs' refer to as "Version 2;"

(8) all electronic (native) files of any Property Management Agreement in their or their affiliates' custody and control, including the Luxe La Cienega Property Management Agreement; and

(9) a list of all of Plaintiffs' and their affiliates' computers and other devices that could have ever sent, received, modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including "Version 2"), Exhibit 41, and all Property Management Agreements (including the Luxe La Cienega PMA), as well as, *Mr. Shekhter's home and office computers (the "Devices")*.

Court's 10/6/15 Order (Emphasis Added). The Court also ordered that, no earlier that October 21, 2015 and no later than October 28, 2015, Plaintiffs shall provide access so Samuel Rubin and Stroz Friedberg (the "Forensic Experts") could create separate "mirror images" of the relevant Devices and independently conduct the forensic examinations. Court's 10/6/15 Order.

Plaintiffs' own evidence and/or undisputed facts establish violations of the Court's 9/8/15 and 10/6/15 discovery orders. Plaintiff Neil Shekhter ("Shekhter") admits he, *before the scheduled forensic examination*, backed-up the hard drive of and all files on his personal computer to an external drive, took his personal computer to have the hard drive replaced, and did not transfer all of the files back from the old hard drive onto the new computer so Defendants' experts would not be able to recover certain deleted files. (Declaration of Shekhter ¶¶147-152)(Declaration of Alan Shekhter ¶¶4-6). Shekhter declared the information on the hard drive was not deleted or altered and the files containing personal information – private pictures of his wife – are the only files that do not exist on the new hard drive. (Declaration of Shekhter ¶¶147-152). By his own admission, Shekhter violated the Court's discovery orders by failing to produce his personal computer for examination, deleting files from his personal computer, changing the hard drive of his personal computer, and/or failing to transfer all of the files to the new hard drive, *all with the admitted intention of preventing the forensic expert(s)*

3

Exhibit 1
158

*from discovering deleted files*. (Declaration of Shekhter ¶¶147-152)(Declaration of Alan Shekhter ¶¶4-6). Shekhter also violated the Court's discovery order(s) by failing to produce the external (Seagate) drive and other USB drives for examination. (Declaration of Rubin ¶¶69-71).

Shekhter also admits he deleted a zip file sent to him by a former AEW employee, Daniel Lennon ("Lennon"), containing Joint Venture related documents *before turning his computer over for forensic examination*. (Declaration of Shekhter ¶¶153-155). Shekhter declared he received the zip file from Lennon on November 24, 2015. (Declaration of Shekhter ¶153). Shekhter declared the zip file contained documents from Lennon's files that Shekhter requested, including Joint Venture related documents. (Declaration of Shekhter ¶¶153-154). Shekhter declared he was "worried AEW would learn that Mr. Lennon was helping [him] and try to do something to him," the files Mr. Lennon sent were not responsive under the Court's order, and he deleted the zip file before turning his computer over for the forensic examination. (Declaration of Shekhter ¶155). Shekhter's act of intentionally deleting the zip file, which contained documents specifically requested by Shekhter, including Joint Venture related documents, constitutes a violation of the Court's discovery order(s).

Enrique Sanchez ("Sanchez"), the IT Administrator for NMS Properties, Inc. ("NMS"), admits he conducted internet searches on the topics of file deletion and recovery *after* he was informed, on or about December 3, 2015, Mr. Rubin and his team from Stroz Friedberg would be coming to the NMS offices the following day to forensically image NMS's network and certain devices. (Declaration of Sanchez ¶¶20-26). Sanchez admits he removed Adobe Acrobat 9.0 from the computer assigned the host name "ADAM-S-PC." (Declaration of Sanchez ¶¶33-38). Sanchez also admits he, on December 3, 2015, at the instruction of Brian Bowis (then Vice President of Finance at NMS) downloaded a program called "EraserPortable" and used it to delete a folder on Bowis's computer desktop that he advised Sanchez contained his private personal information. (Declaration of Sanchez ¶¶39-45). Sanchez's act of deleting the folder constitutes a violation of the Court's discovery order(s).[1]

This Order hereby sets forth the purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED. These violations are on a grand scale and the motion for sanctions is granted. The Court will conduct a

---

[1] Bowis declared that, to the best of his knowledge, he did not delete any files relating to the NMS-AEW Joint Venture. (Declaration of Bowis ¶5). However, the declaration is not exactly a representation that such files were not, in fact, deleted.

Exhibit 1
159

hearing to determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed.

A hearing setting conference is set for September 14, 2016, at 11:00 a.m., in Department 71.

Dated: July 29, 2016

Hon. Suzanne G. Bruguera
Judge of the Superior Court

Exhibit 1
160