# EXHIBIT 2

1  GIBSON, DUNN & CRUTCHER LLP
    JAMES P. FOGELMAN, SBN 161584
2      jfogelman@gibsondunn.com
    JAY P. SRINIVASAN, SBN 181471
3      jsrinivasan@gibsondunn.com
    RACHEL N. PERAHIA, SBN 266877
4      rperahia@gibsondunn.com
    MARYSA LIN, SBN 295429
5      mdlin@gibsondunn.com
    333 South Grand Avenue
6  Los Angeles, CA  90071-3197
    Telephone: 213.229.7000
7  Facsimile:  213.229.7520

8  Attorneys for Defendants Eric Samek;
    Marc Davidson; P6 LA MF Holdings SPE, LLC;
9  AEW Capital Management, L.P.;
    AEW Partners VI, L.P.; AEW Partners VI, Inc.;
10  AEW VI, L.P.; P6 LA MF Holdings I LLC

11  Attorneys for Cross-Complainant
    P6 LA MF Holdings SPE, LLC

**CONFORMED COPY**
ORIGINAL FILED
Superior Court of California
County of Los Angeles

DEC 0 1 2016

Sherri R. Carter, Executive Officer/Clerk
By: R. Inostroza, Deputy

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                  FOR THE COUNTY OF LOS ANGELES    RECEIVED DEC 0 1 2016

| | |
|---|---|
| 15  Lincoln Studios, LLC, et al., | CASE NO. BC551551 |
| | [Related Case *Nebraska Studios, LLC v.* |
| 16          Plaintiffs, | *Chernove, et al.*, Case No. BC550227] |
| | |
| 17     v. | [~~PROPOSED~~] **FINAL JUDGMENT** |
| | |
| 18  DLA, et al., | Assigned to Hon. Suzanne G. Bruguera |
| | Department 71 |
| 19          Defendants. | |
| | |
| 20  P6 LA MF HOLDINGS SPE, LLC, | Complaint Filed:        July 15, 2014 |
| | Cross-Complaint Filed:  November 6, 2015 |
| 21          Cross-Complainant, | Trial Date:             None |
| | Hearing Date:           December 1, 2016 |
| 22     v. | |
| 23  NMS CAPITAL PARTNERS I, LLC | |
| 24          Cross-Defendant. | |

26

27

28

Gibson, Dunn &
Crutcher LLP

Exhibit 2
161

[~~PROPOSED~~] FINAL JUDGMENT

On December 2, 2015, the Demurrers of Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC (the "Entity Defendants") to Plaintiffs' Second Amended Complaint came on for hearing before the Honorable Suzanne G. Bruguera in Department 71 of the Superior Court for the State of California, 111 North Hill Street, Los Angeles, CA 90012. The Court, after considering the Demurrers, all supporting and opposing papers, and oral argument by counsel, sustained the Demurrers without leave to amend as to the Entity Defendants for all of the reasons set forth in the Court's Order of December 2, 2015, which is attached hereto as **Exhibit A.**

On March 16, 2016, the Demurrers of Defendants P6 LA MF Holdings SPE, LLC, Eric Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P. (the "Remaining Defendants" and collectively with the Entity Defendants, the "AEW Defendants") to Plaintiffs' Third Amended Complaint ("TAC") came on for hearing before the Honorable Suzanne G. Bruguera in Department 71 of the Superior Court for the State of California, 111 North Hill Street, Los Angeles, CA 90012.  The Court, after considering the Demurrers, all supporting and opposing papers, and oral argument by counsel, sustained the Demurrers without leave to amend as to the Remaining Defendants for all of the reasons set forth in the Court's Order of June 8, 2016, which is attached hereto as **Exhibit B.**

On October 13, 2016, the AEW Defendants' and Cross-Complainant P6 LA MF Holdings SPE, LLC's ("Cross-Complainant") Motion for Terminating and Other Sanctions Against Plaintiffs for Spoliation of Evidence ("Sanctions Motion") came on for hearing before the Honorable Suzanne G. Bruguera in Department 71 of the Superior Court for the State of California, 111 North Hill Street, Los Angeles, CA 90012.  The Court, after considering the Sanctions Motion, all supporting and opposing papers, oral argument by counsel, and testimony by expert and fact witnesses granted the Sanctions Motion for the reasons set forth in the Court's Order of November 22, 2016 which is attached hereto as **Exhibit C.**  As part of the relief granted in connection with the Sanctions Motion, the Court dismissed all of Plaintiffs' claims in the TAC on an independent basis as to all of the Remaining Defendants.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that:

1.       Judgment is entered in favor of AEW Defendants and against Plaintiffs;

Gibson, Dunn & Crutcher LLP

Exhibit 2
162

1

[PROPOSED] FINAL JUDGMENT

1      2.      All of Plaintiffs' claims against the AEW Defendants are DISMISSED WITH

2              PREJUDICE;

3      3.      Plaintiffs take nothing on their action;

4      4.      The AEW Defendants are awarded attorneys' fees in the amount of

5      $ _pursuant to law_ .

6      5.      The AEW Defendants are awarded costs of suit in the amount of $ _pursuant to law_

7

8      **IT IS SO ORDERED.**

9                                  SUZANNE G. BRUGUERA

10    Dated: _Dec. 1, 2016_

11                            HONORABLE SUZANNE G. BRUGUERA
                          JUDGE OF THE SUPERIOR COURT OF CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Exhibit 2
163

[PROPOSED] FINAL JUDGMENT

Exhibit 2
164

**Exhibit A**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 12/02/15

DEPT. 71

HONORABLE SUZANNE G. BRUGUERA          JUDGE

R. INOSTROZA          DEPUTY CLERK

HONORABLE
#12

JUDGE PRO TEM

ELECTRONIC RECORDING MONITOR

C. RANDLE C.A.          Deputy Sheriff

CINDY CAMERON CSR 10315
PRO TEMPORE COURT          Reporter

11:30 am  BC551551          NO LEGAL FILE

LINCOLN STUDIOS LLC ET AL
VS
DLA ET AL

R/T LEAD BC550227

Plaintiff
Counsel

Defendant
Counsel

SEE APPEARANCES BELOW

**NATURE OF PROCEEDINGS:**

DEFENDANT P6 LA MF HOLDINGS SPE, LLC NOTICE OF
DEMURRER TO PLAINTIFFS SECOND AMENDED COMPLAINT

DEFENDANTS DEMURRER UPSTREAM AEW TO PLAINTIFFS SECOND
AMENDED COMPLAINT

DEFENDANTS P6 LA MF HOLDINGS I LLC; LINCOLN WALK
STUDIOS, LP; AND LUXE LA CINEGA, LLC NOTICE OF
DEMURRER AND DEMURRER TO PLAINTIFFS SECOND AMENDED
COMPLAINT

DEFENDANT AEW MOTION TO STRIKE; MEMO. OF PTS. AND
AUTHS. IN SUPP. THEREOF

The Order Appointing Court Approved Reporter as
Official Reporter Pro Tempore is signed and filed
this date.

Copies of the Court's tentative ruling are given to
parties present this date and recited to parties
appearing via Court Call.

The matter is called for hearing.

Parties submit on the Court's tentative ruling, it is
adopted, signed and filed as Ruling, incorporated
herein by reference to the case file.

Motion for Leave to File Amended Complaint is
advanced and vacated from 12/14/15.

Page   1 of   2   DEPT. 71

MINUTES ENTERED
12/02/15
**COUNTY CLERK**

Exhibit 2
165

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 12/02/15                                                    **DEPT.** 71

HONORABLE SUZANNE G. BRUGUERA    JUDGE    R. INOSTROZA    DEPUTY CLERK

HONORABLE                        JUDGE PRO TEM         ELECTRONIC RECORDING MONITOR
#12                                          CINDY CAMERON CSR 10315
            C. RANDLE C.A.    Deputy Sheriff      PRO TEMPORE COURT    Reporter

11:30 am BC551551        NO LEGAL FILE    Plaintiff
                                          Counsel
         LINCOLN STUDIOS LLC ET AL                 SEE APPEARANCES BELOW
         VS                               Defendant
         DLA ET AL                        Counsel

         R/T LEAD BC550227

**NATURE OF PROCEEDINGS:**

Seyfarth Shaw LLC's Hearing on Demurrer to Plaintiffs'
Second Amended Complaint is advanced and vacated from
12/14/15.

Notice is waived.

Appearances:

BRIAN W. LUDEKE (X)
DANIEL R. SABLE (X)
MARYSA LIN (X)
JAMES P. FOGELMAN (X)
ARMEN ADZHEMYAN (X)
ALEXANDER S. FRID (X)
JAMES GOLDMAN (X)
JASON H. TOKORO (X)
LOUIS R. MILLER (CC)
JIYUN C. LEE (CC)

            Page    2 of    2    DEPT. 71

MINUTES ENTERED
12/02/15
COUNTY CLERK

Exhibit 2
166

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

## DEPARTMENT 71

### ~~TENTATIVE~~ RULING



FILED
Superior Court of California
County of Los Angeles

DEC 02 2015

Sherri R. Carter, Executive Officer/Clerk
R.
BY: R. INOSTROZA, DEPUTY

| | |
|---|---|
| LINCOLN STUDIOS, et al., | Case No.: BC551551 |
| vs. | |
| DLA, et al. | Hearing Date: December 2, 2015 |

**Defendant P6 LA MF Holdings SPE, LLC's demurrer to the 3rd, 4th, 7th – 10th, and 14th – 30th COAs in the second amended complaint is sustained** *without leave to amend* **by stipulation of Plaintiffs without opposition. Defendant's demurrer to the 1st, 2nd, 5th, 6th, 11th, 12th, and 13th COAs in the second amended complaint is sustained with 30 days leave to amend.**

**Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC's demurrer to the 7th and 8th COAs in the second amended complaint is sustained** *without leave to amend* **by stipulation of Plaintiffs without opposition.**

**Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.'s demurrer to the 3rd, 4th, 7th, 8th, 10th, and 14th – 30th COAs in the second amended complaint is sustained** *without leave to amend* **by stipulation of Plaintiffs without opposition. Defendants' demurrer to the 1st, 2nd, 5th, 6th, 11th, 12th, and 13th COAs in the second amended complaint is sustained with 30 days leave to amend**

**Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC's motion to strike is granted (in part).**

1

Exhibit 2
167

## A. Demurrer of Defendant P6 LA MF Holdings SPE, LLC

Defendant P6 LA MF Holdings SPE, LLC ("P6 LLC") demurs to the 1st – 30th COAs in Plaintiffs' second amended complaint. P6 LLC argues Plaintiffs failed to allege sufficient facts to constitute the causes of action.[1]

As a preliminary matter, P6 LLC's demurrer to the 3rd, 4th, 7th – 10th, and 14th – 30th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition. (Notice of Errata and Correction (filed 11/19/15), pg. 1).

*Fraud in the Inducement and in Performance/Conspiracy & Negligent Misrepresentation (1st & 2nd COAs)*

"The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage." *Conroy v. The Regents of the University of California* (2009) 45 Cal.4th 1244, 1255 (Citations Omitted).

"Fraud in the inducement is a subset of the tort of fraud. It 'occurs when ''the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.'''" *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294-295 (Citations Omitted).

"Concealment is a species of fraud or deceit. '[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.'" *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 868 (Citations Omitted).

---

[1] The request for judicial notice (filed by Defendants on 10/29/15) is granted. However, the Court will not take judicial notice of the truth of the matters asserted within the documents.

2

Exhibit 2
168

"The elements of a cause of action for negligent misrepresentation are: '1. The defendant must have made a representation as to a past or existing material fact. [para.] 2. The representation must have been untrue; [para.] 3. Regardless of his actual belief the defendant must have made the representation *without any reasonable ground for believing it to be true*; [para.] 4. The representation must have been made with the intent to induce plaintiff to rely upon it; [para.] 5. The plaintiff must have been unaware of the falsity of the representation; he must have acted in reliance upon the truth of the representation and he must have been justified in relying upon the representation. 6. And, finally, as a result of his reliance upon the truth of the representation, the plaintiff must have sustained damage.'" *Continental Airlines, Inc. v. McDonnell Douglas Corporation* (1989) 216 Cal.App.3d 388, 402 (Citations Omitted).

A cause of action for fraud must be alleged with factual specificity. Plaintiff must plead facts showing "how, when, where, to whom, and by what means the representations were tendered." *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184. "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Tarmann v. State Farm Mutual Automobile Insurance Company* (1991) 2 Cal.App.4th 153, 157 (Citations Omitted).

Plaintiffs' fraud cause of action is uncertain. Plaintiffs combined several causes of action into one (i.e. fraud, fraudulent inducement, fraudulent concealment, etc.) in violation of CRC 2.112.[2]

Plaintiffs also failed to allege sufficient facts to constitute a cause of action for fraud, fraudulent inducement, and/or negligent misrepresentation. Plaintiffs' fraud and negligent misrepresentation causes of action are not alleged with the requisite factual specificity. Plaintiffs did not identify each alleged misrepresentation made by PC LLC, as well as, the names of the persons who

---

[2] CRC 2.112 provides, as follows:

Each separately stated cause of action, count, or defense must specifically state:
(1) Its number (e.g., "first cause of action");
(2) Its nature (e.g., "for fraud");
(3) The party asserting it if more than one party is represented on the pleading (e.g., "by plaintiff Jones"); and
(4) The party or parties to whom it is directed (e.g., "against defendant Smith").

3

Exhibit 2
169

made each misrepresentation, their authority to speak, to whom they spoke, what they said or wrote, and when each misrepresentation was said or written. Additionally, Plaintiffs did not allege facts showing PC LLC made any false representations, justifiable reliance, and/or resulting damages. As argued by PC LLC, Plaintiffs' fraud and negligent misrepresentation causes of action "are...premised on allegations that the Operating Member was defrauded and misled into signing a JV Agreement with a 5-year Buy/Sell provision when it purportedly believed the agreement it was signing contained a 3-year Buy/Sell provision." (Demurrer, pg. 12). The causes of action are also premised on allegations that Operating Member was fraudulently induced to transfer property based on the 3-year buy-out representations. (SAC ¶¶47, 55, 101-103, 422, 430-432, 439, 489-492). However, the allegations in the second amended complaint suggest the purported representations were not false and/or Plaintiffs did not sustain resulting damages. Specifically, the allegations in the second amended complaint suggest Plaintiffs contend "Version 2," which includes the 3-year Buy/Sell provision, is the only valid Joint Venture Agreement. (SAC ¶¶101, 103, 291). In fact, Plaintiffs alleged: "Put another way, had AEW acknowledged the Operating Member's right to buy-out or that Version 3 was not the true operating agreement and that if any Version was in effect it was Version 2, Plaintiffs would have suffered no damage." (SAC ¶291). In opposition, Plaintiffs argue their claims are pled in the alternative. Plaintiffs contend:

> The Complaint pleads alternative legal theories because the facts and their legal significance are disputed by Defendants. Plaintiffs alleged that Defendants fraudulently induced them to enter into the JVA by making false promises that they never intended to perform, justifying rescission of the JVA. Defendants dispute this. *In the alternative*, Plaintiffs alleged Defendants breached Version 2 of the JVA. Defendants dispute this. *In the alternative*, Plaintiffs alleged Defendants breached Versions 1 and 3 of the JVA. Defendants dispute this. Plaintiffs have not alleged that the only agreement a jury could decide to enforce is Version 2...

(Opposition, pg. 7)(Citations Omitted). However, Plaintiffs did not plead each version of the facts and/or legal theories in separate causes of action in the second amended complaint. Instead, Plaintiffs pleaded alternatively and/or inconsistently *in the same causes of action.*

Based on the foregoing, P6 LLC's demurrer to the 1st and 2nd COAs is sustained with leave to amend.

4

Exhibit 2
170

### Breach of Fiduciary Duty (5th COA)

"To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty. Plaintiffs did not allege facts showing P6 LLC had a duty to inform them of any "special compensation agreement between Zimbler and AEW..." (SAC ¶515). Additionally, Plaintiffs did not allege facts showing P6 LLC breached a fiduciary duty to Plaintiffs by engaging in misrepresentations regarding the joint venture agreement(s), contending Version 3 was the valid agreement, and blocking Plaintiffs' attempts to buy-out. (SAC ¶¶506-522). As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend "Version 2" is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 5th COA is sustained with leave to amend.

### Constructive Fraud (6th COA)

"The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516-517, fn. 14. But see Civil Code §1573 ("Constructive fraud consists: 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.").

Plaintiffs failed to allege sufficient facts to constitute a cause of action for constructive fraud. As discussed above, Plaintiffs did not allege facts showing P6 LLC breached a fiduciary duty to Plaintiffs. The allegations in the second amended complaint suggest Plaintiffs contend "Version 2" is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 6th COA is sustained with leave to amend.

5

Exhibit 2
171

*Breach of Contract (Breach of Version 2) (11th COA)*

"The standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" *Wall Street Network, Ltd. v. New York Times Company* (2008) 164 Cal.App.4th 1171, 1178 (Citations Omitted).

Plaintiffs' breach of contract cause of action is uncertain. Plaintiffs combined two causes of action into one (i.e. breach of contract and breach of the implied covenant of good faith and fair dealing) in violation of CRC 2.112. (SAC ¶¶558-573).

Plaintiffs also failed to allege sufficient facts to constitute a cause of action for breach of contract (breach of Version 2). Plaintiffs did not properly allege the existence of an agreement. As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend Version 2 is the only valid Joint Venture Agreement. However, Plaintiffs did not properly plead in the alternative. Additionally, Plaintiffs did not allege facts showing P6 LLC breached Version 2. Plaintiffs alleged P6 LLC breached the contract *and* the implied covenant of good faith and fair dealing by committing various acts. (SAC ¶569). However, Plaintiffs did not identify the specific provisions of Version 2 P6 LLC allegedly breached and/or allege facts showing P6 LLC breached Version 2 of the agreement.

Based on the foregoing, P6 LLC's demurrer to the 11th COA is sustained with leave to amend.

*Breach of Contract (Breach of Version 1) & Breach of Contract (Breach of Version 3) (12th & 13th COAs)*

Plaintiffs' breach of contract causes of action are uncertain. Plaintiffs included causes of action for breach of the implied covenant of good faith and fair dealing in the breach of contract causes of action in violation of CRC 2.112. (SAC ¶¶574-609).

Plaintiffs also failed to allege sufficient facts to constitute causes of action for breach of contract (breach of Versions 1 and 3). Plaintiffs did not properly allege the existence of an agreement. As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend Version 2 is the only valid

6

Exhibit 2
172

Joint Venture Agreement.  However, Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 12th & 13th COAs is sustained with leave to amend.

B. <u>Demurrer of Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe LA Cienega, LLC</u>

Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC (collectively "Defendants") demur to the 7th and 8th COAs in Plaintiffs' second amended complaint. Defendants argue Plaintiffs failed to allege sufficient facts to constitute the causes of action.

Defendants' demurrer to the 7th and 8th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition.

C. <u>Demurrer of Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.</u>

Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P. (collectively "Upstream AEW Defendants") demur to the 1st – 8th and 10th – 30th COAs in Plaintiffs' second amended complaint.  Upstream AEW Defendants argue Plaintiffs failed to allege sufficient facts to constitute the causes of action.

As a preliminary matter, Upstream AEW Defendants' demurrer to the 3rd, 4th, 7th, 8th, 10th, and 14th – 30th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition.

*Fraud in the Inducement and in Performance/Conspiracy & Negligent Misrepresentation (1st & 2nd COAs)*

Plaintiffs' fraud cause of action is uncertain.  Plaintiffs combined several causes of action into one (i.e. fraud, fraudulent inducement, fraudulent concealment, etc.) in violation of CRC 2.112.

7

Exhibit 2
173

Plaintiffs also failed to allege sufficient facts to constitute causes of action for fraud, fraudulent inducement, and/or negligent misrepresentation. Plaintiffs' fraud and negligent misrepresentation causes of action are not alleged with the requisite factual specificity. Plaintiffs did not properly identify each alleged misrepresentation made by Upstream AEW Defendants. Additionally, as discussed above, Plaintiffs did not allege facts showing the representations were false, justifiable reliance, and/or resulting damages. Finally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for fraud or negligent misrepresentation under any other theory.

Based on the foregoing, Upstream AEW Defendants' demurrer to the 1st and 2nd COAs is sustained with leave to amend.

*Breach of Fiduciary Duty & Constructive Fraud (5th & 6th COAs)*

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty against Upstream AEW Defendants. Plaintiffs did not allege facts showing Upstream AEW Defendants owed Plaintiffs a fiduciary duty and/or breached any fiduciary duty owed to Plaintiffs. Additionally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for breach of fiduciary duty or constructive fraud under any other theory.

Based on the foregoing, Upstream AEW Defendants' demurrer to the 5th and 6th COAs is sustained with leave to amend.

*Breach of Contract (Breach of Version 2), Breach of Contract (Breach of Version 1), & Breach of Contract (Breach of Version 3) (11th - 13th COAs)*

Plaintiffs' breach of contract causes of action are uncertain. Plaintiffs included causes of action for breach of the implied covenant of good faith and fair dealing in the breach of contract causes of action in violation of CRC 2.112.

Plaintiffs also failed to allege sufficient facts to constitute the causes of action for breach of contract. As discussed above, Plaintiffs did not properly allege the existence of an agreement and/or allege facts showing Upstream AEW Defendants breached the agreement(s). Additionally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for breach of contract under any other theory.

8

Exhibit 2
174

Based on the foregoing, Upstream AEW Defendants' demurrer to the 11th, 12th, and 13th COAs is sustained with leave to amend.


D.  <u>Motion to Strike</u>

Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings 1 LLC's (collectively "Defendants") motion to strike the claims/allegations against Grobstein Teeple LLP, Howard Grobstein, Eastdil Secured LLC, and Eastdil Secured Broker Services, Inc. is granted by stipulation of Plaintiffs without opposition. (Opposition, pg. 2).[3]

Defendants' motion to strike the 9th COA is moot in light of the ruling on the demurrers.

Defendants' motion to strike the allegations regarding "Gibson, Dunn & Crutcher LLP" and allegations regarding "AEW's Own Investors" is granted by stipulation of Plaintiffs without opposition. (Opposition, pg. 3).[4]

Defendants' motion to strike the allegations regarding "AEW's Conduct at Issue in another Litigation" is moot in light of the ruling on the demurrers, as well as, the ruling granting Defendants' motion to strike the *related* allegations regarding "Gibson, Dunn & Crutcher LLP."


Dated: ~~November 2~~, 2015

*December 2, 2015*

Hon. Suzanne G. Bruguera
Judge of the Superior Court

---

[3] In their opposition to the motion to strike, Plaintiffs stated they are "willing to dismiss without prejudice the New Defendants." (Opposition, pg. 2).

[4] In their opposition to the motion to strike, Plaintiffs stated: "New lead trial counsel for Plaintiffs has determined that it makes sense to streamline and simplify the case. The core claims are for breach of contract and fraud, and for recovery of damages. These are the claims on which Plaintiffs intend to focus in the new, streamlined complaint. To that end, and taking into consideration the points argued in Defendants' motion, Plaintiffs have eliminated from the amended complaint references to Defendants' investors and Gibson Dunn & Crutcher. Therefore, the Motion is moot." (Opposition, pg. 3).

9

Exhibit 2

175

Exhibit 2
176

**Exhibit B**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 06/08/16                                                              **DEPT.** 71

HONORABLE  SUZANNE G. BRUGUERA          JUDGE | R. INOSTROZA          DEPUTY CLERK

HONORABLE                          JUDGE PRO TEM          ELECTRONIC RECORDING MONITOR
NONAPPEARANCE
          C. RANDLE C.A.          Deputy Sheriff | NONE                          Reporter

| 1:30 pm | BC551551          NO LEGAL FILE | Plaintiff Counsel |
| | LINCOLN STUDIOS LLC ET AL | NO APPEARANCES |
| | VS | Defendant |
| | DLA ET AL | Counsel |
| | R/T LEAD BC550227 | |

**NATURE OF PROCEEDINGS:**

NONAPPEARANCE CASE REVIEW;

NOTICE OF ENTRY OF ORDER;

Order Sustaining Defendants' Demurrer to Plaintiffs'
Third Amended Complaint without Leave to Amend,
consisting of 44 pages, was signed and filed on
06/07/16.

Court rules as reflected in the above order,
incorporated herein by reference to the case file.

Defendant to give notice.

        CLERK'S CERTIFICATE OF SERVICE BY FACSIMILE/
                NOTICE OF ENTRY OF ORDER
I, the below named Executive Officer/Clerk of the
above-entitled court, do hereby certify that I am not
a party to the cause herein, and that this date I
served Notice of Entry of the above minute order of
06/08/16 upon each party or counsel named below by
facsimile transmission from the Stanley Mosk
Courthouse in Los Angeles, California, and the
transmission was reported completed and without error.

Dated:  06/08/16

Sherri R. Carter, Executive Officer/Clerk

                Page    1 of    2    DEPT. 71

| MINUTES ENTERED |
| 06/08/16 |
| COUNTY CLERK |

Exhibit 2
177

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 06/08/16                                                                DEPT. 71

HONORABLE SUZANNE G. BRUGUERA          JUDGE    R. INOSTROZA          DEPUTY CLERK

HONORABLE                    JUDGE PRO TEM              ELECTRONIC RECORDING MONITOR
NONAPPEARANCE
           C. RANDLE C.A.      Deputy Sheriff    NONE                    Reporter

---

1:30 pm | BC551551        NO LEGAL FILE    Plaintiff
                                           Counsel
         LINCOLN STUDIOS LLC ET AL                    NO APPEARANCES
         VS
         DLA ET AL                         Defendant
                                           Counsel

         R/T LEAD BC550227

---

NATURE OF PROCEEDINGS:


By: _____*R. Inostroza*_____
         R. INOSTROZA, DEPUTY CLERK

MARYSA LIN 213-229-6234


Page    2 of    2    DEPT. 71

MINUTES ENTERED
06/08/16
COUNTY CLERK

Exhibit 2
178

1  GIBSON, DUNN & CRUTCHER LLP
   JAMES P. FOGELMAN, SBN 161584
2    *jfogelman@gibsondunn.com*
   JAY P. SRINIVASAN, SBN 181471
3    *jsrinivasan@gibsondunn.com*
   RACHEL N. PERAHIA, SBN 266877
4    *rperahia@gibsondunn.com*
   MARYSA LIN, SBN 295429
5    *mdlin@gibsondunn.com*
   333 South Grand Avenue
6  Los Angeles, CA  90071-3197
   Telephone:    213.229.7000
7  Facsimile:    213.229.7520

8  Attorneys for Defendant P6 LA MF
   Holdings SPE, LLC

9

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              FOR THE COUNTY OF LOS ANGELES

12  LINCOLN STUDIOS, LLC, et al.,          CASE NO. BC551551

13          Plaintiffs,                    [Related Case *Nebraska Studios, LLC v.*
                                           *Chernove, et al.*, Case No. BC550227]
14      v.

15  DLA, et al.,                           **ORDER SUSTAINING
                                           DEFENDANTS' DEMURRERS TO
16          Defendants.                    PLAINTIFFS' THIRD AMENDED
                                           COMPLAINT WITHOUT LEAVE TO
17                                         AMEND**

18                                         ASSIGNED FOR ALL PURPOSES TO:
                                           HON. SUZANNE G. BRUGUERA
19                                         DEPARTMENT 71

20                                         HEARING DATE:  MAR. 16, 2016
                                           HEARING TIME:  10:00 A.M.

21                                         **RES ID:**        **1610121098643**

22    *This Order is 44 pages*

23

24              SUZANNE G. BRUGUERA

25

26

27

28

Gibson, Dunn &
Crutcher LLP

─────────────────────────────────────────────

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED
COMPLAINT WITHOUT LEAVE TO AMEND

①

FILED
Superior Court of California
County of Los Angeles

JUN 07 2016

Sherri R. Carter, Executive Officer/Clerk
R. Inostroza
BY: R. INOSTROZA, DEPUTY

Exhibit 2
179

1       This matter came on for hearing on March 16, 2016 at 10:00 a.m., before the Honorable

2  Suzanne G. Bruguera in Department 71 of the above-entitled court.  Appearances of counsel were

3  made on behalf of all Plaintiffs, Defendant P6 LA MF Holdings SPE, LLC (the "Investor Member")

4  and Defendants Eric Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI,

5  L.P., AEW Partners VI, Inc., and AEW VI, L.P. (the "Upstream AEW Defendants," and together

6  with the Investor Member, "Defendants" or "AEW Defendants").  After consideration of the

7  demurrers, points and authorities in support and in opposition, matters judicially noticed, the

8  arguments of counsel, and for good cause appearing, the Court hereby **SUSTAINS** Defendants'

9  demurrers **WITHOUT LEAVE TO AMEND** and **DISMISSES** Plaintiffs' Third Amended

10  Complaint ("TAC") **WITH PREJUDICE**.

11  **April 5, 2015 Ruling Incorporated Herein**

12       The Court hereby adopts and incorporates its April 5, 2015 Ruling, attached hereto as Exhibit

13  A, as part of this Order.

14  **Request for Judicial Notice**

15     The Court **GRANTS** the Request for Judicial Notice concurrently filed with Defendants'
demurrers.  The Court takes judicial notice of the Original Complaint in this action (RJN Exhibit

16  G), First Amended Complaint in this action (RJN Exhibit B ["FAC"]), the Second Amended
Complaint in this action (RJN Exhibit C ["SAC"]), the Complaint in the related action entitled

17  *Nebraska Studios, LLC, et al. v. Chernove, et al.*, Case No. BC550227 (filed June 30, 2014) (RJN

18  Exhibit D), and the Court's December 2, 2015 Order (RJN Exhibit A) as matters within the
Court's own files.  (Evid. Code, § 452, subd. d.)  The Court also takes judicial notice of "Version

19  1" and "Version 2" of the Joint Venture Agreement ("JV Agreement") (RJN Exhibits E and F)
referenced in the Third Amended Complaint ("TAC").  (Evid. Code, § 452, subd. h; see also

20  *Salvaty v. Falcon Cable Tel.* (1985) 165 Cal.App.3d 798, 800, fn. 1; *Marina Tenants Assn. v.
Deauville Marina Dev. Co.* (1986) 181 Cal.App.3d 122, 130.)  However, the Court will not take

21  judicial notice of the truth of the matters asserted within Exhibits B-G.  (RJN Exs. B-G.)

22  On a demurrer, the Court must "consider the sufficiency of the allegations . . . to determine

23  whether [a] contract is reasonably susceptible to plaintiff's alleged interpretation." (*George v.
Auto. Club of So. Cal.* (2011) 201 Cal.App.4th 1112, 1128; see also *Beck v. Am. Health Group*

24  *Internat.* (1989) 211 Cal.App.3d 1555, 1561 [court may "construe the language of the contract on
its face to determine whether, as a matter of law, the contract is reasonably subject to a

25  construction sufficient to sustain a cause of action"].)

26

27

28

Gibson, Dunn &
Crutcher LLP

2

Exhibit 2
180

**Joinder**

The Investor Member's joinder in the Upstream AEW Defendants' demurrer is hereby **GRANTED**.

The Upstream AEW Defendants' joinder in the Investor Member's demurrer is hereby **GRANTED**.

**Legal Standard**

A demurrer must be granted if the complaint is legally insufficient as a matter of law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 21-22 [sustaining demurrer where reasonable interpretation of facts as pleaded, as well as those judicially noticed, does not support proper cause of action]; Code Civ. Proc., §§ 430.10, 430.30.) A court need not accept a plaintiff's "contentions, deductions, or conclusions of fact or law." (*Moore v. Regents of Univ. of Cal.* (1990) 51 Cal.3d 120, 125.) Furthermore, "a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

Although California law applies to procedural matters, including the legal standard for demurrer (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 834-836), Delaware law governs the substantive aspect of Plaintiffs' claims because the JV Agreement contains a Delaware choice of law provision. (TAC, Ex. B; RJN Exs. E & F, cover page ["THIS AGREEMENT AND ALL QUESTIONS RELATING TO INTERPRETATION, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS BY THE SUBSTANTIVE LAWS OF THE STATE OF DELAWARE . . ."]; Section 15.3 ["This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware."].)

These choice of law provisions govern all of Plaintiffs' claims. (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 468-469 ["the most reasonable interpretation" of a choice of law clause stating that "[t]his agreement shall be governed by and construed in accordance with" particular law is that the parties "intended for the clause to apply to all causes of action arising from or related to their contract"]; *Cal-State Bus. Prods. & Servs. v. Ricoh* (1993) 12 Cal.App.4th 1666, 1673, 1677, fn. 4. [applying *Nedlloyd*, and holding that a forum selection clause that applied to "any case of [sic] controversy arising under or in connection with this Agreement" covered "allegedly false promises made in the course of the negotiations . . . that culminated in [the] contracts"].)

Even if the Court applied California law, Plaintiffs would fail to state a claim for the reasons discussed below.

The parties met and conferred, but were unable to reach an agreement resolving the objections raised in the demurrers.

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

Gibson, Dunn & Crutcher LLP



Exhibit 2
181

**Court's December 2, 2015 Order**

On December 2, 2015, the Court sustained Defendants' Demurrers to Plaintiffs' SAC in their entirety, dismissing all 32 of the causes of action alleged in the Complaint. The Court granted leave to amend with respect to seven of Plaintiffs' causes of action, sustaining the demurrers to the remaining causes of action without leave to amend. The Court also dismissed three former Defendants affiliated with the AEW Defendants with prejudice. The Court's December 2, 2015 Order is attached hereto as Exhibit B.

The Court granted Plaintiffs leave to amend to address certain deficiencies in the SAC. Plaintiffs filed a TAC that fails to address the defects identified in the Court's Order.

The TAC withdraws many of the factual allegations in the SAC and replaces them with conclusory and inconsistent allegations instead of substantive, factual allegations to address the defects identified in the Court's December 2, 2015 Order. Plaintiffs failed to provide any additional factual allegations with which to support the claims in the TAC.

**Relevant Allegations**

On or about September 8, 2010, Plaintiff NMS Capital Partners I, LLC (the "former Operating Member") and the Investor Member are alleged to have entered into a Joint Venture Agreement ("JV Agreement"). The TAC refers to the executed JV Agreement as "Version 1." (TAC ¶¶ 8, 22.b.) Section 11.1 of "Version 1" of the JV Agreement contains a 5-year "Buy/Sell" provision. (See TAC ¶ 22.g.)

Plaintiffs allege that in September of 2010, they realized that the JV Agreement, which already had been executed and which Plaintiffs refer to as "Version 1," contained a 5-year Buy/Sell provision, rather than the 3-year Buy/Sell provision that Plaintiffs claim the parties agreed to. (See TAC ¶ 22.b.) Plaintiffs allege that they alerted the Investor Member about this purported "mistake," prompting the Investor Member to allegedly deliver to the former Operating Member "Version 2" of the JV Agreement, which, according to Plaintiffs, contains a 3-year Buy/Sell provision. (See ibid.) Other than correcting this alleged "mistake" in the Buy/Sell provision, "Version 1" and "Version 2" are alleged to be identical in all material respects. (See TAC ¶ 22.c ["it makes no difference which version of the Joint Venture Agreement controlled . . . ."].)

Plaintiffs previously alleged that "Version 2" was the operative agreement between the former Operating Member and the Investor Member, because it was the only "version" of the JV Agreement that contained the 3-year Buy/Sell provision of which they claimed to have been deprived. (See, e.g., FAC ¶¶ 6B, 37-40, 123, 166-68, 336; SAC ¶¶ 33.B, 101-03, 283, 291.) Now, Plaintiffs attach "Version 1" of the JV Agreement to the TAC. (TAC, Ex. B.) But Plaintiff previously alleged that "Version 1" of the JV Agreement was "unenforceable and "of no effect" (SAC ¶¶ 88, 93; RJN Ex. D, ¶ 31), and they further assert in the TAC that no "version" of the JV Agreement is effective. (See TAC ¶ 22.b ["A new version, 'Version 2,' was created by AEW (Samek) shortly thereafter to correct a mistake in 'Version 1' . . . at least two more versions of the JVA, 'Version 3' and 'Version 4,' were created by AEW . . . [n]one of [which] became effective."].) Plaintiffs also now expressly disavow any reliance on the 3-year Buy/Sell provision contained in Article 11 of only "Version 2." (See TAC ¶ 22.g.)

Gibson, Dunn & Crutcher LLP

4

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND



Exhibit 2
182

Plaintiffs assert breach of contract claims without identifying which "version" of the JV Agreement is controlling or a contractual provision that, on its face, provides a Member of the Joint Venture with the right to procure the other Member's interest in the Joint Venture. Instead, Plaintiffs allege that Section 6 of the JV Agreement was breached. (TAC ¶¶ 22.c, 36 ["By refusing to accept" 1.75 times its net invested capital or a 24% IRR, "the Investor Member violated . . . Section 6 of the Joint Venture Agreement"].) According to the TAC, "Section 6 of the LLC Agreement provides that Neil [Shekhter]'s company will be entitled to all of the economic benefits in the Joint Venture if, within five years, AEW receives the greater of 1.75 times its invested capital or a 24% annual return. [¶] . . . Section 6.1 was intended by the Members to, and did, implement the terms set forth in Samek/AEW's May 19, 2010 e-mail referenced in paragraph 6, above. [¶] Section 6.1 is consistent in the so-called 'versions' of the Joint Venture Agreement and allows for Neil to 'monetize' or take-out AEW's interest in the joint venture within five years of its formation." (TAC ¶¶ 8-10.)

Plaintiffs allege that, with regards to their cause of action for breach of Section 6, "all 'versions' of the Joint Venture Agreement are the same; and, therefore, it makes no difference which version of the Joint Venture Agreement controlled . . . ." (TAC ¶ 22.c.)

Plaintiffs assert six causes of action. The first cause of action is brought by NMS Capital Partners I, LLC (the "former Operating Member") against the Investor Member for breach of contract, asserting breach of Section 6 of the JV Agreement. The second cause of action is brought by the former Operating Member against the Investor Member for breach of contract, asserting breach of other provisions of the JV Agreement. The third cause of action for fraud is brought by all Plaintiffs against all Defendants. The fourth cause of action for false promise is brought by the former Operating Member against the Investor Member. The fifth cause of action for breach of fiduciary duty is brought by the former Operating Member against the Investor Member and Defendant Eric Samek. The sixth cause of action for constructive fraud is brought by the former Operating Member against the Investor Member and Defendant Eric Samek. The Investor Member demurs to all six causes of action, while the Upstream AEW Defendants demur to causes of action three, five and six.

**Plaintiff's Third Amended Complaint is a Sham Pleading**

The Court **SUSTAINS** all of Defendants' demurrers without leave to amend because certain allegations in the TAC violate the sham pleading doctrine.

"[A] party will not be allowed to file an amendment contradicting an admission made in his original pleadings." (*Meyer v. State Bd. of Equalization* (1954) 42 Cal.2d 376, 386; see also *Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425; *Hendy v. Losse* (1991) 54 Cal.3d 723, 742-743; *Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151; *Amid v. Hawthorne Community Med. Group, Inc.* (1989) 212 Cal.App.3d 1383, 1390.)

While a party can allege alternative legal theories, one cannot allege alternative facts. (See *Manti v. Gunari* (1970) 5 Cal.App.3d 442, 449 [party cannot plead "inconsistent facts"]; *Ambers v. Beverages & More, Inc.* (2015) 236 Cal.App.4th 508, 515 ["Plaintiff's attempt to disavow that initial factual allegation by arguing that it was simply a change in legal theory is unavailing. When the purchase transaction was completed is a factual occurrence, not a legal theory."]; *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d

Gibson, Dunn & Crutcher LLP

Exhibit 2
183

379, 384 [plaintiff cannot allege injury on a public street, lose on his claim, then re-allege injury occurred on defendant's property as "this amendment was made solely for the purpose of avoiding a demurrer"].)

The TAC is a sham pleading. Plaintiffs' TAC changes critical facts and theories, and omits certain facts, without offering any explanation for the discrepancies.

Plaintiffs repeatedly have alleged in their prior complaints that the 3-year "buy out" right found only in "Version 2" of the JV Agreement was a crucial contractual term, without which they would not have entered into the Joint Venture. (See, e.g., FAC ¶¶ 6B, 37-39, 123; SAC ¶¶ 33.B, 283 [referring to Section 11.1's "right to buy AEW out at the 3 year anniversary"].) In their SAC, Plaintiffs alleged specific and detailed facts explaining why "Versions" 1 and 3 of the JV Agreement were void and unenforceable. (SAC ¶¶ 88, 100-103 [alleging Samek sent "Version 2" to correct a supposed error in "Version 1"—the alleged mistaken inclusion of a 5-year Buy/Sell right instead of a 3-year Buy/Sell right], 170-172 [alleging that AEW "fabricated" "Version 3" "by lifting NEIL's signature from other documents and physically placing it into the Version"].)

In their SAC, Plaintiffs alleged that "had AEW acknowledged . . . that if any Version was in effect it was Version 2, *Plaintiffs would have suffered no damage*." (SAC ¶ 291, emphasis added.)

Further, in their SAC, Plaintiffs premised their tort causes of action on the allegation that the former Operating Member was defrauded and misled into signing a JV Agreement that incorporated a five-year Buy/Sell provision (as opposed to a three-year Buy/Sell provision), as well as on the allegation that the former Operating Member was fraudulently induced into transferring properties to the Joint Venture based on the representations that the JV Agreement incorporated a three-year Buy/Sell provision. (SAC ¶¶ 47, 55, 101-103, 422, 430-432, 439, 489-492.)

But, in the TAC, Plaintiffs allege for the first time that "Version 2" and its alleged 3-year Buy/Sell provision in Section 11.1 are irrelevant, and argue instead that this case allegedly is about the cash flow distribution provisions contained in Section 6.1. (See, e.g., TAC ¶¶ 22.c, 22.e, 22.g.) Plaintiffs now repeatedly refer to an alleged "take-out" right in the JV Agreement, but this right is no different from the "buy-out" or Buy/Sell right Plaintiffs previously sought to enforce. (See, e.g., SAC ¶¶ 100-03, 254, 287, 422, 439, 457, 552 [referring to "buy-out" right]; compare, e.g., TAC ¶ 5 ["Samek told Neil that under AEW's program, Neil could 'monetize,' or 'take-out' AEW's interest in the joint venture by paying AEW the greater of: (1) 1.75 times its invested capital, or (2) a 24% annual return."] with, e.g., SAC ¶ 48 ["Operating Member would have the right to buy-out the Investor Member (AEW) within 5 years . . . at an amount equal to the greater of 1.75% of the amount of AEW's invested capital or an amount needed to enable AEW to achieve an 'internal rate of return' ("IRR") of 24% per annum"]; see also TAC ¶¶ 26.f [referring to the "1.75/24% Buy-out"]; 26.g ["Why can't you tell the truth regarding the buy-out deal we made?"].) Plaintiffs also allege that none of the "Versions" of the JV Agreement (i.e. Versions 1-4) ever "became effective; none was 'executed and delivered by all of the Members' of the Joint Venture, as required by Section 15.10 of the JVA." (TAC ¶ 22.) Plaintiffs attach a copy of only "Version 1" to the TAC. (TAC ¶ 22, Ex. B.)

Gibson, Dunn & Crutcher LLP

6

Exhibit 2
184

Thus, the allegations in the TAC demonstrate Plaintiffs are no longer alleging that "Version 2" is the only valid version of the JV Agreement.

These are contradictory factual allegations. Plaintiffs fail to explain these inconsistent and contradictory factual allegations, and as such they violate the sham pleading doctrine.

## Plaintiffs' Breach of Contract Claims Fail (Causes of Action 1 and 2)

The Court **SUSTAINS** Defendants' Demurrers to the First and Second Causes of Action for Breach of Contract without leave to amend because Plaintiffs have not alleged an enforceable contract.

Plaintiffs' Breach of Contract claims fail because Plaintiffs have not alleged an enforceable contract, and one cannot pursue a claim for breach of an agreement one has repudiated. (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 418-419 [a plaintiff cannot allege denial of existence of contract and assert a claim for breach of contract]; *Goodrich v. E.F. Hutton* (Del.Ch. 1988) 542 A.2d 1200 [dismissing breach of contract claim for failure to allege the existence of a valid contract].)

Plaintiffs did not allege the existence of a valid agreement with Investor Member. Plaintiffs' breach of contract cause of action is based on "the Joint Venture Agreement." (TAC ¶¶ 34, 41.) However, Plaintiffs alleged there are at least four versions of the JV Agreement. (TAC ¶¶ 22, 33.) Plaintiffs also alleged that none of the "Versions" of the JV Agreement "became effective; none was 'executed and delivered by all of the Members of the Joint Venture, as required by Section 15.10 of the JVA." (TAC ¶¶ 22, 33.) These allegations are incorporated into the breach of contract causes of action. (TAC ¶¶ 33, 40.) Plaintiffs' breach of contract causes of action cannot be premised on a JV Agreement that allegedly never became effective.

Even assuming Plaintiffs' breach of contract causes of action are based on one of the four versions of the JV Agreement, Plaintiffs do not identify which version of the JV Agreement is the operative agreement. Plaintiffs only attached a copy of "Version 1" to the TAC. (TAC ¶ 22; TAC, Ex. B). Plaintiffs allege that it makes no difference which version of the JV Agreement controls because the "important portion of the Joint Venture Agreement is Section 6" and "all 'versions' of the Joint Venture Agreement are the same" with respect to the "monetization" provision in Section 6. (TAC ¶ 22.) However, these conclusory and inconsistent allegations are insufficient, especially considering Plaintiffs' allegation that none of the versions of the JV Agreement became effective and Plaintiffs' express repudiation of "Versions" 1 and 3 in prior pleadings. (FAC ¶¶ 57, 162, 496; SAC ¶¶ 101-103, 560, 577; TAC ¶ 22.b.)

The Court **SUSTAINS** Defendants' Demurrers to the First Cause of Action for Breach of Contract without leave to amend because Plaintiffs' claim is contradicted by the express terms of the relevant agreement, which would be rendered meaningless under Plaintiffs' interpretation.

Where a "contract is not reasonably susceptible to the meaning alleged in the complaint, it is proper to sustain a demurrer without leave to amend." (*George v. Auto. Club of So. Cal.*

Gibson, Dunn & Crutcher LLP

7

[~~PROPOSED~~] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

⑦

Exhibit 2
185

(2011) 201 Cal.App.4th 1112, 1126; see also *Beck v. Am. Health Group Internat.* (1989) 211 Cal.App.3d 1555, 1561 [court may "construe the language of the contract on its face to determine whether, as a matter of law, the contract is reasonably subject to a construction sufficient to sustain a cause of action"].) Plaintiffs' allegations either do not assert violations of the provisions contained in the JV Agreement or purport to assert breaches based on the Investor Member's exercise of the rights expressly granted to it under the JV Agreement. Plaintiffs' allegations directly contradict the express terms of the JV Agreement they seek to enforce, therefore their causes of action for breach must be dismissed. (See *Fremont Indem. Co. v. Fremont Gen. Corp.* (2007) 148 Cal.App.4th 97, 114.)

Plaintiffs' first cause of action for breach of contract fails because the plain language of Article 11 of "Version 1" contradicts Plaintiffs' allegations that Section 6.1(b) of the JV Agreement provides the former Operating Member the right to acquire the Investor Member's ownership interest in the Joint Venture. Article 11 of "Version 1," entitled **"BUY/SELL,"** sets forth in detail the sole method by which the former Operating Member or the Investor Member can "buy out" the other member of the Joint Venture. In Section 11.1(g), the "Members hereby expressly acknowledge and agree" that "the 'Buy Out Rights'" were the result of an arm's-length negotiation, and that each Member carefully read and considered "the terms and conditions of the Buy Out Rights and agrees that they are reasonable and proper." (TAC, Ex. B, Section 11.1; RJN Exs. E & F, Section 11.1.) Further, Article 1 of the JV Agreement defines "Buy Out Rights" to refer to the rights set forth in Article 11. (TAC, Ex. B, Art. 1 [defining "Buy Out Rights"].)

Plaintiffs expressly abandon any claim based on breach of Article 11 of the JV Agreement, and rely instead on the alleged breach of Section 6.1(b). (TAC ¶ 22.g.)

Plaintiffs' first cause of action for breach of contract fails because Plaintiffs fail to point to any language in Article 6 that confers any acquisition, monetization, buy-out, or "take out" rights on either Member. By its plain terms, Article 6 addresses "Distributions" and Section 6.1 addresses "Non-Liquidating Distributions." It explains how distributions of "Net Operating Cash Flow" and "Net Capital Proceeds" shall be made. Both of these terms are defined with reference to the Joint Venture's money (or that of a subsidiary), not any Member's funds. (TAC, Ex. B, Arts. 1 and 6; RJN Exs. E & F, Arts. 1 and 6.)

The TAC concedes that Plaintiffs proposed that the parties amend the JV Agreement, which Plaintiffs also concede never happened, to include the right that Plaintiffs now seek to enforce. (See Compl. ¶¶ 13, 30.) If Article 6 already entitled Plaintiffs to exercise that right, then Plaintiffs would have had no reason to propose amending the JV Agreement, as they allege they did.

Plaintiffs' allegations in support of their first cause of action for breach of contract vitiate the entirety of Article 11 by claiming that it is Article 6—not Article 11—that controls the transfer of ownership interest in the Joint Venture even though the plain language of Article 6 has nothing to do with the transfer of any interest in the Joint Venture. Section 6.1 addresses only the manner in which cash flow distributions are to be made from the Joint Venture to its members. (TAC, Ex. B, Section 6.1; RJN Exs. E & F, Section 6.1.) Thus, Plaintiffs' breach of contract cause of action based on an alleged breach of Article 6 must be dismissed. "To the extent practicable, the meaning of a contract must be derived

8

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

⑧

Exhibit 2
186

from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless." (*Zalkind v. Ceradyn, Inc.* (2011) 194 Cal.App.4th 1010, 1027.) "Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive. Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless." (*O'Brien v. Progressive N. Ins. Co.* (Del.Ch. 2001) 785 A.2d 281, 287.)

In addition, Plaintiffs' interpretation of Section 6.1(b) is contradicted by the other terms of the JV Agreement. For example, Section 8.1 of Version 1 gives the Investor Member the sole power and authority to make any distributions in accordance with the terms of the agreement and Section 8.4 of Version 1 provides the "Operating Member" may not, without the prior written approval of Investor Member, "make a distribution of any Net Operating Cash Flow or Net Capital Proceeds or other funds or property of the Company not in accordance with <u>Sections 6.1(b)</u> or <u>6.2</u>." (TAC Ex. B, Sections 8.1, 8.4; RJN Exs. E & F, Sections 8.1, 8.4.) The provisions giving the Investor Member sole authority to make any distributions are directly at odds with Plaintiffs' claim that Section 6.1(b) gives them a monetization or take-out right.

☐ Plaintiffs never alleged that the Investor Member authorized any cash flow distribution, and never make any allegation pertaining to breach of the "waterfall" provisions in Section 6.1.

The Court **SUSTAINS** the Investor Member's Demurrers to the Second Cause of Action for Breach of Contract without leave to amend because Plaintiffs' Breach of Contract claim lacks the requisite specificity, and because Plaintiffs' claims of breach are contradicted by the express terms of the relevant agreement.

Plaintiffs' Second Breach of Contract Claim (Cause of Action 2) fails for the independent reason that it lacks specificity. Plaintiffs have not identified the specific provisions of the JV Agreement the Investor Member allegedly breached or alleged facts showing the Investor Member breached the JV Agreement. Although Plaintiffs argue they base this cause of action on Section 8.2(a) of JV Agreement, that Section is not mentioned in the TAC and, on its face, it does not apply. (See Opp. 11:28-12:2.) Furthermore, the allegations of breach are not linked to any specific provisions of the JV Agreement, which on its face does not prohibit any of the conduct alleged. (See *Levy v. State Farm Mutual Auto. Ins. Co.* (2007) 150 Cal.App.4th 1, 5-6.) Indeed, all of the conduct alleged is either expressly permitted by or not addressed by the terms of the JV Agreement, and therefore the claim fails for this reason as well. (*Beck, supra,* 211 Cal.App.3d at p. 1561.)

As the Court found with respect to Plaintiffs' SAC, "Plaintiffs did not identify the specific provisions of Version 2 [the Investor Member] allegedly breached and/or allege facts showing [the Investor Member] breached Version 2 of the agreement." (RJN Ex. A [Dem. Order], at 6.)

In addition, Plaintiffs' second cause of action for breach of contract fails because it rests on allegations that purport to fault the Investor Member for exercising its express rights under the

Gibson, Dunn & Crutcher LLP

9

Exhibit 2
187

1  JV Agreement.  Plaintiffs allege that the Investor Member breached the JV Agreement by
2  providing notice to the former Operating Member that it was in default; by conducting an
   audit of the Joint Venture; by "purporting to remove" the Operating Member; by requiring
3  that Capital Contributions be credited; by causing the Joint Venture to make distributions; and
   by repudiating the former Operating Member's alleged Buy/Sell offer after it had been
4  removed.  (See TAC ¶¶ 27, 28, 42.)  However, each of these actions is expressly authorized
5  by the JV Agreement.  (TAC, Ex. B, Sections 4.1(a), 8.1(b), 11.1, Art. 10.)

6  **Plaintiffs' Non-Contractual Claims Are Superseded By Their Claims for Breach of Contract (Causes of Action 3-6)**

7  The Court **SUSTAINS** the Defendants' Demurrers to the Third Cause of Action for Fraud, Fourth
8  Cause of Action for False Promise, Fifth Cause of Action for Breach of Fiduciary Duty, and Sixth
   Cause of Action for Constructive Fraud without leave to amend because they are superseded by
9  Plaintiffs' breach of contract claims.

10     Plaintiffs' non-contractual claims are barred because they "arise[] from obligations that are
11  expressly addressed by contract," and must be treated as breach of contract claims.  (*Nemec v.*
   *Shrader* (Del. 2010) 991 A.2d 1120, 1129 [where a "dispute arises from obligations that are
12  expressly addressed by contract," under "a well-settled principle" of Delaware law, "that
13  dispute will be treated as a breach of contract claim"]; see also *Applied Equip. Corp. v. Litton*
   *Saudi Arabia Ltd.* (1999) 7 Cal.4th 503, 515.)
14
      Merely alleging failure to comply with a contract term is insufficient to allege fraud under
15  either Delaware or California law.  (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 31;
   *Smith v. Allstate Ins. Co.* (S.D.Cal. 2001) 160 F.Supp.2d 1150, 1152 ["fraudulent intent
16  cannot be proven . . . by simply pointing to the defendant's subsequent failure to perform
17  as promised"]; see *Nemec, supra,* 991 A.2d at p. 1129.)

18  All of Plaintiffs' causes of action turn on the alleged right of the former Operating Member to
19  "take out" the Investor Member—a right which arises exclusively from the JV Agreement.
   The alleged wrongful misrepresentations expressly implicate rights that are addressed in the
20  JV Agreement.  (TAC ¶¶ 48-49 [claiming misrepresentations about (1) what was "in the Joint
   Venture Agreement relating to the monetization feature, NMS Capital's take-out right, and
21  NMS Capital's buy/sell right"; and (2) "their joint venture program and . . . the [former]
   Operating Member's right to monetize the Investor Member"], 55.)  Similarly, Plaintiffs'
22  claims are not based on duties independent of the JV Agreement.  (TAC ¶¶ 63, 68 [claiming
23  Defendants "owed fiduciary duties to [the former Operating Member] . . . by virtue of, among
   other things, the terms of the Joint Venture Agreement, and because they exercised, [sic] total
24  control over the Joint Venture"].)

25  Because Plaintiffs' non-contractual claims are completely duplicative of their breach of
26  contract claims, and derive from rights and obligations that are expressly governed by the JV
   Agreement (see, e.g., TAC ¶¶ 48, 55, 63, 68), causes of action numbers 3-6 are improper and
27  must be dismissed. (*Nemec, supra,* 991 A.2d at pp. 1129-1130 ["This contention, in our view,
   lacks merit.  Even though the Directors caused the Company to redeem the plaintiffs' shares
28  when it did, the fiduciary duty claim still arises from a dispute relating to the exercise of a
   contractual right—the Company's right to redeem the shares of retired nonworking

Gibson, Dunn &
Crutcher LLP

stockholders. That right was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract. Rather, that right was solely a creature of contract, and attached only to those shares that retired stockholders acquired under the Stock Plan. As a consequence, the nature and scope of the Directors' duties when causing the Company to exercise its right to redeem shares covered by the Stock Plan were intended to be defined solely by reference to that contract. Any separate fiduciary duty claims that might arise out of the Company's exercise of its contract right, therefore, were foreclosed. Accordingly, the Chancellor committed no error by dismissing the fiduciary claim in Count II."]; see also *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 ["Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law."]; *Erlich v. Menezes* (1999) 21 Cal.4th 543.)

### Plaintiffs' Fraud Claims Fail (Causes of Action 3 and 4)

The Court **SUSTAINS** the Defendants' Demurrers to the Third Cause of Action for Fraud and Fourth Cause of Action for False Promise without leave to amend for the additional, independent reason that Plaintiffs have failed to plead the essential elements of their claims and, instead, allege that they received the rights they claim they were defrauded out of.

"The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage." (*Conroy v. Regents of the Univ. of Cal.* (2009) 45 Cal.4th 1244, 1255, citations omitted; accord *In re Wayport, Inc. Litig.* (Del.Ch. 2013) 76 A.23d 296, 323.)

"Fraud in the inducement is a subset of the tort of fraud. It 'occurs when "'the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.""'" (*Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4111 289, 294-295, citations omitted.)

"The facts essential to the statement of a cause of action in fraud or deceit based on a promise made without any intention of performing it are: (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent at the time of making the promise; (3) the promise was made with intent to deceive or with intent to induce the party to whom it was made to enter into the transaction; (4) the promise was relied on by the party to whom it was made; (5) the party making the promise did not perform; (6) the party to whom the promise was made was injured." (*Regus v. Schartkoff* (1957) 156 Cal.App.2d 382, 389, citations omitted.)

Plaintiffs' fraud causes of action fail because Plaintiffs allege that they received the contractual right that they claim they were defrauded out of. Plaintiffs' fraud causes of action are based on alleged promises made regarding the former Operating Member's right to purportedly monetize, take-out, or buy-out Investor Member's interest in the Joint Venture. (Compl ¶¶ 48-49, 55.) However, Plaintiffs alleged facts in the TAC indicating they received the right to acquire Investor Member's interest. (See, e.g., TAC ¶¶ 6, 8, 9 ["Section 6.1 was intended by the Members to, and did, implement the terms set forth in Samek/AEW's May 19, 2010 email"], 10, 22.) Further, Plaintiffs allege that they received the rights that they

11

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

Gibson, Dunn & Crutcher LLP




Exhibit 2
189

were promised no matter which "version" of the JV Agreement controls.  (TAC ¶ 10 ["Section 6.1 is consistent in the so-called 'versions' of the Joint Venture Agreement."].)  Accordingly, Plaintiffs have failed to allege any misrepresentation, reliance or damages.

―    Plaintiffs' TAC repeats the mistakes that rendered Plaintiffs' SAC vulnerable to demurrer.  The Court previously dismissed Plaintiffs' fraud causes of action because they were "premised on allegations that Operating was defrauded and misled into signing a JV Agreement with a 5-year Buy/Sell provision when it purportedly believed the agreement it was signing contained a 3-year Buy/Sell provision," and on "allegations that Operating Member was fraudulently induced to transfer property based on the 3-year buy-out representations."  (RJN Ex. A, at 4, 8, citing SAC ¶¶ 47, 55, 101-103, 422, 430-432, 439, 489-492; cf. TAC ¶¶ 48-49, 55.)  But Plaintiffs also alleged that they relied on a "version" of the JV Agreement that included the 3-year Buy/Sell provision to which Plaintiffs claimed they were entitled.  (Ibid., citing SAC ¶¶ 101, 103, 291.)  Because Plaintiffs alleged that they obtained the contractual term of which they claimed they had been deprived, Plaintiffs effectively conceded that "the purported representations were not false and/or Plaintiffs did not sustain resulting damages." (Ibid.)

The Court **SUSTAINS** the Defendants' Demurrers to the Third Cause of Action for Fraud and Fourth Cause of Action for False Promise without leave to amend for the additional, independent reason that Plaintiffs' claims lack the requisite specificity.

A cause of action for fraud must be alleged with factual specificity.  Plaintiffs must plead facts showing "how, when, where, to whom, and by what means the representations were tendered."  (Small v. Fritz Companies, Inc. (2003) 30 Cal.4th 167, 184.)  "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." (Tarmann v. State Farm Mutual Automobile Insurance Company (1991) 2 Cal.App.4th 153, 157, citations omitted.)  Plaintiffs failed to plead fraud with particularity.  (Lazar v. Superior Court (1996) 12 Cal.4th 631, 645; Hamilton v. Greenwich Investors XXVI, LLC (2011) 195 Cal.App.4th 1602, 1614.)

The TAC does not allege the fraud causes of action with the requisite factual specificity.  Plaintiffs did not identify each alleged promise by Defendants or the names of the persons who made each alleged promise, their authority to speak, to whom they spoke, what they said or wrote, and when each alleged promise was said or written.  (Tarmann, supra, 2 Cal.App.4th at p. 157.)

The TAC fails to allege any fraudulent conduct by any Upstream AEW Defendant, with particularity or otherwise.  The TAC fails to allege any conduct by Defendants AEW Capital Management, L.P., AEW Partners VI, L.P., AEW VI, L.P., and AEW Partners VI, Inc., but nevertheless seeks to attribute conduct by Defendant Eric Samek, generally, to "AEW," the "AEW Defendants," or "all Defendants."  (See, e.g., TAC ¶¶ 1-2, 19.a.i, 19.b.)

Defendant Marc Davidson is not alleged to have made any representations whatsoever.  (See TAC ¶¶ 19.a.ii, 20.a, 21.b.iv.)

12

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

Exhibit 2
190

1

2    Aside from the former Operating Member, the TAC does not allege that any Plaintiff has standing to pursue its cause of action for fraud, because the TAC does not allege

3    that any of the Upstream AEW Defendants committed any actionable conduct with respect to any Plaintiff.

4

5    Plaintiffs' references to "guarantees" allegedly made by certain Plaintiffs changes nothing, because no such guarantees are alleged to be at issue in this or any other

6    litigation, and none establishes liability under the JV Agreement. (*Talbott v. Hustwitt* (2008) 164 Cal.App.4th 148, 151, quoting *Security-First Nat'l Bank v.*

7    *Chapman* (1940) 41 Cal.App.2d 219, 221.)

8    The TAC also fails to allege precisely what representations were made by any Defendant. The TAC alleges that Plaintiffs were promised a right to "take-out'" or

9    "monetize" AEW's interest in the Joint Venture (See, e.g., TAC ¶ 21), but it also alleges that the statements upon which Plaintiff Shekhter relies referenced a "buy-out"

10   right, not a "take-out" right. (TAC ¶¶ 5, 21, 25, 26 ["Why can't you tell the truth regarding the buy-out deal we made?"].)

11

12   Similarly, the TAC fails to allege with particularity that any putative representations were false, but instead, generally describes the agreement the parties reached as being

13   "consistent" with their discussions. (See, e.g., TAC ¶¶ 8-10, 22.)

14   This Court previously ruled that Plaintiffs' fraud claims failed for lack of specificity.

15   (RJN Ex. A, at 4.) Plaintiffs' TAC offers even fewer allegations and less specificity than what the Court found to be insufficient to state a claim in the SAC. Thus, the TAC fails

16   for the same reasons as the SAC failed. (*Tarmann, supra,* 2 Cal.App.4th at p. 157.)

17   The Court **SUSTAINS** Defendants' Demurrers to the Third Cause of Action for Fraud, Fourth

18   Cause of Action for False Promise, and Sixth Cause of Action for Constructive Fraud without leave to amend for the additional, independent reason that Plaintiffs fail to allege reasonable

19   reliance.

20   Plaintiffs' causes of action for fraud and false promise require a showing of reasonable

21   reliance. (*Lazar, supra,* 12 Cal.4th at pp. 638-39; see CACI 1900 [element 5], 1902 [element 4].) Similarly, Plaintiffs' sixth cause of action for constructive fraud requires an allegation of

22   reasonable reliance. (*Younan, supra,* 111 Cal.App.3d at pp. 516-517, fn. 14; *In re Wayport, Inc. Litig.* (Del.Ch. 2013) 76 A.3d 296, 327.)

23

24   A demurrer based on the absence of reasonable reliance is proper because reasonable reliance can be decided as a matter of law. (See, e.g., *Brakke v. Economic Concepts*

25   (2013) 213 Cal.App.4th 761, 769 [affirming order sustaining demurrer: "the reasonable reliance element of any fraud claim based on these predictions [of future IRS enactments]

26   fails as a matter of law"]; *Home Ins. Co. v. Zurich Ins.* (2002) 96 Cal.App.4th 17, 22-23 [affirming order sustaining demurrer, holding that reliance was unreasonable as a matter

27   of law]; see also *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823, 836-837 [deciding that reliance on an opinion of adverse counsel was not reasonable as a matter of law].)

28

Gibson, Dunn &
Crutcher LLP

13

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED
COMPLAINT WITHOUT LEAVE TO AMEND



Exhibit 2
191

A party is presumed to have read and understood an agreement that it signed. (See *Rosenfeld v. JP Morgan Chase Bank, N.A.* (N.D.Cal. 2010) 732 F.Supp.2d 952, 965; *Stornaway Capital LLC v. Smithers* (Del.Ch., Feb. 12, 2010) 2010 WL 673291, at *1, fn. 3.) Reasonable reliance cannot be established where the alleged representation is irreconcilable with an agreement executed by the party allegedly relying on the representation. (See *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.* (Del.Ch. July 9, 2002) 2002 WL 1558382, at *1 [approving argument that "[b]ecause Progressive's claims are based on supposed representations that are not memorialized within the text of the License Agreement itself . . . Progressive cannot as a matter of law have justifiably relied on them"]; *Rowland v. PaineWebber* (1992) 4 Cal.App.4th 279, 286 ["[r]eliance on an alleged misrepresentation is not reasonable" when contract says otherwise].)

Further, Plaintiffs may not assert claims for fraud or constructive fraud because Plaintiffs could not reasonably have relied on any oral statements (or silence in response to statements) at odds with the express terms of the JV Agreement. (*Gramercy Inv. Trust v. Lakemont Homes Nev., Inc.* (2011) 198 Cal.App.4th 903, 911 ["[P]arties who have expressed their mutual assent are bound by the contents of the instrument they have signed, and may not thereafter claim that its provisions do not express their intentions or understanding [citation]."]; *Rowland v. PaineWebber Inc.* (1992) 4 Cal.App.4th 279, 286 ["[r]eliance on an alleged misrepresentation is not reasonable" when contract says otherwise]; *Progressive Int'l Corp. v. E.I. DuPont de Nemours & Co.* (Del.Ch. July 9, 2002) 2002 WL 1558382, at *7 [approving of argument that "[b]ecause Progressive's claims are based on supposed representations that are not memorialized within the text of the License Agreement itself . . . Progressive cannot as a matter of law have justifiably relied on them"]; see also TAC, Ex. B, Sections 15.6, 15.10; RJN Exs. E & F, Sections 15.6, 15.10.)

The TAC does not allege facts showing Plaintiffs reasonably relied on the alleged promises. For example, Plaintiffs are barred from asserting any pre- or post-contract misrepresentation claims because the JV Agreement contains an integration clause (TAC Ex. B, Section 15.6; RJN Exs. E & F, Section 15.6 ["This Agreement and the schedules attached hereto constitute the entire agreement between the parties hereto with respect to the transactions contemplated herein and supersede all prior understandings or agreements between the parties."]) as well as a provision stating "no amendment or modification of this Agreement shall be effective unless reflected in a document executed and delivered by all of the Members" (TAC Ex. B, Section 15.10; RJN Exs. E & F, Section 15.10). Plaintiffs fail to allege how they could have reasonably relied on representations/promises contrary to the terms of the agreement in light of §§ 15.6 and 15.10 (under California or Delaware law). (See *Black Horse Capital, LP v. Xstelos Holdings, Inc.* (Del.Ch., Sept. 30, 2014, CIV.A. 8642-VCP) 2014 WL 5025926, at *22.)

Plaintiffs' reliance on *Riverisland Cold Storage v. Fresno-Madera Prod. Credit Ass'n* (2013) 55 Cal.4th 1169, is misplaced. *Riverisland* primarily addressed the application of the parol evidence rule to bar a cause of action for fraud. (See *id.*) However, the decision expressly recognized that a showing of reasonable reliance may be impossible as a matter of law where, as here, a party has failed to "acquaint [it]self with the contents of a written agreement." (*Id.* at p. 1183 & fn. 11, citation omitted.)

14

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

*14*

Exhibit 2
192

**Plaintiffs' Breach of Fiduciary Duty and Constructive Fraud Causes of Action Fail (Causes of Action 5 and 6)**

The Court **SUSTAINS** Defendants' demurrers to the Fifth Cause of Action for Breach of Fiduciary Duty and Sixth Cause of Action for Constructive Fraud without leave to amend for the additional, independent reason that Plaintiffs failed to allege sufficient facts to constitute a cause of action.

Plaintiffs' fifth and sixth causes of action both require Plaintiffs to allege the existence of a fiduciary relationship between plaintiff and defendant. (See *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182 ["To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages."]; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516-517, fn. 14 ["The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)."]; accord *Beard Res., Inc. v. Kates* (Del.Ch. 2010) 8 A.3d 573, 601 [breach of fiduciary duty]; *In re Wayport, Inc. Litig.* (Del.Ch. 2013) 76 A.3d 296, 327 [constructive fraud].)

The TAC alleges that the "AEW Defendants named in this cause of action owed fiduciary duties to NMS Capital because they possessed by virtue of, among other things, the terms of the Joint Venture Agreement, and because they exercised, total control over the Joint Venture . . ." (TAC ¶¶ 63, 68.) But the TAC expressly alleges that none of the "versions" of the JV Agreement is valid or enforceable. (TAC ¶ 22.b.) Accordingly, Plaintiffs have failed to plead sufficient facts in support of their causes of action for breach of fiduciary duty and constructive fraud.

In any event, all of the alleged versions of the JV Agreement expressly disavow any fiduciary relationship between the parties. Section 8.17 provides: "with respect to any approval or other right granted to the Members, the other Member shall not have any fiduciary duty to any other Member." (TAC, Ex. B, Section 8.17; RJN Exs. E & F, Section 8.17.) Plaintiffs' entire lawsuit is predicated on the assertion that the former Operating Member was deprived of its alleged rights under the JV Agreement. (See, e.g., TAC ¶¶ 13-15.) Because the former Operating Member—the only Plaintiff to bring a cause of action for breach of fiduciary duty or constructive fraud—agreed that the Investor Member owed it no fiduciary duty with respect to such rights, it cannot pursue causes of action premised on the assertion that it was owed such duties.

Section 8.17 is valid and enforceable. (*Kelly v. Blum* (Del.Ch. Feb. 24, 2010, No. CIV.A. 4516-VCP) 2010 WL 629850, at *10, fn. 67; *CSH Theatres, LLC v. Nederlander of S.F. Assocs.* (Del.Ch., Apr. 21, 2015) C.A. No. 9380-VCP) 2015 WL 1839684, at *11.)

There is no merit to Plaintiffs' argument that Section 8.17 should not apply. The TAC does not allege facts showing that (1) the waiver of fiduciary duties is somehow invalid, (2) Defendants owed them fiduciary duties that are not covered by and/or were not waived by the modification of liability provision, and/or (3) Defendants breached any fiduciary duties owed to Plaintiffs. Plaintiffs' conclusory allegations are insufficient.

15

Gibson, Dunn & Crutcher LLP

/5

Exhibit 2
193

Because Defendant Eric Samek is alleged to have been an employee of the Investor Member (TAC ¶ 19), the waiver incorporated into Section 8.17 of JV Agreement bars any fiduciary relationship between Samek and Plaintiffs.

Plaintiffs' causes of action for breach of fiduciary and constructive fraud fail against Defendant Eric Samek for the additional reason that Plaintiffs have failed to allege any independent basis for a fiduciary relationship between Defendant Eric Samek and the former Operating Member. (*City of Hope Nat'l Med. Ctr. v. Genentech* (2008) 43 Cal.4th 375, 386 [requiring that a party "knowingly undertake to act on behalf of and for the benefit of another"]; *NACCO Indus., Inc. v. Applica Inc.* (Del.Ch. 2009) 997 A.2d 1, 33.) On the contrary, the TAC alleges the opposite: that "at all relevant times, Samek was acting individually and on behalf of AEW in connection with the matters that are the subject of this action." (TAC ¶ 19.a.i.) Therefore, Samek's demurrers to Plaintiffs' Fifth and Sixth Causes of Action must be sustained without leave to amend on this additional basis.

In sustaining Defendants' demurrers to Plaintiffs' SAC, this Court previously held that "Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty." (Ex. B, at 5.) Plaintiffs' TAC did nothing to remedy the defects the Court identified in Plaintiffs' SAC.

Because reasonable reliance is an element of a cause of action for constructive fraud, Plaintiffs' Sixth Cause of Action for Constructive Fraud fails for the same reasons set forth above, in the section of this Order pertaining to Plaintiffs' third and fourth causes of action for fraud and false promise. (*Younan, supra,* 111 Cal.App.3d at pp. 516-517, fn. 14; *In re Wayport, Inc. Litig.* (Del.Ch. 2013) 76 A.3d 296, 327.)

### Plaintiffs May Not Proceed Against the Upstream AEW Defendants (Causes of Action 3, 5 and 6)

Plaintiffs' third, fifth and sixth causes of action for fraud, breach of fiduciary duty and constructive fraud fail against the Upstream AEW Defendants for the additional, independent reason that the JV Agreement expressly prohibits Plaintiffs from proceeding against these defendants. Section 15.11 of the Joint Venture Agreement expressly states that the former Operating Member may not "seek to recover against any direct or indirect owner of any other Member with respect to any claim or circumstance arising out of or relating to the Company or the Property." (TAC, Ex. B, Section 15.11; RJN Exs. E & F, Section 15.11.) Plaintiffs failed to present any reason why Section 15.11 does not bar Plaintiffs' claims against the Upstream AEW Defendants, concede that the provision is enforceable under Delaware law, and present no valid reason why Section 15.11 would be unenforceable under California law. Moreover, Section 15.17 expressly prohibits any third party beneficiary from obtaining rights under the JV Agreement, and prevents any such person or entity from making "any claim against the Company or any Member." (TAC, Ex. B, Section 15.17; RJN Exs. E & F, Section 15.17.) Further, none of the Plaintiffs other than the former Operating Member has alleged its standing to pursue any claim of damages against Defendants, nor has any Plaintiff alleged any relationship to any of the Upstream AEW Defendants. Therefore, the Court **SUSTAINS** the Upstream AEW Defendants' demurrers without leave to amend.

[PROPOSED] ORDER SUSTAINING DEFENDANTS' DEMURRERS TO PLAINTIFFS' THIRD AMENDED COMPLAINT WITHOUT LEAVE TO AMEND

(16)

Exhibit 2
194

**Leave to Amend Is Denied**

The Court **SUSTAINS** the Defendants' Demurrers to all causes of action without leave to amend.

The trial court has broad discretion to determine whether to allow the amendment of any pleading. (*Melican v. Regents of the Univ. of Cal.* (2007) 151 Cal.App.4th 168, 175 [leave to amend denied based on unreasonable delay].) Although California has a liberal policy toward amendment of pleadings, leave to amend will be denied when Plaintiffs have failed successively to allege cognizable claims, and where there is no reasonable possibility that Plaintiffs can cure the defects of the complaint. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 333 [sustaining demurrers to first amended complaint without leave to amend]; *Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 534 [denying leave to amend where "based on the nature of the [complaint's] defects and [the plaintiff's] previous unsuccessful attempts to plead, it is improbable the plaintiff can state a cause of action"]; *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 69, 77 [no leave to amend where trial court gave plaintiffs a "last opportunity . . . to amend the complaint" but plaintiffs failed to do so].)

Plaintiffs have had three chances to adequately allege their claims against the AEW Defendants—the FAC, the SAC, and the TAC. Plaintiffs also have had ample opportunity to plead sufficient facts to support their claims, but have failed to do so. In particular, in their TAC, Plaintiffs were unable to cure the defects specifically identified by the Court's December 2, 2015 Order sustaining the demurrers to Plaintiffs' SAC. Further, Plaintiffs' prior complaints include allegations that are fatal to their causes of action and that cannot be overcome in light of the sham pleading doctrine.

Indeed, Plaintiffs' Oppositions to Defendants' demurrers to the TAC largely rehashed the same arguments advanced in support of Plaintiffs' SAC, which the Court had already rejected. (Compare, e.g., Opp. 9 [sufficiency of fraud allegations] with Pls.' Combined Opp. to the AEW Defendants' Demurrers to the SAC, Nov. 17, 2015 ["SAC Opp."] [same]; Opp. 10-11 [§ 15.11] with SAC Opp. 9-10 [same]; Opp. 11-13 [reasonable reliance] with SAC Opp. 13-14 [same]; Opp. 13-14 [breach of fiduciary duty] with SAC Opp. 14-15 [same]; Opp. 15 [leave to amend] with SAC Opp. 4-5 [same]; see also RJN Ex. A [Dec. 2, 2015 Demurrer Order].)

Accordingly, no further amendment would cure the fatal defects in Plaintiffs' TAC.

**IT IS SO ORDERED.**

Dated: June 7, 2016

_____
HONORABLE SUZANNE G. BRUGUERA
JUDGE OF THE SUPERIOR COURT OF
CALIFORNIA

*Objection to this Order are overruled.*

17

*17*

Gibson, Dunn &
Crutcher LLP

Exhibit 2
195

# EXHIBIT A

18

Exhibit 2
196

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

APR 05 2016

Sherri R. Carter, Executive Officer/Clerk
By: R. Inostroza, Deputy

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

### DEPARTMENT 71

### ~~TENTATIVE~~ RULING

| LINCOLN STUDIOS, et al., | Case No.: BC551551 |
| --- | --- |
| vs. | |
| DLA, et al. | Hearing Date: March *16* 7, 2016 |

**Defendant P6 LA MF Holdings SPE, LLC's demurrer to the third amended complaint is *sustained without leave to amend*.**

**Defendants Eric Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.'s demurrer to the third amended complaint is *sustained without leave to amend*.**

A. Demurrer – Defendant P6 LA MF Holdings SPE, LLC

Defendant P6 LA MF Holdings SPE, LLC ("Investor Member") demurs to the 1st (breach of contract – re section 6 of the joint venture agreement), 2nd (breach of contract – re other provisions in the joint venture agreement), 3rd (fraud), 4th (false promise), 5th (breach of fiduciary duty), and 6th (constructive fraud) causes of action in the third amended complaint of Plaintiffs Lincoln Studios, LLC ("Lincoln Studios"), Neil Shekhter, individually and as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), Margot Shekhter, individually and as Trustee of The NMS Family Living Trust dated September 3, 1991 (2000 Restatement), The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC ("NMS LLC"), NMS Capital Partners I, LLC ("NMS I LLC"), NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC (collectively "Plaintiffs"). Investor Member argues the third amended complaint is a sham pleading and/or Plaintiffs failed to allege sufficient facts to constitute the causes of action asserted in the third amended complaint.

1


(19)

Exhibit 2
197

04/06/2016  14:41    213613 55                    LASC/DEPT-71                                    PAGE  05/19

Investor Member's request for judicial notice is granted. However, the Court will not take judicial notice of the truth of the matters asserted within the first amended complaint (BC551551), second amended complaint (BC551551), complaint (BC550227), Version 1 of the LLC Operating Agreement/Joint Venture Agreement (Exhibit B to the third amended complaint – BC551551), Version 2 of the LLC Operating Agreement/Joint Venture Agreement (referenced in the second and third amended complaints – BC551551), and complaint (BC551551). (RJN, Exhibits B-G).

*Sham Pleading*

"Under the sham pleading doctrine, allegations in an original pleading that rendered it vulnerable to demurrer or other attack cannot simply be omitted without explanation. The purpose of the doctrine is to enable the courts to prevent an abuse of process. The doctrine is not intended to prevent honest complainants from correcting erroneous allegations or to prevent the correction of ambiguous facts." *Hahn v. Mirda* (2007) 147 Cal.App.4th 740, 751 (Citations Omitted). See also *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383-384 ("It is axiomatic that the function of a demurrer is to test the legal sufficiency of the pleading by raising questions of law. It is also well established that, when reviewing a judgment entered following the sustaining of a demurrer without leave to amend, the appellate court must assume the truth of the factual allegations of the complaint. However, an exception exists where a party files an amended complaint and seeks to avoid the defects of a prior complaint either by omitting the facts that rendered the complaint defective or by pleading facts inconsistent with the allegations of prior pleadings. In these circumstances, the policy against sham pleading permits the court to take judicial notice of the prior pleadings and requires that the pleader explain the inconsistency. If he fails to do so the court may disregard the inconsistent allegations and read into the amended complaint the allegations of the superseded complaint.")(Citations Omitted).

Plaintiffs' third amended complaint is a sham pleading. Plaintiffs filed a second amended complaint. (RJN, Exhibit B). Investor Member filed a demurrer to the second amended complaint. The Court sustained Investor Member's demurrer to the 1st (fraud in the inducement and in performance/conspiracy), 2nd (negligent misrepresentation), 5th (breach of fiduciary duty), 6th (constructive fraud), 11th (breach of contract – Version 2), 12th (breach of contract – Version 1), and 13th (breach of contract – Version 3) causes of action with 30 days leave to

2



Exhibit 2
198

amend.[1] (RJN, Exhibit A). <u>See also</u> Court's 12/2/15 Minute Order & Ruling. As discussed below in detail, Plaintiffs sought to avoid the defects identified in the second amended complaint by omitting certain facts in the third amended complaint and/or pleading facts in the third amended complaint that are inconsistent with the allegations of prior pleadings – including the second amended complaint - *without explanation.*

Plaintiffs took the position, in the second amended complaint, that if any version of the operating agreement/joint venture agreement was valid, it was Version 2, which included a three-year Buy/Sell provision. (SAC ¶¶101, 103, 291, 309). As noted in the Court's Ruling on Investor Member's demurrer to the second amended complaint, Plaintiffs' fraud and negligent misrepresentation causes of action were premised on allegations that Operating Member was defrauded and misled into signing an operating agreement/joint venture agreement with a *five-year Buy/Sell provision* (as opposed to a three-year Buy/Sell provision), as well as, allegations that Operating Member was fraudulently induced to transfer the property based on the *three-year buy-out representations.* (RJN, Exhibit A)(RJN, Exhibit C, SAC ¶¶47, 55, 101-103, 422, 430-432, 439, 489-492). The Court sustained Investor Member's demurrer to the fraud and negligent misrepresentation causes of action in the second amended complaint for, among other things, failure to state sufficient facts to constitute the causes of action. The Court determined Plaintiffs did not allege facts showing Investor Member made any misrepresentations, justifiable reliance, and/or resulting damages. The Court reasoned Plaintiffs took the position that Version 2 was the only valid operating agreement/joint venture agreement and *Version 2 includes the three-year Buy/Sell provision* at issue. (RJN, Exhibit A). The Court also determined Plaintiffs did not properly plead alternative versions of the facts and/or legal theories. (RJN, Exhibit A).

The Court sustained Investor Member's demurrer to the breach of fiduciary duty and constructive fraud causes of action in the second amended complaint for the same or similar reasons. The Court determined Plaintiffs did not allege sufficient facts to show Investor Member breached a fiduciary duty to Plaintiffs "by engaging in misrepresentations regarding the joint venture agreement(s), contending Version 3 was the valid agreement, and blocking Plaintiffs' attempts to buy-out" because "the allegations in the second amended complaint suggest

---

[1] The Court sustained Investor Member's demurrer to the 3rd, 4th, 7th – 10th, and 14th – 30th COAs in the second amended complaint *without leave to amend by stipulation of Plaintiffs without opposition.* The Court also sustained Defendant P6 LA MF Holdings I LLC's demurrer to the 7th and 8th COAs in the second amended complaint *without leave to amend by stipulation of Plaintiffs without opposition.* <u>See</u> Court's 12/2/15 Minute Order and Ruling.

3



Exhibit 2
199

Plaintiffs contend 'Version 2' is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative." (RJN, Exhibit A).  Similarly, with respect to the constructive fraud cause of action, the Court determined Plaintiffs failed to allege facts showing Investor Member breached a fiduciary duty to Plaintiffs because "the allegations in the second amended complaint suggest Plaintiffs contend 'Version 2' is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative." (RJN, Exhibit A).

The Court also sustained Investor Member's demurrer to the breach of contract causes of action (Version 1, Version 2, and Version 3).  The Court determined Plaintiffs failed to properly allege the existence of an agreement with Investor Member because Plaintiffs contend Version 2 is the only valid operating agreement/joint venture agreement and Plaintiffs did not properly allege alternative facts and/or theories.  The Court also determined Plaintiffs did not allege facts showing Investor Member breached Version 2.  (RJN, Exhibit A).

Plaintiffs, in an effort to remedy the defects listed in the Court's ruling on Investor Member's demurrer to the second amended complaint, filed a third amended complaint on January 13, 2016.  In the third amended complaint, Plaintiffs omitted certain facts and changed certain facts/theories *without explanation*.  For example, Plaintiffs took the position, in the second amended complaint, that Versions 1, 2, *and* 3 of the operating agreement/joint venture agreement "are of no effect or are unenforceable," but if any version of the operating agreement/joint venture agreement was valid, it was Version 2, which included a three-year Buy/Sell provision.  (SAC ¶¶101, 103, 291, 309).[2]  In the third amended complaint, Plaintiffs alleged that *none* of the versions of the operating agreement/joint venture agreement (i.e. Versions 1-4) ever "became effective; none was 'executed and delivered by all of the Members' of the Joint Venture, as required by Section 15.10 of the JVA." (TAC ¶22)  Plaintiffs also alleged "all 'versions' of the Joint Venture Agreement are the same" with respect to the "'monetization' provision in Section 6" and, therefore, "it makes no difference which version of the Joint Venture Agreement controlled when Neil advised AEW in 2013 that he wanted to exercise his right to take-out or 'monetize'

---

[2] In the second amended complaint Plaintiffs alleged they contend Versions 1, 2, and/or 3 "are of no effect or are unenforceable (but if any version is in effect it is Version 2)." (SAC ¶309). Plaintiffs also alleged that "had AEW acknowledged the Operating Member's *right to buy-out* or that Version 3 was not the true operating agreement and that if any Version was in effect it was Version 2, *Plaintiffs would have suffered no damage.*" (SAC ¶291)(Emphasis Added).

4

22

Exhibit 2
200

AEW." (TAC ¶22).[3] Thus, the allegations in the third amended complaint suggest Plaintiffs are no longer taking the position that Version 2 is the only valid version of the operating agreement/joint venture agreement. In addition, rather than focusing on *Article 11* of the operating agreements/joint venture agreements (i.e. the three-year Buy/Sell provision vs. the five-year Buy/Sell provision), Plaintiffs changed their focus in the third amended complaint to *Article 6* of the agreements. (TAC ¶¶22-26, 30, 35-36, 55). Instead of alleging a dispute regarding the Buy/Sell provision, Plaintiffs alleged a right to monetize or "take-out" Investor Member's interest. Plaintiffs alleged Article 6 provides them with the right to "take-out" or "monetize" the Investor Member's investment (leaving the Investor Member with no economic interest in the joint venture), Investor Member took the position that Operating Member did not have the right to acquire Investor Member's interest under the joint venture agreement, and Investor Member attempted to "concoct defaults" of the operating agreements/joint venture agreements (i.e. falsely accused Neil of fabricating Version 2, falsely claimed the joint venture had been randomly selected for a "year end fund audit," etc.). (TAC ¶¶22, 26, 27). As argued by Defendants, rather "than calling this right a 'buy-out' and relying on…'Version' 2 – as Plaintiffs did in their prior Complaints, the TAC simply replaces…references to an alleged 'buy-out' right with references to a 'take-out' right, without otherwise altering the content of the allegations." (Demurrer, pg. 7)(TAC ¶¶5, 13)(SAC ¶48, 86:15-16)(FAC ¶122). Moreover, as argued by Defendants, Plaintiffs' claim remains the same regardless of the terminology used – "Plaintiffs alleged they were deprived of 'the right to *acquire* the interest of AEW through various mechanisms at an acceptable rate within a set amount of time.'" (Demurrer, pgs. 7-8). "Neil Shekhter's own words – repeated in the TAC – confirm that the *only* right the Operating Member had to acquire the Investor Member's interest in the Joint Venture was through the 'buy-out' right alleged in the First and Second Amended Complaints." (Demurrer, pg. 8)(TAC ¶26f).[4] Further, as noted above, Plaintiffs previously alleged that "had AEW acknowledged the Operating Member's *right to buy-out* or that Version 3 was not the true operating agreement

---

[3] Plaintiffs only attached a copy of Version 1 to the third amended complaint. (TAC ¶22; Exhibit B).

[4] Plaintiffs alleged Neil sent a text message to Samek on December 11, 2013 stating, in pertinent part, as follows:

> I don't understand why you told me that you will tell the truth when asked, but keep referring to AEW attorneys and playing games and not talking to me regarding the agreement we made re 1.75/24% *Buy-out*….

(TAC ¶26f)(Emphasis Added).

5

(23)

Exhibit 2
201

and that if any Version was in effect it was Version 2, *Plaintiffs would have suffered no damage.*" (SAC ¶291)(Emphasis Added).

Based on the foregoing, Investor Member's demurrer to the third amended complaint is sustained *without leave to amend* based on the sham pleading doctrine. Even assuming, arguendo, the third amended complaint is not a sham pleading, as discussed below in detail, Plaintiffs failed to allege sufficient facts to constitute the causes of action.

*Breach of Contract – Re Section 6 of the Joint Venture Agreement (1st COA) vs. Investor Member*

"The standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" *Wall Street Network, Ltd. v. New York Times Company* (2008) 164 Cal.App.4th 1171, 1178 (Citations Omitted).

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of contract against Investor Member. Plaintiffs did not allege the existence of a valid agreement with Investor Member. Plaintiffs' breach of contract cause of action is based on "the Joint Venture Agreement." (TAC ¶34). However, Plaintiffs alleged there are at least *four* versions of the operating agreement/joint venture agreement. (TAC ¶¶22, 33). Plaintiffs also alleged that *none* of the versions of the operating agreement/joint venture agreement "became effective; none was 'executed and delivered by all of the Members' of the Joint Venture, as required by Section 15.10 of the JVA." (TAC ¶¶22, 33). These allegations are incorporated into the breach of contract cause of action. Plaintiffs' breach of contract cause of action cannot be premised on an operating agreement/joint venture agreement that allegedly never became effective.

Even assuming, arguendo, Plaintiffs' breach of contract cause of action is based on one of the *four* versions of the operating agreement/joint venture agreement, Plaintiffs did not identify *which* version of the operating agreement/joint venture agreement is the operative agreement and/or attach a copy of the agreement to the third amended complaint. Plaintiffs only attached a copy of Version 1 to the third amended complaint. (TAC ¶22; Exhibit B). Plaintiffs alleged it makes no difference which version of the joint venture agreement/ operating agreement controls because the "important portion of the Joint Venture Agreement is Section 6" and "all 'versions' of the Joint Venture Agreement are the same" with respect to the "monetization" provision in Section 6. (TAC ¶22).

6

(24)

Exhibit 2
202

However, the conclusory and inconsistent allegations are insufficient, especially considering Plaintiffs alleged that none of the versions of the joint venture agreement/operating agreement became effective and Plaintiffs repudiated Version 1 in prior pleadings. (FAC ¶¶157, 162, 496)(SAC ¶¶101-103, 560, 577).

Additionally, assuming the breach of contract cause of action is based on the joint venture agreements/operating agreements and they all have the same "monetization provision," Plaintiffs did not allege facts showing Investor Member breached the joint venture agreements/operating agreements. Plaintiffs alleged "Investor Member breached its obligations under the Joint Venture Agreement...by refusing to accept...and rejecting...Neil's offers, which he made on behalf of NMS Capital, to provide sufficient funds to 'monetize,' or take-out, the Investor Member's investment pursuant to Section 6 of the Joint Venture Agreement."  (TAC ¶35). Plaintiffs alleged the "Investor Member was entitled to receive the greater of: (a) 1.75 times its net invested capital, or (b) a 24% IRR, i.e., approximately $105 million. By refusing to accept, and by repudiating its obligation to accept, this sum, the Investor Member violated its obligations and the Operating Member's rights under Section 6 of the Joint Venture Agreement." (TAC ¶36). However, Section 6.1(b) of the joint venture agreements/operating agreements does not provide Plaintiffs with a right to monetize, buy-out, or take-out Investor Member's rights as alleged.  (TAC ¶22).  Section 6.1(b) of the joint venture agreements/operating agreements pertains to distributions of "Net Operating Cash Flow" and "Net Capital Proceeds." Plaintiffs alleged "Section 6.1(b) of the JVA includes what is referred to as the 'Waterfall,' outlining how distributions are to occur.  The Waterfall includes seven different levels, all of which together constitute a formula for distributing cash flow generated from operations of the Joint Venture properties and from capital transactions..." (TAC ¶22). Plaintiffs alleged "Section 6.1(b)(vii) contains the critical last level of the Waterfall."  (TAC ¶22).  Plaintiff alleged the "purpose and effect of this provision [was] to confirm the take out terms, or 'monetization' feature, on which Neil and Samek had agreed and that had been confirmed in Samek's e-mail of May 19, 2010."  (TAC ¶22).  However, Section 6.1(b)(vii) does *not* provide Plaintiffs with a right to monetize or take-out Investor Member's interest.  Section 6.1(b)(vii) of Version 1 states:

> Thereafter, (i) forty-five percent (45%) to Operating Member and (ii) fifty-five percent (55%) to the Members (including Operating Member) pari passu in accordance with their Percentage Interests (subject, however, to adjustment/reallocation, as provided in Section 6.2(c) below); provided, however, one hundred percent (100%) shall be distributed to Operating Member if within five (5) years from the

7



Exhibit 2
203

date hereof Investor Member receives all amounts it is entitled to receive under <u>Section 6.1(i)</u> through <u>(vi)</u>.”

Section 6.1(b)(vii) does not make any mention of a buy-out, take-out, or monetization of *Investor Member's interest*.  As argued by Defendants, “Plaintiffs do not explain how Article 6 – a contract term that explains how certain funds should be allocated between the parties – confers any right on either Member or Joint Venture to *acquire* the interests of the other.”  (Demurrer, pg. 8).

Moreover, Plaintiffs' interpretation of Section 6.1(b) is contradicted by the other terms of the joint venture agreements/operating agreements.  For example, Section 8.1 of Version 1 gives *Investor Member* the sole power and authority to make any distributions in accordance with the terms of the agreement and Section 8.4 of Version 1 provides the “Operating Member” may not, without the prior written approval of Investor Member, “make a distribution of any Net Operating Cash Flow or Net Capital Proceeds or other funds or property of the Company not in accordance with <u>Sections 6.1(b)</u> or <u>6.2</u>.”  The provisions giving *Investor Member* sole authority to make any distributions are directly at odds with Plaintiffs' claim that Section 6.1(b) gives them a monetization or take-out right. Article 11 of Version 1 also contradicts Plaintiffs' interpretation of Section 6.1(b). Article 11 of Version 1, entitled “**BUY/SELL**” sets forth in detail the method by which the Operating Member or the Investor Member can “buy out” the other member of the operating agreement/joint venture agreement.  As argued by Investor Member, “Plaintiffs' allegations, if allowed, would vitiate the entirety of Article 11, which is contrary to both Delaware and California law.”  (Reply, pg. 7). See *Zalkind v. Ceradyn, Inc.* (2011) 194 Cal.App.4th 1010, 1027 (“‘The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.’ To the extent practicable, the meaning of a contract must be derived from reading the whole of the contract, with individual provisions interpreted together, in order to give effect to all provisions and to avoid rendering some meaningless.”)(Citations Omitted) and *O'Brien v. Progressive N. Ins. Co.* (Del. 2001) 785 A.2d 281, 287 (“Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive. Contracts are to be interpreted in a way that does not render any provisions ‘illusory or meaningless.’”)(Citations Omitted).

Based on the foregoing, Investor Member's demurrer to the 1st COA is sustained *without leave to amend*.

8



Exhibit 2
204

*Breach of Contract – Re Other Provisions in the Joint Venture Agreement (2nd COA) vs. Investor Member*

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of contract against Investor Member. Plaintiffs did not allege the existence of a valid agreement with Investor Member. Plaintiffs' breach of contract cause of action is based on "the Joint Venture Agreement." (TAC ¶¶41-42). However, Plaintiffs alleged there are at least *four* versions of the operating agreement/joint venture agreement. (TAC ¶¶22, 40). Plaintiffs also alleged that *none* of the versions of the operating agreement/joint venture agreement "became effective; none was 'executed and delivered by all of the Members' of the Joint Venture, as required by Section 15.10 of the JVA." (TAC ¶¶22, 40). These allegations are incorporated into the breach of contract cause of action. Plaintiffs' breach of contract cause of action cannot be premised on an operating agreement/joint venture agreement that allegedly never became effective.

Even assuming, arguendo, Plaintiffs' breach of contract cause of action is based on one of the *four* versions of the operating agreement/joint venture agreement, Plaintiffs did not identify which version is the operative agreement and/or attach a copy of the agreement to the third amended complaint. Plaintiffs only attached a copy of Version 1 to the third amended complaint. (TAC ¶22; Exhibit B). Plaintiffs alleged it makes no difference which version of the joint venture agreement/operating agreement controls because the "important portion of the Joint Venture Agreement is Section 6" and "all 'versions' of the Joint Venture Agreement are the same" with respect to the "monetization" provision in Section 6. (TAC ¶22). However, Plaintiffs' breach of contract cause of action is *not* based on Section 6 of the operating agreements/joint venture agreements. Plaintiffs did not allege facts suggesting each version of the joint venture agreement/operating agreement has the same provisions at issue in the breach of contract cause of action.

Additionally, assuming the breach of contract cause of action is based on Version 1 and/or all versions of the joint venture agreement/operating agreement have the same provisions at issue, Plaintiffs did not identify the specific provisions of the joint venture agreement(s)/operating agreement(s) Investor Member allegedly breached and/or facts showing Investor Member breached each provision. (FAC ¶42). Plaintiffs alleged Investor Member "violated its obligations and the Operating Member's rights under Sections 4, 5, 6, 7, 8, 10 and 14 of the Joint Venture Agreement." (FAC ¶43). However, Plaintiffs did not identify the provisions and/or allege facts showing how Investor Member breached each provision. Moreover, as argued by Investor Member, "Plaintiffs' claims fail for

9

27

Exhibit 2
205

the additional reason that they consist almost entirely of assertions that simply fault the Investor Member for exercising its own rights under the JV Agreement." (Demurrer, pg. 10). For example, Plaintiffs alleged Investor Member breached the joint venture agreement(s)/operating agreement(s) by declaring NMS to be in default when it was not in default, wrongfully appropriating joint venture funds to conduct an audit that it was not entitled to conduct, purporting to remove NMS Capital as the Operating Member despite a valid reason, repudiating NMS Capital's right to serve a Buy/Sell Notice on factually and legally baseless grounds, etc. (TAC ¶42). Version 1 provides Investor Member with the right/authority to audit the books and records of account (§4.1 – "Each Member or its duly authorized representative shall have the right to inspect, examine and copy and audit such books and records of account (and audit internal systems and procedures of the Operating Member) at the Company's office during reasonable business hours."), the sole discretion regarding the "requiring or making of any Capital Contribution" and "making any distribution" (§8.1(b), (e)), and the authority to remove the Operating Member at any time following a "Removal Event" (§10). Moreover, Version 1 states, in pertinent part, as follows: "in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event." (§11.1).

Based on the foregoing, Investor Member's demurrer to the 2nd COA is sustained *without leave to amend*.

### *Fraud (3rd COA) vs. AEW Entities,[5] Samek, and Davidson & False Promise (4th COA) vs. Investor Member*

"The elements of fraud, which give rise to the tort action for deceit, are (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) justifiable reliance, and (5) resulting damage." *Conroy v. The Regents of the University of California* (2009) 45 Cal.4th 1244, 1255 (Citations Omitted).

"Fraud in the inducement is a subset of the tort of fraud. It 'occurs when ''the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is voidable.'''" *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294-295 (Citations Omitted).

---

[5] Plaintiffs alleged the "AEW Entities" are AEW Partners, VI, L.P., AEW VI, L.P., AEW Capital Management, L.P., Investor Member, and AEW Partners VI, Inc. (TAC ¶19).

10

28

Exhibit 2
206

"The facts essential to the statement of a cause of action in fraud or deceit based on a promise made without any intention of performing it are: (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent at the time of making the promise; (3) the promise was made with intent to deceive or with intent to induce the party to whom it was made to enter into the transaction; (4) the promise was relied on by the party to whom it was made; (5) the party making the promise did not perform; (6) the party to whom the promise was made was injured." *Regus v. Schartkoff* (1957) 156 Cal.App.2d 382, 389 (Citations Omitted).

A cause of action for fraud must be alleged with factual specificity. Plaintiffs must plead facts showing "how, when, where, to whom, and by what means the representations were tendered." *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184. "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Tarmann v. State Farm Mutual Automobile Insurance Company* (1991) 2 Cal.App.4th 153, 157 (Citations Omitted).

Plaintiffs failed to allege sufficient facts to constitute a cause of action for fraud or promissory fraud against Investor Member.  Plaintiffs alleged the fraud cause of action "concerns statements made by AEW Defendants during the negotiations for the Joint Venture Agreement and after the Joint Venture Agreement was executed."  (TAC ¶48).  Plaintiff alleged the "AEW Defendants conspired with each other to defraud Plaintiffs in multiple ways," including knowingly making materially false or misleading misrepresentations to Plaintiffs – during negotiations relating to the joint venture – "about their joint venture program and, in particular, *the Operating Member's right to monetize the Investor Member*" and fraudulently inducing Plaintiffs to transfer several properties into the joint venture at pre-entitlement, below-market valuations – after the joint venture agreement was executed – "based on the knowingly false and highly material representation that the valuations did not matter and would enable the venture to obtain more money." (TAC ¶49).  Plaintiffs' promissory fraud cause of action is based on the allegation that "Investor Member knowingly made false promises and undertook obligations with an intent to defraud NMS Capital" by making promises and undertaking obligations in the joint venture agreement "relating to the monetization feature, NMS Capital's take-out right, and NMS Capital's buy/sell right that it did not intend to perform or honor" and entering into the joint venture agreement "with the intention of repudiating and refusing to comply with the terms, including, but not limited to, those relating to monetization in Section 6 and

11

29

Exhibit 2
207

the buy/sell provision in Section 11." (TAC ¶55). However, Plaintiffs did not allege the fraud causes of action with the requisite factual specificity. Plaintiffs did not identify each alleged misrepresentation/promise by Investor Member, as well as, the names of the persons who made each alleged misrepresentation/promise, their authority to speak, to whom they spoke, what they said or wrote, and when each misrepresentation/promise was said or written.

Additionally, Plaintiffs did not allege facts showing the alleged representations/promises were false. Plaintiffs' fraud causes of action are based on alleged representations/promises made regarding Operating Member's right to purportedly monetize, take-out, or buy-out Investing Member's right. However, Plaintiffs alleged facts in the third amended complaint suggesting they received the right to *acquire* Investor Member's interest. Plaintiffs' alleged "Section 6.1 was intended by the Members to, and *did*, implement the terms set forth in Samek/AEW's May 19, 2010 e-mail." (TAC ¶9). Plaintiffs also alleged that all versions of the joint venture agreement/operating agreement are the same with respect to the "monetization" provision in Section 6. (TAC ¶22). Moreover, Version 1 of the operating agreement/joint venture agreement, as discussed above, gives Operating Member the right to *acquire* (buy-out) Investor Member's interest.

Plaintiffs also did not allege facts showing they reasonably relied on the alleged promises/representations. Version 1 contains an integration clause (§15.6 – "This Agreement and the schedules attached hereto constitute the entire agreement between the parties hereto with respect to the transactions contemplated herein and supersede all prior understandings or agreements between the parties."), as well as, a provision stating "…no amendment or modification of this Agreement shall be effective unless reflected in a document executed and delivered by all of the Members" (§15.10). Plaintiffs failed to allege how they could have reasonably relied on representations/promises in light of §§15.6 and 15.10 (under California or Delaware law).

Based on the foregoing, Investor Member's demurrer to the 3rd and 4th COAs is *sustained without leave to amend.*[6]

_____

[6] Additionally, Plaintiffs' fraud causes of action appear to be barred under Delaware law because they derive from rights and obligations covered by the operating agreement(s)/joint venture agreement(s). See *Nemec v. Shrader* (Del. 2010) 991 A.2d 1120, 1129-1130 ("This contention, in our view, lacks merit. Even though the Directors caused the Company to redeem the plaintiffs' shares when it did, the fiduciary duty claim still arises from a dispute relating to the exercise of a *contractual* right -- the Company's right to redeem the shares of retired nonworking stockholders. That right was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract. Rather, that right was solely a creature of

12



Exhibit 2
208

*Breach of Fiduciary Duty (5th COA) vs. Investor Member and Samek*

"To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty against Investor Member. Plaintiffs did not allege facts showing Investor Member owed them a fiduciary duty. Plaintiffs' breach of fiduciary duty cause of action appears to be based on a joint venture agreement/operating agreement. Plaintiffs alleged the "AEW Defendants named in this cause of action owed fiduciary duties to NMS Capital because they possessed by virtue of, among other things, the terms of the Joint Venture Agreement, and because they exercised, total control over the Joint Venture..." (TAC ¶63). However, as discussed above, Plaintiffs' allegations regarding the validity of the joint venture agreement(s)/operating agreement(s) are contradictory.

Even assuming, arguendo, Plaintiffs' breach of fiduciary duty cause of action is based on Version 1 and/or all versions of the joint venture agreement/operating agreement have the same modification of liability provision, Plaintiffs did not allege facts showing Investor Member owed them a fiduciary duty. Version 1 of the joint venture agreement/operating agreement contains a disclaimer of any fiduciary relationship between the parties:

> **Modification of Liability**. The Members expressly agree that (i) *with respect to any approval or other right granted to the Members, the other Member shall not have any fiduciary duty to any other Member or the Company and may exercise such right or grant or refuse to grant such approval under this Agreement for the sole benefit of such Member, as determined in its sole discretion,* and (ii) with respect to any action taken by the Company which was directed by the Investor Member or Operating Member or undertaken by the Company with the Investor Member's or Operating Member's consent, the Operating Member or Investor Member shall not have any fiduciary duty to any other Member or the Company. *The Members (including any*

contract, and attached only to those shares that retired stockholders acquired under the Stock Plan. As a consequence, the nature and scope of the Directors' duties when causing the Company to exercise its right to redeem shares covered by the Stock Plan were intended to be defined solely by reference to that contract. Any separate fiduciary duty claims that might arise out of the Company's exercise of its contract right, therefore, were foreclosed. Accordingly, the Chancellor committed no error by dismissing the fiduciary claim in Count II.").

13



Exhibit 2
209

> *subsequently admitted Members) acknowledge that any fiduciary or other duty imposed under the Act or any other applicable law, rule or regulation shall be deemed modified, waived or restricted in each case pursuant to the foregoing.* The Members shall, however, be obligated to properly account for all funds received by it from the Properties.

(Emphasis Added).  Plaintiffs did not allege facts showing the waiver of fiduciary duties is somehow invalid, Investor Member owed them fiduciary duties that are not covered by and/or were not waived by the modification of liability provision, and/or Investor Member breached any fiduciary duties owed to Plaintiffs. Plaintiffs' conclusory allegations are insufficient.

Based on the foregoing, Investor Member's demurrer to the 5th COA is *sustained without leave to amend.*[7]

### *Constructive Fraud (6th COA) vs. Investor Member and Samek*

"The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516-517, fn. 14.  But see Civil Code §1573 ("Constructive fraud consists:  1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.").

Plaintiffs failed to allege sufficient facts to constitute a cause of action for constructive fraud against Investor Member.  As discussed above, Plaintiffs did not allege facts showing Investor Member owed them a fiduciary duty.

Based on the foregoing, Investor Member's demurrer to the 6th COA is *sustained without leave to amend.*

---

[7] Additionally, Plaintiffs' breach of fiduciary duty and constructive fraud causes of action appear to be barred under Delaware law because they derive from rights and obligations covered by the operating agreement(s)/joint venture agreement(s).  See *Nemec* at 1129-1130.

14



Exhibit 2
210

B. Demurrer – Defendants Eric Samek, Marc Davidson, AEW Capital
Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc. and
AEW VI, L.P.

Defendants Eric Samek ("Samek"), Mark Davidson ("Davidson") AEW
Capital Management, L.P. ("AEW Capital"), AEW Partners, VI, L.P. ("AEW
Partners LP"), AEW Partners VI, Inc. ("AEW Partners INC"), and AEW VI, L.P.
("AEW LP")(collectively AEW Defendants") demur to the 3rd, 5th, and 6th causes
of action in Plaintiffs' third amended complaint.  AEW Defendants argue Plaintiffs
failed to allege sufficient facts to constitute the causes of action.

As discussed above in detail, the Court finds Plaintiffs' third amended
complaint is a sham pleading.  Even assuming, arguendo, the third amended
complaint is not a sham pleading, as discussed below in detail, Plaintiffs failed to
allege sufficient facts to constitute the causes of action asserted against AEW
Defendants in the third amended complaint.

*Fraud (3rd COA) vs. AEW Entities, Samek, and Davidson & False Promise*

Plaintiffs failed to allege sufficient facts to constitute a cause of action for
fraud against AEW Defendants.  As discussed above, Plaintiffs did not allege the
fraud cause of action with the requisite factual specificity.  Plaintiffs did not
identify each alleged misrepresentation/promise made by Samek and Davidson, as
well as, how, when, where, to whom, and by what means each misrepresentation/
promise was tendered.  Additionally, Plaintiffs did not identify each alleged
misrepresentation/promise made by AEW Capital, AEW Partners LP, AEW
Partners INC, and AEW LP, as well as, the names of the persons who made each
alleged misrepresentation/promise, their authority to speak, to whom they spoke,
what they said or wrote, and when each misrepresentation/promise was said or
written.

Plaintiffs also did not allege facts showing the alleged representations/
promises were false.  Plaintiffs' fraud cause is based on alleged representations/
promises made regarding Operating Member's right to purportedly monetize, take-
out, or buy-out Investing Member's right.  (TAC ¶¶46-53).  As discussed above in
detail, Plaintiffs alleged facts in the third amended complaint suggesting they
received the right to *acquire* Investor Member's interest.  Further, for the reasons
discussed above in detail, Plaintiffs did not allege facts showing they reasonably
relied on the promises/representations.

15

33

Exhibit 2
211

Based on the foregoing, AEW Defendants' demurrer to the 3rd COA is *sustained without leave to amend.*

*Breach of Fiduciary Duty (5th COA) vs. Investor Member and Samek & Constructive Fraud (6th COA) vs. Investor Member and Samek*

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty or constructive fraud against Samek. Specifically, Plaintiffs did not allege facts showing Samek owed them a fiduciary duty. As discussed above, Plaintiffs failed to allege facts showing Investor Member owed them a fiduciary duty in light of the inconsistent allegations regarding the joint venture agreements/operating agreements and the modification of liability provision in Version 1. The modification of liability provision appears to apply to Samek. Plaintiffs alleged Samek, at all relevant times, has been an officer, director, and/or managing agent of Investor Member. (TAC ¶19). Plaintiffs did not allege facts showing the waiver of fiduciary duties is somehow invalid and/or does not apply to Samek, Samek owed them fiduciary duties that are not covered by and/or were not waived by the modification of liability provision, and/or Samek breached any fiduciary duties owed to Plaintiffs.

Even assuming, arguendo, the modification of liability provision does not apply and/or does not apply to Samek, Plaintiffs failed to allege *facts* showing Samek owed them a fiduciary duty and/or breached the duty. Conclusory allegations are insufficient.

Based on the foregoing, Samek's demurrer to the 5th and 6th COA is *sustained without leave to amend.*

Dated: _April 5_, 2016

_____
Hon. Suzanne G. Bruguera
Judge of the Superior Court

Moving Parties shall on or before April 15, 2016 provide & serve a Proposed Order incorporating each and every argument presented by moving parties at the hearing on this matter and moving papers and reply papers. Objections to order shall be filed & served on or before 4-25-2016
16          Reply on or before 4-29-16.

34

Exhibit 2
212

# EXHIBIT B



Exhibit 2
213

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

**DEPARTMENT 71**

~~TENTATIVE~~ RULING

*FILED*
*Superior Court of California*
*County of Los Angeles*
DEC 02 2015
*Sherri R. Carter, Executive Officer/Clerk*
*R. Inostroza*
BY: R. INOSTROZA, DEPUTY

| | |
|---|---|
| LINCOLN STUDIOS, et al., | Case No.: BC551551 |
| vs. | |
| DLA, et al. | |
| | Hearing Date: December 2, 2015 |

**Defendant P6 LA MF Holdings SPE, LLC's demurrer to the 3rd, 4th, 7th – 10th, and 14th – 30th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition. Defendant's demurrer to the 1st, 2nd, 5th, 6th, 11th, 12th, and 13th COAs in the second amended complaint is sustained with 30 days leave to amend.**

**Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC's demurrer to the 7th and 8th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition.**

**Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.'s demurrer to the 3rd, 4th, 7th, 8th, 10th, and 14th – 30th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition. Defendants' demurrer to the 1st, 2nd, 5th, 6th, 11th, 12th, and 13th COAs in the second amended complaint is sustained with 30 days leave to amend**

**Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC's motion to strike is granted (in part).**

1

(36)

Exhibit 2
214

A. Demurrer of Defendant P6 LA MF Holdings SPE, LLC

Defendant P6 LA MF Holdings SPE, LLC ("P6 LLC") demurs to the 1st –
30th COAs in Plaintiffs' second amended complaint. P6 LLC argues Plaintiffs
failed to allege sufficient facts to constitute the causes of action.[1]

As a preliminary matter, P6 LLC's demurrer to the 3rd, 4th, 7th – 10th, and 14th
– 30th COAs in the second amended complaint is sustained *without leave to amend*
by stipulation of Plaintiffs without opposition. (Notice of Errata and Correction
(filed 11/19/15), pg. 1).

*Fraud in the Inducement and in Performance/Conspiracy & Negligent
Misrepresentation (1st & 2nd COAs)*

"The elements of fraud, which give rise to the tort action for deceit, are (1) a
misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce
another's reliance on the misrepresentation, (4) justifiable reliance, and (5)
resulting damage." *Conroy v. The Regents of the University of California* (2009)
45 Cal.4th 1244, 1255 (Citations Omitted).

"Fraud in the inducement is a subset of the tort of fraud. It 'occurs when
''the promisor knows what he is signing but his consent is induced by fraud,
mutual assent is present and a contract is formed, which, by reason of the fraud, is
voidable.'''" *Hinesley v. Oakshade Town Center* (2005) 135 Cal.App.4th 289, 294-
295 (Citations Omitted).

"Concealment is a species of fraud or deceit. '[T]he elements of an action
for fraud and deceit based on concealment are: (1) the defendant must have
concealed or suppressed a material fact, (2) the defendant must have been under a
duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally
concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the
plaintiff must have been unaware of the fact and would not have acted as he did if
he had known of the concealed or suppressed fact, and (5) as a result of the
concealment or suppression of the fact, the plaintiff must have sustained damage.'"
*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th
858, 868 (Citations Omitted).

---

[1] The request for judicial notice (filed by Defendants on 10/29/15) is granted. However, the
Court will not take judicial notice of the truth of the matters asserted within the documents.

2

$\overline{37}$

Exhibit 2
215

"The elements of a cause of action for negligent misrepresentation are: '1. The defendant must have made a representation as to a past or existing material fact. [para.] 2. The representation must have been untrue; [para.] 3. Regardless of his actual belief the defendant must have made the representation *without any reasonable ground for believing it to be true*; [para.] 4. The representation must have been made with the intent to induce plaintiff to rely upon it; [para.] 5. The plaintiff must have been unaware of the falsity of the representation; he must have acted in reliance upon the truth of the representation and he must have been justified in relying upon the representation. 6. And, finally, as a result of his reliance upon the truth of the representation, the plaintiff must have sustained damage.'" *Continental Airlines, Inc. v. McDonnell Douglas Corporation* (1989) 216 Cal.App.3d 388, 402 (Citations Omitted).

A cause of action for fraud must be alleged with factual specificity. Plaintiff must plead facts showing "how, when, where, to whom, and by what means the representations were tendered." *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184. "The requirement of specificity in a fraud action against a corporation requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Tarmann v. State Farm Mutual Automobile Insurance Company* (1991) 2 Cal.App.4th 153, 157 (Citations Omitted).

Plaintiffs' fraud cause of action is uncertain. Plaintiffs combined several causes of action into one (i.e. fraud, fraudulent inducement, fraudulent concealment, etc.) in violation of CRC 2.112.[2]

Plaintiffs also failed to allege sufficient facts to constitute a cause of action for fraud, fraudulent inducement, and/or negligent misrepresentation. Plaintiffs' fraud and negligent misrepresentation causes of action are not alleged with the requisite factual specificity. Plaintiffs did not identify each alleged misrepresentation made by PC LLC, as well as, the names of the persons who

---

[2] CRC 2.112 provides, as follows:

Each separately stated cause of action, count, or defense must specifically state:
(1) Its number (e.g., "first cause of action");
(2) Its nature (e.g., "for fraud");
(3) The party asserting it if more than one party is represented on the pleading (e.g., "by plaintiff Jones"); and
(4) The party or parties to whom it is directed (e.g., "against defendant Smith").

3

Exhibit 2
216

made each misrepresentation, their authority to speak, to whom they spoke, what they said or wrote, and when each misrepresentation was said or written. Additionally, Plaintiffs did not allege facts showing PC LLC made any false representations, justifiable reliance, and/or resulting damages. As argued by PC LLC, Plaintiffs' fraud and negligent misrepresentation causes of action "are ... premised on allegations that the Operating Member was defrauded and misled into signing a JV Agreement with a 5-year Buy/Sell provision when it purportedly believed the agreement it was signing contained a 3-year Buy/Sell provision." (Demurrer, pg. 12). The causes of action are also premised on allegations that Operating Member was fraudulently induced to transfer property based on the 3-year buy-out representations. (SAC ¶¶47, 55, 101-103, 422, 430-432, 439, 489-492). However, the allegations in the second amended complaint suggest the purported representations were not false and/or Plaintiffs did not sustain resulting damages. Specifically, the allegations in the second amended complaint suggest Plaintiffs contend "Version 2," which includes the 3-year Buy/Sell provision, is the only valid Joint Venture Agreement. (SAC ¶¶101, 103, 291). In fact, Plaintiffs alleged: "Put another way, had AEW acknowledged the Operating Member's right to buy-out or that Version 3 was not the true operating agreement and that if any Version was in effect it was Version 2, Plaintiffs would have suffered no damage." (SAC ¶291). In opposition, Plaintiffs argue their claims are pled in the alternative. Plaintiffs contend:

> The Complaint pleads alternative legal theories because the facts and their legal significance are disputed by Defendants. Plaintiffs alleged that Defendants fraudulently induced them to enter into the JVA by making false promises that they never intended to perform, justifying rescission of the JVA. Defendants dispute this. *In the alternative,* Plaintiffs alleged Defendants breached Version 2 of the JVA. Defendants dispute this. *In the alternative,* Plaintiffs alleged Defendants breached Versions 1 and 3 of the JVA. Defendants dispute this. Plaintiffs have not alleged that the only agreement a jury could decide to enforce is Version 2 ...

(Opposition, pg. 7)(Citations Omitted). However, Plaintiffs did not plead each version of the facts and/or legal theories in separate causes of action in the second amended complaint. Instead, Plaintiffs pleaded alternatively and/or inconsistently *in the same causes of action.*

Based on the foregoing, P6 LLC's demurrer to the 1st and 2nd COAs is sustained with leave to amend.

4

(39)

Exhibit 2
217

*Breach of Fiduciary Duty (5th COA)*

"To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages." *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty. Plaintiffs did not allege facts showing P6 LLC had a duty to inform them of any "special compensation agreement between Zimbler and AEW..." (SAC ¶515). Additionally, Plaintiffs did not allege facts showing P6 LLC breached a fiduciary duty to Plaintiffs by engaging in misrepresentations regarding the joint venture agreement(s), contending Version 3 was the valid agreement, and blocking Plaintiffs' attempts to buy-out. (SAC ¶¶506-522). As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend "Version 2" is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 5th COA is sustained with leave to amend.

*Constructive Fraud (6th COA)*

"The elements of the cause of action for constructive fraud are: (1) fiduciary relationship; (2) nondisclosure (breach of fiduciary duty); (3) intent to deceive, and (4) reliance and resulting injury (causation)." *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516-517, fn. 14. But see Civil Code §1573 ("Constructive fraud consists: 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud.").

Plaintiffs failed to allege sufficient facts to constitute a cause of action for constructive fraud. As discussed above, Plaintiffs did not allege facts showing P6 LLC breached a fiduciary duty to Plaintiffs. The allegations in the second amended complaint suggest Plaintiffs contend "Version 2" is the only valid Joint Venture Agreement and Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 6th COA is sustained with leave to amend.

5

40

Exhibit 2
218

*Breach of Contract (Breach of Version 2) (11th COA)*

"The standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom.'" *Wall Street Network, Ltd. v. New York Times Company* (2008) 164 Cal.App.4th 1171, 1178 (Citations Omitted).

Plaintiffs' breach of contract cause of action is uncertain. Plaintiffs combined two causes of action into one (i.e. breach of contract and breach of the implied covenant of good faith and fair dealing) in violation of CRC 2.112. (SAC ¶¶558-573).

Plaintiffs also failed to allege sufficient facts to constitute a cause of action for breach of contract (breach of Version 2). Plaintiffs did not properly allege the existence of an agreement. As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend Version 2 is the only valid Joint Venture Agreement. However, Plaintiffs did not properly plead in the alternative. Additionally, Plaintiffs did not allege facts showing P6 LLC breached Version 2. Plaintiffs alleged P6 LLC breached the contract *and* the implied covenant of good faith and fair dealing by committing various acts. (SAC ¶569). However, Plaintiffs did not identify the specific provisions of Version 2 P6 LLC allegedly breached and/or allege facts showing P6 LLC breached Version 2 of the agreement.

Based on the foregoing, P6 LLC's demurrer to the 11th COA is sustained with leave to amend.

*Breach of Contract (Breach of Version 1) & Breach of Contract (Breach of Version 3) (12th & 13th COAs)*

Plaintiffs' breach of contract causes of action are uncertain. Plaintiffs included causes of action for breach of the implied covenant of good faith and fair dealing in the breach of contract causes of action in violation of CRC 2.112. (SAC ¶¶574-609).

Plaintiffs also failed to allege sufficient facts to constitute causes of action for breach of contract (breach of Versions 1 and 3). Plaintiffs did not properly allege the existence of an agreement. As discussed above, the allegations in the second amended complaint suggest Plaintiffs contend Version 2 is the only valid

6

*41*

Exhibit 2
219

Joint Venture Agreement.  However, Plaintiffs did not properly plead in the alternative.

Based on the foregoing, P6 LLC's demurrer to the 12th & 13th COAs is sustained with leave to amend.

### B. Demurrer of Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe LA Cienega, LLC

Defendants P6 LA MF Holdings I LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC (collectively "Defendants") demur to the 7th and 8th COAs in Plaintiffs' second amended complaint.  Defendants argue Plaintiffs failed to allege sufficient facts to constitute the causes of action.

Defendants' demurrer to the 7th and 8th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition.

### C. Demurrer of Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P.

Defendants Erick Samek, Marc Davidson, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., and AEW VI, L.P. (collectively "Upstream AEW Defendants") demur to the 1st – 8th and 10th – 30th COAs in Plaintiffs' second amended complaint.  Upstream AEW Defendants argue Plaintiffs failed to allege sufficient facts to constitute the causes of action.

As a preliminary matter, Upstream AEW Defendants' demurrer to the 3rd, 4th, 7th, 8th, 10th, and 14th – 30th COAs in the second amended complaint is sustained *without leave to amend* by stipulation of Plaintiffs without opposition.

### *Fraud in the Inducement and in Performance/Conspiracy & Negligent Misrepresentation (1st & 2nd COAs)*

Plaintiffs' fraud cause of action is uncertain.  Plaintiffs combined several causes of action into one (i.e. fraud, fraudulent inducement, fraudulent concealment, etc.) in violation of CRC 2.112.

7

Exhibit 2
220

Plaintiffs also failed to allege sufficient facts to constitute causes of action for fraud, fraudulent inducement, and/or negligent misrepresentation. Plaintiffs' fraud and negligent misrepresentation causes of action are not alleged with the requisite factual specificity. Plaintiffs did not properly identify each alleged misrepresentation made by Upstream AEW Defendants. Additionally, as discussed above, Plaintiffs did not allege facts showing the representations were false, justifiable reliance, and/or resulting damages. Finally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for fraud or negligent misrepresentation under any other theory.

Based on the foregoing, Upstream AEW Defendants' demurrer to the 1st and 2nd COAs is sustained with leave to amend.

*Breach of Fiduciary Duty & Constructive Fraud (5th & 6th COAs)*

Plaintiffs failed to allege sufficient facts to constitute a cause of action for breach of fiduciary duty against Upstream AEW Defendants. Plaintiffs did not allege facts showing Upstream AEW Defendants owed Plaintiffs a fiduciary duty and/or breached any fiduciary duty owed to Plaintiffs. Additionally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for breach of fiduciary duty or constructive fraud under any other theory.

Based on the foregoing, Upstream AEW Defendants' demurrer to the 5th and 6th COAs is sustained with leave to amend.

*Breach of Contract (Breach of Version 2), Breach of Contract (Breach of Version 1), & Breach of Contract (Breach of Version 3) (11th - 13th COAs)*

Plaintiffs' breach of contract causes of action are uncertain. Plaintiffs included causes of action for breach of the implied covenant of good faith and fair dealing in the breach of contract causes of action in violation of CRC 2.112.

Plaintiffs also failed to allege sufficient facts to constitute the causes of action for breach of contract. As discussed above, Plaintiffs did not properly allege the existence of an agreement and/or allege facts showing Upstream AEW Defendants breached the agreement(s). Additionally, Plaintiffs did not allege facts showing Upstream AEW Defendants are liable for breach of contract under any other theory.

8

(43)

Exhibit 2
221

Based on the foregoing, Upstream AEW Defendants' demurrer to the 11th, 12th, and 13th COAs is sustained with leave to amend.

### D. Motion to Strike

Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings 1 LLC's (collectively "Defendants") motion to strike the claims/allegations against Grobstein Teeple LLP, Howard Grobstein, Eastdil Secured LLC, and Eastdil Secured Broker Services, Inc. is granted by stipulation of Plaintiffs without opposition. (Opposition, pg. 2).[3]

Defendants' motion to strike the 9th COA is moot in light of the ruling on the demurrers.

Defendants' motion to strike the allegations regarding "Gibson, Dunn & Crutcher LLP" and allegations regarding "AEW's Own Investors" is granted by stipulation of Plaintiffs without opposition. (Opposition, pg. 3).[4]

Defendants' motion to strike the allegations regarding "AEW's Conduct at Issue in another Litigation" is moot in light of the ruling on the demurrers, as well as, the ruling granting Defendants' motion to strike the *related* allegations regarding "Gibson, Dunn & Crutcher LLP."

Dated: ~~November 2~~, 2015
December 2, 2015

Hon. Suzanne G. Bruguera
Judge of the Superior Court

---

[3] In their opposition to the motion to strike, Plaintiffs stated they are "willing to dismiss without prejudice the New Defendants." (Opposition, pg. 2).

[4] In their opposition to the motion to strike, Plaintiffs stated: "New lead trial counsel for Plaintiffs has determined that it makes sense to streamline and simplify the case. The core claims are for breach of contract and fraud, and for recovery of damages. These are the claims on which Plaintiffs intend to focus in the new, streamlined complaint. To that end, and taking into consideration the points argued in Defendants' motion, Plaintiffs have eliminated from the amended complaint references to Defendants' investors and Gibson Dunn & Crutcher. Therefore, the Motion is moot." (Opposition, pg. 3).

9

44

Exhibit 2
222

Exhibit 2
223

**Exhibit  C**

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 11/22/16                                                                 DEPT. 71

HONORABLE SUZANNE G. BRUGUERA        JUDGE   R. INOSTROZA        DEPUTY CLERK

HONORABLE                            JUDGE PRO TEM              ELECTRONIC RECORDING MONITOR
NONAPPEARANCE
          C. RANDLE C.A.        Deputy Sheriff   NONE                    Reporter

| 1:30 pm | BC551551        NO LEGAL FILE | Plaintiff Counsel | |
|---|---|---|---|
| | LINCOLN STUDIOS LLC ET AL | | NO APPEARANCES |
| | VS | Defendant | |
| | DLA ET AL | Counsel | |
| | R/T LEAD BC550227 | | |

**NATURE OF PROCEEDINGS:**

NONAPPEARANCE CASE REVIEW RE RULING ON MATTER TAKEN
UNDER SUBMISSION ON 10/28/16;

NOTICE OF ENTRY OF ORDER;

Order granting Defendants' and Cross-Complainant's
motion for terminating and other sanctions is signed
and filed this date incorporated herein by reference
to the case file.

Court rules as reflected in the above order.

A prove-up hearing regarding all of the specific
relief to which Cross-Complainant is entitled is
scheduled for December 1, 2016 at 10:30 a.m. in this
department.

Defendant/cross-complainant is to give notice.

                    Page   1 of   1   DEPT. 71

```
MINUTES ENTERED
11/22/16
COUNTY CLERK
```

Exhibit 2
224

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

NOV 2 2 2016

Sherri R. Carter, Executive Officer/Clerk
By: R. Inostroza, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| LINCOLN STUDIOS, LLC, et al.,<br><br>                 Plaintiffs,<br><br>         v.<br><br>DLA, et al.,<br>                 Defendants.<br>_____<br><br>P6 LA MF HOLDINGS SPE, LLC,<br><br>                 Cross-Complainant,<br><br>         v.<br><br>NMS CAPITAL PARTNERS I, LLC<br><br>         Cross-Defendant. | CASE NO. BC551551<br><br>*[Related Case Nebraska Studios, LLC et. al v. Chernove, et al., Case No. BC550227]*<br><br>**ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS**<br><br>ASSIGNED FOR ALL PURPOSES TO:<br><br>HON. SUZANNE G. BRUGUERA<br><br>DEPARTMENT 71 |

Defendants' and Cross-Complainant's Motion for Terminating and Other Sanctions Against Plaintiffs for Spoliation of Evidence ("Motion" or "Spoliation Motion") and Plaintiffs' Motion to Strike AEW's Terminating Sanctions Motion and Supporting Evidence ("MTS")

1

Exhibit 2
225

came on for hearing on June 13, 2016 at 10:00 a.m., before the Honorable Suzanne G. Bruguera in Department 71 of the above-entitled court.  Appearances of counsel were made on behalf of Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC ("Cross-Complainant"), AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC (collectively, "Defendants"), as well as Lincoln Studios, LLC, Neil Shekhter, Margot Shekhter, The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC ("Cross-Defendant"), NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC (collectively, "Plaintiffs").  On July 29, 2016, the Court issued an Order granting the Motion, subject to a later-ordered Evidentiary Hearing to "determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed."  (Exhibit A [July 29, 2016 Order], p. 4.)  The Evidentiary Hearing commenced on October 14, 2016, and concluded on October 28, 2016, with live testimony of twelve witnesses taking place over eight court days for the purpose of the Court assessing credibility of the witnesses.  Both Plaintiffs and Defendants participated.  After consideration of the briefs and supporting papers, witness testimony, exhibits, the arguments of counsel, and for good cause appearing, the Court hereby **GRANTS** Defendants' Motion in its entirety, and **ORDERS** the following:

Evidentiary Objections

The Court hereby *overrules* Plaintiffs' Objections to the Declarations of Gerald M. La Porte and Samuel S. Rubin in their entirety.

The Court hereby *overrules* Defendants' Objections to the Declarations of Adam Shekhter, Alan Shekhter, Brian Bowis, Eddie Valentin, Enrique Sanchez, Kathleen Annunziata Nicolaides, Neil Shekhter, Rod Saunders, Sasha Frid, Scott Cooper, Skip Miller, Valery Aginsky, and William Flynn in their entirety.

2

Exhibit 2
226

The Court sustained certain objections at the Evidentiary Hearing.  To the extent the Court's rulings at the Evidentiary Hearing conflicts with this Order, those rulings control.

The Court hereby *denies* Plaintiffs' Request for Judicial Notice.

For the reasons stated at the Evidentiary Hearing, the Court hereby *denies* Plaintiffs' "Motion *in Limine* to Exclude Samuel S. Rubin and Gerald M. LaPorte From Testifying At The October 13, 2015 Hearing Or, Alternatively, Continuing The Hearing To Permit Plaintiffs To Conduct Discovery."

The Court's Authority

The Court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose "a monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct. . . . If a monetary sanction is authorized . . . the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust."  (Code Civ. Proc., § 2023.030(a).)

The Court, after notice to any affected party, person, or attorney, and after opportunity for hearing, may impose "a terminating sanction by one of the following orders":

"An order striking out the pleadings or parts of the pleadings of any party engaging in the misuse of the discovery process."

3

Exhibit 2
227

"An order dismissing the action, or any part of the action, of that party."

"An order rendering a judgment by default against that party."

(Code Civ. Proc., §§ 2023.030(d)(1), (2), and (4).)

Misuses of the discovery process include, but are not limited to, "[f]ailing to respond or to submit to an authorized method of discovery," "[m]aking an evasive response to discovery," "[d]isobeying a court order to provide discovery," and "[m]aking or opposing, unsuccessfully and without substantial justification, a motion to compel or to limit discovery." (Code Civ. Proc., §§ 2023.010(d), (f), (g), and (h).)

It is also within the Court's inherent power to issue terminating sanctions for misuses of the courts or the discovery process. (*Stephen Slesinger, Inc. v. Walt Disney, Co.* (2007) 155 Cal.App.4th 736, 740; *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 391.) Terminating sanctions may be appropriate in the first instance. (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 497.) As the court in *R.S. Creative* stated, "We recognize that terminating sanctions are to be used sparingly, only when the trial court concludes that lesser sanctions would not bring about the compliance of the offending party." (*Id.* at p. 496.) Where "[t]he record demonstrates repeated violations of stipulations and court orders, a forged document offered as true, and deliberate destruction of evidence pertinent to exposing that fact" terminating sanctions are appropriate. (*Ibid.*)

The California Code of Judicial Ethics states in Canon 3D(2): "Whenever a judge ... concludes in a judicial decision, that a lawyer has committed misconduct or has violated any

4

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
228

provision of the Rules of Professional conduct, the judge shall take appropriate corrective action, which may include reporting the violation to the appropriate authority."

Further, Business & Professions Code section 6086.7 requires the Court to notify the State Bar of "[t]he imposition of any judicial sanctions against an attorney except for failure to make discovery or monetary sanctions of less than one thousand dollars."

A "[j]udge who learns in court proceedings that a witness has engaged in criminal activity," such as perjury, may inform law enforcement authorities.  Canons 2A, 3A."  Cal. Judges Ass'n, *Judicial Ethics Update*, February 2010, section C1.

The Court's Prior Orders

On September 8, 2015, the Court ordered Plaintiffs to "immediately take steps to freeze all of their electronic documents so that they cannot be modified or deleted."  (Declaration of Jay P. Srinivasan in Support of Defendants' Motion for Terminating and Other Sanctions Against Plaintiffs for Spoliation of Evidence ("Srinivasan Decl."), Exh. Y, at p. 1.)

On October 6, 2015, the Court ordered a forensic examination of all of Plaintiffs' relevant electronic media, and ordered Plaintiffs to produce for forensic imaging all of Plaintiffs' and Plaintiffs' affiliates' devices that "could have ever sent, received modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including 'Version 2'), Exhibit 41 [the cover letter], and all Property Management Agreements (including the Luxe La Cienega PMA), as well as Neil Shekhter's home and office computers (the 'Devices')."  (Srinivasan Decl., Exh. Z, at p. 2; see also Plaintiffs' Evidentiary Hearing Exhibits ("Plfs.' Hr. Exhs."), Exh. 26, at p. 2.)  The Court also ordered

5

Exhibit 2
229

Plaintiffs to produce a list of all such relevant devices.  (Srinivasan Decl., Exh. Z, at p. 2; see also Plfs.' Hr. Exhs., Exh. 26, at p. 2.)

On July 29, 2016, the Court issued an Order granting Defendants' and Cross-Complainant's Motion subject to an Evidentiary Hearing to resolve the allegedly conflicting testimony submitted in support of or in opposition to the Motion, a true and correct copy of which is attached hereto as **Exhibit A**.  (Exh. A [July 29, 2016 Order].)  The Order detailed the "purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED."  (*Id.*, at p. 4.)  The Order determined that "Plaintiffs' own evidence and/or undisputed facts establish violations of the Court's 9/8/2015 and 10/6/2015 discovery orders."  (*Id.*, at p. 3.)  For instance, the Court found that Neil Shekhter admitted to deleting files from his personal computer, replacing the hard drive of his computer with a new one, altering files, and failing to transfer all files to the new hard drive.  (*Ibid.*)  The Court also found that Neil Shekhter admitted to deleting a zip file from a former AEW employee, Daniel Lennon, containing Joint Venture related documents, and that the IT Administrator for NMS Properties, Inc. admitted to using a program called "eraser Portable" to delete files from another NMS employee's computer.  (*Ibid.*)

Recognizing the severity of terminating sanctions, on September 14, 2016, the Court ordered that an Evidentiary Hearing would be held to resolve the alleged conflicts in the testimony submitted by Defendants in support of the Motion as compared to the testimony submitted by Plaintiffs in opposition to the Motion, and to assess each of the witness' credibility.  The Court invited counsel for both Plaintiffs and Defendants to present live testimony from any witness whose declaration or deposition testimony had been submitted in support of or in opposition to the Motion.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
230

The Evidentiary Hearing took place on October 14, October 17, October 18, October 19, October 20, October 24, October 25, and October 28, 2016.

Defendants presented for direct and cross-examination the following percipient witnesses: Michelle McClure, Steven Fein, Jonathan Watson, and Eric Samek. Defendants also presented for direct and cross-examination the following expert witnesses: Gerald LaPorte and Samuel Rubin.

Plaintiffs presented for direct and cross-examination the following percipient witnesses: Daniel Lennon and Brian Bowis. Plaintiffs also presented for direct and cross-examination the following expert witnesses: Valery Aginsky, Scott Cooper, William Flynn, and Kathleen Nicolaides.

Factual Findings

*The Joint Venture Agreement as Executed and Amended*

On or about September 8, 2010 the parties entered into a Limited Liability Company Agreement for P6 LA MF Holdings I LLC (hereinafter the "JVA") to acquire, finance, hold, develop, construct, operate, maintain, renovate, lease, market, sell, and otherwise deal with multi-unit residential apartment buildings in Los Angeles. (See Srinivasan Decl., Exh. E; see also Defendants' Evidentiary Hearing Exhibits ("Defs.' Hr. Exhs."), Exh. 1.)

Throughout this litigation, Plaintiffs have advanced and continue to rely on what they refer to as "Version 2" of the JVA. (See, e.g. Third Am. Compl. ("TAC"), ¶ 22(b); Declaration of Neil Shekhter In Support of Plaintiffs' Motion for Forensic Examination, filed on January 19, 2016, ¶¶ 11-14; Sec. Am. Compl. ("SAC"), ¶ 291, First Am Compl. ("FAC"), ¶¶ 40-41, 67.B,

168, 171.) "Version 2" is the only "version" of the JVA alleged to be effective by Plaintiffs. (TAC, ¶ 22(b).) Plaintiffs have previously taken the position that the question of whether "Version 2" is authentic is at the core of this case. (Srinivasan Decl., Exh. O, at 8:7-9:2 [Plaintiffs' counsel stating that the disagreement over different "versions" of the JVA is "really at the heart of the case" and equating the "buy/sell arrangement" with the right to "buy out AEW"]; *id.*, Exh. P, at p. 5 [explaining that the alleged Buy/Sell right was "critical to the deal insofar as Shekhter was concerned."].)

Plaintiffs' attempt to walk away from these claims now not only ignores Plaintiffs' past pleadings, but also violates the sham pleading doctrine, as the Court already found in its order granting Defendants' demurrer to the TAC. (*Cont'l Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 [Plaintiffs cannot "discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading."] [internal marks and citations omitted]; June 8, 2016 Order Sustaining Defendants' Demurrers to Plaintiffs' Third Amended Complaint, at pp. 5-7 [rejecting as a sham pleading Plaintiffs' allegations in the TAC for the first time that the three-year Buy/Sell provision in Section 11.1 is irrelevant].) Even Plaintiffs' Opposition claims that "Version 2" is the only version of the JVA that could be effective. (See Plaintiffs' Opposition To Defendants' Motion For Terminating And Other Sanctions ("Opp.") at pp. 4-6; Declaration of Neil Shekhter In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Shekhter Decl. ISO Sanctions Opp."), ¶¶ 26-33.)

In 2010, Neil Shekhter of NMS Capital Partners I, LLC ("NMS") and Eric Samek of P6 LA MF Holdings SPE, LLC ("AEW") initiated discussions regarding a potential real estate joint venture. Both parties were represented by skilled and able counsel (AEW being

8

Exhibit 2
232

represented by DLA Piper, LLC, and NMS being represented by Sheldon Chernove and then Schultz & Wright, LLP), and all aspects of the joint venture agreement were heavily negotiated in arm's-length discussions. (Srinivasan Decl., Exh. B, at 39:18-25 [deposition of Jim Andersen].)

Article 11.1 of the JVA contains the Buy/Sell provision, whereby either party could have the opportunity to buy or sell the other member's interest in the joint venture at a certain price, assuming certain conditions are met. "Version 1"—what Plaintiffs call the as-executed JVA— contains a 5-year Buy/Sell provision ("At any time after five (5) years from the date hereof"). (Id., Exh. E at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 1.) "Version 2" contains a 3-year Buy/Sell ("At any time after three (3) years from the date hereof"). (Id., Exh. K, at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 3.) "Version 3"—what Plaintiffs call the as-amended operative JVA—contains the same 5-year Buy/Sell provision contained in the executed JVA. (Defs.' Hr. Exhs., Exh. 2, at Art 11.1.)

The parties negotiated and agreed to a 5-year Buy/Sell provision in Article 11.1, and Neil Shekhter was aware of this. Initially, as reflected in the May 2010 term sheet that was "not a legally binding commitment by either party," AEW and NMS considered a buy/sell right that could be triggered "for individual properties at the later of (i) three years from the acquisition of the property for which the buy/sell is being triggered or (ii) the stabilization of the property for which the buy/sell is being triggered." (Srinivasan Decl., Exh. A; see also Defs.' Hr. Exhs., Exh. 6.) On July 28, 2010, Sheldon Chernove, NMS' deal counsel, requested in edits to the draft agreement that the Buy/Sell term not be available until after five years, writing regarding Article 11.1 to a draft joint venture agreement: "SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD." (Srinivasan

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
233

Decl., Exh. D at Art. 11.1 [capitalization in original]; see also Defs.' Hr. Exhs., Exh. 7.) NMS (*i.e.*, Neil Shekhter) received a copy of these redlines. (*Id.*) This email and draft from Mr. Chernove was a request by NMS to change the Buy/Sell term from the later of three years or stabilization to a 5-year Buy/Sell term. (See Oct. 24, 2016 Hr. Tr., at 11:2-14:16 [testimony of Eric Samek].)

Around the same time, then-Chief Operating Officer and later NMS President Jim Andersen also requested a 5-year Buy/Sell term instead of the later of three years or stabilization by calling Jonathan Watson at AEW and directly asking for this term. (Oct. 20, 2016 Hr. Tr., at 10:8-13:3; 14:1-15:9.) Mr. Watson testified credibly at the Evidentiary Hearing that NMS requested a 5-year Buy/Sell term because "he was concerned that NMS may not have the financial capacity to compete with AEW in a buy-sell situation within three years" and that NMS' request was accepted by AEW, incorporated into the JVA, and never altered thereafter. (Srinivasan Decl., Exh. E, at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 1.) Plaintiffs have provided no evidence to the contrary. In fact, at the Evidentiary Hearing, Plaintiffs introduced a contemporaneous AEW memorandum dated August 30, 2010, which affirms that the Buy/Sell "can now be triggered after five years only," a change from the "the later of 3 years or stabilization." (Plfs.' Hr. Exhs., Exh. 81.)

Plaintiffs have provided no evidence that during the negotiations, before the JVA was executed, the parties contemplated a Buy/Sell provision that could be triggered after 3 years alone, and ample testimony from Defendants' witnesses supports the fact that a "straight" 3-year Buy/Sell has never appeared in any draft or final JVA. (See, e.g., Oct. 19, 2016 Hr. Tr., at 141:4-8 and 159:24-160:13 [testimony of Steven Fein]; Oct. 14, 2016 PM Hr. Tr., at

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
234

27:12-17 [testimony of Michelle McClure].)  Plaintiffs' only support is to cite two emails that predate months of negotiations as well as the execution of the JVA.  (See Opp. at p. 15.)

NMS' counsel testified at his deposition that the inclusion of the 5-year term reflected AEW's acceptance of NMS' request for a longer Buy/Sell provision (Srinivasan Decl., Exh. F at 129:18-130:8), and NMS repeatedly provided third parties with copies of this agreement containing the 5-year provision (see, e.g., *id.*, Exhs. G, H).  NMS' General Counsel also confirmed, in July 2013, that the three-year "concept" "didn't make it into the actual LLC Agreement."  (Srinivasan Decl., Exh. I; see also Defs.' Hr. Exhs., Exh. 47.)  Plaintiffs have provided no evidence to the contrary.

The 5-year Buy/Sell language was included in the executed JVA.  (See, e.g., Oct. 14, 2016 AM Hr. Tr., at 17:16-19:22 [testimony of Michelle McClure]; Oct. 24, 2016 Hr. Tr., at 14:13-16 [testimony of Eric Samek].)  In fact, Plaintiffs concede this point.  (Oct. 28, 2016 Hr. Tr., at 178:2-9.)

The JVA was amended numerous times after it was executed, by both standalone, separately executed amendments and by slipsheet or substitute pages.  (See, e.g., Oct. 14, 2016 PM Hr. Tr., at 30:6-33:3 [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 16:4-32:1 [testimony of Jonathan Watson].)

    First, as multiple witnesses have testified, these included amendments by slipsheet pages in January 2011 to include the concept of "Specified Properties," a term that continued to be included and affirmed in later standalone Amendments including at least the Third, Sixth, Eighth, Ninth, and Tenth Amendments to the JVA.  (See, e.g., Oct. 14, 2016 PM Hr. Tr., at 30:6-33:3 [testimony of Michelle McClure]; Oct. 19,

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
235

2016 Hr. Tr. at 134:10-139:23 [testimony of Steven Fein]; Oct. 20, 2016 Hr. Tr., at 16:4-32:1 [testimony of Jonathan Watson]; see also Defs.' Hr. Exhs., Exhs. 11-15.) Email communications confirm that the as-amended JVA including these January 2011 "Specified Property" amendments was approved by and consistently relied upon by all parties going forward. (Defs.' Hr. Exhs., Exhs. 9, 17.) Plaintiffs failed to present any testimony other than Neil Shekhter's self-serving declaration undermining the well-supported position that the operative JVA as amended by the parties contained the "Specified Properties" concept.

As "Version 2" does not contain this concept, this is yet another reason "Version 2" cannot have been the JVA relied upon by the parties for five years, and Neil Shekhter's claims to the contrary are not credible in light of this evidence. Jonathan Watson and others testified that NMS' practice of making and requesting capital contributions on a basis other than 70% from the Investor Member and 30% from the Operating Member would be inconsistent with a JVA without the "Specified Property" term. (See, e.g., Oct. 20, 2016 Hr. Tr., at 27:28-28:21 [testimony of Jonathan Watson]; Oct. 19, 2016 Hr. Tr., at 134:11-137:21 [testimony of Steven Fein].) Plaintiffs have not provided any credible testimony contradicting the extensive evidence that all parties used and relied upon the JVA as amended with the "Specified Properties" concept, and the 5-year Buy/Sell provision.

Second, every subsequent amendment of the JVA is well documented, whether through contemporaneous email communication or a standalone executed amendment, and every subsequent amendment involved the participation of counsel. (See Defs.' Hr. Exhs., Exhs. 9, 11-15, 17.) By contrast, Plaintiffs have

12

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
236

presented no contemporaneous written evidence of the alleged "typo" which purportedly resulted in the creation of "Version 2" as alleged by Neil Shekhter except for the September 14, 2010 "Cover Letter." As discussed further below, this single communication is itself a forgery and lends no support to Plaintiffs' claims.

Both the incorporation of the 5-year Buy/Sell term and the January 2011 "Specified Properties" amendments also were affirmed by Tom Johnston, NMS' counsel, repeatedly in writing. (See Defs.' Hr. Exhs., Exhs. 10, 17 ["NMS has consistently certified that the [JVA] with the 'Change Pages' is the [JVA] on transaction [sic] after January 21, 2011."].)

*"Version 2" of the JVA*

"Version 2" first appeared on NMS' devices on July 15, 2013. (Rubin Decl., ¶ 24.) Plaintiffs do not dispute this. (Declaration of Scott Cooper In Support Of Plaintiffs' Opposition To AEW's Motion For Terminating And Other Sanctions ("Cooper Decl."), ¶¶ 17-19; Defs.' Hr. Exhs., Exh. 31.) "Version 2" contains a 3-year Buy/Sell term, not the 5-year term negotiated and confirmed by NMS' lawyers. (Srinivasan Decl., Exh. K, at Exh. 5, at Art. 11.1; see also Defs.' Hr. Exhs., Exh. 3.) According to Neil Shekhter's sworn testimony, he received "Version 2" in hard copy from Eric Samek in 2010, after claiming that the original version of the agreement's inclusion of a 5-year Buy/Sell provision was a "typo," and that it should have been three years instead. (Srinivasan Decl., Exh. J at 47:10-14; 52:24-53:1; Exh. K, ¶ 13.)

According to Neil Shekhter's testimony, the 5-year Buy/Sell term contained in the executed JVA was a "typo" that Mr. Samek agreed to "fix . . . by changing Section 11's Buy/Sell from a 5-year term to a 3-year term." (Shekhter Decl. ISO Sanctions Opp., ¶ 26; Srinivasan

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
237

Decl., Exh. J [Deposition of Neil Shekhter], at 52:24-53:1.)  This allegedly led to Mr. Samek sending a hard copy of "Version 2" to Neil Shekhter along with the September 14, 2010 "Cover Letter" in September 2010.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 28-31.)  Aside from Neil Shekhter's testimony, which lacks credibility, there is no testimony that the 5-year Buy/Sell language was ever changed after the JVA was executed.  AEW presented extensive testimony to the contrary, including deposition testimony by ex-NMS executive Jim Andersen and NMS' own deal counsel at the time the JVA was negotiated.  (See, e.g., Srinivasan Decl., Exh. F [Deposition of Sheldon Chernove], at 131:9-13:5; id., Exh. B [deposition of Jim Andersen], at 120:18-121:22; Oct. 14, 2016 AM Hr. Tr., at 19:2-22 [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 14:24-28 [testimony of Jonathan Watson]; Oct. 19, 2016 Hr. Tr., at 133:21-134:9 [testimony of Steven Fein]; Oct. 24, 2016 Hr. Tr., at 18:14-20:7 [testimony of Eric Samek].)

Neil Shekhter testified that he has "carefully maintained" the original document since receiving it from Mr. Samek, even keeping it in his safe.  (Srinivasan Decl., Exh. K, ¶ 14; see also id., Exh. J [Sept. 22, 2015 Deposition of Neil Shekhter], at 59:20-60:5; Defs.' Hr. Exhs., Exh. 40.)  According to Plaintiffs, no hard copies of "Version 2" have been destroyed. (Srinivasan Decl., Exh. N [Dec. 10, 2015 Deposition of Neil Shekhter], at 291:9-12.) Plaintiffs and their counsel have repeatedly verified their story about "Version 2" under oath. (See, e.g., Srinivasan Decl., Exh. K, ¶ 13; see also Defs.' Hr. Exhs., Exh. 40; Srinivasan Decl., Exh. L, ¶ 12; id., Exh. M, ¶ 3 ["At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication . . . ."].)

Plaintiffs were ordered to produce the "original hard copy" of "Version 2" in the Court's October 6, 2015 Order Granting Defendants' Motion for Forensic

14

Exhibit 2
238

Examination (the "October 6, 2015 Order"), and repeatedly assured the Court that

they had complied with this Order.

Plaintiffs have repeatedly alleged that "Version 2" is the "only version" of the Joint

Venture Agreement that they agreed to, and have repeatedly asserted that the

document they provided to Defendants on September 22, 2015 is the "original"

"Version 2" that was allegedly delivered to Neil Shekhter in September 2010.   (See,

e.g., Srinivasan Decl., Exh. J, at 15:3-16:11; 22:10-25 ["This document, sir, is the

document that was sent to our office, that is correct."]; *id.*, Exh. K at ¶ 14 ["Since my

receipt of the documentation in the preceding paragraph in mid-September 2010, I

have carefully maintained the original hard copies of Version 2 and Mr. Samek's

September 14, 2010 cover letter for it.  Pursuant to the Court's September 8, 2015

order in this case, I recently turned them over to my counsel, Steven Zelig."]; *id.*,

Exh. P, at pp. 5, 11-12 ["[T]he original has remained in Shekhter's possession until

recently, when he turned it over to NMS counsel for handling and maintaining in

accordance with the September 8, 2015 order of this Court."; "[P]laintiffs have

assembled original hard copies of the agreements for holding in escrow . . . [and]

produced for copying by AEW the original hard copies of JVA Version 2 and the La

Cienega PMA." ]; Supplemental Declaration of Jay P. Srinivasan In Support Of

Reply To Motion For Terminating And Other Sanctions Against Plaintiffs For

Spoliation Of Evidence ("Supp. Srinivasan Decl."), Exh. E ["Please understand that it

is our position that this letter and version 2 was received in 2010.  Once again, if you

take the only copy of the letter and subsequent testing demonstrates that the age of

15

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
239

the paper is after 2010, it will be our position that there has been an alteration."]; see also Defs.' Hr. Exhs., Exh. 40.)

"Version 2" was not created and sent to NMS from AEW in September 2010. It was printed at the NMS offices on July 15, 2013. (Declaration of Gerald M. LaPorte In Support Of Motion For Terminating And Other Sanctions Against Plaintiffs And Plaintiffs' Counsel ("LaPorte Decl."), ¶ 116; see also *id.*, ¶¶ 38-45; Plfs.' Hr. Exhs., Exh. 14.) Plaintiffs' own expert William Flynn admitted this fact. (Oct. 28, 2016 Hr. Tr. at 62:25-63:14; 70:11-15; 71:19-25; 76:23-77:11.) Plaintiffs' counsel did not argue to the contrary at the Evidentiary Hearing.

Gerald LaPorte, the Director of the Office of Investigative and Forensic Sciences at the National Institute of Justice, a division of the United States Department of Justice, who is a nationally recognized expert trained by the Secret Service, examined the actual document Neil Shekhter claims he received in 2010 and kept in his safe. (LaPorte Decl., ¶¶ 3, 15; see also Plfs.' Hr. Exhs., Exh. 14.) Based on Mr. LaPorte's findings, "Version 2" is not authentic. (LaPorte Decl., ¶ 116; see also Plfs.' Hr. Exhs., Exh. 14.) It is conclusive from examining the "CPS" code of the document—an anti-counterfeiting code that is created by some office printers—that "Version 2" was first printed on a Xerox WorkCenter 7775 multifunction office machine at Plaintiffs' offices on July 15, 2013 —not at AEW's offices in September 2010. (*Id.*, ¶ 116; see also *id.*, ¶¶ 38-45; Plfs.' Hr. Exhs., Exh. 14.) Mr. LaPorte confirmed these findings in credible and unrebutted testimony before this Court. (See Oct. 14, 2016 PM Hr. Tr., at 51:27-52:9; 64:9-28 ["I am a hundred percent

16

Exhibit 2
240

certain that [the] Q-1 Version 2 document was printed in July of 2013. It was not produced in September of 2010."].)

None of Plaintiffs' forensic experts dispute Mr. LaPorte's finding that, per the CPS code reflected on the original "Version 2," it was printed on July 15, 2013 on a machine located in NMS' offices. (See, e.g., Oct. 17, 2016 Hr. Tr., at 55:12-58:4 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr., at 62:27-63:22; 66:10-15 [testimony of William Flynn]; Oct. 28, 2016 Hr. Tr., at 105:8-22 [testimony of Kathleen Nicolaides].) In fact, Mr. Flynn testified that it would be "inauthentic" to represent the original "Version 2" document produced by Plaintiffs as a document from September 2010. (Oct. 28, 2016 Hr. Tr., at 71:18-28; 72:11-77:11.)

In the face of Mr. LaPorte's un-contradicted findings that the "original Version 2" was printed in July 2013 from an NMS printer, and despite Plaintiffs' repeated sworn representations that the "Version 2" in their possession was the "original" they received in 2010, Plaintiffs' response is to claim that the "Version 2" produced for forensic examination is not an original at all and in fact is merely a copy of the original document. However, Mr. LaPorte credibly and thoroughly testified that the "Version 2" produced by Plaintiffs is not a photocopy of any "original" that they received. It is a first generation iteration of the document, sent from a computer directly to a printer. (LaPorte Decl., ¶¶ 18, 48-49; see also Oct. 14, 2016 PM Hr. Tr., at 62:3-63:15; Plfs.' Hr. Exhs., Exh. 14.) Plaintiffs' evidence to the contrary is not credible as Mr. Flynn does not provide a "reasoned explanation of why the underlying facts lead to the ultimate conclusion" that he believes the original

17

Exhibit 2
241

"Version 2" was "a copy or scanned version of the document that was subsequently printed." (*Bushling v. Fremont Med. Ctr*. (2004) 117 Cal.App.4th 493, 510; Cooper Decl., ¶ 40.) Mr. Flynn, Plaintiffs' expert, conceded that the document NMS produced was printed on July 15, 2013, not in September 2010. (Oct. 28, 2016 Hr. Tr. at 62:25-63:2.)

"Version 2" also contains a CPS code on every page, but for one page—Mr. Samek's signature page, which differs from the rest of the document in other ways as well. (LaPorte Decl., ¶¶ 46-53; see also Plfs.' Hr. Exhs., Exh. 14.) This means that Mr. Samek's signature page on "Version 2" was removed or taken from another source and substituted into the document after it was first printed on July 15, 2013. (*Id.*, see also *id.*, ¶ 16.) Again, Plaintiffs do not dispute this. (Flynn Decl., ¶ 44; see also Defs.' Hr. Exhs., Exh. 32.)

Finally, Mr. LaPorte examined all other copies of "Version 2" produced by Plaintiffs (as Plaintiffs testified that no copies of "Version 2" have been destroyed). (Srinivasan Decl., Exh. N, at 291:9-12 [deposition testimony of Neil Shekhter].) Based upon examining these other documents and their various imperfections and trash marks, these other copies are copies of the July 2013 "Version 2" produced by Plaintiffs, not the other way around. (LaPorte Decl., ¶¶ 17, 54-67; see also Plfs.' Hr. Exhs., Exh. 14.) Plaintiffs do not dispute this. (Flynn Decl., ¶¶ 46-47; see also Defs.' Hr. Exhs., Exh. 32; Oct. 28, 2016 Hr. Tr., at 68:5-69:14.)

"Version 2" was created by Neil Shekhter and his son Adam Shekhter in July 2013.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
242

Samuel S. Rubin, Managing Director of Digital Forensics at Stroz Friedberg, was able to tie the creation of "Version 2" to Neil Shekhter's and Adam Shekhter's computers.  Mr. Rubin's findings indicate that on July 12, 2013, Neil Shekhter emailed his son Adam a PDF of the original, executed agreement with the 5-year Buy/Sell provision—in an electronic file called "P6 LA MF Holdings I LLC." (Declaration of Samuel S. Rubin In Support Of Motion For Terminating And Other Sanctions Against Plaintiffs For Spoliation Of Evidence ("Rubin Decl."), ¶ 27(a); see also Plfs.' Hr. Exhs., Exh. 7.)  Then, on the night of Sunday, July 14, 2013, at 9:46 p.m., an unknown computer not produced for forensic examination opened and modified a file called "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf"—a title identical to the PDF of the original agreement forwarded to Adam Shekhter, but for the appended language "clean NS 123 PRINT."  (Rubin Decl., ¶ 27(b); see also Plfs.' Hr. Exhs., Exh. 7.)

The next day, on July 15, 2013 at 1:24 p.m., this same file was then transferred to a USB flash drive (which Plaintiffs have not produced to Defendants), from the unknown computer, and opened on Adam Shekhter's NMS desktop computer at 3:51 p.m.  (Rubin Decl., ¶¶ 27(c)-(d); see also Plfs.' Hr. Exhs., Exh. 7.)  The file was then printed—matching perfectly with the timing of the printing seen on the CPS code discovered by Mr. LaPorte.  (See LaPorte Decl., ¶¶ 15, 39 ["[Version 2] was printed between 1500 and 1600 hours, or 3:00 p.m.– 4:00 p.m. PST on July 15, 2013"]; see also Plfs.' Hr. Exhs., Exh. 14.)  Then, just after 4 p.m. and after "Version 2" was printed, it was scanned (eliminating all metadata), and then emailed at 4:51 p.m., by Adam to his father.  (Rubin Decl., ¶¶ 27(f)-(h); see also Plfs.' Hr. Exhs.,

Exh. 7.) Further, there is no forensic record or discussion of "Version 2" at all in NMS' files until it was created in July 2013. (Rubin Decl., ¶ 5(a); see also Plfs.' Hr. Exhs., Exh. 7.)

Plaintiffs' arguments to the contrary are not convincing or credible. (See Opp. at pp. 13-14; Cooper Decl., ¶¶ 17-28; see also Defs.' Hr. Exhs., Exh. 31.) In fact, other than the contents of the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" file, Plaintiffs' expert Scott Cooper testifies that he does not dispute any element of Mr. Rubin's timeline as described above, including the fact that Neil Shekhter sent PDF copies of "Version 1" and "Version 3" to Adam Shekhter on July 12, 2013, and the fact that the file was copied to a USB flash drive which was connected to and opened on Adam Shekhter's computer just moments before the "Scan/Adam" folder was created and Adam emailed the electronic version of "Version 2" to Neil. (See Oct. 25, 2016 Hr. Tr., at 106:16-108:17.) However, the fact that Defendants are unable to detail what was contained in the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" file is due to Plaintiffs' deletion and/or withholding of the file, and does not entitle Plaintiffs to an inference in their favor. (See Cooper Decl., ¶¶ 23-27; see also Defs.' Hr. Exhs., Exh. 31.) Plaintiffs have not provided any evidence that this file is not the original forged PDF version of "Version 2." The fact that Defendants cannot analyze this file is due to Plaintiffs' destruction of evidence, and will not excuse Plaintiffs' misconduct. (*Reeves v. MV Transp., Inc.* (2010) 186 Cal.App.4th 666, 681.) Plaintiffs maintained this frivolous position during the Evidentiary Hearing, and none of Plaintiffs' witnesses were able to provide any credible alternative explanation as to the contents of the "P6 LA MF Holdings I LLC clean NS

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
244

123 PRINT.pdf" document.  The fact that Plaintiffs chose not to have either Neil or Adam Shekhter testify at the Evidentiary Hearing only confirms that there is no viable alternative explanation.

Significantly, Mr. Cooper did not make any forensic findings affirmatively establishing that "Version 2" with the 3-year Buy/Sell provision was first created in September 2010 or confirming Neil Shekhter's story about "Version 2." (Oct. 25, 2016 Hr. Tr., at 42:3-16.)  Neither did Dr. Aginsky, Mr. Flynn, or Ms. Nicolaides. (Oct. 17, 2016 Hr. Tr., at 55:4-58:2 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr., at 62:27-63:22; 66:10-15 [testimony of William Flynn]; Oct. 28, 2016 Hr. Tr., at 105:8-22 [testimony of Kathleen Nicolaides].)

"Version 2" is not an authentic document.  It is a forgery.

The Court adopts and is persuaded by with Mr. LaPorte's and Mr. Rubin's conclusions, based on extensive evidence, that "Version 2" is a forgery, that it was not created and delivered in 2010 by AEW, and that it was fabricated and printed by Plaintiffs at their own offices in 2013.  (LaPorte Decl., ¶ 116 ["it is my unequivocal opinion that ["Version 2"] is not authentic."]; Rubin Decl., ¶ 15 ["Forensic evidence on the NMS Devices establishes that 'Version 2' of the JV Agreement is a forgery."]; see also Plfs.' Hr. Exhs., Exh. 7 & 14.)  The Court also notes the extensive contemporaneous documentary evidence supporting the incorporation of the 5-year Buy/Sell term, the fact that this term was never changed, even when the January 2011 "Specified Property" amendments were agreed to, as well as the extensive, consistent, and credible testimony of multiple witnesses.  There was no testimony to

21

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
245

the contrary, whether by declaration or live testimony, except for the declarations of Neil Shekhter, whose testimony the Court finds not to be credible, and who failed to appear for live testimony.  (See Pen. Code, § 470(c) ["(c) Every person who, with the intent to defraud, alters, corrupts, or falsifies any record of any will, codicil, conveyance, or other instrument, the record of which is by law evidence ... is guilty of forgery."], *id*., § 470(d) ["(d) Every person who, with the intent to defraud, falsely makes, alters, forges, or counterfeits, utters, publishes, passes or attempts or offers to pass, as true and genuine, any of the following items, knowing the same to be false, altered, forged, or counterfeited, is guilty of forgery: . . . contract for money or other property, [or] contract."]; *id*., § 471 ["Every person who, with intent to defraud another, makes, forges, or alters ... any instrument purporting to be any record ... specified in Section 470, is guilty of forgery."].)

*The "La Cienega Property Management Agreement"*

Plaintiffs have represented to the Court that the "La Cienega Property Management Agreement" is not a forgery.  (Srinivasan Decl., Exh. K, ¶¶ 22-23; see also Defs.' Hr. Exhs., Exh. 5.)  Plaintiffs produced the purported original hard copy "La Cienega PMA" for forensic examination.  (LaPorte Decl., ¶ 10.b; Srinivasan Decl., Exh. K, ¶¶ 23-24; see also Plfs.' Hr. Exhs., Exh. 14; Defs.' Hr. Exhs., Exh. 5.)

The "La Cienega PMA" was first submitted in the matter of *P6 LA MF Holdings I LLC, et al. v. NMS Properties, Inc*., BC 584878 (Los Angeles Superior Court, filed June 11, 2015) (the "*P6* Action"), in which AEW sought the removal of Plaintiff-affiliate NMS Properties, Inc. as property manager of the various properties associated with the joint venture. (See generally

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
246

Srinivasan Decl., Exh. Q.)   NMS Properties, Inc. is represented by the same counsel as Plaintiffs in this matter and is an affiliate of Plaintiffs and Neil Shekhter, who is also CEO. (See generally Srinivasan Decl., Exh. R; Shekhter Decl. ISO Sanctions Opp., ¶ 1; see also Defs.' Hr. Exhs., Exh. 4.)  On June 23, 2015, the Court conducted a lengthy hearing on AEW's request for a preliminary injunction—a request that had been extensively briefed over the previous two weeks.  At the hearing on that motion and in connection with the briefing, Plaintiffs submitted only a single Property Management Agreement ("PMA")—for 1410 5th Street—which contained a 30-day notice of termination provision, as did all other PMA versions and copies.  (Srinivasan Decl., Exh. R, ¶¶ 25, 25.1 & Exh. F; see also Defs.' Hr. Exhs., Exh. 4.)  Neil Shekhter represented that this was the only PMA he was able to locate.  (Srinivasan Decl., Exh. T [Supplemental Declaration of Neil Shekhter], ¶ 3.)  The next day, on June 24, 2015, the Court granted AEW's motion for a preliminary injunction removing NMS Properties, Inc. based upon the 30-day notice provision and NMS Properties gave *ex parte* notice that it would move for reconsideration.  (*Id.*, Exh. S, at 5-6 of 9.)  **The next day** NMS Properties moved *ex parte* to have the ruling reversed based on Neil Shekhter's sudden discovery of a supposed 2012 PMA for a property on La Cienega—"the La Cienega PMA"—that purported to include a **60-day** termination provision, as opposed to the 30-day termination provision in the form PMA used for all of the properties.  (*Id.*, Exh. T at Section 12.1; see also Defs.' Hr. Exhs., Exh. 4.)  The presentation of this forgery and the breach of the actual La Cienega PMA are the subject of the Cross-Complaint in this action.

Two versions of the "La Cienega PMA" were created on June 24, 2015, and both were fabrications.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
247

On June 24, 2015, beginning sometime between 7:00 a.m. and 7:30 a.m., Neil Shekhter received multiple emails from the email accounts of then-former NMS employees containing Word and PDF versions of PMAs for various properties, all of which contained the 30-day provision, despite the fact that the parties had already finished briefing and arguing the preliminary injunction motion.  (See Rubin Decl., ¶ 48(a); see also Plfs.' Hr. Exhs., Exh. 7.)  Shortly thereafter, around 7:40 a.m., the Court (Dept. 82) notified the parties that it had granted AEW's request for a preliminary injunction.  (Srinivasan Decl., Exh. S.)

A Microsoft Word file titled "Property Management-375 ns.doc" was created minutes after the Court's Order on June 24, 2015 at 7:55 a.m.  It was modified at 8:48 a.m.  (Supplemental Declaration of Samuel S. Rubin In Support Of Defendants' And Cross Complainant's Motion For Terminating And Other Sanctions Against Plaintiffs For Spoliation Of Evidence ("Supp. Rubin Decl."), ¶¶ 45-46; see also Plfs.' Hr. Exhs., Exh. 9.)  This document was later wiped or deleted from Neil Shekhter's computer hard drive.  (Supp. Rubin Decl., ¶ 31; see also Plfs.' Hr. Exhs., Exh. 9.)  It was never produced.

Then, on or around 9:00 a.m. on June 24, 2015, Neil Shekhter scanned one copy of what appeared to be the executed "La Cienega PMA" at his home.  (Rubin Decl., ¶ 48(b); see also Plfs.' Hr. Exhs., Exh. 7.)  The scan occurred in two parts, with the break in the two scans occurring at the exact page where the termination provision appears—the first and only termination provision anywhere in the record that specifies a 60-day term.  (Rubin Decl., ¶ 48(b); see also Plfs.' Hr. Exhs., Exh. 7.)  But this scan, while purporting to be for the "La Cienega PMA" with a never-before-

24

Exhibit 2
248

seen 60-day termination provision, *contained a cover page showing that this PMA was for a different property* (for which Neil Shekhter had received the PMA earlier that morning)—*not the La Cienega property*.  (Rubin Decl., ¶ 48(c); see also Plfs.' Hr. Exhs., Exh. 7.)

According to Neil Shekhter's own declaration, this botched PMA was emailed to his counsel on June 24, 2015.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 165-168.)  However, it was not produced or disclosed despite being clear evidence of the forgery and fabrication of evidence, and despite being ordered produced by this Court.  (See Oct. 18, 2016 PM Hr. Tr., at 40:23-42:22 [testimony of Samuel Rubin].)

Later that same day, but after Plaintiffs provided *ex parte* notice based upon this botched forgery, Neil Shekhter apparently realized his oversight and emailed himself a corrected version of the "La Cienega PMA" at 11:22 p.m., this time with the corrected owner listed on the face page ("Luxe La Cienega, LLC" instead of "1410 5th Street LLC").  (Rubin Decl., ¶ 48(d); see also Plfs.' Hr. Exhs., Exh. 7; Defs.' Hr. Exhs., Exh. 4.)  This corrected PMA—not the botched one circulated to his counsel earlier that day and which formed the basis for NMS' *ex parte* notice—was the version submitted with Neil Shekhter's declaration less than 10 hours later in support of NMS' *ex parte* application.  There, Neil Shekhter swears that he suddenly found this "La Cienega PMA" *after* the Court's hearing somewhere he had not previously looked and that it had been "misfiled." (Srinivasan Decl., Exh. T, ¶¶ 3, 4; see also Defs.' Hr. Exhs., Exh. 4.)  Neil Shekhter also testified that he found the "La Cienega PMA" in his office. (Srinivasan Decl. Exh. N., at 390:15-20.)  It makes no sense— and Plaintiffs have proffered no explanation—why Neil Shekhter would take the

25

Exhibit 2
249

document from his office and then bring it home to scan. Again, none of these documents were produced.

Neil Shekhter's testimony that he "noticed that the PMA had a second cover" so he "re-scanned the agreement" is not a credible explanation for the botched PMA. Neil Shekhter provides no details explaining why he performed multiple scans, including one with a face page listing a different property. (See Shekhter Decl. ISO Sanctions Opp., ¶ 134.) Neil Shekhter did not provide any live testimony to bolster this claim. Nor was any credible explanation offered for the very existence of this document.

Neil Shekhter's testimony that it "makes perfect sense" that he received PMAs by email the morning of June 24, 2015 is also not credible. He does not explain why the emails came from the email accounts of **then-former** NMS employees and why he was receiving them **after** the preliminary injunction had been briefed and argued. (See Shekhter Decl. ISO Sanctions Opp., ¶ 133.) Again, Neil Shekhter did not provide any live testimony to bolster this claim.

Mr. Cooper, Plaintiffs' forensic expert, did not affirmatively establish that the "La Cienega PMA" proffered by Plaintiffs with a 60-day no cause termination period was created in March 2012 as it purports. (Oct. 25, 2016 Hr. Tr., at 42:17-43:2.)

There is extensive other evidence that the parties did not agree to the "La Cienega PMA" presented by Neil Shekhter.

The JVA mandates that any PMA for the Joint Venture properties ("Properties") include, among other terms, a provision allowing for no-cause termination upon 30

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
250

days' notice to the Property Manager.  (See Defs.' Hr. Exhs., Exhs. 1 & 2 at Art. 1 [defining "Property Management Agreement"]; Oct. 14, 2016 AM Hr. Tr., at 30:5-31:5. [testimony of Michelle McClure]; Oct. 20, 2016 Hr. Tr., at 33:18-34:5 [testimony of Jonathan Watson].)

Each of the Properties was managed pursuant to a PMA, and each PMA was expected to conform in substance to a "form" PMA including a 30-day no cause termination clause as well as an immediate termination clause.  (See Oct. 20. 2016 Hr. Tr., at 33:9-34:26 [testimony of Jonathan Watson].)  Defendants presented substantial evidence and live witness testimony that the JVA mandated a 30-day no cause termination clause, that the parties agreed to a "form" PMA with a 30-day no cause termination clause and an immediate termination clause, and that no 60-day termination provision was ever contemplated, negotiated, or agreed to.  (See, e.g., Oct. 24, 2016 Hr. Tr., at 21:23-24:17 [testimony of Eric Samek]; Oct. 20, 2016 Hr. Tr. at 33:7-46:5 [testimony of Jonathan Watson]; Defs.' Hr. Exhs., Exhs. 18 & 19; Srinivasan Decl., Exhs. U, V, W; see also Defs.' Hr. Exhs., Exhs. 20, 21, 22.)

Consistent with the "form" PMA, a draft La Cienega PMA with a 30-day term was approved by Plaintiffs and circulated with their knowledge and consent to a lender. (Srinivasan Decl., Exhs. U, V, W; see also Defs.' Hr. Exhs., Exhs. 20, 21, 22.)  Ms. McClure testified extensively and credibly that the draft La Cienega PMA was based on the "form," that it was circulated among the parties including NMS' counsel as well as a third party, and that the PMAs were required to have a 30-day no cause termination provision.  (See Oct. 14, 2016 AM Hr. Tr., at 28:6-37:21.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
251

There is no evidence or electronic record at all of any PMA with a 60-day termination provision until it appears on June 24, 2015, over three years after the draft La Cienega PMA was negotiated, and only after AEW's preliminary injunction removing NMS Properties, Inc. had been granted. (Rubin Decl., ¶¶ 41-43; see also Plfs.' Hr. Exhs., Exh. 7.)

Furthermore, the "La Cienega PMA" that Plaintiffs purport is the "final" version is textually different from the actual draft La Cienega agreements. It is, however, consistent in formatting, textual anomalies, and other characteristics with two earlier executed PMAs—both of which were emailed to Neil Shekhter the morning that he created the forgery. (LaPorte Decl., ¶¶ 22, 106-115; Rubin Decl., ¶¶ 48(a)-(c); see also Plfs.' Hr. Exhs., Exh. 7, 14.) Plaintiffs do not dispute this, and in fact assert that the "La Cienega PMA" was most likely created "by editing a digital copy" of one of the agreements Neil Shekhter received the morning of June 24, 2015. (See Declaration of Kathleen Annunziata Nicolaides In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Nicolaides Decl."), ¶ 34.) Plaintiffs do not provide any affirmative evidence to explain why the "La Cienega PMA" is inconsistent with the formatting of the draft La Cienega agreements, or why it is based on a much earlier format that does not fall logically within the timeline of other PMAs, or why it contains certain typographical errors that had already been fixed long before the draft La Cienega PMA was circulated and approved.

Aside from Neil Shekhter's declaration to the contrary, Plaintiffs provide no evidence, whether by declaration or live testimony, that the 60-day termination provision (or any of the other changes in the "La Cienega PMA" inconsistent with the "form" PMA) were ever

28

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
252

discussed, let alone approved.  None of Plaintiffs' expert witnesses opine that the "La Cienega PMA" is a genuine or authentic document from March 2012 as it purports and as Neil Shekhter claims.  (See, e.g., Oct. 17, 2016 Hr. Tr., at 65:19-28 [testimony of Valery Aginsky]; Oct. 28, 2016 Hr. Tr., at 51:12-22 (testimony of William Flynn); Oct. 28, 2016 Hr. Tr., at 109:24-28 [testimony of Kathleen Nicolaides].)  In addition, Brian Bowis, former Vice President of Finance at NMS, confirmed on cross-examination that the parties used a "form" PMA with a 30-day no cause termination provision.  (Oct. 25, 2016 Hr. Tr., at 174:22-176:13.)

Finally, Plaintiffs did not dispute and the Court finds that at least one individual within NMS manually deleted electronic evidence of the "La Cienega PMA."  (Rubin Decl., ¶ 93; see also Plfs.' Hr. Exhs., Exh. 7.)  (Cooper Decl., ¶ 92; see also Defs.' Hr. Exhs., Exh. 31.)  Further, Mr. Cooper confirms Mr. Rubin's finding that there is no longer a single Microsoft Word version of the La Cienega PMA on the NMS systems but that the Microsoft Word document called "Property Management-375 ns.doc"—the document created and modified on the day the "La Cienega PMA" first appeared—was deleted and does not exist anywhere else.  (Oct. 25, 2016 Hr. Tr., at 79:11-80:7.)

The "La Cienega PMA" is a forgery."

*The "Cover Letter"*

Plaintiffs proffered an alleged "Cover Letter" dated September 14, 2010 from Eric Samek to Neil Shekhter for the very first time on September 21, 2015 at Mr. Samek's deposition, after Defendants had spent months questioning the legitimacy of "Version 2" and over a year after this litigation was initially filed.  Plaintiffs claim this "Cover Letter" was delivered by Mr.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
253

Samek to Plaintiffs in 2010, accompanying the alleged hard copy of "Version 2." (Srinivasan Decl., Exh. K, ¶ 13; see also Defs.' Hr. Exhs., Exh. 40.) The "Re" line of the "Cover Letter" reads: "JV AGREEMENT (3 YEAR BUY/SELL)." (Srinivasan Decl., Exh. X; see also Defs.' Hr. Exhs., Exh. 5 [Ex. 4].) Plaintiffs claim to have produced the original "Cover Letter" for examination. (See Srinivasan Decl., Exh. K, ¶¶ 13-14; see also Defs.' Hr. Exhs., Exh. 40.) Neil Shekhter claims that he has "carefully maintained the original hard cop[y]" of the letter since his receipt of it in 2010. (Srinivasan Decl., Exh. K at ¶ 14; see also Defs.' Hr. Exhs., Exh. 40.)

The "Cover Letter" is not an original document from September 14, 2010.

> Plaintiffs proffer only the declaration of Neil Shekhter to support the authenticity of the "Cover Letter." However, Defendants provided extensive testimony, including live testimony, regarding the invalidity of a 3-year Buy/Sell term (as detailed above), as well as sworn testimony on the witness stand that Mr. Eric Samek did not send or cause to be sent the "Cover Letter." (See Oct. 24, 2016 Hr. Tr., at 20:8-21:22 [testimony of Eric Samek that he "did not" write this letter or cause it to be written, and that the letter is "another forgery."].)

> In addition, Plaintiffs misleadingly argued that "the forgery allegations have been refuted by AEW's own employee," Daniel Lennon, and that "Lennon confirmed that he received Version 2, [and] the Cover Letter." (Opp., at p. 8.) This is completely undermined by Mr. Lennon's testimony before this Court under oath: Mr. Lennon does not remember receiving the letter and, in fact, he does not even know if the JVA contains a Buy/Sell provision *at all*. (Oct. 25, 2016 Hr. Tr., at 143:9-147:2;

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
254

157:3-19.)  Aside from rendering the remainder of his testimony not credible, Mr. Lennon did not provide any support for the authenticity of the "Cover Letter," contrary to Plaintiffs' characterizations.

The "Cover Letter" is a low-quality document, indicating "it is not a first generation document or it is a document composed from multiple sources." (LaPorte Decl., ¶¶ 21, 78-81; see also Plfs.' Hr. Exhs., Exh. 14.)  Moreover, "the signature and surrounding text block [of Mr. Samek's alleged letter], including the text above, below, and adjacent to the signature, is a reproduction of the exact same signature and surrounding text block from another source." (LaPorte Decl., ¶¶ 20, 82-91; see also Plfs.' Hr. Exhs., Exh. 14.)  Specifically, it is identical to the Term Sheet that Neil Shekhter possessed in Microsoft Word format.  (LaPorte Decl., ¶¶ 20, 82-91; see also Plfs.' Hr. Exhs., Exh. 14.)   During his live testimony, Mr. LaPorte credibly affirmed his findings that the "Cover Letter" is not authentic, including based on the fact that it refers to "Version 2," which did not exist as of the date of the letter, the inferior print resolution and extremely faint CPS codes of the document, and the fact that the entire signature block including all adjacent text was duplicated exactly from another source.  (Oct. 17, 2016 Hr. Tr., at 69:21-74:2.)  Neither Dr. Aginsky nor Ms. Nicolaides disputed Mr. LaPorte's conclusions or provided evidence of the "Cover Letter's" authenticity.  (See Oct. 17, 2016 Hr. Tr., at 58:5-60:9; Oct. 28, 2016 Hr. Tr. at 105:8-22.)  Mr. Flynn admitted that he did not opine that the "Cover Letter" is authentic as to its purported September 14, 2010 creation date, nor did he corroborate Neil Shekhter's story that the letter is from September 2010.  (See Oct. 28, 2016 Hr. Tr., at 78:10-79:9.)

31

Exhibit 2
255

Furthermore, Mr. LaPorte conducted a chemical comparison of the black toner used on the original "La Cienega PMA" and the original "Cover Letter," finding that the black toner in these documents had a connection and were consistent with each other. (Oct. 14, 2016 PM Hr. Tr., at 78:18-78:9.) This was uncontested, and Dr. Aginsky confirmed that the "Cover Letter" and "La Cienega PMA" could have been printed at the same time in 2015. (Oct. 17, 2016 Hr. Tr., at 67:3-68:15.)

The "Cover Letter" was created by Plaintiffs in 2015, not sent by Mr. Samek to NMS in September 2010.

On June 21, 2015, Neil Shekhter emailed himself a copy of the "Cover Letter" (which is the first date it ever appears anywhere in any of Plaintiffs' devices) in PDF form. (Rubin Decl., ¶ 34; see also Plfs.' Hr. Exhs., Exh. 7.) The PDF has metadata indicating it was created on September 21, 2010. (Rubin Decl., ¶ 34; see also Plfs.' Hr. Exhs., Exh. 7.) <u>However, the PDF was created with a version of Adobe Acrobat not even available until December 2014, demonstrating that the document was artificially backdated by Neil Shekhter "turning back" his computer clock when he created the letter.</u> (Rubin Decl., ¶ 35; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' evidence to the contrary is not credible, as Mr. Cooper proffers no evidence to explain the artificial backdating, and merely proposes a hypothetical software "bug" that is not based on the facts. (Cooper Decl., ¶¶ 34-35; see also Defs.' Hr. Exhs., Exh. 31.) During his live testimony, Mr. Cooper admitted that he had no evidence that the particular version installed on Neil Shekhter's computer exhibited any software "bug." (Oct. 25, 2016 Hr. Tr., at 119:20-120:8.) He also conceded that no

32

Exhibit 2
256

bug he could identify changed the date of creation. (Oct. 25, 2016 Hr. Tr., at 119:26-120:11.)

Neil Shekhter then created two more versions, also backdating them through a computer clock change, but this time using an older version of Adobe. (Rubin Decl., ¶¶ 36, 37; see also Plfs.' Hr. Exhs., Exh. 7.) After this Court issued its September 8, 2015 preservation Order (the "September 8, 2015 Order"), Neil Shekhter then emailed two of these versions to colleagues, asking if they could tell when those files were created. (Rubin Decl., ¶¶ 39(a)-(b); see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' evidence that there are two electronic versions of the "Cover Letter" letter dated September 14, 2010 is not credible. Among other things, the evidence shows that Neil Shekhter emailed these two versions to two NMS employees, asking one to look at the metadata and the other if she can tell "when the original was taken or scanned." (Rubin Decl., ¶ 39; see also Plfs.' Hr. Exhs., Exh. 7.) One employee responded with a link to a program capable of removing embedded metadata. (Rubin Decl., ¶ 39; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs provide no testimony or evidence to explain Neil Shekhter's requests that employees tell him "if you can tell when the original was taken or scanned" and "take a look at metadata" of a document Neil Shekhter supposedly received *and scanned* in 2010. (Rubin Decl., ¶ 39 & Ex. 13; see also Plfs.' Hr. Exhs., Exh. 7; Shekhter Decl. ISO Sanctions Opp., ¶ 30.) Neil Shekhter did not testify about why or how he created the various versions of the "Cover Letter" or why he sent them to his employees before producing them at Eric Samek's deposition. Mr. Cooper provided only conclusory

33

Exhibit 2
257

testimony that such conduct is "completely normal" and "exactly a normal progression of events." (Oct. 25, 2016 Hr. Tr., at 5:26-6:17.)

None of the above-referenced emails or versions of the "Cover Letter were produced to Defendants, through general discovery or pursuant to the Court's October 6, 2015 Order. (Rubin Decl., ¶¶ 32-33; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs appear to concede this troubling fact.

There is absolutely no electronic record or evidence of this "Cover Letter"—allegedly delivered in September 2010—in any of Plaintiffs' files or materials, until June 2015. (Rubin Decl., ¶¶ 32-37; see also Plfs.' Hr. Exhs., Exh. 7.) Nor is there any explanation from Plaintiffs as to how this purportedly controlling cover letter—which Plaintiffs' counsel claimed was "fatal" to Defendants' arguments (Srinivasan Decl., Exh. M, ¶ 4; see also Defs.' Hr. Exhs., Exh. 38)—was not produced or even alluded to until September 21, 2015, over five years after it was allegedly received by Neil Shekhter and months into discovery. Neil Shekhter's refusal to testify at the Evidentiary Hearing regarding these matters confirms there is no credible explanation other than forgery.

The "Cover Letter" is a forgery.

*Spoliation of Evidence*

Plaintiffs and their counsel repeatedly confirmed that they had taken concrete steps to preserve all files and devices. (Srinivasan Decl., Exh. K, ¶ 25 ["I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
258

of emails and other files."]; Declaration of John Genga in Opposition to Defendants' Motion for Forensic Examination, filed September 28, 2015, ¶ 4 ["The media have been identified as all possible sources of any information pertaining to the NMS-AEW venture, and would include NMS's full electronic record of all drafts and versions of the joint venture agreement and all property management agreements involving the venture."]; Srinivasan Decl., Exh. P, at 7 [Plaintiffs "unilaterally implemented an internal 'litigation hold' around the beginning of the case so that documents and emails would not be deleted . . . . plaintiffs have preserved their records fully for examination, and have nothing to hide."]; id., Exh. M, ¶ 3 ["At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication."]; Srinivasan Supp. Decl., Exh. C, at 76:16-19 ["But a litigation hold was implemented in this case at the very beginning by Neil Shekhter.  Systems were set up so that emails couldn't be deleted, files could not be deleted, according to him . . ."]; see also Defs.' Hr. Exhs., Exhs. 5, 38.) These statements have proven to be false.  Neither Plaintiffs nor their counsel provided any evidence to the contrary or explanation in their Opposition or at the Evidentiary Hearing.

The home computer Neil Shekhter used in 2014-2015 ("Neil's New Home Computer") is indisputably a critical piece of evidence.  On it, Neil Shekhter communicated and conducted NMS business during much of the time period of this litigation, and Neil Shekhter purported to produce this computer for forensic imaging in recognition of its importance.  (See Declaration of A. Sasha Frid In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Frid Decl."), Exh. 11.)  Despite this computer's obvious relevance, Plaintiffs, through Neil Shekhter and his son, Alan—after the Court had issued its hold order and immediately in advance of the Court-ordered forensic analysis—set out on a scheme to destroy and alter its contents.

35

Exhibit 2
259

Neil Shekhter's actions were entirely intentional and done while Plaintiffs were fully represented by counsel. This spoliation constitutes a flagrant disregard for and violation of the Court's September 8 and October 6, 2015 Orders, counsel's ethical obligations to ensure that relevant information is preserved, and contradicts sworn statements made to this Court by Plaintiffs.

On the morning of October 15, 2015, the day before the court-ordered forensic examination was originally scheduled to take place, Neil Shekhter's son, Alan Shekhter, ran a series of Google searches indicating his interest in deleting evidence and escaping forensic detection: "secure wipe hard drive," "backdated secure wipe," "Los Angele[s] anti-computer forensics," and "how to avoid computer forensics." (Rubin Decl., ¶ 6(a) & fig. 10; Oct. 25, 2016 Hr. Tr., at 99:17-100:3 [testimony of Scott Cooper]; see also Plfs.' Hr. Exhs., Exh. 7.) Neil Shekhter and his son engaged in a text message exchange (which Neil Shekhter then deleted—a sanctionable act of spoliation on its own) in advance of the Court-ordered inspection. Among other things, the text message exchange, which Mr. Rubin was able to recover, outlines in excruciating detail Neil and Alan Shekhter's plan to remove Neil Shekhter's old hard drive from Neil's New Home Computer, replace it, and then backdate the computer and load it with files. (See Mot., Exh. A; Rubin Decl., ¶ 51 & fig. 7; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' expert witness, Scott Cooper, did not dispute these findings. (Oct. 25, 2016 Hr. Tr., at 100:1-3; id. at 46:11-19.) In fact, Mr. Cooper testified at the Evidentiary Hearing that these actions were "dumb" and a "horrendous idea." (Id. at 46:20-25; id. at 58:16-23.) The forensic evidence confirms that Neil and Alan Shekhter went through with the plan described in the

36

Exhibit 2
260

deleted text messages.  On October 15, 2015– one day before Plaintiffs' compliance with the October 6, 2015 Order for a forensic examination was due— Neil and Alan Shekhter initiated and executed a plan to: (i) remove a hard drive from Neil's New Home Computer; (ii) replace it with a new hard drive that looked similar to the old one; (iii) manipulate and alter the computer by artificially backdating the computer's clock to make the files appear older than they were; and then (iv) flood the new hard drive with more than 75,000 backdated files and folders.  (Rubin Decl., ¶¶ 54-56; see also Plfs.' Hr. Exhs., Exh. 7.)  They accomplished each of these tasks, causing the permanent loss of untold evidence and metadata, all in violation of the Court's October 6, 2015 Order.  (Rubin Decl., ¶¶ 54-58; see also Plfs.' Hr. Exhs., Exh. 7; Oct. 25, 2016 Hr. Tr., at 48:4-8 ["Q. You don't dispute that Alan and Neil Shekhter engaged in a process by where they took documents off of or removed files from the old hard drive, correct? A. [Mr. Cooper] Correct."].)

Neither Neil Shekhter nor Alan Shekhter disputes the fact that they conspired to replace an entire hard drive on a computer subject to the Court's Order in order to conceal and spoliate evidence.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 148-151; Declaration of Alan Shekhter In Support Of Plaintiffs' Opposition To AEW's Motion For Terminating Sanctions ("Alan Shekhter Decl."), ¶¶ 4-6; see also Exh. A [July 29, 2016 Order], at pp. 3-4.)  Plaintiffs' brief admits to further spoliation of evidence— claiming the old hard drive and the external drive used to create a backup of the old drive were discarded.  (Opp. at 18.)

While Plaintiffs state that they "discarded" both the old hard drive and the Seagate device on which they backed up the old hard drive, forensic

37

Exhibit 2
261

evidence shows that the Seagate device was connected to Neil's computer as late as December 2, 2015, after Plaintiffs' lost their writ application and approximately 48 hours before the forensic examination took place.  (Rubin Decl. ¶¶ 50-51; see also Plfs.' Hr. Exhs., Exh. 7.)  Neither the old hard drive nor the back-up drive was ever produced, in violation of this Court's Orders.  Yet, it has not been produced or has been destroyed—both in plain violation of this Court's Orders.  Plaintiffs offered no evidence to refute this finding.

In his live testimony, Mr. Rubin confirmed that the Seagate drive and the old hard drive were not produced by Plaintiffs for forensic imaging.  (Oct. 17, 2016 Hr. Tr., at 109:24-110:2.)  However, forensic evidence demonstrates that the Seagate back-up drive was connected to Neil Shekhter's computer as recently as December 2, 2015—two days before the forensic imaging took place.  (Id. at 110:2-16.)  Plaintiffs offered no evidence to explain why these devices had not been produced, nor did Plaintiffs' forensic expert, Mr. Cooper, credibly address these findings.

There is no justification for the willful violation of a Court Order.  By Neil Shekhter's own admission, he replaced his hard drive in order to conceal it from the Court-ordered forensic examination.  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 149, 151.)  Plaintiffs have provided no evidentiary support for their alleged fear that any personal "photographs" from their devices would "end up in the wrong hands" and no evidence that such "photographs" ever existed; it would not excuse a willful violation of this Court's Orders in any event.  (Id. ¶ 148.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
262

Contrary to the declarations of Neil and Alan Shekhter, material documents at the core of this case were never transferred to the new hard drive, including copies of the Joint Venture Agreement and a document titled "Property Management-375 ns.doc," and were therefore lost from Neil's New Home Computer as a result of Plaintiffs' actions. (Supp. Rubin Decl. ¶¶ 39-47; see also Plfs.' Hr. Exhs., Exh. 9.) Plaintiffs' expert witness admitted that a file by this name no longer exists on Neil Shekhter's computer or any of the NMS devices produced for examination. (Oct. 25, 2016 Hr. Tr., at 75:8-12.) The Court finds Mr. Cooper's purported explanation that a file could have been "renamed" as not credible. (See *id.* at 75:13-17.) Regardless, renaming a relevant file would also violate the Court's September 8 and October 6, 2015 Orders.

Like Neil's New Home Computer, the home computer that Neil Shekhter used in the summer of 2013 when allegedly receiving the scan of "Version 2" and sending "Version 2" to Defendants ("Neil's 2012 Home Computer") is another critical piece of evidence. It appears to be the "unknown computer" that opened and created the forged document "Version 2." (Rubin Decl., ¶¶ 27, 28; see also Plfs.' Hr. Exhs., Exh. 7.) As a result, Defendants aggressively sought access to this computer for forensic examination. (Srinivasan Decl., ¶ 6.) Plaintiffs, however, refused to provide this device to Defendants' experts. (Oct. 17, 2016 Hr. Tr., at 102:15-17 ["Q. This computer, the 2012 computer, was never turned over to you; is that right? Mr. Rubin: That's right.].) Instead, Neil Shekhter testified at his December 10, 2015 deposition simply that he "threw [this device] away" by "put[ting] it in the trash"

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
263

(Srinivasan Decl., Exh. N at 206:18-25; 207:18-208:17), despite his obvious obligation to preserve evidence relevant to a pending lawsuit.

This alone, if true, would be sanctionable discovery misconduct. Plaintiffs have concealed and potentially destroyed this evidence and have failed to produce it, all in violation of the Court's September 8 and October 6, 2015 Orders.

Moreover, despite Neil Shekhter's testimony, credible forensic evidence offered by Mr. Rubin demonstrates that Neil's 2012 Home Computer was in use as late as September 19, 2015, after this Court issued its September 8, 2015 Order. (Rubin Decl., ¶ 50; Oct. 18, 2016 AM Hr. Tr., at 16:16-28; *id.* 17:16-20 [Mr. Rubin: "I looked at other information on the NMS Devices that I did have available to me for inspection and what I found was two primary types of information that demonstrate that th[e] old computer was in use at least until September of 2015."]; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs' expert, Mr. Cooper, did not credibly refute this testimony.

Plaintiffs and their affiliates engaged in an extensive plan to alter, conceal, destroy, or manipulate evidence in violation of the Court's September 8 and October 6, 2015 Orders.

In attempting to artificially backdate the new hard drive that Neil and Alan Shekhter had purchased to alter and conceal the contents of Neil's New Home Computer, Neil Shekhter picked the backdating date of January 10, 2015. (Rubin Decl., ¶ 56; see also Plfs.' Hr. Exhs., Exh. 7.) This was no accident, as the date coincided with Neil Shekhter's later false testimony as to when he "threw away" his 2012 Home Computer and allegedly "copied information from [his] old computer to the new one."

40

Exhibit 2
264

(Srinivasan Decl., Exh. N at 212:1-12; see also *id.*, at 208:5-13; 213:3-7; Rubin Decl.

¶¶ 49, 50 ["Despite Mr. Shekhter's testimony that he threw away the computer he

used in 2013, there is evidence that a Dell computer with the name

"DELLNEIL2012-PC" was in use until at least September 19, 2015, but was not

made available . . . for examination."]; see also Plfs.' Hr. Exhs., Exh. 7.)  In other

words, Plaintiffs not only lied about the availability of Neil's 2012 Home Computer

(which was still in use as of September 2015 and not "thrown away" in January

2015), but then—in altering Neil's New Home Computer by removing a hard drive

from that computer, replacing it, and backdating it—they tried to make it appear that

the lie that Neil Shekhter would later tell about Neil's 2012 Home Computer was

true.  This is evidence of both the destruction and fabrication of evidence and of Neil

Shekhter's perjury.

On December 2, 2015, two days before the Court-ordered imaging of Plaintiffs'

computers was to occur, Plaintiffs manually and volitionally installed a new

Operating System on Neil's New Home Computer.  (Rubin Decl., ¶ 66; Plfs.' Hr.

Exhs., Exh. 7.)  As set forth in the declaration and live testimony of Mr. Rubin, the

installation was not one that would occur automatically, and it instead required an

affirmative, manual upload.  (Rubin Decl., ¶ 66; Supp. Rubin Decl., ¶¶ 54-55; see

also Plfs.' Hr. Exhs., Exhs. 7, 9; Oct. 18, 2016 AM Hr. Tr., at 35:1-20.)  This

installation of a new operating system made thousands of changes to the file system

metadata on the computer, which makes the forensic examination of what existed

on the computer prior to the installation much more difficult.  (Rubin Decl., ¶ 67;

Plfs.' Hr. Exhs., Exh. 7; see also Oct. 18, 2016 AM Hr. Tr., at 35:21-36:10.)  Mr.

41

Exhibit 2
265

Cooper's testimony that the installation of the new Operating System was automatic is not credible. (See Oct. 25, 2016 Hr. Tr., at 21:12-22:20.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

On or after December 2, 2015, a folder called "AEW" was renamed and certain files and folders were deleted from Neil's New Home Computer. (Rubin Decl., ¶ 63; Supp. Rubin Decl. ¶ 48; see also Plfs.' Hr. Exhs., Exhs. 7, 9.) This clearly related to the matters at issue in this case, and the subfolder in particular related to the forged "Cover Letter." (Rubin Decl. ¶ 63; see also Plfs.' Hr. Exhs., Exh. 7.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders.

     Mr. Cooper admitted that certain subfolders no longer exist in the renamed "W" folder. (Oct. 25, 2016 Hr. Tr., at 83:18-84:6.) The Court finds that Mr. Cooper's purported explanation that those files could have been "renamed elsewhere" as lacking credibility and pure speculation. Mr. Cooper admitted that he did not, on his own, even attempt to locate such files. (Id. at 87:4-7 ["Q. Do you have any evidence, any affirmative forensic evidence, that they were moved or renamed to a different location? A. No."].) Regardless, renaming and moving folders in December 2015 is, on its own, a violation of the Court's September 8 and October 6, 2015 Orders.

Exhibit 2
266

Numerous USB external storage devices used on Neil's New Home Computer were

withheld and/or destroyed. (Rubin Decl., ¶ 70; see also Plfs.' Hr. Exhs., Exh. 7.)

While of particular note is the Seagate external hard drive that was plugged in on

October 15, 2015, and that "backed up" the existing hard drive before it was

swapped out for the "new" drive (as well as the old drive itself), at least 21 devices

were connected to Neil's New Home Computer that have never been produced.

(Rubin Decl., ¶ 69 & fig. 9; Plfs.' Hr. Exhs., Exh. 7.)  The Seagate was accessed

after the hard drive swap, on December 2, 2015.  (Supp. Rubin Decl. ¶ 51; see also

Plfs.' Hr. Exhs., Exh. 9.)  All of this constitutes intentional concealment of evidence

in violation of the Court's September 8 and October 6, 2015 Orders.

      Mr. Cooper testified that it "wasn't [his] job" to request these devices from

NMS.  (Oct. 25, 2016 Hr. Tr., at 90:8-12.)  Regardless, Mr. Cooper testified

that he understands that the devices do not exist.  (*Id.* at 89:19-90:3.)

Between the period of October 4, 2015 and December 4, 2015, the computer clock

on Neil's New Home Computer was also manually changed seventeen times,

making forensic examination many times more difficult than it otherwise would have

been. (Rubin Decl., ¶ 59; see also Plfs.' Hr. Exhs., Exh. 7.)  In the aggregate, during

the periods when the clock was changed, over 800,000 files and folders were

affected. (Rubin Decl., ¶ 61; see also Plfs.' Hr. Exhs., Exh. 7.)  Plaintiffs offered no

credible evidence to dispute these findings. (Oct. 25, 2016 Hr. Tr., at 49:5-17; 50:26-

51:3; 52:25-53:2.)  This conduct constitutes concealment and manipulation of

evidence in violation of the Court's September 8 and October 6, 2015 Orders.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
267

Plaintiffs' contention that the manual backdating of Neil's New Home Computer did not prejudice Defendants is not credible. (Cooper Decl., ¶ 66; see also Defs.' Hr. Exhs., Exh. 31.) They do not dispute that the backdating fraudulently alters the file system metadata for all file copies when the device clock is set back. (Supp. Rubin Decl., ¶¶ 40, 41; see also Plfs.' Hr. Exhs., Exh. 9.) In fact, the evidence demonstrates that on December 4, 2015, the day of the forensic collection, between approximately 6:00 p.m. and 7:20 p.m., the computer clock on Neil's New Home Computer was backdated and over 60,000 files were loaded onto his computer. (Oct. 18, 2016 AM Hr. Tr., at 29:15-31:11.) This occurred just ten minutes before Mr. Rubin arrived to conduct the forensic collection, (id.), and constitutes another shocking violation of the Court's September 8 and October 6, 2015 Orders. The fact that Neil and Alan Shekhter, NMS' IT Administrator, Enrique Sanchez, and NMS' own forensic expert, Scott Cooper, were all present at NMS' offices when this took place and none of them offered any explanation at the Evidentiary Hearing is, quite frankly, shocking.

Sometime between November 25, 2015 and December 4, 2015, a zip file emailed to Neil Shekhter from Daniel Lennon purporting to contain files related to AEW and NMS was deleted by Neil Shekhter. (Rubin Decl., ¶ 64; Plfs.' Hr. Exhs., Exh. 7.) This constitutes further destruction of evidence in violation of the Court's September 8 and October 6, 2015 Orders. Plaintiffs do not dispute this, and in fact admit that the zip file contained "Joint Venture related documents." (Shekhter Decl. ISO Sanctions Opp., ¶¶ 153-155.) Plaintiffs also admit to willfully deleting and spoliating this evidence for the express purpose of avoiding detection in a court-ordered

44

Exhibit 2
268

forensic examination.  (*Id.*)  Moreover, Plaintiffs' expert witness, Scott Cooper, agreed in his live testimony that this evidence was deleted.  (Oct. 25, 2016 Hr. Tr., at 87:20-28.)

Other employees within NMS participated in the widespread deletion and alteration of evidence as well.

For example, in December 2015, just days before Defendants were to conduct their forensic imaging of Plaintiffs' computers, Enrique Sanchez, the IT Administrator at NMS, searched for "file deletion utility windows 7," and "free SSD secure erase." (Rubin Decl., ¶ 6(a) & fig. 11; Oct. 25, 2016 Hr. Tr., at 100:25-101:8 [testimony of Scott Cooper]; see also Plfs.' Hr. Exhs., Exh. 7.)  He then downloaded an application called "Eraser Portable," which is a computer data destruction and wiping application, and on December 4, 2015, the application was copied to the NMS corporate file server.  (Rubin Decl., ¶ 90; see also Plfs.' Hr. Exhs., Exh. 7.)  This data wiping utility was used by another NMS employee, Brian Bowis (Vice President of Finance at NMS), the day the court-ordered imaging was to occur.  (Rubin Decl., ¶¶ 90, 91; see also Plfs.' Hr. Exhs., Exh. 7.)  The use of this data wiping utility was in violation of the Court's September 8 and October 6, 2015 Orders.  Plaintiffs do not dispute that the data wiping utility was obtained and used.  (Declaration of Brian Bowis In Support Of Opposition to AEW's Motion For Terminating And Other Sanctions ("Bowis Decl."), ¶ 4; Declaration of Enrique Sanchez In Support Of Opposition To AEW's Motion For Terminating And Other Sanctions ("Sanchez Decl."), ¶¶ 42-45; see also Plfs.' Hr. Exhs., Exh. 100.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
269

Mr. Cooper did not dispute that files were deleted from Brian Bowis' computer on December 4, 2015, the same day Defendants' experts were scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices.  (Oct. 25, 2016 Hr. Tr., at 95:3-10.)

Mr. Bowis admitted that he instructed Mr. Sanchez to delete the files so that no one would have access to the file and so that they would never be retrieved.  (Oct. 25, 2016 Hr. Tr., at 166:6-168:11.)  Contrary to his sworn declaration and direct testimony, Mr. Bowis admitted under cross-examination that among the files deleted were joint venture records and not "personal" files as he had claimed.  (Id. at 170:6-25.)

These searches were not unique; after the Court had ordered preservation, Mr. Sanchez searched for "wipe multiple hard drives simultaneously," "hard drive destruction service," and "hard drive destruction service Los Angeles."  (Rubin Decl., fig. 11; see also Plfs.' Hr. Exhs., Exh. 7.)  Mr. Sanchez's proffered explanation for such searches is not credible, and Plaintiffs' decision not to offer any live testimony of Mr. Sanchez at the Evidentiary Hearing only confirms the lack of his credibility.

Mr. Sanchez had also searched for "Adobe Acrobat removal tool" on November 13, 2015, and Adobe Acrobat was deleted sometime after October 2, 2015 from Adam Shekhter's computer, which had been the host of one of the forged copies of "Version 2."  (Rubin Dec., ¶ 80; see also Plfs.' Hr. Exhs., Exh. 7.)  This conduct was in violation of the Court's September 8 and October 6, 2015 Orders.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
270

On December 3, 2015, Eddie Valentin, who counsel for NMS described as Neil Shekhter's assistant of "many years," deleted a copy of the forged "La Cienega PMA" from his desktop computer.  (Srinivasan Decl., Exh. AA, at 71:25-72:2; Rubin Decl., ¶ 93; see also Plfs.' Hr. Exhs., Exh. 7.)  This conduct was in violation of the Court's September 8 and October 6, 2015 Orders.

And finally, on December 4, 2015, the day Defendants were to conduct the imaging, Mr. Sanchez ran the search: "does eraser work on ssd?"  (Rubin Decl., fig. 11; see also Plfs.' Hr. Exhs., Exh. 7.)  "Eraser" here referring to the wiping utility he had downloaded, and "SSD" referring to any of the data drives falling into that category.

Plaintiffs' contention that these internet searches are not relevant to the improper spoliation of evidence is not credible in light of the context and circumstances surrounding the searches, as well as the other evidence of their spoliation.  (See Opp. at 20.)

In addition to all of the foregoing, Plaintiffs have unabashedly violated the Court's October 6, 2015 Order in still more respects:

There are no less than four critical data sources that Plaintiffs have still yet to produce:  (i) Neil's 2012 Home Computer; (ii) the hard drive that was removed from Neil's New Home Computer; (iii) the Seagate backup that was taken of Neil's New Home Computer; and (iv) the USB drive containing the "original Version 2" that was taken from an "unknown computer" (likely Neil's 2012 Home Computer) and inserted into Adam's computer to distribute the forged "Version 2."  These items—the last three of which were never even listed by Plaintiffs when purporting to comply with

47

Exhibit 2
271

the Court's Forensic Examination Order—are either being knowingly concealed or were destroyed by Plaintiffs. Indeed, Plaintiffs claim that items (ii) and (iii) were intentionally destroyed to avoid full compliance with this Court's orders. In total, there are at least 21 devices that have been plugged into Neil's New Home Computer alone that have not been produced by Plaintiffs. (Rubin Decl., ¶ 71 & fig. 9; see also Plfs.' Hr. Exhs., Exh. 7.) Plaintiffs offered no evidence to credibly refute this evidence. The failure to preserve and produce these devices violates the Court's September 8 and October 6, 2015 Orders, and Plaintiffs' assertion that Neil Shekhter likes to "give away" such devices is no excuse for violating this Court's Orders. (See Shekhter Decl. ISO Sanctions Opp., ¶¶ 162-164.)

Plaintiffs refused to comply with the Court's October 6, 2015 Order that they list all devices responsive to the Court's Order, simply reassuring AEW that it would receive "everything." (Srinivasan Decl., Exh. AA, at 105:23 ["We intend to give you everything."].) Instead, Plaintiffs only "adopted" the list created by Defendants' experts once they had the chance to conduct a forensic investigation. This list did not include a number of items, such as the Seagate backup, and Plaintiffs never corrected that list.

Plaintiffs repeatedly informed Defendants that they had made available all of Adam Shekhter's computers. But Defendants' experts discovered that a Dell Latitude E6520 desktop computer belonging to Adam, with a host name ADAM-S-PC, had not been provided by Plaintiffs. This is the same PC that was used to load the forged "Version 2" and email that document, and the computer from which Adobe Acrobat was removed after October 2, 2015. (Rubin Decl., ¶¶ 76, 79-80; see also

48

Exhibit 2
272

Plfs.' Hr. Exhs., Exh. 7.)  Once AEW actually did obtain the device (along with 13 additional computers Plaintiffs had not previously provided), Plaintiffs' efforts to hide Adam's computer became clear.  (Rubin Decl., ¶¶ 77-78; see also Plfs.' Hr. Exhs., Exh. 7.)  The computer regularly accessed the NMS network, and it was frequently used at the NMS offices, from as early as 2013 until as recently as December 3, 2015 at 7:26 p.m., merely 24 hours before Defendants began their forensic imaging. (Rubin Decl., ¶ 78; see also Plfs.' Hr. Exhs., Exh. 7.)  The computer was then taken offline while the imaging and forensic analysis occurred, and it was not used again until December 21, 2015, after most of the imaging had concluded.  (Id.)  Plaintiffs offered no credible evidence to refute these findings.  The failure to timely produce this device violated the Court's October 6, 2015 Order.  Neither Plaintiffs nor their counsel provided any explanation for this misconduct.

*Perjury*

The Court also finds ample evidence that Plaintiffs—in particular Neil Shekhter— have provided false testimony under oath in order to mislead the Court and cover up their own misconduct.  Some of the most egregious examples include the following:

Neil Shekhter testified that, in connection with his alteration, removal, and destruction of the hard drive from his computer in October 2015, "No information on the hard drive was deleted or altered.  The files containing the personal information are the only files that do not exist on the new hard drive."  (Shekhter Decl. ISO Sanctions Opp., ¶ 151.)  However, Mr. Rubin's testimony demonstrates that in fact, many files were deleted and lost as a

49

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
273

result of this process, including ones clearly relevant to the issues in this lawsuit and explicitly ordered preserved and produced by the Court. (Supp. Rubin Decl., ¶¶ 44-47; see also Plfs.' Hr. Exhs., Exh. 9.)  This includes a Word document titled "Property Management-375 ns.doc," which was created on June 24, 2015 at 7:55 a.m.  (Supp. Rubin Decl. ¶¶ 45-46; see also Plfs.' Hr. Exhs., Exh. 9.)  Thus, Neil Shekhter's testimony was knowingly false.

For the same reasons, the Court finds Alan Shekhter's statements that "I did not delete or alter any information on the hard drive" to be false testimony.  (Alan Shekhter Decl., ¶ 6.)

Neil Shekhter testified that "I eventually threw away the old computer . . . before there was any litigation with AEW" (Shekhter Decl. ISO Sanctions Opp., ¶¶ 144-145), when the evidence demonstrates that Neil's 2012 Home Computer was active and functioning as late as September 19, 2015.  (Rubin Decl., ¶ 51; Supp. Rubin Decl., ¶¶ 34-38; see also Plfs.' Hr. Exhs., Exhs. 7, 9.)  Thus, again, Neil Shekhter's testimony was false.

Neil Shekhter also testified that "I also instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other files." (Srinivasan Decl., Exh. K, at ¶ 25; see also Defs.' Hr. Exhs., Exh. 5.)  However, it is clear that at least Neil Shekhter, Mr. Bowis, and Mr. Valentin deleted information from their computers in October 2015—over a year after the litigation first began—

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
274

<u>and Mr. Sanchez at the very least assisted in this.</u>  (Shekhter Decl. ISO Sanctions Opp., ¶¶ 148, 151-152, 155; Bowis Decl., ¶¶ 3-5; Declaration of Eddie Valentin In Support Of Opposition to AEW's Motion For Terminating And Other Sanctions ("Valentin Decl."), ¶¶ 2-6; Sanchez Decl., ¶ 42; Rubin Decl., ¶¶ 63-65, 80, 88-93; see also Plfs.' Hr. Exhs., Exhs. 9, 100.)  <u>Both the forensic evidence and Neil Shekhter's own subsequent testimony proved this to have been knowingly false testimony.  Moreover, contrary to Neil Shekhter's sworn statements, Mr. Bowis, a then-high ranking executive at NMS, testified that he was never informed that a litigation hold was in place.</u>  (Oct. 25, 2016 Hr. Tr., at 166:6-19.)

*Findings With Respect To Plaintiffs' Experts*

Scott Cooper

Plaintiffs' expert, Scott Cooper, opined that "AEW has been given access to all relevant data and information.  Plaintiffs have not engaged in efforts to withhold, destroy, and alter evidence.  To the contrary, Plaintiffs went above and beyond the Court's Order and made all devices in their possession available to AEW and its experts."  (Cooper Decl., ¶ 10; see also Defs.' Hr. Exhs., Exh. 31.)  Mr. Cooper reiterated his opinion while testifying before the Court, stating that "AEW had access to all of the relevant information and data that they needed for this case."  (Oct. 24, 2016 Hr. Tr., at 83:10-12.)  Given the evidence of spoliation of documents, data, and other materials by Plaintiffs, as discussed in greater detail below, the Court finds that Mr. Cooper's opinion that Plaintiffs had provided "all relevant data and information"

51

Exhibit 2
275

and had gone "above and beyond" the Court's orders defies the record and establishes, along with other testimony, that he was not a credible witness.

Mr. Cooper admitted that he did not affirmatively establish that any of the alleged forgeries were, in fact, authentic.

>Mr. Cooper admitted that he did not affirmatively establish that "Version 2" of the JVA was first created in September 2010.  (Oct. 25, 2016 Hr. Tr., at 42:3-8; 111:3-8.)

>Mr. Cooper admitted that he did not affirmatively establish that the "Cover Letter" was first created in September 2010.  (Oct. 25, 2016 Hr. Tr., at 43:3-19.)

>Mr. Cooper admitted that he did not affirmatively establish that the "La Cienega PMA" was first created in March 2012.  (Oct. 25, 2016 Hr. Tr., at 42:3-43:2.)

Mr. Cooper did not dispute several aspects of evidence spoliation committed by Plaintiffs and their affiliates, and he admitted that he did not conduct his own forensic examination to refute that any of this had occurred.

>Mr. Cooper did not dispute that Neil and Alan Shekhter engaged in a text message conversation on October 15, 2015 regarding swapping out a hard drive from Neil's New Home Computer and backdating the clock on that computer, and that this text message conversation was deleted from Neil Shekhter's phone.  (Oct. 25, 2016 Hr. Tr., at 45:19-46:19.)

52

Exhibit 2
276

Mr. Cooper did not dispute that one of the hard drives from Neil's New Home Computer was removed and replaced with a new hard drive of the exact same size. (Oct. 25, 2016 Hr. Tr., at 47:26-48:3.)

Mr. Cooper did not dispute that Alan and Neil Shekhter removed documents from the old hard drive from Neil's New Home Computer. (Oct. 25, 2016 Hr. Tr., at 48:4-8.)

Mr. Cooper did not dispute that the clock on Neil's New Home Computer was backdated at least 17 times between October 4 and December 4, 2015, and that during one of these times, the clock was backdated to January 2015 for approximately 14 hours. (Oct. 25, 2016 Hr. Tr., 49:5-17; 50:26-51:3; 52:25-53:2.) Mr. Cooper also did not dispute that the clock on Neil's New Home Computer was backdated on December 4, 2015 between 6:00 p.m. and 7:20 p.m., just minutes before Defendants' expert was scheduled to arrive at NMS' offices to conduct a forensic examination of Plaintiffs' devices. (Oct. 25, 2016 Hr. Tr., at 53:3-14; see also Oct. 18, 2016 AM Hr. Tr., at 29:27-30:18 [testimony of Samuel Rubin].) Moreover, over 60,000 new files were loaded onto Neil's New Home Computer while it was backdated the night of the forensic examination. Mr. Cooper did not dispute that either. (Oct. 18, 2016 AM Hr. Tr., at 30:19-31:11 [testimony of Samuel Rubin].)

Mr. Cooper did not conduct his own examination to determine the 800 files that Defendants' expert Samuel Rubin found were missing from the new

Exhibit 2
277

hard drive on Neil's New Home Computer, but were present on either the old hard drive or the external hard drive used to copy files. (Oct. 25, 2016 Hr. Tr., at 65:10-67:24.)

Mr. Cooper admitted that the deleted file "Property management-375 ns.doc" was not provided for forensic examination. (Oct. 25, 2016 Hr. Tr., at 79:28-80:5.)

Mr. Cooper admitted that a folder on Neil's New Home Computer called "AEW" was renamed to "W" on December 4, 2015, the same day Defendants' experts were scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices, and that subfolders within the "W" folder were no longer in the "W" folder when it was produced. (Oct. 25, 2016 Hr. Tr., at 82:28-83:11; 86:22-87:7.)

Mr. Cooper did not dispute that a zip file obtained from former AEW employee Daniel Lennon was deleted from Neil's New Home Computer. (Oct. 25, 2016 Hr. Tr., at 87:20-88:6.)

Mr. Cooper admitted that there were 21 devices that were connected to Neil's New Home Computer, but he did not try to locate these devices because "it wasn't my job." (Oct. 25, 2016 Hr. Tr., at 90:8-12.)

Mr. Cooper did not dispute that files were deleted from Brian Bowis' computer on December 4, 2015, the same day Defendants' experts were

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
278

scheduled to come to NMS' office to conduct a forensic examination of Plaintiffs' devices.  (Oct. 25, 2016 Hr. Tr., at 95:3-10.)

Mr. Cooper did not dispute that NMS employees conducted Google searches such as "how to avoid computer forensics," "Los Angeles anti-computer forensics," and "backdated secure wipe."  (Oct. 25, 2016 Hr. Tr., at 99:17-100:3.)

As set forth above, the Court finds Mr. Cooper lacks credibility because Mr. Cooper continued to insist that Defendants had been given access to all relevant information and that Plaintiffs had gone above and beyond the Court's Order, despite making these various concessions.

Mr. Cooper's credibility was further compromised because he refused to make any concession that Plaintiffs withheld relevant evidence despite making the following admissions:

Mr. Cooper admitted that it was "dumb" and a "bad idea" to delete the text message conversation between Neil and Alan Shekhter regarding swapping out hard drives and backdating the clock on Neil Shekhter's computer.  (Oct. 25, 2016 Hr. Tr., at 45:19-46:19.)

Mr. Cooper admitted that it was a "horrendous idea" to advise a client to swap out a hard drive, backdate a computer, and load files back onto the hard drive while subject to court orders to preserve all documents and to submit to a forensic examination.  (Oct. 25, 2016 Hr. Tr., at 58:16-23.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
279

Mr. Cooper admitted that it was a "stupid thing" for Neil Shekhter to delete text messages, swap out a hard drive, backdate a computer, and load files back onto the new hard drive, and that Mr. Cooper "wouldn't have recommended" this conduct to his clients.  (Oct. 25, 2016 Hr. Tr., at 60:20-23.)

Mr. Cooper admitted that he would not advise a client and that it was a "bad idea" to delete files from a computer even if there is an earlier image of the computer with the deleted files.  (Oct. 25, 2016 Hr. Tr., at 97:12-98:12.)

Mr. Cooper admitted that Plaintiffs did "some stupid things" in responding to the Court's October 6, 2015 Order.  (Oct. 25, 2016 Hr. Tr., at 102:11-15.)

The Court also finds Mr. Cooper lacks credibility due to his failure to answer questions directly, which forced the Court to admonish him several times.  (See, e.g., Oct. 25, 2016 Hr. Tr., at 49:18-27 [THE COURT: "Would you please just listen to the question and answer it.  You are an expert.  You are in court.  Please.  Go ahead."]; 92:23-94:6 [THE COURT: [In response to Mr. Cooper refusing to answer a question after the Court overruled Plaintiffs' counsel's objection] "You're overrul[ing] my ruling? . . .  So listen.  It's your job to listen to the question and answer it.  If there's an objection, I'll make the ruling.  It is your job to answer the question and not comment on my ruling."].)

Dr. Valery Aginsky

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
280

Plaintiffs' expert, Dr. Valery Aginsky, testified that he was not offering any opinion regarding the authenticity of "Version 2" of the JVA, the "Cover Letter," or the "La Cienega PMA." (Oct. 17, 2016 Hr. Tr., at 55:9-19; 59:18-21; 65:19-28.)

Dr. Aginsky opined on the limited topic that the black toner from the "La Cienega PMA" is not consistent with the black toner from the "Cover Letter" dated September 14, 2010, but Dr. Aginsky admitted that his methodology to test the rate and extent of extraction of toner in the "La Cienega PMA" and the "Cover Letter" is not a generally accepted method, nor is such a methodology disclosed in any publications. (Oct. 17, 2016 Hr. Tr., at 72:2-18.)

The Court finds that Dr. Aginsky's complaints that a portion of Mr. LaPorte's examination of questioned documents was done outside his presence are without merit. Mr. LaPorte was not required by this Court's Orders to examine the questioned documents only in the presence of Dr. Aginsky. (See Srinivasan Decl., Exh. Z at pp. 3-4; see also Plfs.' Hr. Exhs., Exh. 26.) The Court's Orders were limited to the physical testing of such documents that may have impacted the documents, not visual examination, including under high powered microscopes. (See Srinivasan Decl., Exh. Z at pp. 3-4; see also Plfs.' Hr. Exhs., Exh. 26.) Dr. Aginsky also admitted that he was not prejudiced by Mr. LaPorte's examination. (Oct. 17, 2016 Hr. Tr., at 75:15-19.) Dr. Aginsky also admitted that he conducted his own chemical testing of the questioned documents outside the presence of Mr. LaPorte and that there is "nothing forensically improper" about conducting examinations alone. (Oct. 17, 2016 Hr. Tr., at 76:11-77:5.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
281

The Court also finds Dr. Aginsky's credibility was undermined due to his refusals on several occasions to answer questions directly, resulting in the Court's admonishment of Dr. Aginsky. (See, e.g., Oct. 17, 2016 Hr. Tr., at 16:4-16 [THE COURT: "You don't want to be an advocate. You want me to see you as a witness that's telling the truth without advocating for one side, right?"]; 63:21-64:3 [THE COURT: "I want you to know that I'm trying to assess credibility. So that's what I'm trying to do is assess your credibility. And there are many elements to that. And one of the elements is not fighting with the person asking you questions."]; 70:15-71:7 [THE COURT: "So listen. I'm trying to assess credibility. One of the ways to assess credibility is how you answer the question. You're a very smart man. And I want to listen and understand your answers so you don't want to be evasive when I'm trying to assess your credibility. So I suggest you listen to the question and you answer the question that's asked. It's not a jury."].) Dr. Aginsky even claimed at one point during cross-examination that he was not fluent in English, even though he testified in English without complaint or difficulty during his direct examination and confirmed he has testified as an expert witness in both state and federal courts in the United States. (Oct. 17, 2016 Hr. Tr., at 8:22-28; 59:5-17.)

William Flynn

Plaintiffs' expert, William Flynn, did not affirmatively find that "Version 2" of the JVA was genuine or that it was created in September 2010. (Oct. 28, 2016 Hr. Tr., at 60:22-26.) He also *agreed* with Mr. LaPorte that "Version 2" of the JVA was printed or copied on July 15, 2013, and not in September 2010. (Oct. 28, 2016 Hr. Tr., at 62:25-63:14; 70:11-15; 71:19-25; 76:23-77:11.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
282

Mr. Flynn also agreed that if "Version 2" of the JVA was not printed in September 2010, then the "Cover Letter" dated September 14, 2010 also could not be from September 2010 as purported by Plaintiffs.  (Oct. 28, 2016 Hr. Tr., at 78:20-79:1.)

The Court does not find that the remainder of Mr. Flynn's testimony, which was limited and based on limited instructions and evidence, undermines Mr. LaPorte's testimony.

Kathleen Nicolaides

Plaintiffs' expert, Kathleen Nicolaides, testified that she did not have sufficient information to determine whether the "La Cienega PMA" is an authentic document created on or about March 1, 2012.  (Oct. 28, 2016 Hr. Tr., at 109:24-28.)

Ms. Nicolaides also confirmed that the "La Cienega PMA" is the only PMA that has a 60-day notice period in Article 12.1, as opposed to a 30-day notice period in all other examined property management agreements.  (Oct. 28, 2016 Hr. Tr., at 108:9-17.)

Ms. Nicolaides further confirmed that the "La Cienega PMA" was formatted differently than the draft La Cienega PMAs, including the draft La Cienega PMA that was attached to emails in early 2012.  (Oct. 28, 2016 Hr. Tr., at 85:1-22; 100:3-17.)

The Court does not find that the remainder of Ms. Nicolaides' testimony, which was limited and based on limited instructions and evidence, undermines Mr. LaPorte's testimony.  The fact that Ms. Nicolaides admitted she was not qualified to opine on some of the bases of Mr. LaPorte's opinions also calls into question her own testimony.  (Oct. 28, 2016 Hr. Tr., at 105:25-106:18.)

59

Exhibit 2
283

*Findings Regarding Failure of NMS Witnesses To Appear At Evidentiary Hearing*

At the Evidentiary Hearing, Plaintiffs did not call several witnesses to testify, including NMS principal Neil Shekhter and NMS employees Adam Shekhter, Alan Shekhter, Enrique Sanchez (NMS' IT Administrator), and Eddie Valentin (Neil Shekhter's assistant), all of whom submitted declarations in opposition to Defendants' Motion.  Plaintiffs did not explain why these witnesses were not called.  The failure to call these witnesses despite an opportunity to do so undermines all of their credibility.

The Court finds that Plaintiffs' failure to call these witnesses to testify at the Evidentiary Hearing means that the testimony these witnesses would have offered would have been harmful to Plaintiffs.  (See Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a part, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."].)

Plaintiffs also offered no explanation regarding the provenance of the three alleged forgeries, two of which were allegedly created during the pendency of this action.  Plaintiffs have not proffered anyone, including Plaintiffs' own principal Neil Shekhter, to explain why the three documents are not forgeries, or to explain the discrepancies in the sworn statements of NMS' employees and the briefs submitted by NMS' counsel.  Nor have Plaintiffs proffered any testimony or explanation to rebut Defendants' showing that Plaintiffs failed to produce documents related to the alleged forgeries in the normal course of discovery even though this material was in Plaintiffs' and Plaintiffs' counsel's possession.  In

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
284

particular, Plaintiffs' own expert confirmed that "Version 2," identified by Plaintiffs and their counsel as an "original" from September 2010, was actually printed on July 15, 2013. (Oct. 28, 2016 Hr. Tr., at 60:22-26 [testimony of William Flynn].)  Neither Plaintiffs nor their counsel offered any credible explanation or testimony regarding the production of a July 15, 2013 document rather than the September 2010 document they claimed it to be.

Terminating And Monetary Sanctions

"The [court's] power to impose discovery sanctions is a broad discretion subject to reversal only for arbitrary, capricious, or whimsical action.  Only two facts are absolutely prerequisite to imposition of the sanction:  (1) there must be a failure to comply . . . and (2) the failure must be willful. . . ." (R.S. Creative, supra, 75 Cal.App.4th at p. 496 [citations omitted].) Moreover, Code of Civil Procedure "Section 2023 authorizes terminating sanctions in the first instance in egregious cases such as this one." (Id. at p. 497; see Williams v. Russ (2008) 167 Cal.App.4th 1215, 1223.)  Where conduct is "illustrat[ive] [of] a kind of discovery abuse that is intolerable in civil litigation," an award of terminating sanctions and fees and costs is appropriate. (R.S. Creative, supra, 75 Cal.App.4th at pp. 486, 488 [affirming the lower court's granting of terminating sanctions and fees and costs against a plaintiff who relied upon a forged contract in her pleadings, provided false testimony about the nature of that contract, and altered or deleted data on her own computer and potentially destroyed some floppy discs].)

Terminating and monetary sanctions are appropriate in light of the extensive evidence that Plaintiffs forged several pieces of evidence—at least "Version 2," the "La Cienega PMA," and the "Cover Letter." (R.S. Creative, supra, 75 Cal.App.4th at pp. 487-488.)  This by itself

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
285

constitutes a fraud on the court, the unlawful spoliation of evidence, and attempts to undermine the judicial system.  (*Williams*, *supra*, 167 Cal.App.4th at p. 1223 ["Spoliation of evidence means the destruction or *significant alteration* of evidence or the failure to preserve evidence for another's use in pending or future litigation"] [emphasis added]; see also *Stephen Slesinger*, *supra,* 155 Cal.App.4th at p. 758 ["California courts possess [the] power" to dismiss an action "when faced with pervasive litigation abuse"]; *Aoude v. Mobil Oil Corp* (1st Cir. 1989) 892 F.2d 1115, 1118-1119 [affirming terminating sanctions because plaintiff pled a case based upon a forged document and such constituted fraud on the court].)

Terminating and monetary sanctions are also appropriate in light of Plaintiffs' perjury regarding the authenticity of and circumstances surrounding all of the forged documents. (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 487-488, 490.)  This misconduct is also reprehensible.  (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 9 ["Perjury, like spoliation, undermines the search for truth and fairness by creating a false picture of the evidence before the trier of fact"]; *Michaely v. Michaely* (2007) 150 Cal.App.4th 802, 806 [affirming award of sanctions due to sanctioned party's "consistent evasion, coupled with responses which were blatant untruths and not credible, amount[ing] to an egregious abuse of the discovery process."].)

    In addition to the examples described, *supra*, Plaintiffs' perjury includes, for example, first swearing that their copy of "Version 2" was the actual one delivered in 2010, and then later swearing it may be a "copy."  (Compare Srinivasan Decl., Exh. K, ¶ 14 & Exh. J, at 59:20-60:5, with Opp. at 13; see also Defs.' Hr. Exhs., Exh. 5.) Lead plaintiff Neil Shekhter also created an entirely fabricated story about "throwing

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
286

away" his computer in early 2015 (Srinivasan Decl., Ex. N, at 206:18-208:20), which itself would have been an act of spoliation, but it was later discovered that this computer still existed as late as September 19, 2015.  (See Pen. Code §§ 118(a), 118a; Rubin Decl., ¶ 50; see also Plfs.' Hr. Exhs., Exh. 5.)

Neil Shekhter also swore under oath that he carefully maintained the "original hard copies" of the "Cover Letter" and "Version 2" that he purportedly received in 2010, but later contradicted himself by testifying that it may be a copy.  (Srinivasan Decl., Exh. K, ¶ 14; Opp. at 13; see also Defs.' Hr. Exhs., Exh. 5.)  This was false.

Neil Shekhter made no mention of the "Cover Letter" until his deposition on September 22, 2015, in which he testified: "I didn't independently remember this letter."  (Srinivasan Decl., Exh. J, at 72:4-6.)  At the same time, he claims the letter was delivered to his office in 2010 with "Version 2," and that he "carefully maintained the original hard copies" until 2015.  (Srinivasan Decl., Exh. K, ¶¶ 13, 14; see also Defs.' Hr. Exhs., Exh. 5.)  This too was false.

Even in opposing Defendants' Spoliation Motion, Neil Shekhter made inconsistent and demonstrably false statements in his declaration.  (Compare Shekhter Decl. ISO Sanctions Opp., ¶ 152 ["I did not delete any information that had anything to do with this case."] with id. at ¶¶ 153, 155 ["I received a zip file from former AEW employee Daniel Lennon containing Joint Venture related documents . . . . I deleted the zip file before turning my computer over for the forensic examination"].)

Plaintiffs also misled the Court when they stated that everything had been—and would be—preserved and produced.  (Srinivasan Decl., Exh. K, ¶ 25 ("I also

63

Exhibit 2
287

instituted a litigation hold within my company around the time this lawsuit commenced, so as to prevent deletion of emails and other file"); *id.*, Exh. M at ¶ 3 ("At least on Plaintiffs' end, there has been no document alteration, spoliation or fabrication."); Supp. Srinivasan Decl., Exh. C, at 76:16-19 ("But a litigation hold was implemented in this case at the very beginning by Mr. Shekhter. Systems were set up so that emails couldn't be deleted, files could not be deleted . . . ."); see also Defs.' Hr. Exhs., Exh. 5.) (See Pen. Code § 125 ["An unqualified statement of that which one does not know to be true is equivalent to a statement of that which one knows to be false."].)

Terminating and monetary sanctions are also appropriate here in this case, with respect to both Plaintiffs' claims and Cross-Complainant's Cross-Complaint, given Plaintiffs' massive, intentional, coordinated effort to destroy evidence, especially in light of, and in plain violation of, the specific September 8, 2015 Order of this Court directing them to preserve and not alter evidence and the October 2015 Order requiring them to produce evidence for forensic examination. (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 487-488.)

These actions of spoliation and evidence destruction justify terminating and monetary sanctions on their own, even without Plaintiffs' fabrication and perjury. <u>To be clear, if it was only these actions at issue, the Court would still impose terminating and monetary sanctions.</u>

Under California law, these actions of document destruction and manipulation in violation of this Court's Orders provide a firm basis for terminating sanctions. (*Cedars Sinai*, *supra*, 18 Cal.4th at p. 12 ["[d]estroying evidence . . . [is] surely . . . a misuse of discovery within the

64

Exhibit 2
288

meaning of section 2023" subject to terminating sanctions]; *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1518 [affirming terminating sanctions where party "fail[ed] to obey a court order to provide discovery"]; *Los Defensores, supra,* 223 Cal.App.4th at p. 391 [affirming terminating sanctions where there was "sufficient evidence that [defendants] willfully failed to comply with the [court's orders]" by willfully concealing or destroying materials]; *Electronic Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1183-1184 [affirming award of terminating sanctions on account of defendant's running data-wiping software prior to turning over computers for court-ordered inspection]; Code Civ. Proc., § 2023.010, subd. (g) [violation of court order, such as the court's preservation and production order, provides grounds for sanctions].) Indeed, the level of document and evidence destruction here is so shocking, intentional, and pervasive that violations of prior court orders are not even required for the imposition of such sanctions—although such violations do exist here and justify terminating sanctions. (*Williams, supra*, 167 Cal.App.4th at pp. 1219, 1223 [affirming award of terminating sanctions without a violation of prior court order for intentional destruction of evidence].)

Among the many actions, including those discussed above, Plaintiffs fraudulently altered and modified Neil's New Home Computer, destroying evidence in the process; lied about and have failed to produce Neil's 2012 Home Computer; intentionally deleted relevant materials provided by a witness; intentionally downloaded and installed updates that destroyed evidence; downloaded and installed data sweeping software that destroyed evidence; altered and attempted to backdate key files; failed to produce at least four key devices with critical evidence and at least 21 devices in total; by their own admission, intentionally destroyed key

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
289

hard drives and a backup; and deleted specific files relating to the forgeries in this case.

Plaintiffs' misconduct was knowing and intentional, in plain violation of this Court's September 8 and October 6, 2015 Orders.  Intentional, willful, coordinated destruction of evidence certainly justifies terminating sanctions, especially here where many of those actions were in plain violation of the Court's Orders.  (See *Williams*, *supra*, 167 Cal.App.4th at pp. 1219, 1223 [affirming the granting of terminating sanctions due to plaintiff's failure to pay fees on a storage unit, which then led to the loss of the items in that unit]; *Los Defensores, supra,* 223 Cal.App.4th at p. 391 [affirming terminating sanctions for defendants' failure to produce documents ordered by the court for production]; *Electronic Funds*, *supra*, 134 Cal.App.4th at pp. 1183-1184 [affirming award of terminating sanctions on account of defendant's destruction of evidence ordered to be produced].)

Terminating sanctions are also appropriate because the violation is "willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules." (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992 [citations omitted].)  Plaintiffs forged at least one key document—the JVA their claims relied upon—in 2013.  This was followed by additional forgeries, perjury, and the coordinated and widespread spoliation and concealment of evidence in this case. There is no way to effect compliance with civil discovery or the Court's Orders, since Plaintiffs have already destroyed countless materials relevant to this case.  And there is no way to know the full extent of the damage done.  Plaintiffs' actions, particularly those since the Court entered its Orders, were willful and show a history of abuse that continues to this

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
290

day, and nothing less than terminating sanctions would produce compliance with this Court's Orders.

Because of Plaintiffs' actions and the substantial showing by Defendants and Cross-Complainant, the burden was on Plaintiffs to demonstrate any alleged lack of prejudice to Defendants from Plaintiffs' actions.  Plaintiffs failed to meet this burden.  In *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1227, the court held that when the party moving for discovery sanctions based on the spoliation of evidence makes an initial prima facie showing that the responding party in fact destroyed evidence that had a substantial probability of damaging the moving party's ability to establish an essential element of its claims or defenses—under principles derived from Evidence Code section 500 and case law interpreting that section— the burden shifts to the spoliating party to "disprov[e] prejudice," such as by demonstrating all of the destroyed evidence remains available from another source.  Here, Defendants have easily met this prima facie showing, with respect to both their defenses to Plaintiffs' claims and also Cross-Complainant's Cross-Complaint.  Among many other things, Defendants have demonstrated that the very computer used by Neil Shekhter has been forever corrupted and a untold amount of evidence has been hidden or destroyed; Plaintiffs intentionally and purposefully hid or "discarded" the backup that was taken of that computer prior to the hard drive swap, as well as the hard drive that had previously been on the computer; Plaintiffs have also destroyed or intentionally withheld Neil Shekhter's 2012 Computer; Plaintiffs have destroyed or intentionally withheld the very files and drives upon which the forgeries that they attempted to perpetrate on Defendants (and the Court) were created (such as the drive containing forged "Version 2"); and files from alleged witnesses (such as Daniel Lennon) have been intentionally destroyed by Plaintiffs.  These are just but

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
291

a few of the actions taken by Plaintiffs that have resulted in prejudice to Defendants' ability to present their defenses and evidence in support of the cross-claims. The volume of relevant materials that has been concealed, destroyed, or altered in violation of this Court's Orders undeniably prejudices Defendants' ability to defend itself and to pursue cross-claims. (See Rubin Decl., ¶¶ 61, 63, 88, 91-93; see also Plaintiffs' Evidentiary Hearing Exhibits ("Plfs.' Hr. Exhs."), Exh. 7.) This constitutes prejudice of the highest magnitude. (*Williams, supra,* 167 Cal.App.4th at p. 1227; see also *Cedars-Sinai, supra,* 18 Cal.4th at p. 14).

With the burden having shifted to Plaintiffs as a result of their widespread misconduct, they had to "disprov[e] prejudice." (*Williams, supra,* 167 Cal.App.4th at p. 1227.) This is something Plaintiffs simply have not done, and cannot do. Plaintiffs cannot dispute that there is extensive evidence—such as that on Neil's New Home Computer prior to his hard drive swap, that on the back-up used as part of that hard drive swap, the materials provided by Daniel Lennon, and the materials that exist on all of the USB and other drives that have been withheld—that Defendants will never have access to. (*Williams, supra,* 167 Cal.App.4th at p. 1227 [finding spoliating party failed to meet burden because he could not show that destroyed files were available from another source].)

Plaintiffs' argument that Defendants have not "proven" exactly what was destroyed or its impact on the case misses the point. Plaintiffs' coordinated, intentional, widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony Plaintiffs may intend to offer. As the court aptly stated in *Electric Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, 1184: "[D]efendants' actions have made it virtually impossible to determine what defendants destroyed. The mere fact that plaintiffs' forensic consultant

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
292

recovered some of the data does not mean none was lost." And the court there rejected the very argument Plaintiffs make here that the moving party was required to show more prejudice than it already had based upon the spoliating party's running data-wiping software on computers: "[D]efendants' own actions [of intentional document destruction] make that showing difficult, if not impossible." (*Ibid.*) The same is true here; yet, there is no question that Defendants and Cross-Complainant have been immensely prejudiced by Plaintiffs' actions in this case. (See also *Williams*, *supra*, 167 Cal.App.4th at p. 1227 [where the spoliating party fails to identify precisely what was destroyed, "it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action"].)

Additionally, the Court considers the fact that, despite their actions being front and center in Defendants' Motion, Plaintiffs did not call as witnesses at the Evidentiary Hearing (despite more than ample opportunity to do so) Neil Shekhter (who engaged in the outrageous actions of spoliation, perjury, and forgery presented to the Court), Adam Shekhter (who participated with Neil Shekhter in creating the forgery of "Version 2"), and Alan Shekhter (who assisted Neil Shekhter with the hard drive swap discussed above). Plaintiffs likewise failed to present testimony from Enrique Sanchez and Eddie Valentin at the Evidentiary Hearing. The absence of any live testimony from these individuals was stunning.

California Evidence Code section 413 provides that "[i]n determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
293

testimony such evidence or facts in the case against him, or his willful suppression
of evidence relating thereto, if such be the case."

Here, there can be no question that Plaintiffs' failure to call these key witnesses, as
well as Plaintiffs' willful destruction of evidence and document destruction, leads to
the inference that Plaintiffs are guilty of the forgery, perjury, and spoliation
Defendants claim. (See *California Fair Employment and Housing Com'n v. Gemini
Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1022 [proper to infer the missing
testimony would have supported the opposing party].) After hearing all of the
evidence, the Court has no doubt this is the case.

As the Supreme Court has said, "[t]he intentional destruction of evidence is a grave affront
to the cause of justice and deserves our unqualified condemnation," as it "can destroy
fairness and justice, . . . increases the risk of an erroneous decision, [and] . . . increase[s]
the costs of litigation." (*Cedars-Sinai, supra,* 18 Cal.4th at pp. 4, 8.) All of that is present
here. Terminating sanctions are necessary.

Indeed, this case involves circumstances far worse than those at issue in numerous other
cases in which terminating sanctions have been issued and affirmed.

In *R.S. Creative*, an officer of R.S. Creative brought a breach of contract action against a
company called Creative Cotton, and the contract attached to the complaint was alleged by
the Defendant to be a forgery. (See *R.S. Creative, supra*, 75 Cal.App.4th at p. 488.)
Defendants demanded all copies, including electronic copies, be produced as well as the
plaintiffs' computer. (*Id.* at p. 489.) The plaintiff agreed not to use her computer until the
defendants' expert could conduct a forensic examination. (*Id.* at p. 490.) But before that

70

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
294

examination took place, the plaintiff deleted files from the hard drive or replaced the hard drive with a new one.  The plaintiff then tried to amend the complaint to rely on a new, non-forged version of the contract and brought in a new lead lawyer.  (*Id.* at p. 492.)  The court issued terminating sanctions for the misconduct and the decision was affirmed on appeal. (*Id.* at pp. 488, 496.)  The court also rejected plaintiffs' claim that terminating sanctions constituted a due process violation.  (*Id.* at p. 497.)  "On the record we have summarized, we find no due process violation.  RSC and Ms. Sebastian had ample opportunities to comply with discovery orders, but failed to do so.  Section 2023 authorizes terminating sanctions in the first instance in egregious cases such as this one."  (*Ibid.*)  *Ceglia v. Zuckerberg* (W.D.N.Y. Mar. 26, 2013) 2013 WL 1208558, involved similar facts as well—a forged document and spoliation about the forgery—and the court there also easily granted terminating sanctions.

A similar result occurred in *Williams v. Russ* (2008) 167 Cal.App.4th 1215, in much less egregious circumstances than those here.  In *Williams*, the plaintiff had demanded its client file be returned from its former attorney after filing suit against him, and then let the contract for the storage locker expire during the litigation so the files were destroyed.  (*Id.* at p. 1222).  The trial court rejected the plaintiff's excuses and speculation that the defendant had not been prejudiced, and issued terminating sanctions.  The Court of Appeal affirmed the termination sanctions that were issued by the trial court, noting, "[w]hile there is no tort cause of action for the intentional destruction of evidence after litigation has commenced, it is a misuse of the discovery process that is subject to a broad range of punishment, including . . . terminating sanctions."  (*Id.* at p. 1223 [internal citations omitted].)

71

Exhibit 2
295

*Electronic Funds Solutions v. Murphy* (2005) 134 Cal.App.4th 1161, is also instructive. There, the trial court ordered the defendants to produce computers upon which defendants conducted business that defendants claimed had been corrupted by a computer virus, warning of terminating sanctions if they failed to do so. (*Id.* at p. 1669.) Upon receiving the computers, plaintiffs' expert was able to determine that the computers produced by defendants "had their hard drives 'wiped' by 'Data Eraser' software between the time the court ordered their production and [the plaintiffs'] inspection." (*Ibid.*) In facts eerily similar to those here, the plaintiffs' expert further "surmised that data had been copied from the hard drives, the drives wiped, and selected data reinstalled." (*Ibid.*) The Court of Appeal affirmed the trial court's granting of plaintiffs' motion for terminating sanctions, striking defendants' answer, and ordering defendants' default entered, as the trial court "could have reasonably concluded a lesser sanction would not have been sufficient to compel compliance and that terminating sanctions were necessary to provide plaintiffs' with the due process to which they were equally entitled." (*Id.* at p. 1184.)

*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, is also on point. There, the Court of Appeal affirmed an order entering terminating sanctions against the defendants—striking their answers and entering default against them—for failing to produce certain documents (such as call logs) defendants had testified to during their depositions. (*Id.* at pp. 391-392.) The Court of Appeal found terminating sanctions were appropriate, as the evidence revealed "willful noncompliance" by defendants of the court's orders. (*Id.* at p. 391.) The "appellants willfully concealed or destroyed" the written documents they testified to. (*Ibid.*)

72

Exhibit 2
296

Finally, the decision in *Peal v. Lee* (2010) 403 Ill.App.3d 197, is instructive. "During the course of discovery, plaintiff deliberately deleted thousands of files from his personal computer, using multiple programs with names like File Shredder and Privacy Eraser Pro." (*Id.* at p. 198.)  The trial court dismissed his complaint as a sanction "for the profligacy of his electronic spoliation of evidence." (*Ibid.*)  The Appellate Court of Illinois, First District, Fifth Division, affirmed.  "[Plaintiff] argues that because he has denied authoring the 2004 Documents, defendants cannot claim surprise that the documents sought were not found on his computer . . . the real surprise is that a litigant would have the audacity to discard his old hard drive and delete tens of thousands of electronic files with sophisticated data-wiping programs and then cry foul that his opponents should not be surprised. This sounds like the story of the children who murdered their parents and then pled for sympathy as orphans." (*Id.* at p. 205.)

The actions of Plaintiffs here were far worse than those in any of the cases cited above. Defendants have made a prima facie showing that the spoliation by Plaintiffs has impaired their ability to defend against Plaintiffs' claims and pursue Cross-Complainant's Cross-Complaint.  Plaintiffs have not and cannot disprove prejudice to Defendants and Cross-Complainant.  Terminating sanctions are justified.

In response to these compelling facts, Plaintiffs have asserted a series of arguments over the course of the proceedings before this Court.  These arguments are not well taken.

First, Plaintiffs, citing *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, argue that a jury should decide the issues presented by Defendants' motion

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
297

because Plaintiffs claim there are disputes of fact. This is not the law; it is a serious misreading of *New Albertsons*; and it is a misstatement of the facts found here.

The statute itself authorizes "*the court*, after notice to any affected party, person, or attorney, and after opportunity for hearing" to impose terminating sanctions. (Code Civ. Proc., §§ 2023.030(d)(1), (2), and (4) [emphasis added].) And each of the cases discussed by the Court above involved disputes of fact in some form; that did not prevent the court from entering terminating sanctions and from the Court of Appeal affirming. (See, e.g., *Williams*, *supra*, 167 Cal.App.4th at p. 1224 ["[w]hen the *conflicting evidence* is viewed through [the abuse of discretion] standard, it is more than sufficient to affirm the trial court's findings"] [emphasis added]; *Los Defensores*, *supra*, 223 Cal.App.4th at p. 391-392 [awarding terminating sanctions against defendants for failure to produce documents defendants claimed in sworn declarations never existed].) In fact, in *Tucker v. Pac. Bell Mobile Services* (2010) 186 Cal.App.4th 1548, the court stated that "[i]t is the *exclusive* function of the trial court to weigh[] the evidence, resolve conflicts and determine the credibility of witnesses" when ruling on a sanctions motion. (*Id.* at p. 1562 [emphasis added].) This makes sense too; otherwise, as another court has stated, it "would be to permit a plaintiff who is perpetrating a fraud on the court to run roughshod over the court's integrity." (*Ceglia*, *supra*, 2013 WL 1208558 at *11.)

The quote that Plaintiffs rely upon from *New Albertsons*, meanwhile, simply stands for the unremarkable proposition that "[r]ather than decide the facts

74

Exhibit 2
298

with respect to the intentional destruction of evidence and impose a

nonmonetary sanction on a pretrial motion *in circumstances not*

*contemplated by the discovery statutes*"—i.e., where sanctions are not

authorized by the Code of Civil Procedure or under the court's inherent

authority—"we believe that in most cases of purported spoliation the facts

should be decided and any appropriate inference should be made by the

trier of fact after a full hearing at trial." (*New Albertsons*, *supra*, 168

Cal.App.4th at p. 1431 [emphasis added].)  Of course, sanctions are

authorized here by the discovery statutes and the court's inherent

authority, as discussed above.  *New Albertsons*—which involved the

innocent destruction of an irrelevant videotape that the moving party had

waived its right to—does not hold that a jury should hear a sanctions

motion simply because there are alleged "disputes of fact"; quite the

contrary, the cases *New Albertsons* cites demonstrate it is for the court to

decide these issues.  (*Id.* at pp. 1424-1426, 1431-1434 [citing multiple

cases].)  And this is the way it must be—a jury could not be tasked with

enforcing a court's discovery orders or enforcing a court's inherent

authority; nor could a jury be asked to sanction counsel, for instance.

Plaintiffs also failed to identify any genuine material "disputes of fact."  As

discussed above, there are no genuine disputes regarding the core

material facts relating to Plaintiffs' misconduct.

Second, Plaintiffs have argued that the relief Defendants and Cross-Complainant

seek through their motion would constitute an unlawful "forfeiture" or unconstitutional

75

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
299

"takings," but have not provided any support for this proposition. Plaintiffs sued Defendants in this case; one Defendant (P6 LA MF Holdings SPE, LLC) has filed a Cross-Complaint. The parties were facing off in litigation against each other. Plaintiffs then took actions that were in violation of this Court's orders, undermined the judicial process, and resulted in immense and untold prejudice to Defendants and Cross-Complainant. As a result, terminating sanctions are justified under both the Code of Civil Procedure and the Court's inherent authority (Code Civ. Proc. §§ 2023.030; *Stephen Slesinger, supra*, 155 Cal.App.4th at p. 740), and this includes the authority—specifically identified in the Code of Civil Procedure—for the Court to strike Cross-Defendant's answer to the Cross-Complaint and enter judgment against Cross-Defendant as to the Cross-Complaint. (Code Civ. Proc. §§ 2023.030(d)(1), (2), and (4).) That the consequences of this may ultimately end up being high for Plaintiffs does not affect whether the relief should be granted; rather, it simply shows the risk that Plaintiffs knowingly undertook when they intentionally violated the Court's Orders and destroyed evidence relevant to this dispute. Indeed, courts in circumstances far less egregious than this have stricken parties' pleadings and entered default judgment against them. (See, e.g., *Los Defensores, supra,* 223 Cal.App.4th at p. 391; *Electronic Funds, supra*, 134 Cal.App.4th at p. 1184.) There is no reason that the result should be any different here. Moreover, Plaintiffs ignore the fact that the default on its own is authorized by the Code; the *remedy* to which Cross-Complainant will actually be entitled on the Cross-Complaint will be set pursuant to a separate prove-up hearing. Those remedies are nothing more than one party to a contract obtaining default judgment

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
300

on its contractual claims pursuant to specific contractual provisions, and enforcing its contractual rights.  (See Oct. 28, 2016 Hr. Tr., at 167:15-21.)

Nor is the case that Plaintiffs cited to during argument for their "forfeiture" point, *Caryl Richards, Inc. v. Superior Court* (1961) 188 Cal.App.2d 300, at all applicable here.  There, the court issued terminating sanctions against defendant on account of the defendant's alleged failure to fully answer *an interrogatory*, which the court found was an issue that could be remedied by taking the facts requested in the interrogatory as conceded.  (*Id.* at pp. 303, 305.)  There was simply no need for any default in this case after the evidentiary sanction had been imposed.  This case is very different.

Third, Plaintiffs claim that an order granting terminating sanctions would violate their due process rights.  This argument repackages Plaintiffs' "takings" and "forfeiture" arguments and fails for the same reasons.  Additionally, the Court of Appeal has rejected this very argument from a spoliating party in facts less egregious than those here.  (*R.S. Creative*, *supra*, 75 Cal.App.4th at p. 497.)  Indeed, as the *Electronic Funds* court pointed out, it is Defendants—if anyone—who have had their due process rights violated here as a result of Plaintiffs' misconduct.  (*Electronic Funds*, *supra*, 134 Cal.App.4th at p. 1184 ["terminating sanctions were necessary to provide [the moving party] with the due process to which they were equally entitled"].)

Similarly, Plaintiffs' claim that their due process rights were violated by their failure to take the deposition of Defendants' experts is not persuasive. Plaintiffs had no such right, and Plaintiffs' cross-examination of these very

77

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
301

same experts over many hours at the Evidentiary Hearing moots their argument in any event.

The Court similarly rejects Plaintiffs' other "due process" argument that their later-filed motions should have been decided before the instant Motion, which Defendants filed before Plaintiffs' motions.  (Plaintiffs' Objection to Terminating Sanctions; and Legal Brief For October 13 Evidentiary Hearing ("NMS Objections"), at pp. 5, 7, 23-24.)  These motions which seek sanctions against Defendants for filing the instant now-granted Motion, and disqualification of Gibson Dunn, have no bearing on the instant Motion and Plaintiffs' own misconduct.

Fourth, Plaintiffs have advanced a series of merits-related arguments as to what they claim are the rights and obligations under the parties' JVA, as well as to the merits of the Cross-Complaint, including whether Defendants have a right to sell the Joint Venture properties, the status of NMS as the Operating Member of the Joint Venture, and the status of NMS' affiliate as the Property Manager of the Joint Venture Properties.  (NMS Objections, at pp. 3, 4, 15-19, 21-22.)  Though virtually every aspect of these arguments is incorrect, belied by the evidence, and constitute arguments that the Court has already rejected in its demurrer rulings, none of it is relevant to the instant Motion, which is concerned solely with whether Plaintiffs' substantial misconduct warrants terminating sanctions.  Plaintiffs actually admit this point, conceding in their Objection that "[n]one of these issues have [sic] anything to do with spoliation of evidence or alleged forgeries."  (*Id.* at p. 18.)  If anything, Plaintiffs' merits-related arguments confirm that virtually every key issue in this case

78

centers on the JVA, which is the focus of Plaintiffs' discovery misconduct, only further demonstrating that terminating sanctions should be issued.

Plaintiffs' claim that terminating sanctions would also somehow result in a "windfall" to Defendants is inapt.  Any remedies Cross-Complainant receives from the Cross-Complaint will be determined during a prove-up hearing, and at any rate the Court of Appeal has rejected similar "windfall" arguments by parties engaged in intentional spoliation:  "Defendants argue plaintiffs were required to show prejudice from the deletion of data.  Otherwise, they contend, terminating sanctions bestow a windfall to plaintiffs.  But defendants' own actions make that showing difficult, if not impossible."  (*Electronic Funds, supra,* 134 Cal.App.4th at p. 1184 [], citation omitted.)

Plaintiffs' similar claim that sanctions should not be issued because the Court dismissed their claims on demurrer based upon the forged "Version 2" fails to recognize the gravity of their misconduct.  Plaintiffs, like the plaintiff in *R.S. Creative*, brought this case based upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries (which related to Plaintiffs' original claims and Cross-Complainant's Cross-Complaint claims).  It does not remedy the situation that Plaintiffs' claims based upon the forgery have been dismissed; rather, their widespread misconduct infects the entirety of these proceedings.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
303

Monetary sanctions in the form of attorney's fees, expert fees, and costs against both Plaintiffs are appropriate here.

Monetary sanctions are mandatory where the responding party has no justification as to why imposition of the sanction would be unjust. (Code Civ. Proc., § 2023.030, subd. (a) ["If a monetary sanction is authorized by any provision of this title, the court shall impose that sanction unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust"].) Plaintiffs cannot demonstrate that sanctions for extensive spoliation of evidence, fabrication of key evidence, and perjury about the same would be unjust.

Plaintiffs fabricated evidence, submitted perjury about the same, and destroyed evidence, while simultaneously representing to the Court that they were proffering authentic documents and that they had preserved evidence. In light of these facts, fees and costs should—and indeed must—be awarded against Plaintiffs. (Cedars-Sinai, supra, 18 Cal.4th at p. 12 [recognizing that spoliating party may be forced to incur "monetary sanctions"]; Kravitz v. Superior Court (2001) 91 Cal.App.4th 1015, 1016 ["Under the Civil Discovery Act of 1986, the trial court must impose monetary sanctions against anyone engaging in conduct that is a misuse of the discovery process, and must order the abuser to pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct."].)

Plaintiffs' Motion to Strike

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
304

*Plaintiffs' MTS Was Filed in Violation of Section 1005, This Court's Local Rules, and This Court's Order*

Plaintiffs' Motion to Strike ("MTS") is untimely. Plaintiffs filed their MTS on February 23, 2016, serving it by overnight delivery and listing a hearing date of March 7, 2016 on the face page of their memorandum. Section 1005 of the Code of Civil Procedure requires that a moving party serve and file its moving and supporting papers "at least 16 court days before the hearing." (Code Civ. Proc., § 1005, subd. (b).) This notice period is extended by two calendar days where, as here, a party serves notice "by facsimile transmission, express mail, or another method of delivery providing for overnight delivery." (*Ibid.*) The statutory deadline for Plaintiffs' MTS fell on February 10, 2016 for service by personal delivery, or February 8, 2016 for service by overnight delivery. Thus, Plaintiffs' filing came fifteen days after the statutory deadline.

Plaintiffs also failed to properly reserve a hearing date for their MTS (see Dept. 71 Rules, at p. 2), and instead misappropriated the hearing date of March 7, 2016 *after* this Court had denied their *ex parte* application to advance the hearing date on the MTS. (See Order Denying Plaintiffs' *Ex Parte* Application, Feb. 8, 2016.)

The Reservation ID Number on the face page of Plaintiffs' MTS corresponds to a March 16, 2016 hearing date for a discovery motion, not to a March 7, 2016 hearing on a motion to strike. Plaintiffs' filing would be untimely even for the March 16, 2016 hearing date, however, because Plaintiffs served the MTS by overnight delivery. (See Code Civ. Proc., § 1005.)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
305

Because Plaintiffs' MTS is untimely and filed in violation of Section 1005, the local rules, and this Court's Order, Plaintiffs' MTS is denied.

*Plaintiffs Failed to File a Noticed Motion*

Plaintiffs failed to include a notice of motion with their MTS specifying the nature of the order sought, the grounds upon which the motion would be made and the papers upon which it was to be based, as required under Section 1010 of the Code of Civil Procedure and Rules 3.1110(a) and 3.1112(a) of the California Rules of Court. "A court cannot grant different relief, or relief on different grounds, than stated in the notice of motion." (Weil & Brown, Cal. Practice Guide: Civ. Proc. Before Trial (The Rutter Group 2015) ¶ 9:38, citing *People v. Am. Sur. Ins. Co.* (1999) 75 Cal.App.4th 719, 726; *Luri v. Greenwald* (2003) 107 Cal.App.4th 1119, 1124.) Defects in the Notice of Motion, to say nothing of a party's failure altogether to supply a Notice of Motion, are grounds for denying the motion. (*Galleria Plus, Inc. v. Hanmi Bank* (2009) 179 Cal.App.4th 535, 536-537 [reversing order granting sanctions for frivolous filing based on violation of Section 1010 of the Code of Civil Procedure].) Accordingly, Plaintiffs' MTS is denied for failure to include a proper notice of motion.

*There is No Legal Basis for Plaintiffs' MTS*

Plaintiffs identify no law authorizing Plaintiffs' motion to strike an opposing party's motion and have proceeded under the wrong statutes. Section 436 permits a party to file a motion to strike any "pleading." (Code Civ. Proc., § 436 [permitting a motion to "[s]trike out all or any part of any pleading"].) The statute specifically defines the term "pleading" to mean "a demurrer, answer, complaint, or cross-complaint." (Code Civ. Proc., § 435,

82

Exhibit 2
306

subd. (a)(2).)  Because Defendants' Spoliation Motion is not a "pleading," Plaintiffs may

not bring a statutory motion to strike the Spoliation Motion.  (Code Civ. Proc., §§ 435,

436.)

> Plaintiffs have failed to comply with the procedural requirements governing
> motions to strike pleadings.  Section 436 of the Code of Civil Procedure permits
> the Court to strike a pleading "upon a motion made pursuant to Section 435, or at
> any time in its discretion."  (Code Civ. Proc., § 436.)  However, Section 435, in
> turn, requires a party bringing a motion to strike to "serve and file a notice of
> motion," to serve and file the motion "within the time allowed to respond to a
> pleading," and to "specify a hearing date set in accordance with Section 1005."
> (Code Civ. Proc., § 435, subds. (b)(1) & (2).)  Plaintiffs have failed to fulfill any of
> these requirements, therefore their MTS must be denied.

Neither the Court's inherent authority, nor the statutory grant of discretion in Section 436,

permits Plaintiffs to circumvent the procedural requirements for motions to strike, set

forth in Sections 435 and 436 of the Code of Civil Procedure.  (See *Le Francois v. Goel*

(2005) 35 Cal.4th 1094, 1096 [court's inherent authority to reconsider its orders did not

excuse a party from complying with Code of Civil Procedure sections 437 and 1008].)

Accepting Plaintiffs' contrary argument would entirely obviate the procedural

requirements attaching to motions to strike.  (See *Clements v. T.R. Bechtel Co.* (1954)

43 Cal.2d 227, 233 ["every word, phrase and provision employed in a statute is intended

to have meaning and to perform a useful function and it is not to be supposed that the

Legislature used language in a sense which would . . . render nugatory an important

provision . . . ."].)

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
307

*Defendants Fully Complied with the Court's October 6, 2015 Order*

Defendants did not violate the provisions in this Court's October 6, 2015 Order requiring the Forensic Experts to submit Forensics Reports to the parties and the Court.

Defendants' submission of expert declarations in support of the Spoliation Motion, filed January 29, 2016, did not violate the October 6, 2015 Order. The October 6, 2015 Order requires the Forensic Experts to submit a Forensic Report to the parties and the Court "[w]ithin twenty-one days of the completion of the forensics investigation." (Srinivasan Decl., Exh. Z, at 3:12.) Nothing in the October 6 Order prevented the Forensic Experts from submitting declarations prior to the expiration of the twenty-one day period following conclusion of the forensic investigation.

Plaintiffs' proffered interpretation of the October 6, 2015 Order—that it "required the experts to complete their examination, prepare a Report and provide it to the Court and both parties" and only then permitted Defendants to "go to the Court and make [their] 'forgery' argument" (MTS 3:19-23)—is not supported by the language of the Order and is incorrect.

As Plaintiffs concede (MTS 4:8-9), the declarations submitted in support of the Spoliation Motion were substantively identical and equivalent to expert reports. As required by the October 6, 2015 Order, the declarations "provide[d] [a] summary of its findings concerning 'Version 2,' Exhibit 41, and any Property Management Agreements" (Srinivasan Decl., Exh. Z,, at 3:15-16), as well as the Forensic Experts' findings regarding spoliation of evidence. There is no claim by

Plaintiffs or any evidence showing that these reports were not timely filed. Accordingly, the submission of declarations fully complied with the October 6, 2015 Order.

Plaintiffs' assertions of misconduct by AEW and Gibson Dunn, and intimations of bias by the Forensic Experts, are not supported by citations to accompanying declarations or affidavits and, therefore, are not properly before the Court. (See MTS 3-23-4:1.)

Further, Plaintiffs' assertions of misconduct are contradicted by the evidence. This Court specifically approved the Forensic Experts, by name, in the October 6, 2015 Order. Plaintiffs did not oppose the experts' qualifications. Plaintiffs have not presented any evidence to call into question the Forensic Experts' independence, objectivity, or expertise. On the contrary, the Forensic Experts conducted fully independent and objective investigations and properly reported the results of their investigation to the parties and the Court.

Defendants did not breach the confidentiality provisions of the October 6, 2015 Order.

Nothing in the October 6 Order prohibits disclosure of the outcome of the forensic examination to the parties, their counsel, and the Court, together with the documents and exhibits on which the Forensic Experts' conclusions were based. That is all that was disclosed here. The Forensic Experts (Stroz Friedberg) conducted an independent investigation and then provided their conclusions to Defendants and Defendants' counsel, together with the supporting documentation, on the eve of filing the same with the Court and serving the same

85

Exhibit 2
309

on Plaintiffs. This approach fully complied with the confidentiality requirements of the October 6, 2015 Order.

Plaintiffs provide no evidence that confidential information was disclosed in violation of the Court's October 6, 2015 Order. (See Frid Decl., ¶¶ 79-86.)

Statements by Defendants' counsel to the effect Defendants intended to file a motion for sanctions based on forgery and spoliation do not establish that any confidential information was disclosed in violation of the October 6, 2015 Order. (See Frid Decl., ¶¶ 80-82.)

Similarly, the statement by Defendants' counsel that "a shocking level of spoliation and/or concealment of critical evidence" had occurred does not establish that any confidential information had been disclosed. (Frid Decl., ¶ 84.)

Several of Plaintiffs' examples of supposedly improper disclosures in fact involve wrongdoing by Plaintiffs.

As purported examples of the supposed improper disclosure of their confidential information, Plaintiffs point to Defendants' discoveries that: (i) Plaintiffs had withheld a device named "ADAM-S-PC" from production (Frid Decl., ¶ 83); (ii) Plaintiff Neil Shekhter had upgraded his operating system, resulting in data loss (id., ¶ 85); and (iii) Plaintiffs had concealed an email server from disclosure (id., ¶ 86).

86

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
310

However, these examples offer instances in which the Forensic Experts properly disclosed omissions from the production of materials required by the October 6, 2015 Order.

Each of these examples admits a clear violation of the October 6 Order by Plaintiffs. That Order required Plaintiffs to produce "all of Plaintiffs' and Plaintiffs' affiliates' computers and other devices that could have ever sent, received, modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including 'Version 2'), Exhibit 41, and all Property Management Agreements (including the Luxe La Cienega PMA), as well as Mr. Shekhter's home and office computers (the 'Devices')." (See Srinivasan Decl., Exh. Z, at 2:14-17.) As Plaintiffs admit, Plaintiffs violated this provision by failing to disclose critical devices.

Defendants provided appropriate notice of all forensic testing.

Defendants' expert, Gerald LaPorte, properly conducted all forensic testing of the documents subject to the October 6, 2015 Order in the presence of Plaintiffs' witness, Valery Aginsky, after providing notice compliant with the October 6, 2015 Order.

Mr. LaPorte's non-invasive examination and observation of documents outside of the presence of Plaintiffs' expert witness did not violate the October 6, 2015 Order

87

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
311

and did not threaten the integrity of the examination and analysis LaPorte performed.

Defendants' expert did not disclose privileged communications.

The attorney-client privilege does not attach to non-privileged materials simply because the materials are transmitted to an attorney.  (*San Francisco Unified Sch. Dist. v. Sup. Ct. for the City and Cnty. of S.F.* (1961) 55 Cal.2d 451, 457 ["We hold that the forwarding to counsel of non-privileged records, in the guise of reports, will not create a privilege with respect to such records and their contents where none existed theretofore."].)

In paragraph 48.b of his Declaration, Defendants' expert Samuel Rubin disclosed that Plaintiff Neil Shekhter transmitted two attachments in an email and briefly described the attachments, as well as the date and time the email was sent.

Mr. Rubin did not disclose any information regarding the content of the email itself, nor the identity of the recipient.

No privilege attached to the email attachments described in paragraph 48.b of Rubin's Declaration.  (*San Francisco Unified Sch. Dist. v. Sup. Ct. for the City and Cnty. of S.F.* (1961) 55 Cal.2d 451, 457.)  Accordingly, the description of those attachments did not disclose privileged information in violation of the October 6, 2015 Order.

Mr. Rubin's disclosure of the date and time the attachments were sent, and the name of the sender, did not disclose privileged information in violation

88

Exhibit 2
312

of the October 6, 2015 Order.  To the contrary, this is exactly the type of information required for a privilege log.  (See *Catalina Island Yacht Club v. Sup. Ct.* (2015) 242 Cal.App.4th 1116, 1129-1130 ["[A] privilege log typically should provide the identity and capacity of all individuals who authored, sent, or received each allegedly privileged document, the document's date, a brief description of the document and its contents or subject matter sufficient to determine whether the privilege applies, and the precise privilege or protection asserted."].)

> To the extent that either the attachments or the information
> regarding the sender, date and time of the email were privileged,
> any such privilege was lost pursuant to the crime/fraud exception.
> (*State Farm Fire & Cas. Co. v. Sup. Ct.* (1997) 54 Cal.App.4th 625,
> 648-649.)

In their MTS, Plaintiffs disclose that the email described in Paragraph 48.b of Rubin's declaration was transmitted by Shekhter to his litigation counsel.  (MTS 5:23-6:4.)  When non-privileged materials are transmitted to an attorney, the fact of their transmission may be privileged.  (See *Mitchell v. Sup. Ct.* (1984) 37 Cal.3d 591, 600.)  However, Plaintiffs waived any such privilege by voluntarily disclosing that the non-privileged attachments were forwarded to their litigation counsel.  (See Evid. Code, § 912.)

Although the content of the email attaching the documents described in paragraph 48.b of Mr. Rubin's declaration was not disclosed to

Defendants, and is not at issue in any of the pending motions, any privilege over the content of the underlying email has been lost pursuant to the crime-fraud exception to the attorney-client privilege. (*State Farm Fire & Cas. Co.*, *supra*, 54 Cal.App.4th at pp. 648-649.)

Plaintiffs' Motion *in Limine*

One week before the Court began the Evidentiary Hearing in this case, Plaintiffs filed a Motion *in Limine* to Exclude Samuel S. Rubin and Gerald M. LaPorte From Testifying At The October 13, 2016 Hearing, Or, Alternatively, Continuing The Hearing TO Permit Plaintiffs To Conduct Discovery. The Motion *in Limine* is denied.

First, motions *in limine* are made "for the purpose of precluding the mention or display of inadmissible and prejudicial matter *in the presence of the jury*." (Cal. R. Ct. 3.57 [emphasis added].) Plaintiffs' motion was not directed at a trial, let alone at evidence presented to a jury, since Messrs. LaPorte and Rubin testified before the Court with no jury present during an Evidentiary Hearing.

The Motion *in Limine* is further denied because Plaintiffs have no right to obtain deposition testimony from Messrs. Rubin and LaPorte. Neither of these witnesses have been designated as an expert witness subject to deposition notice pursuant to the Code of Civil Procedure. (Code Civ. Proc. § 2034.010 *et seq.*) The Court previously quashed Plaintiffs' subpoena on Mr. Rubin and his firm Stroz Friedberg in September 2016 on this very basis, finding that the prior subpoena was "an improper attempt to obtain premature expert discovery" and sanctioning Plaintiffs $5,000. Plaintiffs cite no authority supporting their right to issue deposition notices to witnesses not yet designated by the parties.

90

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
314

(Declaration of Michael Lee In Support of Opposition to Plaintiffs' Motion *in Limine*, Ex.
G.)

Furthermore, Plaintiffs have not demonstrated any prejudice in allowing Messrs. Rubin
and LaPorte to testify.  Plaintiffs submitted four rebuttal expert witness declarations in
opposition to Messrs. Rubin and LaPorte, and had the opportunity to cross examine both
at the Evidentiary Hearing.

The Court ordered live testimony of the parties' witnesses for the purpose of judging
credibility.  Plaintiffs' Motion *in Limine* provides no authority for excluding the very
evidence the Court ordered produced.

Jurisdiction

The Court retains jurisdiction over affirmative claims in this action and has authority to
dismiss Plaintiffs' Third Amended Complaint on additional grounds beyond the grounds
outlined in the Court's June 7, 2016 Order sustaining Defendants' demurrer to the Third
Amended Complaint without leave to amend.  No judgment has been entered in this
action, and Plaintiffs' "appeal" of the June 7, 2016 Order is an improper attempt to divest
this Court of jurisdiction, given that the instant Motion was pending and the Court was
considering the extent of additional misconduct Plaintiffs committed and additional
sanctions to be imposed.  (See *Griset v. Fair Political Practices Comm'n* (2001) 25
Cal.4th 688, 697; *Horton v. Jones* (1972) 26 Cal.App.3d 952, 957-959; see also
*Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1396.)

91

Exhibit 2
315

Because the Court retains jurisdiction to hear the instant Motion, the Court has the authority to enter and will enter a second ground for dismissal of Plaintiffs' Third Amended Complaint by granting Defendants' Motion and issuing terminating sanctions against Plaintiffs.

The Court finds that Cross-Complainant's Cross-Complaint sets forth a basis for breach of the JVA relating to the property management agreements pursuant to the JVA. As a result, even if there are pending claims in the *P6* Action in Department 56 before the Hon. Michael Johnson, any claim related to the property management agreements are still at issue in the Cross-Complaint in this action. The Court rejects Plaintiffs' argument that Department 56 in the *P6* Action has exclusive jurisdiction over claims relating to the property management agreements.

The Court rejects Plaintiffs' argument that Department 56's denial of a motion for terminating and other sanctions in the *P6* Action is binding on this Court. That motion was decided on a different record and, as stated in the Notice of Ruling, was denied *without prejudice* and in deference to this Court's ultimate ruling on this Motion. (Defendants' Objection and Response to Plaintiffs' "Hearing Setting Conference Brief," Filed Sept. 13, 2016, Exh. B [July 5, 2016 Hr. Tr. (*P6* Action)], at 13:6-19; Plaintiffs' Hearing Setting Conference Brief, Filed Sept. 9, 2016, Exh. A [". . . the Court said that either party could come back to this Court in the event the Honorable Suzanne G. Bruguera issued an order on the sanctions motion pending in the *Lincoln Studios, LLC, et al. v. DLA, et al.* matter."].)

Relief

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
316

Plaintiffs' Third Amended Complaint is hereby **DISMISSED with prejudice** in its entirety for the reasons set forth above (and in the attached July 29, 2016 Order), which are independent of and in addition to the grounds for dismissal with prejudice set forth in the Court's April 5, 2016 Ruling sustaining Defendants' demurrers to the Third Amended Complaint without leave to amend and the Court's June 7, 2016 Order Sustaining Defendants' Demurrers to Plaintiffs' Third Amended Complaint Without Leave to Amend;

Cross-Defendant NMS Capital Partners I, LLC's Answer to Cross-Complainant P6 LA MF Holdings SPE, LLC's Cross-Complaint is hereby **STRICKEN**;

The Cross-Complaint contains claims for breach of contract, declaratory relief, and injunctive relief.  A default is hereby entered in Cross-Complainant P6 LA MF Holdings SPE, LLC's favor on all claims in the Cross-Complaint.

A prove-up hearing regarding all of the specific relief to which Cross-Complainant is entitled is scheduled for December 1, 2016 at 10:30 a.m. in Department 71.  Cross-Complainant is ordered to submit the necessary documentation establishing that it is entitled to the relief it seeks in the Cross-Complaint except for unspecified monetary damages, as well as all other authorized relief.  In light of the default, no further showing of liability is required.  (See Code Civ. Proc., § 585, subd. (b).)  Cross-Defendant, having been defaulted, does not have a right to participate in the prove-up hearing.  (*Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 385 ["The entry of a default terminates a defendant's rights to take any further affirmative steps in the litigation until either its default is set aside or a default judgment is entered"].)  Following this prove-up hearing, a default judgment will be entered on all relief the Court finds the Cross-Complainant is entitled to.

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
317

All Plaintiffs shall be jointly and severally liable for monetary sanctions to include all attorney's fees, expert fees, court reporter fees, and costs incurred by Defendants and Cross-Complainant on and after September 8, 2015, the date of this Court's freeze Order, including but not limited to fees and costs incurred in briefing and discovery related to the spoliation and forgery of evidence.  (See Code Civ. Proc., § 2023.030(a) [authorizing "monetary sanction ordering that one engaging in the misuse of the discovery process, or any attorney advising that conduct, or both pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct"].)

With respect to the Cross-Complainant, the specific amount of attorney's fees, expert fees, and related costs, along with any memoranda or other supporting materials, shall be submitted by Cross-Complainant in advance of the prove-up hearing as part of the documentation supporting Cross-Complainant's request for entry of default judgment.

With respect to all Defendants, the specific amount of attorney's fees, expert fees, and related costs shall be identified and submitted in the context of a post-judgment motion such as one brought under California Code of Civil Procedure section 1032, *et seq.*

**IT IS SO ORDERED.**

Dated: *Nov. 22, 2016*

SUZANNE G. BRUGUERA

HONORABLE SUZANNE G. BRUGUERA
JUDGE OF THE SUPERIOR COURT OF
CALIFORNIA

94

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
318

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SGB/jjs
Lincoln Studios v. DLA
Order Granting Defendants'
And Cross-Complaint's
Motion for Terminating
and Other Sanctions.
11-21-16

95

ORDER GRANTING DEFENDANTS' AND CROSS-COMPLAINANT'S MOTION FOR TERMINATING AND OTHER
SANCTIONS AGAINST PLAINTIFFS

Exhibit 2
319

# EXHIBIT A

Exhibit 2
320

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

### DEPARTMENT 71

### RULING ON SUBMITTED MATTER

LINCOLN STUDIOS, LLC, et al.,

Case No.: BC551551
(Related to Case No.: BC550227)

vs.

DLA, et al.

**Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC's and Cross-Complainant P6 LA MF Holdings SPE, LLC's motion for sanctions is granted as follows:**

Defendants Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI, L.P., and P6 LA MF Holdings I LLC (collectively "Defendants") and Cross-Complainant P6 LA MF Holdings SPE, LLC ("Cross-Complainant") move for an order imposing sanctions, including the following: (1) dismissing Plaintiffs Lincoln Studios, LLC, Neil Shekhter, individually and as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), Margot Shekhter, individually and as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC, NMSLUXE375, LLC, NMSLUXE415, LLC, and 9901 LUXE, LLC's (collectively "Plaintiffs") third amended complaint with prejudice and entering judgment as to Plaintiffs' claims in Defendants' favor; (2) striking the answer of Cross-Defendant NMS Capital Partners I, LLC as to the cross-complaint of P6 LA MF Holdings SPE, LLC, and entering judgment in favor of Cross-Complainant; and (3) issuing monetary sanctions against Plaintiffs and their counsel of record for all attorneys' fees, expert fees, and costs incurred by Defendants in this matter. (Notice of Motion, pgs. 1-2).

1

Exhibit 2
321

The Court may, after notice to any affected party, person, or attorney, and after opportunity for hearing, impose monetary, issue, evidentiary, and/or terminating sanctions against anyone engaging in conduct that is a misuse of the discovery process. See C.C.P. §2023.030(a)-(d). Misuses of the discovery process include failing to respond or submit to an authorized method of discovery and disobeying a court order to provide discovery. C.C.P. §2023.010(d) and (g).

The Court has inherent power to impose a terminating sanction when a party's "deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial." *Slesinger, Inc. v. The Walt Disney Company* (2007) 155 Cal.App.4th 736, 740.

On September 8, 2015, the Court issued the following orders:

(1) *Plaintiffs are required to immediately take steps to freeze all of their electronic documents so they cannot be modified or deleted until further order of the Court on Defendants' request for a forensic examination*;

(2) All original agreements and original copies of agreements will be placed in escrow with a neutral third party document vendor awaiting a ruling by the Court on Defendants' request for a forensic examination.

Court's 9/8/15 Order (Emphasis Added).

On October 6, 2015, the Court issued an order granting Defendants' motion for forensic examination. See Court's 10/6/15 Order. The Court ordered Plaintiffs to produce the following for testing by October 16, 2015:

(1) the original hard copy, and all copies made, of any Joint Venture Agreement in their or their affiliates' custody or control, including what Plaintiffs refer to as "Version 2;"

(2) the original hard copy, and all copies made, of the September 14, 2010 letter marked as Exhibit 41 in the deposition of Eric Samek ("Exhibit 41");

(3) the boxes used, including the original contents thereof, to store "Version 2" and Exhibit 41;

(4) ten additional pages of other hard copy documents stored in similar conditions in the same location as where Exhibit 41 and Version 2 were allegedly discovered;

2

Exhibit 2
322

(5) the original hard copy, and all copies made, of any Property Management Agreement in their or their affiliates' custody or control, including the Luxe La Cienega Property Management Agreement;

(6) all electronic (native) files of Exhibit 41;

(7) all electronic (native) files of any Joint Venture Agreement in their or their affiliates' custody and control, including what Plaintiffs' refer to as "Version 2;"

(8) all electronic (native) files of any Property Management Agreement in their or their affiliates' custody and control, including the Luxe La Cienega Property Management Agreement; and

(9) a list of all of Plaintiffs' and their affiliates' computers and other devices that could have ever sent, received, modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including "Version 2"), Exhibit 41, and all Property Management Agreements (including the Luxe La Cienega PMA), as well as, *Mr. Shekhter's home and office computers (the "Devices")*.

Court's 10/6/15 Order (Emphasis Added). The Court also ordered that, no earlier that October 21, 2015 and no later than October 28, 2015, Plaintiffs shall provide access so Samuel Rubin and Stroz Friedberg (the "Forensic Experts") could create separate "mirror images" of the relevant Devices and independently conduct the forensic examinations. Court's 10/6/15 Order.

Plaintiffs' own evidence and/or undisputed facts establish violations of the Court's 9/8/15 and 10/6/15 discovery orders. Plaintiff Neil Shekhter ("Shekhter") admits he, *before the scheduled forensic examination*, backed-up the hard drive of and all files on his personal computer to an external drive, took his personal computer to have the hard drive replaced, and did not transfer all of the files back from the old hard drive onto the new computer so Defendants' experts would not be able to recover certain deleted files. (Declaration of Shekhter ¶¶147-152)(Declaration of Alan Shekhter ¶¶4-6). Shekhter declared the information on the hard drive was not deleted or altered and the files containing personal information – private pictures of his wife – are the only files that do not exist on the new hard drive. (Declaration of Shekhter ¶¶147-152). By his own admission, Shekhter violated the Court's discovery orders by failing to produce his personal computer for examination, deleting files from his personal computer, changing the hard drive of his personal computer, and/or failing to transfer all of the files to the new hard drive, *all with the admitted intention of preventing the forensic expert(s)*

3

Exhibit 2
323

*from discovering deleted files.* (Declaration of Shekhter ¶¶147-152)(Declaration of Alan Shekhter ¶¶4-6). Shekhter also violated the Court's discovery order(s) by failing to produce the external (Seagate) drive and other USB drives for examination. (Declaration of Rubin ¶¶69-71).

Shekhter also admits he deleted a zip file sent to him by a former AEW employee, Daniel Lennon ("Lennon"), containing Joint Venture related documents *before turning his computer over for forensic examination.* (Declaration of Shekhter ¶¶153-155). Shekhter declared he received the zip file from Lennon on November 24, 2015. (Declaration of Shekhter ¶153). Shekhter declared the zip file contained documents from Lennon's files that Shekhter requested, including Joint Venture related documents. (Declaration of Shekhter ¶¶153-154). Shekhter declared he was "worried AEW would learn that Mr. Lennon was helping [him] and try to do something to him," the files Mr. Lennon sent were not responsive under the Court's order, and he deleted the zip file before turning his computer over for the forensic examination. (Declaration of Shekhter ¶155). Shekhter's act of intentionally deleting the zip file, which contained documents specifically requested by Shekhter, including Joint Venture related documents, constitutes a violation of the Court's discovery order(s).

Enrique Sanchez ("Sanchez"), the IT Administrator for NMS Properties, Inc. ("NMS"), admits he conducted internet searches on the topics of file deletion and recovery *after* he was informed, on or about December 3, 2015, Mr. Rubin and his team from Stroz Friedberg would be coming to the NMS offices the following day to forensically image NMS's network and certain devices. (Declaration of Sanchez ¶¶20-26). Sanchez admits he removed Adobe Acrobat 9.0 from the computer assigned the host name "ADAM-S-PC." (Declaration of Sanchez ¶¶33-38). Sanchez also admits he, on December 3, 2015, at the instruction of Brian Bowis (then Vice President of Finance at NMS) downloaded a program called "EraserPortable" and used it to delete a folder on Bowis's computer desktop that he advised Sanchez contained his private personal information. (Declaration of Sanchez ¶¶39-45). Sanchez's act of deleting the folder constitutes a violation of the Court's discovery order(s).[1]

This Order hereby sets forth the purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED. These violations are on a grand scale and the motion for sanctions is granted. The Court will conduct a

---

[1] Bowis declared that, to the best of his knowledge, he did not delete any files relating to the NMS-AEW Joint Venture. (Declaration of Bowis ¶5). However, the declaration is not exactly a representation that such files were not, in fact, deleted.

4

Exhibit 2
324

hearing to determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed.

A hearing setting conference is set for September 14, 2016, at 11:00 a.m., in Department 71.


Dated: July 29, 2016


Hon. Suzanne G. Bruguera
Judge of the Superior Court


5

Exhibit 2
325