# EXHIBIT 5

Filed 6/20/18

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

COURT OF APPEAL – SECOND DIST.

**FILED**

Jun 20, 2018

JOSEPH A. LANE, Clerk

jzelaya                Deputy Clerk

| | |
|---|---|
| LINCOLN STUDIOS, LLC et al., | B279305 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC551551) |
| P6 LA MF HOLDINGS SPE, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Suzanne G. Bruguera, Judge.  Affirmed in part, reversed in part and remanded.

Miller Barondess, Louis R. Miller, James Goldman and A. Sasha Frid; Greines, Martin, Stein & Richland, Timothy T. Coates and Jeffrey E. Raskin for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, James P. Fogelman, Jay P. Srinivasan, Kahn A. Scolnick and Marysa Lin for Defendants and Respondents.

Exhibit 5
360

Appellants Lincoln Studios, LLC, Neil Shekhter, individually, Neil Shekhter, as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), Margot Shekhter, individually, Margot Shekhter, as Trustee of The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), The NMS Family Living Trust Dated September 3, 1991 (2000 Restatement), NMS Capital Partners, LLC, NMS Capital Partners I, LLC, NMSLUXE375, LLC, NMSLUXE415, LLC, 9901 LUXE, LLC and cross-defendant NMS Capital Partners I, LLC appeal from a judgment entered in favor of respondents Eric Samek, Marc Davidson, P6 LA MF Holdings SPE, LLC, AEW Capital Management, L.P., AEW Partners VI, L.P., AEW Partners VI, Inc., AEW VI L.P., P6 LA MF Holdings I, LLC, Lincoln Walk Studios, LP, and Luxe La Cienega, LLC following the trial court's order striking appellants' complaint and cross-defendant NMS Capital Partners I, LLC's answer to the Cross-Complaint, and entering its default.

Appellants contend the trial court (1) lacked jurisdiction to enter a default judgment enjoining non-parties to the Cross-Complaint from certain actions; (2) lacked jurisdiction to dismiss the Third Amended Complaint as a discovery sanction while an appeal was pending from an order sustaining a demurrer without leave to amend to that pleading; (3) usurped appellants' right to a jury trial by resolving factual claims of forgery on a motion for terminating sanctions; (4) denied appellants due process by denying them the opportunity to obtain discovery necessary to defend against the terminating sanctions motion; (5) issued terminating sanctions which are excessive and punitive; and (6) denied appellants due process in ordering monetary sanctions.

Exhibit 5
361

We conclude that the trial court lacked jurisdiction to dismiss the Third Amended Complaint as to all appellants except NMS Capital Partners I, LLC, and denied NMS Capital Partners I, LLC due process in ordering monetary sanctions. We affirm the judgment as to the Cross-Complaint because we find that appellants' acts of intentional destruction and suppression of evidence and perjury constitute discovery abuse that is egregious and intolerable and infects the entire proceedings.

BACKGROUND

**1.    The Joint Venture**

This case is a dispute arising out of a joint venture agreement to develop real estate. Appellant Neil M. Shekhter (Shekhter) develops and operates multi-unit real estate projects. He is the CEO of NMS Properties, Inc. and the manager of the other entity appellants. AEW Capital Management, L.P. (AEW) is a large hedge fund. Defendant Eric Samek (Samek) is a director at AEW whose duties include sourcing and managing AEW's West Coast real estate portfolios for its investment funds.

In early 2010, Samek and Shekhter began discussing entering into a joint venture or partnership to engage in real estate development and on September 8, 2010, one of Shekhter's companies, NMS Capital Partners I, LLC, and an AEW affiliate, P6 LA MF Holdings SPE, LLC, executed a written joint venture agreement to acquire, develop and operate real estate projects in the Los Angeles area.[1] NMS Capital Partners I, LLC, the sole "Operating Member," agreed to contribute four properties for which Shekhter paid more than $49 million along with $10

---

[1]    Except where necessary to draw distinctions, we refer to Shekhter and his plaintiff and appellant entities collectively as "NMS" and to the AEW-related parties collectively as "AEW."

3

Exhibit 5<br/>362

million cash, and to be principally responsible for the day to day
operations of the joint venture, including the development,
construction, operation, management and leasing of the
properties once developed.  AEW, the sole "Investing Member,"
contributed $60 million, and was the principal decision maker.

## 2.     The Forgery Dispute

Two provisions of the original Joint Venture Agreement are
relevant to the current dispute.  Article 6, entitled "Distributions"
and characterized as a "waterfall" provision, describes a formula
for the distribution of net operating cash flow between the
parties.  Pursuant to section 6.1(b)(vii), "if within five (5) years"
from the date of the agreement AEW receives profits
distributions pursuant to the waterfall formula in the amount of
1.75 times its invested capital and a 24 percent annual return,
then NMS is entitled to 100 percent of the net operating cash
flow from that point forward.  Based on this language, NMS
urges it has the unilateral right to "take out" or "monetize"
AEW's financial interest at any time within the first five years by
paying AEW the amount described in section 6.1(b)(vii), through
net operating cash or otherwise, because there is no financial
benefit to AEW to remain in the joint venture once that sum is
received.

Article 11 is the "Buy/Sell" provision.  The original version
of the agreement provides that "after five (5) years" either party
could trigger a process pursuant to which one party could "buy
out" the other's interest in the joint venture by giving a written
Buy/Sell Offer Notice.  NMS states there is a subsequent Version
2 of the Joint Venture Agreement which is the operative
agreement.  Among other things, Version 2 alters the word "five"
to become "three" in Article 11 to permit Buy/Sell Offer Notices to

Exhibit 5
363

be made after three years, rather than after the five years provided in Version 1 and subsequent versions. NMS maintains that *AEW* created Version 2 to correct the "scrivener's error" in the prior version concerning the number of years, but AEW maintains there was no error and that *Shekhter* fabricated the document.

On June 26, 2013, approximately three months before the joint venture's three year anniversary, NMS wrote to Samek reminding him that "pursuant to Section 6(b) of the LLC Agreement, the Investor Member's economic interest becomes zero if, within 5 years of the date of the LLC Agreement, the Investor Member receives all amounts it is entitled to receive under Section 6.1(b)(i) through (vi) of the LLC Agreement . . . ." Shekhter proposed a single transaction where NMS would pay AEW that sum through the use of third party funds (rather than the net operating cash distributions provided in Article 6) in return for AEW's withdrawal from the joint venture.

Samek did not respond, so Shekhter wrote again on August 2, 2013, to inform Samek of some favorable refinancing terms for the properties that "would move us a long way down the road toward our agreement of a buy-out of the Investor Member . . . ." On November 18, 2013, Shekhter told Samek that Shekhter understood their deal included his ability to buy out AEW pursuant to Article 6 and that he was getting mixed messages from Samek.

On November 22, 2013, Samek dispelled all uncertainty by sending Shekhter an email stating that the agreement did not include the buy-out right Shekhter claimed to have, that Version 3 was the operative version and had been certified as such to lenders by NMS, and that Shekhter fabricated Version 2.

Exhibit 5
364

### 3.    The Litigation

For the next two years NMS continued to develop properties for the joint venture, while pursuing legal remedies.[2] First, NMS filed suit against its own deal attorneys alleging malpractice.  Then in July 2014, it filed this action against AEW's former deal counsel alleging among other things that counsel "had not included a clear buy out provision" in the joint venture agreement.  Respondents were added as defendants to the First Amended Complaint, which alleges that the Joint Venture Agreement included a right to "buy out" the other member, exercisable at the three-year anniversary, rather than the five-year term in Version 1.  It asserts that when Shekhter received a copy of the executed Version 1, he noticed the "mistake," and discussed it with Samek, who purportedly said he would have counsel revise Version 1 to state the three year term in Article 11's Buy/Sell provision.  The Second Amended Complaint asserts largely the same claims.  However, the Third Amended Complaint, filed on January 13, 2016, alleges that the basis for the action is violation of Article 6 "take-out" rights, not Article 11 "buy out" rights.

AEW's demurrer to the Third Amended Complaint was sustained without leave to amend by an order of June 7, 2016, based in part upon the court's finding it was a sham complaint because it alleged inconsistent facts and theories when compared to the prior complaints.  This ruling terminated the action as to all NMS entities except NMS Capital Partners I, LLC, which remained a party to AEW's pending Cross-Complaint.

---

[2]    By the time of the default prove up on the Cross-Complaint in December 2016, the joint venture owned, developed and controlled nine properties through eight subsidiary companies.

Exhibit 5
365

AEW filed a Cross-Complaint on November 6, 2015. It alleges, among other things, that NMS misrepresented the terms of the Joint Venture Agreement, fabricated Version 2, its alleged transmittal cover letter, and a property management agreement, and engaged in other acts of misconduct. It seeks, among other things, a declaration that Version 2 is not valid or operative, that NMS breached multiple provisions of the Joint Venture Agreement, and that AEW has the right under the Joint Venture Agreement to sell or finance the joint venture's properties in its sole discretion. It also seeks an injunction requiring NMS and its affiliates to vacate the properties.

### 4.     The Discovery Sanctions

At an informal discovery conference of September 8, 2015, AEW argued it needed to conduct a forensic examination of NMS's documents and computer devices to prove NMS had forged Version 2. The court ordered appellants to "immediately take steps to freeze all of their electronic documents so that they cannot be modified or deleted" and to place "in escrow with a neutral 3rd party document vendor" all "original agreements, and original copies of agreements" pending a hearing on AEW's motion for a forensic examination of those items set for October 6, 2015 (the September 8, 2015 order).

In its opposition to AEW's motion, NMS requested it be granted the same right to image and forensically examine AEW's devices. The court found good cause to grant AEW's motion because "the facts and evidence independently establish that electronic documents are missing, have been destroyed, or questions about their integrity have been shown . . . ." It ordered production of the original and all copies of Version 2, the Samek transmittal cover letter and all property management

Exhibit 5
366

agreements, as well as the computers and devices that could have accessed those documents (the October 5, 2015 order).  The court did not address NMS's request for a reciprocal order.

On January 13, 2016, while the forensic examination was in process, NMS filed its Third Amended Complaint alleging Section 6 of the Joint Venture Agreement was the operative provision, no longer relying on controversial Section 11 and the dispute over whether it was forged.  Six days later, NMS filed a motion to compel a forensic examination of AEW's documents and computers which mirrored AEW's prior successful motion, arguing this examination was necessary to prove AEW created Version 2 and to defend against the terminating sanctions motion that AEW was planning to file.  NMS set the hearing for March 7, 2016, but the court continued the hearing date twice on its own motion, ultimately setting the motion to be heard *after* AEW's motion for terminating sanctions.  NMS tried repeatedly to have this motion heard before the sanctions motion, to no avail.  In fact, it was never heard.

On June 7, 2016, the court issued an order sustaining AEW's demurrer to the Third Amended Complaint without leave to amend and ordering the complaint dismissed.  The court found that the prior complaints had alleged the buy-out provision in Section 11 of Version 2 was crucial, but that the Third Amended Complaint now alleged the case turned on Section 6.1 of Version 1 and its cash flow distribution provisions without explanation for these "inconsistent and contradictory factual allegations."

On June 13, 2016, AEW's motion for sanctions was heard and submitted.  The decision was issued in a detailed ruling on July 29, 2016, granting the motion on the ground "Plaintiffs' own evidence and/or undisputed facts establish violations of the

Exhibit 5
367

Court's 9/8/15 and 10/6/15 discovery orders."  The court found that "[b]y his own admission, Shekhter violated the Court's discovery orders by failing to produce his personal computer, changing the hard drive of his personal computer, and/or failing to transfer all of the files to the new hard drive, *all with the admitted intention of preventing the forensic expert(s) from discovering deleted files.*"  (Original italics.)  Shekhter admitted in his declaration filed in opposition that "he deleted a zip file sent to him by a former AEW employee, Daniel Lennon ("Lennon"), containing Joint Venture related documents *before turning over his computer over for forensic examination.*"  (Original italics.)  NMS's IT administrator admitted to downloading a program called "Eraser Portable" and to using it to delete a file on a computer desktop belonging to NMS's Vice President of Finance.  The court characterized these violations of its discovery orders as "purposeful, bold, breathtaking" and on a "grand scale" and ordered a further future evidentiary hearing to "determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed."

The evidentiary hearing was set for the latter half of October 2016, which would have been subsequent to the hearing of NMS' discovery motion in September, but the court continued NMS's hearing to January 18, 2017, on its own motion. Frustrated in its efforts to have its motion for discovery heard prior to the evidentiary hearing to determine the nature and extent of sanctions to be imposed, NMS noticed the depositions of AEW's two forensic experts who had filed reports of their examinations of NMS documents and devices on January 20, 2016, and would testify at the evidentiary hearing.  On September 23, 2016, AEW served objections to the deposition

Exhibit 5
368

notices and the witnesses were not produced.  On November 17, 2016, NMS filed a motion requesting that the court refrain from ruling on AEW's sanctions motion until the court heard and ruled on NMS's motion for forensic discovery.  The reserved hearing date of June 14, 2017, was well after the October 14, 2016, date set for the evidentiary hearing.

The evidentiary hearing commenced on October 14, 2016, and concluded on October 28, 2016, with live testimony from 12 witnesses over eight court days "for the purpose of the court assessing credibility of the witnesses."  The court issued its 94-page order granting AEW's motion on November 22, 2016.  It ordered (1) the Third Amended Complaint dismissed with prejudice as a sanction for forgery, spoliation and perjury, as well as for the reasons stated in its April 5, 2016 and June 7, 2016 orders sustaining demurrers; (2) the Answer to the Cross-Complaint of cross-defendant NMS Capital Partners I, LLC stricken; and, (3) the entry of a default in favor of cross-complainant and AEW affiliate, P6 LA MF Holdings SPE, LLC, on all claims of the Cross-Complaint.  A prove-up hearing was scheduled for December 1, 2016.

The court also found that all appellants were jointly and severally liable for all attorneys' fees, expert fees, court reporter fees, and costs incurred by AEW on or after September 8, 2015, the date of the court's freeze order, pursuant to Code of Civil Procedure section 2023.030, subdivision (a).[3]  The order provided that "[w]ith respect to the Cross-Complaint," memoranda and materials supporting the attorneys' fees, expert fees and costs sought "shall be submitted in advance of the prove up hearing as

---

[3]     All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

Exhibit 5
369

part of the documentation supporting Cross-Complainant's request for entry of default judgment." With respect to the complaint, the fees sought were ordered to be identified in a postjudgment motion pursuant to section 1032, et seq.

On December 1, 2016, the court entered a final judgment dismissing the Third Amended Complaint and a default judgment on the Cross-Complaint. Both judgments had blank spaces for monetary sanctions. In connection with the judgment on the Third Amended Complaint, AEW filed and served a Memorandum of Costs seeking $6,033,927.40 in monetary sanctions composed of the fees and costs incurred pursuing the forensic exam and terminating sanctions, and a declaration of an expert who opined the fees were reasonable. It did not file the motion ordered by the court. At the December 1, 2016 default prove up regarding the Cross-Complaint, the court heard testimony from AEW's employees, counsel and a fee expert, found the fees and costs of $6,033,927.40 were reasonable and awarded them as sanctions. On December 2, 2016, the court amended the Default Judgment to include the amount of monetary sanctions sought by AEW.

## DISCUSSION

1. **The Trial Court Had Jurisdiction to Enjoin NMS Capital Partners I, LLC and its Affiliate from Engaging in Prohibited Acts**

The default judgment entered on AEW's Cross-Complaint enjoined NMS Capital Partners I, LLC, the former Operating Member, *and* its affiliates, including nonparty NMS Properties, Inc., from interfering with the joint venture properties or holding itself out as the property manager. Appellants argue that the trial court lacked jurisdiction to enter the default judgment

Exhibit 5
370

against NMS Properties, Inc. because it was not a party to the Cross-Complaint.[4]  Although "[r]endering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions," (*Bronco Wine Co. v. Frank Logoluso Farms* (1989) 214 Cal.App.3d 699, 717), neither appellants nor NMS Properties, Inc. has standing to assert an appeal from the judgment on behalf of NMS Properties, Inc.

Only a "party aggrieved" may appeal.  (§ 902.)  As a general rule, a "party" is a party of record in the trial court proceeding and is "'aggrieved'" for appeal purposes only if his or her "rights or interests are injuriously affected by the judgment."  (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736, 737.)  An order enjoining NMS Properties, Inc. from managing the joint venture properties or holding itself out as the manager of those properties does not injuriously affect rights belonging to NMS Capital Partners I, LLC or its affiliates (except NMS Properties, Inc.) and accordingly, appellants (other than NMS Properties, Inc.) may not appeal from the judgment against NMS Properties, Inc.

While NMS Properties, Inc.'s rights are affected by the judgment, it is not a named cross-defendant and therefore it is not a party of record to the Cross-Complaint.  One who is not a party but who is aggrieved, may become a party by moving to vacate or set aside the judgment or order in the trial court and if the motion is denied, may appeal from that order.  (*In re Elliott* (1904) 144 Cal. 501, 509.)  There is no evidence any such motion

---

[4]      The only parties to the Cross-Complaint are AEW affiliate P6 LA MF Holdings SPE, LLC, cross-complainant, and NMS Capital Partners I, LLC, cross-defendant.

Exhibit 5
371

was made in the trial court and therefore, NMS Properties, Inc. has not demonstrated standing to appeal the judgment.

Even if standing were present, the law is clear that an enjoined party may not avoid the operation of an injunction by engaging nonparties to the action to perform the prohibited activities. (*Planned Parenthood Golden Gate v. Garibaldi* (2003) 107 Cal.App.4th 345, 353.)  Courts have held that an injunction can properly run to classes of persons through whom the enjoined party may act. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 906.)  The trial court made unchallenged findings that NMS Properties, Inc. is an affiliate of NMS and that NMS managed the properties through NMS Properties, Inc.  The ruling simply prevents NMS Properties, Inc. from doing what NMS is prohibited from doing by the injunction.

**2.     The Order Sustaining the Demurrer to the Third Amended Complaint Did Not Divest the Trial Court of Jurisdiction to Hear the Terminating Sanctions Motion**

When the trial court sustained AEW's demurrer to the Third Amended Complaint without leave to amend and dismissed it with prejudice, the case was fully resolved for all parties except NMS Capital Partners I, LLC and AEW, the two parties to AEW's still pending Cross-Complaint.  Appellants appealed the dismissal on August 5, 2016.

In NMS's briefing for the evidentiary hearing, NMS argued to the trial court that it lacked jurisdiction to issue terminating sanctions while the appeal from the demurrer ruling was pending because "[t]he Court cannot dismiss a complaint after it has already been dismissed . . . ."  The trial court was not persuaded because "[n]o judgment has been entered in this action, and

13

Exhibit 5
372

[NMS's] 'appeal' of the June 7, 2016 Order is an improper
attempt to divest this Court of jurisdiction, given that the instant
Motion was pending and the Court was considering the extent of
additional misconduct [NMS] committed and additional sanctions
to be imposed."  NMS argues once again that the trial court
lacked jurisdiction to strike the Third Amended Complaint due to
the pendency of the prior appeal from the order sustaining the
demurrer without leave to amend.

As a general rule, "the perfecting of an appeal stays
proceedings in the trial court upon the judgment or order
appealed from or upon the matters embraced therein or affected
thereby, including enforcement of the judgment or order . . . ."
(§ 916, subd. (a); *Varian Medical Systems, Inc. v. Delfino* (2005)
35 Cal.4th 180, 189.)  Further trial court proceedings in
contravention of section 916 are outside of the trial court's
jurisdiction.  (*Varian Medical Systems, Inc. v. Delfino*, *supra*, at
pp. 198-199.)  The purpose of the stay is obvious -- it preserves
the appellate court's jurisdiction and prevents the trial court from
rendering the appeal futile by altering the judgment or order
from which the appeal is taken.  (*Chapala Management Corp. v.
Stanton* (2010) 186 Cal.App.4th 1532, 1542.)  Ruling that the
Third Amended Complaint should be dismissed as a discovery
sanction clearly renders futile the appeal from the order on the
demurrer.

No stay results, however, from an improper appeal from a
nonappealable order.  (*Hearn Pacific Corp. v. Second Generation
Roofing Inc.* (2016) 247 Cal.App.4th 117, 146-147.)  Citing *Berri
v. Superior Court* (1955) 43 Cal.2d 856, 860, AEW argues that an
order sustaining a demurrer without leave to amend is not
appealable because it can be reconsidered by the trial court at

Exhibit 5
373

any time before entering judgment.  The trial court agreed, expressly stating it had authority to proceed because no judgment had been entered and issues remained pending.  However, section 581d states that "[a]ll dismissals ordered by the court . . . in the form of a written order signed by the court and filed in the action . . . shall constitute judgments" and therefore, the trial court's written, signed order which both sustained the demurrer *and* dismissed the action is a judgment.

"Under the 'one final judgment' rule, an order or judgment that fails to dispose of all claims between the litigants is not appealable under Code of Civil Procedure section 904.1, subdivision (a)."  (*Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 436.)  Even though the demurrer order in this case is a judgment under section 581d, it is not a "final" judgment under section 904.1, subdivision (a) as to AEW and NMS Capital Partners I, LLC, parties as to whom a Cross-Complaint remained pending. (*California Dental Assn. v. California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 58-60 [order dismissing complaint not appealable due to pendency of cross-complaint between the parties].)  Accordingly, the appeal from the demurrer ruling did not divest the trial court of jurisdiction to hear the sanctions motion.

**3.    The trial court's imposition of terminating sanctions was not an abuse of discretion**

Appellants do not argue there is no substantial evidence to support the imposition of terminating sanctions.  Instead, they attack the order as depriving NMS of its constitutional right to a jury trial on the factual issue of forgery and of its due process rights to discovery on the same issue.  We do not need to decide the merits of these arguments because the trial court also found

Exhibit 5
374

that separate and apart from forgery, NMS's acts of spoliation and evidence destruction themselves were sufficient to justify both terminating and monetary sanctions. We agree.

A trial court is invested with the inherent power to issue terminating sanctions when a party's deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial. (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 740; *Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 391 (*Los Defensores*).) California discovery law also "authorizes a range of penalties for conduct amounting to 'misuse of the discovery process,'" including terminating sanctions. (§ 2023.030, subd. (d); *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991 (*Doppes*), quoting § 2023.030.) "Destroying evidence . . . [is] surely . . . a misuse of discovery within the meaning of section 2023," (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12 (*Cedars-Sinai*)), as are "repeated violations of . . . court orders," and "repeated efforts . . . to thwart discovery." (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 496.)

The determination of whether sanctions should be imposed for discovery misuse and, if so, the appropriate type of sanction, is reviewed for an abuse of discretion. (*New Albertsons, Inc. v. Superior* Court (2008) 168 Cal.App.4th 1403, 1422.) When the trial court's exercise of its discretion relies on factual determinations, the entire record on appeal is examined for substantial evidence, contradicted or uncontradicted, which will support the determination. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) The record is reviewed in the light most favorable to the court's ruling and all reasonable inferences are drawn in support of it. (*Stephen Slesinger, Inc. v. Walt*

16

Exhibit 5
375

*Disney Co., supra*, 155 Cal.App.4th at p. 765.)  The trial court's decision will be reversed only for "manifest abuse exceeding the bounds of reason."  (*Kuhns v. State of California* (1992) 8 Cal.App.4th 982, 988.)  We conclude there is sufficient evidence to support the trial court's imposition of terminating sanctions.

### A.   *The Destruction of Evidence*

The eight-day evidentiary hearing produced compelling evidence that there had been significant violations of the court's prior discovery orders of (1) September 8, 2015, requiring a freeze of all electronic documents and (2) October 6, 2015 requiring the production for forensic imaging of all devices belonging to NMS Capital Partners I, LLC, all of its affiliates and Shekhter (including Shekhter's home and office computers).  In his declaration, Shekhter admitted he violated the court's discovery orders by failing to produce his personal computer for examination, deleting files from it, changing out the hard drive without transferring to the new hard drive all of the files on the old hard drive, failing to produce external USB drives, including one called the Seagate drive, for examination, and by deleting a zip file received from a former AEW employee that contained joint venture related documents, all with the intention of keeping the information from discovery by the forensic experts.

In addition to his admissions, there was forensic evidence that on the morning before the forensic exam was to occur, Shekhter's son, Alan, ran a series of Google searches, including "secure wipe hard drive," "backdated secure wipe," "Los Angele[s] anti-computer forensics," and "how to avoid computer forensics." He and Shekhter also engaged in a text message exchange outlining a plan to remove Shekhter's old hard drive from Shekhter's 2012 home computer and replace it with another hard

Exhibit 5
376

drive that would be backdated and loaded with files.  That same day, they executed the plan by removing a hard drive from Shekhter's home computer, replacing it with a new hard drive that looked similar to the old one after manipulating it by backdating the computer's clock to make files appear older than they were and then flooding it with more than 75,000 backdated files and folders.  This resulted in the permanent loss of evidence and metadata, in violation of the October 6 order.

Moreover, this old 2012 computer appeared to the forensic examiner to be the "unknown" computer upon which he believed Shekhter created the allegedly forged Version 2 of the Joint Venture Agreement.  Shekhter claimed to have discarded the old hard drive and the external drive (the Seagate device) used to create a backup of the old drive.  However, forensic evidence revealed that the Seagate device had not been discarded before the litigation as Shekhter claimed because it had been connected to his computer as recently as 48 hours before the forensic exam was to occur.

Forensic analysis revealed that material documents were not transferred to the new hard drive, including copies of the Joint Venture Agreement and a document titled "'Property Management-375 ns.doc.'"  This file no longer exists on Shekhter's computer or any other NMS device produced for examination.  Even if the file was renamed, as Shekhter's expert speculated was possible, the act of renaming the file was a violation of the court's order that all documents and devices be frozen in their then-current state.  A folder called "AEW" was renamed and certain files were deleted from it on the new home computer hard drive.  This folder, and its subfolder called "Cover

18

Exhibit 5
377

Letter" clearly related to this action and their deletion was intentional destruction of relevant information.

Sometime between November 25, 2015 and December 4, 2015, Shekhter deleted a zip file emailed to him from Lennon purporting to contain files related to AEW and NMS. Shekhter admits the file contained joint venture related documents. In December 2015, NMS's IT Administrator searched the web for "file deletion utility windows 7," "free SSD secure erase," "wipe multiple hard drives simultaneously," "hard drive destruction service," and "hard drive destruction service Los Angeles," then downloaded an application called "Eraser Portable" which is a computer data destruction and wiping application. On December 4, the application was copied to the NMS corporate file server, where it was used by Brian Bowis, Vice President of Finance at NMS, on the day the forensic imaging was to occur. Bowis admitted he instructed the IT Administrator to delete files so that they could not be retrieved.

On December 3, 2015, Shekhter's assistant, deleted a copy of the La Cienega Property Management Agreement, another document that respondents alleged Shekhter forged.

### B. The Manipulation of Evidence

Two days before the court-ordered imaging of Shekhter's computer, a new operating system was manually and volitionally installed on his new home computer hard drive. That new operating system made thousands of changes to the file system metadata on the computer, making it difficult to determine what existed on the computer before the new operating system was installed. This also was an intentional violation of the court's freeze order.

Exhibit 5
378

Between October 4, 2015 and December 4, 2015, the
computer clock on the new hard drive was manually changed 17
times, affecting over 800,000 files, making forensic examination
much more difficult. Just 10 minutes before the forensic expert
arrived to conduct the forensic collection, the computer clock on
the new hard drive was backdated and over 60,000 files were
loaded onto the computer.

### C.    The Failure to Produce Evidence

Numerous USB external storage devices connected to
Shekhter's new hard drive were withheld or destroyed, including
the Seagate external hard drive that backed up the old hard
drive. At least 21 devices that had been connected to the new
hard drive were never produced in violation of the October 6,
2015 order that all devices be identified and produced for
examination. In addition to Shekhter's old computer and the
Seagate external drive backup, appellants failed to produce the
USB drive containing the original Version 2 that was taken from
an "'unknown computer'" and inserted into the computer of
Shekhter's other son, Adam. Appellants also failed to produce
Adam's computer, which was frequently used at the NMS offices
up to the day before the imaging was scheduled. It was taken
offline while the imaging was taking place and was not used
again until December 21, 2015, after most of the imaging had
concluded.

### D.    The Perjury

The court also found evidence that Shekhter and others in
his employ provided false testimony under oath concerning
spoliation to cover up their misconduct. For instance, Shekhter
testified in a declaration that only files containing personal
information were deleted or altered when the new hard drive was

Exhibit 5
379

installed.  This was demonstrated to be false by the testimony of the forensic experts.  Shekhter testified that he threw away the old computer "before there was any litigation with AEW," when the evidence demonstrated that the old computer was active and functioning as late as September 19, 2015, while the litigation was pending.  He testified that he "instituted a litigation hold within [his] company around the time this lawsuit commenced, so as to prevent deletion of emails and other files," but the forensic evidence indicated Shekhter, Bowis, and Shekhter's assistant all deleted information from their computers in October 2015, over a year after the litigation first began.

### E.    The Court's Terminating Sanctions Order

The court found that the acts of spoliation, evidence destruction and perjury justified terminating and monetary sanctions.  (*Cedars-Sinai, supra,* 18 Cal.4th at p. 12 ["[d]estroying evidence . . . [is] surely . . . a misuse of discovery within the meaning of section 2023" subject to terminating sanctions]; V*an Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1518 [affirming terminating sanctions where party "fail[ed] to obey a court order to provide discovery"]; *Los Defensores, supra,* 223 Cal.App.4th at p. 391.) The misconduct here was extensive, intentional and in violation of court orders designed to prevent the very abuse which occurred.

The purpose of sanctions is not to punish, but rather to remedy the harm caused by the misconduct.  (*McGinty v. Superior* Court (1994) 26 Cal.App.4th 204, 210 [sanctions must be limited to correcting the problem caused by the discovery abuse].)  The court has discretion to choose from a wide range of penalties to fashion an appropriate remedy, including monetary, evidentiary, issue and/or terminating sanctions.  (§ 2023.030.)

Exhibit 5
380

"The trial court should consider both the conduct being sanctioned and its effect on the party seeking discovery and, in choosing a sanction, should "'attempt[] to tailor the sanction to the harm caused by the withheld discovery."'" (*Doppes*, *supra*, 174 Cal.App.4th at p. 992; *Laguna Auto Body v. Farmers Ins. Exchange* (1991) 231 Cal.App.3d 481, 487 ["Discovery sanctions 'should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery'"].)  "But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction." (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 279-280.)

Appellants do not challenge the trial court's findings that the misconduct here included willful tampering with computers and documents and the failure to produce devices, all of which constituted multiple violations of two court orders.  They do not deny that they misused the discovery process.  Instead, they focus their argument on Article 11, argue all of the evidence manipulated or withheld goes to the issue of forgery in that Article and assert terminating sanctions are not warranted because Article 11 does not have "anything to do with [their] claims."  Instead, they argue the claims, as stated in the Third Amended Complaint, are based on Article 6 and that since "the forgery is irrelevant, perjury about the forgery must be irrelevant too."  They also argue that the terminating sanctions are "grossly excessive and impermissibly punitive" because all that was removed from the hard drive were personal photos of Shekhter's

Exhibit 5
381

wife and the tax returns of an employee and "neither these acts nor the alleged forgery remotely warrant terminating sanctions."

These arguments are an oversimplification of the record and neglect the fact that it is impossible to know the full extent of the evidence destroyed or withheld. The Cross-Complaint alleges NMS Capital Partners I, LLC breached the Joint Venture Agreement by, among other things, misrepresenting its terms and refusing to acknowledge its true terms and seeks a declaration that Version 2 is a forgery. Consequently, evidence probative of forgery is by no means irrelevant to the determination of the controversy from AEW's point of view. It is central to AEW's claims.

The trial court found pervasive, massive destruction of documents and files directly relating to the Joint Venture, that caused the "permanent loss of untold evidence and metadata" on Shekhter's computer, including the manipulation and deletion of files, backdating the computer more than 17 times which affected more than 800,000 files and folders and failing to identify and produce at least 21 devices that had access to the documents in question. All of this misconduct irreparably damaged respondents' ability to defend the litigation and pursue cross-claims, even those unrelated to the take-out or buy out of respondents' interest under either Article 6 or 11. Not surprisingly, the trial court rejected appellants' claim that AEW failed to meet its burden to show that the destroyed evidence had a substantial probability of damaging its ability to prove its defenses or claims. Instead, the trial court found that respondents "easily met [the] prima facie showing" of prejudice and appellants "have not and cannot disprove prejudice."

23

Exhibit 5
382

According to the trial court, there "is no way to effect compliance with civil discovery or the Court's Orders, since [Appellants] have already destroyed countless materials relevant to this case.  And there is no way to know the full extent of the damage done."  Appellants' "widespread misconduct infects the entirety of these proceedings," such that the "coordinated[,] intentional[,] widespread destruction of evidence has placed into doubt everything they produced, failed to produce, and any witness testimony [they] may intend to offer."  We find no error in the imposition of terminating sanctions.

## 4.    The Award of Monetary Sanctions Violated Due Process

On November 22, 2016, the trial court found an award of monetary sanctions was appropriate in connection with the judgment against all appellants on the Third Amended Complaint and directed that "the specific amount of attorneys' fees, expert fees, and related costs shall be identified and submitted in the context of a post-judgment motion such as one brought under California Code of Civil Procedure section 1032, et seq."  The trial court stated that "the parties should have the [ability] to let the normal motion to tax costs be filed by [Appellants] in the main case."

On November 30, respondents filed and served a postjudgment memorandum of costs which was supported by the declaration of an expert who opined the fees were reasonable and necessary.  No noticed motion for those fees was filed and no motion to tax the fees as costs was made.  (See Cal. Rules of Court, rule 3.1702(b)(1).)-  Then, only two days later, during the default judgment proceeding as to the Cross-Complaint, AEW was awarded as monetary sanctions all attorneys' fees and costs

24

Exhibit 5
383

incurred since September 8, 2015, consisting of $5,249,643 in fees and $784,284.40 in costs, as part of the  default judgment.  The total is $6,033,927.40.

Remarkably, the trial court awarded millions of dollars in monetary sanctions without ever affording appellants an opportunity to be heard as to the reasonableness of the amount awarded.  It is true that NMS did not challenge the amount of fees sought in the memorandum of costs through a motion to tax costs.  However, NMS had no reason to believe that only two days after the memorandum of costs was filed, and days before a motion to tax costs was due, that the court would decide the monetary sanctions during the default prove up hearing in which NMS was not permitted to participate.  No motion for attorneys' fees as sanctions was ever filed by AEW, despite the fact that the trial court's order contemplated it would be.  Once the sanctions amount was determined to be reasonable by the court, it would have been futile to file a motion to tax.  We reverse the imposition of monetary sanctions.[5]

---

[5]    The court is not persuaded that the court erred in awarding fees under section 580 on the ground the specific amount sought is not plead in the operative pleadings.  In *Simke, Chodos, Silberfeld & Anteau, Inc. v. Athans* (2011) 195 Cal.App.4th 1275, the court rejected that argument, finding that the "relief" which must be stated under section 580 does not include attorneys' fees, the amount of which cannot be known at the outset of the case. *Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489 does not compel a different result.  In that case, the Supreme Court vacated the attorneys' fee portion of a default judgment because plaintiff had failed to include a request for attorneys' fees in the prayer, not because the amount sought was not stated.

Exhibit 5
384

**DISPOSITION**

The trial court's judgment is affirmed in part and reversed in part. The judgment as to the Third Amended Complaint is reversed as to all appellants except NMS Capital Partners I, LLC on the ground that the proceedings against those parties were stayed pending determination of the appeal from the order sustaining the demurrer without leave to amend and dismissing the complaint. The monetary sanctions are reversed and the matter is remanded for further proceedings in the trial court which afford the appellants an opportunity to be heard as to the amount of reasonable monetary sanctions. The judgment on the Cross-Complaint is otherwise affirmed. Each side to bear their own cost.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.*

MATZ

We concur:

_____, P. J.    _____,

LUI                             CHAVEZ


---

\*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Exhibit 5
385