Steven Zelig, SBN 094654
WLA LEGAL SERVICES, INC.
1543 7th St., Suite 300
Santa Monica, California 90401
T: 310/393-6702 F: 310/393-6703

Attorneys for Defendants Steven Zelig, WLA Legal Services, Inc.
and Brentwood Legal Services, LLP, erroneously sued and served
as Brentwood Legal Services

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company, | Case No. 2:19-cv-1150-AB-AFMx |
| Plaintiff, | (Hon. Andrė Birotte, Jr.) |
| vs. | NOTICE OF SPECIAL MOTION TO STRIKE COMPLAINT BY DEFENDANTS STEVEN ZELIG AND BRENTWOOD LEGAL SERVICES, LLP, PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16 |
| NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; AND DOES 1-10, inclusive, | |
| Defendants. | DATE:      May 24, 2019<br>TIME:      10:00 a.m.<br>CRTRM:      7B |

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 24, 2019 at 10:00 a.m. or as soon thereafter as the matter may be heard before the Honorable André Birotte, Jr. in Courtroom 7B, located at 350 W. First Street, Los Angeles, California 90012, Defendants Steven Zelig ("Zelig") and Brentwood Legal Services, LLP erroneously sued as "Brentwood Legal Services" ("BLS"), pursuant to California Code of Civil Procedure § 425.16, hereby move for an order striking the Complaint filed by Plaintiff P6 LA MF Holdings SPE, LLC against Zelig and BLS.[1]

Section 425.16, known as the "anti-SLAPP" statute, is a means to quickly dispose of causes of action arising from a defendant's exercise of his or her constitutional right to petition for redress of grievances. The anti-SLAPP statute can be used against state law claims asserted in federal court. *Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206-07 (9th Cir. 2005) (per curiam). The anti-SLAPP analysis is a two-prong inquiry: (1) the defendant(s) must show that the claims arise from protected activity; and (2) the burden then shifts to the plaintiff(s) to produce admissible evidence to demonstrate a probability of prevailing on the merits of the claims. *Baral v. Schnitt*, 1 Cal. 5th 376, 384 (2016). "An anti-SLAPP motion is available to defendants in federal court." *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014). It is well-established that a claims for malicious prosecution arises from protected petitioning activity. *See* CCP §§ 425.16(e)(1) & (2). More specifically, since 2001, California courts have recognized that CCP Section 425.16 applies to malicious prosecution actions. See *Chavez v. Mendoza*, 94 Cal.App.4th 1083.

The Complaint alleges a single cause of action against Zelig and BLS for malicious prosecution. Because the Complaint arises from protected activity, the burden shifts to AEW to demonstrate a probability of prevailing on the merits. AEW cannot do so. There is no evidence that WLA brought or prosecuted the underlying

---

[1] Brentwood Legal Services had no involvement in any matter, lawsuit or issue between NMS and AEW. (Zelig Decl., ¶5)

1    action without probable cause or with malice – two requirements necessary to support

2    a malicious prosecution claim.

3          Pursuant to Section 425.16(c)(1), the WLA is entitled to and requests their

4    attorneys' fees and costs incurred in prosecuting this Motion.[2]

5          This Motion is made following a meet and confer email pursuant to Local Rule

6    7-3, which was transmitted on April 22, 2019, and an actual meet and confer on April

7    24, 2019.

8          This Motion is based upon:

9         &bull;  This Notice, the attached Memorandum of Points and Authorities, the

10           declaration of Steven Zelig (filed concurrently with this motion);

11         &bull;  The Declarations James Goldman, Skip Miller, Jason Tokoro, and Sasha

12           Frid in support of Special Motion to Strike Complaint (filed on April 18,

13           2019 with the Miller Defendants' Motion to Strike Complaint);

14         &bull;  The Declaration of John Genga (filed on April 13, 2019);

15         &bull;  The Appendix of Exhibits filed by the Miller Defendants on April 18,

16           2019;

17         &bull;  The Declaration of Neil Shekhter dated August 9, 2017, attached to the

18           Appendix as Exhibit 49;

19         &bull;  The Declaration of Neil Shekhter dated January 27, 2016 (Exhibit 24);

20         &bull;  The Request for Judicial Notice filed by the Miller Defendants on April

21           18, 2019;

22         &bull;  The Appendix of Exhibits concurrently filed, all pleadings and papers on

23           file in this action, and such other matter and evidence as may be

24           presented at or before the hearing on this Motion.

25

26    [2] Per Section 425.16(c)(1), the prevailing defendant on a SLAPP motion "shall"

27    recover that party's attorneys' fees and costs. If the Court grants this Motion, Zelig/BLS will file a separate fee motion. *See Ketchum v. Moses*,

28    24 Cal. 4th 1122, 1131-32 (2001).

1

2  DATED:  April 26, 2019          WLA LEGAL SERVICES, INC.

3

4                                              /s/

5                                              STEVEN ZELIG

6                                              Attorneys for Defendants Steven Zelig, WLA

7                                              Legal Services, Inc., and Brentwood Legal
                                               Services, LLP, erroneously sued and served

8                                              as Brentwood Legal Services

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES .......................................... 10

I.  INTRODUCTION .................................................................................. 10

II.  FACTUAL AND PROCEDURAL STATEMENT ................................. 10

III.  SUMMARY OF POINTS IN SUPPORT OF A GRANT ........................ 21

IV.  LEGAL STANDARDS ON ANTI-SLAPP MOTIONS ......................... 23

V.  THERE WAS A GOOD FAITH BASIS FOR ALL OF THE CAUSES
OF ACTION OF THE FAC AND SAC, ESPECIALLY THE
STATUTORY VIOLATION CAUSE OF ACTION FOR VIOLATION
OF PENAL CODE SECTIONS 484 AND 496 .......................................... 24

VI.  AEW CANNOT ESTABLISH A PROBABILITY OF PREVAILING ........ 25

    A.  Plaintiff Cannot Establish That Zelig or BLS Lacked Probable
Cause to Prosecute The *Lincoln* Action ............................................ 25

        1.  There Was Probable Cause for the Allegations in the FAC,
SAC and TAC ............................................................................ 27

            (a)  Evidence Supported the Article 6 Claim in FAC,
SAC and TAC ................................................................ 27

            (b)  AEW's *Conduct* Confirmed That Zelig/WLA Had
Probable Cause to Pursue the *Lincoln* Action ................. 30

            (c)  Third-Party Witnesses Confirmed that AEW
engaged in fraud and that NMS had Take-Out Right ...... 30

            (d)  Deposition of Samek ........................................................ 31

            (e)  Another Court Confirmed That NMS's Article 6
Claim Had Merit .............................................................. 31

            (f)  NMS's Experts Disproved AEW's Allegations ............... 31

            (g)  AEW Blocked Discovery ................................................. 33

            (h)  On Mirror Image Issues, Sanctions Were Denied by
Judge Johnson ................................................................. 34

    B.  AEW's Claims Against Zelig Are Barred By The Interim
Adverse Judgment Rule ....................................................................... 35

    C.  AEW Cannot Establish that Zelig Acted With "Malice" as the
word is used in the context of a malicious prosecution cause of

action ................................................................................................ 35

VII.  CONCLUSION ............................................................................. 36

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 425.16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Baral v. Schnitt,*
    1 Cal. 5th 376 (2016) ................................................................. 2

*Bell v. Feibush* (2013 212 Cal.App.4th 1041 ................................... 15

*Bell v. Feibush,* 212 Cal.App.4th 1041 ............................................ 24

*Bell v. Feibush,* 212 Cal.App.4th 1041 (2013) ................................ 15

*Bertero v. Nat'l Gen. Corp.,*
    13 Cal. 3d 43 (1974) .......................................................... 25, 33

*Chavez v. Mendoza,*
    94 Cal. App. 4th 1083 (2001) .................................................. 24

*Daniels v. Robbins,*
    182 Cal. App. 4th 204 (2010) .................................................. 36

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ................................................................ 32

*Drummond v. Desmarais,* 176 Cal.App. 4th 439, 451-452 (2009) ............ 36

*DuPont Merck Pharm. Co. v. Superior Court,*
    78 Cal. App. 4th 562 (2000) .................................................... 25

*Fleishman v. Superior Court,*
    102 Cal. App. 4th 350 (2002) .................................................. 31

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP,*
    184 Cal. App. 4th 313 (2010) .................................................. 26

*Fremont Indem. Co. v. Fremont Gen. Corp.,*
    148 Cal. App. 4th 97 (2007) .................................................... 29

*Graham-Sult v. Clainos,*
    756 F.3d 724 (9th Cir. 2014) ..................................................... 2

*Grindle v. Lorbeer,*
    196 Cal. App. 3d 1461 (1987) ................................................. 26

*Grindle v. Lorbeer,* 196 Cal.App.3d 1461, 146 (1987) ....................... 36

*Heidlebaugh v. Miller,*
    126 Cal. App. 2d 35 (1954) .................................................... 28

*Jarrow Formulas, Inc. v. LaMarche,*
    31 Cal. 4th 728 (2003) ................................................................. 24

*Jenkins v. Pope,*
    217 Cal. App. 3d 1292 (1990) ...................................................... 23

*Ketchum v. Moses,* 24 Cal. 4th 1122 (2001) .................................................. 3

*Kleveland v. Siegel & Wolensky, LLP,*
    215 Cal. App. 4th 534 (2013) ....................................................... 24

*Larson v. UHS of Rancho Springs, Inc.,*
    230 Cal. App. 4th 344 (2014) ....................................................... 21

*Marijanovic v. Gray, York & Duffy,*
    137 Cal. App. 4th 1262 (2006) ...................................................... 26

*McNeil v. Graner,*
    91 Cal. App. 2d 858 (1949) .......................................................... 28

*New Albertsons, Inc. v. Superior Court,*
    168 Cal. App. 4th 1403 (2008) ...................................................... 32

*Paiva v. Nichols,*
    168 Cal. App. 4th 1007 (2008) ...................................................... 31

*Panos v. Great W. Packing Co.,*
    21 Cal. 2d 636 (1943) ................................................................. 36

*Pattiz v. Minye,*
    61 Cal. App. 4th 822 (1998) ......................................................... 22

*Plumley v. Mockett,*
    164 Cal. App. 4th 1031 (2008) ................................................. 26, 35

*Pond v. Ins. Co. of N. Am.,*
    151 Cal. App. 3d 280 (1984) ........................................................ 34

*Ricard v. Grobstein, Goldman, Stevenson, Siegel, LeVine & Mangel,*
    6 Cal. App. 4th 157 (1992) .......................................................... 36

*Roberts v. L.A. Cty. Bar Ass'n,*
    105 Cal. App. 4th 604 (2003) ....................................................... 24

*S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.,*
    74 Cal. App. 4th 1232 (1999) ....................................................... 30

*Salma v. Capon,*
    161 Cal. App. 4th 1275 (2008) ...................................................... 23

*Samara v. Matar,*
    5 Cal. 5th 322 (2018) ................................................................. 23

*Sangster v. Paetkau,*
    68 Cal. App. 4th 151 (1998) ......................................................... 26

*Sheldon Appel Co. v. Albert & Oliker,*
   47 Cal. 3d 863 (1989) ............................................................. 22, 26, 27

*Thomas v. Fry's Elecs., Inc.,*
   400 F.3d 1206 (9th Cir. 2005) ................................................... 2, 24

*Tool Research & Eng'g Corp. v. Henigson,*
   46 Cal. App. 3d 675 (1975) ............................................................. 27

*Williamson v. Superior Court,*
   21 Cal. 3d 829 (1978) ..................................................................... 34

*Wilson v. Parker, Covert & Chidester,*
   28 Cal. 4th 811 (2002) ................................................................... 26

*Zeavin v. Lee,*
   136 Cal. App. 3d 766 (1982) .......................................................... 27

## TREATISES

Cal. Civ. Proc. Code § 425.16 ..................................................... 23

Cal. Civ. Proc. Code § 425.16(b)(1) ....................................... 23, 24

Cal. Civ. Proc. Code § 425.16(b)(2) ........................................... 23

Cal. Civ. Proc. Code § 425.16(c)(1) ......................................... 3, 24

Cal. Civ. Proc. Code §§ 425.16(e)(1) & (2) .................................. 2

Model Code of Prof'l Responsibility DR 7-102(A)(4), EC 7-6 (Am. Bar Ass'n 1980) .................................................................................. 27

Model Rules of Prof'l Conduct r. 3.4(b) (Am. Bar Ass'n 2018) .............................. 27

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This lawsuit is a strategic maneuver to gain leverage in a long-standing real
estate dispute by driving a wedge between a client and its lawyers. AEW is suing
Zelig for representing a client in a hotly contested lawsuit. Because AEW's sole claim
against Zelig for malicious prosecution arises from protected activity, California's
Anti-SLAPP statute requires dismissal unless AEW can prove it is likely to prevail on
the merits. AEW cannot. There is no *evidence* that Zelig brought or otherwise
prosecuted the underlying action without probable cause or with malice – two
requirements necessary to support a malicious prosecution claim.

## II.    FACTUAL AND PROCEDURAL STATEMENT

AEW and NMS Capital Partners I, LLC ("**NMS**"), a Santa Monica-based real
estate developer, are locked in a major business dispute over the parties' joint venture
("**JV**") involving apartment buildings in West Los Angeles and Santa Monica.

In 2010, NMS, and its principal, Neil Shekhter (Shekhter), were approached by
Ed Zimbler, a person with whom Shekhter had a long term relationship, and a person
Shekhter considered a fiduciary. (Ex. 49 [Shekhter Decl. 8-9-17], ¶¶ 3-13) Zimbler
told Shekhter that he had a great opportunity for NMS to go into partnership/joint
venture with AEW, which he (falsely) described as prominent, honorable and honest.
(*Id.*, ¶ 12)  Shekhter told Zimbler that because the potential partnership involved the
family business, that NMS's partner-to-be had to be "beyond reproach from an
honesty and ethics perspective." (*Id.*, ¶13)  Zimbler assured Shekhter that this was the
case with AEW.  (*Id.*)

Negotiations began between Shekhter and Eric Samek/AEW.  (Ex. 49 [Shekhter
Decl. 8-9-17], ¶14; Ex. 24 [Shekhter Decl. 1-27-16], ¶2) Shekhter repeated to Samek
that because the potential partnership involved the family business, that NMS's
partner-to-be had to be beyond reproach from an ethics and honesty perspective and
their honesty and integrity had to be without question.  (Ex. 49, ¶16, 22) The key

1  inducement for NMS/Shekhter was the right to take out, or monetize, AEW's interest

2  in the JV within 5 years by paying AEW the greater of: (1) 1.75 times its invested

3  capital, or (2) a 24% annual return (the "**Monetization Formula**"). (Ex. 49, ¶ 21)

4      In September of 2010, NMS and AEW signed a JV agreement ("**JVA**").  The

5  JVA included two distinctly different provisions for the take-out of AEW, i.e., Article

6  6.1 and Article 11.  As can be seen by the JVA, multi-page Article 11 set out a

7  complicated mechanism by which either party could exercise a "buy/sell," and it

8  would operate entirely differently from Article 6.  (Ex. 2 [TAC], pp. 78-79, 106-110[3];

9  and, Ex. 49 [Shekhter Decl. 2017], ¶¶ 30-33)

10      Zelig/WLA/BLS were not involved in these events.[4]  (Zelig Decl. , ¶4.1)

11      Shortly after the JVA was executed, Shekhter noticed an error in the JV

12 Agreement.  (Ex. 24 [Shekhter Decl. 2016], ¶¶ 7-8; Ex. 49 [Shekhter Decl. 2017], ¶

13 34) Samek sent Shekhter a letter dated September 14, 2010 (the "**Cover Letter**") and

14 a minimally revised version of the JVA, sometimes referred to as "Version 2."  (Ex.

15 24 [Shekhter Decl. 2016], ¶8, and pp. 33; Ex. 14 [Lennon Decl. 2016], pp. 5)

16      From 2010 until early 2013, everything appeared to run smoothly.  During this

17 period, Shekhter was induced by AEW to transfer 4 substantial properties (owned by

18 various NMS affiliates, Lincoln Studios, LLC, NMSLuxe375, LLC, NMSLuxe415,

19 LLC and 9901 Luxe, LLC) to the joint venture for amounts well under market value.

20 (Ex. 49, ¶¶41, 49, 52, 57.) The fair market value of transferred properties during this

21 period was approximately **$70 million**, but Shekhter conveyed them to the JV for

22 approximately **$30 million**.  (*Id.*)  When Shekhter asked why should make a transfer

23 he transfer for an amount so dramatically below fair market value, Samek told

24 Shekhter since AEW had a finite amount to invest, and the Santa Monica market was

25

26 [3]For clarity, Zelig will hereinafter refer to the "bate numbers," as opposed to the
   actual internal page number of the exhibit.

27 [4] Per paragraph 5 of the Decl. of Zelig, Brentwood Legal Services had no

28 involvement whatsoever with any lawsuit claim or dispute with AEW.

1  clearly hot, that it made sense for Shekhter to transfer the properties for less than fair

2  market value because NMS would be acquiring AEW's shares anyway at the 3-year

3  anniversary of the formation of the joint venture. (*Id.*, ¶17) This would allow the JV to

4  "diversify."  (*Id.*) Samek even joked "that (Shekhter) could sell the properties to the

5  venture for 'no dollars,' because of (Shekhter's) plan to acquire the interests of

6  AEW."  (*Id.*)

7       In June 2013, NMS sought to repay AEW's investment, tendering $106 million:

8  $60 million [AEW's investment] x 24% per annum x 3 years, based on Article 6.1 of

9  the JVA. (Ex. 6; Ex. 24 at ¶¶ 17, 19 and pp. 185-186, 191-193) However, by 2013, the

10  properties of the JV had appreciated in value by much more than 24% per annum.

11  AEW breached the JVA by refusing to allow NMS to take out, or monetize, AEW's

12  interest in the JV.   (Ex. 24, ¶¶17-18; Ex. 49, ¶62)

13       In July 2014, NMS and other related entities, acting through Zelig, filed a

14  lawsuit against two law firms and others in Los Angeles Superior Court, captioned

15  *Lincoln Studios, LLC, et al. v. DLA, et al.*, Case No. BC 551551 (the "*Lincoln*

16  Action"). The matter was assigned to Hon. Suzanne Bruguera.  AEW was not named

17  as a defendant at the time of initial filing. (Zelig Decl., ¶6)

18       In November 2014, in response to a subpoena, Zimbler produced a letter that

19  his lawyer, Andrew Friedman (**Friedman**), sent to AEW in October of 2010, which

20  shocked Zelig because it demonstrated that Zimbler and AEW had worked together to

21  "engineer" and to cause the "marriage" of Shekhter's "slate of properties" to AEW,

22  and that same had "not been orchestrated casually." Friedman stated: (1) That Zimbler

23  had "engineered a relationship and a set of transactions resulting in (AEW's) marriage

24  to Neil and his slate of Santa Monica developments"; (2) That Zimbler "cemented

25  AEW's opportunity to invest in (Shekhter's) projects"; (3) That Zimbler delivered

26  Shekhter, a "needle in a haystack," to AEW; and (4) That same had not been

27

28

1  orchestrated casually."[5]  (Zelig Decl., ¶7; Ex. 44)  Zelig/WLA viewed this evidence as

2  substantial corroboration of AEW's wrongdoing.  (Zelig Decl., ¶7)

3  　　　In November of 2014, in another case, Zelig/WLA and Goldman (then of

4  Pircher Nichols) took the deposition of Zimbler, who corroborated that AEW had

5  cheated Shekhter/NMS, and obtained important documents showing that AEW was

6  very dishonest. (Zelig Decl., ¶8)  Zimbler testified: (1) That Zimbler introduced NMS

7  to AEW because AEW's Samek told him that AEW had a unique JV program under

8  which NMS could "take-out" AEW's interest in the JV. (Ex. 35 [Zimbler Depo.], pp.

9  68:19-69:18);  (2) That Zimbler was the "common denominator between Shekhter and

10  Samek (*Id.,* p 24:19); (3) That AEW was offering a "buy-out right" that was distinctly

11  different then a buy/sell (Id., p. 26:3-14); (4) That Samek, Neil and Zimbler discussed

12  the "buyout provision" (*Id.,* pp. 26:15-18, 40:24-41:2, 42:16-44:7); (5) That **after**

13  January 1, 2011, Zimbler spoke to Samek about the "buyout provision included in the

14  contract between AEW and NMS," and that Samek never "disabused" Zimbler of his

15  perception (*Id,* p. 68:19-69:5); (6) At no time did Samek ever say that the "buyout"

16  right didn't exist or that "that's not the deal with (Shekhter)" (*Id.,* p. 69:11-18); (7)

17  That a "couple years later", "Zimbler "100% believed, that Neil had this buyout right.

18  Not a buy/sell. A buyout right." (Id., p. 87:24-88:2); (8) That "there was never one

19  second or one iota of a minute that (Zimbler) ever thought that (Shekhter) did not have

20  the buyout option." (*Id.,* p. 91:3-5); (9) That Shekhter would say "AEW is making me

21  put more money in, but it was always the same response: 'doesn't matter.  I got the

22  buyout option, so everything is going to be okay.'"  (*Id.,* p. 91:9-15); (10)  Zimbler

23  confirmed that AEW promised NMS the buy-out right and that AEW had engaged in

24  fraud (*Id.,* pp. 26:15-27:16); and (11) That Zimbler "was upset with AEW about

25  (things) they did to (Shekhter)." (*Id.,* p. 84:2-91:12)

26  　　　As set forth above, bear in mind that Shekhter had stressed to Zimbler and

27  ─────────────
[5] Zimbler and AEW never told Shekhter about these issues between them.  (Ex. 49
28  [Shekhter Decl. 2017], ¶¶ 28, 68-69)

1  Samek, that if his family business was going to go into partnership with AEW, that the

2  partner had to have been beyond reproach from an ethics and honesty perspective.

3  (Ex. 49 [Shekhter Decl. 2017], ¶¶ 13, 16, 22)  Hence, the Friedman letter and the

4  following testimony of Zimbler was **very significant** because it corroborated that

5  AEW was dishonest and not to be trusted.  (Zelig Decl., ¶11.) More specifically,

6  Zimbler testified (1) That AEW had made a deal to give him 5% interest in AEW's

7  share in the joint venture and all related transactions (Ex. 44; Ex. 35, pp. 82:5-84:1);

8  (2) That AEW had reneged on the agreement (*Id.*); (3) That AEW's lawyers had

9  drafted a written agreement that did not represent the agreement of Zimbler and AEW,

10  and which according to Zimbler "had ridiculous language in it – that was circular"

11  (Ex. 35, p. 82:17-21); (4) That the dispute was "not resolved in a manner consistent

12  with what (Zimbler) understood the deal to be" (*Id.,* p. 83:11-22); (5) That "Samek

13  had told (Zimbler) things and Samek didn't come through on his promises" (*Id.,* p.

14  83:23-84:1); (6) That AEW "crammed down ... terms and language that was so

15  difficult and so trying" (*Id.,* p. 86:23-87:2); and, (7) That AEW then sent Zimbler "the

16  legal bill for beating him up."  (*Id.,* p. 87:1-2)

17      Zelig/WLA viewed this evidence as substantial corroboration of AEW's

18  wrongdoing.  (Zelig Decl., ¶7-12.)

19      On December 11, 2014, in a related matter, Zelig issued subpoenas for the

20  depositions of two individuals affiliated with AEW at key times, i.e., Daniel Lennon

21  and Jonathan Watson.  (Zelig Decl., ¶13; Exs. 51 and 52.)

22      The deposition of Lennon was set on January 16, 2015. Lennon was

23  subpoenaed and called Watson of AEW.  Watson told Lennon "not to worry about it."

24  (Ex. 14 [Lennon Decl. 2016], ¶14), and did not show. (Zelig Decl., ¶ 14.) Later, on

25  December 16, 2015, AEW's counsel, Jay Srinivasan of Gibson Dunn (**GD**) told

26  Lennon that AEW was trying to keep everyone from being deposed.  (Ex. 14, ¶19)

27  Watson's deposition was **never** obtained.  (Zelig Decl., ¶15)

28      In January of 2015, in another action, Zelig attempted to take the depositions of

1  Samek. (Zelig Decl., ¶16)  GD filed a motion for protective order as to the deposition,

2  and scheduled the motion – 6 months later -- in June of 2015. AEW/GD clearly

3  obstructed Zelig's legitimate efforts to obtain discovery.   (Zelig Decl., ¶ 16)

4          In March 2015, AEW proposed that NMS buy out its interest in the JV for an

5  amount calculated under **Article 6.1** of the JVA. (Ex. 12.)

6          In April 2015, in the *Lincoln* Action, NMS, acting through Zelig/WLA named

7  AEW, Samek and others in the First Amended Complaint (FAC). Among other things,

8  the FAC included causes of action for fraud, breach of contract, and for fraud per

9  Penal Code Section 484 and a recently published case, *Bell v. Feibush*, 212

10  Cal.App.4th 1041 (2013), as a result of AEW's procurement of the four properties

11  under false pretenses.[6] Zelig alleged that AEW had engaged in fraud, that all versions

12  of the JVA were the product of fraud, that it was up to the trier of fact to decide which

13  version, if any, controlled, but that if any version controlled it was Version 2.  Zelig

14  named as plaintiffs the NMS affiliates who had transferred the 4 properties, and as

15  Defendants the AEW-affiliated-transferors. Zelig requested that the JVA be rescinded

16  and canceled and that the transfers of the properties be reversed. Zelig literally spent

17  hundreds of hours evaluating the evidence and drafting the FAC. (Zelig Decl., ¶17)

18          In May of 2015, because he is a solo practitioner and was worried about dealing

19  with an army of lawyers at GD, and because business law was not his forte,

20  Zelig/WLA formally associated in James Goldman/Miller Barondess, and John

21  Genga, another attorney with "business law" experience.  (Zelig Decl., ¶18)

22          As set forth in paragraph 19 of Zelig's declaration, in June of 2015, P6 filed an

23  action entitled *P6 LA MF Holdings I, LLC v. NMS Properties, Inc*. LASC Case No.

24  BC584878 (the "*P6* Action"). (Ex. 34) In the P6 Action, AEW sought an injunction

25  against NMS Properties, an affiliate of NMS Capital. NMS Properties was the

---

[6] In *Bell*, a Court of Appeal confirmed that if one transferred property under false or fraudulent pretenses, the victim could bring a civil action for treble damages and attorney fees.

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 425.16

property manager for the properties owned by the JV. AEW sought a temporary restraining order that would have removed NMS Properties as property manager, Judge Luis Lavin denied the request, finding:

> "The Court finds that (AEW's) recent admission that they did not have copies of all 8 property management agreements undermines (AEW/Davidson's) credibility. … At best, **Davidson's failure to mention these crucial facts in his original declaration shows that his ability to recollect important events is faulty or that there is no foundation for many of the statements in his declaration. At worst, Davidson's failure to inform the Court that he had not reviewed all eight Property Management Agreements before declaring that they contained the "identical" termination provision was deceptive.** …." (Ex. 50)

AEW/Davidson's deception caused concern, and corroborated an ever-growing body of evidence that AEW was dishonest, and had no ethics and was out to cheat NMS. (Zelig Decl., ¶20)

In July 2015, NMS noticed the depositions of 5 employees of AEW. AEW **refused** to produce the witnesses, and filed a motion for protective order. (Zelig Decl., ¶22)

AEW filed a demurrer to the FAC. Judge Bruguera granted but gave leave to amend. (Zelig Decl., ¶23; Complaint at ¶ 79)

In September of 2015, in the *Lincoln* Action, Zelig/WLA filed a Second Amended Complaint (SAC). The SAC was lengthy (over 278 pages) and contained multiple causes of action against AEW, including breach of contract, breach of fiduciary duty, and violation of PC 484. Zelig alleged that AEW had engaged in fraud, that all versions of the JVA were the product of fraud, that it was up to the trier of fact to decide which version, if any, controlled, but that if any version controlled, it was Version 2. Zelig named as plaintiffs the NMS affiliates who had transferred the 4 properties, and as Defendants the AEW-affiliated-transferors. Zelig requested that the JVA be rescinded and canceled and that the transfers of the properties be reversed.

1  Zelig literally spent hundreds of hours evaluating the evidence and drafting the SAC. [7]

2  (Zelig Decl., ¶ 24; Ex. 48)

3      On September 21, 2015, after months of trying, and law and motion activity,

4  NMS finally got to take the deposition of Samek, in which important testimony was

5  obtained **corroborating** NMS's position.  In the deposition, Zelig marked the Cover

6  Letter as Exhibit 41, and inquired as follows:

7      MR. ZELIG: I'm going to go to Exhibit 41, (the Cover Letter) dated September
       14, 2010.
8              (Exhibit 41 marked.)
9      A. Okay.
       BY MR. ZELIG:
10     Q. Is that your signature, sir?
11     A. **I believe that is my electronic signature, yes."**  (Zelig Decl., ¶25; Ex. 45)

12     Initially, Samek did not dispute the authenticity of the Cover Letter, but waited

13  28-minutes (and only after a "break" with multiple counsel) to dispute its authenticity.

14  (Zelig Decl., ¶26)

15     In October 2015, Judge Bruguera heard, AEW's motion for a forensic

16  examination of NMS's data was heard and ordered a forensic examination.  (Ex. 36)

17     In November 2015, Miller became lead counsel for NMS. Zelig remained

18  counsel of record, but was relegated to virtually no role. While he may have formally

19  appeared with members of the Miller firm on a few occasions, to the best of his recall,

20  Zelig can recall only one instance after Miller became lead counsel where he actually

21  addressed the Court. (Zelig Decl., ¶27)

22     Per paragraph 28 of the Declaration of Zelig, on November 10, 2015, Lennon

23  provided an important declaration corroborating AEW's fraud and breach of contract.

24  More specifically, Samek was Lennon's supervisor in August of 2010 – just before

25  NMS and AEW entered into the JVA. In a declaration dated "10 Nov 2015", which

26  _____

27  [7] In its June 20, 2018 opinion, the Court of Appeal (**COA**) expressly acknowledged
    the propriety of pleading in the alternative so that the trier of fact could decide
28  which version, if any, controlled.  (Ex. 4, p. 14)

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 425.16

was partially typed and partially hand-written by Lennon,[8] he stated under penalty of

perjury: (1) that  Samek had repeatedly told him that NMS **had** been given the right to

monetize AEW within 5 years of the anniversary of the formation of the joint venture

at 1.75x or 24%, whichever was greater; (2) that Samek told Lennon that he thought

NMS "*did not know what they were really signing*"; and (3):

> "***At least on one occasion I heard Eric Samek say that NMS believed they had
> the option to buy AEW out @ pre negotiated terms but that NMS was not
> aware of the terms in the agreement they were signing because NMS legal
> was not aware the terms in the JV agreement were different than the
> negotiated terms of the deal***." (Ex. 43)

This data was important. It corroborated that NMS did have the right to buy-out

AEW, and that AEW was attempting to defraud NMS.  (Zelig Decl.,  ¶29.)

On January 13, 2016, the Miller Firm filed a stream-lined TAC, which among

other things, included causes of action for breach of contract, breach of fiduciary duty

and fraud. (Miller Decl. ¶ 21; (Ex. 2).) As was the case with the FAC and the SAC (as

noted by the COA in its 6-20-18 opinion), the TAC alleged that Article 6.1 (invoked

by NMS in 2013 and in AEW's buy-out proposal in 2015) gave NMS the right to buy

out AEW.  (Ex. 4, pp. 13-14; Ex. 47 [FAC] at ¶¶3, 11, 13, 168, 170, 171, and at other

locations; Ex. 48 [SAC] at ¶84D [wherein Article 6 distribution was specifically

quoted], and at other locations; TAC [Ex. 2] ¶¶ 8-10, 13, 22, 25-26.)

Per the declaration of Zelig at paragraph 30, on January 16, 2016, Lennon

signed a more formal declaration, further corroborating Zelig/WLA's sincere belief

that AEW had defrauded NMS and had breached contractual obligations:

> "7.  During my time at AEW, I worked directly for Eric Samek…I
> worked closely with Mr. Samek on the deals he was involved in.
>
> 8.  The majority of the transactions I underwrote while at AEW were
> investments made in AEW's joint venture with NMS Properties ("NMS")
> owned by Neil Shekhter.  I worked with Mr. Samek, who was the senior AEW

---

[8] The handwritten components of the declaration of Lennon have been quoted in
italics.

partner involved in closing the NMS transaction.  In the ordinary course of business, I received letters, emails, correspondence, memoranda, budgets and documents relating to the AEW-NMS joint venture.

9.    For instance, I was recently shown a September 14, 2010 letter on which I was copied, a true and correct copy of which is attached as Exhibit A,. I have no reason to believe that I did not receive the letter at that time in the normal course of business.  I was also copied on an email from an AEW employee, Jonathan Watson, dated September 14, 2010, …. I was recently shown this email and believe I received it in the ordinary course of business.

10.    During my discussions with Mr. Samek about AEW's joint venture with NMS, Mr. Samek told me that NMS believed the deal between NMS and AEW was that NMS had the right to monetize or take-out AEW's interest in the joint venture by paying AEW 1.75 times its invested capital, or 24% per year on its investment, whichever was greater.  Mr. Samek told me that this was how he and Mr. Shekhter of NMS negotiated the deal.

11.    All of the underwriting I did for AEW on the transaction with NMS and AEW's decision to enter into the joint venture was based on NMS having the right to monetize or take-out AEW's interest in the joint venture by paying AEW 1.75 times its invested capital, or a 24% per year on its investment, whichever was greater." (Ex 14)

These statements clearly supported suit against AEW.  (Zelig Decl., ¶31)

In January 2016, in the *Lincoln* Action, AEW filed a motion for sanctions against NMS and its lawyers, alleging forgeries, spoliation of evidence and perjury by NMS. (Ex. 26.) NMS submitted declarations to the effect that none of the lawyers had any knowledge of, or were otherwise involved in the alleged misconduct. (Ex. 42.)

In May 2016, in the *P6* Action, AEW moved for a preliminary injunction. In June 2016, in the *P6* Action, AEW filed a motion for sanctions against NMS. In both motions, AEW alleged the same claims of forgeries, spoliation of evidence and perjury against NMS that AEW had asserted in the *Lincoln* Action. (Exs. 21, 38.)

In June 2016, in the *P6* Action, Judge Johnson **denied** AEW's motion for an injunction, holding that the evidence of NMS's alleged forgery and other misconduct was "**sharply divided**," that there were "**legitimate issues**" concerning NMS's right to buy out AEW under Article 6, and therefore AEW had "**not established a**

Case No. 2:19-cv-01150-AB-AFMx

1  **reasonable probability of success**". (Ex. 38.)

2       On July 5, 2016, in the *P6* Action, Judge Johnson issued an order denying

3  AEW's motion for sanctions, holding that sufficient disputed evidence existed to

4  require that AEW's claims of forgery and other misconduct by NMS be submitted to

5  "the trier of fact." (Ex. 21.) Among the evidence that NMS introduced were

6  declarations of four experts, each of whom disputed and disagreed with AEW's claims

7  of forgery and spoliation. (Exs. 16-19, 41.) AEW never moved for reconsideration or

8  appealed any of the orders of Judge Johnson. (Miller Decl. ¶ 29.)

9       Meanwhile, NMS sought percipient and expert discovery and depositions.  (Ex.

10  13.) AEW blocked **all** discovery, consistent with AEW's "goal" to prevent **all**

11  depositions NMS wanted from going forward. (Ex. 14.)

12       Judge Bruguera did not rule on NMS's motion for a forensic examination of

13  AEW's data and devices. (Ex. 33.)

14       On July 29, 2016, in contrast to Judge Johnson, in the *Lincoln* Action, Judge

15  Bruguera granted AEW's motion for sanctions against NMS, and ordered an

16  evidentiary hearing to determine the sanctions.[9] (*Id.*)

17       In October 2016, Judge Bruguera conducted an evidentiary hearing. (*See* Exs.

18  15, 28.) AEW/GD over-zealously argued that the lawyer Defendants should be

19  sanctioned for their supposed knowledge of, and participation in, NMS's alleged

20  misconduct. (Ex. 28.)

21       Post hearing, AEW submitted a proposed order that included "findings" that

22  sanctions should be imposed on the lawyer Defendants, and that they should be

23  reported to the State Bar. (Exs. 27, 29-31.)

24       On November 22, 2016, Judge Bruguera signed AEW's proposed order, but

25

26       [9] Relative to the alleged spoliation, Zelig/WLA had no involvement whatsoever relative to same.  Zelig/WLA had no knowledge or involvement in any of the creation

27  or changes to documents that AEW claimed had been forged, or any alleged destruction of evidence, or any wrongdoing alleged by AEW.

28

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

1  **rejected** any findings or sanctions against defendant-lawyers, including Zelig/WLA.

2  (Ex. 33) AEW did not seek reconsideration, and did not appeal the denial of the

3  request for sanctions against defendants herein. (Zelig Decl., ¶ 32; Miller Decl. ¶ 29.)

4        In December 2016, Judge Bruguera entered judgment against NMS. (Ex. 1).)

5  NMS appealed. (Ex. 3) The COA reversed, holding that the TAC "adequately

6  allege[d] causes of action for breach of contract, fraud and breach of fiduciary duty."

7  (Ex. 4, pp. 2, 12-16.) The COA only affirmed the dismissal of NMS Capital's First

8  Cause of Action for breach of contract.[10] (*Id.*, p. 2.) The COA specifically held that

9  the TAC was **not** a "sham pleading."[11] (*Id.*)  The COA acknowledged: "[I]t is clear

10 from the FAC to the TAC that (NMS) consistently advocate(d) they have the right to

11 acquire AEW's interest within 5 years by payment of 1.75 times AEW's net capital

12 investment no matter which version of the JVA is legally operative."  (*Id.*, p. 14)

13 "[B]ecause the determination will be made by the trier of fact, the FAC and SAC

14 (both drafted by Zelig) make alternative allegations to respond to whichever version

15 of the agreement is found to be controlling.  (*Id.*, p. 13)  "[P]leading in the alternative

16 is permissible."  (*Id.*, p. 14.)

17       As to sanctions, the COA affirmed the terminating sanctions against NMS *only*.

18 (Ex. 22, pp. 3, 16.) None of the claims of the other *Lincoln* plaintiffs were terminated

19 and matter was. (Ex. 22, p. 26.)

20 **III.    SUMMARY OF POINTS IN SUPPORT OF A GRANT**

21       Zelig summarizes his position as follows:  (1) In bad faith, highly aggressive

22 and vindictive AEW is attempting to repackage the state court litigation into a

23 malicious prosecution claim; (2) There is no evidence that Zelig did anything wrong;

24

---

25 [10] Nonetheless, Zelig's interpretation of Article 6 of a confusing JVA was a good

26 faith interpretation, especially in light of compelling extrinsic evidence.

27 [11] By finding that the pleading of NMS's Article 6 take-out right was not a sham, the
Court of Appeal necessarily found that the pleading was not untruthful and that it

28 did not plead any false facts. (Ex. 4)

(3) AEW's attempts to impute the alleged forgery, spoliation and misconduct on the part of NMS to Zelig/WLA, is improper as a matter of law since the malfeasance or dereliction of a client is not imputed to his/her attorney and *cannot* be a basis for a malicious prosecution action. (*Pattiz v. Minye*, 61 Cal. App. 4th 822, 828 (1998); (4) Malicious prosecution claims against attorneys are disfavored because they create a chilling effect on legal representation; (5) To show that Zelig acted without probable cause, AEW cannot prove that "any reasonable attorney" would agree that NMS's claims were "totally and completely without merit." (*Sheldon Appel Co. v. Albert*, 47 Cal. 3d 863, 885 (1989); (6) The gravamen of this lawsuit is that Zelig lacked probable cause to pursue the claim that AEW had cheated and defrauded NMS, and that NMS had a take-out right under the JVA. (7) The take-out right was supported by substantial evidence that Zelig, Goldman, and the Miller firm considered before moving forward with the *Lincoln* Action: (i) the "waterfall" provision in Article 6.1 which provides that AEW's interest goes to zero once AEW's investment is repaid; (ii) the documents reflecting the pre-JVA negotiations, which confirm that AEW promised NMS that it would have the right to take out or buy out AEW's interest in the JV; (iii) an email (a congratulatory "Mazel Tov" email from Samek); (iv) a term sheet sent by Samek, (v) an internal AEW memo confirming the take-out right; (vi) Shekhter's contribution of four Properties that he owned into the JV for far below market value, which would have made no sense unless NMS had a take-out right; (vii) sworn third-party witness declarations confirming that AEW had promised Shekhter the take-out right; and (viii) 2013 and 2015 negotiations in which AEW made offers for NMS/Shekhter to buy it out and get the Properties, per Article 6.1; (8) In the *P6* Action, Judge Johnson held that the "evidence is **sharply divided**" and that NMS "raised **legitimate issues**" about the exercise of the take-out right in Article 6.1; (9) The Court of Appeal in the *Lincoln* Action specifically held that the TAC was *not* a "sham pleading"; (10) The findings of Judge Johnson and the Court of Appeal **confirm** that all of the lawyers had probable cause to pursue the case, and that there

1  was no malice; (11) As to AEW's claim that the TAC substantially reduced and
2  streamlined the allegations and causes of action pleaded in NMS's earlier complaints,
3  the law outright precludes a claim of malicious prosecution for doing so. (*Jenkins v.*
4  *Pope*, 217 Cal. App. 3d 1292, 1301 (1990) ["To allow a malicious prosecution suit to
5  be based on a cause of action dropped from an amended complaint would discourage
6  amendment of pleadings to delete theories which come to appear untenable."]); (12)
7  With respect to the alleged forgery and spoliation, the expert testimony was in
8  substantial conflict. (Zelig Decl., ¶33, Exs. 16-19); (13) NMS's four experts opined
9  that the findings of AEW's experts were incorrect and unsupported by the evidence.
10  (Zelig Decl., ¶33, Exs. 16-19); (14) Because the evidence was in such dispute, the
11  COA declined to address and affirm the *Lincoln* court's ruling that NMS engaged in
12  forgery; (15)  The COA's decision leaving AEW's forgery claim **unresolved** rendered
13  the forgery issue an open question, **without preclusive effect**. *Samara v. Matar*, 5
14  Cal. 5th 322, 333 (2018); (16) AEW cannot support a claim that any of the lawyers
15  lacked probable cause, let alone acted with malice (17) AEW's contention that Zelig
16  made no effort to investigate the facts is false. The lawyer defendants diligently
17  sought discovery, including depositions of AEW personnel. (Zelig Decl.,); (18) AEW
18  blocked discovery at every step, and went told a third-party witness that AEW's "*goal*
19  *[was] to keep everyone from being deposed*." (Zelig Decl., ¶¶13-16, 22; Frid Decl., ¶
20  12; Ex. 14, ¶19); (20) AEW refused to produce a single document.  (Id.)

21  ## IV.    LEGAL STANDARDS ON ANTI-SLAPP MOTIONS

22       Per CCP § 425.16(b)(1), "[a] cause of action against a person arising from any
23  act . . . in furtherance of the person's right of petition or free speech . . . in connection
24  with a public issue shall be subject to a special motion to strike, unless the court
25  determines that the plaintiff has established that there is a probability that the plaintiff
26  will prevail on the claim." In applying Section 425.16, courts consider the pleadings,
27  affidavits and declarations stating the facts upon which the liability or any defense is
28  based. CCP § 425.16(b)(2); *Salma v. Capon*, 161 Cal. App. 4th 1275, 1289-90 (2008).

1    The anti-SLAPP analysis has two prongs: **First**, defendants must make a prima

2  facie showing that the claims "arise from" protected activity; namely, "any act of that

3  person in furtherance of the person's right of petition or free speech under the United

4  States Constitution or the California Constitution . . . ." CCP § 425.16(b)(1). "[A]

5  court must generally presume the validity of the claimed constitutional right in the

6  first step of the anti-SLAPP analysis." *Chavez v. Mendoza*, 94 Cal. App. 4th 1083,

7  1089 (2001).

8    **Second**, if the claims arise from protected activity, the burden shifts to plaintiffs

9  to show, by "competent, **admissible** evidence," a probability of prevailing on the

10  merits. *Roberts v. L.A. Cty. Bar Ass'n*, 105 Cal. App. 4th 604, 613-14 (2003). If

11  plaintiffs cannot make this showing, the claim is dismissed and defendants must be

12  awarded attorneys' fees and costs. CCP§ 425.16(c)(1).[12]

13    AEW asserts a single cause of action for malicious prosecution. (*See* Compl. ¶¶

14  116-136.) A claim for malicious prosecution always arises from protected activity:

15  "[b]y definition, a malicious prosecution suit alleges that the defendant committed a

16  tort by filing a lawsuit." *Jarrow v. LaMarche*, 31 Cal. 4th 728, 735 (2003).

## V.    THERE WAS A GOOD FAITH BASIS FOR ALL OF THE CAUSES OF ACTION OF THE FAC AND SAC, ESPECIALLY THE STATUTORY VIOLATION CAUSE OF ACTION FOR VIOLATION OF PENAL CODE SECTIONS 484 AND 496.

21    In 2013, *Bell v. Feibush*, 212 Cal.App.4th 1041 (2013) was published.

22    Section 484 states that every person who shall "*knowingly and designedly by*

23  *any false or fraudulent representation or pretense defrauds any other person of...*

24  *real property... is guilty of theft.*"  A violation of Section 496(a) or (b) occurs when

25  a person engages in the conduct set forth in the preceding paragraph. *Bell* at 1045.

26  Significantly, a "conviction" for theft is "not a prerequisite of recovery of treble

27  ──────────────

[12] In federal complaints, state law claims are subject to an anti-SLAPP motion.

28  *Thomas v. Fry's Elecs., Inc.*, 400 F.3d 1206, 1206-07 (9th Cir. 2005).

1  damages under Section 496(c). *Bell*, at 1043.  Per Section 496, any person who has

2  been injured by a **violation** of said section, including "theft by false pretense," may

3  pursue the wrongdoer or anyone who aided and abetted the wrongdoer, for treble

4  damages, costs of suit and reasonable attorney fees. *Bell,* supra, at 1043 and 1045.

5  Per *Bell,* supra, a plaintiff may sue a defendant under Sections 484 and 496, even if

6  a defendant procures real property consensually.  *Bell* at 1049.

7      AEW clearly cheated NMS via false premises and representations.  Samek

8  told Shekhter that he should transfer 4 valuable properties then worth $70 million

9  for $30 million.  Samek explained to Shekhter that NMS could have made the

10  transfers for "no dollars" and it would not have consequences to NMS because NMS

11  planned to buy out AEW at or about the 3-year anniversary of the formation of the

12  venture.  Hence, figuratively, the cause of action for violation of Sections 484 and

13  496 fit like a glove.

14  **VI.    AEW CANNOT ESTABLISH A PROBABILITY OF PREVAILING**

15      "To establish a cause of action for the malicious prosecution of a civil

16  proceeding, a plaintiff must [show] that the prior action (1) was commenced by or at

17  the direction of the defendant and was pursued to a legal termination in his, plaintiff's,

18  favor; (2) was brought without probable cause; and (3) was initiated with malice."

19  *Bertero v. Nat'l Gen. Corp.*, 13 Cal. 3d 43, 50 (1974) (citations omitted). AEW "must

20  provide the court with sufficient **evidence** to permit the court to determine whether

21  'there is a **probability** that [plaintiffs] will prevail on the claim.'" *DuPont Merck*

22  *Pharm. Co. v. Superior Court,* 78 Cal. App. 4th 562, 568 (2000) (citation omitted).

23  **A.    Plaintiff Cannot Establish That Zelig or BLS Lacked Probable**

24      **Cause to Prosecute The *Lincoln* Action[13]**

25      To establish that Zelig lacked probable cause, AEW must show that Zelig had

26  knowledge sufficient to convince "any reasonable attorney" that NMS's claims were

27  ────────────────────
28  [13] BLS was not involved in any issue or dispute between AEW and NMS and/or any
   of their affiliates.  (Zelig Decl., ¶5)

1  untenable and frivolous: that is, totally and completely without merit.[14] *Sheldon Appel,*

2  47 Cal. 3d at 885 (in order to avoid a "chilling effect on the assertion of litigants'

3  rights," an attorney's actions should only be deemed "frivolous" where "any

4  reasonable attorney" would agree that the action was "totally and completely without

5  merit").  The existence of "probable cause" is a question of law. *Sheldon Appel* 47

6  Cal. 3d at 884. An objective test applies, i.e., whether any reasonable attorney would

7  have thought the claim tenable. *Franklin v. Manatt*, 184 Cal. App. 4th 313, 333

8  (2010). "Probable cause is a **low threshold** designed to protect a litigant's right to

9  assert arguable legal claims even if the claims are extremely unlikely to succeed.'"

10 *Sheldon Appel*, 47 Cal. 3d at 886. This rather lenient standard for bringing a civil

11 action reflects "the important public policy of avoiding the chilling of novel or

12 debatable legal claims." *Sheldon Appel*, 47 Cal. 3d at 885. Attorneys "**have a right to**

13 **present issues that are arguably correct, even if it is extremely unlikely that they**

14 **will win . . . .**" *Id.*; *Grindle v. Lorbeer*, 196 Cal. App. 3d 1461, 1467 (1987) ("Zealous

15 representation sometimes requires an attorney to go out on a limb, to be innovative

16 and creative in fashioning theories of liability or defense.").

17      In determining whether an action was supported by probable cause, a court

18 must construe the allegations and evidence in the underlying suit **liberally**, and in a

19 light **most favorable** to the malicious prosecution defendant. *Sangster v. Paetkau*, 68

20 Cal. App. 4th 151, 164-65 (1998). Zelig/WLA was not required to predict how a trier

21 of fact would weigh **competing** evidence, or to abandon its claim if it thought that the

22 evidence might weigh against its client. *Wilson v. Parker*, 28 Cal. 4th 811, 824 (2002).

23 Quite to the contrary, Zelig's ethical obligation required that he resolve **all** reasonable

24 doubts in favor of his client. *Model Rules of Prof'l Conduct* r. 3.4(b) (Am. Bar Ass'n

25

---

26  [14] The fact that **6 experienced lawyers** (Miller, Zelig, Genga, Goldman, Tokoro and
27  Frid) all felt that the action had merit is **strong** evidence that a reasonable attorney
     would conclude the action had merit, and conversely was not untenable, frivolous,
28  or totally and completely without merit.

1   2018); Model Code of Prof'l Responsibility DR 7-102(A)(4), EC 7-6 (Am. Bar Ass'n

2   1980). This rule is not altered by the fact the client's adversary disputes the client's

3   representations, or even if the attorney doubts the client's credibility. *Tool Research v.*

4   *Henigson*, 46 Cal. App. 3d 675, 684 (1975), *disapproved on other grounds by Sheldon*

5   *Appel*, 47 Cal. 3d at 882–83.

6        Finally, as a matter of law, AEW's "group pleading" of allegations against all

7   defendants, designed to conflate Zelig with his client and other attorneys was

8   improper. (*See, e.g.*, Compl. ¶¶ 4, 6, 10, 61, 88-89.) AEW cannot impute to Zelig the

9   knowledge or acts of his client to satisfy AEW's burden to prove a lack of probable

10  cause on the part of Zelig/WLA. *Zeavin v. Lee*, 136 Cal. App. 3d 766, 772-73 (1982)

11  (client's conduct **cannot** be imputed to the attorney in malicious prosecution action).

12
13          **1.    There Was Probable Cause for the Allegations in the FAC, SAC and TAC**

14              **(a)    Evidence Supported the Article 6 Claim in FAC, SAC and TAC**

15       Zelig/WLA named AEW in the FAC and the SAC.  As one can readily see from

16  these documents, Zelig/WLA engaged in a painstaking effort to review and evaluate

17  all available documents and to set forth a detailed and comprehensive chronology.

18  (Zelig Decl., ¶17; Ex. 48)

19       AEW alleges that Zelig/WLA did not have probable cause to plead that Article

20  6 of the JVA provided NMS with a buy-out right, as set forth in the FAC, SAC and

21  TAC. (Compl. ¶¶ 49, 81, 107, 131.) To the contrary, Zelig's pursuit of AEW was

22  supported by, among other things, the JV Agreement, the term sheet, the Mozeltov

23  email, Zimbler's deposition testimony, Friedman's letter, Declaration of Lennon

24  (2015), and, Declaration of Lennon (2016).

25       In the FAC, SAC and TAC, pursuant to Article 6 of the JVA, NMS alleged that

26  NMS had the right to take out, or monetize, AEW's interest within 5 years. Article 6.1

27  prescribed different profit distributions to AEW in seven successive stages –

28

sometimes known as a "waterfall provision." (Ex. "B" to TAC (Ex. 2), pp. 35-36.) As the alleged in the FAC, SAC and TAC, Article 6 provided at the final stage, that the distributions schedule would cease to exist:

> "*one hundred percent (100%) shall be distributed to Operating Member* [NMS] if **within** five (5) years from the date hereof Investor Member [AEW] receives all amounts it is entitled to receive under Article 6.1(i) through (vi)"; that is, either a 24% return-on-investment or 1.75 times AEW's capital contributions. (Art. 6.1(b)(vii) (emphasis added).)

Accordingly, if "**within** five years," AEW received 1.75/24%-return, AEW's economic interest in the JV would be eliminated forever -- a "take-out." (Ex. 47 [FAC] at ¶¶3, 11, 13, 168, 170, 171, and at numerous other locations; Ex. 48 [SAC] at ¶84D [wherein Article 6 distribution was specifically quoted], and at numerous other locations; Ex. 2 [TAC], ¶¶ 8-10, 13, 22, 25-26.)

Zelig's interpretation of Article 6 was reasonable and in accord with well-settled rules of contractual interpretation.

> "The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable; and if this is impossible an interpretation which gives effect to the main apparent purpose of the contract will be favored." *Heidlebaugh v. Miller*, 126 Cal. App. 2d 35, 38 (1954)

First, Article 11, the "buy/sell" provision sets out an **elaborate** procedure that either party could implement, which was **never** triggered by NMS in 2013. (Ex. 49 [Shekhter Decl.] at ¶31)

Second, to construe Article 6 to mean, even after AEW had been paid its full distribution under the seventh stage of the waterfall, and regardless of whether it was paid by NMS or paid via distributions declared by AEW, that AEW would remain as a member, would have been contrary: (1) to the economic and practical operation of the JV; and, (2) to the points negotiated by the parties, as confirmed in various documents. In short, it was reasonable to construe Article 6 to provide that upon completion of the final stage of the waterfall, AEW's interest in the JV would be

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

bought out by NMS. (Zelig Decl., ¶36)

Third, the law is clear. Where there is extrinsic evidence relevant to contract interpretation, the evidence must be considered. *Fremont v. Fremont*, 148 Cal. App. 4th 97, 114-15 (2007).   Extrinsic evidence supported NMS's position that the parties knew and agreed that Article 6 provided NMS with a take-out right **distinct** from the Article 11 buy/sell rights:

- <u>May 2010 "Mazel Tov" Email</u>: On May 19, 2010, Samek of AEW sent NMS an email congratulating NMS on the deal and confirming the Monetization Right: "AEW minimum equity multiple [would be] 1.75" and that "[i]f NMS monetizes all of AEW's investment within 5 years then NMS will keep **all** proceedings above AEW's 24% return." (Ex. 2, pp. 33.)

- <u>May 2010 Term Sheet</u>: AEW further confirmed the deal by sending NMS a term sheet that stated that if AEW's investment has been "monetized … **within** five years," then 100% of the JV's proceeds would go to NMS. (Ex. 5.)

- <u>August 2010 AEW Investment Committee Memo</u>: An internal AEW memo showed that AEW understood and based its projections on the assumption that if it received a 24% return on its invested capital, its interest in the JV would go to zero. (Ex. 41, p. 11.)

- <u>Property Transfers by NMS/Shekhter</u>: NMS/Shekhter transferred to the JV **four** properties at below fair market value. NMS only did this because of Samek's assurances that this "would be of no moment because of [NMS's] right and intention to take-out AEW's interest within a few years . . . ." The below market transfers make no sense if NMS did not have a take-out right. (Ex. 2, ¶ 21.vii.)

- <u>April 2013 Meeting</u>: NMS and AEW had a meeting at a restaurant in Culver City where they discussed buying out AEW's interest in the JV per the take-out right. Specifically, they discussed various ways to effectuate the take-out, including bringing in outside money through loans or having NMS sell or use equity in their other properties to buy out AEW; and thereafter exchanged projections to effectuate the take-out. (Ex. 23, ¶ 84; Ex. 37, pp. 6:7-12:12.)

- <u>June 2013 Letter</u>: Per the discussions above, NMS notified AEW that it intended to pay back AEW's interest, as provided for in Section 6.1 of the JVA. NMS stated therein that, under Section 6(b) of the JVA, AEW's interest in the JV would become zero if, within five years of the formation of the JV, AEW had received 1.75 times its invested capital and a 24% IRR. (Ex. 6.)

**(b)**    **AEW's *Conduct* Confirmed That Zelig/WLA Had Probable Cause to Pursue the *Lincoln* Action**

In construing a contract, the acts and **conduct** of a party with knowledge of its terms, and before a controversy arose, are relevant to the parties' intentions at the time of contracting. *S. Pac. v. Santa Fe.*, 74 Cal. App. 4th 1232, 1242 (1999).

In March 2015 – before AEW was added to the *Lincoln* Action – NMS and AEW had a meeting during which the parties discussed NMS's right to take-out, or monetize, AEW's interest in the JV under Section 6. (Decl. Goldman ¶ 9 and Ex. 12.) Shortly thereafter, AEW made an offer to allow NMS to buy-out AEW for 24% of IRR on AEW's capital contributions, "that is, $135 million." (Ex. 12; Goldman Decl. ¶ 10.) **This buy out of AEW at "24% of IRR" was entirely consistent with AEW's own June 2013 buy-out proposal, per Article 6.[15]**

**(c)**    **Third-Party Witnesses Confirmed that AEW engaged in fraud and that NMS had Take-Out Right**

Two independent witnesses, Zimbler and Lennon, unaffiliated with NMS, confirmed that AEW promised NMS the buy-out right and that AEW had engaged in fraud. (Ex. 35 (Zimbler Depo.) at 26:15-27:16 and discussion at pages 12 and 13 above; Ex. 14 (Lennon Decl.); Ex. 43 (Lennon Decl.).)

As discussed above, in November 2014, Zimbler produced Friedman's letter sent to AEW in October of 2010, of which Shekhter had no knowledge. The text of the letter is cited at page 12 above (Ex. 44) This data was significant.  It demonstrated that Zimbler and AEW acted secretly and concert to induce NMS to enter into the joint venture, and that AEW was dishonest to the core.  (Zelig Decl., ¶7)

In November of 2014, in deposition. Zimbler corroborated more facts supporting NMS's claims that it was defrauded and cheated by AEW.  The text of

---

[15] (*See* March 10, 2015 email of AEW to NMS and attached settlement term sheet (Ex. 12); *compare to* JVA (Ex. B to TAC, Ex. 2) pp. 35-36; TAC ¶¶ 8-10, 13, 22, 25-26.)

1    Zimbler's testimony is cited at pages 12-13 above. This testimony was significant. It

2    supported NMS's claims that it could buy-out AEW, and that AEW knew NMS was

3    relying on the buy-out right. (Zelig Decl., ¶8-12)

4         Samek was Lennon's supervisor at AEW. (Ex. 14, ¶ 8.) As set forth at pages

5    17-19 of this brief, in declarations, Lennon confirmed that Shekhter's understanding

6    of Article 6 was exactly the same as AEW/Samek's. (*Id.* ¶ 10; Ex. 43, ¶¶4-6.) Samek

7    told Lennon that NMS had the right to monetize AEW **within** five years by paying

8    AEW 1.75 times AEW's investment or a 24% yearly return, whichever was greater.

9    (*Id.*) All of AEW's underwriting on the deal was based on the same understanding.

10   (*Id.* ¶11.)  However, Samek also told Lennon, even though this was the deal, that

11   unbeknownst to Shekhter, AEW did **not** intend to let Shekhter monetize AEW's

12   investment. (*Id.* ¶ 12; Ex. 43, ¶¶5-6.) AEW/Samek concealed AEW's true intentions

13   from Shekhter. (*Id.*) [16]

14                    **(d)    Deposition of Samek**

15        See page 17 of this brief and Exhibit 45.

16                    **(e)    Judge Bruguera Confirmed That NMS's Article 6 Claim**

17                         **Had Merit**

18        In the *P6* Action, AEW's failed attempt to obtain injunction establishes

19   probable cause. *See Paiva v. Nichols,* 168 Cal. App. 4th 1007, 1011 (2008).

20                    **(f)    NMS's Experts Disproved AEW's Allegations**

21        Counsel's reliance on expert opinions supporting the claims of the client

22   _____

23   [16] Lennon testified that he believed he and AEW received the cover letter from
     Samek to Shekhter enclosing Version 2 of the JVA – which AEW contradictorily
24   alleged in the *Lincoln* Action, and in this action, was a forgery. (*See* Lennon Decl.
     (Ex. 14) ¶ 9; *cf* Compl. ¶¶ 65, 68, 82, 95, 103(n), 105(b), 121.) Lennon further
25   testified he had no reason to believe that NMS forged anything. (Lennon Decl. (Ex.
     14) ¶¶ 9, 18.) At the evidentiary hearing on AEW's motion for sanctions, Lennon
26   testified to the same effect and said he had no reason to believe Version 2 of the
27   JVA attached to the September 2010 cover letter was a forgery. (Transcript of
     October 25, 2016 hearing (Ex. 15), pp. 9-12, 20, 25.)
28

1   establishes the claims were "objectively tenable" and thus probable cause existed.

2   *New Albertsons, Inc. v. Superior Court*, 168 Cal. App. 4th 1403, 1431 (2008) (where

3   two sets of experts offer opposing opinions concerning purported spoliation, the jury

4   should decide the issue).

5       In January 2016, AEW filed its motion for terminating sanctions based on

6   alleged discovery violations and the alleged forgeries. (Ex. 26) In opposition, NMS

7   offered the testimony of four highly qualified experts: Aginsky, Nicolaides, Flynn and

8   Cooper. These experts opined that the allegations of forgeries and spoliation against

9   NMS were not supported by evidence, and were based on the application of a

10  methodology that was not generally accepted (and therefore inadmissible under

11  *Daubert*).[17] (Ex. 16 ¶¶ 18-26; Ex. 17 ¶¶ 13-14, 38, 40-41; Ex. 18 ¶¶ 19-20, 31, 37, 39,

12  43-44, 50-51, 54, 56, 59-60, 63-64; Ex. 19 ¶¶ 7-9, 12, 14, 16-21, 23-32, 41-44, 48, 52,

13  58-60, 65, 69.)[18] (Decl. ¶33)

14      AEW did not subpoena any NMS witness to appear at the hearing, nor did it

15  subpoena Zelig or anyone at WLA. (See, Zelig Decl., ¶33.1; Exs. 8, 28, 32.) Yet, in

16  this case, via sophistry, AEW claims the Miller Firm's decision not to call certain

17  witnesses and introduce evidence shows an absence of probable cause to defend

18

19

---

20  [17] *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

21  [18] NMS's experts refuted AEW's claims of forgery, testifying that based on the forensic evidence, there was no evidence that Version 2, the "cover letter," or the La

22  Cienega PMA was a forgery. (*Id.*) They also disputed AEW's contentions regarding spoliation. Cooper testified that AEW's expert Rubin's opinion that over 800

23  documents had not been produced by NMS was wrong. Rubin in fact only identified

24  13 "missing" documents, and the review of Rubin's own work showed that eight of those documents had been provided by NMS – meaning that of the 55 terabytes of

25  data (the equivalent of 5.5 million bankers boxes, or 1500 miles of paper laid end-

26  to-end), Rubin could only identify five missing documents. (Ex. 19, ¶¶ 69, 100.) Rubin admitted that he had **not** identified any spoliation on NMS's computer

27  networks, servers, or backup media collected through the forensic examination and

28  that he did not identify any spoliation. (Ex. 32, pp. 6:5-19, 14:11-24, 15:21.)

1   AEW's claims.[19] (Compl. ¶¶ 87, 125.) But that's not the law. The lawyer Defendants

2   may not be held liable for defending AEW's claims against NMS, because in

3   California there is no such thing as "malicious defense". *Bertero*, 13 Cal. 3d at 52.

4   AEW cannot to prove a lack of probable cause on the part of Zelig/WLA. (*Id.*)

### (g)    AEW Blocked Discovery

6        AEW alleges that the lawyer Defendants conducted no investigation or

7   discovery concerning AEW's claims of forgeries, spoliation and misconduct. (Compl.

8   ¶ 118.) The claim is highly dishonest. WLA and the Miller Firm made **substantial**

9   efforts to investigate and conduct discovery, but AEW blocked those efforts.

10        For example, Zelig/WLA sought the deposition of various persons affiliated

11   with AEW but due to AEW's obstruction was only able to take the deposition of

12   Samek. (Zelig Decl., ¶13-16, 22) NMS requested an order allowing  NMS's experts

13   to forensically examine AEW's electronic data.  It was necessary to examine the data

14   of both sides to determine whether Shekhter or AEW had created Version 2. After all,

15   if NMS's examination disclosed that the alleged forgeries were on AEW's computers,

16   AEW's claims of forgery would be invalidated. (1-19-2016 NMS motion for forensic

17   examination [Ex. 13].) AEW opposed NMS's motion.  Judge Bruguera refused to hear

18   the motion. (Frid Decl., ¶ 11.)[20]

19        Before the October 2016 evidentiary hearing. AEW blocked depositions. NMS

20

---

21   [19] When NMS attempted to call Dino Ciarmoli, an officer of NMS, as a witness in
     the hearing, AEW objected.  Ciarmoli would have confirmed that the JV records
22   were maintained on NMS's servers – and not Shekhter's personal home computer –
     and that all of the data was provided to AEW, and hence there was no spoliation.
23   (Declaration of Dino Ciarmoli (Ex. 40), ¶¶ 5-24.)
24
     [20] The need for this examination was obvious: AEW itself had manipulated at least
25   two other "versions" of the JVA by cutting and pasting NMS's signature from
     another agreement onto it, without authorization. (Ex. 13 at pp. 17, NMS motion for
26   examination January 19, 2016; Ex. 24, Shekhter January 27, 2016 Declaration, ¶¶ 9-
27   16; *see also* Miller Firm's PowerPoint compendium of evidence of AEW's
     violations of the *Lincoln* court's forensic order (Ex. 41), pp. 25-27.)
28

---

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 425.16

sought to depose AEW's experts, and obtain their files and documents supporting their opinions on forgery and spoliation. The court ultimately denied NMS's motion to compel those depositions. (November 22, 2016 order (Ex. 2 to Complaint), pp. 314-315.) AEW effectively blocked all attempts by NMS to obtain discovery. (*See* Lennon January 16, 2016 Declaration (Ex. 14) ¶ 19 [AEW "goal" was "to keep **everyone** from being deposed"].)[21] Except for the deposition of Samek, Zelig/WLA was prevented from taking a single deposition. AEW never produced a single document in response to NMS's discovery requests. (See, Frid Decl., ¶ 12; and, Zelig Decl., ¶13-16, 22.)

> **(h)    On Mirror Image Issues, Sanctions Were Denied by Judge Johnson**

In June 2016, AEW filed a motion for terminating sanctions in the P6 Action based on the same facts that AEW alleged in the *Lincoln* Action – and which AEW re-alleges in this case. (*See* AEW motion for sanctions in *P6* Action (Ex. 20, pp. 13-16) (same forgeries alleged in Complaint, e.g., ¶¶ 4-8, 10, 38-47, 54-55, 65-68, 82, 95-96); pp. 10-13 (same destruction and spoliation of evidence alleged in, e.g., Complaint, ¶¶ 73-77, 82, 86, 97-102, 103(s), (u)-(y), 106(a)-(c)); pp. 16-21 (same allegations of knowledge, participation and "willfully blind to the truth" against Zelig/WLA and the Miller Firm alleged in, e.g., Complaint ¶¶ 10, 98, 118, 122, 127).)

On the same record that was before Judge Bruguera, Judge Johnson denied the motion. Judge Johnson held: "plaintiffs [AEW on behalf of P6] have accused defendant [NMS] of committing acts of serious misconduct, such as forgery, false testimony and the destruction of evidence . . . *this is a dispute for the determination by the trier of fact*." (July 5, 2016 Notice and Minute Order of Judge Johnson. (Ex. 21) (emphasis added).)

---

[21] *See Williamson v. Superior Court*, 21 Cal. 3d 829, 836-39 (1978) (agreement to suppress evidence of a witness is illegal). AEW's obstructions demonstrate unclean hands, barring its claims of malicious prosecution against all Defendants. *Pond v. Ins. Co. of N. Am.*, 151 Cal. App. 3d 280, 289-91 (1984).

**B.** **AEW's Claims Against Zelig Are Barred By The Interim Adverse Judgment Rule**

California courts have held that certain interim rulings, e.g., denial of a summary judgment motion, establish the existence of probable cause to pursue the underlying claim. *See, e.g., Plumley v. Mockett*, 164 Cal. App. 4th 1031, 1052 (2008). This has been referred to as the interim adverse judgment rule.

Here, Judge Johnson denied AEW's request for injunction because there was a valid dispute between the parties as to whether Article 6 permitted NMS to take-out AEW's interest in the JV within five years. (Ex. 38.) Judge Johnson denied AEW's motion for terminating sanctions, finding that there were issues of fact regarding AEW's claims, and that each side had accused the other of forging certain documents. (Ex. 21.) These findings establish that Zelig/WLA had probable cause to pursue NMS's claims, including the claim that AEW breached Article 6.

NMS opposed AEW's sanctions motion and submitted evidence showing that **all** counsel, including Zelig/WLA, did not have any knowledge or involvement in any of the alleged wrongdoing (Nov. 7, 2016 Miller Decl., Ex. 42.) Judge Bruguera rejected AEW's claims against Zelig/WLA. (*Compare* Ex. 29 *with* Ex. 33.)

The same thing happened in the *P6* Action. (Ex. 20, pp. 5-6, 21.) Judge Johnson rejected AEW's claims against the Miller Firm and Zelig/WLA. (*See* Ex. 21.)

AEW did not move for reconsideration of, or appeal, the orders in the *Lincoln* Action or *P6* Action. (Miller Decl. ¶ 29.) Thus, in addition to AEW's claims being barred under the interim adverse judgment rule, AEW's claims against Zelig/WLA are barred as improper collateral attacks on two orders of the superior court. *Ricard v. Grobstein, etc.,* 6 Cal. App. 4th 157, 162 (1992).

**C.** **AEW Cannot Establish that Zelig Acted With "Malice" as the word is used in the context of a malicious prosecution cause of action**

"Malice at its core refers to an improper motive for bringing the prior action as an element of liability it reflects the core function of the tort which is to secure

1  compensation for harm inflicted for misusing the judicial system, i.e., using it for

2  something other than to enforce legitimate rights and to secure remedies to which the

3  claimant tenably may claim an entitlement." *Drummond v. Desmarais,* 176 Cal.App.

4  4th 439, 451-452 (2009).  "Negligence dos not equate to malice.  Nor does the

5  negligent filing of a case necessarily constitute the malicious prosecution of that

6  case." *Grindle v. Lorbeer,* 196 Cal.App.3d 1461, 146 (1987).

7       Attorneys **cannot** be held liable for malicious prosecution where the underlying

8  case was terminated for discovery abuse in which the attorney was **not** involved. *Id.* at

9  227.  *Daniels v. Robbins*, 182 Cal. App. 4th 204, 210-211, (2010). In *Daniels,* the

10 COA affirmed the trial court's grant of a SLAPP motion of a malicious prosecution

11 lawsuit filed against attorneys after trial court granted terminating sanctions based on

12 plaintiff's discovery misconduct.

13      AEW's malicious prosecution claim separately fails because AEW cannot show

14 that WLA acted with malice in either the filing or prosecution of the *Lincoln* Action.

15      AEW speculates that "the only explanation" is that Zelig/WLA must have been

16 "actively involved" in NMS's misconduct. (Compl. ¶¶ 98, 122.) In fact, Zelig has

17 affirmatively shown that he did not have any knowledge of, or participate in, the

18 alleged misconduct. (Zelig Decl., ¶34.)

19 **VII.  CONCLUSION**

20      For the foregoing reasons, Zelig/BLS respectfully requests that the Court grant

21 this Motion in its entirety, strike AEW's Complaint, and award Zelig/BLS their

22 reasonable attorneys' fees and costs pursuant to further motion.

23

24

25

26

27

28

DATED:  April 26, 2019

WLA LEGAL SERVICES, INC.

/s/
STEVEN ZELIG
Attorneys for Defendants Steven Zelig, WLA
Legal Services, Inc., and Brentwood Legal
Services, LLP, erroneously sued and served
as Brentwood Legal Services

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 425.16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT ON APRIL 26, 2019, A COPY OF THE

NOTICE OF SPECIAL MOTION TO STRIKE COMPLAINT BY DEFENDANTS

STEVEN ZELIG AND BRENTWOOD LEGAL SERVICES, LLP, PURSUANT TO

CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

was filed electronically and served by mail on anyone unable to accept electronic

filing. Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic filing

as indicated on the Notice of Electronic Filing. Parties may access this filing through

the Court's CM//ECF System.

DATED: April 26, 2019          WLA LEGAL SERVICES, INC.



/s/ _____
STEVEN ZELIG
Attorneys for Defendants Steven Zelig, WLA
Legal Services, Inc., and Brentwood Legal
Services, LLP, erroneously sued and served
as Brentwood Legal Services

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16