1  GIBSON, DUNN & CRUTCHER LLP
   James P. Fogelman, SBN 161584
2      jfogelman@gibsondunn.com
   Jay P. Srinivasan, SBN 181471
3      jsrinivasan@gibsondunn.com
   Shannon E. Mader, SBN 235271
4      smader@gibsondunn.com
   333 South Grand Ave.
5  Los Angeles, CA  90071-3197
   Telephone:  (213) 229-7000
6  Facsimile:  (213) 229-7520

7  Attorneys for Plaintiff
   P6 LA MF Holdings SPE, LLC
8

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11                 **WESTERN DIVISION**

12 | P6 LA MF Holdings SPE, LLC, a limited liability company, | CASE NO. 2:19-cv-1150-AB-(AFMx) |

13 Plaintiff,

14   v.

**PLAINTIFF'S OPPOSITION TO THE MILLER BARONDESS DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

15 NMS CAPITAL PARTNERS I, LLC;
16 BRENTWOOD LEGAL SERVICES;
   STEVEN ZELIG; GENGA &
17 ASSOCIATES, P.C.; WLA LEGAL
   SERVICES, INC.; JOHN GENGA;
18 MILLER BARONDESS LLP; LOUIS
   R. MILLER; JAMES GOLDMAN;
19 ALEXANDER FRID; JASON
   TOKORO; and DOES 1-10, inclusive,

20            Defendants.

21

*[Filed concurrently with Declarations of Jay P. Srinivasan, Eric Samek, Drew Flowers, Jonathan Watson, Gerald M. LaPorte, and Samuel S. Rubin; Evidentiary Objections; and Plaintiff's Request for Judicial Notice; [Proposed] Orders  lodged concurrently herewith]*

**Hearing:**
Date:     May 24, 2019
Time:     10:00 a.m.
Place:    Courtroom 7B
Judge:    Hon. André Birotte Jr.

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................... 7

II. FACTUAL AND PROCEDURAL BACKGROUND ................................ 9

    A.    September 2010—AEW and NMS Capital Form a Joint Venture. ........... 9

    B.    July 2013—NMS Creates a Forged Version of the JVA. ....................... 10

    C.    April 2015—NMS Files Suit Based on the Forgery. .............................. 11

    D.    April 2015—The Miller Defendants Are Involved From the Outset. ..... 13

    E.    June 2015—The Miller Defendants Are Alerted to The Forgery ........... 14

    F.    September/October 2015—The Miller Defendants Hear Testimony from NMS' Former Lawyer and President That The "Typo" Story Is Untrue. .............................................................................................. 14

    G.    Late 2015—The Miller Defendants Aid And Abet NMS' Scheme To Suppress, Alter and Destroy Evidence. ................................................ 15

    H.    January 2016—At the Direction of the Miller Defendants, NMS Files a Third Amended Complaint Continuing to Rely on the Forgery. ................................................................................................. 17

    I.    January/February 2016—In The Face of AEW's Expert Declarations Exposing NMS' Forgeries, the Miller Defendants Do Not Submit Expert Declarations Opining Otherwise ............................... 17

    J.    September/October 2016—The Miller Defendants' Strategy at The Evidentiary Hearing Makes Clear They Knew NMS Forged the Documents ............................................................................................ 18

    K.    November/December 2016—The Court's Order and Judgments ............ 19

    L.    June 2018—The Court of Appeal Affirms Judgment Against NMS. ..... 20

    M.    The Miller Defendants' Misconduct Was Not Limited to the Lawsuit. ............................................................................................... 20

III. LEGAL STANDARD .......................................................................... 21

IV. ARGUMENT ....................................................................................... 21

    A.    AEW Has Made a Prime Facie Showing ............................................. 21

        1.    The Miller Defendants Lacked Probable Cause ........................... 22

        2.    The Miller Defendants Acted with Malice ................................... 28

    B.    The Court Should Reject the Miller Defendants' Lame Excuses ........... 30

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1          C.    At a Minimum, Discovery Should Be Permitted ..................................... 31

2    V. CONCLUSION ..................................................................................................... 31

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Albertson v. Raboff,*

5
    46 Cal. 2d 375 (1956) ................................................................................. 28

6

*Arcaro v. Silva & Silva Enters. Corp.,*
    77 Cal. App. 4th 152 (1999) .......................................................... 23, 24, 25

7

8

*Bertero v. Nat'l Gen. Corp.,*
    13 Cal. 3d 43 (1974) ................................................................................. 22

9

*In re Branch,*

10
    70 Cal. 2d 200 (1969) ............................................................................... 30

11

*Cheveldave v. Tri Palms Unified Owners Ass'n,*

12
    27 Cal. App. 5th 1202 (2018) .................................................................... 21

13

*Crowley v. Katleman,*

14
    8 Cal. 4th 666 (1994) .......................................................................... 26, 27

15

*Daniels v. Robbins,*

16
    182 Cal. App. 4th 204 (2010) ........................................................ 22, 28, 29

17

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP,*
    184 Cal. App. 4th 313 (2010) .................................................................... 22

18

19

*HMS Capital, Inc. v. Lawyers Title Co.,*
    118 Cal. App. 4th 204 (2004) .................................................................... 21

20

21

*Jay v. Mahaffey,*
    218 Cal. App. 4th 1522 (2013) .................................................................. 22

22

*L.G. v. M.B.,*

23
    25 Cal. App. 5th 211 (2018) ...................................................................... 27

24

*Masterson v. Pig'n Whistle Corp.,*

25
    161 Cal. App. 2d 323 (1958) ...................................................................... 26

26

*Medley Capital Corp. v. Sec. Nat'l Guar., Inc.,*

27
    17 Cal. App. 5th 33 (2017) ........................................................................ 28

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

*Mendez v. Superior Ct.*,
   162 Cal. App. 4th 827 (2008) ..................................................................... 30

*Nix v. Whiteside*,
   475 U.S. 157 (1986) ................................................................................. 30

*Nunez v. Pennisi*,
   241 Cal. App. 4th 861 (2015) ..................................................................... 22

*Oasis W. Realty, LLC v. Goldman*,
   51 Cal. 4th 811 (2011) ............................................................................. 21

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
   2017 WL 7411154 (C.D. Cal. June 8, 2017) ................................................... 7

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
   738 F. App'x 563 (9th Cir. 2018) ................................................................. 7

*Parrish v. Latham & Watkins*,
   3 Cal. 5th 767 (2017) ......................................................................... 26, 28

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018) ........... 21, 31

*Ross v. Kish*,
   145 Cal. App. 4th 188 (2006) ..................................................................... 22

*Sangster v. Paetkau*,
   68 Cal. App. 4th 151 (1998) ....................................................................... 22

*Sheldon Appel Co. v. Albert & Oliker*,
   47 Cal. 3d 863 (1989) .............................................................................. 22

*Soukup v. Law Offices of Herbert Hafif*,
   39 Cal. 4th 260 (2006) .............................................................................. 25

*Sparling v. Bank of Am., Nat'l Ass'n*,
   2018 WL 5099728 (C.D. Cal. Mar. 29, 2018) ................................................ 30

*SuperGuide Corp. v. Gemstar Dev. Corp.*,
   2010 WL 11463159 (C.D. Cal. June 3, 2010) ................................................ 26

*Sycamore Ridge Apartments, LLC v. Naumann*,
   157 Cal. App. 4th 1385 (2007) ............................................................ 28, 29, 30

Gibson, Dunn &
Crutcher LLP

5

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

*Thao v. Donovan*,
  2012 WL 4052032 (E.D. Cal. Sept. 14, 2012) ........................................................28

*Tichinin v. City of Morgan Hill*,
  177 Cal. App. 4th 1049 (2009) ...............................................................................30

*Wilson v. Parker, Covert & Chidester*,
  28 Cal. 4th 811 (2002) ...........................................................................................27

*Wright v. Ripley*,
  65 Cal. App. 4th 1189 (1998) ...........................................................................26, 27

*Zamos v. Stroud*,
  32 Cal. 4th 958 (2004) .......................................................................................23, 25

**Statutes**

Cal. Civ. P. Code § 128.5 .............................................................................................30

Cal. Civ. P. Code § 128.7 .............................................................................................30

Cal. Civ. P. Code § 425.16(b)(2) ..................................................................................21

Cal. Evid. Code § 1152(a) ............................................................................................13

**Rules**

Cal. R. Prof'l Conduct, Rule 3-200(A) .......................................................................30

Fed. R. Civ. P. 11 ..........................................................................................................30

Fed. R. Evid. 408 ..........................................................................................................13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

# I.    INTRODUCTION

The Miller Defendants'[1] anti-SLAPP motion should be denied in its entirety, just as a similar motion filed by the Miller Defendants on behalf of NMS Capital Partners I, LLC ("NMS") was denied in *P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 WL 7411154 (C.D. Cal. June 8, 2017), a decision recently upheld by the Ninth Circuit, see *P6 LA MF Holdings SPE, LLC v. Shekhter*, 738 F. App'x 563, 564 (9th Cir. 2018).  The Miller Defendants do not dispute that *Lincoln Studios*[2] was based on forgeries and perjury and lacked probable cause, but claim, based only on conclusory, self-serving declarations, that they were not involved in all of the wrongdoing that led to the Terminating Sanctions Order and Final Judgment against their client, NMS.  The Miller Defendants also assert as a "defense" that "every person" deserves a lawyer and none should be "abandoned."  What claptrap.  A criminal defendant may be entitled to legal counsel, but that does not apply to representing NMS in pursuing a civil case against P6 LA MF Holdings SPE LLC's ("AEW") seeking $12 billion in alleged damages based on known forgeries, fraud and perjury, and destroying and suppressing evidence ordered by the trial court to be preserved and produced.  Yet that is exactly what happened here.  The Miller Defendants also claim that because they were not assessed a monetary sanction in *Lincoln Studios*, and because the forgeries and perjury submitted by an NMS *affiliate* in a *different* case, in which the affiliate was a *defendant*, defrauded that other court into denying a motion for preliminary injunction that AEW had filed in that case (injunctive relief that was later *granted* in *Lincoln Studios* after NMS' fraud in *both* cases was exposed), AEW is somehow precluded from establishing that the Miller Defendants lacked probable cause in pursuing *Lincoln Studios*.  Not only are these arguments contrary to well-settled law, but they defy common sense.

---

[1]  As used herein, the "Miller Defendants" refers to Defendants Miller Barondess LLP, Louis R. Miller, James Goldman, Alexander Frid, and Jason Tokoro.

[2]  As used herein, *Lincoln Studios* refers to *Lincoln Studios, LLC, et al. v. DLA, et al.*

7

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

AEW's 59-page Complaint details overwhelming evidence that the Miller Defendants not only knew of their client's fraud, but were active participants in the misconduct, acting with malice.  The Miller Defendants fail to offer any explanation for their assertion, for years, that NMS' obviously forged copy of the parties' September 2010 Joint Venture Agreement ("JVA") was an "original," genuine document from September 2010, created because of an alleged "typo."  Literally ***every witness***, other than NMS' principal, Neil Shekhter (a confirmed perjurer), including NMS' own former president and deal counsel, and ***every contemporaneous document***, confirmed there was never any such typo and that NMS' "Version 2" of the JVA was a forgery.  The Miller Defendants did not even ask an expert to opine that "Version 2" was an original document from September 2010 and, worse, hid from the experts they ultimately retained the fact that NMS was asserting that "Version 2" was an original document from that time period—an assertion *NMS' own experts rejected* at the 8-day evidentiary hearing held on AEW's Terminating Sanctions Motion.  Yet not only did the Miller Defendants continue to pursue *Lincoln Studios* for years, even after the forgeries, perjury, and evidence destruction was exposed, but they also made numerous patently false statements to AEW's counsel and to the trial court, and actively suppressed evidence of the forgeries and perjury that had been ordered produced, all in an effort to keep NMS' frivolous litigation alive.  The Miller Defendants also filed numerous copycat lawsuits against AEW based on the same known forgeries and fraudulent allegations, all of which were dismissed, and even repeated the same knowing lies in letters they wrote and sent to every major title insurance company in the United States threatening to sue them for $500 million if they insured title in connection with a sale of the nine properties (the "Properties") owned and controlled by the Joint Venture ("JV").  Those very letters were the subject of the Ninth Circuit's decision, affirming the denial of NMS' anti-SLAPP motion.

In short, the Miller Defendants' outrageous conduct is exactly what the malicious prosecution laws are designed to remedy, and AEW is entitled to its day in

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1   court to seek redress for the millions of dollars in damages they caused.  AEW has

2   submitted substantial evidence that every one of the 31 causes of action they pursued

3   on behalf of NMS in *Lincoln Studios* lacked probable cause.  If even one cause of

4   action lacked probable cause then the Miller Defendants' motion must be denied, and

5   here the evidence establishes that they all lacked probable cause.  Even if the Miller

6   Defendants' declarations were credited, at best they would only establish a factual

7   dispute as to some of the claims they pursued on NMS' behalf in *Lincoln Studios*, a

8   factual dispute that would have to be decided in favor of AEW at this stage of the case.

9   Thus, the Miller Defendants' motion should be denied, or, at the very least, AEW

10   should be permitted discovery to respond further to their motion, including discovery

11   into the communications with NMS that the court in *Lincoln Studios* already held are

12   governed by the *crime-fraud* exception.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[3]

14          The Miller Defendants offer no meaningful response to the Complaint's detailed

15   factual allegations.  They recite their resumes, they claim they do pro bono work, and

16   they proclaim they would never do anything unethical.  But they do not deny that NMS

17   forged documents, committed perjury, and destroyed evidence.  And they provide no

18   explanation for why they continued to prosecute NMS' claims despite being on notice

19   that those claims were based on a forgery and obvious lies.  As the facts make clear, a

20   reasonable jury could conclude that the Miller Defendants pursued NMS' claims

21   knowing or recklessly disregarding that they lacked merit.

## A.    September 2010—AEW and NMS Capital Form a Joint Venture.

23          On September 8, 2010, AEW and NMS executed the JVA and formed the JV,

24   which went on to acquire and develop a portfolio of nine properties.  Declaration of

25   Jonathan Watson ("Watson Decl."), ¶¶ 3–4.  As the trial court would later hold, and

26   the Court of Appeal would later affirm, the JVA contained a single mechanism by

---

[3]  A more complete summary of the material facts is set forth in the Complaint.

9

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

which either member could "buy out" the other member's JV interest—the heavily negotiated Buy/Sell provision in Article 11 of the JVA.  Watson Decl., Ex. 1 § 11.1; Compl. Ex. 1 at 10, Ex. 4 at 337, 350–51.  The Buy/Sell mechanism did not confer a unilateral acquisition right, but instead defined a process by which one member could invoke the Buy/Sell process and the other member could elect to sell its interest in the JV to the other member or buy the other member's interest.  *Id.*, ¶ 6; Compl., Ex. 4 at 337, 350–51.  The Buy/Sell provision could not be exercised until "after five (5) years" from the September 8, 2010 execution date of the JVA.  Watson Decl., Ex. 1 § 11.1; Compl., Ex. 1 at 68–72, Ex. 3 at 328.  NMS' deal counsel had specifically demanded the 5-year Buy/Sell term, and it remained unchanged through subsequent drafts, the executed JVA, and the amended JVA.  *Id.*, ¶ 7; Declaration of Jay P. Srinivasan ("Srinivasan Decl."), Ex. 3 at 2, 72; Compl., Ex. 1 at 68–69.

In January 2011, the parties amended the JVA to accommodate NMS' inability to meet the 30% capital contribution.  Watson Decl., ¶ 9.  AEW and NMS agreed to incorporate the concept of "Specified Properties," which permitted NMS to make capital contributions for certain Properties at a lower rate (usually 10%) and credited it at that lower contribution level.  *Id.*; *id.*, Ex. 1, § 1 at p. 22, § 6.1(b).  From January 2011 onwards, NMS generally provided only 10% of the capital, while AEW contributed 90% (up from the original 70%).  *Id.*, ¶ 9.  Accordingly, NMS' share of the JV's assets and proceeds went from 30% to a smaller percentage.  *Id.*  The 5-year Buy/Sell provision remained unchanged in the amended JVA, which was submitted to the JV's lenders and ratified by NMS as authentic and valid on numerous occasions. *Id.*, ¶ 11; Compl., Ex. 1 at 68–69.  Further, when NMS made capital calls for the Joint Venture, it did so on a roughly 90/10 basis for years after the JVA was amended to add the Specified Properties language.  Watson Decl., ¶ 11.

**B.    July 2013—NMS Creates a Forged Version of the JVA.**

In 2013, with real estate values rebounding, NMS became dissatisfied with the deal it negotiated.  So in July 2013, NMS forged a version of the JVA with a 3-year

Gibson, Dunn & Crutcher LLP

10

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Buy/Sell provision, not the 5-year Buy/Sell provision that the parties agreed to.
Compl., Ex. 1 at 72–81, Ex. 5; Declaration of Samuel S. Rubin ("Rubin Decl."), ¶¶
17–32.  NMS also eliminated the "Specified Properties" language in its forged JVA,
which Defendants dubbed "Version 2" in the underlying lawsuit.  Watson Decl., ¶ 9,
Compl. Ex. 1 at 70–71.  NMS' motivation was obvious—by eliminating the Specified
Properties language, NMS wished to recoup a higher share of JV profits than its fair
share and wished to trigger the Buy/Sell provision earlier than permitted.  *Id*.

NMS would later allege (and NMS' Neil Shekhter would later repeatedly testify
that after receiving the original, executed JVA in September 2010, which Defendants
later dubbed "Version 1," Shekhter "noticed that Version 1 appeared to contain a
mistake, i.e., that the Buy/Sell provisions stated that the Buy/Sell procedure could
occur after 5 years, instead of after 3 years;" that Shekhter then "contacted" AEW's
Eric Samek and that Samek "told" Shekhter he would "revise Version 1 so that it
stated 'Buy/Sell' could occur after 3 years, instead of after 5 years"; that AEW
subsequently "delivered a corrected operating agreement ('Version 2')"—***i.e., the
forgery***—by hand to Shekhter in September 2010; and that AEW "fabricated another
version of the operating agreement (Version 3)"—*i.e.*, the JVA as amended to include
the Specified Properties—"by lifting [Shekhter's] signature from other documents and
physically placing it into Version 3."  Declaration of Jay P. Srinivasan ("Srinivasan
Decl."), Ex. Ex. 9, ¶¶ 37–40, Ex. 18, ¶¶ 101–02, Ex. 25, ¶¶ 14–18; Compl., Ex. 1 at
74–75, Ex. 5 at 363–64.  Every aspect of this "typo" story is a lie as definitively
established by the forensic examination, which showed that the hard copy of "Version
2," which Shekhter claimed to have received from Samek in September 2010 (and
which he supposedly maintained in a safe since), was printed on a printer at NMS'
offices in July 2013.  Compl., Ex. 1 at 88–93; Rubin Decl., ¶¶ 29–32.

**C.    April 2015—NMS Files Suit Based on the Forgery.**

In 2014, after suing its own deal counsel, NMS filed the underlying lawsuit at
issue—the *Lincoln Studios* lawsuit—against AEW's deal counsel for purportedly

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

failing to include a 3-year Buy/Sell provision.  Srinivasan Decl., Ex. 7.  In April 2015, NMS filed its First Amended Complaint ("FAC"), naming AEW and its employees and affiliates as defendants and alleging for the first time that its forgery was the operative JVA even though NMS' prior complaints never mentioned it.  *Id.*, Ex. 9.  The 217-page, 660-paragraph FAC asserted a staggering 30 causes of action against AEW, its employees, and affiliates.  *Id.*  The FAC repeated Neil Shekhter's false "typo" story, alleging that the 5-year Buy/Sell provision in the executed version copy of the JVA was a "typo" that AEW agreed to "fix," that AEW delivered the forgery to NMS in September 2010, and that "Version 3" with the Specified Properties language (the actual version of the JVA) was a forgery created by AEW.  *Id.*, ¶¶ 37–40, 48–49.

There is no longer any disputing that NMS "brought [the] case upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries."  Compl., Ex. 1 at 138.  The California Superior Court definitively found that NMS forged the JVA and two other related documents:  (1) a cover letter that NMS falsely contended accompanied the forged JVA; and (2) a property management agreement ("PMA") that NMS forged to stave off an adverse ruling by the California Superior Court in a related action.[4]  Compl., Ex. 1 at 72–93.  In the default judgment that the Superior Court entered against NMS, the court expressly held that "Version 2" of the JVA "is a fabrication and forgery created by NMS and its affiliates," and that NMS "committed a broad variety of fraudulent conduct [and] misrepresentations," including forging "Version 2" and other documents and making "misrepresentations and false statements in

---

[4] Of note, Shekhter, who created both of these forgeries, sent a botched version of the forged La Cienega PMA to the NMS' counsel, that contained an error that would disprove its provenance.  Compl., Ex. 1 at 83–84, Rubin Decl., ¶ 52.  Shekhter soon realized his mistake and sent a "fixed" version of the forgery to the NMS' counsel, who submitted the forgery to the Court in the related action and later in the underlying litigation.  *Id.*  Because they received the botched forgery, the NMS' counsel obviously had reason to suspect a forgery.  But they never did anything about it and failed to produce either document as part of NMS' document production.  Declaration of Jay P. Srinivasan, ¶ 5.

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1    connection with these forgeries."   Compl., Ex. 3 at 328–29.  This default judgment

2    was affirmed, in full, by the Court of Appeal.  *Id.*, Ex. 5.

3            The Miller Defendants do not deny that this misconduct occurred.  Instead, they

4    broadly and conclusorily assert that they had no "knowledge of or involvement in"

5    NMS's misconduct.  Mot. at 15.  But they nowhere explain how they could have taken

6    on the representation of NMS and prosecuted NMS' baseless claims for years without

7    taking any steps to investigate NMS' forgeries or its obvious lies.  Such an explanation

8    is critical where, as here, the evidence shows that no reasonable lawyer could have

9    pursued NMS' claims without realizing that they were based on an obvious forgery

10   and an unconvincing pack of lies to prop up that forgery.  To underscore how even a

11   cursory investigation into the forgery by the Miller Defendants would have revealed its

12   character, AEW's forensic document expert—formerly with the United States Secret

13   Service and currently employed by the Department of Justice—opined that, in his 20-

14   plus year career, "this is one of the top five cases that I have worked on where the

15   forgery seemed so blatant." La Porte Decl., ¶ 131.  Further, as set forth below, the

16   Miller Defendants' conduct in the litigation makes clear that they knew the case was

17   based on a forgery and nevertheless continued to pursue it.

18   **D.     April 2015—The Miller Defendants Are Involved From the Outset.**

19           The Miller Defendants act as if they were not involved in the underlying action

20   until November 2015 (Mot. at 10), but that is not true.  Defendant Goldman of the

21   Miller firm was one of the principal lawyers representing NMS over the Joint Venture

22   dispute even before NMS filed its FAC.[5]  Declaration of Eric Samek, ¶ 7.  Although

23   _____

24   [5]  In its Motion, NMS improperly discusses a March 2015 settlement meeting (Mot. at
     24), the substance of which is inadmissible under both state and federal law.  See
25   Fed. R. Evid. 408; Cal. Evid. Code § 1152(a).  Defendant Goldman was one of the
     lead lawyers representing NMS at this meeting.  Not only was it improper for NMS
26   to raise anything discussed at this meeting, NMS grossly misrepresents the
     substance and circumstances surrounding this meeting.  Nothing AEW did or said
27   at this meeting in any way supports the Miller Defendants' arguments.  In addition,
     NMS' Shekhter launched into a profanity-laced tirade, threatening to bankrupt
28   Samek and AEW if AEW did not give NMS what it wanted, and further threatening

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1  the Miller firm was not listed on the FAC, the firm formally associated into the case

2  the following month, in May 2015.  Srinivasan Decl., Ex. 10.

3  **E.    June 2015—The Miller Defendants Are Alerted to The Forgery.**

4        On June 16, 2015, just a few months after the lawsuit was filed, counsel for

5  AEW and NMS met for a court-ordered and court-reported discovery conference.

6  Srinivasan Decl., Ex. 14.  Defendant Goldman was present.  *Id.*  He, along with NMS'

7  other counsel, were expressly informed that NMS' lawsuit was based on a forged JVA,

8  that emails from NMS' own deal counsel proved that NMS' "typo" story was false,

9  and that "Version 2" of the JVA was a forgery.  *Id.* at 139:23–152:25.  Among other

10 things, Defendant Goldman and his co-counsel received copies of a July 2010 email

11 from NMS' deal counsel, demanding that the JVA include a 5-year Buy/Sell.  *Id.* at

12 139:23–150:25.  There is no evidence that the Miller Defendants ever investigated

13 these facts.  They never produced a *single* document that corroborated their claim that

14 the forgery was genuine or that NMS' "typo" story was true.

15 **F.    September/October 2015—The Miller Defendants Hear Testimony from**

16 **      NMS' Former Lawyer and President That The "Typo" Story Is Untrue.**

17       In Fall 2015, AEW's outside deal counsel, NMS' outside deal counsel, and

18 NMS' former president, among several others, were deposed.  Srinivasan Decl., Exs.

19 75–80.  All witnesses confirmed there was no "typo" in Article 11 of the JVA, that

20 NMS requested the 5-year Buy/Sell, and that the 5-year Buy/Sell was included in

21 every draft, every executed version of the JVA, and all amendments to the JVA.  *Id.*,

22 Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78 at 76:17–

23 78:21, 92:16 – 93:4, 129:18–130:8.  Further, they confirmed there was no confusion

24 over this issue and no evidence supporting NMS' false claim that the parties intended

25 to contract for a 3-year Buy/Sell provision.  *Id.*  At this point, the Miller Defendants

26

27       to "***take [Samek's] house***" and "***make sure [Samek] never got another job***."
         Samek Decl., ¶¶ 7–8.  Defendant Goldman witnessed the threats but said nothing.

28       *Id.*  Defendant Zelig, who was also present, attempted to surreptitiously record the
         meeting with his phone without AEW's consent or knowledge.  *Id.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

knew that nobody, including former executives at NMS, supported the validity of the
forgery upon which they were suing AEW.  To the contrary, they were confronted with
a record where every single witness testified under oath that NMS requested the 5-year
Buy/Sell provision and that there was no typo in Article 11 of the JVA.  And yet the
Miller Defendants pressed on with the lawsuit.

**G.    Late 2015—The Miller Defendants Aid And Abet NMS' Scheme To
Suppress, Alter and Destroy Evidence.**

In Fall 2015, just as NMS' former lawyers and executives were refuting NMS'
allegations, AEW brought the forgeries to the attention of the *Lincoln Studios* court,
and sought forensic preservation orders.  Srinivasan Decl., Ex. 16.  In Fall 2015, the
court ordered NMS, among other things, to freeze all of its computers and electronic
devices, to produce a list of every device on which the forged JVA and the two other
forgeries had ever appeared, and eventually to turn over all hardcopies of the forgeries
and its devices to AEW's experts for forensic examination.  *Id.*, Exs. 17, 29.

Rather than comply with the court's orders, the Miller Defendants and their co-
counsel tried to keep this material from AEW's experts and otherwise obstructed the
process.  For example, before turning over hardcopies of the forgeries, NMS' counsel
threatened to cut (literally) the original, hardcopies of the forgeries in half and that,
"[i]f you take the letter, and it ends up being dated at any other time in 2010, *it will be
our position that you have altered or substituted the document*."  *Id.*, Ex. 65 at 2
(emphasis added).  The Miller Defendants were copied on this email.  No reasonable
lawyer would send or receive that email, believing the document was genuine, and the
Miller Defendants have never explained the basis for their repeated assertions to the
Court that NMS' obvious forgery was an original document from September 2010.

When NMS eventually produced the hardcopy originals of the forged documents
and many (but not all) of the NMS devices that touched the forgeries, AEW's experts
were able to show (and the trial court and appellate court) would agree that NMS
engaged in a massive, coordinated campaign to manipulate, destroy, and suppress

15

1    evidence—something that would have been mitigated had NMS' devices and

2    documents been properly preserved and produced. Compl., Ex. 1 at 93–108. AEW

3    was able to prove that, as part of this scheme, NMS was erasing and manipulating

4    documents and devices just minutes before AEW's forensic team arrived. *Id*. But

5    more astonishing still is that Defendant Frid of the Miller firm and Defendant Zelig,

6    along with Defendant Shekhter, were on the NMS premises the same evening as when,

7    as NMS' own forensic expert conceded, the spoliation was taking place. Srinivasan

8    Decl., ¶ 4; & Ex. 89, ¶¶ 38–39.

9         The Miller Defendants' misconduct did not end there. When it became clear to

10   AEW that key NMS devices, including those that directly facilitated or created the

11   forgeries, were not turned over for forensic examination, AEW's counsel reached out

12   to the Miller Defendants, identifying the relevant devices and asking that they be

13   produced. Srinivasan Decl., Exs. 36, 37. In response, the Defendant Tokoro and his

14   colleagues repeatedly claimed (falsely) that the devices did not exist and only

15   produced them when AEW threatened to go to the court over the issue. *Id.*; *id.*, Exs.

16   30–32, 35. So not only did the Miller Defendants prosecute a case based on a forgery

17   for which there was no supporting evidence, they joined their client in actively

18   attempting to suppress evidence of the forgery. *Id.*; see also *id.*, Ex. 65.

19        Notwithstanding NMS' intentional spoliation, AEW's experts were able to

20   prove NMS' misconduct. Their findings were set forth in their declarations below and

21   are reflected in the trial court's order. Srinivasan Decl., Exs. 40, 41; Rubin Decl.;

22   LaPorte Decl.; Compl, Ex. 1 at 72–93. The Complaint contains detailed allegations

23   regarding NMS' misconduct based on their findings, and both experts have submitted

24   declarations in support of AEW's opposition. Notably, NMS did not challenge any of

25   the trial court's factual findings and they were all affirmed by the Court of Appeal. *Id*

26   Nor do the Miller Defendants challenge those findings now—indeed, Defendant Miller

27   recently apologized to the *Lincoln Studios* court for NMS' egregious misconduct.

28   Srinivasan Decl., Ex. 82 at 6:9–12.

Gibson, Dunn &
Crutcher LLP

16
PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

**H.    January 2016—NMS' New Complaint Continues to Rely on the Forgery.**

In January 2016, the Miller Defendants filed a Third Amended Complaint ("TAC"). Srinivasan Decl., Ex. 38. The TAC continued to falsely allege that "Version 2" was genuine, that "Version 1" contained a "mistake" that AEW supposedly "fixed," and that "Version 3" was a forgery created by AEW. *Id.*, ¶ 22b. In a deliberate decision to avoid relying on the altered Buy/Sell provision in Article 11 of the forged "Version 2," the Miller Defendants "***completely change[d] [NMS'] theory***" in the TAC.[6] Dkt. 41 at 3; Srinivasan Decl., Ex. 38. But Defendants' new theory, like their old one, depended on the false allegation that "Version 3" was a forgery and that NMS never agreed to the Specified Properties language—even though not a single witness (other than Shekhter) supported those allegations.[7] Srinivasan Decl., Ex. 43, ¶ 22b. It was obvious at the time, and even more so now, that the Article 6 theory was nothing more than a contrivance to shift the focus of the case away from the forgery without expressly disavowing the forgery. The trial court would find that the Miller Defendants' attempt to shift the case to one based on Article 6 was baseless as a matter of law before dismissing the Article 6 claims on the pleadings, which dismissal the Court of Appeal would later affirm. Srinivasan Decl., Ex. 47; Compl. Ex. 4 at 352.

**I.    January/February 2016—In The Face of AEW's Expert Declarations Exposing NMS' Forgeries, the Miller Defendants Do Not Submit Expert Declarations Opining Otherwise.**

The Miller Defendants do not dispute that AEW's experts opined that NMS created multiple forgeries or that their opinions were supported with detailed evidence.

---

[6] Prior to filing the TAC, NMS abandoned 23 of its claims rather than oppose a demurrer, which claims were dismissed with prejudice. Srinivasan Decl., Ex. 92.

[7] There can no doubt that the Miller Defendants did not believe "Version 3" was a forgery. They were in possession of an August 2013 email from NMS' deal counsel to NMS' former General Counsel in which the deal counsel confirmed unequivocally that "Version 3" was the genuine and operative version of the JVA, writing that "Version 3" "has been treated as the [operative agreement] and presented as so on all transactions . . . NMS has consistently certified that ["Version 3"] is the [operative agreement]." Srinivasan Decl., Ex. 6 at 2, 75.

Gibson, Dunn & Crutcher LLP

17

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Nor do the Miller Defendants contend that they reevaluated or changed their position in any way when confronted with this evidence, which included forensic evidence that indisputably showed that the forged JVA that NMS claimed was created in September 2010 was actually created in July 2013 on an NMS printer.  Instead, in response, the Miller Defendants submitted a declaration from NMS' Shekhter—that the trial court would later find to be perjurious—and declarations from four experts.  Compl., Ex. 1 at 108–119. Critically, none of the experts opined that the documents were genuine. *Id.* at 80:5–12.  In fact, one of the experts, a physical document expert, later admitted on cross-examination that NMS' lawyers had not told him that NMS was holding out the June 2013 forgery as an original from September 2010.  Srinivasan Decl., Ex. 71 at 13:12-23.  The Miller Defendants' calculated decision to leave this expert in the dark indicates that they knew that their own expert would not agree that the forgery was genuine.  Yet, the Miller Defendants continued to represent to the trial court that the forgeries were authentic, and continued to repeat the false "typo" story.

**J.      September/October 2016—The Miller Defendants' Strategy at The Evidentiary Hearing Makes Clear They Knew NMS Forged the Documents.**

On July 29, 2016, the trial court issued an order finding that NMS had engaged in "purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED" but set an evidentiary hearing "to determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed" and to assess witness "credibility."  Srinivasan Decl., Ex. 58.  In October 2016, an evidentiary hearing on AEW's terminating sanctions motion took place over eight days and multiple fact witnesses and six expert witness (two for AEW and four for NMS) testified.  Srinivasan Decl., Ex. 71.  The trial court repeatedly stated to the parties that the entire purpose of the hearing was to hear from the key declarants in order to assess their credibility.  *Id.* at 8:3, 3:21–22, 6:9–12.  Yet, the Miller Defendants did not offer a single lay witness to testify about the forgeries—not even Shekhter, who was the only individual who submitted a declaration advancing the

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

"mistake" story and who was the only person who ever claimed to have found or received the forgeries. Compl., Ex. 1 at 119–20. NMS's entire lawsuit was built on Shekhter's deposition testimony and declarations that the three forgeries were genuine. Yet, for reasons they have never explained, the Miller Defendants did not call him to testify. *Id.* Critically, absent the testimony of Shekhter, the Miller Defendants could not have reasonably expected a judgment in favor of NMS.

Nor did the Miller Defendants put on any other evidence to prove the authenticity of "Version 2," the Cover Letter, or the La Cienega PMA. Not a single fact witness supported NMS' bogus "typo" story. Not one of NMS' experts opined that "Version 2" was authentic. *Id.* One of NMS' experts even agreed that "Version 2" was created on July 15, 2013, *id.* at 119; *id.*, Srinivasan Decl., Ex. 71 at 15:22–26, and another testified that NMS' actions were "stupid," "horrendous," "bad," and "dumb," Compl. Ex. 1 at 115, Srinivasan Ex. 71 at 8:24–25, 15:23. Shekhter admitted in a declaration filed prior to the hearing that he had intentionally replaced his computer hard drive and deleted files, Srinivasan Decl., Ex. 87 at ¶¶ 147-151, and other NMS employees admitted that they destroyed evidence. Compl., Ex. 1 at 105.

## K.    November/December 2016—The Court's Order and Judgments.

On November 22, 2016, the court issued an order granting terminating sanctions based on NMS' "shocking, intentional, and pervasive" misconduct. Compl., Ex. 1 at 124. The court found that "Version 2," the Cover Letter, and the La Cienega PMA were forgeries created by NMS, that NMS knowingly "provided false testimony under oath," and that NMS had engaged in "coordinated, intentional widespread destruction of evidence." *Id.*, at 108, 127. The court concluded that Appellants "brought this case upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries." *Id.* at 138. Based on these findings, the court awarded terminating sanctions. Compl., Ex. 1. While the trial court declined to impose monetary sanctions on the NMS' counsel, it did not set forth its reasoning. The order was simply silent on that issue.

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1   On December 1, 2016, the trial court entered judgment against NMS on all of its

2   claims.  Compl., Ex. 2.  On December 2, 2016, the court entered a default judgment

3   against NMS and in favor of AEW on its cross-complaint.  Compl., Ex. 3.  The default

4   judgment found that "Version 2" was a forgery created by NMS.  *Id.* at 328.

5   **L.    June 2018—The Court of Appeal Affirms Judgment Against NMS.**

6   On June 20, 2018, the Court of Appeal affirmed the terminating sanctions order

7   and the judgments as against NMS.  Compl., Ex. 5.  Notably, NMS did not challenge

8   the trial court's factual findings.  *Id.* at 381.  Instead, NMS argued that the forgeries

9   were "***irrelevant***" and that "***[s]ince the forgery is irrelevant, perjury about the forgery***

10  ***must be irrelevant too***."  Srinivasan Decl., Ex. 85 (emphasis added).

11  **M.    The Miller Defendants' Misconduct Was Not Limited to the Lawsuit.**

12  To make matters worse, while the litigation left no doubt that the Miller

13  Defendants were knowingly pursuing claims based on forgeries, the Miller Defendants

14  also sent letters to Eastdil Secured, LLC (a real estate broker), potential buyers of the

15  Properties, the JV's lender, and every major title insurer in the country threatening to

16  sue them for "***hundreds of millions in . . . damages***" if they participated in any sale of

17  the Properties (the JV had started efforts to sell the Properties).  Srinivasan Decl., Exs.

18  44, 46, 48–52, 54.  The letters falsely represented that NMS had acquired AEW's JV

19  interest in 2013 even though the only "version" of the JVA that contained a 3-year

20  Buy/Sell was the forged "Version 2," and represented that "AEW's interest in the Joint

21  Venture [is] *zero*" even though the trial court had sustained AEW's demurrer.  *Id.*

22  These letters succeeded in chilling all of the title insurers from participating in the sale,

23  causing millions of dollars in damages to the Joint Venture.  Declaration of Drew

24  Flowers ("Flowers Decl."), ¶ 3 & Exs. A, B.  Watson Decl., ¶¶ 17-18.

25  To this day, the Miller Defendants have not disavowed the forgeries, repudiated

26  or withdrawn the perjurious declaration, or come clean about NMS' massive spoliation

27  of evidence.  To the contrary, they pursued NMS' frivolous claims on appeal and have

28  filed and subsequently dismissed a series of copycat lawsuits involving the same false

Gibson, Dunn &
Crutcher LLP

20

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

and misleading allegations regarding the authenticity of the JVA.  Srinivasan Decl.,
Exs. 43, 45, 56, 59, 61.  Indeed, between January 2016 and August 2016, the Miller
Defendants filed no less than five separate lawsuits on behalf of NMS and Shekhter
that targeted AEW, its affiliates, and its attorneys—all of which were subsequently
dismissed.  *Id.*; *id.*, Exs. 67–70.  There can be no question that the lawsuits were filed
for the improper purpose of increasing the pressure on AEW and forcing a settlement.
In an August 8, 2016 letter, Shekhter expressly warned an affiliate of AEW that "*[o]ne
way or another*, I intend to pay-back and/or buy-out AEW and get AEW and its AEW
Fund VI investors out of this portfolio," and that *"[y]our [AEW's] best case scenario
is years of litigation* before there is any finality or resolution."  *Id.*, Ex. 60 (emphases
added).  The Miller Defendants were copied on the letter and for his part, Defendant
Miller echoed his client's threats, stating that it was his plan to "***never stop suing
AEW***" until they cave.  Declaration of Eric Samek ("Samek Decl."), ¶ 11.

## III.   LEGAL STANDARD

In deciding anti-SLAPP motions, court consider the pleadings as well as
affidavits.  Cal. Civ. P. Code § 425.16(b)(2).  Courts must "accept as true the evidence
favorable to the plaintiff and evaluate the defendant's evidence only to determine if it
has defeated that submitted by the plaintiff as a matter of law."  *HMS Capital, Inc. v.
Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004).  "If the plaintiff can show a
probability of prevailing on *any part of its claim,* the cause of action is not meritless
and will not be stricken."  *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820
(2011) (internal quotations omitted, emphasis in original).  Where, as here, the motion
turns on the facts, "discovery must be allowed . . . before any decision is made. . . ."
*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834-
35 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018).

## IV.   ARGUMENT

### A.   AEW Has Made a Prime Facie Showing

To defeat this motion, AEW need only show the minimal merit of its claim by

making a prima facie showing.  *See Cheveldave v. Tri Palms Unified Owners Ass'n*, 27 Cal. App. 5th 1202, 1214 (2018).  The elements of malicious prosecution are lack of probable cause, malice, and favorable termination on the merits.  *See Bertero v. Nat'l Gen. Corp.*, 13 Cal. 3d 43, 50 (1974).[8]  As set forth below, the evidence is more than sufficient to establish a prima facie case for each of these elements.

### 1.    The Miller Defendants Lacked Probable Cause

Probable cause is a question of law.  *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 875 (1989).  The standard is objective.  *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2010).  The question "is whether, on the basis of the facts known to the defendant, the prosecution of the prior action was legally tenable."  *Sangster v. Paetkau*, 68 Cal. App. 4th 151, 164 (1998).

Probable cause to bring a cause of action exists when it is based on facts reasonably believed to be true and all asserted theories are legally tenable.  *See Jay v. Mahaffey*, 218 Cal. App. 4th 1522, 1540 (2013).  Probable cause for a cause of action is lacking when any of the following is present:  (1) an action is based on facts the defendant has no reasonable basis to believe are true, (2) the defendant seeks recovery under a legal theory that is untenable, or (3) the defendant lacks evidence sufficient to uphold a favorable judgment or information affording a reasonable inference that such evidence exists.  *See, e.g.*, *Nunez v. Pennisi*, 241 Cal. App. 4th 861, 875 (2015); *Daniels v. Robbins*, 182 Cal. App. 4th 204, 222 (2010).

Here, NMS brought dozens of meritless causes of action.  The Miller Defendants did not even attempt to bring an anti-SLAPP motion on NMS' behalf.  Nor could they.  By definition, a lawsuit based on forgeries and perjury lacks probable cause.  *See, e.g.*, *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *12 (W.D.N.Y. Mar. 26, 2013); *Stipe v. Smith*, 2011 WL 2975502, at *3 (M.D. La. July 7, 2011); *Benjamin v.*

---

[8]  The Miller Defendants do not dispute nor could they truthfully dispute that there was a favorable termination on the merits in favor of AEW on all of the causes of action.  *See Ross v. Kish*, 145 Cal. App. 4th 188, 192 (2006).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

*BWIA Airlines*, 2009 WL 783353, at *6 (S.D. Fla. Mar. 24, 2009).  To prevail on its claim (and defeat the instant motion), AEW need only show that one of these claims lacked probable cause but, as set forth above, the Miller Defendants did not have probable cause to prosecute any of the underlying claims because they were all based on a forgery and a set of obvious lies to support that forgery.

### a.    There Was No Reasonable Basis for NMS' Bogus Allegations

Incredibly, the Miller Defendants barely mention, much less respond to, the numerous factual allegations in the Complaint that detail how any reasonable attorney would have known that the underlying lawsuit was based on forgeries and a set of transparent lies propping up those forgeries (like the "typo" story).  Rather than detail how they reasonably believed that "Version 2" was genuine, that the authentic, operative version of the JVA that all of the parties, lawyers, and banks were using was a forgery, and how the "typo" story was plausible, they dodge all of these questions.  Their declarations say virtually nothing about the facts of the case but instead highlight their resumes and that the Court should take their word that they would never engage in misconduct.  But this is not a serious response—it is never sufficient for a party to simply self-declare that he or she is free from liability; rather, the onus is on the party to submit factual evidence rebutting the allegations.  The Miller Defendants should know this better than anyone, and their decision not to defend their actions can only be construed as a deliberate concession.

Again, the Miller Defendants do not deny NMS' misconduct and have even apologized for it before the court.  Srinivasan Decl., Ex. 82 at 6:9–12.  They make no attempt to show that the forgeries were genuine or, just as importantly, that there was a shred of evidence for their claim that "Version 3"—the genuine, operative JVA—was itself a forgery created by AEW.  There is no explanation for their continued prosecution of the case after they were put on notice in June 2015 that NMS' claims were based on a forgery.  *Id.*, Ex. 14.   Instead, they claim they had no "knowledge of or involvement in" NMS's misconduct.  Mot. at 15.  This is woefully insufficient.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1    "[W]hen a party is put on notice that a fundamental element of its case is

2    disputed, it should not proceed without evidence sufficient to support a favorable

3    judgment or . . . information affording an inference such evidence can be obtained."

4    *Arcaro v. Silva & Silva Enters. Corp.*, 77 Cal. App. 4th 152, 158-59 (1999).  *See also*

5    *Zamos v. Stroud*, 32 Cal. 4th 958, 971-73 (2004).  In *Arcaro*, the defendant was given

6    evidence that the plaintiff's signature had been forged.  *Arcaro*, 77 Cal. App. 4th at

7    158-59.  The defendant continued pursuing the suit even though it did not "possess any

8    extrinsic evidence of the genuineness of the signature" and could not "identify what

9    evidence it possessed which reasonably would have warranted it to infer evidence of

10   the genuineness of Arcaro's signature existed."  *Id.* at 157-158.  Thus, the defendant

11   "lacked probable cause . . . because it had no objective, reasonable basis in the facts

12   known to it for a belief Arcaro's purported signature was genuine."  *Id.* at 159.  The

13   defendant's rank speculation that discovery might have uncovered "chicanery" by

14   Arcaro—speculation the court aptly dismissed as a "mere 'shot in the dark'" and a

15   "hope for a Perry Mason-style denouement"—did not suffice.  *Id.* at 158-59.

16   Here, the Miller Defendants were repeatedly presented with evidence that the

17   version of the JVA with the 3-year Buy/Sell was a forgery.  In June 2015, the Miller

18   Defendants were shown evidence that NMS' own counsel requested the 5-year

19   Buy/Sell.  Srinivasan Decl., Ex. 14.  In September 2015, NMS' own witnesses testified

20   that there was no "typo" in the 5-year Buy/Sell provision in the original, executed

21   JVA.  *Id.*, Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78

22   at 76:17–78:21, 92:16 – 93:4, 129:18–130:8.  In October 2015, AEW submitted

23   additional evidence that "Version 2" was a forgery, and on that basis, the trial court

24   ordered a forensic exam of NMS' computers and devices.  *Id.*, Exs. 21, 22, 29; LaPorte

25   Decl., Ex. 3.  In January 2016, AEW filed a motion for terminating sanctions,

26   supported by expert declarations and nine volumes of evidence showing that "Version

27   2," the Cover Letter, and the La Cienega PMA were forgeries and that NMS destroyed

28   and altered evidence.  *Id.*, Exs. 39–41.  Among other things, AEW's experts

Gibson, Dunn &
Crutcher LLP

24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

determined that the anti-counterfeiting code on "Version 2" showed it had been printed at NMS' offices in July 2013, not in September 2010, as NMS repeatedly asserted. Compl., Ex. 1 at 75; LaPorte Decl., ¶¶ 38–45, 116.  Finally, and perhaps most damning of all, the Miller Defendants offer no explanation for their decisions:  (1) not retain a single expert who would opine that their forgeries were in fact genuine documents; (2) to mislead their own expert that they were contending in the lawsuit that the forged JVA (created in 2013) was created in 2010; and (3) not to put Shekhter on the stand for the evidentiary hearing—the only plausible explanation is that they knew he lied in his declaration and that the lawsuit was based on his forgery.

Confronted with this steadily mounting evidence, the Miller Defendants refused to disavow the forgeries, refused to come clean about NMS' spoliation, continued to advance and rely upon the forged "Version 2," and continued to repeat NMS' false allegations, submitting sworn statements and verified discovery responses, offering hours of testimony from Shekhter, and making countless representations to the court.  See, e.g., Srinivasan Decl., Exs. 8, 9, 18–20, 23–26, 38, 61, 74, 81, 86, 87–90. Even worse, the Miller Defendants failed to preserve NMS' computers and devices, despite their repeated representations to the contrary.  *Id.*, Exs. 30–32, 35–37; Compl., Ex. 1 at 99.  And they literally stood by and did nothing as NMS engaged in massive evidence destruction.  Srinivasan Decl., ¶ 4 & Ex. 89, ¶¶ 38–39.

Once the Miller Defendants were put on notice that NMS' claims were based on an obvious forgery, they lacked probable cause to continue prosecuting those claims "because [they] had no objective, reasonable basis in the facts known to [them]" to believe "Version 2" and the other forgeries were genuine.  *Arcaro*, 77 Cal. App. 4th at 159; *see also Zamos*, 32 Cal. 4th at 971–72.

### b.    None of NMS' Legal Theories Were Tenable

To prevail on their Motion, the Court must believe that probable cause existed for every one of dozens of causes of action brought in the underlying litigation.  *See Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 292 (2006).  But the Miller

Gibson, Dunn &
Crutcher LLP

1  Defendants make no attempt to defend the vast majority of NMS' claims. Nor can

2  they. All of NMS' claims were infected by the forgeries, the perjury, and the evidence

3  spoliation, as the trial court and the Court of Appeal held. Compl., Ex. 5 at 362.

4  Further, the one claim they do focus on—a breach of contract claim based on Article 6

5  in the JVA—was concocted after it became clear that the lawsuit was based on a

6  forgery. Mot. at 17. But this claim was just an attempt to shift the focus away from

7  the forged "Version 2." Nothing in Article 6 of the JVA supported the theory. Indeed,

8  the trial court sustained AEW's demurrer to that claim without leave to amend, and the

9  Court of Appeal affirmed, holding that "Article 6 is not reasonably susceptible to an

10  interpretation that it confers an acquisition right." Compl., Ex. 1 at 335. The Miller

11  Defendants lacked probable cause to assert a clearly erroneous interpretation of the

12  JVA. *See Masterson v. Pig'n Whistle Corp.*, 161 Cal. App. 2d 323, 337-338 (1958);

13  *cf. SuperGuide Corp. v. Gemstar Dev. Corp.*, 2010 WL 11463159, at *8 (C.D. Cal.

14  June 3, 2010).

15       Nor does the extrinsic evidence cited by the Miller Defendants here (and below)

16  prove otherwise. The May 2010 term sheet was a non-binding term sheet drafted

17  before negotiations began. Watson Declaration, ¶ 7 & Ex. 2. The May 2010 email

18  "states nothing about acquiring the other party's interest, much less about acquiring it

19  for 1.75 times its investment." *Id*. And the June 2013 letter "acknowledges that the

20  JVA needs to be amended both 'to provide for the withdrawal of [AEW] from the [JV]

21  . . .' and 'to allow [NMS] to use outside funds to get [AEW] to an IRR of 24% and

22  1.75 multiple.'" Def's Ex. 6. No reasonable attorney would have argued that a letter

23  asking AEW to "consider" amending the JVA and selling its interest to NMS equated

24  to the exercise of a contractual "right" to "monetize" AEW's interest.

25              **c.    The Interim Adverse Judgment Rule Is Inapplicable**

26       The interim adverse judgment rule provides that "a trial court judgment or

27  verdict in favor of the plaintiff . . . in the underlying case, ___***unless obtained by means of***___

28  ___***fraud or perjury***___, establishes probable cause . . . , even though the judgment or verdict

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

is overturned on appeal or by later ruling of the trial court." *Parrish v. Latham & Watkins*, 3 Cal. 5th 767, 776 (2017) (emphasis added).  It has no application here.

First, orders denying monetary sanctions do not suffice.  *See, e.g.*, *Wright v. Ripley*, 65 Cal. App. 4th 1189, 1191 (1998); *Crowley v. Katleman*, 8 Cal. 4th 666, 688 (1994).  In *Wright*, the court held that the denial of a motion for sanctions under Code of Civil Procedure section 128.5 did not preclude the plaintiff's malicious prosecution suit.  *Id.* at 1191.  The court found that a contrary rule would threaten the efficient disposition of sanctions motions.  *Id.* at 1194–95.  *See also Crowley*, Cal. 4th at 688.  The same reasoning applies with even greater force to orders denying monetary sanctions for discovery violations.  Thus, it is irrelevant that the trial court—for unknown reasons—declined to imposed monetary sanctions on the Miller Defendants.[9]

Second, two of the orders on which the Miller Defendants rely were entered in a *different case* involving *different parties*.  In 2015, AEW, the JV and the subsidiary companies that owned the Properties filed an action (the "*P6* Action") to have NMS Properties removed as the property manager of the Properties.  Srinivasan Decl., Ex. 82.  That action was based on the 30-day termination notice in the PMAs for the Properties.  *Id.*  The trial court originally granted a preliminary injunction but reversed course after NMS Properties submitted the forged La Cienega PMA and a perjurious declaration from Shekhter.  *Id.*, Exs. 83, 84; Compl., Ex. 1 at 83–85.  The Miller Defendants do not cite a single case applying the interim adverse judgment rule based on an order in a different case involving different parties asserting different claims.  *See Crowley v. Katleman*, 8 Cal. 4th 666, 671 (1994) (holding that probable cause on one cause of action does not establish probable cause on a different cause of action).

Third, the orders in the *P6* Action were procured by fraud and perjury.  The trial court relied on the forged La Cienega PMA and the perjurious Shekhter declaration in

---

[9]  Notably, the trial court did not explain its reasons for not sanctioning the Miller Defendants.  This alone precludes application of the rule.  *See, e.g.*, *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 823 (2002); *L.G. v. M.B.*, 25 Cal. App. 5th 211, 230 (2018).

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

denying the motions.  Srinivasan Decl., Ex. 84 at 4 ("There is at least some evidence that [the La Cienega PMA] contained a 60-day termination provision.  *See* June 25 Shekhter Decl., Ex. A, § 12.1."); *id.*, Ex. 91 at 3 ("There are serious questions of credibility of the declarants and authenticity of documents. . . ."); *id.*, Ex. 55 at 3 ("Defendant has adamantly denied Plaintiffs' allegations.").  That one of NMS' affiliates successfully defrauded a different court in a different action does not establish the Miller Defendants had probable cause in *Lincoln Studios*.  *See, e.g.*, *Parrish*, 3 Cal. 5th at 782; *Thao v. Donovan*, 2012 WL 4052032, at *11 (E.D. Cal. Sept. 14, 2012).  Further, that the Miller Defendants would continue to cite to and rely on rulings procured through documents adjudicated to be forgeries further establishes their willingness to advance bad faith arguments.

## 2.    The Miller Defendants Acted with Malice

Malice "is not limited to ill will . . . but exists when the proceedings are [prosecuted] primarily for an improper purpose."  *Medley Capital Corp. v. Sec. Nat'l Guar., Inc.*, 17 Cal. App. 5th 33, 48 (2017) (quotations omitted).  Improper purposes include (1) the person initiating the proceedings does not believe that the claim may be held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; and (4) the proceedings are initiated for the purpose of forcing a settlement bearing no relation to the merits of the claim.  *See Daniels*, 182 Cal. App. 4th at 224; *see also Albertson v. Raboff*, 46 Cal. 2d 375, 383 (1956).  Further, a person who attempts to establish a claim to property knowing the claim is invalid can only be motivated by an improper purpose.  *Id*.

Here, there is ample evidence of malice, including that the Miller Defendants either knew NMS' claims were baseless or were "indifferent as to whether the claims . . . had any basis in fact."  *Sycamore Ridge Apartments, LLC v. Naumann*, 157 Cal. App. 4th 1385, 1408 (2007).  At a minimum, "the record discloses that the

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

[Miller Defendants] failed to conduct any reasonable investigation" into NMS' claims. *Id.*   The evidence of malice includes:

- The threat to "***never stop suing AEW***" until it caves.  Samek Decl., ¶ 11.

- The continued prosecution of NMS' baseless claims ***for years*** despite being on notice of the forgeries.

- The failure to repudiate the forgeries and the perjurious declarations.

- Asserting ***billions of dollars*** in damages.  Srinivasan Decl., Ex. 19 at 3. Alleging damages having "no apparent basis in fact" is evidence of an improper purpose.  *Sycamore Ridge*, 157 Cal. App. 4th at 1409.

- Failing to retain an expert to opine that the documents were genuine. Worse still, the Miller Defendants ***concealed*** from their experts that NMS was asserting that the documents were originals.  Srinivasan Decl., Ex. 71 at 13:12-23; Compl., Ex. 1 at at 115.

- Taking actions that made it harder for AEW to discover the truth, including misrepresenting their efforts to preserve evidence. Srinivasan Decl., Exs. 30–32, 35, 65.

- Producing a version of the Cover Letter with the metadata stripped out, and withholding three "botched" versions of the Cover Letter.  Rubin Decl., ¶ 36.

- filing ***nearly a half dozen*** copycat lawsuits against.  Srinivasan Decl., Exs. 43, 45, 56, 59, 61.

- Sending letters to brokers, lenders, potential buyers, and every title insurer in the United States threatening to sue them for ***hundreds of millions of dollars*** if they did business with AEW.  *Id.*, Exs. 44, 46, 48–52, 54.

None of the Miller Defendants' arguments negate this overwhelming showing. Indeed, their arguments only underscore their culpability.  For instance, they argue that they "streamlined" the SAC by abandoning 23 claims.  Srinivasan Decl., Ex. 92.  But the TAC continued to allege that "Version 2" was created by AEW (not NMS) to correct a "mistake" in Article 11 of the original, executed JVA.  *Id.*, Ex. 38, ¶ 22b. This was a blatant lie, and the Miller Defendants had no reasonable basis to believe it was true by the time they filed the TAC.  Continuing to pursue even a single claim— let alone ***six***—based on "Version 2" and the bogus "typo" allegations smacks of malice and improper purpose.  *See Daniels*, 182 Cal. App. 4th at 226 (malice may be inferred

Gibson, Dunn & Crutcher LLP

29
PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1    where the defendant knowingly brought an action without probable cause or continued

2    to prosecute it after becoming aware it lacked probable cause).

3           Similarly, the Miller Defendants claim they "stepped in as NMS's lead counsel

4    in November 2015." Mot. 10. Not only is this false, but it is irrelevant. They were on

5    notice from the outset that "Version 2" was forged. "If the [Miller] defendants were

6    not aware of the relevant facts because they failed to adequately familiarize themselves

7    with the case before associating in . . ., this would indicate a degree of indifference

8    from which one could . . . infer malice." *Sycamore Ridge*, 157 Cal. App. 4th at 1409.

9    "Once it became clear that there was no basis for" NMS' claims, they "should have

10   dismissed the claims immediately." *Id.* at 1408 (internal quotations omitted). *See also*

11   *Sparling v. Bank of Am., Nat'l Ass'n*, 2018 WL 5099728, at *7 (C.D. Cal. Mar. 29,

12   2018).

13   **B.    The Court Should Reject the Miller Defendants' Lame Excuses**

14          The Miller Defendants make two galling excuses for their prosecution of NMS'

15   baseless claims. Their excuses are as unpersuasive as they sound. First, they falsely

16   claim they were "blocked from getting discovery." Mot. at 28-29.[10] But they did not

17   need discovery from *AEW* to know that *NMS* forged the documents. The evidence

18   proving the forgeries came from ***NMS' own files***, to which the Miller Defendants had

19   access. No amount of discovery could have proven otherwise. Second, the Miller

20   Defendants argue they had an ethical duty to pursue NMS' claims. Mot. at 13, 20.

21   Not so. Attorneys have an ethical duty ***not*** to pursue frivolous claims. *See, e.g.*, Fed.

22   R. Civ. P. 11; Cal. R. Prof'l Conduct, Rule 3-200(A); Cal. Civ. P. Code §§ 128.5,

23   128.7. Attorneys have "a duty to investigate the facts underlying a client's claims and

24   can be sanctioned for failing to do so." *Tichinin v. City of Morgan Hill*, 177 Cal. App.

25   4th 1049, 1069 (2009). And they owe their clients no duty to offer false testimony. *In*

26

27

28   [10]   In fact, NMS deposed Samek and AEW produced 25,000+ pages of documents. Srinivasan Decl, ¶ 3 & Ex. 73. And the Miller Defendants cross-examined all of AEW's key witnesses, including their experts, at the eight-day evidentiary hearing.

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

*re Branch*, 70 Cal. 2d 200, 210 (1969). Indeed, an attorney's duties to his or her clients are tempered "by an equally solemn duty to comply with the law and standards of professional conduct," which include "prevent[ing] and disclos[ing] frauds upon the court[.]" *Nix v. Whiteside*, 475 U.S. 157, 168–69 (1986). *See also Mendez v. Superior Ct.*, 162 Cal. App. 4th 827, 834 (2008). The Miller Defendants were not just "doing [their] job" when they facilitated NMS' fraud on the legal system. Mot. at 33.

## C.    At a Minimum, Discovery Should Be Permitted

As set forth above, AEW has made a prima facie showing as to each element of its claim. To the extent the Court disagrees, it should permit discovery. The law is clear that where, as here, an anti-SLAPP motion is based on the plaintiff's alleged lack of evidence, discovery must be allowed. *See, e.g.*, *Planned Parenthood*, 890 F.3d at 834–35. The Srinivasan Declaration sets forth the discovery that AEW would seek if afforded the opportunity. *See* Srinivasan Decl., ¶¶ 8-10. The need for discovery here is particularly critical given the application of the crime/fraud exception.

**V.    CONCLUSION**

For the foregoing reasons, the Miller Defendants' Motion should be denied.

Dated: May 3, 2019
                              JAMES P. FOGELMAN
                              GIBSON, DUNN & CRUTCHER LLP


                              By: */s/ James P. Fogelman*
                                     James P. Fogelman

                              Attorneys for Plaintiffs

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

Gibson, Dunn &
Crutcher LLP