1  GIBSON, DUNN & CRUTCHER LLP
   James P. Fogelman, SBN 161584
2     jfogelman@gibsondunn.com
   Jay P. Srinivasan, SBN 181471
3     jsrinivasan@gibsondunn.com
   Shannon E. Mader, SBN 235271
4     smader@gibsondunn.com
   333 South Grand Ave.
5  Los Angeles, CA  90071-3197
   Telephone:  (213) 229-7000
6  Facsimile:  (213) 229-7520

7  Attorneys for Plaintiff
   P6 LA MF Holdings SPE, LLC
8

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11                   **WESTERN DIVISION**

12 | P6 LA MF Holdings SPE, LLC, a | CASE NO. 2:19-cv-1150-AB-(AFMx) |

P6 LA MF Holdings SPE, LLC, a
limited liability company,

              Plaintiff,

        v.

NMS CAPITAL PARTNERS I, LLC;
BRENTWOOD LEGAL SERVICES;
STEVEN ZELIG; GENGA &
ASSOCIATES, P.C.; WLA LEGAL
SERVICES, INC.; JOHN GENGA;
MILLER BARONDESS LLP; LOUIS
R. MILLER; JAMES GOLDMAN;
ALEXANDER FRID; JASON
TOKORO; and DOES 1-10, inclusive,

              Defendants.

CASE NO. 2:19-cv-1150-AB-(AFMx)

**PLAINTIFF'S OPPOSITION TO THE GEGNA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16**

[*Filed concurrently with Declarations of Jay P. Srinivasan, Eric Samek, Drew Flowers, Jonathan Watson, Gerald M. LaPorte, and Samuel S. Rubin; Evidentiary Objections; and Plaintiff's Request for Judicial Notice; [Proposed] Orders lodged concurrently herewith*]

**Hearing:**
Date:    May 24, 2019
Time:    10:00 a.m.
Place:   Courtroom 7B
Judge:   Hon. André Birotte Jr.

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1

# TABLE OF CONTENTS

2

Page

3   I.     INTRODUCTION ................................................................................ 5

4   II.    FACTUAL AND PROCEDURAL BACKGROUND ......................... 7

5          A.   September 2010—AEW and NMS Capital Form a Joint Venture. ........... 7

6          B.   July 2013—NMS Creates a Forged Version of the JVA. .......................... 8

7          C.   April 2015—NMS Files Suit Based on the Forgery. ................................. 9

8          D.   June 2015—The Genga Defendants Are Alerted to The Forgery. .......... 11

9          E.   June 2015—NMS Forges Two More Documents to Bolster Its
               False Claims. ......................................................................................... 12

10

11         F.   September/October 2015—The Genga Defendants Hear Testimony
               from NMS' Former Lawyer and President That The "Typo" Story
               Is Untrue. ............................................................................................... 13

12
           G.   September 2015—NMS Files the Second Amended Complaint. ............. 13

13
           H.   Late 2015—The Genga Defendants Aid And Abet NMS' Scheme
14             To Suppress, Alter and Destroy Evidence. ............................................. 14

15         I.   November 2016—NMS Seeks Leave to File a New Complaint. ............ 16

16         J.   November/December 2016—The Court's Order and Judgments............ 17

17         K.   June 2018—The Court of Appeal Affirms Judgment Against NMS. ..... 17

18  III.   LEGAL STANDARD ........................................................................ 18

19  IV.    ARGUMENT..................................................................................... 18

20         A.   The Motion is Procedurally Improper..................................................... 18

21         B.   AEW Has Made a Prime Facie Showing ................................................ 19

22              1.   The Genga Defendants Lacked Probable Cause........................... 19

23              2.   There Was a Favorable Termination on the Merits ..................... 24

24         C.   At a Minimum, Discovery Should Be Permitted ..................................... 24

25  V.     CONCLUSION ................................................................................. 25

26

27

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE
PLAINTIFFS' COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Access Ins. Co. v. Paralta*,
    2015 WL 13036938 (C.D. Cal. Oct. 13, 2015) ........................................ 19

5

6

*Arcaro v. Silva & Silva Enters. Corp.*,
    77 Cal. App. 4th 152 (1999) ...................................................... 21, 24

7

8

*Benjamin v. BWIA Airlines*,
    2009 WL 783353 (S.D. Fla. Mar. 24, 2009) ........................................ 20

9

10

*Bertero v. Nat'l Gen. Corp.*,
    13 Cal. 3d 43 (1974) ................................................................ 19

11

12

*Ceglia v. Zuckerberg*,
    2013 WL 1208558 (W.D.N.Y. Mar. 26, 2013) ...................................... 20

13

14

*Cheveldave v. Tri Palms Unified Owners Ass'n*,
    27 Cal. App. 5th 1202 (2018) ...................................................... 19

15

16

*Daniels v. Robbins*,
    182 Cal. App. 4th 204 (2010) .................................................... 20, 24

17

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*,
    184 Cal. App. 4th 313 (2010) ...................................................... 19

18

19

*HMS Capital, Inc. v. Lawyers Title Co.*,
    118 Cal. App. 4th 204 (2004) ...................................................... 18

20

21

*Jay v. Mahaffey*,
    218 Cal. App. 4th 1522 (2013) .................................................... 20

22

23

*Nunez v. Pennisi*,
    241 Cal. App. 4th 861 (2015) .................................................... 20

24

25

*Oasis W. Realty, LLC v. Goldman*,
    51 Cal. 4th 811 (2011) ............................................................ 18

26

27

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
    2017 WL 7411154 (C.D. Cal. June 8, 2017) ........................................ 5

28

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
    738 F. App'x 563 (9th Cir. 2018) ........................................................... 5

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018) ........... 18, 24

*Rivera v. County of San Diego*,
    2017 WL 6001689 (C.D. Cal. May 18, 2017) ........................................... 19

*Ross v. Kish*,
    145 Cal. App. 4th 188 (2006) ............................................................ 24

*Sangster v. Paetkau*,
    68 Cal. App. 4th 151 (1998) ............................................................. 20

*Sheldon Appel Co. v. Albert & Oliker*,
    47 Cal. 3d 863 (1989) .................................................................... 19

*Stipe v. Smith*,
    2011 WL 2975502 (M.D. La. July 7, 2011) ............................................ 20

*Superbalife, Int'l v. Powerpay*,
    2008 WL 4559752 (C.D. Cal. Oct. 7, 2008) ........................................... 19

*Sycamore Ridge Apartments, LLC v. Naumann*,
    157 Cal. App. 4th 1385 (2007) ............................................... 19, 22, 24

*Zamos v. Stroud*,
    32 Cal. 4th 958 (2004) ............................................................. 21, 24

**Statutes**

Cal. Civ. P. Code § 1049 ....................................................................... 18

Cal. Civ. P. Code § 425.16(b)(2) ............................................................. 18

**Rules**

C.D. Cal. L.R. 6-4.6.1 ......................................................................... 18

C.D. Cal. L.R. 7-3 ............................................................................. 18

Cal. R. Court, Rule 8.264(b)(1) .............................................................. 18

Cal. R. Court, Rule 8.532(b)(2) .............................................................. 18

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

## I.    INTRODUCTION

The Genga Defendants'[1] anti-SLAPP motion should be denied in its entirety, just as a similar motion filed by the Miller Defendants[2] on behalf of NMS Capital Partners I, LLC ("NMS") was denied in *P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 WL 7411154 (C.D. Cal. June 8, 2017), a decision recently upheld by the Ninth Circuit, see *P6 LA MF Holdings SPE, LLC v. Shekhter*, 738 F. App'x 563, 564 (9th Cir. 2018).  The Genga Defendants do not dispute that *Lincoln Studios*[3] was based on forgeries and perjury and lacked probable cause, but claim, based only on a single, conclusory, self-serving declaration, that they were not involved in the wrongdoing that led to the Terminating Sanctions Order and Final Judgment against their client, NMS, and insisting that they were "only" counsel of record for eight months.  The Genga Defendants were on notice from the outset that NMS was basing all of its claims on a forged version of the parties' September 2010 Joint Venture Agreement ("JVA"), yet not only were they counsel of record for NMS when NMS repeatedly lied and submitted forgeries to the court, but they also made repeated false representations of their own to the court regarding NMS' document preservation and suppressed crucial evidence of NMS' misconduct despite multiple court orders that such evidence be produced.  The Genga Defendants continued to pursue NMS' bogus claims even after they were provided irrefutable proof of NMS' forgeries and perjury, and even after NMS' own witnesses testified, under oath, that there was no "typo" in the JVA, as NMS had claimed.  The Genga Defendants also covered up NMS' massive campaign to spoliate evidence in violation of the multiple court orders, despite the Genga Defendants' own representations to the court that all documents and devices

---

[1]  As used herein, the "Genga Defendants" refers to Defendants John Genga and Genga & Associates, P.C.

[2]  As used herein, the "Miller Defendants" refers to Defendants Miller Barondess LLP, Louis R. Miller, James Goldman, Alexander Frid, and Jason Tokoro.

[3]  As used herein, *Lincoln Studios* refers to *Lincoln Studios, LLC, et al. v. DLA, et al.*

5

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1    were being preserved.

2         AEW's 59-page Complaint details overwhelming evidence that the Genga

3    Defendants not only knew of their client's fraud, but were active participants in the

4    misconduct, acting with malice.  The Genga Defendants fail to offer any explanation

5    for their assertion that NMS' obviously forged copy of the parties' September 2010

6    Joint Venture Agreement ("JVA") was an "original," genuine document from

7    September 2010, created because of an alleged "typo."  Literally ***every witness***, other

8    than NMS' principal, Neil Shekhter (a confirmed perjurer), including NMS' own

9    former president and deal counsel, and ***every contemporaneous document***, confirmed

10    there was never any such typo and that NMS' "Version 2" of the JVA was a forgery.

11    The Genga Defendants do not even claim to have engaged an expert to determine

12    whether "Version 2" was an original document from September 2010, even after being

13    provided evidence in June 2015 that NMS' own deal counsel expressly requested the

14    five-year Buy/Sell language in the JVA that NMS falsely asserted was a "typo" and

15    even after NMS' former President and deal counsel testified, under oath, that there was

16    no "typo."  The Genga Defendants now have the audacity to suggest the second

17    forgery they helped submit to the court in Lincoln Studios justified their pursuit of

18    claims based on the first forgery they submitted.  Nonsense.  The Genga Defendants

19    had overwhelming evidence that the Cover Letter was a forgery, and their submission

20    of that document to this Court as evidence of "good faith" is itself an act of bad faith.

21         In short, the Genga Defendants' outrageous conduct is exactly what the

22    malicious prosecution laws are designed to remedy, and AEW is entitled to its day in

23    court to seek redress for the millions of dollars in damages they caused.  AEW has

24    submitted substantial evidence that every one of the 31 causes of action they pursued

25    on behalf of NMS in *Lincoln Studios* lacked probable cause.  If even one cause of

26    action lacked probable cause then the Genga Defendants' motion must be denied, and

27    here the evidence establishes that they all lacked probable cause.  Even if the Genga

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Defendants' declaration were credited, at best it would only establish a factual dispute as to some of the claims they pursued on NMS' behalf in *Lincoln Studios*, a factual dispute that would have to be decided in favor of AEW at this stage of the case. Moreover, the Genga Defendants failed to meet and confer before filing this frivolous motion. Thus, the Genga Defendants' motion should be denied, or, at the very least, AEW should be permitted discovery to respond further to their motion, including discovery into the communications with NMS that the court in *Lincoln Studios* already held are governed by the *crime-fraud* exception.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[4]

The Genga Defendants offer no meaningful response to the Complaint's detailed factual allegations. At most, they claim they did nothing unethical. But they do not deny that NMS forged documents, committed perjury, and destroyed evidence. And they provide no explanation for why they continued to prosecute NMS' claims despite being on notice that those claims were based on a forgery and obvious lies. As the facts make clear, a reasonable jury could conclude that the Genga Defendants pursued NMS' claims knowing or recklessly disregarding that they lacked merit.

**A.     September 2010—AEW and NMS Capital Form a Joint Venture.**

On September 8, 2010, AEW and NMS executed the JVA and formed the JV, which went on to acquire and develop a portfolio of nine properties. Declaration of Jonathan Watson ("Watson Decl."), ¶¶ 3–4. As the trial court would later hold, and the Court of Appeal would later affirm, the JVA contained a single mechanism by which either member could "buy out" the other member's JV interest—the heavily negotiated Buy/Sell provision in Article 11 of the JVA. Watson Decl., Ex. 1 § 11.1; Compl. Ex. 1 at 10, Ex. 4 at 337, 350–51. The Buy/Sell mechanism did not confer a unilateral acquisition right, but instead defined a process by which one member could invoke the Buy/Sell process and the other member could elect to sell its interest in the

---

[4]  A more complete summary of the material facts is set forth in the Complaint.

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

JV to the other member or buy the other member's interest.  *Id.*, ¶ 6; Compl., Ex. 4 at
337, 350–51.  The Buy/Sell provision could not be exercised until "after five (5) years"
from the September 8, 2010 execution date of the JVA.  Watson Decl., Ex. 1 § 11.1;
Compl., Ex. 1 at 68–72, Ex. 3 at 328.  NMS' deal counsel had specifically demanded
the 5-year Buy/Sell term, and it remained unchanged through subsequent drafts, the
executed JVA, and the amended JVA.  *Id.*, ¶ 7; Declaration of Jay P. Srinivasan
("Srinivasan Decl."), Ex. 3 at 2, 72; Compl., Ex. 1 at 68–69.

In January 2011, the parties amended the JVA to accommodate NMS' inability
to meet the 30% capital contribution.  Watson Decl., ¶ 9.  AEW and NMS agreed to
incorporate the concept of "Specified Properties," which permitted NMS to make
capital contributions for certain Properties at a lower rate (usually 10%) and credited it
at that lower contribution level.  *Id.*; *id.*, Ex. 1, § 1 at p. 22, § 6.1(b).  From January
2011 onwards, NMS generally provided only 10% of the capital, while AEW
contributed 90% (up from the original 70%).  *Id.*, ¶ 9.  Accordingly, NMS' share of the
JV's assets and proceeds went from 30% to a smaller percentage.  *Id.*  The 5-year
Buy/Sell provision remained unchanged in the amended JVA, which was submitted to
the JV's lenders and ratified by NMS as authentic and valid on numerous occasions.
*Id.*, ¶ 11; Compl., Ex. 1 at 68–69.  Further, when NMS made capital calls for the Joint
Venture, it did so on a roughly 90/10 basis for years after the JVA was amended to add
the Specified Properties language.  Watson Decl., ¶ 11.

**B.    July 2013—NMS Creates a Forged Version of the JVA.**

In 2013, with real estate values rebounding, NMS became dissatisfied with the
deal it negotiated.  So in July 2013, NMS forged a version of the JVA with a 3-year
Buy/Sell provision, not the 5-year Buy/Sell provision that the parties agreed to.
Compl., Ex. 1 at 72–81, Ex. 5; Declaration of Samuel S. Rubin ("Rubin Decl."), ¶¶
17–32.  NMS also eliminated the "Specified Properties" language in its forged JVA,
which Defendants dubbed "Version 2" in the underlying lawsuit.  Watson Decl., ¶ 9,

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Compl. Ex. 1 at 70–71.  NMS' motivation was obvious—by eliminating the Specified
Properties language, NMS wished to recoup a higher share of JV profits than its fair
share and wished to trigger the Buy/Sell provision earlier than permitted.  *Id.*

NMS would later allege (and NMS' Neil Shekhter would repeatedly testify) that
after receiving the original, executed JVA in September 2010, which Defendants later
dubbed "Version 1," Shekhter "noticed that Version 1 appeared to contain a mistake,
i.e., that the Buy/Sell provisions stated that the Buy/Sell procedure could occur after 5
years, instead of after 3 years;" that Shekhter then "contacted" AEW's Eric Samek and
that Samek "told" Shekhter he would "revise Version 1 so that it stated 'Buy/Sell'
could occur after 3 years, instead of after 5 years"; that AEW subsequently "delivered
a corrected operating agreement ('Version 2')"—***i.e., the forgery***—by hand to
Shekhter in September 2010; and that AEW "fabricated another version of the
operating agreement (Version 3)"—*i.e.*, the JVA as amended to include the Specified
Properties—"by lifting [Shekhter's] signature from other documents and physically
placing it into Version 3."  Declaration of Jay P. Srinivasan ("Srinivasan Decl."), Ex.
Ex. 9, ¶¶ 37–40, Ex. 18, ¶¶ 101–02, Ex. 25, ¶¶ 14–18; Compl., Ex. 1 at 74–75, Ex. 5 at
363–64.  Every aspect of this "typo" story is a lie as definitively established by the
forensic examination, which showed that the hard copy of "Version 2," which
Shekhter claimed to have received from Samek in September 2010 (and which he
supposedly maintained in a safe since), was printed on a printer at NMS' offices in
July 2013.  Compl., Ex. 1 at 88–93; Rubin Decl., ¶¶ 29–32.

**C.    April 2015—NMS Files Suit Based on the Forgery.**

In 2014, after suing its own deal counsel, NMS filed the underlying lawsuit at
issue—the *Lincoln Studios* lawsuit—against AEW's deal counsel for purportedly
failing to include a 3-year Buy/Sell provision.  Srinivasan Decl., Ex. 7.  In April 2015,
NMS filed its First Amended Complaint ("FAC"), naming AEW and its employees
and affiliates as defendants and alleging for the first time that its forgery was the

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

1  operative JVA even though NMS' prior complaints never mentioned it. *Id.*, Ex. 9.

2  The 217-page, 660-paragraph FAC asserted a staggering 30 causes of action against

3  AEW, its employees, and affiliates. *Id.* The FAC repeated Neil Shekhter's false

4  "typo" story, alleging that the 5-year Buy/Sell provision in the executed version copy

5  of the JVA was a "typo" that AEW agreed to "fix," that AEW delivered the forgery to

6  NMS in September 2010, and that "Version 3" with the Specified Properties language

7  (the actual version of the JVA) was a forgery created by AEW. *Id.*, ¶¶ 37–40, 48–49.

8       There is no longer any disputing that NMS "brought [the] case upon forged

9  documents, committed perjury, and then intentionally and purposefully destroyed a

10  wide swath of evidence relating to the forgeries." Compl., Ex. 1 at 138. The

11  California Superior Court definitively found that NMS forged the JVA and two other

12  related documents: (1) a cover letter that NMS falsely contended accompanied the

13  forged JVA; and (2) a property management agreement ("PMA") that NMS forged to

14  stave off an adverse ruling by the California Superior Court in a related action.[5]

15  Compl., Ex. 1 at 72–93. In the default judgment that the Superior Court entered

16  against NMS, the court expressly held that "Version 2" of the JVA "is a fabrication

17  and forgery created by NMS and its affiliates," and that NMS "committed a broad

18  variety of fraudulent conduct [and] misrepresentations," including forging "Version 2"

19  and other documents and making "misrepresentations and false statements in

20  connection with these forgeries." Compl., Ex. 3 at 328–29. This default judgment was

21  affirmed, in full, by the Court of Appeal. *Id.*, Ex. 5.

22       The Genga Defendants do not even deny that this misconduct occurred. Instead,

23

24  [5] Of note, Shekhter, who created both of these forgeries, sent a botched version of the
   forged La Cienega PMA to the Zelig Defendants, that contained an error that would
25  disprove its provenance. Compl., Ex. 1 at 83–84, Rubin Decl., ¶ 52. Shekhter soon
   realized his mistake and sent a "fixed" version of the forgery to the Zelig
26  Defendants, who submitted the forgery to the Court in the related action and later in
   the underlying litigation. *Id.* Because they received the botched forgery, the Zelig
27  Defendants obviously had reason to suspect a forgery. But they never did anything
   about it and suppressed the documents despite multiple court orders that such
28  documents be produced. Declaration of Jay P. Srinivasan, ¶ 5.

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

1   they claim that "[w]hatever occurred happened within NMS without us seeing,

2   knowing or being told about it."  *See* Declaration of John M. Genga in Support of

3   Special Motion to Strike Complaint Per Cal. Code Civ. Proc. § 425.16 ("Genga

4   Decl."), ¶ 9.  But they nowhere explain how they could have taken on the

5   representation of NMS and prosecuted NMS' baseless claims without taking any steps

6   to investigate NMS' forgeries or its obvious lies.  Such an explanation is critical

7   where, as here, the evidence shows that no reasonable lawyer could have pursued

8   NMS' claims without realizing that they were based on an obvious forgery and an

9   unconvincing pack of lies to prop up that forgery.  To underscore how even a cursory

10  investigation into the forgery by the Genga Defendants would have revealed its

11  character, AEW's forensic document expert—formerly with the United States Secret

12  Service and currently employed by the Department of Justice—opined that, in his 20-

13  plus year career, "this is one of the top five cases that I have worked on where the

14  forgery seemed so blatant."  La Porte Decl., ¶ 131.

15  **D.    June 2015—The Genga Defendants Are Alerted to The Forgery.**

16          The Genga Defendants formally associated into the case in May 2015.

17  Srinivasan Decl., Ex. 10.  On June 16, 2015, just a few weeks later, counsel for AEW

18  and NMS met for a court-ordered and court-reported discovery conference.  Srinivasan

19  Decl., Ex. 14.  Defendant Genga was present.  *Id.*  He, along with NMS' other counsel,

20  were expressly informed that NMS' lawsuit was based on a forged JVA, that emails

21  from NMS' own deal counsel proved that NMS' "typo" story was false, and that

22  "Version 2" of the JVA was a forgery.  *Id.* at 139:23–152:25.  Among other things,

23  Defendant Genga and his co-counsel received copies of a July 2010 email from NMS'

24  deal counsel, demanding that the JVA include a 5-year Buy/Sell.  *Id.* at 139:23–

25  150:25.  There is no evidence that the Genga Defendants ever investigated these facts.

26  They never produced a *single* document that corroborated their claim that the forgery

27  was genuine or that NMS' "typo" story was true.

28

Gibson, Dunn & Crutcher LLP

11

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

**E.      June 2015—NMS Forges Two More Documents to Bolster Its False Claims.**

Only days later, NMS created a new forgery to bolster the forged "Version 2"—
a "Cover Letter" from AEW to NMS dated September 14, 2010 that purported to state
that it enclosed "Version 2" and expressly referenced the "3-year Buy/Sell."  Compl.
Ex. 1 at 88-93; Rubin Decl., ¶ 5.  In creating the forgery, Shekhter set back the clock
on his computer from June 21, 2015 to September 21, 2010, and then loaded a pdf of
the forged "Cover Letter" onto his computer in order to attach "metadata" to the
document that would make it appear as if the document had been on his computer
since September 21, 2010. Compl. Ex. 1 at 96; Rubin Decl., ¶¶ 63-67.  The pdf
software from Adobe that NMS used to create the forgery, however, did not exist until
December 2014, making the document another obvious forgery.  Rubin Decl., ¶¶ 38-
39; Compl. Ex. 1 at 91.  Internal emails sent by NMS' Shekhter also confirmed that the
document was a forgery.  Compl. Ex. 1 at 92.  The Genga Defendants suppressed this
evidence. *Id.*

Around that same time, NMS created yet another forgery—a copy of a Property
Management Agreement for the JV's La Cienega Property (the "La Cienega PMA").
Compl. Ex. 1 at 88-93; Rubin Decl., ¶¶ 44-52.  NMS created the La Cienega PMA
because its affiliate NMS Properties was about to lose a preliminary injunction motion
in a related case, forcing it off of all the Properties because AEW had exercised its
right, on behalf of the JV, to terminate NMS Properties as property manager.  Compl.
Ex. 1 at 81-85.  NMS' Shekhter, however, mistakenly sent a botched version of the
forged La Cienega PMA to NMS' attorneys, inadvertently listing the owner of a
different JV Property.  *Id.* at 84.  NMS' Shekhter later realized his mistake and sent a
"fixed" version of the forgery to NMS' counsel, who submitted the forgery to the court
in the related action and in *Lincoln Studios.  Id.* at 81-85.

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

**F.**      **September/October 2015—The Genga Defendants Hear Testimony from NMS' Former Lawyer and President That The "Typo" Story Is Untrue.**

In Fall 2015, AEW's outside deal counsel, NMS' outside deal counsel, and NMS' former president, among several others, were deposed.  Srinivasan Decl., Exs. 75–80.  All witnesses confirmed there was no "typo" in Article 11 of the JVA, that NMS requested the 5-year Buy/Sell, and that the 5-year Buy/Sell was included in every draft, every executed version of the JVA, and all amendments to the JVA.  *Id.*, Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78 at 76:17–78:21, 92:16 – 93:4, 129:18–130:8.  Further, they confirmed there was no confusion over this issue and no evidence supporting NMS' false claim that the parties intended to contract for a 3-year Buy/Sell provision.  *Id.*  At this point, the Genga Defendants knew that nobody, including former executives at NMS, supported the validity of the forgery upon which they were suing AEW.  To the contrary, they were confronted with a record where every single witness testified under oath that NMS requested the 5-year Buy/Sell provision and that there was no typo in Article 11 of the JVA.  And yet the Genga Defendants pressed on with the lawsuit.

**G.**      **September 2015—NMS Files the Second Amended Complaint.**

In September 2015, NMS filed a Second Amended Complaint ("SAC").  Srinivasan Decl., Ex. 18.  The SAC repeated the same false allegations and bogus claims that were in the FAC.  The Genga Defendants were counsel of record on the SAC, but do not claim to have done *any* research or investigation to validate NMS' claims or allegations.  Rather than oppose AEW's demurrer, NMS abandoned 23 causes of action, representing 80% of the claims alleged in the SAC.  *Id.*, at Ex. 34.  The trial court subsequently dismissed these claims with prejudice.  *Id.*

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

**H.    Late 2015—The Genga Defendants Aid And Abet NMS' Scheme To
Suppress, Alter and Destroy Evidence.**

In Fall 2015, just as NMS' former lawyers and executives were refuting NMS'
allegations, AEW brought the forgeries to the attention of the *Lincoln Studios* court,
and sought forensic preservation orders.  Srinivasan Decl., Ex. 16.  In Fall 2015, the
court ordered NMS, among other things, to freeze all of its computers and electronic
devices, to produce a list of every device on which the forged JVA and the two other
forgeries had ever appeared, and eventually to turn over all hardcopies of the forgeries
and its devices to AEW's experts for forensic examination.  *Id.*, Exs. 17, 29.

Rather than comply with the court's orders, the Genga Defendants and their co-
counsel tried to keep this material from AEW's experts and otherwise obstructed the
process.  For example, before turning over hardcopies of the forgeries, NMS' counsel
threatened to cut (literally) the original, hardcopies of the forgeries in half and that,
"[i]f you take the letter, and it ends up being dated at any other time in 2010, ***it will be
our position that you have altered or substituted the document***."  *Id.*, Ex. 65 at 2
(emphasis added).  The Genga Defendants were copied on this email.  No reasonable
lawyer would send or receive that email, believing the document was genuine, and the
Genga Defendants have never explained the basis for their repeated assertions to the
court that NMS' obvious forgery was an original document from September 2010.

The Genga Defendants, in particular, made false and misleading representations
that they had preserved and produced all relevant documents when, in fact, they had
not.  For instance, in a letter to AEW's counsel, the Genga Defendants identified only
12 devices that were responsive to the court's Forensic Examination Order. Srinivasan
Decl., Ex. 30.  On October 30, 2015, the Genga Defendants represented to AEW's
counsel that they complied with the court's order and had preserved and produced all
hard copy originals of "Version 2" of the JVA, the Cover Letter and the PMAs.  *Id.*,
Ex. 31.  On November 4, 2015, the Genga Defendants again represented that they had

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

1    complied with the court's forensic examination. *Id.*, Ex. 32.  Genga even represented

2    to the court that "***[s]ystems were set up so that emails couldn't be deleted, files could***

3    ***not be deleted*.***"  *Id.*, at Ex. 28 at 17-20.  These representations were clearly false.  The

4    evidence later showed that Defendants failed to preserve and produce dozens of

5    devices, including a Seagate hard drive, a computer used Adam Shekhter, and 21 USB

6    drives. *See* Rubin Decl. ¶¶ 80-84.  And the forensic examination later proved that

7    Defendants never produced drafts of the forged Cover Letters, emails from Shekhter

8    forwarding drafts of the Cover Letter, and a "botched" version of the La Cienega PMA

9    that Shekther sent to NMS' counsel.  Compl. Ex. 1 at 84, 91-93.  Yet the Genga

10   Defendants never corrected their false statements to the court nor offered any

11   explanation for their having made them in the first place.

12       When NMS eventually produced the hardcopy originals of the forged documents

13   and some (but not all) of the NMS devices that touched the forgeries, AEW's experts

14   were able to show (and the trial court and appellate court would agree) that NMS

15   engaged in a massive, coordinated campaign to manipulate, destroy, and suppress

16   evidence—something that would have been mitigated had NMS' devices and

17   documents been properly preserved and produced, as the Genga Defendants claimed

18   had been done.  Compl., Ex. 1 at 93–108.  AEW was able to prove that, as part of this

19   scheme, NMS was erasing and manipulating documents and devices just minutes

20   before AEW's forensic team arrived.  *Id.*

21       Notwithstanding NMS' intentional spoliation, AEW's experts were able to

22   prove NMS' misconduct.  Their findings were set forth in their declarations below and

23   are reflected in the trial court's order.  Srinivasan Decl., Exs. 40, 41; Rubin Decl.;

24   LaPorte Decl.; Compl. Ex. 1 at 72–93.  The Complaint contains detailed allegations

25   regarding NMS' misconduct based on their findings, and both experts have submitted

26   declarations in support of AEW's opposition.  Notably, NMS did not challenge any of

27   the trial court's factual findings and they were all affirmed by the Court of Appeal.  *Id.*

28

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Nor do the Genga Defendants challenge those findings now.

## I.    November 2016—NMS Seeks Leave to File a New Complaint.

In November 2015, NMS filed an ex parte application for leave to file a Third Amended Complaint ("TAC"). Srinivasan Decl., Ex. 38. The Genga Defendants put their name on the request for leave and the proposed TAC but do not claim to have done any research or investigation to verify the accuracy of the claims and allegations. *Id.*, at Ex. 92. The TAC continued to falsely allege that "Version 2" was genuine, that "Version 1" contained a "mistake" that AEW supposedly "fixed," and that "Version 3" was a forgery created by AEW. Srinivasan Decl., Ex. 38, ¶ 22b. In a deliberate decision to avoid relying on the altered Buy/Sell provision in Article 11 of the forged "Version 2," Defendants "***completely change[d] [NMS'] theory***" in the TAC. Dkt. 41 at 3; Srinivasan Decl., Ex. 38. But Defendants' new theory, like their old one, depended on the false allegation that "Version 3" was a forgery and that NMS never agreed to the Specified Properties language—even though not a single witness (other than Shekhter) supported those allegations.[6] Srinivasan Decl., Ex. 43, ¶ 22b. It was obvious at the time, and even more so now, that the Article 6 theory was nothing more than a contrivance to shift the focus of the case away from the forgery without expressly disavowing the forgery. The trial court would find that Defendants' attempt to shift the case to one based on Article 6 was baseless as a matter of law before dismissing the Article 6 claims on the pleadings, which dismissal the Court of Appeal would later affirm. Srinivasan Decl., Ex. 47; Compl., Ex. 4 at 352.

---

[6] There can no doubt that the Genga Defendants did not believe "Version 3" was a forgery. They were in possession of an August 2013 email from NMS' deal counsel to NMS' former General Counsel in which the deal counsel confirmed unequivocally that "Version 3" was the genuine and operative version of the JVA, writing that "Version 3" "has been treated as the [operative agreement] and presented as so on all transactions . . . NMS has consistently certified that ["Version 3"] is the [operative agreement]." Srinivasan Decl., Ex. 6 at 2, 75.

16

Gibson, Dunn &
Crutcher LLP

**J.     November/December 2016—The Court's Order and Judgments.**

On November 22, 2016, the court issued an order granting terminating sanctions based on NMS' "shocking, intentional, and pervasive" misconduct.  Compl., Ex. 1 at 124.  The court found that "Version 2," the Cover Letter, and the La Cienega PMA were forgeries created by NMS, that NMS knowingly "provided false testimony under oath," and that NMS had engaged in "coordinated, intentional widespread destruction of evidence." *Id.*, at 108, 127.  The court concluded that Appellants "brought this case upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries." *Id.* at 138.  Based on these findings, the court awarded terminating sanctions.  Compl., Ex. 1.  While the trial court declined to impose monetary sanctions on the NMS Counsel Defendants, it did not set forth its reasoning.  The order was simply silent on that issue.

On December 1, 2016, the trial court entered judgment against NMS on all of its claims.  Compl., Ex. 2.  On December 2, 2016, the court entered a default judgment against NMS and in favor of AEW on its cross-complaint.  Compl., Ex. 3.  The default judgment found that "Version 2" was a forgery created by NMS.  *Id.* at 328.

**K.     June 2018—The Court of Appeal Affirms Judgment Against NMS.**

On June 20, 2018, the Court of Appeal affirmed the terminating sanctions order and the judgments as against NMS.  Compl., Ex. 5.  Notably, NMS did not challenge the trial court's factual findings.  *Id.* at 381.  Instead, NMS argued that the forgeries were "***irrelevant***" and that "***[s]ince the forgery is irrelevant, perjury about the forgery must be irrelevant too***."  Srinivasan Decl., Ex. 85 (emphasis added).  That same day, the Court of Appeal affirmed the trial court's order sustaining AEW's demurrer to NMS' claim for breach of Article 6 of the JVA. Compl., Ex. 4.  The Court of Appeal held that Article 6 is not reasonably susceptible to NMS' interpretation. *Id.*, at 335. The Court of Appeal denied NMS' petition for rehearing on July 17, 2018.  And the California Supreme Court denied review on September 12, 2018. Srinivasan Decl., Ex.

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

62.  Thus, the judgments against NMS are final.  *See* Cal. Civ. P. Code § 1049; Cal. R. Court, Rule 8.264(b)(1); Cal. R. Court, Rule 8.532(b)(2).

## III.  LEGAL STANDARD

In deciding anti-SLAPP motions, court consider the pleadings as well as affidavits.  Cal. Civ. P. Code § 425.16(b)(2).  Courts must "accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law."  *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004).  "If the plaintiff can show a probability of prevailing on *any part of its claim,* the cause of action is not meritless and will not be stricken."  *Oasis W. Realt*y, *LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011) (internal quotations omitted, emphasis in original).  Where, as here, the motion turns on the facts, "discovery must be allowed . . . before any decision is made. . . ."  *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018).

## IV.  ARGUMENT

### A.  The Motion is Procedurally Improper

The Motion should summarily be denied because the Genga Defendants did not meet and confer and because the Motion is untimely.  The Genga Defendants were required to respond to the Complaint by no later than Friday, April 12, 2019.  *See* Dkt. 28.  Pursuant to Local Rule 7-3, the Genga Defendants were required to meet and confer "at least seven (7) days prior to the filing of the motion."  C.D. Cal. L.R. 7-3.  As this Court's Standing Order makes clear, it "strictly enforces Local Rule 7-3."  Dkt. 12, p. 4.  The Genga Defendants never met and conferred before filing the Motion.  Srinivasan Decl., ¶ 7.  Moreover, the Genga Defendants missed the filing deadline.  Pursuant to Local Rule 5-6.7.1, documents must be electronically filed prior to midnight to be considered timely filed that day.  *See* C.D. Cal. L.R. 6-4.6.1.  The Genga Defendants did not file the Motion until 1:06 a.m. on Saturday, April 13,

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

2019.  *See* Dkt. 41.  For these reasons alone, the Motion should be denied.  *See, e.g.*, *Rivera v. County of San Diego*, 2017 WL 6001689, at *1 (C.D. Cal. May 18, 2017) (denying motion for summary judgment for failure to meet and confer); *Access Ins. Co. v. Paralta*, 2015 WL 13036938, at *1 (C.D. Cal. Oct. 13, 2015) (striking motion to dismiss for failure to meet and confer); *Superbalife, Int'l v. Powerpay*, 2008 WL 4559752, at *1-2 (C.D. Cal. Oct. 7, 2008) (denying motion to dismiss for failure to meet and confer).

**B.    AEW Has Made a Prime Facie Showing**

To defeat this motion, AEW need only show the minimal merit of its claim by making a prima facie showing.  *See Cheveldave v. Tri Palms Unified Owners Ass'n*, 27 Cal. App. 5th 1202, 1214 (2018).  The elements of malicious prosecution are lack of probable cause, malice, and favorable termination on the merits.  *See Bertero v. Nat'l Gen. Corp.*, 13 Cal. 3d 43, 50 (1974).[7]  As set forth below, the evidence is more than sufficient to establish a prima facie case for each of these elements.

**1.    The Genga Defendants Lacked Probable Cause**

Probable cause is a question of law.  *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 875 (1989).  The standard is objective.  *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2010).  The question "is whether, on the basis of the facts known to the defendant, the prosecution of the prior action was

---

[7] The Genga Defendants do not even challenge the existence of malice.  Nor can they.  Malice may reasonably be inferred from the facts establishing lack of probable cause, which are overwhelming.  *See Sycamore Ridge Apartments, LLC v. Naumann*, 157 Cal. App. 4th 1385, 1409 (2007).  Moreover, there is ample evidence that the Genga Defendants either knew or reasonably suspected that NMS' claims were baseless or were "indifferent as to whether the claims . . . had any basis in fact."  *Id.* at 1408.  At a minimum, "the record discloses that the [Genga Defendants] failed to conduct any reasonable investigation" into NMS' claims.  *Id.*  "If the [Genga] defendants were not aware of the relevant facts because they failed to adequately familiarize themselves with the case before associating in as cocounsel, this would indicate a degree of indifference from which one could also infer malice."  *Id.* at 1409.  "Once it became clear that there was no basis for" NMS' claims, the Genga Defendants "should have dismissed [them] immediately."  *Id.* at 1408–09 (internal quotations omitted).

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

1    legally tenable." *Sangster v. Paetkau*, 68 Cal. App. 4th 151, 164 (1998).

2          Probable cause to bring a cause of action exists when it is based on facts

3    reasonably believed to be true and all asserted theories are legally tenable.  *See Jay v.*

4    *Mahaffey*, 218 Cal. App. 4th 1522, 1540 (2013).  Probable cause for a cause of action

5    is lacking when any of the following is present:  (1) an action is based on facts the

6    defendant has no reasonable basis to believe are true, (2) the defendant seeks recovery

7    under a legal theory that is untenable, or (3) the defendant lacks evidence sufficient to

8    uphold a favorable judgment or information affording a reasonable inference that such

9    evidence exists.  *See, e.g.*, *Nunez v. Pennisi*, 241 Cal. App. 4th 861, 875 (2015);

10   *Daniels v. Robbins*, 182 Cal. App. 4th 204, 222 (2010).

11          Here, NMS brought dozens of meritless causes of action—all based on forgeries

12   and perjury.  By definition, a lawsuit based on forgeries and perjury lacks probable

13   cause.  *See, e.g.*, *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *12 (W.D.N.Y. Mar. 26,

14   2013); *Stipe v. Smith*, 2011 WL 2975502, at *3 (M.D. La. July 7, 2011); *Benjamin v.*

15   *BWIA Airlines*, 2009 WL 783353, at *6 (S.D. Fla. Mar. 24, 2009).  To prevail on its

16   claim (and defeat the instant motion), AEW need only show that one of these claims

17   lacked probable cause but, as set forth above, the Genga Defendants did not have

18   probable cause to prosecute any of the underlying claims because they were all based

19   on a forgery and a set of obvious lies to support that forgery.

20          Incredibly, the Genga Defendants barely mention, much less respond to, the

21   numerous factual allegations in the Complaint that detail how any reasonable attorney

22   would have known that the underlying lawsuit was based on forgeries and a set of

23   transparent lies propping up those forgeries (like the "typo" story).  Rather than detail

24   how they reasonably believed that "Version 2" was genuine, that the authentic,

25   operative version of the JVA that all of the parties, lawyers, and banks were using was

26   a forgery, and how the "typo" story was plausible, they dodge all of these questions.

27   They make no attempt to show that the forgeries were genuine or, just as importantly,

28

20

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

that there was a shred of evidence for their claim that "Version 3"—the genuine, operative JVA—was itself a forgery created by AEW.  And there is no explanation for their continued prosecution of the case after being put on notice in June 2015 that NMS' claims were based on a forgery.  *Id.*, Ex. 14.   Instead, they conclusorily claim they had no knowledge of NMS' misconduct.  Mot. at 4.  This is not a serious response—it is never sufficient for a party to simply self-declare that he or she has no liability; rather, the onus is on the party to submit factual evidence rebutting the allegations.  The Genga Defendants have completely failed to do so.

       "[W]hen a party is put on notice that a fundamental element of its case is disputed, it should not proceed without evidence sufficient to support a favorable judgment or . . . information affording an inference such evidence can be obtained." *Arcaro v. Silva & Silva Enters. Corp.*, 77 Cal. App. 4th 152, 158-59 (1999).  *See also Zamos v. Stroud*, 32 Cal. 4th 958, 971-73 (2004).  In *Arcaro*, the defendant was given evidence that the plaintiff's signature had been forged.  *Arcaro*, 77 Cal. App. 4th at 158-59.  The defendant continued pursuing the suit even though it did not "possess any extrinsic evidence of the genuineness of the signature" and could not "identify what evidence it possessed which reasonably would have warranted it to infer evidence of the genuineness of Arcaro's signature existed."  *Id.* at 157-158.  Thus, the defendant "lacked probable cause . . . because it had no objective, reasonable basis in the facts known to it for a belief Arcaro's purported signature was genuine."  *Id.* at 159.  The defendant's rank speculation that discovery might have uncovered "chicanery" by Arcaro—speculation the court aptly dismissed as a "mere 'shot in the dark'" and a "hope for a Perry Mason-style denouement"—did not suffice.  *Id.* at 158-59.

       Here, the Genga Defendants were repeatedly presented with evidence that the version of the JVA with the 3-year Buy/Sell was a forgery.  In June 2015, the Genga Defendants were shown evidence that NMS' own counsel requested the 5-year Buy/Sell.  Srinivasan Decl., Ex. 14.  In September 2015, NMS' own witnesses testified

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

1    that there was no "typo" in the 5-year Buy/Sell provision in the original, executed
2    JVA.  *Id.*, Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78
3    at 76:17–78:21, 92:16 – 93:4, 129:18–130:8.  And in October 2015, AEW submitted
4    additional evidence that "Version 2" was a forgery, and on that basis, the trial court
5    ordered a forensic exam of NMS' computers and devices.  *Id.*, Exs. 21, 22, 29; LaPorte
6    Decl., Ex. 3.

7        Confronted with this steadily mounting evidence, the Genga Defendants refused
8    to disavow the forgeries, continued to advance and rely upon the forged "Version 2,"
9    and continued to repeat NMS' false allegations, submitting sworn statements and
10   verified discovery responses, offering hours of testimony from Shekhter, and making
11   countless representations to the court.  *See, e.g.*, Srinivasan Decl., Exs. 18–20, 23–26.
12   Even worse, the Genga Defendants failed to preserve NMS' computers and devices,
13   despite their repeated representations to the contrary.  *Id.*, Exs. 30–32; Compl., Ex. 1 at
14   83, 93-101.  Finally, and perhaps most damning of all, the Genga Defendants offer no
15   explanation for their decision not retain a single expert who would opine that their
16   forgeries were in fact genuine documents.   The mere fact that the Genga Defendants
17   only represented NMS for eight months is no excuse for their proceeding without
18   probable cause.  *See Sycamore Ridge*, 157 Cal. App. 4th at 1406 (no probable cause
19   where attorney continued to prosecute case for 10 months after being put on notice it
20   lacked probable cause).

21       At most, the Genga Defendants argue that the forged Cover Letter appeared to
22   support the authenticity of the forged "Version 2."  *See* Mot. at 2, 7; Genga Decl., ¶ 6.
23   This argument is as outrageous as it is insulting.  The Genga Defendants had no
24   reasonable basis to believe "Version 2" was genuine and, thus, no reasonable basis to
25   believe the Cover Letter was genuine.  They did nothing to authenticate either
26   document and do not identify a single fact that supported NMS' story that Samek hand
27   delivered both "Version 2" and the Cover Letter to Shekhter in September 2013.
28

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Indeed, the Genga Defendants nowhere explain why, if the Cover Letter supported the authenticity of "Version 2," they did not immediately produce it in August 2015. Instead, they held it back until late September 2015, when they marked it as an exhibit in the Samek deposition.  Nor do the Genga Defendants explain how the sudden appearance of the Cover Letter "shortly" after the June 2015 meet and confer (Mot. at 2) could have inspired confidence that the forged "Version 2" was genuine when, according to NMS, Shekhter received both documents at the same time in September 2010 and "carefully maintained the original hard copies" since then. Compl., Ex. 1 at 73; Srinivasan Decl., Ex. 25 ¶ 14.  Why would the Cover Letter suddenly turn up years after NMS first began touting "Version 2" if NMS had "carefully maintained" both documents since receiving them?  Far from bolstering "Version 2," the Cover Letter only undermines its credibility.

And far from exculpating the Genga Defendants, the Cover Letter only underscores their culpability.  If the Genga Defendants had simply looked at NMS' devices and documents, as they claimed they did, they would have known that "Version 2" was created in July 2013 and that the Cover Letter was therefore a forgery because it referred to "Version 2," which did not exist as of the date of the letter. Compl, Ex. 1 at 91.  And had they looked at NMS' devices and documents, they would have known that Shekhter emailed himself a PDF copy of the Cover Letter on June 21, 2015 and that the PDF was created using a version of Adobe Acrobat that was not available until December 2014. *Id.*; Rubin Decl., ¶¶ 38-39.  And they would also have known that Shekhter created two more versions of the Cover Letter and emailed them to colleagues, asking if they could tell when they had been created. Compl., Ex. 1 at 92; Rubin Decl., ¶ 43.  Either the Genga Defendants failed to do these things, or they did them and simply went along with NMS' extortionate scheme.  Either way, they lacked probable cause to proceed.

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1    Once the Genga Defendants were put on notice that NMS' claims were based on

2  an obvious forgery, they lacked probable cause to continue prosecuting those claims

3  "because [they] had no objective, reasonable basis in the facts known to [them]" to

4  believe "Version 2" and the other forgeries were genuine. *Arcaro*, 77 Cal. App. 4th at

5  159; *see also Zamos*, 32 Cal. 4th at 971–72.

### 2.    There Was a Favorable Termination on the Merits

7    The Genga Defendants lamely suggest that there was no favorable termination

8  on the merits because they had withdrawn or been fired by the time the *Lincoln Studios*

9  court issued the terminating sanctions order and entered judgment.  Mot. at 6.  But this

10  argument not only misstates the law—it is wrong factually.  The Genga Defendants

11  were counsel of record when NMS abandoned 23 causes of action. Srinivasan Decl.,

12  Ex. 34.  A voluntary dismissal is presumed to be a favorable termination on the merits,

13  unless otherwise proved to a jury.  *See Sycamore Ridge*, 157 Cal. App. 4th at 1400.

14  Moreover, all of the remaining claims were ultimately dismissed with prejudice, and

15  AEW's motion for terminating sanctions (which was based, in part, on conduct by

16  NMS that took place while the Genga Defendants were counsel of record) was granted

17  and affirmed on appeal.  A dismissal as a result of discovery sanctions satisfies the

18  element of favorable termination on the merits.  *See, e.g.*, *Daniels*, 182 Cal. App. 4th at

19  222; *Ross v. Kish*, 145 Cal. App. 4th 188, 192 (2006).

### C.    At a Minimum, Discovery Should Be Permitted

21    As set forth above, AEW has made a prima facie showing as to each element of

22  its claim.  To the extent the Court disagrees, it should permit discovery.  The law is

23  clear that where, as here, an anti-SLAPP motion is based on the plaintiff's alleged lack

24  of evidence, discovery must be allowed.  *See, e.g.*, *Planned Parenthood*, 890 F.3d at

25  834–35.  The Srinivasan Declaration sets forth the discovery that AEW would seek if

26  afforded the opportunity.  *See* Srinivasan Decl., ¶¶ 8-10.  The need for discovery here

27  is particularly critical given the application of the crime/fraud exception, and the

28

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Genga Defendants' reliance on the attorney-client privilege to shield their knowledge
of NMS' wrongdoing.  *See* Mot. at 4.

## V.    CONCLUSION

For the foregoing reasons, the Genga Defendants' Motion should be denied.

Dated:  May 3, 2019                    JAMES P. FOGELMAN
                                       GIBSON, DUNN & CRUTCHER LLP


                                       By:  */s/ James P. Fogelman*
                                                James P. Fogelman

                                       Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO THE GENGA DEFENDANTS' SPECIAL
MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT
TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP