1 | GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
2 |   jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
3 |   jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
4 |   smader@gibsondunn.com
333 South Grand Ave.
5 | Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
6 | Facsimile: (213) 229-7520

7 | Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC
8 |

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 | **WESTERN DIVISION**

12 | P6 LA MF Holdings SPE, LLC, a limited liability company,

CASE NO. 2:19-cv-1150-AB-(AFMx)

13 |           Plaintiff,

**PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTIONS TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16 [D.E. 48, 53]**

14 |   v.

15 |

16 | NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,

[*Filed concurrently with Declarations of Jay P. Srinivasan, Eric Samek, Drew Flowers, Jonathan Watson, Gerald M. LaPorte, and Samuel S. Rubin; Evidentiary Objections; and Plaintiff's Request for Judicial Notice; [Proposed] Orders lodged concurrently herewith*]

17 |

18 |

19 |

20 |           Defendants.

21 |

**Hearing:**
Date:    May 24, 2019
22 | Time:    10:00 a.m.
Place:   Courtroom 7B
Judge:   Hon. André Birotte Jr.

23 |

24 |

25 |

26 |

27 |

28 |

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................... 7

II. FACTUAL AND PROCEDURAL BACKGROUND ................................. 9

    A.    September 2010—AEW and NMS Capital Form a Joint Venture. ........... 9

    B.    July 2013—NMS Creates a Forged Version of the JVA. ........................ 10

    C.    April 2015—NMS Files Suit Based on the Forgery. ............................... 11

    D.    June 2015—The Zelig Defendants Are Alerted to The Forgery. ............ 13

    E.    September/October 2015—The Zelig Defendants Hear Testimony from NMS' Former Lawyer and President That The "Typo" Story Is Untrue. .............................................................................................. 14

    F.    Late 2015—The Zelig Defendants Aid And Abet NMS' Scheme To Suppress, Alter and Destroy Evidence. ................................................ 14

    G.    January 2016—NMS' New Complaint Continues to Rely on the Forgery. ............................................................................................. 16

    H.    January/February 2016—In The Face of AEW's Expert Declarations Exposing NMS' Forgeries, the Zelig Defendants Do Not Submit Expert Declarations Opining Otherwise. ............................. 17

    I.    September/October 2016—The Zelig Defendants' Strategy at The Evidentiary Hearing Makes Clear They Knew NMS Forged the Documents. ........................................................................................ 18

    J.    November/December 2016—The Court's Order and Judgments. ........... 19

    K.    June 2018—The Court of Appeal Affirms Judgment Against NMS. ..... 19

    L.    The Zelig Defendants' Misconduct Was Not Limited to the Lawsuit. ............................................................................................ 20

III. LEGAL STANDARD ............................................................................ 20

IV. ARGUMENT ........................................................................................ 21

    A.    The Zelig Defendants Failed to Satisfy the Meet and Confer Requirements. ..................................................................................... 21

    B.    AEW Has Made a Prime Facie Showing ............................................. 22

        1.    The Zelig Defendants Lacked Probable Cause ............................. 22

        2.    The Zelig Defendants Acted with Malice ..................................... 28

    C.    The Court Should Reject the Zelig Defendants' Lame Excuses ............ 30

PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

D.    At a Minimum, Discovery Should Be Permitted .....................................31

V. CONCLUSION ........................................................................................31

Gibson, Dunn & Crutcher LLP

3

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1

## TABLE OF AUTHORITIES

2

Page(s)

3 **Cases**

4 *Albertson v. Raboff,*
5     46 Cal. 2d 375 (1956) ................................................................. 28

6 *Arcaro v. Silva & Silva Enters. Corp.,*
    77 Cal. App. 4th 152 (1999) ........................................ 23, 24, 25
7

8 *Bertero v. Nat'l Gen. Corp.,*
    13 Cal. 3d 43 (1974) ................................................................. 22
9

10 *In re Branch,*
    70 Cal. 2d 200 (1969) ............................................................... 30

11 *Cheveldave v. Tri Palms Unified Owners Ass'n,*
12     27 Cal. App. 5th 1202 (2018) ................................................... 21

13 *Crowley v. Katleman,*
14     8 Cal. 4th 666 (1994) .......................................................... 26, 27

15 *Daniels v. Robbins,*
16     182 Cal. App. 4th 204 (2010) .......................................22, 28, 29

17 *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP,*
    184 Cal. App. 4th 313 (2010) ................................................... 22
18

19 *HMS Capital, Inc. v. Lawyers Title Co.,*
    118 Cal. App. 4th 204 (2004) ................................................... 21
20

21 *Jay v. Mahaffey,*
    218 Cal. App. 4th 1522 (2013) ................................................. 22

22 *L.G. v. M.B.,*
23     25 Cal. App. 5th 211 (2018) ..................................................... 27

24 *Masterson v. Pig'n Whistle Corp.,*
25     161 Cal. App. 2d 323 (1958) ................................................... 26

26 *Medley Capital Corp. v. Sec. Nat'l Guar., Inc.,*
27     17 Cal. App. 5th 33 (2017) ....................................................... 28

28

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

*Mendez v. Superior Ct.*,
   162 Cal. App. 4th 827 (2008) .................................................................... 30

*Nix v. Whiteside*,
   475 U.S. 157 (1986) ................................................................................ 30

*Nunez v. Pennisi*,
   241 Cal. App. 4th 861 (2015) .................................................................... 22

*Oasis W. Realty, LLC v. Goldman*,
   51 Cal. 4th 811 (2011) ............................................................................ 21

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
   2017 WL 7411154 (C.D. Cal. June 8, 2017) ................................................ 7

*P6 LA MF Holdings SPE, LLC v. Shekhter*,
   738 F. App'x 563 (9th Cir. 2018) ................................................................ 7

*Parrish v. Latham & Watkins*,
   3 Cal. 5th 767 (2017) ........................................................................ 26, 28

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018) ........... 21, 31

*Ross v. Kish*,
   145 Cal. App. 4th 188 (2006) .................................................................... 22

*Sangster v. Paetkau*,
   68 Cal. App. 4th 151 (1998) ...................................................................... 22

*Sheldon Appel Co. v. Albert & Oliker*,
   47 Cal. 3d 863 (1989) .............................................................................. 22

*Soukup v. Law Offices of Herbert Hafif*,
   39 Cal. 4th 260 (2006) ............................................................................ 25

*Sparling v. Bank of Am., Nat'l Ass'n*,
   2018 WL 5099728 (C.D. Cal. Mar. 29, 2018) ............................................... 30

*SuperGuide Corp. v. Gemstar Dev. Corp.*,
   2010 WL 11463159 (C.D. Cal. June 3, 2010) .............................................. 26

*Sycamore Ridge Apartments, LLC v. Naumann*,
   157 Cal. App. 4th 1385 (2007) ............................................................ 28, 29, 30

5

Gibson, Dunn &
Crutcher LLP

*Thao v. Donovan*,
    2012 WL 4052032 (E.D. Cal. Sept. 14, 2012) ........................................................ 28

*Tichinin v. City of Morgan Hill*,
    177 Cal. App. 4th 1049 (2009) ........................................................ 30

*Wilson v. Parker, Covert & Chidester*,
    28 Cal. 4th 811 (2002) ........................................................ 27

*Wright v. Ripley*,
    65 Cal. App. 4th 1189 (1998) ........................................................ 26, 27

*Zamos v. Stroud*,
    32 Cal. 4th 958 (2004) ........................................................ 23, 25

**Statutes**

Cal. Civ. P. Code § 128.5 ........................................................ 30

Cal. Civ. P. Code § 128.7 ........................................................ 30

Cal. Civ. P. Code § 425.16(b)(2) ........................................................ 21

Cal. Evid. Code § 1152(a) ........................................................ 13

**Rules**

Cal. R. Prof'l Conduct, Rule 3-200(A) ........................................................ 30

Fed. R. Civ. P. 11 ........................................................ 30

Fed. R. Evid. 408 ........................................................ 13

Gibson, Dunn &
Crutcher LLP

6

## I.     INTRODUCTION

The Zelig Defendants'[1] anti-SLAPP motions should be denied in their entirety, just as a similar motion filed by the Miller Defendants[2] on behalf of NMS Capital Partners I, LLC ("NMS") was denied in *P6 LA MF Holdings SPE, LLC v. Shekhter*, 2017 WL 7411154 (C.D. Cal. June 8, 2017), a decision recently upheld by the Ninth Circuit, *see P6 LA MF Holdings SPE, LLC v. Shekhter*, 738 F. App'x 563, 564 (9th Cir. 2018).  The Zelig Defendants do not dispute that *Lincoln Studios*[3] was based on forgeries and perjury and lacked probable cause, but claim, based only on conclusory, self-serving declarations, that they were not involved in all of the wrongdoing that led to the Terminating Sanctions Order and Final Judgment against their client, NMS.  The Zelig Defendants assert that they conducted an investigation before filing suit but fail to identify a scintilla of evidence supporting the forgeries and perjury they and NMS wrongfully submitted to the court in *Lincoln Studios* and relied on for years.  The Zelig Defendants wrongfully pursued a civil case against P6 LA MF Holdings SPE LLC's ("AEW") seeking $12 billion in alleged damages based on known forgeries, fraud and perjury, and destroying and suppressing evidence ordered by the trial court to be preserved and produced.  The Zelig Defendants also claim that because they were not assessed a monetary sanction in *Lincoln Studios*, and because the forgeries and perjury submitted by an NMS *affiliate* in a *different* case, in which the affiliate was a *defendant*, defrauded that other court into denying a motion for preliminary injunction that AEW had filed in that case (injunctive relief that was later *granted* in *Lincoln Studios* after NMS' fraud in *both* cases was exposed), AEW is somehow precluded from establishing that the Zelig Defendants lacked probable cause in pursuing *Lincoln*

---

[1]  As used herein, the "Zelig Defendants" refers to Defendants Steven Zelig, Brentwood Legal Services, and WLA Legal Services, Inc.

[2]  As used herein, the "Miller Defendants" refers to Defendants Miller Barondess LLP, Louis R. Miller, James Goldman, Alexander Frid, and Jason Tokoro.

[3]  As used herein, *Lincoln Studios* refers to *Lincoln Studios, LLC, et al. v. DLA, et al.*

7

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

*Studios*.  Not only are these arguments contrary to well-settled law, but they defy common sense.

AEW's 59-page Complaint details overwhelming evidence that the Zelig Defendants not only knew of their client's fraud, but were active participants in the misconduct, acting with malice.  The Zelig Defendants fail to offer any explanation for their assertion, for years, that NMS' obviously forged copy of the parties' September 2010 Joint Venture Agreement ("JVA") was an "original," genuine document from September 2010, created because of an alleged "typo."  Literally ***every witness***, other than NMS' principal, Neil Shekhter (a confirmed perjurer), including NMS' own former president and deal counsel, and ***every contemporaneous document***, confirmed there was never any such typo and that NMS' "Version 2" of the JVA was a forgery. The Zelig Defendants did not even ask an expert to opine that "Version 2" was an original document from September 2010 and, worse, hid from the experts they ultimately retained the fact that NMS was asserting that "Version 2" was an original document from that time period—an assertion *NMS' own experts rejected* at the 8-day evidentiary hearing held on AEW's Terminating Sanctions Motion.  Yet not only did the Zelig Defendants continue to pursue *Lincoln Studios* for years, even after the forgeries, perjury, and evidence destruction was exposed, but they also made numerous patently false statements to AEW's counsel and to the trial court, and actively suppressed evidence of the forgeries and perjury that had been ordered produced, all in an effort to keep NMS' frivolous litigation alive.  The Zelig Defendants also filed numerous copycat lawsuits against AEW based on the same known forgeries and fraudulent allegations, all of which were dismissed.

In short, the Zelig Defendants' outrageous conduct is exactly what the malicious prosecution laws are designed to remedy, and AEW is entitled to its day in court to seek redress for the millions of dollars in damages they caused.  AEW has submitted substantial evidence that every one of the 31 causes of action they pursued on behalf of

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

Gibson, Dunn &
Crutcher LLP

NMS in *Lincoln Studios* lacked probable cause.  If even one cause of action lacked
probable cause then the Zelig Defendants' motion must be denied, and here the
evidence establishes that they all lacked probable cause.  Even if Zelig's declaration
were credited, at best it would only establish a factual dispute as to some of the claims
the Zelig Defendants pursued on NMS' behalf in *Lincoln Studios*, a factual dispute that
would have to be decided in favor of AEW at this stage of the case.  Moreover, the
Zelig Defendants failed to satisfy the requirement that they meet and confer seven days
before filing their motions.  Thus, the Zelig Defendants' motions should be denied, or,
at the very least, AEW should be permitted discovery to respond further to them,
including discovery into the communications with NMS that the court in *Lincoln
Studios* already held are governed by the *crime-fraud* exception.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[4]

The Zelig Defendants offer no meaningful response to the Complaint's detailed
factual allegations.  They do not deny that NMS forged documents, committed perjury,
and destroyed evidence.  And they provide no explanation for why they continued to
prosecute NMS' claims despite being on notice that those claims were based on a
forgery and obvious lies.  As the facts make clear, a reasonable jury could conclude
that the Zelig Defendants pursued NMS' claims knowing or recklessly disregarding
that they lacked merit.

**A.    September 2010—AEW and NMS Capital Form a Joint Venture.**

On September 8, 2010, AEW and NMS executed the JVA and formed the Joint
Venture ("JV"), which went on to acquire and develop a portfolio of nine properties
(the "Properties").  Declaration of Jonathan Watson ("Watson Decl."), ¶¶ 3–4.  As the
trial court would later hold, and the Court of Appeal would later affirm, the JVA
contained a single mechanism by which either member could "buy out" the other
member's JV interest—the heavily negotiated Buy/Sell provision in Article 11 of the

---

[4]  A more complete summary of the material facts is set forth in the Complaint.

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

1   JVA.  Watson Decl., Ex. 1 § 11.1; Compl. Ex. 1 at 10, Ex. 4 at 337, 350–51.  The

2   Buy/Sell mechanism did not confer a unilateral acquisition right, but instead defined a

3   process by which one member could invoke the Buy/Sell process and the other

4   member could elect to sell its interest in the JV to the other member or buy the other

5   member's interest.  *Id.*, ¶ 6; Compl., Ex. 4 at 337, 350–51.  The Buy/Sell provision

6   could not be exercised until "after five (5) years" from the September 8, 2010

7   execution date of the JVA.  Watson Decl., Ex. 1 § 11.1; Compl., Ex. 1 at 68–72, Ex. 3

8   at 328.  NMS' deal counsel had specifically demanded the 5-year Buy/Sell term, and it

9   remained unchanged through subsequent drafts, the executed JVA, and the amended

10  JVA.  *Id.*, ¶ 7; Declaration of Jay P. Srinivasan ("Srinivasan Decl."), Ex. 3 at 2, 72;

11  Compl., Ex. 1 at 68–69.

12          In January 2011, the parties amended the JVA to accommodate NMS' inability

13  to meet the 30% capital contribution.  Watson Decl., ¶ 9.  AEW and NMS agreed to

14  incorporate the concept of "Specified Properties," which permitted NMS to make

15  capital contributions for certain Properties at a lower rate (usually 10%) and credited it

16  at that lower contribution level.  *Id.*; *id.*, Ex. 1, § 1 at p. 22, § 6.1(b).  From January

17  2011 onwards, NMS generally provided only 10% of the capital, while AEW

18  contributed 90% (up from the original 70%).  *Id.*, ¶ 9.  Accordingly, NMS' share of the

19  JV's assets and proceeds went from 30% to a smaller percentage.  *Id.*  The 5-year

20  Buy/Sell provision remained unchanged in the amended JVA, which was submitted to

21  the JV's lenders and ratified by NMS as authentic and valid on numerous occasions.

22  *Id.*, ¶ 11; Compl., Ex. 1 at 68–69.  Further, when NMS made capital calls for the Joint

23  Venture, it did so on a roughly 90/10 basis for years after the JVA was amended to add

24  the Specified Properties language.  Watson Decl., ¶ 11.

25  **B.    July 2013—NMS Creates a Forged Version of the JVA.**

26          In 2013, with real estate values rebounding, NMS became dissatisfied with the

27  deal it negotiated.  So in July 2013, NMS forged a version of the JVA with a 3-year

28

Gibson, Dunn &
Crutcher LLP

10

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

Buy/Sell provision, not the 5-year Buy/Sell provision that the parties agreed to.
Compl., Ex. 1 at 72–81, Ex. 5; Declaration of Samuel S. Rubin ("Rubin Decl."), ¶¶
17–32.  NMS also eliminated the "Specified Properties" language in its forged JVA,
which Defendants dubbed "Version 2" in the underlying lawsuit.  Watson Decl., ¶ 9,
Compl. Ex. 1 at 70–71.  NMS' motivation was obvious—by eliminating the Specified
Properties language, NMS wished to recoup a higher share of JV profits than its fair
share and wished to trigger the Buy/Sell provision earlier than permitted.  *Id*.

NMS would later allege (and NMS' Neil Shekhter would later repeatedly testify
that after receiving the original, executed JVA in September 2010, which Defendants
later dubbed "Version 1," Shekhter "noticed that Version 1 appeared to contain a
mistake, i.e., that the Buy/Sell provisions stated that the Buy/Sell procedure could
occur after 5 years, instead of after 3 years;" that Shekhter then "contacted" AEW's
Eric Samek and that Samek "told" Shekhter he would "revise Version 1 so that it
stated 'Buy/Sell' could occur after 3 years, instead of after 5 years"; that AEW
subsequently "delivered a corrected operating agreement ('Version 2')"—***i.e., the
forgery***—by hand to Shekhter in September 2010; and that AEW "fabricated another
version of the operating agreement (Version 3)"—*i.e.*, the JVA as amended to include
the Specified Properties—"by lifting [Shekhter's] signature from other documents and
physically placing it into Version 3."  Declaration of Jay P. Srinivasan ("Srinivasan
Decl."), Ex. Ex. 9, ¶¶ 37–40, Ex. 18, ¶¶ 101–02, Ex. 25, ¶¶ 14–18; Compl., Ex. 1 at
74–75, Ex. 5 at 363–64.  Every aspect of this "typo" story is a lie as definitively
established by the forensic examination, which showed that the hard copy of "Version
2," which Shekhter claimed to have received from Samek in September 2010 (and
which he supposedly maintained in a safe since), was printed on a printer at NMS'
offices in July 2013.  Compl., Ex. 1 at 88–93; Rubin Decl., ¶¶ 29–32.

**C.    April 2015—NMS Files Suit Based on the Forgery.**

In 2014, after suing its own deal counsel, NMS filed the underlying lawsuit at

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

Gibson, Dunn &
Crutcher LLP

issue—the *Lincoln Studios* lawsuit—against AEW's deal counsel for purportedly failing to include a 3-year Buy/Sell provision. Srinivasan Decl., Ex. 7. In April 2015, NMS filed its First Amended Complaint ("FAC"), naming AEW and its employees and affiliates as defendants and alleging for the first time that its forgery was the operative JVA even though NMS' prior complaints never mentioned it. *Id.*, Ex. 9. The 217-page, 660-paragraph FAC asserted a staggering 30 causes of action against AEW, its employees, and affiliates. *Id.* The FAC repeated Neil Shekhter's false "typo" story, alleging that the 5-year Buy/Sell provision in the executed version copy of the JVA was a "typo" that AEW agreed to "fix," that AEW delivered the forgery to NMS in September 2010, and that "Version 3" with the Specified Properties language (the actual version of the JVA) was a forgery created by AEW. *Id.*, ¶¶ 37–40, 48–49.

There is no longer any disputing that NMS "brought [the] case upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries." Compl., Ex. 1 at 138. The California Superior Court definitively found that NMS forged the JVA and two other related documents: (1) a cover letter that NMS falsely contended accompanied the forged JVA; and (2) a property management agreement ("PMA") that NMS forged to stave off an adverse ruling by the California Superior Court in a related action.[5] Compl., Ex. 1 at 72–93. In the default judgment that the Superior Court entered against NMS, the court expressly held that "Version 2" of the JVA "is a fabrication and forgery created by NMS and its affiliates," and that NMS "committed a broad variety of fraudulent conduct [and] misrepresentations," including forging "Version 2"

---

[5] Of note, Shekhter, who created both of these forgeries, sent a botched version of the forged La Cienega PMA to the Zelig Defendants, that contained an error that would disprove its provenance. Compl., Ex. 1 at 83–84, Rubin Decl., ¶ 52. Shekhter soon realized his mistake and sent a "fixed" version of the forgery to the Zelig Defendants, who submitted the forgery to the Court in the related action and later in the underlying litigation. *Id.* Because they received the botched forgery, the Zelig Defendants obviously had reason to suspect a forgery. But they never did anything about it and suppressed the documents despite multiple court orders that such documents be produced. Declaration of Jay P. Srinivasan, ¶ 5.

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

and other documents and making "misrepresentations and false statements in connection with these forgeries."   Compl., Ex. 3 at 328–29.  This default judgment was affirmed, in full, by the Court of Appeal.  *Id.*, Ex. 5.

The Zelig Defendants do not deny that this misconduct occurred.  Nor do they explain how they could have taken on the representation of NMS and prosecuted NMS' baseless claims for years without taking any identified steps to investigate NMS' obvious forgeries and lies.  Such an explanation is critical where, as here, the evidence shows that no reasonable lawyer could have pursued NMS' claims without realizing that they were based on an obvious forgery and an unconvincing pack of lies to prop up that forgery.  To underscore how even a cursory investigation into the forgery by the Zelig Defendants would have revealed its character, AEW's forensic document expert—formerly with the United States Secret Service and currently employed by the Department of Justice—opined that, in his 20-plus year career, "this is one of the top five cases that I have worked on where the forgery seemed so blatant." La Porte Decl., ¶ 131.  Further, as set forth below, the Zelig Defendants' conduct in the litigation makes clear that they knew the case was based on a forgery and nevertheless continued to pursue it.

## D.    June 2015—The Zelig Defendants Are Alerted to The Forgery.

On June 16, 2015, just two months after the Zelig Defendants filed the First Amended Complaint ("FAC") against AEW, counsel for AEW and NMS met for a court-ordered and court-reported discovery conference.  Srinivasan Decl., Ex. 14.  Defendant Zelig was present.  *Id.*  He, along with NMS' other counsel, were expressly informed that NMS' lawsuit was based on a forged JVA, that emails from NMS' own deal counsel proved that NMS' "typo" story was false, and that "Version 2" of the JVA was a forgery.  *Id.* at 139:23–152:25.  Among other things, Defendant Zelig and his co-counsel received copies of a July 2010 email from NMS' deal counsel, demanding that the JVA include a 5-year Buy/Sell.  *Id.* at 139:23–150:25.  There is no

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

evidence that the Zelig Defendants ever investigated these facts.  They never produced a *single* document that corroborated their claim that the forgery was genuine or that NMS' "typo" story was true.

**E.     September/October 2015—The Zelig Defendants Hear Testimony from NMS' Former Lawyer and President That The "Typo" Story Is Untrue.**

In Fall 2015, AEW's outside deal counsel, NMS' outside deal counsel, and NMS' former president, among several others, were deposed.  Srinivasan Decl., Exs. 75–80.  All witnesses confirmed there was no "typo" in Article 11 of the JVA, that NMS requested the 5-year Buy/Sell, and that the 5-year Buy/Sell was included in every draft, every executed version of the JVA, and all amendments to the JVA.  *Id.*, Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78 at 76:17–78:21, 92:16 – 93:4, 129:18–130:8.  Further, they confirmed there was no confusion over this issue and no evidence supporting NMS' false claim that the parties intended to contract for a 3-year Buy/Sell provision.  *Id.*  At this point, the Zelig Defendants knew that nobody, including former executives at NMS, supported the validity of the forgery upon which they were suing AEW.  To the contrary, they were confronted with a record where every single witness testified under oath that NMS requested the 5-year Buy/Sell provision and that there was no typo in Article 11 of the JVA.  And yet the Zelig Defendants pressed on with the lawsuit.

**F.     Late 2015—The Zelig Defendants Aid And Abet NMS' Scheme To Suppress, Alter and Destroy Evidence.**

In Fall 2015, just as NMS' former lawyers and executives were refuting NMS' allegations, AEW brought the forgeries to the attention of the *Lincoln Studios* court, and sought forensic preservation orders.  Srinivasan Decl., Ex. 16.  In Fall 2015, the court ordered NMS, among other things, to freeze all of its computers and electronic devices, to produce a list of every device on which the forged JVA and the two other

Gibson, Dunn & Crutcher LLP

14

forgeries had ever appeared, and eventually to turn over all hardcopies of the forgeries and its devices to AEW's experts for forensic examination. *Id.*, Exs. 17, 29.

Rather than comply with the court's orders, the Zelig Defendants and their co-counsel tried to keep this material from AEW's experts and otherwise obstructed the process. For example, before turning over hardcopies of the forgeries, Defendant Zelig threatened to cut (literally) the original, hardcopies of the forgeries in half and that, "[i]f you take the letter, and it ends up being dated at any other time in 2010, *it will be our position that you have altered or substituted the document*." *Id.*, Ex. 65 at 2 (emphasis added). No reasonable lawyer would send or receive that email, believing the document was genuine, and the Zelig Defendants have never explained the basis for their repeated assertions to the Court that NMS' obvious forgery was an original document from September 2010.

When NMS eventually produced the hardcopy originals of the forged documents and many (but not all) of the NMS devices that touched the forgeries, AEW's experts were able to show (and the trial court and appellate court) would agree that NMS engaged in a massive, coordinated campaign to manipulate, destroy, and suppress evidence—something that would have been mitigated had NMS' devices and documents been properly preserved and produced. Compl., Ex. 1 at 93–108. AEW was able to prove that, as part of this scheme, NMS was erasing and manipulating documents and devices just minutes before AEW's forensic team arrived. *Id*. But more astonishing still is that Defendant Frid of the Miller firm and Defendant Zelig, along with Shekhter, were on the NMS premises the same evening as when, as NMS' own forensic expert conceded, the spoliation was taking place. Srinivasan Decl., ¶ 4; & Ex. 89, ¶¶ 38–39.

The Zelig Defendants' misconduct did not end there. When it became clear to AEW that key NMS devices, including those that directly facilitated or created the forgeries, were not turned over for forensic examination, AEW's counsel reached out

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

to the Zelig Defendants and their co-counsel, identifying the relevant devices and asking that they be produced. Srinivasan Decl., Exs. 36, 37. In response, the Miller Defendants, in emails that included the Zelig Defendants, repeatedly claimed (falsely) that the devices did not exist and only produced them when AEW threatened to go to the court over the issue. *Id.*; *id.*, Exs. 30–32, 35. So not only did the Zelig Defendants prosecute a case based on a forgery for which there was no supporting evidence, they joined their client in actively attempting to suppress evidence of the forgery. *Id.*; see also *id.*, Ex. 65.

Notwithstanding NMS' intentional spoliation, AEW's experts were able to prove NMS' misconduct. Their findings were set forth in their declarations below and are reflected in the trial court's order. Srinivasan Decl., Exs. 40, 41; Rubin Decl.; LaPorte Decl.; Compl, Ex. 1 at 72–93. The Complaint contains detailed allegations regarding NMS' misconduct based on their findings, and both experts have submitted declarations in support of AEW's opposition. Notably, NMS did not challenge any of the trial court's factual findings and they were all affirmed by the Court of Appeal. *Id* Nor do the Zelig Defendants challenge those findings now.

**G.    January 2016—NMS' New Complaint Continues to Rely on the Forgery.**

In January 2016, the Zelig Defendants filed a Third Amended Complaint ("TAC"). Srinivasan Decl., Ex. 38. The TAC continued to falsely allege that "Version 2" was genuine, that "Version 1" contained a "mistake" that AEW supposedly "fixed," and that "Version 3" was a forgery created by AEW. *Id.*, ¶ 22b. In a deliberate decision to avoid relying on the altered Buy/Sell provision in Article 11 of the forged "Version 2," the Zelig Defendants "***completely change[d] [NMS'] theory***" in the TAC.[6] Dkt. 41 at 3; Srinivasan Decl., Ex. 38. But Defendants' new theory, like their old one, depended on the false allegation that "Version 3" was a forgery and that NMS

---

[6]  Prior to filing the TAC, NMS abandoned 23 of its claims rather than oppose a demurrer, which claims were dismissed with prejudice. Srinivasan Decl., Ex. 92.

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

never agreed to the Specified Properties language—even though not a single witness
(other than Shekhter) supported those allegations.[7]  Srinivasan Decl., Ex. 43, ¶ 22b.  It
was obvious at the time, and even more so now, that the Article 6 theory was nothing
more than a contrivance to shift the focus of the case away from the forgery without
expressly disavowing the forgery.  The trial court would find that the Zelig
Defendants' attempt to shift the case to one based on Article 6 was baseless as a matter
of law before dismissing the Article 6 claims on the pleadings, which dismissal the
Court of Appeal would later affirm.  Srinivasan Decl., Ex. 47; Compl. Ex. 4 at 352.

## H.    January/February 2016—In The Face of AEW's Expert Declarations Exposing NMS' Forgeries, the Zelig Defendants Do Not Submit Expert Declarations Opining Otherwise.

The Zelig Defendants do not dispute that AEW's experts opined that NMS
created multiple forgeries or that their opinions were supported with detailed evidence.
Nor do the Zelig Defendants contend that they reevaluated or changed their position in
any way when confronted with this evidence, which included forensic evidence that
indisputably showed that the forged JVA that NMS claimed was created in September
2010 was actually created in July 2013 on an NMS printer.  Instead, in response, the
Zelig Defendants submitted a declaration from NMS' Shekhter—that the trial court
would later find to be perjurious—and declarations from four experts.  Compl., Ex. 1
at 108–119. Critically, none of the experts opined that the documents were genuine.
*Id.* at 80:5–12.  In fact, one of the experts, a physical document expert, later admitted
on cross-examination that NMS' lawyers had not told him that NMS was holding out
the June 2013 forgery as an original from September 2010.  Srinivasan Decl., Ex. 71 at

---

[7]  There can no doubt that the Zelig Defendants did not believe "Version 3" was a
forgery.  They were in possession of an August 2013 email from NMS' deal
counsel to NMS' former General Counsel in which the deal counsel confirmed
unequivocally that "Version 3" was the genuine and operative version of the JVA,
writing that "Version 3" "has been treated as the [operative agreement] and
presented as so on all transactions . . . NMS has consistently certified that ["Version
3"] is the [operative agreement]."  Srinivasan Decl., Ex. 6 at 2, 75.

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

13:12-23.  The Zelig Defendants' calculated decision to leave this expert in the dark indicates that they knew that their own expert would not agree that the forgery was genuine.  Yet, the Zelig Defendants continued to represent to the trial court that the forgeries were authentic, and continued to repeat the false "typo" story.

**I.      September/October 2016—The Zelig Defendants' Strategy at The Evidentiary Hearing Makes Clear They Knew NMS Forged the Documents.**

On July 29, 2016, the trial court issued an order finding that NMS had engaged in "purposeful, bold, breathtaking violations of this Court's Orders that are UNDISPUTED and ADMITTED" but set an evidentiary hearing "to determine the additional violations claimed by moving parties and the type and extent of sanctions to be imposed" and to assess witness "credibility."  Srinivasan Decl., Ex. 58.  In October 2016, an evidentiary hearing on AEW's terminating sanctions motion took place over eight days and multiple fact witnesses and six expert witness (two for AEW and four for NMS) testified.  Srinivasan Decl., Ex. 71.  The trial court repeatedly stated to the parties that the entire purpose of the hearing was to hear from the key declarants in order to assess their credibility.  *Id.* at 8:3, 3:21–22, 6:9–12.  Yet, the Zelig Defendants did not offer a single lay witness to testify about the forgeries—not even Shekhter, who was the only individual who submitted a declaration advancing the "mistake" story and who was the only person who ever claimed to have found or received the forgeries.  Compl., Ex. 1 at 119–20.  NMS's entire lawsuit was built on Shekhter's deposition testimony and declarations that the three forgeries were genuine.  Yet, for reasons they have never explained, the Zelig Defendants did not call him to testify.  *Id.* Critically, absent the testimony of Shekhter, the Zelig Defendants could not have reasonably expected a judgment in favor of NMS.

Nor did the Zelig Defendants put on any other evidence to prove the authenticity of "Version 2," the Cover Letter, or the La Cienega PMA.  Not a single fact witness supported NMS' bogus "typo" story.  Not one of NMS' experts opined that "Version

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

2" was authentic.  *Id.*  One of NMS' experts even agreed that "Version 2" was created

on July 15, 2013, *id.* at 119; *id.*, Srinivasan Decl., Ex. 71 at 15:22–26, and another

testified that NMS' actions were "stupid," "horrendous," "bad," and "dumb," Compl.

Ex. 1 at 115, Srinivasan Ex. 71 at 8:24–25, 15:23.  Shekhter admitted in a declaration

filed prior to the hearing that he had intentionally replaced his computer hard drive and

deleted files, Srinivasan Decl., Ex. 87 at ¶¶ 147-151, and other NMS employees

admitted that they destroyed evidence, Compl., Ex. 1 at 105.

**J.    November/December 2016—The Court's Order and Judgments.**

On November 22, 2016, the court issued an order granting terminating sanctions

based on NMS' "shocking, intentional, and pervasive" misconduct.  Compl., Ex. 1 at

124.  The court found that "Version 2," the Cover Letter, and the La Cienega PMA

were forgeries created by NMS, that NMS knowingly "provided false testimony under

oath," and that NMS had engaged in "coordinated, intentional widespread destruction

of evidence."  *Id.*, at 108, 127.  The court concluded that Appellants "brought this case

upon forged documents, committed perjury, and then intentionally and purposefully

destroyed a wide swath of evidence relating to the forgeries."  *Id.* at 138.  Based on

these findings, the court awarded terminating sanctions.  Compl., Ex. 1.  While the trial

court declined to impose monetary sanctions on the NMS' counsel, it did not set forth

its reasoning.  The order was simply silent on that issue.

On December 1, 2016, the trial court entered judgment against NMS on all of its

claims.  Compl., Ex. 2.  On December 2, 2016, the court entered a default judgment

against NMS and in favor of AEW on its cross-complaint.  Compl., Ex. 3.  The default

judgment found that "Version 2" was a forgery created by NMS.  *Id.* at 328.

**K.    June 2018—The Court of Appeal Affirms Judgment Against NMS.**

On June 20, 2018, the Court of Appeal affirmed the terminating sanctions order

and the judgments as against NMS.  Compl., Ex. 5.  Notably, NMS did not challenge

the trial court's factual findings.  *Id.* at 381.  Instead, NMS argued that the forgeries

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

were "*__irrelevant__*" and that "*__[s]ince the forgery is irrelevant, perjury about the forgery must be irrelevant too__*." Srinivasan Decl., Ex. 85 (emphasis added).

**L.      The Zelig Defendants' Misconduct Was Not Limited to the Lawsuit.**

To this day, the Zelig Defendants have not disavowed the forgeries, repudiated or withdrawn the perjurious declaration, or come clean about NMS' massive spoliation of evidence. To the contrary, they pursued NMS' frivolous claims on appeal and have filed and subsequently dismissed a series of copycat lawsuits involving the same false and misleading allegations regarding the authenticity of the JVA. Srinivasan Decl., Exs. 43, 45, 56, 59, 61. Indeed, between January 2016 and August 2016, the Zelig Defendants filed no less than five separate lawsuits on behalf of NMS and Shekhter that targeted AEW, its affiliates, and its attorneys—all of which were subsequently dismissed. *Id.*; *id.*, Exs. 67–70. The Zelig Defendants filed multiple additional lawsuits against AEW's counsel of record, Gibson Dunn, all of which were dismissed. Exs. 43, 45, 56, 59, 61. There can be no question that the lawsuits were filed for the improper purpose of increasing the pressure on AEW and forcing a settlement. In an August 8, 2016 letter, Shekhter expressly warned an affiliate of AEW that "*__[o]ne way or another__*, I intend to pay-back and/or buy-out AEW and get AEW and its AEW Fund VI investors out of this portfolio," and that "*__[y]our [AEW's] best case scenario is years of litigation__* before there is any finality or resolution." *Id.*, Ex. 60 (emphases added).

### III.   LEGAL STANDARD

In deciding anti-SLAPP motions, court consider the pleadings as well as affidavits. Cal. Civ. P. Code § 425.16(b)(2). Courts must "accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004). "If the plaintiff can show a probability of prevailing on *any part of its claim,* the cause of action is not meritless

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

1   and will not be stricken." *Oasis W. Realt*y, *LLC v. Goldman*, 51 Cal. 4th 811, 820

2   (2011) (internal quotations omitted, emphasis in original).  Where, as here, the motion

3   turns on the facts, "discovery must be allowed . . . before any decision is made. . . ."

4   *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834-

5   35 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018).

## IV.   ARGUMENT

### A.   The Zelig Defendants Failed to Satisfy the Meet and Confer Requirements

The Zelig Defendants did not timely meet and confer before filing their motions.

Defendant WLA Legal Services filed its motion on April 22, 2019 but did not even

attempt to meaningfully meet and confer before filings its motion.  Instead, Defendant

Zelig sent an email the very morning it filed its motion, on April 22, asking AEW to

simply accept the email as "an admittedly belated meet and confer." Srinivasan Decl.,

Ex. 93.  Pursuant to Local Rule 7-3, Defendant WLA Legal Services was required to

meet and confer "at least seven (7) days prior to the filing of the motion." C.D. Cal.

L.R. 7-3.  As this Court's Standing Order makes clear, it "strictly enforces Local Rule

7-3." (Dkt. 12, p. 4.)  Defendant WLA Legal Services' same-day email plainly does

not comply with the Court's rule and so the Court should deny the motion.  *See, e.g.,*

*Rivera v. County of San Diego*, 2017 WL 6001689, at *1 (C.D. Cal. May 18, 2017)

(denying motion for summary judgment for failure to meet and confer); *Access Ins.*

*Co. v. Paralta*, 2015 WL 13036938, at *1 (C.D. Cal. Oct. 13, 2015) (striking motion to

dismiss for failure to meet and confer); *Superbalife, Int'l v. Powerpay*, 2008 WL

4559752, at *1-2 (C.D. Cal. Oct. 7, 2008) (denying motion to dismiss for failure to

meet and confer).

Similarly, Defendants Zelig and Brentwood Legal Services also failed to timely

meet and confer.  These defendants filed their motions on April 26, 2019, mandating a

meet and confer by April 19, 2019.  But again, they failed to meet and confer seven

days in advance of filing.  (Srinivasan Decl., ¶ 7.)  The Court can and should deny

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

their motions on this basis alone.

**B.    AEW Has Made a Prime Facie Showing**

To defeat this motion, AEW need only show the minimal merit of its claim by making a prima facie showing. *See Cheveldave v. Tri Palms Unified Owners Ass'n*, 27 Cal. App. 5th 1202, 1214 (2018). The elements of malicious prosecution are lack of probable cause, malice, and favorable termination on the merits. *See Bertero v. Nat'l Gen. Corp.*, 13 Cal. 3d 43, 50 (1974).[8] As set forth below, the evidence is more than sufficient to establish a prima facie case for each of these elements.

**1.    The Zelig Defendants Lacked Probable Cause**

Probable cause is a question of law. *Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 875 (1989). The standard is objective. *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2010). The question "is whether, on the basis of the facts known to the defendant, the prosecution of the prior action was legally tenable." *Sangster v. Paetkau*, 68 Cal. App. 4th 151, 164 (1998).

Probable cause to bring a cause of action exists when it is based on facts reasonably believed to be true and all asserted theories are legally tenable. *See Jay v. Mahaffey*, 218 Cal. App. 4th 1522, 1540 (2013). Probable cause for a cause of action is lacking when any of the following is present: (1) an action is based on facts the defendant has no reasonable basis to believe are true, (2) the defendant seeks recovery under a legal theory that is untenable, or (3) the defendant lacks evidence sufficient to uphold a favorable judgment or information affording a reasonable inference that such evidence exists. *See, e.g.*, *Nunez v. Pennisi*, 241 Cal. App. 4th 861, 875 (2015); *Daniels v. Robbins*, 182 Cal. App. 4th 204, 222 (2010).

Here, NMS brought dozens of meritless causes of action. The Zelig Defendants did not even attempt to bring an anti-SLAPP motion on NMS' behalf. Nor could they.

---

[8] The Zelig Defendants do not dispute nor could they truthfully dispute that there was a favorable termination on the merits in favor of AEW on all of the causes of action. *See Ross v. Kish*, 145 Cal. App. 4th 188, 192 (2006).

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

By definition, a lawsuit based on forgeries and perjury lacks probable cause. *See, e.g.*, *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *12 (W.D.N.Y. Mar. 26, 2013); *Stipe v. Smith*, 2011 WL 2975502, at *3 (M.D. La. July 7, 2011); *Benjamin v. BWIA Airlines*, 2009 WL 783353, at *6 (S.D. Fla. Mar. 24, 2009). To prevail on its claim (and defeat the instant motion), AEW need only show that one of these claims lacked probable cause but, as set forth above, the Zelig Defendants did not have probable cause to prosecute any of the underlying claims because they were all based on a forgery and a set of obvious lies to support that forgery.

### a. There Was No Reasonable Basis for NMS' Bogus Allegations

Incredibly, the Zelig Defendants barely mention, much less respond to, the numerous factual allegations in the Complaint that detail how any reasonable attorney would have known that the underlying lawsuit was based on forgeries and a set of transparent lies propping up those forgeries (like the "typo" story). Rather than detail how they reasonably believed that "Version 2" was genuine, that the authentic, operative version of the JVA that all of the parties, lawyers, and banks were using was a forgery, and how the "typo" story was plausible, they dodge all of these questions.

The Zelig Defendants make no attempt to show that the forgeries were genuine or, just as importantly, that there was a shred of evidence for their claim that "Version 3"—the genuine, operative JVA—was itself a forgery created by AEW. There is no explanation for their continued prosecution of the case after they were put on notice in June 2015 that NMS' claims were based on a forgery. *Id.*, Ex. 14.

"[W]hen a party is put on notice that a fundamental element of its case is disputed, it should not proceed without evidence sufficient to support a favorable judgment or . . . information affording an inference such evidence can be obtained." *Arcaro v. Silva & Silva Enters. Corp.*, 77 Cal. App. 4th 152, 158-59 (1999). *See also Zamos v. Stroud*, 32 Cal. 4th 958, 971-73 (2004). In *Arcaro*, the defendant was given evidence that the plaintiff's signature had been forged. *Arcaro*, 77 Cal. App. 4th at

Gibson, Dunn & Crutcher LLP

158-59.  The defendant continued pursuing the suit even though it did not "possess any extrinsic evidence of the genuineness of the signature" and could not "identify what evidence it possessed which reasonably would have warranted it to infer evidence of the genuineness of Arcaro's signature existed."  *Id.* at 157-158.  Thus, the defendant "lacked probable cause . . . because it had no objective, reasonable basis in the facts known to it for a belief Arcaro's purported signature was genuine."  *Id.* at 159.  The defendant's rank speculation that discovery might have uncovered "chicanery" by Arcaro—speculation the court aptly dismissed as a "mere 'shot in the dark'" and a "hope for a Perry Mason-style denouement"—did not suffice.  *Id.* at 158-59.

Here, the Zelig Defendants were repeatedly presented with evidence that the version of the JVA with the 3-year Buy/Sell was a forgery.  In June 2015, the Zelig Defendants were shown evidence that NMS' own counsel requested the 5-year Buy/Sell.  Srinivasan Decl., Ex. 14.  In September 2015, NMS' own witnesses testified that there was no "typo" in the 5-year Buy/Sell provision in the original, executed JVA.  *Id.*, Ex. 75 at 120:18–121:22, Ex. 76 at 53:1–54:16, Ex. 77 at 35:13–36:8, Ex. 78 at 76:17–78:21, 92:16 – 93:4, 129:18–130:8.  In October 2015, AEW submitted additional evidence that "Version 2" was a forgery, and on that basis, the trial court ordered a forensic exam of NMS' computers and devices.  *Id.*, Exs. 21, 22, 29; LaPorte Decl., Ex. 3.  In January 2016, AEW filed a motion for terminating sanctions, supported by expert declarations and nine volumes of evidence showing that "Version 2," the Cover Letter, and the La Cienega PMA were forgeries and that NMS destroyed and altered evidence.  *Id.*, Exs. 39–41.  Among other things, AEW's experts determined that the anti-counterfeiting code on "Version 2" showed it had been printed at NMS' offices in July 2013, not in September 2010, as NMS repeatedly asserted.  Compl., Ex. 1 at 75; LaPorte Decl., ¶¶ 38–45, 116.  Finally, and perhaps most damning of all, the Zelig Defendants offer no explanation for their decisions: (1) not retain a single expert who would opine that their forgeries were in fact genuine documents; (2)

24

Gibson, Dunn &
Crutcher LLP

1  to mislead their own expert that they were contending in the lawsuit that the forged

2  JVA (created in 2013) was created in 2010; and (3) not to put Shekhter on the stand for

3  the evidentiary hearing—the only plausible explanation is that they knew he lied in his

4  declaration and that the lawsuit was based on his forgery.

5       Confronted with this steadily mounting evidence, the Zelig Defendants refused

6  to disavow the forgeries, refused to come clean about NMS' spoliation, continued to

7  advance and rely upon the forged "Version 2," and continued to repeat NMS' false

8  allegations, submitting sworn statements and verified discovery responses, offering

9  hours of testimony from Shekhter, and making countless representations to the

10  court. *See, e.g.*, Srinivasan Decl., Exs. 8, 9, 18–20, 23–26, 38, 61, 74, 81, 86, 87–90.

11  Even worse, the Zelig Defendants failed to preserve NMS' computers and devices,

12  despite their repeated representations to the contrary. *Id.*, Exs. 30–32, 35–37; Compl.,

13  Ex. 1 at 99. And they literally stood by and did nothing as NMS engaged in massive

14  evidence destruction. Srinivasan Decl., ¶ 4 Ex. 89, ¶¶ 38–39.

15       Once the Zelig Defendants were put on notice that NMS' claims were based on

16  an obvious forgery, they lacked probable cause to continue prosecuting those claims

17  "because [they] had no objective, reasonable basis in the facts known to [them]" to

18  believe "Version 2" and the other forgeries were genuine. *Arcaro*, 77 Cal. App. 4th at

19  159; *see also Zamos*, 32 Cal. 4th at 971–72. The Zelig Defendants' reliance on

20  Zimbler, Ciarmoli, and Lennon does not alter this conclusion. None testified that

21  "Version 2," the Cover Letter, or the La Cienega PMA was genuine, that "Version 3"

22  was a forgery, or that "Version 1" contained a "typo." Compl. Ex. 1 at 119-20. They

23  did not even offer testimony from Zimbler or Cairmoli in opposing the terminating

24  sanctions motions. *Id.* at 66. While they offered a declaration from Cairmoli on the

25  eve of the evidentiary hearing, nothing in that declaration supports NMS' core

26  allegations. Srinivasan Decl., Ex. 94. Finally, Lennon's declaration merely stated he

27  had "no reason to believe that [he] did not receive" the Cover Letter. *Id.*, Ex.

28

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION
TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P.
§ 425.16

95.  Lennon, however, admitted at the evidentiary hearing that he didn't even know that the JVA contained a Buy/Sell provision. Compl. Ex. 1 at 89-90.  Worse still, Defendant WLA has provided a draft declaration for Lennon that the Miller Defendants never disclosed and that is inconsistent with the declaration they did submit.  *Compare* Srinivasan Decl., Ex. 95 *with* Dkt. 49-16.

### b.    None of NMS' Legal Theories Were Tenable

To prevail on their Motion, the Court must believe that probable cause existed for the dozens of causes of action brought in the underlying litigation.  *See Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 292 (2006).   But the Zelig Defendants make no attempt to defend the vast majority of NMS' claims.  Nor can they.  All of NMS' claims were infected by the forgeries, the perjury, and the evidence spoliation, as the trial court and the Court of Appeal held.  Compl., Ex. 5 at 362.  Further, the one claim they do focus on—a breach of contract claim based on Article 6 in the JVA— was concocted after it became clear that the lawsuit was based on a forgery.  Mot. at 17.  But this claim was just an attempt to shift the focus away from the forged "Version 2."  Nothing in Article 6 of the JVA supported the theory.  Indeed, the trial court sustained AEW's demurrer to that claim without leave to amend, and the Court of Appeal affirmed, holding that "Article 6 is not reasonably susceptible to an interpretation that it confers an acquisition right."  Compl., Ex. 1 at 335.  The Zelig Defendants lacked probable cause to assert a clearly erroneous interpretation of the JVA. *See Masterson v. Pig'n Whistle Corp.*, 161 Cal. App. 2d 323, 337-338 (1958); *cf. SuperGuide Corp. v. Gemstar Dev. Corp.*, 2010 WL 11463159, at *8 (C.D. Cal. June 3, 2010).

Nor does the extrinsic evidence cited by the Zelig Defendants here (and below) prove otherwise.  The May 2010 term sheet was a non-binding term sheet drafted before negotiations began.  Watson Declaration, ¶ 7 & Ex. 2.  The May 2010 email "states nothing about acquiring the other party's interest, much less about acquiring it

Gibson, Dunn &
Crutcher LLP

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

for 1.75 times its investment." *Id*. And the June 2013 letter "acknowledges that the JVA needs to be amended both 'to provide for the withdrawal of [AEW] from the [JV] . . .' and 'to allow [NMS] to use outside funds to get [AEW] to an IRR of 24% and 1.75 multiple.'" Def's Ex. 6. No reasonable attorney would have argued that a letter asking AEW to "consider" amending the JVA and selling its interest to NMS equated to the exercise of a contractual "right" to "monetize" AEW's interest.

### c.  The Interim Adverse Judgment Rule Is Inapplicable

The interim adverse judgment rule provides that "a trial court judgment or verdict in favor of the plaintiff . . . in the underlying case, ***unless obtained by means of fraud or perjury***, establishes probable cause . . . , even though the judgment or verdict is overturned on appeal or by later ruling of the trial court." *Parrish v. Latham & Watkins*, 3 Cal. 5th 767, 776 (2017) (emphasis added). It has no application here.

First, orders denying monetary sanctions do not suffice. *See, e.g.*, *Wright v. Ripley*, 65 Cal. App. 4th 1189, 1191 (1998); *Crowley v. Katleman*, 8 Cal. 4th 666, 688 (1994). In *Wright*, the court held that the denial of a motion for sanctions under Code of Civil Procedure section 128.5 did not preclude the plaintiff's malicious prosecution suit. *Id*. at 1191. The court found that a contrary rule would threaten the efficient disposition of sanctions motions. *Id*. at 1194–95. *See also Crowley*, Cal. 4th at 688. The same reasoning applies with even greater force to orders denying monetary sanctions for discovery violations. Thus, it is irrelevant that the trial court—for unknown reasons—declined to imposed monetary sanctions on the Zelig Defendants.[9]

Second, two of the orders on which the Zelig Defendants rely were entered in a *different case* involving *different parties*. In 2015, AEW, the JV and the subsidiary companies that owned the Properties filed an action (the "*P6* Action") to have NMS

---

[9] Notably, the trial court did not explain its reasons for not sanctioning the Zelig Defendants. This alone precludes application of the rule. *See, e.g.*, *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 823 (2002); *L.G. v. M.B.*, 25 Cal. App. 5th 211, 230 (2018).

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP

Properties removed as the property manager of the Properties. Srinivasan Decl., Ex. 82. That action was based on the 30-day termination notice in the PMAs for the Properties. *Id.* The trial court originally granted a preliminary injunction but reversed course after NMS Properties submitted the forged La Cienega PMA and a perjurious declaration from Shekhter. *Id.*, Exs. 83, 84; Compl., Ex. 1 at 83–85. The Zelig Defendants do not cite a single case applying the interim adverse judgment rule based on an order in a different case involving different parties asserting different claims. *See Crowley v. Katleman*, 8 Cal. 4th 666, 671 (1994) (holding that probable cause on one cause of action does not establish probable cause on a different cause of action).

Third, the orders in the *P6* Action were procured by fraud and perjury. The trial court relied on the forged La Cienega PMA and the perjurious Shekhter declaration in denying the motions. Srinivasan Decl., Ex. 84 at 4 ("There is at least some evidence that [the La Cienega PMA] contained a 60-day termination provision. *See* June 25 Shekhter Decl., Ex. A, § 12.1."); *id.*, Ex. 91 at 3 ("There are serious questions of credibility of the declarants and authenticity of documents. . . ."); *id.*, Ex. 55 at 3 ("Defendant has adamantly denied Plaintiffs' allegations."). That one of NMS' affiliates successfully defrauded a different court in a different action does not establish the Zelig Defendants had probable cause in *Lincoln Studios*. *See, e.g.*, *Parrish*, 3 Cal. 5th at 782; *Thao v. Donovan*, 2012 WL 4052032, at *11 (E.D. Cal. Sept. 14, 2012). Further, that the Zelig Defendants would continue to cite to and rely on rulings procured through documents adjudicated to be forgeries further establishes their willingness to advance bad faith arguments.

### 2. The Zelig Defendants Acted with Malice

Malice "is not limited to ill will . . . but exists when the proceedings are [prosecuted] primarily for an improper purpose." *Medley Capital Corp. v. Sec. Nat'l Guar., Inc.*, 17 Cal. App. 5th 33, 48 (2017) (quotations omitted). Improper purposes include (1) the person initiating the proceedings does not believe that the claim may be

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

held valid; (2) the proceedings are begun primarily because of hostility or ill will; (3) the proceedings are initiated for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; and (4) the proceedings are initiated for the purpose of forcing a settlement bearing no relation to the merits of the claim. *See Daniels*, 182 Cal. App. 4th at 224; *see also Albertson v. Raboff*, 46 Cal. 2d 375, 383 (1956).  Further, a person who attempts to establish a claim to property knowing the claim is invalid can only be motivated by an improper purpose. *Id.*

Here, there is ample evidence of malice, including that the Zelig Defendants either knew NMS' claims were baseless or were "indifferent as to whether the claims . . . had any basis in fact." *Sycamore Ridge Apartments, LLC v. Naumann*, 157 Cal. App. 4th 1385, 1408 (2007).  At a minimum, "the record discloses that the [Zelig Defendants] failed to conduct any reasonable investigation" into NMS' claims. *Id.* The evidence of malice includes:

- Falsely telling the court that NMS' forgery was a genuine document that had been kept under lock and key.  (Srinivasan Decl., Ex. 25 ¶ 14.)

- Threatening to destroy key evidence by "cutting it in half" and threatening to falsely tell the Court that AEW's counsel of record "switched" the documents once the testing proved, as he expected, the documents to be a forgery.  (*Id.*, Ex. 65.)

- Illegally recording a conversation with AEW and its counsel.  Samek Decl., ¶ 8.

- The continued prosecution of NMS' baseless claims ***for years*** despite being on notice of the forgeries.

- The failure to repudiate the forgeries and the perjurious declarations.

- Asserting ***billions of dollars*** in damages.  Srinivasan Decl., Ex. 19 at 3. Alleging damages having "no apparent basis in fact" is evidence of an improper purpose. *Sycamore Ridge*, 157 Cal. App. 4th at 1409.

- Failing to retain an expert to opine that the documents were genuine. Worse still, the Zelig Defendants ***concealed*** from their experts that NMS was asserting that the documents were originals.  Srinivasan Decl., Ex. 71 at 13:12-23; Compl., Ex. 1 at at 115.

- Taking actions that made it harder for AEW to discover the truth, including misrepresenting their efforts to preserve evidence. Srinivasan Decl., Exs. 30–32, 35, 65.

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

- Producing a version of the Cover Letter with the metadata stripped out, and withholding three "botched" versions of the Cover Letter.  Rubin Decl., ¶ 36.

- filing ***nearly a half dozen*** copycat lawsuits against.  Srinivasan Decl., Exs. 43, 45, 56, 59, 61.

- Filing multiple baseless lawsuits against AEW's counsel of record, Gibson Dunn, and its partners, only to dismiss them later (*Id.* Ex. 56, 59, 61, 64, 67-70.)

None of the Zelig Defendants' arguments negate this overwhelming showing. Indeed, their arguments only underscore their culpability.  Their pursuit of claims based on known forgeries and perjury is alone sufficient to support a finding of malice, and here AEW has presented substantial evidence well beyond that.  But the TAC continued to allege that "Version 2" was created by AEW (not NMS) to correct a "mistake" in Article 11 of the original, executed JVA.  *Id.*, Ex. 38, ¶ 22b.  This was a blatant lie, and the Zelig Defendants had no reasonable basis to believe it was true by the time they filed the TAC.  Continuing to pursue even a single claim—let alone ***six***—based on "Version 2" and the bogus "typo" allegations smacks of malice and improper purpose.  *See Daniels*, 182 Cal. App. 4th at 226 (malice may be inferred where the defendant knowingly brought an action without probable cause or continued to prosecute it after becoming aware it lacked probable cause).

## C.    The Court Should Reject the Zelig Defendants' Lame Excuses

The Zelig Defendants make two galling excuses for their prosecution of NMS' baseless claims.  Their excuses are as unpersuasive as they sound.  First, they falsely claim they were "blocked from getting discovery." Mot. at 28-29.[10]  But they did not need discovery from *AEW* to know that *NMS* forged the documents.  The evidence proving the forgeries came from ***NMS' own files***, to which the Zelig Defendants had access.  No amount of discovery could have proven otherwise.  Second, the Zelig Defendants argue they had an ethical duty to pursue NMS' claims.  Mot. at 13, 20.

---

[10]  In fact, NMS deposed Samek and AEW produced 25,000+ pages of documents. Srinivasan Decl, ¶ 3 & Ex. 73.  And the Zelig Defendants cross-examined all of AEW's key witnesses, including their experts, at the eight-day evidentiary hearing.

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn &
Crutcher LLP

Not so.  Attorneys have an ethical duty *not* to pursue frivolous claims.  *See, e.g.*, Fed. R. Civ. P. 11; Cal. R. Prof'l Conduct, Rule 3-200(A); Cal. Civ. P. Code §§ 128.5, 128.7.  Attorneys have "a duty to investigate the facts underlying a client's claims and can be sanctioned for failing to do so."  *Tichinin v. City of Morgan Hill*, 177 Cal. App. 4th 1049, 1069 (2009).  And they owe their clients no duty to offer false testimony.  *In re Branch*, 70 Cal. 2d 200, 210 (1969).  Indeed, an attorney's duties to his or her clients are tempered "by an equally solemn duty to comply with the law and standards of professional conduct," which include "prevent[ing] and disclos[ing] frauds upon the court[.]"  *Nix v. Whiteside*, 475 U.S. 157, 168–69 (1986).  *See also Mendez v. Superior Ct.*, 162 Cal. App. 4th 827, 834 (2008).  The Zelig Defendants were not just "doing [their] job" when they facilitated NMS' fraud on the legal system.  Mot. at 33.

## D.    At a Minimum, Discovery Should Be Permitted

As set forth above, AEW has made a prima facie showing as to each element of its claim.  To the extent the Court disagrees, it should permit discovery.  The law is clear that where, as here, an anti-SLAPP motion is based on the plaintiff's alleged lack of evidence, discovery must be allowed.  *See, e.g.*, *Planned Parenthood*, 890 F.3d at 834–35.  The Srinivasan Declaration sets forth the discovery that AEW would seek if afforded the opportunity.  *See* Srinivasan Decl., ¶¶ 8-10.  The need for discovery here is particularly critical given the application of the crime/fraud exception.

## V.    CONCLUSION

For the foregoing reasons, the Zelig Defendants' Motion should be denied.

Dated: May 3, 2019                    JAMES P. FOGELMAN
                                      GIBSON, DUNN & CRUTCHER LLP


                                      By: */s/ James P. Fogelman*
                                      _____
                                              James P. Fogelman


                                      Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO THE ZELIG DEFENDANTS' SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR DAMAGES PURSUANT TO C.C.P. § 425.16

Gibson, Dunn & Crutcher LLP