GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
smader@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

P6 LA MF Holdings SPE, LLC, a limited liability company,

Plaintiff,

v.

NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,

Defendants.

CASE NO. 2:19-cv-01150-AB-AFM

**DECLARATION OF SAMUEL S. RUBIN IN SUPPORT OF PLAINTIFF'S OPPOSITIONS TO DEFENDANTS' SPECIAL MOTIONS TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO C.C.P. § 425.16**

[*Filed concurrently with Opposition Briefs, Declarations of Jay P. Srinivasan, Drew Flowers, Jonathan Watson, Gerald M. LaPorte, and Eric Samek, Evidentiary Objections, and Plaintiff's Request for Judicial Notice; [Proposed] Orders lodged concurrently herewith*]

**Hearing:**
Date: May 24, 2019
Time: 10:00 a.m.
Place: Courtroom 7B
Judge: Hon. André Birotte Jr.

# DECLARATION OF SAMUEL S. RUBIN

I, Samuel S. Rubin, declare as follows:

1. I am currently the Vice President of the Crypsis Group, a company specializing in data breach response, digital forensics, and risk management consulting services. At the time of the events described in this declaration, I was a Managing Director at Stroz Friedberg, LLC ("Stroz Friedberg"). I provide this declaration in support of Plaintiff's Opposition To Defendants' Special Motions To Strike Plaintiff's Complaint Pursuant To C.C.P. § 425.16. This declaration is based upon my own personal knowledge except where otherwise indicated, and if called as a witness, I could and would testify to the facts stated herein.

2. Pursuant to the October 6, 2015 Order Granting AEW Defendants' Motion for Forensic Examination (the "Order") in the matter of *Lincoln Studios et al. v. DLA et al.*, Case No. BC551551 (L.A.S.C., filed July 15, 2014) ("*Lincoln Studios*"), I conducted an examination of computers and other devices used by NMS Properties, Inc. ("NMS")[1] employees in order to evaluate the authenticity of three "questioned documents":

i) a document NMS contends to be "Version 2" of a Limited Liability Company Agreement for P6 LA MF Holdings I LLC (referred to herein as the "Version 2" of the "JV Agreement");

ii) the cover letter that NMS claims accompanied "Version 2" (referred to herein as "Exhibit 41" or the "Cover Letter") and;

iii) a Property Management Agreement ("PMA") proffered by NMS related to the Luxe La Cienega property, which contains language in Article 12.1 that differs from earlier drafts of the same PMA, as well as from PMAs for other

[1] The Order in *Lincoln Studios* was directed at plaintiffs NMS Capital Partners I, LLC and Neil Shekhter, as well as their affiliates. For the purposes of this declaration only, "NMS" includes NMS Properties Inc., NMS Capital Partners I, LLC, and its affiliates in *Lincoln Studios*. In addition, NMS officers like Neil Shekhter appear to use the same computer regardless of which entity they are working on behalf of.

properties governed by the same parent contract (referred to herein as the "Luxe La Cienega PMA").

3. The scope of my work included collecting and examining any computer or device that "could have ever sent, received, modified, opened, altered, or otherwise would have been used to view any copy of the Joint Venture Agreement (including "Version 2"), Exhibit 41, and all Property Management Agreements (including the Luxe La Cienega), as well as Mr. Shekhter's home and office computers," (the computers and devices are referred to herein as the "NMS Devices"). (See Order, p. 2).

4. This declaration details the findings from my examination of the NMS Devices pursuant to the Order.

**SUMMARY OF FORENSIC FINDINGS**

5. As set forth below, I found that each of the three questioned documents are forgeries:

a. "Version 2" of the JV Agreement – which purports to be a document created in 2010 – does not appear on the NMS Devices until a scanned version was created in mid-July, 2013. A timeline of activity surrounding its creation establishes that on July 14, 2013 the file was edited from a preexisting copy of the JV Agreement and then, on July 15, 2013, printed and scanned to create an electronic PDF of "Version 2."

b. An electronic copy of the purported Cover Letter that NMS claims accompanied "Version 2" is an Adobe PDF file that was backdated to make it appear to have been scanned on September 21, 2010. The digital evidence establishes that in reality the file was created on June 21, 2015.

c. NMS' PDF version of the Luxe La Cienega PMA, which contains a notice period of 60 days in the Termination provision and which NMS contends is the operative version, does not appear on the NMS Devices until June 24, 2015, when two different versions were created. The first version of the document contains a cover

page from an altogether different property.  The second version of the document, which is the one ultimately produced by NMS, contains a different property name and owner.  Further, I did not identify a Microsoft Word draft version of the Luxe La Cienega PMA with the 60-day Termination provision on the NMS Devices.

6.    I identified this evidence of forgery despite extensive efforts to hide, alter and destroy evidence in an apparent effort to thwart my examination.  Specifically:

a.  After the Court's Order in *Lincoln Studios*, between October 6 and December 4, 2015, NMS employees searched the Internet for terms including "how to avoid computer forensics," "backdated secure wipe," "los angele[sic] anti-computer forensics," "hard drive destruction service los angeles," "file deletion utility windows 7," "adobe acrobat removal tool," and "physical destruction of hard drives."

b.  A Dell computer used by Neil Shekhter during the period of time when I believe "Version 2" was fabricated has not been produced.  I understand that Neil Shekhter has testified that he threw this computer away in late 2014 or early 2015; however, I identified forensic evidence of the use of this computer as recently as September 19, 2015.

c.  On or around October 15, 2015, one of the two hard drives from Neil Shekhter's "new" Dell desktop computer was removed and replaced with a new hard drive of the exact same size and brand.  On or around this time, attempts were made to make it appear as if the new hard drive had been used on an ongoing basis since January of 2015.  These efforts included backdating the computer clock on Neil Shekhter's computer so it would appear that files were created on the drive in January of 2015 and other dates.  The original hard drive has not been produced and files that were present on the old hard drive are missing from the replacement drive.

d.  Between October 15, 2015 and December 5, 2015, the date that Stroz Friedberg imaged the computer, folders containing copies of the JV Agreement and its purported Cover Letter (among other files), and a zip file sent from former AEW

employee Dan Lennon, were manually deleted or removed from Neil Shekhter's Dell computer.

       e.  On December 2, 2015, the Windows 7 operating system on Neil Shekhter's desktop was manually upgraded to the Windows 10 operating system.  The replacement of the old operating system with a newer version of Windows updated, changed, and/or overwrote many forensic artifacts I would otherwise rely on in my analysis.

       f.  On December 4, 2015, a folder called "AEW" on Neil Shekhter's desktop computer was manually renamed to simply "W."

       g.  The NMS computer used by Adam Shekhter was originally withheld from production in connection with the Order.  The computer was made available for inspection only after I identified forensic evidence of its existence and ongoing use, and counsel notified NMS of their intention to seek *ex parte* relief to compel production of the device.  Upon review of the computer, I found that it had been in regular use on the NMS corporate network up until 7:26 PM on December 3, 2015, the evening before Stroz Friedberg was permitted to collect forensic images of computers at NMS.  Further, the NMS computer used by Adam Shekhter contained key information related to the origin of the disputed "Version 2" document.  Specifically:

- There is evidence of the use of a USB flash drive on Adam Shekhter's NMS computer on July 15, 2013.  The USB flash drive contained a copy of the JV Agreement, which I believe to be a version that was edited to create "Version 2," but this USB flash drive has not been made available for inspection.
- The Adam Shekhter NMS computer had the Adobe Acrobat program uninstalled on or after October 2, 2015.  Adobe Acrobat is the program used to edit the JV Agreement to create "Version 2."

       h.  On December 3, 2015, the day before Stroz Friedberg imaged the computers, a PDF copy of the Luxe La Cienega PMA (the version that was produced

by NMS in *P6 LA MF Holdings I LLC, et al. v. NMS* Properties, Case No. BC584878 (L.A.S.C., filed June 11, 2015) (the "Property Management Action") was deleted from the computer used by NMS employee Eddie Valentin.

i. On December 3 and 4, 2015, respectively, the data destruction software "Eraser Portable" was used on the computers used by then-NMS Properties Inc., Vice President of Finance Brian Bowis and current Information Technology Administrator Enrique Sanchez. On Mr. Bowis' computer the Eraser software was used to destroy apparent NMS business files, among other data.

**BACKGROUND AND QUALIFICATIONS**

7. Founded in 2000, Stroz Friedberg is an international digital risk management firm specializing in digital forensics, electronic discovery, data breach and cybercrime response, and investigations. Its management includes former federal and state prosecutors and former law enforcement officers with both government and private-sector experience in traditional and cyber-based investigations, digital forensics, data preservation and analysis, infrastructure protection, and electronic discovery. Many of its digital forensic examiners, electronic security professionals, electronic discovery specialists, and private investigators joined Stroz Friedberg following careers in law enforcement, the intelligence community, consulting, and academia.

8. In my capacity as a Managing Director at Stroz Friedberg, I led and performed examinations in digital forensic investigations on behalf of Stroz Friedberg's clients. I have experience and have been trained in the use of computer forensic tools and techniques, including forensic software such as EnCase, Access Data's Forensic Toolkit, Cellebrite, and The Sleuth Kit. I hold active certifications as an EnCase Certified Forensic Examiner (EnCE), a Global Information Assurance Certification Certified Forensic Analyst (GCFA), and as a Certified Information Systems Security Professional (CISSP). I also have received training in the investigation and analysis of networked and stand-alone systems, including Microsoft

Windows, Mac OSX, and Linux operating systems, and mobile devices. I have forensically acquired and analyzed thousands of items of digital media, including desktops, laptops, mobile devices, and server computers. In addition, I have authored numerous expert reports on a variety of computer forensic matters, including metadata analysis, file deletion activity, the chronology of movement of electronic documents among different storage media, and the analysis of the authors and editors of key electronic documents.

9. I have testified as a digital forensic expert in both state and federal courts, including in connection with matters that have involved the suspected alteration of electronic documents. These matters have included analysis of electronic accounting records and expert testimony on behalf of the U.S. Government in a criminal tax fraud prosecution; analysis of altered emails and letter correspondence in a contract dispute in state court; and analysis and testimony regarding fabricated wire transfer and bank statements in connection with a civil case related to a $1.2 billon Ponzi scheme.

10. Attached as **Exhibit 1** to this declaration is a true and correct copy of my curriculum vitae, incorporated herein by reference, which sets forth in detail additional aspects of my qualifications and background, including a list of all publications I authored within the past ten years and a list of all cases in which I testified as an expert at trial or by deposition within the last 4 years.

11. I am being compensated at the rate of $785 per hour for my services in this matter. I have no financial interest in the outcome of this litigation.

12. Many of the documents upon which I relied to form my opinion, as well as exhibits supporting my opinion and findings, are not attached hereto because of their volume but are available at any time upon the Court's request in either hard copy or electronic form.

**<u>EVIDENCE EXAMINED BY STROZ FRIEDBERG</u>**

13. Pursuant to the Order, starting on the evening of December 4, 2015, and continuing from time to time through January 25, 2016, a team of Stroz Friedberg

digital forensic consultants working at my direction created forensic images and copies of electronic data from numerous devices in the possession, custody, or control of NMS.  During this period, Stroz Friedberg's imaging and copying of NMS Devices occurred in what I would describe as five distinct groupings, as the devices were not made available to Stroz Friedberg all at once:

  a.  Between December 4, 2015 and December 8, 2015, Stroz Friedberg imaged what was identified as Neil Shekhter's home computer and all of the NMS corporate devices and accounts that NMS made available to us at this time.

  b.  Between December 18, 2015 and December 22, 2015, Stroz Friedberg imaged personal devices identified as having been used by Adam Shekhter and Margo Shekhter.

  c.  On January 6, 2016 and January 7, 2016, Stroz Friedberg imaged additional NMS corporate devices, which were not made available to us initially. This included what was identified as Adam Shekhter's NMS computer.

  d.  Between January 15, 2016 and January 19, 2016, Stroz Friedberg created copies of forensic images of certain NMS corporate computers that had been created by NMS' digital forensic consultants in September and October, 2015.  These images were a subset of the same computers imaged by Stroz Friedberg, but reflected the contents of the computers at an earlier point in time.

  e.  Between January 19, 2016 and January 25, 2016, Stroz Friedberg imaged the contents of NMS employees' GoDaddy email accounts.

14. As described below, the timing of Stroz Friedberg's forensic preservations for the later collected items is notable because it appears consistent with NMS' efforts to withhold certain key devices from my examination.

15. To date, Stroz Friedberg has preserved data from 45 desktop computers, 24 printers, 11 laptop computers, 7 iOS devices, 9 servers, 2 USB hard drives, 1 cable box, 1 server backup device, and Office365 and GoDaddy email accounts.  **Exhibit 2** to the declaration is a true and correct description of each piece of equipment

inspected, copied or imaged, as well as chain of custody documentation. Stroz Friedberg has provided NMS' forensic consultant Scott Cooper a copy of each of the forensic images that we created.

16. Stroz Friedberg forensically preserved the NMS Devices using accepted industry standards, techniques and procedures. The forensic images of the NMS Devices were created by professionals with training and expertise in creating forensic images.[2] Further, wherever possible, Stroz Friedberg created the forensic images using write-blocking hardware that prevents making any changes to the original media. These procedures resulted in the creation of accurate and complete copies of data upon which I can rely in my analysis.

## FORENSIC ANALYSIS & FINDINGS

### A. Forensic Evidence Demonstrates That Each of the Three Questioned Documents is a Forgery.

#### 1. "Version 2" of the JV Agreement

17. Forensic evidence on the NMS Devices establishes that "Version 2" of the JV Agreement is a forgery.

##### a. Article 11.1(a)(i) of "Version 2" differs from all other copies and iterations of the JV Agreement.

18. I understand the document NMS refers to as "Version 1" of the JV Agreement was finalized and executed by the parties on or around September 8, 2010.

19. I understand that NMS contends that the document it calls "Version 2" of the JV Agreement was allegedly delivered to NMS' offices in hard copy (paper) along with a September 14, 2010 Cover Letter in mid-September 2010 after "Version 1" was finalized.

20. Finally, I understand that the version of the document that NMS refers to as "Version 3" of the JV Agreement was finalized on or around January 20, 2011.

---

[2] The Stroz Friedberg consultants who performed the forensic preservations maintain GIAC GCFE/GCFA and/or EnCE certifications in digital forensics.

21. I have examined these different versions of the JV Agreement and have found that "Version 2" differs from the other versions. Specifically, the language included in Article 11.1(a)(i) contains a differing period of time, as demonstrated in Figures 1 and 2 below:

**Figure 1: Article 11.1 from all executed copies of JV Agreement, except for "Version 2"**

**11.1 Buy/Sell.**

(a) **Buy/Sell Offer Notice**. The operation of this Section 11.1 may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:

(i) At any time after five (5) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided, however, that in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event. In addition to the foregoing, if at any time an Event of Default, Removal Event or Incentive Loss Event occurs, the Investor Member may give a Buy/Sell Offer Notice. Additionally, with respect to Operating Member, upon the occurrence of any Impasse Buy/Sell pursuant to Section 4.6, the Operating Member may give a Buy/Sell Offer Notice. Notwithstanding the foregoing, neither Member may give a Buy/Sell Offer Notice while any Property is under a contract for sale and the consummation of such sale is pending.

**Figure 2: Article 11.1 from "Version 2"**

**11.1 Buy/Sell.**

(a) **Buy/Sell Offer Notice**. The operation of this Section 11.1 may be triggered upon written notice (the "Buy/Sell Offer Notice") at the times and upon the conditions set forth below:

(i) At any time after three (3) years from the date hereof, either the Operating Member or the Investor Member may give a Buy/Sell Offer Notice at any time, provided, however, that in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event. In addition to the foregoing, if at any time an Event of Default, Removal Event or Incentive Loss Event occurs, the Investor Member may give a Buy/Sell Offer Notice. Additionally, with respect to Operating Member, upon the occurrence of any Impasse Buy/Sell pursuant to Section 4.6, the Operating Member may give a Buy/Sell Offer Notice. Notwithstanding the foregoing, neither Member may give a Buy/Sell Offer Notice while any Property is under a contract for sale and the consummation of such sale is pending.

22. "Version 2" of the JV Agreement contains a term of three years in Article 11.1(a)(i) (see Figure 2), whereas other versions of the agreement contain a term of five years (see Figure 1).

23. Also of note, the paragraphs of all drafts and executed copies of the JV Agreement have justified alignment, which means the text aligns on both the left and right margins of the document. The only deviation from the justified formatting in all iterations of the documents appears in "Version 2," where the "g" from the word "Operating" hangs outside of the right margin of the paragraph in the same line that was altered (see Figure 2).

24. To assess the authenticity of "Version 2," I undertook an effort to compare it against other versions of the JV Agreement maintained on the NMS Devices made available for my examination. In total I identified 509 copies of the JV Agreement, including drafts, email attachments, and iterations of the agreement circulated over time. Of all these copies of the Agreement, the only version that contained the three year language in Article 11.1(a)(i) was the PDF file "Version 2."

25. If "Version 2" was authentic, I would expect to find contemporaneously created drafts of the document circulated internally at NMS and/or between the parties prior to the creation of the final version. Indeed, there are numerous Word versions of the JV Agreement sent back and forth between the parties; however, across all of NMS' computer systems that I was provided, I did not identify a single copy of "Version 2" in Word format.[3]

26. Figure 3 below depicts the timing and frequency of the modification/email date of copies of the JV Agreement by month on the NMS devices.

a. The lines in YELLOW represent copies of "Version 1" of the JV Agreement;

b. The lines in RED represent copies of "Version 2" of the JV Agreement;

---

[3] There is a document called "JV2.docx" (NMS-1000074) that was created on August 8, 2013, that appears to be a "cut & paste" of a PDF version of "Version 2" of the JV Agreement.

c.  The lines in BLUE represent copies of "Version 3" of the JV

Agreement.



**Figure 3: Versions of the JV Agreement modified/emailed over time on the NMS Devices**

27. This chart illustrates that drafts of "Version 1" of the JV Agreement first appeared on the NMS Devices in August 2010. "Version 3" of the JV Agreement is present on NMS Devices in January 2011. "Version 2" of the JV Agreement does not appear on the NMS Devices until July 15, 2013.

28. Unlike other undisputed versions of the JV Agreement, there are no contemporaneously created drafts of the "Version 2" document circulated internally at NMS and/or between the parties prior to the creation of the final version.

**b. <u>Document metadata demonstrates that the PDF of "Version 2" was created on July 15, 2013, from an earlier PDF.</u>**

29. The document metadata, the misaligned paragraph formatting, and my own testing of "Version 2" of the JV Agreement demonstrates that the file was most likely created by editing an existing Adobe PDF document, printing that edited PDF file to paper, and then scanning the resulting paper to create a new PDF file.

30. My examination of the NMS Devices pursuant to the Order supports this conclusion. In fact, I found evidence that sheds further light on the events surrounding the creation of the document in mid-July 2013. Based on digital evidence on the NMS devices, I developed the following timeline related to the origin of "Version 2" of the JV Agreement:

a. On <u>Friday, July 12, 2013 at 4:57 PM</u>, Neil Shekhter emailed his son Adam Shekhter two PDFs, containing "Version 1" and "Version 3," of the JV Agreement. The files both contain a five year term in Article 11.1(a)(i).

b. On <u>Sunday, July 14, 2013 at 9:46 PM</u>, a document called "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" was last modified on an unknown computer. I believe that this is when the Adobe Acrobat "Edit Document Text" (or "TouchUp Text" for Acrobat version nine) tool was used to change the "five (5)" in section 11.1(a)(i) to read "three (3)." This moved the "g" in the word "operating" one space to the right of the otherwise justified paragraph margin.

c. On Monday, July 15, 2013 at 1:24 PM, the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" document was copied from an unknown computer to a PNY brand USB flash drive with volume name "USB20FD" and the serial number 0000000041728351 (the "PNY USB drive").

d. On Monday, July 15, 2013 at 3:51 PM, the PNY USB drive was connected to Adam Shekhter's NMS computer (ES092) and the "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" document was opened with Adobe Reader 11.0.3.

e. I believe that shortly thereafter, the document was printed to hard (paper) copy.

f. On Monday, July 15, 2013 at 4:01 PM, a folder called "Scans\Adam" was created on the NMS file server share drive as a destination folder for files scanned from the Xerox Workstation.

g. On Monday, July 15, 2013 at 4:18 PM, the modified hard copy document was scanned with a Xerox WorkCentre 7775 copier. Scanning the document to PDF resulted in the creation of a new file, called "DOC.pdf" and eliminated all metadata that might otherwise link the new file to the prior file.

h. On Monday, July 15, 2013 at 4:51 PM, Adam Shekhter emailed his father Neil Shekhter the "DOC.pdf" file in an email with no body text with the subject "File."

i. On Monday, July 15, 2013 at 9:43 PM, the document was modified, indicating that a change was saved to the document, such as changing the orientation of the file from "landscape" (horizontal) to "portrait" (vertical).

31. This timeline supports the conclusion that the file "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf" was the electronic document that forms the basis for what NMS now calls "Version 2." Unfortunately, this file has never been produced by NMS and is not on any of the NMS Devices made available for my examination. While NMS has failed to produce the "NS 123 PRINT" file, the first part of the file name ("P6 LA MF Holdings I LLC") is identical to the attachments to the June 12,

2013 email from Neil to Adam Shekhter, as well as to over 350 other files that I identified on NMS Devices and have confirmed reflect copies of the JV Agreement.

32. Further, the PNY USB flash drive connected to the Adam Shekhter Dell Desktop has not been produced. It is possible if not likely that one or more of the devices withheld, destroyed, or wiped by NMS contained this file.

**2. The "Version 2" Cover Letter**

33. On September 21, 2015, NMS produced a document in hard copy that I understand NMS contends was a cover letter dated September 14, 2010 from Eric Samek at AEW. I understand NMS states that this document was delivered in hard copy (paper) accompanying "Version 2" of the JV Agreement, in mid-September 2010. The "Version 2" Cover Letter is also a forgery.

34. To evaluate the authenticity of the Cover Letter, I identified electronic versions of the document on the NMS Devices and analyzed the embedded and file system metadata to identify the circumstances surrounding the creation of the files.

35. I identified four different electronic versions of the Cover Letter, all of which contain the same content on the face of the document, but contain different embedded metadata attributes:

a. "AEW ltr 09 14 2010 001.pdf" ("Cover Letter v1")

b. "Letter fr AEW 9 14 2010 001.jpg" ("Cover Letter v2")

c. "Letter fr AEW 9 14 2010 001.pdf" ("Cover Letter v3")

d. "AEW Letter 09 2010 (09 24 2015).pdf" ("Cover Letter v4")

36. The only electronic version of the Cover Letter produced in discovery by NMS in the *Lincoln Studios* case is the version I have identified as "Cover Letter v4." Cover Letter v4 contains embedded metadata demonstrating that it was modified on September 24, 2015 at 8:30 AM. The file does not contain any embedded metadata indicating when it was created, however.

37. Regarding the other three electronic versions of the Cover Letter, the digital evidence demonstrates that someone attempted to backdate these versions to make them appear as if they were scanned in 2010.

38. On June 21, 2015 at 2:58 PM, Neil Shekhter sent himself an email with a PDF copy of Cover Letter v1 attached. This PDF file has embedded metadata reflecting a purported creation date of September 21, 2010 at 2:50 PM. The metadata also records that the PDF was created using the program Adobe Acrobat version 10.1.13.

39. Adobe Acrobat version 10.1.13, however, was not released until December 14, 2014; it did not exist in 2010 and therefore could not have been used to create Cover Letter v1 at that time. As one would expect, all of the other PDF files on the NMS Devices that were created with this version of Adobe Acrobat (totaling over 800 documents) were created on or after December 16, 2014.

40. The second indication that Cover Letter v1 was backdated can be found in the file creation day ("21") and time ("2:50 PM"). The day 21 happens to be the same day of the month as the day Neil Shekhter emailed himself the file in 2015, and 2:50 PM happens to be eight minutes earlier than the time of day that Neil Shekhter emailed himself the file. In order to backdate the document, someone would need to turn back the computer clock on the computer used to create the file. If in setting back the clock, that person changed the month from June to September and the year from 2015 to 2010, but left the day and time unchanged, this is the pattern that would appear in the resulting file. The month and year would be different, but the day and time would be consistent with the true creation time of the file: June 21, 2015 at 2:50 PM. This pattern is consistent with other instances of clock backdating I observed on Neil Shekhter's New Dell Computer, as discussed below.

41. Given the clock backdating on June 21, 2015 to set the clock to September 21, 2010, I believe that Cover Letter v2 and Cover Letter v3 were also created on June 21, 2015, but later that same day:

i) Cover Letter v2 is an image file (JPG). The file reflects the same embedded creation time as the Cover Letter v1, "September 21, 2010," but later the same day, at 6:37 PM.

ii) Cover Letter v3 is a PDF file. The file reflects the same embedded creation time as Cover Letter v1, "September 21, 2010," but later the same day, at 6:39 PM. This file was created with Adobe Acrobat version 9.0 using a plug-in called the Adobe Acrobat 9.0 Image Conversion Plug-in. This plug-in is used to convert image files (like JPG files) to PDF.

42.    One explanation for the multiple versions of the Cover Letter is that Neil Shekhter and/or NMS were working to create a version of the document that could not be identified as a forgery. In fact, each version of the Cover Letter that Neil Shekhter/NMS created was more challenging to authenticate than the last: Cover Letter v1 is easily identified as a forgery because of the software used in its creation; Cover Letter v2 and v3 are harder to detect as forged, but were created on a day in which there is confirmed clock backdating; Cover Letter v4 does not contain any embedded software or creation timestamps.

43.    This theory is consistent with emails sent internally at NMS shortly before Cover Letter v4 was produced.

i) On September 9, 2015, Neil Shekhter sent NMS employee Terra Andersen an email with the subject "I have a question on this letter." The email attached Cover Letter v2. The email states, "I wanted to know if you can tell when the original was taken or scanned."

ii) On September 18, 2015, Neil Shekhter sent NMS IT administrator Enrique Sanchez an email with the subject "Call." The email attached Cover Letter v2 and Cover Letter v3. The email states "Please take a look at metadata. I'll call you in 15." Approximately one hour later, Enrique Sanchez sent two emails in reply containing a link to a website regarding an application called "ExifTool" and attaching the actual application in a zip file. ExifTool is a

powerful metadata analysis program that is used to read, write and edit metadata information.[4] The program has the capability to remove embedded metadata from files.

3. **The Luxe La Cienega PMA**

44. On June 25, 2015, NMS produced a version of the PMA for the Luxe La Cienega property in connection with its *Ex Parte* Application for Reconsideration or Alternatively, to Stay Preliminary Injunction Pending Appeal Upon Posting of Undertaking in the Property Management Action. This version of the Luxe La Cienega PMA is different than all other versions and drafts of the Luxe La Cienega PMA; it contained a written notice period of 60 days in Article 12, (this PMA is referred to herein as "NMS' Luxe La Cienega PMA"). Figures 4 and 5 below reflect these differences:

**Figure 4: Article 12.1 from all other versions and drafts of the Luxe La Cienega PMAs except for NMS' Luxe La Cienega PMA**

ARTICLE 12. TERMINATION

12.1 Termination. The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 60 days prior to the end of the then existing term, or by Manager to Owner at least 90 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 60 days prior written notice. Manager may terminate this Agreement at any time with or without cause by giving Owner at least 90 days' prior written notice.

**Figure 5: Article 12.1 from NMS' Luxe La Cienega LLC PMA**

4 See http://www.sno.phy.queensu.ca/~phil/exiftool/. Retrieved January 28, 2016.

**ARTICLE 12. TERMINATION**

**12.1 Termination.** The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 30 days prior to the end of the then existing term, or by Manager to Owner at least 60 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 30 days prior written notice, or (iii) immediately upon payment by Owner to Manager of a termination fee equal to one month's Management Fee (such monthly fee to be determined by calculating the average monthly Management Fee over the prior 12-month period). Manager may terminate this Agreement at any time with or without cause by giving Owner at least 60 days' prior written notice.

**a. NMS' Luxe La Cienega PMA is the only PMA with a 60 day notice period in Article 12.1.**

45. To assess the authenticity of NMS' Luxe La Cienega PMA, I searched for all PMAs related to the AEW-NMS joint venture on NMS' devices. This included PMAs for the following properties:

a. 1410 5th Street LLC
b. NMS Broadway LP
c. Lincoln Walk Studios LLC
d. Luxe 1420 5th LLC
e. Luxe 1440 5th LLC
f. Luxe Washington LLC
g. Luxe Broadway LLC
h. Luxe La Cienega LLC

I reviewed each PMA I identified for these properties to identify whether Article 12.1 contained a 30 or 60 day notice period. Across all of the NMS Devices made available for examination, I identified a total of 424 PMA documents, in either Microsoft Word or PDF format.

46. With the exception of NMS' Luxe La Cienega PMA, every PMA document I identified—including drafts of the Luxe La Cienega PMA created before

NMS' version—contain a written notice period of 30 days in Article 12.1. NMS' Luxe La Cienega PMA was the only PMA that contains a notice period of 60 days.

47. If NMS' Luxe La Cienega PMA was authentic, I would expect to find contemporaneously created drafts of the document circulated internally at NMS and/or between the parties prior to the creation of the final version. Indeed, there are numerous Word versions of other PMAs sent back and forth between the parties; however, across all of NMS' computer systems that I was provided, I did not identify a single copy of NMS' Luxe La Cienega PMA in Word format.

**b. NMS' version of the Luxe La Cienega PMA was not created until June 24, 2015.**

48. I next evaluated metadata dates of all versions of the Luxe La Cienega PMA identified on the NMS Devices.

49. Even though the Luxe La Cienega PMA is dated "March 1, 2012," the earliest PDF version of NMS' Luxe La Cienega PMA was created on June 24, 2015. The chart below depicts the timing and frequency of the modification/email date of all versions of the Luxe La Cienega PMA on the NMS Devices. The copies in blue contain a 30 day notice period in Article 12.1; the versions reflected in yellow contain a 60 day notice period in Article 12.1:

**Figure 6: Versions of the Luxe La Cienega PMA modified/emailed over time on the NMS Devices**

Term: 30-day 60-day
0
5
10
15
20
2012
2013
2014
2015
JAN
FEB
MAR
APR
MAY
JUN
JUL
AUG
SEP
OCT
NOV
DEC
4
3
4
1
2
1
4
21
5
1
46 TOTAL = 24 + 22

Gibson, Dunn & Crutcher LLP

21

DECLARATION OF SAMUEL S. RUBIN

50. If NMS' Luxe La Cienega PMA were authentic, I would expect to have identified copies of the file created contemporaneously with the date on the face of the document, which is March 1, 2012. Instead, as the chart above demonstrates, NMS' Luxe La Cienega PMA did not exist on the NMS Devices until it was created on June 24, 2015.

**c. <u>NMS created two different versions of the Luxe La Cienega PMA on June 24, 2015.</u>**

51. In addition to NMS' Luxe La Cienega PMA being first created on June 24, 2015, the evidence demonstrates that NMS actually created two different versions on that day (identified herein as "NMS' Luxe La Cienega PMA v1" and "NMS' Luxe La Cienega PMA v2").

52. The circumstances surrounding the creation of these files further establish that the document is a forgery:

a. On June 24, 2015, between approximately 7:00 and 7:30 AM, multiple emails attaching PMA documents in both Word and PDF format were forwarded to Neil Shekhter from the NMS email accounts of Jim Andersen and John Colletti (both NMS employees whom I understand had left the company prior to this date). Among the PMA documents attached were Microsoft Word version drafts for the 1410 5th Street, LLC and Luxe Washington, LLC properties.

b. On June 24, 2015 at 7:55 AM, a file with the name "Property Management-375 ns.doc" was created on Neil Shekhter's new computer. Based on the name, this file appears to be a Word version of a property management agreement for the Luxe La Cienega property. This file resided on the secondary hard drive of the Neil Shekhter new Computer, but was not copied to the new replacement hard drive, establishing that it is among the many files lost as a result of the October 15, 2015 hard drive swap (the missing hard drive and missing files are addressed further, below).

The forensic evidence further establishes that this file was last written (changed) at 8:48 AM.[5] These actions were all taken on Neil Shekhter's home computer.

c. Approximately 20 minutes later, on June 24, 2015 at 9:08 AM, Neil Shekhter sent an email with NMS' Luxe La Cienega PMA v1 as an attachment. The PMA was split into two files called "375 MA Scan 1.pdf" and "375 MA Scan 2.pdf." The last page of the first file, "375 MA Scan 1.pdf" contains the disputed Article 12.1 60 day language, and the second file "375 MA Scan 2.pdf" continues on the next page.

d. The cover page of NMS' Luxe La Cienega PMA v1 is different from all other versions of the Luxe La Cienega PMA. While the property listed on the first page was "LUXE LA CIENEGA," the owner was listed as "1410 5th Street LLC." "1410 5th Street LLC" is the same owner listed on the cover of the Microsoft Word version drafts of the 1410 5th Street LLC and Luxe Washington, LLC PMAs. This suggests that one of the preexisting Word documents emailed to Neil Shekhter on June 24, 2015 was used to create NMS' Luxe La Cienega PMA v1.

e. Later that same day, on June 24, 2015 at 11:22 PM, Neil Shekhter emailed another version of NMS' Luxe La Cienega PMA to himself (NMS' Luxe La Cienega PMA v2). This document had the name "375 Management Agreement Scan.pdf," and was last modified at 11:16 PM. This file is different than v1 because the property name on the first page is now "LUXE@375" and the owner is "LUXE LA CIENEGA, LLC."

f. On June 25, 2015, the NMS' Luxe La Cienega PMA v2 was attached to NMS' ex parte filing.

### B. NMS undertook extensive efforts to withhold, destroy, and alter evidence related to the suspected forgeries.

#### 1. Neil Shekhter Devices

---

[5] The file metadata dates are derived from Jumplist artifacts on the Neil Shekhter new Computer (ES108) and are derived from the Target Created and Target Modified dates for the "Property Management-375 ns.doc"

**a.  A computer called "DELLNEIL2012-PC" was withheld from examination.**

53.    In his December 10, 2015 deposition in *Lincoln Studios*, Neil Shekhter testified that he purchased the Dell desktop computer that he currently uses in the fall of 2014.  He further testified that, after transferring files from an old Dell computer to this new Dell computer in either late 2014 or early 2015, he "threw out" the old Dell computer. (See December 10, 2015 Deposition Transcript of Neil Shekhter, p. 203 - 220).

54.    Despite Mr. Shekhter's testimony that he threw away the computer he used in 2013, there is evidence that a Dell computer with the name "DELLNEIL2012-PC" was in use until at least September 19, 2015, but was not made available to Stroz Friedberg for examination:

a.  Neil Shekhter's new Dell desktop computer (identified as Stroz Evidence Sequence Number ES006 and as ES108, and referred to herein as the "New Shekhter Dell Desktop") was connected via a network connection to a computer with the name "DELLNEIL2012-PC" between October 8, 2014 and May 10, 2015.  In other words, during this period, Neil Shekhter's old computer was connected to his new computer.

b.  During this period, the New Shekhter Dell Desktop was used to access files and folders on the "DELLNEIL2012-PC."

c.  A file identified on the NMS Devices also contains embedded metadata, which establishes that a file called "1331 havenhurst proforma.xlsx" was created and last modified on September 19, 2015 by the user "Dell Neil 2012."  This name value would be populated by information entered as the registered user of the Microsoft Office program and establishes that this file was created and modified on a version of Microsoft Excel by this user on September 19, 2015.  In other words, there is forensic evidence that Neil Shekhter's old computer was still in use as of September 19, 2015.

55. No computer with the name DELLNEIL2012-PC, or with a Microsoft Office username of "Dell Neil 2012" was made available for my examination.

**b. Neil Shekhter's iPhone contained a deleted conversation from October 2015 that makes reference to replacing a hard drive and copying files.**

56. Among the devices I examined was a forensic image of Neil Shekhter's iPhone (identified as ES076). I recovered a deleted iMessage (text) conversation from October 15, 2015 that makes reference to replacing a hard drive and copying files. The following deleted iMessage (text) communication was between Neil Shekhter and his son Alan. The text in white is from the phone number +1 310-201-0040, which I have confirmed is Alan Shekhter's cell phone number, and the text in blue is from Neil Shekhter's iPhone:

**Figure 7: Recovered iMessage conversation between Neil and Alan Shekhter, October 15, 2015. Annotated with dates and times for clarity**

Take it and have it done today

I'll call u

10/15/2015 12:05:00 PM

Okay want me to get the new drive

10/15/2015 12:06:07 PM

Yes

Best Buy ?

10/15/2015 12:07:37 PM

What siZe drive is in it now

10/15/2015 12:17:41 PM

And which computer

10/15/2015 12:25:48 PM

Since you have more than one

10/15/2015 12:25:56 PM

Also I will need your password

10/15/2015 12:26:16 PM

Just for me to log in

10/15/2015 12:26:25 PM

I can meet u home later

I'll call u soon

I'm getting my dell info to make sure u get the right drive

10/15/2015 12:31:43 PM

Oh I was going to open it up to make sure I get it all right
10/15/2015 12:32:30 PM

K

U can

It's the 5810 model

Let's wait until I get home

I'll email u the computer info from my dell acc

10/15/2015 12:36:26 PM

Is Eddie there?
10/15/2015 12:36:55 PM

Yes he's there today I just left the office was going to get a drive
10/15/2015 12:37:19 PM

10/15/2015 12:45:11 PM

This is it
10/15/2015 12:46:15 PM

K
10/15/2015 12:47:35 PM

It tells u exactly what I got
10/15/2015 12:48:23 PM

U can see both drives on page 3
10/15/2015 12:49:47 PM

10/15/2015 12:51:01 PM

Looks like I got second drive 4tb
10/15/2015 12:51:58 PM

Now u know what drive to get

Maybe they have 6 or 8tb
10/15/2015 12:56:20 PM

Yea I'm at the house
10/15/2015 12:59:05 PM

I would clean up the desktop files but it should be good to go
10/15/2015 12:59:20 PM

I'll go get the drive
10/15/2015 12:59:25 PM

Your external finished backing up
10/15/2015 12:59:44 PM

Thu, Oct 15, 3:46 PM

I have the drive and a new computer, Best Buy on pico wouldn't have it done today but maybe the valley would calling now
10/15/2015 03:46:00 PM

Maybe some other shop in the area?
10/15/2015 03:50:02 PM

Maybe pay them extra?
10/15/2015 03:56:41 PM

Best Buy in the valley got an appt
10/15/2015 03:59:06 PM

Thanks bro
10/15/2015 04:00:34 PM

No prob
10/15/2015 04:00:46 PM

What's password for computer
10/15/2015 04:13:41 PM

(Password Redacted)
10/15/2015 04:14:35 PM

K
10/15/2015 04:18:50 PM

We could even put some data files from another one of your computers which will show date created as before
10/15/2015 04:46:06 PM

I know

I'll do that later
10/15/2015 04:46:41 PM

As long as I change the date before
10/15/2015 04:47:48 PM

I'll show you what to do it should be fine
10/15/2015 04:48:14 PM

K bro

I'll see u home around 8?
10/15/2015 04:48:32 PM

Ok
10/15/2015 04:51:06 PM

57. This recovered deleted chat communication suggests that on October 15, 2015, Neil Shekhter and his son Alan were conspiring to swap the second of two hard drives from his current New Dell Desktop computer with a new hard drive, and to take steps to hide the replacement by, among other things, backdating the computer clock. The reference to the "5810 model" in the conversation is the model of the New Shekhter Dell Desktop computer, a Dell Precision Tower 5810.

58. Further, the content of this deleted chat communication is consistent with the forensic evidence I identified regarding the existence of another computer used by Neil Shekhter. (See Figure 7: Alan: "And which computer since ***you have more than one***[?]" and "We could even put some data files from ***another one of your computers*** which will show date created as before,"… Neil: "I know I'll do that later."(emphasis added)).

**c. On approximately October 15, 2015, a four terabyte hard drive was removed from Neil Shekhter's "new" Dell computer, withheld from examination, and replaced with another hard drive.**

59. Evidence on the New Shekhter Dell Desktop confirms that on October 15, 2015, the plan discussed by Alan and Neil Shekhter was carried out, and the computer now contains a new hard drive that is different than the one shipped from Dell:

a. The Dell website reports that the New Shekhter Dell Desktop computer shipped with two hard drives, a Hynix 512 gigabyte SSD drive used for the

computer operating system (the operating system hard drive), and a secondary Seagate 4 terabyte drive available for additional storage of files and folders.

b. The Seagate 4 terabyte drive shipped from Dell had a drive speed of 5,400 RPM.[6] When imaged by Stroz Friedberg, the computer did contain a 4 terabyte Seagate hard drive; however, the drive speed is 5,900 RPM.

c. Evidence on the computer establishes that the old Seagate hard drive had a volume serial number "6a88-d535"; the Seagate drive in the computer now has a volume serial number "86c5-163a."

d. The Dell website states that the New Shekhter Dell Desktop shipped on October 3, 2014. Consistent with that shipment date from Dell, the file system of the operating system hard drive was formatted one day prior. I would expect that the secondary 4 terabyte hard drive would also have been formatted before the computer was shipped by Dell. However, the file system creation date for the 4 terabyte drive suggested that it was formatted on January 10, 2015.

e. Finally, the Seagate warranty validation website states that the warranty for the 4 terabyte hard drive expires approximately two years after October 15, 2015, in November 2017. I reviewed the warranty information for other Seagate hard drives that accompanied Dell computers examined from NMS, and the Seagate warranty validation website states that the product was sold as a system component. This further demonstrates (i) that the 4 terabyte hard drive was purchased recently and (ii) that the 4 terabyte hard drive did not ship with the Dell computer.

60. The January 10, 2015 date is also a ruse. On October 15, 2015, a user of the New Shekhter Dell Desktop set the computer clock back to January 10, 2015, in an apparent attempt to make it appear as if the new hard drive had been used on an ongoing basis from that point forward. There is evidence in the Windows Event Logs on the New Shekhter Dell Desktop demonstrating that on October 15, 2015, the

---

[6] See http://www.dell.com/support/home/us/en/04/product-support/servicetag/CX60N22/configuration. Retrieved January 27, 2016.

computer clock was changed so that it would reflect a time of January 10, 2015. It was set to this date for a period of 14 hours and 40 minutes. While the clock was set back, any actions on the computer would appear as if they occurred at this time. In this period, more than 75,000 files and folders amounting to approximately 309 gigabytes were copied to the new 4 terabyte hard drive.

61. Notably, the forensic image of the New Shekhter Dell Desktop computer was not created by NMS' forensic consultants until October 19, 2015, after the hard drive swap occurred. This timing is interesting, given that the forensic images that the NMS consultant created for its other employees were all made about three weeks earlier, on September 25, October 1, or October 2, 2015.

62. The deleted text communication and backdating actions on this computer make it clear that NMS was attempting to hide the original 4 terabyte hard drive. This hard drive has not been produced, and as a result I am unable to examine its contents to make determinations regarding the files it contained, or their relationship to the provenance of the questioned documents.

**d. The computer clock was backdated numerous times on Neil Shekhter's "new" Dell computer.**

63. Between the period of October 4, 2015 and December 4, 2015, the computer clock on the New Shekhter Dell Desktop was manually changed approximately 17 times. These clock change events happened in seven distinct groupings where there were multiple clock changes in near-term succession. The table below contains a listing of the clock change events:

**Figure 8: Summary of Clock Changes on the New Shekhter Dell Desktop**

JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV DEC | DURATION

Session 1

The time was changed from **10/4/2015** to **9/1/2015** for 8 seconds, then to **9/6/2015** for 34 minutes and 16 seconds, and then to **9/7/2015** for 21 minutes and 23 seconds.

Session 2

The time was changed from **10/15/2015** to **8/30/2015** for 48 seconds, and then to **1/10/2015** for 14 hours, 40 minutes, and 39 seconds.

Session 3

The time was changed from **10/17/2015** to **7/1/2015** for 10 minutes and 55 seconds, then to **9/2/2015** for 2 minutes and 15 seconds, then to **9/4/2015** for 2 minutes and 22 seconds, then to **9/16/2015** for 1 minute and 18 seconds, then to **9/18/2015** for 2 hours and 19 seconds, then to **9/19/2015** for 2 hours, 9 minutes, and 14 seconds, and then to **8/31/2015** for 1 hour, 35 minutes, and 52 seconds.

Session 4

The time was changed from **10/18/2015** to **9/12/2015** for 43 minutes and 20 seconds.

Session 5

The time was changed from **12/2/2015** to **7/1/2015** for 8 hours, 14 minutes, and 40 seconds.

Session 6

The time was changed from **12/2/2015** to **8/2/2015** for 1 hour, 15 minutes, and 20 seconds.

Session 7

The time was changed from **12/4/2015** to **11/4/2015** for 41 seconds, and then to **11/27/2015** for 1 hour, 39 minutes, and 57 seconds.

KEY

TIME OCCURED (PACIFIC) TO NEW TIME (PACIFIC) 24 HOURS 60 MINUTES 60 SECONDS

Gibson, Dunn & Crutcher LLP

35

DECLARATION OF SAMUEL S. RUBIN

64. Session 2, above, reflects when the computer clock was set back from October 15, 2015 to January 10, 2015 and files were copied to the new replacement hard drive in an attempt to cover up the hard drive swap.

65. Session 7, above, reflects when the computer clock was set back in the evening of December 4, 2015 which is the day my team and I arrived to begin the forensic examination. On December 4, 2015, the computer clock on the New Shekhter Dell Desktop was set back to November 7th, 2015. The clock was changed around 6:00 p.m. and stayed backdated for about an hour and 30 minutes. Shortly before I arrived around 7:20 p.m., the computer was shut down. During the time the computer clock was set back immediately before my arrival, over 60,000 files were copied to the computer hard drive, which titled over 200 gigabytes of information. When I arrived at the NMS offices, Alan Shekhter and Scott Cooper were present, but neither told me that the New Shekhter Dell Desktop had been backdated.

66. It is generally not possible to distinguish files that were created or changed in real time from those that were affected during the clock change events; but in the aggregate, during the periods when the clock was changed, over 800,000 files and folders were affected.

67. The clock change events on the New Shekhter Dell Desktop made my examination of this device many times more difficult than it otherwise would have been, as dates and times for any material findings had to be checked to confirm what time the activity really occurred.

**e. <u>Relevant files and folders were deleted and are missing from the New Shekhter Dell Desktop.</u>**

68. As a result of the hard drive swap on the New Shekhter Dell Desktop, files are missing or were destroyed. Forensic artifacts on Neil Shekhter's New Desktop contain evidence of over 800 files that existed either on a Seagate external hard drive connected to the computer, or on the secondary hard drive, that are no longer present on Neil's computer and were never produced. The list includes

approximately 76 Excel spreadsheets, 66 Word documents and 85 PDF files, many of which contain file names that mention AEW or the Joint Venture. These are by no means all of the files that are missing from what was on the old hard drive or the Seagate external drive, but represent those that were recently interacted with (accessed, opened, or edited) and therefore had entries in the available forensic artifacts called Jumplists and LNK files. The tables below contain some examples of these missing or destroyed files.

69. The following list includes examples of files or folders that were accessed on the Seagate External hard drive used on the Neil Shekhter new Computer that are not present on Neil Shekhter's new swapped out hard drive:

**Figure 9: Examples of files/folders opened on the Seagate external drive that are no present on the new drive**

| Full Path | File Opened (Lnk Modified) |
|---|---|
| F:\D2\My Scans\2015\2015 Scan NS2.png | 11/11/2015 13:23 |
| F:\D2\My Scans\2015\2015 Scan NS1.png | 11/11/2015 13:04 |
| F:\AEW 2 | <not available> |
| F:\MA Scan 1.pdf | <not available> |

70. The following list includes examples of files that were accessed on the now-missing hard drive from the Neil Shekhter new Computer that are not present on Neil Shekhter's new swapped out hard drive. These files were accessed before the hard drive swap, and are not contained on the new replacement hard drive.

**Figure 10: Examples of files/folders opened on the Neil Shekhter new Computer that are no present on the new drive**

| Full Path | File Opened (Lnk Modified) |
|---|---|
| D:\My Documents\05 2010\2156\375\AEW\Closing Binder\Draft.xlsx | 3/29/2015 22:42 |
| D:\My Documents\05 2010\2156\NMS\AEW\P6 LA MF Holdings I LLC - fully executed (ver1).pdf | 11/15/2014 9:14 |
| D:\My Documents\05 2015\2156\NMS\AEW 2\AEW K1\AEW Partners 6 K1 n.pdf | <not available> |
| D:\My Documents\05 2015\2156\NMS\AEW 2\AEW NMS LLC\2010 12 14 P6 LA MF Holdings I LLC - final Ver 4.pdf | <not available> |
| D:\My Documents\05 2015\2156\NMS\AEW\AEW_NMS - LLC Agreement of P6 LA MF Holdings I LLC (JV) Ver 3 from email February 08, 2012.DOC | 6/21/2015 14:26 |
| D:\My Documents\05 2015\2156\NMS\AEW\Management Agr\Property Management AEW 2010 Form-1.doc | 6/24/2015 21:25 |
| D:\My Documents\05 2015\2156\NMS\AEW\Management Agr\Property Management-375 ns.doc | 6/24/2015 21:29 |
| D:\My Documents\05 2015\2156\NMS\AEW\Management Agr\Property Management-9901 LUXE-v1.DOC | 6/24/2015 7:33 |
| D:\My Documents\05 2015\2156\NMS\AEW\Management Agr\WSComparison_Property Management-9901 LUXE-v0-Property Management-9901 LUXE-v1.doc | 6/24/2015 7:33 |
| D:\My Documents\05 2015\My Scans\2015 Scan NS.jpg | 6/15/2015 19:55 |
| D:\My Documents\05 2015\My Scans\2015\2015 Scan NS.jpg | 6/16/2015 00:37 |
| D:\My Documents\05 2015\My Scans\2015\2015 Scan NS1.png | 6/15/2015 20:00 |
| D:\My Documents\05 2015\My Scans\2015\2015 Scan NS2.png | 6/16/2015 00:46 |

71. As noted above, among the files missing from the computer as a result of the hard drive swap is a file with the name "Property Management-375 ns.doc." This file was created on June 24, 2015 at 7:55 AM and last written at 8:48 AM.[7] This is approximately 20 minutes before Neil Shekhter emailed out the first scanned version of the Luxe La Cienega PMA with the 60-day termination provision. Based on the file name and associated file metadata times, this Microsoft Word file likely was the PMA file used to create the forged version with the 60-day provision.

72. Also among the information deleted from the New Shekhter Dell Desktop are files and folders within a folder that was that was called "AEW." Forensic artifacts demonstrate that the folder named "AEW" was manually renamed from "AEW" to "W" on December 4, 2015, at some point between 2:02 AM and when the computer

---

[7] The file created and last written dates are reflected in the "Target Created" and "Target Modified" Jumplist artifacts for this file on the Neil Shekhter New Computer.

*(Cont'd on next page)*

was shutdown at 7:21 PM.[8] Stroz Friedberg created a forensic image of the computer later that same evening, at approximately 8:30 PM.

73. This renamed "W" folder is missing certain folders that were part of the original directory structure, including folders with the following names:

AEW docs

AEW docs\From AEW

AEW docs\From AEW\09 21 2010

AEW docs\From AEW\09 21 2010\AEW v2 Letter

AEW Legal

AEW Legal\Neil Decl

AEW Legal\Key Bank

AEW Legal\From AEW

AEW Legal\From AEW\Removal

There is evidence that the missing folder "AEW v2 Letter" contained a file called "Letter fr AEW 9 14 2010 001.jpg." As discussed above, I believe this file to be a forged version of the disputed Cover Letter.

74. Finally, a zip file called "NMS-2015-11-24.zip." was recently deleted from the New Shekhter Dell Desktop. On November 24, 2015, Dan Lennon ("lennon.dan@gmail.com") emailed Neil Shekhter: *"Neil - let me know if the attached .zip file comes through. Contains all the AEW/NMS files I found."* The email includes a hyperlink to download the zip file from a Google Drive account. The file was downloaded to the New Shekhter Dell Desktop computer on November 25, 2015 at 12:42 AM and deleted sometime after this date, but before Stroz Friedberg imaged the computer on December 5, 2015.

75. Ultimately, because of the hard drive swap we will never know all that the old hard drive contained. The limited forensic evidence available related to its

---

[8] Shellbag entries on the New Shekhter Dell Desktop (ES06) establish that the AEW folder existed as recently as December 4, 2015 at 2:02 AM.

contents demonstrates that the old hard drive contained relevant if not dispositive evidence related to the questioned documents.

**f. <u>The Windows Operating System on the New Shekhter Dell Desktop was manually upgraded on December 2, 2015.</u>**

76. From the day the Windows Operating System was originally installed in October 2014, until December 2, 2015, the New Shekhter Dell Desktop ran the Windows 7 Professional operating system. On December 2, 2015, three days before Stroz Friedberg imaged the computer, the operating system was manually upgraded to Windows 10. While Windows software updates or "patches" can be configured to be applied automatically, major version upgrades to an operating system are not installed automatically.

77. To upgrade the computer from Windows 7 to Windows 10, a user of Neil Shekhter's computer initiated the Windows update application, downloaded the update, and then went through the process of installing the upgrade. The digital evidence and log files establish that this upgrade was not performed automatically or as a result of a software "bug" – it was a manual user-initiated upgrade.

78. The December 2, 2015 change of the operating system to Windows 10 caused thousands of changes to the file system metadata and operating system files on the New Shekhter Dell Desktop. These changes updated, overwrote, and rendered unrecoverable forensic artifacts that I would have otherwise relied upon in my examination, making my examination more difficult than it otherwise would have been. For example, the following digital artifacts were changed in ways that hampered my examination:

a. Windows LNK files and registry "shellbag" timestamps were updated, which are areas of the Windows operating system that I have used to make determinations about when files and folders were accessed on a computer, and to address questions such as when the computer was last connected to Neil Shekhter's old computer.

b. Windows registry keys relating to recently accessed files were updated, which made it much more difficult to ascertain information about the access of certain key files, including the "NMS-2015-11-24.zip" file.

c. The Windows registry hives were updated, which otherwise may have maintained the date and time that USB devices had first been connected.

d. The available hard drive disk space was partially overwritten by the download and installation of the new version of Windows, which overwrote and rendered unrecoverable an unknown quantity of data.

79. The forensic image that the NMS consultant created of the New Shekhter Dell Desktop computer on October 19, 2015, after the swap out of the 4 terabyte hard drive, but before the upgrade of the operating system, contained some, but not all of the information that had been lost by the Windows upgrade. For example, artifacts affected by the Windows upgrade that pertain to usage of the computer after October 19, 2015 when the computer was imaged, have been lost or updated.

**g. <u>USB external storage devices used on the New Neil Shekhter Dell Desktop computer were withheld.</u>**

80. Between June 2015, and December 5, 2015, the date that Stroz Friedberg imaged the computer, the following devices were connected to and used on the New Shekhter Dell Desktop computer:

**Figure 11: USB Storage Devices Connected to the New Shekhter Dell Desktop**

| # | Device Name | Serial# | First Connect Date | Most Recent Connect Date |
|---|---|---|---|---|
| 1 | Seagate BUP Slim BK USB Device | NA7G6KRW | 10/15/2015 8:51 | 11/20/2015 0:59 |
| 2 | iXpand Flash Drive | 00000000EF32 | <n/a> | 11/3/2015 20:01 |
| 3 | SanDisk Cruzer Glide USB Device | 200524439307BE20F6E9 | 9/24/2015 12:10 | 10/15/2015 0:11 |
| 4 | Sony Hard Drive USB Device | 21021X170C60____ | 11/25/2014 10:43 | 10/14/2015 23:46 |
| 5 | Memorex Mini TravelDrive USB Device | 0EF1B5612370A8A7 | 9/24/2015 10:31 | 9/24/2015 10:31 |
| 6 | SanDisk Cruzer U USB Device | 4C530199970318101083 | 9/24/2015 10:21 | 9/24/2015 10:21 |
| 7 | SanDisk Cruzer U USB Device | 4C530103230318100541 | 9/24/2015 10:04 | 9/24/2015 10:04 |
| 8 | SanDisk Cruzer Orbit USB Device | 4C530006061222113521 | 9/21/2015 9:04 | 9/21/2015 9:04 |
| 9 | SanDisk Cruzer U USB Device | 4C530499910318101083 | 9/20/2015 13:57 | 9/21/2015 8:54 |
| 10 | SanDisk Cruzer Glide USB Device | 20051740130C5B604F72 | 10/13/2014 0:30 | 9/20/2015 21:38 |
| 11 | SanDisk Cruzer Orbit USB Device | 4C530007631222114091 | 9/20/2015 21:37 | 9/20/2015 21:37 |
| 12 | 2.0 Flash Disk USB Device | 011630008DD96A01 | 9/20/2015 21:33 | 9/20/2015 21:33 |

| | | | | |
|---|---|---|---|---|
| 13 | SanDisk Cruzer USB Device | 01646218FA402E1C | 9/20/2015 21:33 | 9/20/2015 21:33 |
| 14 | SanDisk Cruzer Glide USB Device | 20060877820F49633FAC | 8/30/2015 11:53 | 8/30/2015 11:53 |
| 15 | SanDisk Cruzer Glide USB Device | 2004220490111E201409 | 8/23/2015 23:02 | 8/23/2015 23:02 |
| 16 | Multiple Flash Reader USB Device | 058F63376377 | 8/2/2015 12:03 | 8/20/2015 3:18 |
| 17 | SanDisk Cruzer Glide USB Device | 2005485731111E201413 | 8/15/2015 20:11 | 8/15/2015 20:11 |
| 18 | SanDisk Cruzer Glide USB Device | 20052845020F49633FA4 | 8/11/2015 0:05 | 8/11/2015 0:05 |
| 19 | Syntek USB MSDC USB Device | 0123456789AC | 6/28/2015 16:04 | 6/29/2015 11:04 |
| 20 | PNY USB 2.0 FD USB Device | 0416KK00000000000447 | 10/13/2014 0:30 | 6/27/2015 22:54 |
| 21 | WD My Passport 082A USB Device | 575843314137344E54595634 | 3/9/2015 11:33 | 6/22/2015 22:01 |

81. Of particular note, the first listed device, a Seagate BUP Slim BK USB, is an external hard drive in a product line from Seagate that ranges in size from 500 gigabytes to four terabytes. This drive was connected to the New Shekhter Dell Desktop computer for the first time on the morning of the same day that the hard drive was swapped out of this computer, on October 15, 2015. I understand that NMS has stated that (consistent with the iMessage communication between Neil Shekhter and his son Alan) files from the now missing 4 terabyte drive were copied to the Seagate before the old hard drive was removed from the computer. I further understand that NMS claims that the Seagate external drive no longer exists.

82. Despite the assertion that the drive no longer exists, there is forensic evidence establishing that the Seagate external hard drive was used on the Neil Shekhter new Computer as recently as December 2, 2015. LNK files on the computer show that files were opened from the Seagate external drive while it was connected to the computer on this date. This evidence establishes that the device was in NMS' possession as of that date, but has not been produced.

83. Neither the Seagate USB drive nor any of the other 21 devices connected to the New Shekhter Dell Desktop were made available for my examination.

**2. <u>Adam Shekhter Devices</u>**

**a. <u>The NMS computer used by Adam Shekhter was originally withheld from examination.</u>**

84. The NMS computer used by Adam Shekhter was withheld from my examination for approximately one month.

85.    I understand that Neil Shekhter has stated that he asked his son Adam to email him a scanned copy of "Version 2" on July 15, 2013.  (See September 29, 2014 Decl. of Neil Shekhter, ¶¶16, 17).

86.    Because of his involvement with the scanning of "Version 2," I have stated from the outset of my examination that any computer used by Adam Shekhter at NMS would be important to review.  In fact, I made several attempts to ensure the availability of any such computer.  On December 4, 2015, when my team and I were at NMS' offices forensically imaging computers pursuant to the Order, I asked NMS' employee Alan Shekhter and NMS' forensic consultant Scott Cooper about the existence of a computer used by Adam Shekhter.  Both Alan Shekhter and Mr. Cooper informed me that they were unaware of any such device.

87.    Subsequently, as I commenced my analysis of the NMS devices, I identified an active and regularly used email account with over 10,000 email items on the company email server in Adam Shekhter's name.  On or around this time, I asked counsel for AEW to inquire further about the existence of a NMS computer used by Adam Shekhter.  On or around December 22, 2015, NMS produced what I understand are two of Adam Shekhter's personal computers, but still did not produce an NMS corporate computer.

88.    I subsequently found affirmative evidence of the existence of a NMS corporate computer used by Adam Shekhter:

a.  Internal NMS emails established that NMS purchased a Dell OptiPlex 7010 desktop computer, service tag 1TYW5V1, on or around June 27, 2012 and assigned that computer the host name "ADAM-S-PC."

b.  Windows event logs from other NMS Devices established that the ADAM-S-PC had been in regular use on the NMS corporate network up until December 3, 2015 at 7:26 PM, the evening before Stroz Friedberg began its forensic imaging at NMS' corporate offices.

89. NMS ultimately made the computer available for examination on January 6, 2016, but only after I identified forensic evidence of its existence and ongoing use, and after AEW's counsel notified NMS of their intention to move *ex parte* to compel production of the device if it was not produced.

90. The file system artifacts on the computer establish that the Adam Shekhter NMS computer (identified as ES092 and referred to as the "Adam Shekhter Dell Desktop") was in regular use until approximately 7:26 PM on December 3, 2015 – the night before Stroz Friedberg arrived at NMS' offices to preserve computers – and then not used again until December 21, 2015. This evidence is consistent with what I would expect to see if NMS was intentionally withholding/hiding it so that it would not be imaged and examined by Stroz Friedberg.

91. As discussed above, the Adam Shekhter Dell Desktop ultimately turned out to contain many of the digital artifacts that were critical to my analysis of the authenticity of "Version 2."

**b. Adobe Acrobat was removed from the Adam Shekhter NMS computer on or after October 2, 2015.**

92. Adobe Acrobat version 9 was installed on the Adam Shekhter Dell Desktop computer on or around September 27, 2012. There is evidence that the program was present on the computer until as recently as October 2, 2015; however, the Adobe Acrobat version 9 was removed from the computer on or after this date. The previous presence of Adobe Acrobat on this computer is significant because the "Version 2" document was created by editing an earlier version of the JV Agreement using the Adobe Acrobat program.

**c. A USB flash drive used in connection with "Version 2" of the JV Agreement was withheld from examination.**

93. As addressed in the discussion of the "Version 2" document above, a USB flash storage device was first connected to the Adam Shekhter Dell Desktop on July 15, 2013, the same day that "Version 2" was scanned and emailed at NMS. Even more

critically, there is evidence that this USB flash drive contained a file called "P6 LA MF Holdings I LLC clean NS 123 PRINT.pdf." This USB device has not been made available for my examination even though it relates to the origin of "Version 2" of the JV Agreement. Additionally, this electronic file was never produced.

**3. Additional Anti-forensic Tactics Undertaken By NMS**

94. In addition to the actions taken on the computers used by Neil and Adam Shekhter, I identified the following further examples of anti-forensic actions taken after the Order.

**a. NMS Devices were used to perform Internet searches for wiping, drive destruction, and anti-forensics.**

95. Between October 4 and December 4, 2015, the NMS computer used by Alan Shekhter (ES016) was used to search the Internet for the following terms, listed in Figure 10:

## Figure 12: Internet Searches on Alan Shekhter Dell Desktop (ES016)

| Search Term | Date/Time (Pacific) |
|---|---|
| how to encrypt hard drive | 12/4/2015 16:43 |
| solid state drive vs hard drive | 10/28/2015 14:29 |
| how fast can usb transfer data | 10/28/2015 10:17 |
| intel hard drive clone | 10/28/2015 10:10 |
| how much space does windows 10 take | 10/28/2015 10:09 |
| how much space does windows 10 take | 10/27/2015 14:16 |
| how to install additional hard drive | 10/27/2015 14:12 |
| Dell OptiPlex 7010 - Core i7 3770 3.4 GHz - 8 GB RAM - 1 TB HDD - AMD Radeon HD 7570 - Windows 7 Professional | 10/27/2015 14:12 |
| dell optiplex 7010 | 10/27/2015 14:12 |
| samsung ssd | 10/27/2015 13:28 |
| los angele anti-computer forensics | 10/15/2015 11:01 |
| los angele secure wipe | 10/15/2015 11:00 |
| los angeles secure wipe | 10/15/2015 10:43 |
| los angeles secure wipe | 10/15/2015 10:42 |
| los angeles secure wipe | 10/15/2015 10:41 |
| los angeles secure wipe | 10/15/2015 10:39 |
| backdated secure wipe | 10/15/2015 10:39 |
| backdated secure wipe | 10/15/2015 10:38 |
| los angele anti-computer forensics | 10/15/2015 10:37 |
| los angele anti-computer forensics | 10/15/2015 10:36 |
| how to avoid computer forensics | 10/15/2015 10:36 |
| backdated secure wipe | 10/15/2015 10:30 |
| computer expert los angeles | 10/15/2015 10:29 |
| computer expert los angeles | 10/15/2015 10:28 |
| secure wipe hard drive | 10/15/2015 10:26 |

96. Between November 9 and December 4, 2015, the NMS computer used by NMS IT administrator Enrique Sanchez (ES037) was used to search the Internet for the following terms, listed in Figure 11:

**Figure 13: Internet Searches on Enrique Sanchez Dell Desktop (ES037)**

| Search Term | Date/Time (Pacific) |
|---|---|
| does eraser work on ssd | 12/4/2015 14:29 |
| restore hard drive from ftk imager | 12/4/2015 13:15 |
| Forensic | 12/4/2015 11:51 |
| free ssd secure erase | 12/3/2015 15:13 |
| file deletion utility windows 7 | 12/3/2015 15:00 |
| hard drive destruction service los angeles | 11/13/2015 13:51 |
| hard drive destruction service | 11/13/2015 13:47 |
| adobe acrobat removal tool | 11/13/2015 12:39 |
| NIST SP 800-88 compliant drive sanitizer | 11/9/2015 14:48 |
| NIST SP 800-88 complaint drive sanitizer | 11/9/2015 14:41 |
| physical destruction of hard drives | 11/9/2015 14:08 |
| nist sp 800-88 media erasure guidelines | 11/9/2015 13:35 |
| DoD 5220.22-M Data Sanitization Compliant\ | 11/9/2015 13:34 |
| DoD 5220.22-M Data Sanitation Compliant\ | 11/9/2015 13:34 |
| wipe multiple hard drives simultaneously | 11/9/2015 12:42 |

**b. <u>Files from NMS Devices were wiped with the use of the software wiping program Eraser Portable.</u>**

97. On the day Stroz Friedberg began its forensic imaging, files from NMS Devices were wiped.

98. On December 3, 2015 at 2:44 PM, the NMS computer used by NMS IT administrator Enrique Sanchez (ES037) was used to download a program called "EraserPortable" from the website sourceforge.net. Eraser is a data destruction and wiping application. It is used to permanently delete data from digital media, rendering it unrecoverable, even with the use of forensic data recovery techniques. The portable

version of Eraser is a version designed to run from portable media connected to a computer without the need to install the application.[9]

99. On December 4, 2015 at 2:09 PM, the program file was copied to the NMS corporate file server. Shortly thereafter, the application was run on the NMS computer used by Enrique Sanchez (ES037).

100. On December 4, 2015 at approximately 2:11 PM the NMS computer used by Brian Bowis (ES008) was used to run the Eraser Portable application from the NMS file server. Artifacts related to the use of the application suggest it was used to wipe files that were maintained on the Desktop of Brian Bowis' computer. The forensic image of Brian Bowis' NMS computer created by NMS' consultants on October 2, 2015 contains many, but not necessarily all, of the files that a user of the Bowis computer attempted to destroy. This earlier snapshot of the computer suggests that the wiping on December 4, 2015 destroyed over 300 files.

101. Many of the files wiped on the Bowis NMS computer appear related to NMS business. Among the files targeted by the wiping were approximately 126 PDF files, 39 Word Document files, and 90 spreadsheet files, including files that appear related to JV properties or issues including "1410 5th St Pro Forma.xls" and "Waterfall Model.xlsx.":

[9] See http://portableapps.com/apps/security/eraser-portable. Retrieved January 29, 2016.

**Figure 14: Example files wiped from Bowis' NMS computer on December 4, 2015**

| File Name |
|---|
| NMS Properties Bio.docx |
| NMS General Specifications.doc |
| Sale vs JV Analysis.xls |
| Promote JV Structure.pdf |
| Copy of NMS Property List-Entity Tax ID APN.xls |
| 1432 - 1444 Lincoln - Summary 2012 0210 (NMS).docx |
| JV Investment Set Up.xls |
| JV Structure Sheet 33rd St.pdf |
| Sample_JV_Waterfall Structure.xls |
| REFM_JV_Waterfall_Bootcamp_v3_0.xls |
| 1410 5th St Pro Forma.xls |
| Waterfall Model.xlsx |

c. **Deletion on the Eddie Valentin Computer.**

102. On December 3, 2015 at 4:19 PM, the day before Stroz Friedberg imaged this computer, a file called "375 Management Agreement Scan.pdf" was deleted from the computer used by NMS employee Eddie Valentin (ES013). This file was a copy of the forged Luxe La Cienega PMA. It was copied to Eddie Valentin's computer on June 29, 2015.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 3rd day of May 2019, at Arlington, Virginia.

Samuel S. Rubin