GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
    jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
    jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
    smader@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 2:19-cv-01150-AB-AFM<br><br>**DECLARATION OF GERALD M. LAPORTE IN SUPPORT OF PLAINTIFF'S OPPOSITIONS TO DEFENDANTS' SPECIAL MOTIONS TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO C.C.P. § 425.16**<br><br>*[Filed concurrently with Opposition Briefs, Declarations of James P. Fogelman, Harper Gernet-Girard, Jonathan Watson, Drew Flowers, and Samuel S. Rubin, Evidentiary Objections, and Plaintiffs' Request for Judicial Notice; [Proposed] Orders  lodged concurrently herewith]*<br><br>**Hearing:**<br>Date:      May 24, 2019<br>Time:      10:00 a.m.<br>Place:     Courtroom 7B<br>Judge:    Hon. André Birotte Jr. |

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

## DECLARATION OF GERALD M. LAPORTE

I, Gerald M. LaPorte, declare and state as follows:

1.      I am a Forensic Chemist and Document Dating Specialist with Riley Welch LaPorte & Associates Forensic Laboratories.  I make this declaration in support of the Plaintiff's Oppositions to Defendants' Special Motion to Strike Plaintiff's Complaint Pursuant to C.C.P. § 425.16.  I have personal knowledge of the matters testified to herein, and if called as a witness, I could and would competently testify thereto.

2.      I was retained by Gibson, Dunn & Crutcher LLP to conduct a forensic examination and expert analysis of certain documents in connection with *Lincoln Studios, LLC, et al. v. DLA, et al.*, Case No. BC551551(L.A.S.C., filed July 15, 2014) ("*Lincoln Studios*").

## QUALIFICATIONS

3.      I am a Forensic Chemist and Document Dating Specialist with Riley Welch LaPorte & Associates Forensic Laboratories.  I am also employed full time as the Director of the Office of Investigative and Forensic Sciences at the National Institute of Justice, which is within the United States Department of Justice.  I have permission to operate as an independent consultant in civil matters and have done so since 2008.  My findings and conclusions in this matter do not represent the views of the United States government.

4.      I have over 25 years of experience in the field of forensic science and over 18 years of experience performing physical and chemical examinations on a variety of documents to determine how they were produced, where they may have originated from, and whether they are authentic.  I trained with the United States Secret Service in the field of questioned document examination, specializing in the area of ink and paper analysis.  For more than 6 years, I was responsible for maintaining the largest international collection of writing ink standards in the world – a collection of nearly 10,000 inks that date back to the 1920s.  In 2005, I was promoted and designated a

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

"National Expert" by the United States Secret Service in the forensic examination of documents produced using printers and copiers. Prior to my current position, I served as the Chief Research Forensic Chemist in the Forensic Services Division at the United States Secret Service until March of 2009.

5.      During my tenure with the United States Secret Service, I examined hundreds of items of evidence (easily exceeding over 1000) with CPS codes as part of many counterfeit and other criminal investigations. I have issued dozens of reports in criminal and civil cases involving CPS codes. Also, I have provided training to incoming examiners and I have testified in Federal Court on matters related to CPS codes.[1]

6.      I have testified over 100 times in International, Federal, and State courts and have never been excluded as an expert witness.

7.      For three years, I served as the co-chair of the Standards Practices and Protocols Interagency Working Group (SPPIWG), under the Office of Science and Technology Policy within the Executive Office of the President of the United States.

8.      I am a member of several professional organizations including the American Academy of Forensic Sciences (AAFS), American Society of Questioned Document Examiners (ASQDE), Mid-Atlantic Association of Forensic Scientists (MAAFS), the American Society of Testing and Materials (ASTM) International, and the American Bar Association (ABA) – Criminal Justice Section. I was also a contributing member in the Scientific Working Group for Questioned Documents (SWGDOC) and served as a Technical Contact when standards were developed for the questioned document community.

9.      I was selected by the Attorney General of the United States to serve as a Commissioner on the National Commission on Forensic Science from 2014 through 2017. This Commission was composed of esteemed scientists, law enforcement

---

[1]  *E.g.* USA v Robert Sterling Miller – Western District of Texas Austin, Texas, Case #A-05-CR-247 SS

officials, prosecutors, defense attorneys, and judges, with the underlying objective to enhance the practice of forensic science.

10.     I also currently serve as the Chairperson on the Forensic Document Examination Subcommittee on the Organization of Scientific Area Committees (OSAC) for Forensic Science, which works to strengthen the nation's use of forensic science by facilitating the development of technically sound forensic science standards and by promoting the adoption of those standards by the forensic science community.

11.     I participated in the European Document Experts Working Group (EDEWG) and I am a contributing member of the International Collaboration for Ink Dating (INCID), an international group dedicated to collaborating on methods for ink dating.  I have conducted more than 100 lectures, seminars, and training events in 13 different countries for law enforcement agencies, professional organizations, and technical experts.

12.     I have also organized and personally conducted workshop trainings in the areas of document authentication and ink analysis.

13.     I have published several scientific papers in the area of forensic document examination and authored chapters in the Forensic Chemistry Handbook (*Chemical Analysis Techniques Used in Forensic Document Examinations*), The Wiley Encyclopedia of Forensic Sciences (*Documents, Forgeries and Counterfeits*), and Forensic Chemistry Fundamentals and Applications (*Chemical Analysis for the Scientific Examination of Questioned Documents*).  A full and complete copy of my curriculum vitae is included as **Exhibit 1** to this Declaration.  Exhibit 1 includes a list of all publications I authored within the past ten years and a list of all cases in which I testified as an expert at trial or by deposition within the last 4 years.

14.     Most of the documents upon which I relied to form my opinion, and which I examined pursuant to the forensic examination, are not attached hereto because of their volume but are available at any time upon the Court's request in electronic form.

**FORENSIC EXAMINATION**

15.    In the case *Lincoln Studios*, I conducted a forensic examination on behalf of Defendants Eric Samek; Marc Davidson; P6 LA MF Holdings SPE, LLC; AEW Capital Management, L.P.; AEW Partners VI, L.P.; AEW Partners VI, Inc.; AEW VI, L.P.; and P6 LA MF Holdings I LLC (collectively, the "AEW Parties") pursuant to Court order.  I understand that the instant, above-captioned case is brought against some of the plaintiffs in *Lincoln Studios*, as well as NMS Properties, Inc. ("NMS Properties"), an affiliate of the Plaintiffs in *Lincoln Studios*.  I collectively refer to the Defendants in the above-captioned case for purposes of this Declaration only as "NMS."  I previously filed my findings regarding three documents advanced by the NMS as a result of this forensic examination in two declarations in *Lincoln Studios*.

16.    I conducted my forensic exam pursuant to the Court's October 6, 2015 Order Granting AEW Defendants' Motion for Forensic Examination in *Lincoln Studios* case (the "Order"), which ordered NMS to produce the "original hard copy" of "Version 2," the September 14, 2010 "Cover Letter," and "La Cienega PMA."  In addition to the three questioned documents I received and examined, I also reviewed 72 known documents (K1 through K72), including numerous emails and attachments.

**QUESTIONED DOCUMENTS RECEIVED FOR EXAMINATION**

17.    On October 17, 2015, I received one (1) FedEx box (FedEx Tracking #8597 9522 2827) containing the following:

a.    **Q1**    *A one hundred and twenty-four (124) page document titled "LIMITED LIABILITY COMPANY AGREEMENT FOR P6 LA MF HOLDINGS I LLC, a Delaware limited liability company" dated September 8, 2010.  This document contains a title page, table of contents (page I through v), a page titled "LIST OF SCHEDULES AND EXHIBITS," pages 1 through 79, a second page 79, and 37 pages of Schedules and Exhibits.  The first page numbered 79 contains a signature in the name of Neil Shekhter and the second page numbered 79 contains a signature in the*

name of Eric Samek.  This document is referenced herein as the Q1 VERSION 2 LLC AGREEMENT.

        **b.**    **Q2**    A forty-two (42) page document titled "<u>MANAGEMENT AGREEMENT</u>" for the Property Name Luxe @ 375, dated March 1, 2012.  This document contains a title page, table of contents (page ii through iv), pages 1 through 23 (with two pages numbered 18), and fourteen (14) pages of Schedules.  Page 2 contains two signatures in the name of Naum Neil Shekhter.  This document is referenced herein as the Q2 MARCH 2012 PMA.

        **c.**    **Q3**    One (1) page letter with the subject line "RE: JV AGREEMENT (3 YEAR BUY/SELL)," dated September 14, 2010, and bearing a signature in the name of Eric Samek.  This document is referenced herein as the Q3 COVER LETTER.

## KNOWN (EXEMPLAR) DOCUMENTS RECEIVED FOR EXAMINATION

18.    A description of the documents I received for comparison to the questioned documents, and their referenced designations, is included in the Appendix, along with true and correct copies of the documents I examined. These known, or exemplar, documents are referenced with a "K" designation in order to differentiate them from the questioned documents, which have a "Q" designation.  Not all known, or exemplar, documents are presumed to be authentic.  I examined seventy-two (72) documents (K1 through K72) in this matter as of the date of this report, to include hard copy documents received via FedEx and UPS, as well as electronic documents I received from counsel for NMS.  Attached as **Exhibit 2** to this declaration is a true and correct copy of the Document Inventory from my records, which details the receipt and describes the appearance of each Known or Exemplar document (designated "K").

19.    Throughout this report, I reference the terms, which I understand to be terminology used by NMS: "Version 1 LLC Agreements," "Version 2 LLC Agreements," and "Version 3 LLC Agreements."  All of these documents bear the same title, which reads, "LIMITED LIABILITY COMPANY AGREEMENT FOR P6

LA MF HOLDINGS I LLC, a Delaware limited liability company" and dated September 8, 2010.  However, one of several differences is the "Version 1 LLC Agreements" do not include a definition for "Specified Property" and "Specified Property Rider" on page 21 while the "Version 3 LLC Agreements" do contain definitions for these two terms on page 21.  The "Version 2 LLC Agreements" were identified based on the verbiage reading "three (3) years" in the first line of Article 11.1(a)(i) on page 63.  The "Version 1 LLC Agreements" and "Version 3 LLC Agreements" contain the verbiage "five (5) years" instead of "three (3) years."  Also, the Q2 VERSION 2 LLC AGREEMENT is referenced as a unique document and is not included in the group designated as the "Version 2 LLC Agreements."

**ASSIGNMENT**

20.    I was requested to conduct a forensic examination to determine if the Q1 VERSION 2 LLC AGREEMENT, Q2 MARCH 2012 PMA, and Q3 COVER LETTER are authentic with respect to their purported dates of preparation, and whether they were fabricated or otherwise manipulated.

21.    On January 14, 2016, I arranged for four boxes of documents to be delivered to Dr. Valery Aginsky, expert witness for NMS in *Lincoln Studios*, via FedEx, which included the questioned and known documents referenced above.

22.    The forensic testing of documents involves physical testing that may affect the integrity of a document or require removal of portions of a document such as the paper or ink in order to perform an analysis of the materials.  This is different than performing non-destructive examinations such as visualizing a document with magnification and light.  In this case, I performed all physical testing while Dr. Aginsky was present in my laboratory.  I did not perform any physical forensic testing that would affect the integrity of any of the produced documents outside of Dr. Aginsky's supervision.  In this case, a significant amount of my work was based on examining the documents using my naked eye, a microscope, and filtered light.  None of these latter techniques can physically affect the document, and it was my

1  understanding that I was not required to give Dr. Aginsky notice of any non-
2  destructive examinations.

3  **COMPENSATION**

4      23.    I am being compensated at the rate of $450 for my services in this matter.
5  My compensation is not contingent on my findings, testimony rendered, or the
6  outcome of this litigation.

7  **SUMMARY OF OPINIONS**

8      24.    Based on a comprehensive forensic examination of the questioned and
9  known documents, the Q1 VERSION 2 LLC AGREEMENT was first created on July
10  15, 2013 – not on or around September 8, 2010.  Some office machines, such as color
11  photocopiers and color laser printers, have an anti-counterfeiting feature that will
12  impart a counterfeit protection system (CPS) code on the document using a yellow dot
13  pattern, which is not visible to the naked eye, but can be viewed with a specialized
14  filter.  The CPS code can then be deciphered to determine information such as the date
15  the document was created and the serial number of the office machine.  All of the
16  pages in the Q1 VERSION 2 LLC AGREEMENT, except one page bearing a signature
17  in the name of Eric Samek, were produced with color toner and contained the same
18  CPS code. I was able to decipher the CPS code on the Q1 VERSION 2 LLC
19  AGREEMENT and determine that all of the pages, except a page bearing a signature
20  in the name of Eric Samek (one of two pages numbered 79, or the 87th page of 124
21  total pages), were produced on July 15, 2013 on a Xerox WorkCenter 7775 office
22  machine located at NMS Properties, Inc.  I also identified CPS codes on some of the
23  known documents, which I used to verify the accuracy of the information I deciphered
24  from the Q1 VERSION 2 LLC AGREEMENT.

25      25.    There is no evidence to indicate that the Samek Signature Page was
26  printed simultaneously with the other pages in the Q1 VERSION 2 LLC
27  AGREEMENT.  The Samek Signature Page was removed or taken from another

28

source and substituted into the Q1 VERSION 2 LLC AGREEMENT after the document was first created on July 15, 2013.

26.    I also examined two other "Version 2 LLC Agreements" referenced as the K61 SCOTT W. VERSION 2 LLC AGREEMENT and K66 WILLIFORD VERSION 2 LLC AGREEMENT.  I determined that both of these documents are later generation copies of the Q1 VERSION 2 LLC AGREEMENT, and were therefore copied and printed on or after July 15, 2013.

27.    There is evidence to indicate that the Q1 VERSION 2 LLC AGREEMENT is a first generation creation (or the first hardcopy iteration).  Based on a microscopic examination, the quality of the machine printed text on the Q1 VERSION 2 LLC AGREEMENT is far too superior to have been a reproduction created by scanning, copying and/or printing.  Moreover, there were no significant printing artifacts or defects on the color toner pages to suggest the document was scanned and reproduced from another document and then printed from the Xerox WorkCenter 7775.

28.    The verbiage reading "five (5) years" in the first line of Article 11.1(a)(i) in the K28 VERSION 1 LLC AGREEMENT was altered and substituted with "three (3) years" to create the Q1 VERSION 2 LLC AGREEMENT.  I reviewed various hardcopy and electronic copies of the "Version 1 LLC Agreements" and "Version 2 LLC Agreements," which include both drafts and fully executed documents.  The Q1 VERSION 2 LLC AGREEMENT and the "Version 2 LLC Agreements" are the only set of documents with text that reads "three (3) years" in the first line of Article 11.1(a)(i).

29.    My examination of the Q3 COVER LETTER revealed that the Q3 COVER LETTER was not produced on September 14, 2010 since it references the Q1 VERSION 2 LLC AGREEMENT (including the "three year" provision), which was not created until July 15, 2013.  Moreover, the signature and surrounding text block,

Gibson, Dunn & Crutcher LLP

including the text above, below, and adjacent to the signature, is a reproduction of the exact same signature and surrounding text block from another source.

30.    The overall quality of the machine printed text on the Q3 COVER LETTER is inferior, indicating it is not a first generation document or it is a document composed from multiple sources.  The Q3 COVER LETTER is not consistent with the quality I would expect from an original document (i.e. the first hard copy iteration).

31.    The Q2 MARCH 2012 PMA is substantially different from drafts of the Property Management Agreement for the same "La Cienega property" that were circulated between the parties by e-mail before the date of the Q2 MARCH 2012 PMA.  Rather than sharing similarities with the earlier circulated drafts of the Property Management Agreement for the "La Cienega property," the Q2 MARCH 2012 PMA is consistent in terms of formatting, textual anomalies, and other characteristics with two earlier executed Property Management Agreements for two other properties, 1410 5th Street ("Lido Apartments") and 9901 Washington.  There is evidence to indicate that the Q2 MARCH 2012 PMA was created using one of these older Property Management Agreements and not the draft agreements for the "La Cienega property."

**BASIS OF EXAMINATION**

32.    I performed a series of physical, optical, and chemical examinations using widely accepted procedures.  As part of my testing, I also rely, in part, on numerous published standards distributed by the Scientific Working Group for Forensic Document Examiners (SWGDOC).  My examination and testing relied, in part, on the following standards, which can be found at the following web link:

http://www.swgdoc.org/index.php/standards/published-standards

a.    SWGDOC Standard for Scope of Work of Forensic Document Examiners

b.    SWGDOC Standard for Test Methods for Forensic Writing Ink Comparison

Gibson, Dunn & Crutcher LLP

8

DECLARATION OF GERALD M. LAPORTE

c.     SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

d.     SWGDOC Standard for Indentation Examinations

e.     SWGDOC Standard for Non-destructive Examination of Paper

f.     SWGDOC Standard for Examination of Altered Documents

g.     SWGDOC Standard for Examination of Documents Produced with Toner Technology

h.     SWGDOC Standard for Examination of Documents Produced with Liquid Inkjet Technology

33.     A description and the scientific basis of the procedures I used are described in the following paragraphs of Section VI.

**A.     Physical and Optical Examinations**

34.     Physical examinations include non-destructive methods for inspecting the documents visually with an appropriate magnification device and/or light source.  This portion of the examination is necessary to determine how a questioned document was produced and whether the written entries are original (i.e., created with a writing instrument) or reproductions (e.g., photocopied or scanned and printed).  In addition, I examine the documents for evidence of any salient features such as alterations, obliterations, erasures, text substitution, page substitution, format changes, font variations, and staple hole inconsistencies.

35.     The text, format, and/or images on documents can be printed using various methods.  These methods of production are referred to as printing processes and are identifiable using a magnifying device with an appropriate light source.  The most common types of home and office machines utilize toner (e.g., photocopiers, laser printers, and some facsimile machines) or inkjet technology (e.g., inkjet printers and some types of multifunction machines capable of scanning, copying, faxing, and printing).  Typically, inkjet ink absorbs into the paper and appears planar, or flat, when visualized with a microscope.  Toner consists of a particulate material and sits on top

9

DECLARATION OF GERALD M. LAPORTE

of the paper, which appears to have a three-dimensional effect when observed with magnification.

36.    Printers and copiers - both inkjet and toner-based systems - use at least four different ink colors: cyan (C), magenta (M), yellow (Y), and black (K).  The CMY components are primary subtractive colors which, when combined, allow for images or text with a gamut of colors and shades. In some cases, the black text found on documents can be produced with black and/or a combination of CMY (i.e., composite black); however, to the naked eye – the text printing will appear to have been printed with only black toner or ink.

37.    Many office machine systems that utilize color toner have an anti-counterfeiting feature that produces a series of yellow dots on the document that are not visible with the naked eye, but can be observed using magnification with a specialized viewing filter.  The yellow dot pattern is referred to as a counterfeit protection system (CPS) code.  Articles in the Journal for the American Society of Questioned Document Examiners[2] and PC World Magazine[3] describe the development and use of this technology.

38.    In some instances, the yellow dots create a pattern that allows for information to be deciphered regarding the manufacturer of the machine used to produce the document, the serial number, and the date on which the document was produced.[4,5,6]

_____

[2] Tweedy, J. S., "Class characteristics of counterfeit protection system codes of color laser copiers," *Journal of the American Society of Questioned Document Examiners* 4(2), 53–66 (2001).

[3] "Government Uses Color Laser Printer Technology to Track Documents" found at: http://www.pcworld.com/article/118664/article.html

[4] https://w2.eff.org/Privacy/printers/docucolor/

[5] https://www.eff.org/press/archives/2005/10/16

[6] Tweedy, J., "Class Characteristics of Counterfeit Protection System Codes of Color Laser Copiers," *Journal of the American Society of Questioned Document Examiners*, Vol 4, No. 2, Dec. 2001.

Gibson, Dunn &
Crutcher LLP

10

DECLARATION OF GERALD M. LAPORTE

39.    When documents are printed or copied from an office machine, they may contain printing imperfections, commonly referred to as "trash marks." The identification and comparison of trash marks for linking multiple documents and determining the sequence of multiple copies is a generally accepted principle in forensic document examination. Printing defects, or imperfections, sometimes occur on machine printed documents and can be used to help prove that two or more items originated from a common source. With respect to photocopiers and some printers, printing imperfections can be imparted onto a document as a result of marks, scratches, dust or dirt on the glass platen, cuts on the delivery belt, dirt on the lens, scratches on the drum, and/or problems with the fusion system. These circumstances can arise as a result of normal wear and tear, abuse, or poor care and maintenance of the office machine. Therefore, when documents are produced contemporaneously, they may contain the same trash marks. When documents are created at different intervals from the same machine, new trash marks may begin to appear over time. And, when multiple copies of the same document are created, it may be possible to determine the sequence in which the copies were printed.

40.    Writing inks can be classified into ballpoint, non-ballpoint (e.g., roller ball, felt tip, gel), and fountain pen inks based on their unique microscopic characteristics that result from the combination of their differential chemical composition and interactions with paper. Determining the type and color of a writing ink is commonly reported following a physical examination and is further described in the *Standard for Test Methods for Forensic Writing Ink Comparison,* which is published and endorsed by SWGDOC.

41.    Documents can be examined for the presence of indented writing or other identifying impressions, which can appear on paper from writings or other markings made to another page while it was superimposed over the questioned material. I used an Electrostatic Detection Apparatus™ (ESDA) to recover potential impressions that

could indicate what was written on top of the questioned document, and whether the
other document(s) contained a date.

### B.    Chemical Examination

42.    The various ingredients of inks and toner can be analyzed using
specialized laboratory equipment, and I used a widely accepted technique to analyze
the chemical components known as thin-layer chromatography (TLC).  In order to
conduct TLC, I removed paper and ink plugs (circular discs ranging from 0.5 to 1.0
millimeter in diameter) from representative areas of the written entries and toners with
a specialized hypodermic-like device.

43.    Inks are typically composed of dyes and pigments (colorants), solvents,
and other trace materials.  TLC is a widely used and scientifically accepted method to
separate and compare the various colorants present in the inks.  In order to perform
TLC, the ink is extracted with a solvent from the sample plugs removed from the
written entries.  The ink or toner extract is then applied, as a tiny liquid spot, onto a
glass plate coated with a white chalk-like silica layer.  The TLC plate is then
developed with a mixture of solvents.  As the TLC plate develops, the solvent mixture
then diffuses up the plate by capillary action and carries the ink spot upwards.  Each
colorant component of the ink will move at different rates along the TLC plate due to
their physical and chemical differences, and stop migrating at different points.  Once
the TLC plate is fully developed, the multiple colorant components will appear as a
pattern of spots and bands.  The separated components can then be compared with the
separated components of other ink samples to determine if they match.  In the event
that inks contain colorant components that separate and migrate identically, the
formulations (or recipes) are then said to match[7] each other per the *Standard for Test
Methods for Forensic Writing Ink Comparison.*

---

[7]  The SWGDOC standard defines a match between ink samples as the inability to
distinguish between ink samples at a given level of analysis.  Note that "match"
does not necessarily imply that the two inks came from the same pen.

Gibson, Dunn &
Crutcher LLP

12

**RESULTS OF FORENSIC TESTING: Q1 VERSION 2 LLC AGREEMENT**

**A.      The Q1 VERSION 2 LLC AGREEMENT was printed on July 15, 2013 – not in September 2010.**

44.     The Q1 VERSION 2 LLC AGREEMENT is composed of one hundred and twenty-four (124) pages, to include a title page, table of contents (page i through v), a page titled "LIST OF SCHEDULES AND EXHIBITS," pages 1 through 79, a second page 79, and 37 pages of Schedules and Exhibits.  The first page 79 (which is the 86th page of 124 total pages) contains a signature in the name of Neil Shekhter ("Shekhter Signature Page") and the second page 79 (which is the 87th page of 124 total pages) contains a signature in the name of Eric Samek ("Samek Signature Page").

45.     All of the pages in the Q1 VERSION 2 LLC AGREEMENT, except the Samek Signature Page, were prepared with an office machine system utilizing color toner such as a photocopier or laser printer.  The Samek Signature Page was prepared with black toner.  Moreover, the signatures in the name of Neil Shekhter and Eric Samek on the respective pages are not original writing ink signatures.  That is, the signature in the name of Neil Shekhter was produced with the color toner used to print the entire Shekhter Signature Page, and the signature in the name of Eric Samek was produced with the black toner used to print the entire Samek Signature Page.

46.     As discussed in paragraphs 27 and 28, many office machines that use color toner will print a counterfeit protection system (CPS) code on a document in the form of tiny yellow dots that are not visible to the naked eye, but may be viewed with a specialized filter.  I determined that each of the one hundred and twenty-three (123) color pages (except the Samek Signature Page) contained a CPS code consistent with a dot pattern observed in office machines manufactured by Xerox®.  **Figure 1** below shows the dot pattern found on the Q1 VERSION 2 LLC AGREEMENT when viewed with a microscope and a specialized filter.

**Figure 1:  The CPS code pattern found on the Q1 VERSION 2 LLC AGREEMENT when viewed with magnification and a specialized filter.  In the image below, the yellow dots appear as black dots because of the special filter used.  The pattern is printed using 15 rows and 8 columns.**



47.    I deciphered the CPS code and determined that the Q1 VERSION 2 LLC AGREEMENT was first created on July 15, 2013, not in September 2010.

48.    Information from the CPS code found on the Q1 VERSION 2 LLC AGREEMENT indicates the document was printed between 1500 and 1600 hours, or 3:00 p.m. – 4:00 p.m. PDT on July 15, 2013.  Since the Xerox office machine is located in the Pacific Time Zone, and July 15 falls within the daylight savings time period, the clock time on the machine likely corresponds to Pacific Daylight Time.

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

**B.**    **The Q1 VERSION 2 LLC AGREEMENT was printed on a Xerox® WorkCenter 7775 (Serial Number RFX001896) located at Defendant's offices on July 15, 2013.**

49.    Information from the CPS code found on the Q1 VERSION 2 LLC AGREEMENT corresponds to a machine identification number 2882001896, which represents a portion of the serial number on the machine.[8]

50.    On December 12, 2015, counsel for NMS provided me with an inventory list of digital evidence produced during discovery in *Lincoln Studios* titled, "*Lincoln Studios, LLC, et al. v. DLA, et al. LASC Case No. BC551551 Plaintiffs' and Plaintiffs'-Affiliates' Devices Produced to the AEW Defendants Pursuant to an October 6, 2015 Order.*"  Based on the information provided in the inventory list, two (2) Xerox® WorkCenter 7775 full color copy machines were identified at Defendant's Offices. The serial numbers obtained from the two machines are RFX001896 (identified as Device #51) and RFX001867 (identified as Device #52).  The RFX<u>001896</u> serial number obtained directly from one of the Xerox® machines correlates with the last six digits I deciphered from the Q1 VERSION 2 LLC AGREEMENT CPS CODE (2882<u>001896</u>).  The "RFX" designation at the beginning of the serial number is the coordinating alpha-characters used by the manufacturer for the 2882 numeric value I deciphered from the CPS code.

51.    To verify the accuracy and reliability of the decoded information from the Q1 VERSION 2 LLC AGREEMENT, I examined the known documents I received from NMS to identify other documents that may have contained a Xerox® CPS code.

52.    I observed CPS codes consistent with a Xerox® machine on page 2 of K5 and K10 which are spiral bound reports from NMS.

---

[8]  The machine identification number is a unique number used by the manufacturer and may or may not pertain to all or a portion of the serial number directly on the office machine.

53.     K5 and K10 were printed on a Xerox® office machine with an identification number of 2882<u>001867</u>.  This number matches the serial number for the second Xerox WorkCenter 7775 (identified as Device #52) inventoried at Defendant's office, which was listed as RFX<u>001867</u>.  Also, the number "2882" that prefaces the serial number in the CPS code from K5 and K10 represents the "RFX" designation obtained directly from the copy machine.  This information is consistent with the machine identification information I deciphered for the Q1 VERSION 2 LLC AGREEMENT.

54.     Information from the CPS code found on the K5 document indicates the document was printed on June 10, 2013 between 0900 and 1000 hours (9:00 a.m. – 10:00 a.m. PDT).  And, information from the CPS code found on the K10 document indicates the document was printed on July 24, 2013 between 1600 and 1700 hours (4:00 p.m. – 5:00 p.m. PDT).  The date information I deciphered from K5 and K10 is consistent with when the documents were prepared and would have been printed from the Xerox WorkCenter 7775.  That is, K5, a report for activities in May 2013, was printed on June 10, 2013 and K10, a report for activities in June 2013, was printed on July 24, 2013.  This further confirms the accuracy and reliability of the information deciphered from the CPS code on the Q1 VERSION 2 LLC AGREEMENT.

**C.     <u>The Samek Signature Page was removed or taken from another source and substituted into the Q1 VERSION 2 LLC AGREEMENT after the document was printed.</u>**

55.     As discussed earlier, all of the pages in the Q1 VERSION 2 LLC AGREEMENT, except the Samek Signature Page, were printed using color toner.  This indicates the Samek Signature Page was not printed contemporaneously from the same source as the other 123 pages.  Accordingly, I proceeded to perform additional examinations to determine if the Samek Signature Page was obtained from another source and inserted into the Q1 VERSION 2 LLC AGREEMENT.

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

56.     The Samek Signature Page did contain numerous printing imperfections, or "trash marks," that occur when a document is copied, and printed from an office machine. As described in Section VII, printing imperfections, or trash marks, can be imparted onto a document during the copying and printing process.  The Shekhter Signature Page did not contain the same trash marks. **Figure 2** shows the various trash marks found on the Samek Signature Page, which are not present on the Shekhter Signature Page.

**Figure 2:  The top figure is an image of a portion of the Samek Signature Page, and the circles are placed around some of the trash marks.  The lower figure is an image of a portion of the Shekhter Signature Page, which does not contain any trash marks similar to those on the Samek Signature Page.**

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn &
Crutcher LLP

57.    Based on a microscopic examination, the machine printed text on the Q1 VERSION 2 LLC AGREEMENT is very high quality, indicating that the document is a first generation creation (or first physical iteration), not a reproduction created by scanning, printing and/or copying.

58.    Unlike the Samek Signature Page, none of the other 123 pages of the Q1 VERSION 2 LLC AGREEMENT contained any significant printing imperfections, trash marks, or other copier remnants that can occur when documents are placed directly on the glass or fed through an automatic document feeder (ADF) indicating the Q1 VERSION 2 LLC AGREEMENT was a document sent from a computer, which was networked to the Xerox® WorkCenter, and then printed directly from the office machine.

59.    I also examined the Samek Signature Page used in the fully executed K28 VERSION 1 LLC AGREEMENT.  The Samek Signature Page used in the Q1 VERSION 2 LLC AGREEMENT is either a reproduction (including the signature in the name of Eric Samek) of the same Samek Signature Page used in the K28 VERSION 1 LLC AGREEMENT or was simply taken from an existing copy of the K28 VERSION 1 LLC AGREEMENT.

60.    I proceeded to perform a chemical analysis of the toners used for the Shekhter Signature Page and the Samek Signature Page, but in this case, the black component from the Shekhter Signature Page could not be isolated from the CMY color components (see discussion in paragraph 27) in order to compare with the black toner from the Samek Signature Page.  Therefore, no conclusion can be reached regarding whether or not the black toner from the Shekhter Signature Page was different than the black toner from the Samek Signature Page.

61.    Of the 124 pages used for the Q1 VERSION LLC AGREEMENT, 123 pages were created using color toner, and each of the 123 pages contained a CPS code. The only page that did not contain a CPS code was the Samek Signature Page.

Gibson, Dunn &
Crutcher LLP

19

DECLARATION OF GERALD M. LAPORTE

62.    The information discussed in the aforementioned paragraphs indicates that the Samek Signature Page was not printed contemporaneously with the other pages, and therefore removed or taken from another source, such as the K28 VERSION 1 LLC AGREEMENT, and substituted into the Q1 VERSION 2 LLC AGREEMENT after the document was printed.

**D.    All other versions of the Q1 VERSION 2 LLC AGREEMENT provided by the NMS Parties are later generation copies that were made on or after July 15, 2013.**

63.    As described above, the machine-printed text on the Q1 VERSION 2 LLC AGREEMENT was very high quality and none of the 123 pages of the Q1 VERSION 2 LLC AGREEMENT contained any significant printing imperfections, trash marks, or other copier remnants that can occur when documents are placed directly on the glass or fed through an automatic document feeder (ADF).

64.    I also received two (2) printed copies of the "Version 2 LLC Agreement" for examination on December 5, 2015.  I proceeded to examine whether these two documents were produced on or around September 2010 or after the Q1 VERSION 2 LLC AGREEMENT was created on July 15, 2013.

65.    The first hard copy I examined was the K61 SCOTT W. VERSION 2 LLC AGREEMENT.  It is composed similarly of the 124 pages described in the Q1 VERSION 2 LLC AGREEMENT.

66.    The K61 SCOTT W. VERSION 2 LLC AGREEMENT does not contain any hole punches, is held together with a binder clip, and attached to the outside of a white three-ring binder with a rubber band.  Inside the binder is the K62 SCOTT W. VERSION 1 LLC AGREEMENT.  If the K61 SCOTT W. VERSION 2 LLC AGREEMENT was printed on or around September 2010, it seems logical and reasonable that it would have been placed within the 3 ring binder, following the K62 SCOTT W. VERSION 1 LLC AGREEMENT – and not just attached with a rubber band over five years ago.  I also observed obvious printing imperfections on the K61

SCOTT W. VERSION 2 LLC AGREEMENT, which were not present on the Q1

VERSION 2 LLC AGREEMENT, and proceeded to examine the document further

with magnification.

67.    The machine printed text on the K61 SCOTT W. VERSION 2 LLC

AGREEMENT was created with black toner.  Each of the 124 pages contains a black

vertical line, composed of black toner, along the right edge of the page that resulted

from the copying and printing process.  The Q1 VERSION 2 LLC AGREEMENT

does not have the same vertical black toner line, indicating the K61 SCOTT W.

VERSION 2 LLC AGREEMENT could not have been used as a precursor document

to produce the Q1 VERSION 2 LLC AGREEMENT.  If it had been copied or used to

create the Q1 VERSION 2 LLC AGREEMENT, then similar markings and

imperfections would be present on the Q1 VERSION 2 LLC AGREEMENT.  **Figure
3** is a digital photograph showing the vertical line along the right edge of one of the

pages from the K61 SCOTT W. VERSION 2 LLC AGREEMENT.  The same vertical

line occurs on all 124 pages, including the Samek Signature Page and the Shekhter

Signature Page.

**Figure 3:  The red arrows are used to highlight the black toner line along the right edge of the K61 SCOTT W. VERSION 2 LLC AGREEMENT, indicating this version could not have been used as a precursor document to reproduce the Q1 VERSION 2 LLC AGREEMENT.**



68.    I observed small remnants (or markings) of blue toner on over 100 pages of the Q1 VERSION 2 LLC AGREEMENT.  These remnants had a peculiar hook-like shape that were likely transferred on the pages as the pages were printed from the Xerox® WorkCenter office machine.

69.    I determined that the blue remnants were reproduced – as faint black toner marks – directly on the K61 SCOTT W. VERSION 2 LLC AGREEMENT in the same positions as the blue remnants on the Q1 VERSION 2 LLC AGREEMENT.  These findings confirm that the K61 SCOTT W. VERSION 2 LLC AGREEMENT is a reproduction of the Q1 VERSION 2 LLC AGREEMENT.  The black toner marks on

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn & Crutcher LLP

the K61 SCOTT W. VERSION 2 LLC AGREEMENT are too faint to have been copied and reproduced as the full and clear blue hook-like shaped remnants on the Q1 VERSION 2 LLC AGREEMENT.  **Figure 4** and **Figure 5** illustrate examples of the blue toner remnants on the Q1 VERSION 2 LLC AGREEMENT that were reproduced as black toner remnants on the K61 SCOTT W. VERSION 2 LLC AGREEMENT.  I made this same observation on over 100 pages throughout the document.

**Figure 4:  The photographic images show a comparison of the blue toner remnants from the Q1 VERSION 2 LLC AGREEMENT (top image) with the black toner marks on the K61 SCOTT W. VERSION 2 LLC AGREEMENT (bottom image). I observed similar reproductions of the blue toner remnants on over 100 pages of the two LLC Agreements.**

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn & Crutcher LLP

**Figure 5:  The photographic images show a comparison of the blue toner remnants from the Q1 VERSION 2 LLC AGREEMENT (left image) with the black toner marks on the K61 SCOTT W. VERSION 2 LLC AGREEMENT (right image).  I observed similar reproductions of the blue toner remnants on over 100 pages of the two LLC Agreements.**



70.     I also compared the quality of the printed text on the Q1 VERSION 2 LLC AGREEMENT and the K61 SCOTT W. VERSION 2 LLC AGREEMENT. Based on the microscopic examination, the quality of the printed text used for the K61 SCOTT W. VERSION 2 LLC AGREEMENT is significantly inferior to the quality of the printed text found on the Q1 VERSION 2 LLC AGREEMENT making it impossible for the Q1 VERSION 2 LLC AGREEMENT to be a "later generation" of the K61 SCOTT W. VERSION 2 LLC AGREEMENT.  **Figure 6** shows the differences in the quality of the text printing found on the two "LLC Agreements."

DECLARATION OF GERALD M. LAPORTE

**Figure 6:   Some of the printed text in the K61 SCOTT W. VERSION 2 LLC
AGREEMENT (left side) is illegible when compared with the printed text in the
Q1 VERSION 2 LLC AGREEMENT (right side), indicating this version could not
have been used as a precursor document to reproduce the Q1 VERSION 2 LLC
AGREEMENT.**

71.     Based on the results discussed in the aforementioned paragraphs, the K61

SCOTT W. VERSION 2 LLC AGREEMENT could not have been created before July

15, 2013 since it is a "later generation" copy of the Q1 VERSION 2 LLC

AGREEMENT, which was printed on July 15, 2013.

72.     The second hard copy of the "Version 2 LLC Agreement" is the K66

WILLIFORD VERSION 2 LLC AGREEMENT. This document was found in a white

three-ring binder (no title) following a copy of the K65 WILLIFORD VERSION 3

AMENDED LLC AGREEMENT.  The K65 WILLIFORD VERSION 3 AMENDED

LLC AGREEMENT is behind TAB 1 and the K66 WILLIFORD VERSION 2 LLC

AGREEMENT is behind Tab 2.  The positioning of the documents within the binder

suggests the K66 WILLIFORD VERSION 2 LLC AGREEMENT was placed in the binder after the K65 WILLIFORD VERSION 3 AMENDED LLC AGREEMENT.

73.    The machine-printed text on the K66 WILLIFORD VERSION 2 LLC AGREEMENT was created with black toner, and each of the 124 pages contains a rectangle positioned horizontally across the top of the paper, which is composed of black toner as a result of the copying and printing process.  This document could not have been used as a precursor document to create the Q1 VERSION 2 LLC AGREEMENT.  If it was used as a precursor document then the rectangular pattern would have been reproduced directly on the Q1 VERSION 2 LLC AGREEMENT. Instead, there are indications the K66 WILLIFORD VERSION 2 LLC AGREEMENT was copied from the Q1 VERSION 2 LLC AGREEMENT.  **Figure 7** shows the black toner rectangle positioned along the top edge of first page of the K66 WILLIFORD VERSION 2 LLC AGREEMENT, which occurs on all 124 pages of the document, including the Samek Signature Page and Shekhter Signature Page.

**Figure 7:  A photograph showing a rectangular pattern on the top portion of the first page of the K66 WILLIFORD VERSION 2 LLC AGREEMENT, which appears on all 124 pages.  The rectangle is composed of black toner indicating the document is a later generation copy of another LLC Agreement, indicating this version could not have been used as a precursor document to reproduce the Q1 VERSION 2 LLC AGREEMENT.**



LIMITED LIABILITY COMPANY AGREEMENT

FOR

P6 LA MF HOLDINGS I LLC, a Delaware limited liability company

74.    I overlaid the K66 WILLIFORD VERSION 2 LLC AGREEMENT with the Q1 VERSION 2 LLC AGREEMENT and determined the K66 WILLIFORD VERSION 2 LLC AGREEMENT, and the machine printed text, was reduced in size compared to Q1 VERSION 2 LLC AGREEMENT.  Thus, the K66 WILLIFORD VERSION 2 LLC AGREEMENT could not have been a precursor used to create the Q1 VERSION 2 LLC AGREEMENT.

75.    Also, the Q1 VERSION 2 LLC AGREEMENT has a blue pen marking in the top right corner of the title page.  This blue marking is duplicated – as black toner – in the top right corner of the title page on the K66 WILLIFORD VERSION 2 LLC

Gibson, Dunn & Crutcher LLP

27

AGREEMENT.  The K66 WILLIFORD VERSION 2 LLC AGREEMENT is a "later generation" copy of the Q1 VERSION 2 LLC AGREEMENT since the blue marking is original writing ink that was reproduced when the K66 WILLIFORD VERSION 2 LLC AGREEMENT was copied and printed.  **Figure 8** shows the blue pen mark in the top right corner of the Q1 VERSION 2 LLC AGREEMENT, which was reproduced as a black toner mark on the K66 WILLIFORD VERSION 2 LLC AGREEMENT.

**Figure 8:  The black toner mark on the K66 WILLIFORD VERSION 2 LLC AGREEMENT (left side) was reproduced as a result of a blue pen mark on the Q1 VERSION 2 LLC AGREMEENT (right side).  This is definitive evidence that the K66 WILLIFORD VERSION 2 LLC AGREEMENT was not created before July 15, 2013.**



Black toner mark found on the K66 WILLIFORD VERSION 2 LLC AGREEMENT

Blue pen mark found on the Q1 LLC VERSION 2 LLC AGREEMENT

76.    Based on the results discussed in the aforementioned paragraphs, the K66 WILLIFORD VERSION 2 LLC AGREEMENT could not have been created before

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn & Crutcher LLP

July 15, 2013 since it is a "later generation" copy of the Q1 VERSION 2 LLC AGREEMENT.

77.    I have not seen any evidence that any hardcopies of the "Version 2 LLC Agreements," other than the three produced by the NMS and analyzed here, are in existence or have ever existed.  The first physical iteration of Q1 VERSION 2 LLC AGREEMENT was printed and created on July 15, 2013.

**E.**    **The verbiage reading "three (3) years" in the first line of Article 11.1(a)(i) in the Q1 VERSION 2 LLC AGREEMENT was changed from "five (5) years."**

78.    Upon review of the text and formatting features of the Q1 VERSION 2 LLC AGREEMENT, I noted an inconsistency in the alignment of a single line of text on page 63, in the first line of Article 11.1(a)(i), where the "three (3) years" language appears.  All of the text on pages 1 through 78 is justified to the right margin except the first line of Article 11.1(a)(i).  That is, the "g" at the end of the word "Operating" in that same line hangs over the right-justified margin by one letter.  **Figure 9** below shows the inconsistent alignment of this line when compared with the remaining text.

**Figure 9:  As shown in the top image, the first line of Article 11.1(a)(i) is the only line of text on pages 1 through 78 that is not right justified.  The bottom image is magnified to show that the last letter in the line of text extends past the right margin by a single character since the word "three" is one character longer than the word "five."**

79.    I compared the Q1 VERSION 2 LLC AGREEMENT with the K28 VERSION 1 LLC AGREEMENT and the K29 VERSION 3 AMENDED LLC

AGREEMENT.  On page 63, in the first line of Article 11.1(a)(i), the text in the K28 VERSION 1 LLC AGREEMENT and the K29 VERSION 3 AMENDED LLC AGREEMENT reads "five (5) years."  However, the Q1 VERSION 2 LLC AGREEMENT has been altered to read "three (3) years" instead of "five (5) years."  Moreover, there is one additional character in "three (3)" when compared with "five (5)."  Therefore, the alteration from "five (5) years" to "three (3) years" resulted in the text misalignment discussed in the previous paragraph such that the "g" in the word "operating" is no longer justified to the right margin.

80.    I reviewed the drafts and executed versions of the K31 ORIGINAL LLC AGREEMENT attached to emails sent from Michelle McClure on August 11, 2010, August 27, 2010, September 6, 2010, September 7, 2010, and September 10, 2010. Every document included in these documents has text that reads "five (5) years" in the first line of Article 11.1(a)(i), and not "three (3) years."

81.    I reviewed the K32 JANUARY 6, 2011 EMAIL and attached changes to the document titled "K32 Blackline of changed pages only."  In that email, Michelle McClure wrote, "*Since capital for some of the properties is not being contributed on a 70/30 basis, we concluded that certain changes to the Master JV LLC agreement were appropriate. Rather than putting these changes in a separate amendment, we thought it made more sense to revise the Master and substitute pages. Please review and, if these changes are acceptable, please provide authorization to substitute pages. If you have any comments or questions, please contact Steve Fein at (213) 330-7772. Thank you, Michelle.*"  There was no indication from this email that "five (5) years" in the first line of Article 11.1(a)(i) was changed to "three (3) years."

82.    I reviewed the January 20, 2011 email and the PDF of a fully executed copy of the K29 VERSION 3 AMENDED LLC AGREEMENT tilted "P6 LA MF Holdings I LLC – final" (K33), in which Michelle McClure wrote, "*[a]ttached are the following items that have been requested below ... P6 LA MF Holdings ... LLC Agreement.*"  This version of the "Version 3 Amended LLC Agreement" contains the

text that reads "five (5) years" in the first line of Article 11.1(a)(i), and not "three (3) years."

83.     I have also reviewed a copy of the "Version 2 LLC Agreement" that was attached to a Declaration of Neil Shekhter in Opposition to Motion For Preliminary Injunction, filed on June 19, 2015 in the instant action and also attached electronically to a July 19, 2013 email from Steve Williford of NMS Properties, Inc. to Drew Flowers of Gibson Dunn & Crutcher LLP.  In this email, Mr. Williford says "attached please find the last version of the LLC Agreement that was approved by Neil, which was sent hard copy to our offices in September 2010."

84.     Based on a review of the aforementioned documents and supporting information via the emails, the verbiage reading "three (3) years" in the first line of Article 11.1(a)(i) in the Q1 VERSION 2 LLC AGREEMENT was changed from "five (5) years."  The "five (5) years" provision appears in every hardcopy and electronic document I reviewed, including fully executed and draft documents, of the "Version 1 LLC Agreement."

85.     On September 20, 2015, I prepared a Declaration in Support of AEW Defendants' Motion for Forensic Examination referenced herein as my "Declaration" in *Lincoln Studios*.  Attached hereto as **Exhibit 3** is a true and correct copy of my Declaration.  As described in my Declaration, I reviewed multiple versions and drafts of the "LLC Agreements."  Based on my review of an electronic copy (PDF) of the "Version 2 LLC Agreement," I noted abnormalities in the formatting and text on page 63 of the document.  One of my observations referenced in the Declaration was that the "g" at the end of the word "Operating" in that line of text hangs over the right-justified margin by one letter and that this was the only line of text in the document that is not justified on the right-hand side of the document.  My initial observation has been confirmed based on my examination of the original hard copy of the Q1 VERSION 2 LLC AGREEMENT as described previously in this report.

86.    I also noted in my Declaration that, based on my review of the PDF, the second "e" in the word "three" in the first line of Article 11.1(a)(i) is lower than any other "e" on that page and the "e" appears to use a different typeface than the other letters in the document.  Following a microscopic examination of the Q1 VERSION 2 LLC AGREEMENT produced by NMS, I observed that the last "e" in the word "three" is consistent with the alignment and typeface of the entire word.  A discrepancy with respect to subtle features and typeface between an electronic PDF and the original hardcopy version is not atypical.  In some instances, when documents are scanned and converted to an electronic format such as a PDF, subtle artifacts or irregularities may result.  In this case, a review of the original hard copy documents proved to be the best evidence for examination, especially given the identification of the CPS code that would not have been evident in the black and white electronic PDF that I initially examined.

**F.    Seven (7) hardcopies of the "Version 3 Amended LLC Agreement" were produced by NMS.**

87.    On December 5, 2015, I received numerous hardcopy documents of the "LLC Agreements" belonging to various employees of NMS, including multiple copies of the "Version 3 Amended LLC Agreement."  The following is a list of the hardcopies of the "Version 3 Amended LLC Agreements," all of which contain a copy of the Samek Signature Page and the Shekhter Signature Page:

a.    a black two-ring closing binder for a building loan to Luxe La Cienega LLC, dated March 15, 2012, containing the K44 VERSION 3 AMENDED LLC AGREEMENT;

b.    a black three-ring binder titled, "AEW Operating Agreement and Amendments" containing the K45A NMS TERM SHEET, the K45B VERSION 3 AMENDED LLC AGREEMENT, and ten Amendments;

c.    one (1) "LLC Agreement" document beginning with a TABLE OF CONTENTS bearing handwritten notes on some of the pages and referenced as the K48A WILLIFORD VERSION 3 LLC AMENDED AGREEMENT;

d.    one (1) document titled "LIMITED LIABILITY COMPANY AGREEMENT FOR P6 LA MF HOLDINGS I LLC, a Delaware limited liability company" bearing handwritten notes on some of the pages and referenced as the K48B WILLIFORD VERSION 3 AMENDED LLC AGREEMENT;

e.    a white three-ring binder titled, "NMS PROPERTIES P6 LA MF Holdings I, LLC Operating Agreements & Amendments" with a yellow sticky note reading "Patrick's JV" containing the K63 PATRICK VERSION 3 LLC AGREEMENT.  This binder also contains a NMS MEMORANDUM, dated January 3, 2011, to Eric Samek from Neil Shekhter;

f.    a white three-ring binder titled, "P6 LA MF HOLDINGS I LLC; LLC AGREEMENT" with a yellow sticky note reading "Steve W. w/o Notes" contains the K64 WILLIFORD VERSION 3 LLC AGREEMENT;

g.    a second white three-ring binder (no title) received with the binder described in (ii) containing the K65 WILLIFORD VERSION 3 LLC AGREEMENT (located at Tab 1) followed by the K66 WILLIFORD VERSION 2 LLC AGREEMENT (located at Tab 2).

## RESULTS OF FORENSIC TESTING: Q3 COVER LETTER

### A.    The Q3 Cover Letter is a color copy and is not signed with original writing ink.

88.    The Q3 COVER LETTER was produced with an office machine system utilizing color toner.  The signature in the name of Eric Samek was also produced with toner, and therefore is not an original writing ink signature.

89.    The Q3 COVER LETTER does contain a CPS code, which is unusually faint and difficult to discern.  The dot patterns on documents created using color toner can become increasingly faint if the document was originally produced on a machine

with CPS codes, and then copied on another machine.  That is, the CPS code on the

original document can be reproduced in subsequent generations of copies in some

instances, but the resulting CPS code will be inferior in quality when compared to the

CPS code in the originating document.  The CPS code on the Q3 COVER LETTER is

not from a Xerox® office machine.  I could not determine unequivocally the

manufacturer of the machine used to print the Q3 COVER LETTER.

90.    The overall quality of the machine-printed text on the Q3 COVER

LETTER is inferior, indicating it is not a first generation document or it is a document

composed from multiple sources.  The inferior quality of printing is notable in the

footer portion of the document where the text is faint and blurred.  **Figure 10** is a

cropped image of the footer from a high resolution photograph of the Q3 COVER

LETTER.  This image is not consistent with the quality I would expect from an

original document (i.e. the first hard copy iteration).

**Figure 10: The overall quality of the machine printed text on the Q3 COVER
LETTER appears to be of inferior quality and blurry.  The image below is a
cropped image area from the footer portion of the Q3 COVER LETTER.  The
quality of this image is not consistent with what I would expect in an original
document.**



91.    I also identified CPS codes on pages within the K1 (Luxe La Cienega

Binder), K12 through K14 (Bound Books for Luxe Studios @ Broadway), and K19

(Bound Book for Luxe @ 1410) documents.  The CPS codes on these documents are

not from a Xerox® office machine, and are not consistent with portions of the CPS

code pattern I observed on the Q3 COVER LETTER.  This indicates that the

referenced known documents were not printed from the same source as the Q3 COVER LETTER.

**B.**    **The signature and surrounding text block, including the text above, below, and adjacent to the signature, is a reproduction that was used from another source and then inserted into the Q3 COVER LETTER.**

92.    I conducted a comparison of the signature block used in the Q3 COVER LETTER with the K41 NMS TERM SHEET, a Microsoft Word document that was attached to an email correspondence from Neil Shekhter to Eric Samek on May 20, 2010.

93.    The entire signature block from the K41 NMS TERM SHEET – including the electronic signature, along with the text above ("AEW Capital Management, L.P."); to the left ("By"); and below ("Eric Samek" and "Director") the electronic signature–is the same as the entire signature block from the Q3 COVER LETTER. That is, the Eric Samek signatures from both documents overlay each other and are perfectly aligned with the surrounding text in both documents. Therefore, the entire signature block in the Q3 COVER LETTER was reproduced from another source. **Figure 11** below shows how the Eric Samek electronic signature is aligned identically with the printed text above, below, and to the left of the signature in the Q3 COVER LETTER and the K41 NMS TERM SHEET.  **Figure 12** below shows how the font in the signature block of the Q3 COVER LETTER is the same as the font in the K41 NMS TERM SHEET.

Gibson, Dunn &
Crutcher LLP

36
DECLARATION OF GERALD M. LAPORTE

1
2
3
4

**Figure 11:  The entire signature block (text and electronic signature) from the K41 NMS TERM SHEET is the same as the signature block (text and electronic signature) used in the Q3 COVER LETTER. That is, the signature blocks and the relative placement of the signatures from both documents overlay each other perfectly.**

5
6
7

Signature block from the Q3 COVER LETTER

Signature block from the K41 NMS TERM SHEET – an attachment in an email sent from Eric Samek to Neil Shekhter on May 20, 2010

8
9
10
11
12




13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

**Figure 12: An analysis of the original PDF image I created of the Q3 COVER LETTER shows that the font in the Q3 COVER LETTER is the same as the font in the K41 NMS TERM SHEET, as demonstrated by the below images.**

 (i) Text above the Eric Samek Signature from a PDF of the Q3 COVER LETTER I created when the document was in my possession

(ii) Text above the Eric Samek Signature from the Microsoft Word version of K41 NMS TERM SHEET

94.    I also identified a hard copy of the "May 20, 2010 NMS Term Sheet" in a black three-ring binder titled, "AEW Operating Agreement and Amendments."  The binder contained the K45A NMS TERM SHEET, K45B VERSION 3 AMENDED LLC AGREEMENT, and ten Amendments.

95.    I compared the K45A NMS TERM SHEET hard copy with the K41 NMS TERM SHEET electronic document.  The documents appear to be the same, but pages 2 through 8 in the electronic version each contain an "Automatic Date Change" function, such that the date in the top right corner automatically changes to the date the document is opened.  The K45A NMS TERM SHEET is dated May 20, 2010 on the first page, but May 26, 2010 on pages 2 through 8 indicating the document was opened and printed on May 26, 2010.

96.    I also examined the K34 APRIL 2011 WALD LETTER and the K40 AUGUST 2011 MORRIS LETTER, both of which contain an electronic signature in the name of Eric Samek.

97.    The electronic signature (not the entire signature block with the adjacent text) used in these two documents is the same electronic signature that was used in the Q3 COVER LETTER and the K41 MAY 2010 NMS TERM SHEET; however, only

1  the electronic signature in the name of Eric Samek was used in the K34 APRIL 2011

2  WALD LETTER and the K40 AUGUST 2011 MORRIS LETTER – not the entire

3  signature block that was used in the Q3 COVER LETTER and K41 NMS TERM

4  SHEET.  These findings indicate that "copying and pasting" the entire signature block,

5  as was done in the Q3 COVER LETTER, is not common practice for

6  letters/communications bearing the signature in the signature of Eric Samek.

7      98.    In an email, dated May 20, 2010, Eric Samek sent the K41 NMS TERM

8  SHEET Microsoft Word attachment to Neil Shekhter and James Anderson.

9      99.    The K41 NMS TERM SHEET contained the same color AEW logo in the

10  top left corner; the same color address footer for AEW Capital Management and

11  affiliated entities (Boston, MA); and the same signature block (and signature in the

12  name of Eric Samek) that was used for the Q3 COVER LETTER, including the

13  surrounding text.

14      100.   Also, the K41 NMS TERM SHEET was formatted similar to the Q3

15  COVER LETTER with respect to the relative positions of the date, addressee

16  information, the "RE" line, and the salutation.  Moreover, the text in the "RE" line in

17  the K41 NMS TERM SHEET automatically changed the typed entries to uppercase

18  letters.  The text reading "JV AGREEMENT (3 YEAR BUY/SELL)" in the "RE" line

19  of the Q3 COVER LETTER is composed of all uppercase letters.

20      101.   I proceeded to examine the K41 NMS TERM SHEET Microsoft Word

21  document and discovered that the document could be easily manipulated by deleting

22  text and adding new text, without affecting the signature block.  Therefore, using this

23  Microsoft Word document , I re-created an exact duplicate of the Q3 COVER

24  LETTER by deleting most of the text body and repeating the same verbiage used in the

25  Q3 COVER LETTER.  I also added "CC: Daniel Lennon (AEW)" after the closing

26  signature, again perfectly duplicating the Q3 COVER LETTER.  Therefore, anyone

27  who received the email attaching the Microsoft Word version of the K41 NMS TERM

28  SHEET could have easily created the Q3 COVER LETTER by manipulating the K41

39

DECLARATION OF GERALD M. LAPORTE

NMS TERM SHEET Microsoft Word version that was attached to the email.  Neil Shekhter was one of the recipients of the email.  **Figure 13** is an image of the re-creation of the Q3 COVER LETTER.

DECLARATION OF GERALD M. LAPORTE

**Figure 13:  A re-creation of the Q3 COVER LETTER using the K41 NMS TERM SHEET, which was sent as an attachment in an email from Eric Samek to Neil Shekhter on May 20, 2010.**

September 14, 2010

Mr. Neil Shekhter
NMS Properties
10599 Wilshire Blvd., Suite 108
Los Angeles, CA 90024

RE:  JV AGREEMENT (3 YEAR BUY/SELL)

Dear Mr. Shekhter:

Pursuant to our earlier telephone conversation, attached please find a copy of the JV agreement we will be using.

We look forward to a long and profitable relationship.

Sincerely,

AEW CAPITAL MANAGEMENT, L.P.

By:

Eric Samek
Director

CC: Daniel Lennon (AEW)

THIS LETTER IS A RE-CREATION OF THE Q3 COVER LETTER USING THE K41 MAY 2010 NMS TERM SHEET.

## RESULTS OF FORENSIC TESTING: Q2 MARCH 2012 PMA

102.   The Q2 MARCH 2012 PMA is a forty-two (42) page document containing a title page, table of contents (page ii through iv), pages 1 through 23 (with two pages numbered 18), and fourteen (14) pages of Schedules.  Page 2 contains two signatures in the name of Naum Neil Shekhter.

103.   The entire document is right justified except sections 3.1 through 3.5 under "ARTICLE 3. INSURANCE AND CLAIMS."

104.   The two (2) signatures in the name of Naum Neil Shekhter were executed with a blue non-ballpoint writing ink.  I conducted TLC analysis and determined that the blue non-ballpoint ink is consistent with an ink formulation that was commercially available prior to 2012 and still remains widely available.

105.   The machine printed text on the Q2 MARCH 2012 PMA was created with an office machine utilizing black toner.

106.   To determine if Q2 MARCH 2012 PMA comported with the other Property Management Agreements ("PMA Documents"), I compared the Q2 MARCH 2012 PMA with all of the other hardcopy "PMA Documents," which include the K27 NOVEMBER 2010 PMA, K53 MARCH 2012 PMA, K54 JANUARY 2012 PMA, K55 OCTOBER 2012 PMA, K56 NOVEMBER 2010 PMA, K57 JANUARY 2011 PMA, and K58 SEPTEMBER 2010 PMA.

107.   The Q2 MARCH 2012 PMA and the K27 NOVEMBER 2010 PMA were the only two "PMA Documents" that contained original handwritten signatures in the name of Naum Neil Shekhter.  Also, the K53 MARCH 2012 PMA is a copy of the Q2 MARCH 2012 PMA (including the signature page) and the K56 NOVEMBER 2010 PMA is a copy of the K27 NOVEMBER 2010 PMA (including the signature page).

108.   Table 1 below shows a comparison of various features of the Q2 MARCH 2012 PMA when compared with the other "PMA Documents."  After comparing all of the "PMA Documents," the Q2 MARCH 2012 is most similar to the K57 JANUARY 2011 PMA and the K58 SEPTEMBER 2010 PMA.  However,  the Q2 MARCH 2012

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn & Crutcher LLP

PMA is unique from all of the "PMA Documents" in at least four major aspects: (i) there is a major omission of certain terms listed in Article 12.1 of the Q2 MARCH 2012 PMA; (ii) the font size used in the Q2 MARCH 2012 PMA is larger than the font used in the other "PMA Documents"; (iii) the page number listings in the TABLE OF CONTENTS in the Q2 MARCH 2012 PMA is incorrect in at least three different areas; and  (iv) "Article 15.13 Intentionally Deleted" is omitted in the Q2 MARCH 2012 PMA.  I will discuss some of these differences in the following paragraphs.

Gibson, Dunn &
Crutcher LLP

43
DECLARATION OF GERALD M. LAPORTE

## Table 1: Comparison of Features in the PMA Documents.

| | Q2 March 2012 PMA | K27 November 2010 PMA | K54 January 2012 PMA | K55 October 2011 PMA | K57 January2011 PMA | K58 September 2010 PMA |
|---|---|---|---|---|---|---|
| **Machine Printed Text** | Black Toner | Black Toner | Color Toner | Color Inkjet | Color Toner | Color Toner |
| **Signatures** | Blue Non-Ballpoint | Blue Ballpoint | Not Original Writing | Not Original Writing | Not Original Writing | Not Original Writing |
| **Table of Contents Format (Designated either 1 or 2 depending on the type of formatting)** | 1 | 2 | 2 | 2 | 1 | 1 |
| **Pagination on Cover** | Yes | No | No | No | Yes | Yes |
| **Article 12.1** | Articles (i) and (ii) | Articles (i), (ii), and (iii) | Articles (i), (ii), and (iii) | Articles (i), (ii), and (iii) | Articles (i), (ii), and (iii) | Articles (i), (ii), and (iii) |
| **Article 12.1 (# of days in subsection (ii) of Article 12.1)** | 60 | 30 | 30 | 30 | 30 | 30 |
| **Version Number Marking Present** | No | No | Yes | Yes | No | No |
| **Pagination** | Bottom Right | Bottom Center | Bottom Center | Bottom Center | Bottom Right | Bottom Right |
| **Spacing in Article 13 – P. 21** | No | Yes | Yes | Yes | No | No |
| **Typographical Error: 6.1 "Writting"** | Yes | No | No | No | Yes | Yes |
| **Font Size Designation (Small; medium; large)** | Large | Small | Small | Small | Medium | Medium |
| **Article 15.13 "Intentionally Deleted" Present** | No | Yes | Yes | Yes | Yes | Yes |

Gibson, Dunn &
Crutcher LLP

44

DECLARATION OF GERALD M. LAPORTE

109.   The following images are examples of some of the differences and similarities between the various "PMA Documents" noted during my examination:

### Figure 14: TABLE OF CONTENTS FORMAT

| Q2 MARCH 2012 PMA<br>(Designated as format "1") | K58 SEPTEMBER 2010 PMA<br>(Designated as format "1") |
| --- | --- |



K58 SEPTEMBER 2010 PMA
(Designated as format "2")

### Figure 15: SPACING IN "ARTICLE 13.  SUBSIDIARIES AND AFFILIATES"

| Q2 MARCH 2012 PMA | K58 SEPTEMBER 2010 PMA |
| --- | --- |

ARTICLE 13. SUBSIDIARIES AND AFFILIATES          ARTICLE 13. SUBSIDIARIES AND AFFILIATES

K54 JANUARY 2012 PMA



DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn &
Crutcher LLP

## Figure 16: ARTICLE 12.1 VARIATIONS

Q2 MARCH 2012 PMA

> **12.1    Termination.**  The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 60 days prior to the end of the then existing term, or by Manager to Owner at least 90 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 60 days prior written notice. Manager may terminate this Agreement at any time with or without cause by giving Owner at least 90 days' prior written notice.

All Other Examined PMA Documents

> **12.1    Termination.**  The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 30 days prior to the end of the then existing term, or by Manager to Owner at least 60 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 30 days prior written notice, or (iii) immediately upon payment by Owner to Manager of a termination fee equal to one month's Management Fee (such monthly fee to be determined by calculating the average monthly Management Fee over the prior 12-month period). Manager may terminate this Agreement at any time with or without cause by giving Owner at least 60 days' prior written notice.

110.    The signatures on the K27 NOVEMBER 2010 PMA were executed with blue ballpoint writing ink and the machine printed text was created with an office machine system utilizing black toner.

111.    The K53 MARCH 2012 PMA (a copy of the Q2 MARCH 2012 PMA), K54 JANUARY 2012 PMA, and K57 JANUARY 2011 PMA were created with color toner and all three documents contain a CPS code, which appears to be consistent with a HP Color LaserJet printer.[9]  The machine-printed text on the first five (5) pages of the K58 SEPTEMBER 2010 PMA was created with black toner, but the remaining pages were printed with color toner, which contained a CPS code consistent with an

---

[9]  Printers from different manufacturers that use the same print engines may have the same general CPS code pattern.  HP has been known to use the same print engine as Canon, as described at the following link:
http://www.printerworks.com/Catalogs/CX-Catalog/CX-HP_LaserJet.html.

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

HP Color LaserJet printer.  There is no evidence to indicate when any of these documents were first created.

112.   K55 OCTOBER 2011 PMA and K56 NOVEMBER 2010 PMA (copy of K27 NOVEMBER 2010 PMA) were produced with an office machine system utilizing color inkjet technology.

113.   I conducted a TLC analysis of the black toners from the Q2 MARCH 2012 PMA with representative known documents, to include K1, K2, K3, K14, K18, K19, K21, K27 NOVEMBER 2010 PMA, and the Q3 COVER LETTER to establish whether the Q2 MARCH 2012 PMA was prepared on the same printer as one of the other documents or contemporaneously with any of the documents.  The black toner from the Q2 MARCH 2012 PMA is consistent with the black toner from the Q3 COVER LETTER, but different than the black toner used to print the other known documents.   The verbiage in Article 12.1 in the Q2 MARCH 2012 PMA is different than all of the other "PMA Documents."  The following sentence, which appears in all of the other "PMA Documents," is not present in the Q2 MARCH 2012 PMA: "*(iii) immediately upon payment by Owner to Manager of a termination fee equal to one month's Management Fee over the prior 12-month period.*"  Also, "30 days" in subsection (ii) has been changed from "without cause, by giving Manager at least *30 days* prior written notice" to "without cause, by giving Manager at least *60 days* prior written notice" (*emphasis added*).

114.   I proceeded to review the page number listing in the TABLE OF CONTENTS in the Q2 MARCH 2012 PMA and observed that incorrect page numbers are listed for Article 12.3, Article 15.1, and Article 15.10. That is, the page number that each of the three Articles begins on is one page before the page numbers listed in the TABLE OF CONTENTS, indicating that the omission of the text in Article 12.1 discussed in the above paragraph caused the page number listing in the TABLE OF CONTENTS to be incorrectly numbered.  None of these page numbering inconsistencies occur in any of the other "PMA Documents."

115.   I reviewed the TABLE OF CONTENTS used in the other "PMA Documents."  The format for the TABLE OF CONTENTS in the Q2 MARCH 2012 PMA is consistent with the TABLE OF CONTENTS found in the K57 JANUARY 2011 PMA and K58 SEPTEMBER 2010 PMA, but different than the format used in the K27 NOVEMBER 2010 PMA, K54 JANUARY 2012 PMA, and K55 OCTOBER 2011 PMA.

116.   I also reviewed a series of five (5) emails, along with attached documents, that transpired between Michelle McClure and NMS from January 25, 2012 through April 12, 2012 referencing the "La Cienega" property, which is the same property referenced in the Q2 March 2012 PMA.  The following are the documents I reviewed, which are further described in Appendix I: i) K68A EXHIBIT 18 PMA (attached to a January 25, 2012 McClure email); ii) K68B EXHIBIT 18 PMA (attached to a January 25, 2012 McClure email); iii) K69 EXHIBIT 19 COLLETTI EMAIL (email sent on January 26, 2012 referencing receipt of the "AEW NMS Luxe La Cienega" PMA); iv) K70 EXHIBIT 76 PMA (attached to the January 27, 2012 McClure email); v) K71 EXHIBIT 77 MCCLURE EMAIL (attached to the March 16, 2012 McClure email); and vi) K72 EXHIBIT 78 MCCLURE EMAIL (email sent on April 12, 2012 referencing the decision not to sign the "AEW NMS Luxe La Cienega" PMA).

117.   Because these documents appeared to be drafts of a property management agreement for the La Cienega property that predate the March 1, 2012 date of the Q2 MARCH 2012 PMA, I compared the Q2 MARCH 2012 PMA with the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA ("Draft PMA Documents").

118.   As discussed in previously, verbiage in Article 12.1 in the Q2 MARCH 2012 PMA is different than all of the other "Draft PMA Documents."  This same verbiage in Article 12.1 of the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA is also different from the Q2 MARCH 2012 PMA.  That is,  the sentence that reads, "*(iii) immediately upon payment by Owner to Manager of a*

*termination fee equal to one month's Management Fee over the prior 12-month period,"* has been removed from the Q2 MARCH 2012 PMA but is present in the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA.

119.   Each of the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents include "30 days" in subsection (ii) of Article 12.1, which has been changed to "60 days" in the Q2 MARCH 2012 PMA.  That is, subsection (ii) has been changed from "without cause, by giving Manager at least ***30 days*** prior written notice" in K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA to "without cause, by giving Manager at least ***60 days*** prior written notice" in the Q1 MARCH 2012 PMA (emphasis added).

120.   The spelling error in the word "writing" (appears as "writting") in the first sentence of Article 6.1 is not present in the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents, but is present in the Q2 MARCH 2012 PMA.

121.   A version marking designated as "14130035v.1" is present in the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents, but not present in the Q2 MARCH 2012 PMA.

122.   The pagination on K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents is located in the bottom center.   The pagination on Q2 MARCH 2012 PMA is located in the lower right portion of the pages.

123.   There is different spacing in the title, "ARTICLE 13. SUBSIDIARIES AND AFFILIATES" when I compared the Q2 MARCH 2012 PMA with the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents.

124.   The following images are examples of some of differences between the Draft PMA Documents and the Q2 MARCH 2012 PMA:

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

# Figure 17: TABLE OF CONTENTS FORMAT

## Q2 MARCH 2012 PMA

**TABLE OF CONTENTS**

| | Page |
|---|---|
| PART I - REFERENCE DATA | 1 |
| PART II - STANDARD TERMS | 3 |
| ARTICLE 1 - RETENTION OF MANAGER; GENERAL DEFINITIONS | 3 |
| 1.1   Retaining Manager | 3 |
| 1.2   General Definitions | 3 |

## K70 EXHIBIT 76 PMA

**TABLE OF CONTENTS**

| | Page |
|---|---|
| PART I  REFERENCE DATA | 1 |
| PART II  STANDARD TERMS | 3 |
| ARTICLE 1.  RETENTION OF MANAGER; GENERAL DEFINITIONS | 3 |
| 1.1   Retaining Manager | 3 |
| 1.2   General Definitions | 3 |

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn &
Crutcher LLP

**Figure 18: ABSENCE OF "INTENTIONALLY DELETED" SECTION IN THE Q2 MARCH 2012 PMA**

Q2 MARCH 2012 PMA

| 15.10 | Exculpation | 23 |
|---|---|---|
| 15.11 | ERISA/UBTI | 23 |
| 15.12 | Other Information | 23 |
| 15.13 | Owner Representative | 23 |
| 15.14 | Confidentiality | 23 |
| 15.15 | Attorneys' Fees | 23 |

K70 EXHIBIT 76 PMA

| 15.10 | Exculpation | 21 |
|---|---|---|
| 15.11 | ERISA/UBTI | 21 |
| 15.12 | Other Information | 21 |
| 15.13 | Intentionally Deleted | 21 |
| 15.14 | Owner Representative | 22 |
| 15.15 | Confidentiality | 22 |
| 15.16 | Attorneys' Fees | 22 |

Gibson, Dunn & Crutcher LLP

DECLARATION OF GERALD M. LAPORTE

# Figure 19: ARTICLE 12.1 VARIATIONS

## Q2 MARCH 2012 PMA

> **12.1  Termination.** The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 60 days prior to the end of the then existing term, or by Manager to Owner at least 90 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 60 days prior written notice. Manager may terminate this Agreement at any time with or without cause by giving Owner at least 90 days' prior written notice.

## K70 EXHIBIT 76 PMA

> **12.1  Termination.** The term of this Agreement will be for a period of one year and will be renewed automatically for successive periods of one year each, unless written notice of non renewal is given by Owner to Manager at least 30 days prior to the end of the then existing term, or by Manager to Owner at least 60 days prior to the end of the then existing term. Notwithstanding the foregoing, and in addition to the provisions of Section 12.2, Owner may terminate this Agreement: (i) for cause, immediately upon notice at any time, or (ii) without cause, by giving Manager at least 30 days prior written notice, or (iii) immediately upon payment by Owner to Manager of a termination fee equal to one month's Management Fee (such monthly fee to be determined by calculating the average monthly Management Fee over the prior 12-month period). Manager may terminate this Agreement at any time with or without cause by giving Owner at least 60 days' prior written notice.

125.   Since the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA documents are draft agreements for the same "La Cienega property" described in the Q2 MARCH 2012 PMA, I would expect the final agreement for the "La Cienega property" to be created using either K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, or K70 EXHIBIT 76 PMA as a template.  However, the Q2 MARCH 2012 PMA is substantially different in terms of formatting, textual anomalies, and other characteristics from the draft agreements for the "La Cienega property" and there is no evidence to suggest that the Q2 MARCH 2012 PMA was created using either the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, or K70 EXHIBIT 76 PMA.

## OPINION

126.    Based on my professional experience, established scientific principles, and full consideration of the findings from the forensic examination, it is my unequivocal opinion that the Q1 VERSION 2 LLC AGREEMENT is not authentic. All of the pages in the Q1 VERSION 2 LLC AGREEMENT, except the Samek Signature Page, contained a CPS code, which I used to determine that the Q1 VERSION 2 LLC AGREEMENT was first created on a Xerox WorkCenter 7775 multifunction office machine at the offices of NMS Properties on July 15, 2013 – not in September 2010.

127.    I also received two additional "Version 2 LLC Agreements" referenced as the K61 SCOTT W. VERSION 2 LLC AGREEMENT and the K66 WILLIFORD VERSION 2 LLC AGREEMENT.  I determined that both of these documents are photocopies (later generation copies) of the Q1 VERSION 2 LLC AGREEMENT and were therefore copied on or after July 15, 2013.  Therefore, there are no "Version 2 LLC Agreements" – copies, original printed documents, emails with attachments, or otherwise – that existed before July 15, 2013.  Further, neither of these "Version 2 LLC Agreements" could have been the precursor document used to create the Q1 VERSION 2 LLC AGREEMENT.

128.    The Samek Signature Page (one of the pages numbered 78) was removed or taken from another source and substituted into the Q1 VERSION 2 LLC AGREEMENT.  The Samek Signature Page was the only page in the 124 page Q1 VERSION 2 LLC AGREEMENT that was not printed using color toner, and it was the only page with unique trash marks that differed from all other pages.

129.    It is my unequivocal opinion that the Q3 COVER LETTER was not created on September 14, 2010.  The Q3 COVER LETTER makes reference to the "JV AGREEMENT (3 YEAR BUY/SELL)," and has been purported to accompany the Q1 VERSION 2 LLC AGREEMENT.  The Q1 VERSION 2 LLC AGREEMENT and all the other hardcopy documents of the "Version 2 LLC Agreements" were not available

in September 2010.  The "Version 2 LLC Agreements," which are the only documents
to contain the "3 YEAR BUY/SELL" provision, were created on or after July 15,
2013.  Therefore the Q3 COVER LETTER could not have been created until July 15,
2013 or after.

130.   The signature and surrounding text block, including the text above, below,
and adjacent to the signature, is a reproduction that was used from another source and
then inserted into the Q3 COVER LETTER.

131.   There is no evidence to indicate that the Q3 COVER LETTER is a first
generation document (i.e. the first hard copy iteration).  The overall quality of the
machine printed text on the Q3 COVER LETTER is inferior, indicating the document
(or portions thereof) has been reproduced from another source or is a document
composed from multiple sources.

132.   It is highly probable[10] the Q2 MARCH 2012 PMA was fabricated and is
not an authentic document based on the following:

a.  The Q2 MARCH 2012 PMA has significant differences when
compared with the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70
EXHIBIT 76 PMA documents, which are agreements for the same property as the Q2
MARCH 2012 PMA that predate the Q2 MARCH 2012 PMA;

b.  The black toner used to print the Q2 MARCH 2012 PMA is
consistent with the black toner used to print the Q3 COVER LETTER, which was
printed on or after July 15, 2013 or a later date; and

c.  The toner used to print the Q2 MARCH 2012 PMA is different than
the toner used to print Exhibit K1, K2, K3, K14, K18, K19, and K21.

---

[10]   The forensic document community relies on the Scientific Working Group for
Forensic Document Examiners: *Standard Terminology for Expressing Conclusions
of Forensic Document Examiners*.  "Highly Probable" is used to describe evidence
that is very persuasive and the examiner is virtually certain, but there is some factor
that precludes the examiner from reaching absolute certainty.

*(Cont'd on next page)*

133.   The Q2 MARCH 2012 PMA is substantially different from the K68A EXHIBIT 18 PMA, K68B EXHIBIT 18 PMA, and K70 EXHIBIT 76 PMA, even though each of these documents references the same "La Cienega Property" and predates the Q2 MARCH 2012 PMA.  It is probable[11] that the Q2 MARCH 2012 PMA was created using portions of the K57 JANUARY 2011 PMA and/or K58 SEPTEMBER 2010 PMA.  It appears there was an attempt to keep the Q2 MARCH 2012 PMA consistent with the formatting in the K58 SEPTEMBER 2010 PMA and/or the K57 JANUARY 2011 PMA by enlarging the font, but as a result, some sections in the TABLE OF CONTENTS used in the Q2 MARCH 2012 PMA were numbered incorrectly.

134.   A significant amount of blatant forgery took place in this case.  In my over 20-year career, this is one of the top five cases that I have worked on where the forgery seemed so blatant.  This is the type of case I might do a presentation on or include as an example in a textbook.  For example, the inconsistently aligned "g" in the word "operating" in Article 11.1(a)(i) of the Q1 VERSION 2 LLC AGREEMENT was visible on the face of the document, presenting obvious indicia of forgery visible without chemical analysis.

//

//

//

//

//

//

//

---

[11]  The forensic document community relies on the Scientific Working Group for Forensic Document Examiners: Standard Terminology for Expressing Conclusions of Forensic Document Examiners standard.  "Probable" is used to describe an opinion when there is strong evidence to support the conclusion.  This opinion meets or exceeds the "reasonable degree of scientific certainty" threshold.

135.   All of my opinions expressed in the aforementioned paragraphs are based on widely accepted scientific principles and methodologies.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed this 30th day of April, 2019, at VIENNA, VIRGINIA.

By: _____

Gerald M. LaPorte

DECLARATION OF GERALD M. LAPORTE

Gibson, Dunn & Crutcher LLP