GIBSON, DUNN & CRUTCHER LLP
James P. Fogelman, SBN 161584
   jfogelman@gibsondunn.com
Jay P. Srinivasan, SBN 181471
   jsrinivasan@gibsondunn.com
Shannon E. Mader, SBN 235271
   smader@gibsondunn.com
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

Attorneys for Plaintiff
P6 LA MF Holdings SPE, LLC

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| P6 LA MF HOLDINGS SPE, LLC, a limited liability company,<br><br>            Plaintiff,<br><br>    v.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,<br><br>            Defendants. | CASE NO. 2:19-cv-01150-AB-AFMx<br><br>**DECLARATION OF JONATHAN WATSON IN SUPPORT OF PLAINTIFF'S OPPOSITIONS TO DEFENDANT'S SPECIAL MOTIONS TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO C.C.P. § 425.16**<br><br>[*Filed concurrently with Opposition Briefs, Declarations of Jay P. Srinivasan, Eric Samek, Drew Flowers, Gerald M. LaPorte, and Samuel S. Rubin, Evidentiary Objections, and Plaintiff's Request for Judicial Notice; [Proposed] Orders lodged concurrently herewith*]<br><br>**Hearing:**<br>Date:    May 24, 2019<br>Time:   10:00 a.m.<br>Place:   Courtroom 7B<br>Judge:  Hon. André Birotte Jr. |

Gibson, Dunn & Crutcher LLP

DECLARATION OF JONATHAN WATSON

# DECLARATION OF JONATHAN WATSON

I, Jonathan Watson, declare and state as follows:

1. I make this declaration in support of Plaintiff's Oppositions to Defendants' Special Motions to Strike Plaintiff's Complaint Pursuant to C.C.P. § 425.16. I have personal knowledge of the facts set forth in this Declaration and if called as a witness, I could and would competently testify thereto.

2. I am a Director at AEW Capital Management, L.P. ("AEW Capital Management"). AEW Capital Management provides investment management and related services to institutional investors who seek to benefit from real estate as an investment asset. Its clients consist primarily of retirement funds, including retirement funds for health care workers, teachers, police officers, and firefighters. My duties as Director include sourcing and managing AEW Capital Management's real estate portfolios for its investment funds.

## I. The Joint Venture Agreement

3. Since 2010, I have been one of the people designated by AEW Capital Management to monitor the investments of P6 LA MF Holdings I LLC, the "Joint Venture" that was formed pursuant to a written agreement (the "JVA") dated as of September 8, 2010, and as subsequently amended, between P6 LA MF Holdings SPE, LLC ("AEW"[1] or the "Investor Member") and NMS Capital Partners I, LLC (the former "Operating Member" or "NMS Capital") (collectively, the "Joint Venture"). Attached hereto as **Exhibit 1** is a true and correct copy of the JVA, which is the operative version of the JVA as amended from the originally executed JVA. NMS Capital and AEW are the only members of the Joint Venture. The JVA was negotiated by the parties over several months before it was approved and executed, and both parties were represented by counsel during negotiations.

---

[1] AEW is a subsidiary of AEW Partners VI, L.P., an investment fund managed by AEW Capital Management.

4. I am generally familiar with the various properties owned by the Joint Venture (the "Properties") and the sale of those Properties. Prior to the sale, the Properties were owned and controlled by various Subsidiary Companies, as defined in the JVA, with each Subsidiary Company being controlled exclusively by the Joint Venture, which is in turn managed and controlled by AEW. The Properties are as follows: (1) 1502 Broadway, Santa Monica, CA 90404 and (2) 1511 15th Street, Santa Monica, CA 90404 (collectively, "Luxe Broadway"); (3) 375 N. La Cienega Blvd., West Hollywood, CA 90048 ("La Cienega"); (4) 9901 Washington Blvd., Los Angeles, CA 90232 ("Washington"); (5) 1410 5th St., Santa Monica, CA 90401 ("Lido"); (6) 1420 5th St., Santa Monica, CA 90401 ("San Marco"); (7) 1430 5th St., Santa Monica, CA 90401 ("Rapallo"); (8) 829 Broadway, Santa Monica, CA 90401 ("NMS Broadway"); and (9) 1447 Lincoln Blvd., Santa Monica, CA 90401 ("Lincoln Walk").

5. AEW has the exclusive power and authority to, in its sole discretion, sell the Properties. Pursuant to Article 8.1(c) of the JVA, AEW has the sole authority to conduct the "marketing for sale and sale or other disposition of the assets of the Company and/or the Subsidiary Companies."

6. The JVA does not contain a mechanism for either party to unilaterally "buy out," "take out," "monetize," or otherwise acquire either the Properties or the other member's interest in the Joint Venture. It does contain, however, a "Buy/Sell" mechanism in Section 11 (defined in the JVA as "the Buy Out Rights"). Pursuant to the Buy/Sell Provision, "[a]t any time after five (5) years from the date [of execution of the JVA], either the Operating Member or the Investor Member may give a Buy/Sell Notice at any time." Under the Buy/Sell provision, the party invoking the Buy/Sell rights, the "Initiating Member," is not the party electing to sell or purchase interests— the "Responding Member" chooses which member will be the seller and which member will be the buyer. (Ex. 1, Art. 11.1(a)-(b).)

7. However, the Buy/Sell rights are not unlimited. The Section 11 Buy/Sell provisions cannot be triggered until "after five (5) years from the date" of execution of the JVA. (Ex. 1, Art. 11.1(a)(i).) No Buy/Sell Notice can be issued "while any Property is under a contract for sale and the consummation of such sale is pending." Further, "in no event shall the Operating Member be entitled to give a Buy/Sell Offer Notice at any time after the occurrence of a Removal Event." (Ex. 1, Art. 11.1(a)(i).) NMS Capital requested the five-year Buy/Sell provision during the negotiations of the JVA, to which AEW agreed. The executed JVA had a five-year Buy/Sell provision, and that has never been changed in any subsequent amendment. The operative JVA has a five-year Buy/Sell provision. As part of the negotiations leading up to the execution of the JVA, on May 26, 2010, the parties exchanged a non-binding term sheet, which was not a legally binding commitment by either party. A true and correct copy of a May 26, 2010 email from Neil Shekhter, attaching this non-binding Term Sheet, is attached hereto as **Exhibit 2**. While the parties briefly considered a Buy/Sell right that could be triggered at the later of three years from acquisition or stabilization, NMS' own deal counsel requested that this term be changed to a five-year Buy/Sell, and no three-year Buy/Sell term ever made it into the JVA.

8. Article 6.1 of the JVA dictates the "order and priority" of how "all distributions of Net Operating Cash Flow and Net Capital Proceeds shall be made." It is in AEW's sole discretion to decide whether and when to authorize the distribution of proceeds. (Ex. 1, Art. 8.1(e).) Article 6.1 does not provide NMS Capital with a unilateral "buy out right," "right to take out," "right to buy-out," right to "monetize" or other right to acquire AEW's interest in the Joint Venture or acquire the Properties, nor does it address the transfer of one member's interest to the other. It simply governs the distribution of the Joint Venture's proceeds from the Joint Venture to its members. (Ex. 1, Art. 6.1(a)-(b).) There is no unilateral right in the JVA for one party to forcibly "buy out," "take out," "monetize," or otherwise acquire the interest of the other member or the Properties.

9. After executing the JVA, the capital contribution requirements were changed to allow for subsequent deals to deviate from what the executed JVA required. Originally, the members were required to contribute capital at a 70-30 ratio: AEW contributed 70%, and NMS Capital was required to contribute 30%. However, NMS Capital requested that the JVA be amended to accommodate deals funded at a 90-10 ratio so that NMS Capital could contribute less capital under the JVA. The parties agreed to execute amendments incorporating the "Specified Properties" concept in or around January 2011. A true and correct copy of these amendments is attached hereto as **Exhibit 3**. With each of these amendments, NMS affirmed the validity of the JVA, and five of these amendments expressly referenced the term "Specified Properties," which first appeared in the January 2011 amendments to the JVA agreed to by the parties. After the "Specified Properties" amendments, several Properties were acquired at or around a 90-10 ratio, where AEW contributed 90% of the equity and NMS Capital contributed only 10%. The "Specified Properties" amendments constitute a material change in the structure of the Joint Venture, and since each member's ownership interest in the Properties is based on its capital contribution, NMS Capital's share of the Joint Venture's assets and proceeds were diluted accordingly. The operative JVA incorporates the "Specified Properties" amendments. Despite later circulating "Version 2" as discussed below, NMS Capital repeatedly requested and made capital contributions consistent with the 90-10 ratio allowed for Specified Properties. NMS continued to request and make capital contributions according to the 90-10 ratio even after NMS' Shekhter sent the June 26, 2013 letter to Eric Samek discussed below in paragraph 11. In fact, even after filing the *Lincoln Studios* case, NMS continued to request and make capital contributions according to the 90-10 ratio.

10. What Defendants refer to as "Version 2," a version of the JVA without the "Specified Properties" amendments and with a three-year Buy/Sell provision instead of a five-year Buy/Sell provision, is a forgery. AEW did not approve "Version 2," and

the parties did not negotiate those terms. The first time AEW saw "Version 2" was after Defendants emailed it to AEW's counsel. Although NMS and its counsel claimed that "Version 2" was created by AEW to correct a "mistake" in "Version 1," this is not true. There was no "mistake" in Article 11 of the JVA executed on September 8, 2010. NMS Capital threatened to submit "Version 2" to at least one lender in connection with the refinancing of a Joint Venture loan and refused to certify the actual operative JVA but appeared to back down after AEW threatened removal if NMS engaged in such misconduct.

11. The three-year Buy-Sell language in Section 11 of the forged "Version 2" never appeared in a single draft of the JVA, a single written communication between the parties or their counsel, or any of the amendments to the JVA.

## II. NMS' June 2013 Unsolicited Proposal

11. On or about June 26, 2013, Neil Shekhter sent an unsolicited letter to AEW Capital Management proposing a "single transaction where [AEW] would receive, concurrently with the closing of such transaction, (i) an IRR of 24% and (ii) aggregate distributions equal to the product of 1.75 multiplied by [AEW]'s aggregate Capital Contributions," and "[u]pon such payment, [AEW] would withdraw as a Member of [the Joint Venture] and have no further rights or obligations under the LLC Agreement." (Declaration of Eric Samek, Ex. A.) In addition, Shekhter suggested "cleaning up the LLC Agreement" and amending it "to provide for the withdrawal of the Investor Member." AEW was not interested in NMS' proposal or in amending the JVA to impair its rights, nor was it obligated to do so.

## III. Sale of the Properties

12. The Joint Venture retained Eastdil Secured, L.L.C. ("Eastdil") to market and sell the Properties to the most qualified, bona fide bidder for the best overall sale terms. Through Eastdil's efforts and several months of marketing, the Joint Venture received and evaluated several bids to purchase the Properties from several interested buyers.

13. By the spring of 2016, the Joint Venture urgently needed to push ahead with the sale of the Properties. The misconduct of NMS Capital and its counsel had caused the Joint Venture to incur substantial default penalties, such as fees and interest, stemming from the Joint Venture's loans. At least one Joint Venture lender informed AEW that it would not grant any extension or forbearance of Joint Venture loans without a signed contract for sale by November or December 2016, and that without a sale, additional substantial penalties and foreclosure proceedings were imminent. The Joint Venture needed to sell the Properties immediately to repay the Joint Venture's debts and free the Joint Venture from the risk of foreclosure. In total, the misconduct of NMS Capital and its counsel caused the Joint Venture to incur at least $2 million in penalties relating to the Joint Venture's loans.

14. At least one potential buyer received a letter from Skip Miller and Miller Barondess, LLP, counsel for NMS and its affiliates, during the time the potential buyer was evaluating a potential purchase of the Properties and ultimately decided not to submit a bid.

15. During the marketing and sales process, NMS' agents' were present at the Properties and distributed letters drafted by Skip Miller and Miller Barondess, LLP to prospective buyers who were conducting on-site visits at the Properties. It is my understanding that these letters were similar to if not identical to Skip Miller's letters to other potential buyers.

16. Despite the attempts of NMS Capital and its affiliates to derail any sale process in violation of AEW's rights pursuant to the JVA, AEW did find a willing, well-qualified, neutral third-party buyer for all of the Properties (the "Buyers"). The Properties were sold to the Buyers pursuant to a Purchase and Sale Agreement executed on October 31, 2016 with the sale transaction closing on November 21, 2016.

17. The Buyers initially submitted a bid offering to purchase the Properties for $439.2 million in June 2016, and indicated they were willing to bid even higher to $440 million, if the sale could proceed expeditiously and close quickly. However,

because of the June 29, 2016 letter from Skip Miller and Miller Barondess on behalf of NMS to fourteen major title insurance companies in the United States, the sale process was significantly delayed due to the Joint Venture's inability to obtain title insurance for a sale transaction. As a result, the Joint Venture was unable to take advantage of the original offer from the Buyers. Ultimately, between June 2016 and October 31, 2016, when the Purchase and Sale Agreement was executed, the Buyers reduced their offer by approximately $9 million and the Properties were sold for $430.5 million.

18.  As a result of the inability to obtain title insurance for the sale transaction, the Buyers and the Joint Venture were also forced to change the structure of the sale. While commercial transactions of this size generally require and involve the use of bank financing, that was not possible without title insurance. In lieu of a bank loan, the only feasible solution was for the Joint Venture to provide $236.8 million of seller financing in the form of promissory notes made by the Buyers and payable to the Joint Venture (the "Notes"). To date, AEW has not sold the note and has been advised that without title insurance, the discount required in order to liquidate would be unacceptable, if liquidating without title insurance was even possible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on this 2nd day of May, 2019.

_____
Jonathan Watson

Gibson, Dunn & Crutcher LLP

7
DECLARATION OF JONATHAN WATSON