Steven Zelig, SBN 094654
WLA LEGAL SERVICES, INC.
1543 7th St., Suite 300
Santa Monica, California 90401
T: 310/393-6702 F: 310/393-6703

Attorneys for Defendants Steven Zelig, WLA Legal Services, Inc. and Brentwood Legal Services, LLP, erroneously sued and served as Brentwood Legal Services

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; AND DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:19-cv-1150-AB-AFMx<br><br>(Hon. André Birotte, Jr.)<br><br>REPLY TO OPPOSITION TO SPECIAL MOTION TO STRIKE COMPLAINT BY DEFENDANTS STEVEN ZELIG, BRENTWOOD LEGAL SERVICES, LLP, AND WLA LEGAL SERVICES, INC. PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16<br><br>DECLARATION OF STEVEN ZELIG<br><br>DATE:    May 24, 2019<br>TIME:    10:00 a.m.<br>CRTRM:  7B |

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 4

I. SUMMARY OF REPLY ................................................................................ 4

II. P6 FAILED TO ADDRESS COUNTLESS SIGNIFICANT POINTS RAISED AND PROVED IN THE MOTIONS .................................................. 4

III. MISCELLANEOUS ARGUMENTS .......................................................... 10

IV. CONCLUSION .......................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

## CASES

*Daniels v. Robbins,* 182 Cal.App.4th 204, 221 (2010) .................................................. 9

*Leonardine v. Shell,* 216 Cal.App.3d 547, 571 (1989) ................................................. 9

*Morrison v. Rudolf,* 103 Cal.App.4th 506, 512-513 (2002) .......................................... 9

*Roberts v. L.A.,* 105 Cal.App.4th 604, 613-14 (2003) ................................................. 4

*Sangster v. Paetkau,* 68 Cal.App.4th 151, 164-164 ...................................................... 9

*Uzyel v. Kadisha,* 188 Cal.App.4th 866, 927 (2010) .................................................... 8

*Zeavin v. Lee,* 136 Cal.App.3d 766, 772-773 (1982) .................................................... 9

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. SUMMARY OF REPLY**

This is a senseless legal vendetta fueled by unadulterated malice of P6 and Gibson Dunn. P6 has not met its burden. The Court should grant the motions of Steven Zelig, Brentwood Legal Services, LLP and WLA Legal Services, Inc. (collectively "Zelig" or "Zelig Defendants") and establish a briefing schedule relative to attorney fees and costs.

**II. P6 FAILED TO ADDRESS COUNTLESS SIGNIFICANT POINTS RAISED AND PROVED IN THE MOTIONS OF THE ZELIG DEFENDANTS**

By admissible evidence, Zelig proved that he had probable cause and did not act with malice. Hence, the burden shifted to P6 to prove by admissible evidence that it has a probability of prevailing. *Roberts v. L.A.*, 105 Cal.App.4th 604, 613-14 (2003). P6 did not even attempt to refute the position of Zelig via **admissible** evidence. Instead, it resorted to smoke, confusion, irrelevant claims and unsubstantiated speculation.

Zelig raised many significant points in his motion. Rather than address them, P6 instead decided to obfuscate in an effort to lead this court into an erroneous decision. For example, P6 did not address the following key **evidence** that clearly demonstrates that Zelig, in pursuing the claims of the various NMS entities, had substantial probable cause, acted without malice, and there was no "favorable termination"[1]:

- P6 did **not** address the mazel tov email.

---

[1] Six experienced lawyers, i.e., Miller, Goldman, Genga, Frid, Tokoro, and Zelig, pursued the claims of NMS before appeal. On appeal 2 more highly thought of lawyers, i.e., Timothy Coates and Gary Wax, both certified appellate specialists, felt comfortable to present the appeal on behalf of NMS/Shekhter. Mr. Coates is the author of CEB's California Tort Liability Practice.

- P6 did **not** address the internal memo of AEW, confirming that NMS had the takeout right.

- P6 did **not** address the key data in the 2 declarations from Lennon, including but not limited to:
  - That Samek had repeatedly told him that NMS **had** been given the right to monetize AEW within 5 years of the anniversary of the formation of the joint venture at 1.75x or 24%, whichever was greater;
  - That Samek told Lennon that he thought NMS "*did not know what they were really signing*";
  - That "(a)t **least on one occasion I heard Eric Samek say that NMS believed they had the option to buy AEW out @ pre negotiated terms but that NMS was not aware of the terms in the agreement they were signing because NMS legal was not aware the terms in the JV agreement were different than the negotiated terms of the deal**." (Ex. 43)
  - "7. During my time at AEW, I worked directly for Eric Samek...I worked closely with Mr. Samek on the deals he was involved in.

    8. The majority of the transactions I underwrote while at AEW were investments made in AEW's joint venture with NMS Properties ("NMS") owned by Neil Shekhter. I worked with Mr. Samek, who was the senior AEW partner involved in closing the NMS transaction. In the ordinary course of business, I received letters, emails, correspondence, memoranda, budgets and documents relating to the AEW-NMS joint venture.

    9.    For instance, I was recently shown a September 14, 2010 letter on which I was copied, a true and correct copy of which is attached as Exhibit A,. I have no reason to believe that I did not receive the letter at that time in the normal course of business. I was also copied on an email from an AEW employee, Jonathan Watson, dated September 14, 2010, …. I was recently shown this email and believe I received it in the ordinary course of business.

    10.    During my discussions with Mr. Samek about AEW's joint venture with NMS, Mr. Samek told me that NMS believed the deal

between NMS and AEW was that NMS had the right to monetize or take-out AEW's interest in the joint venture by paying AEW 1.75 times its invested capital, or 24% per year on its investment, whichever was greater. Mr. Samek told me that this was how he and Mr. Shekhter of NMS negotiated the deal.

11. All of the underwriting I did for AEW on the transaction with NMS and AEW's decision to enter into the joint venture was based on NMS having the right to monetize or take-out AEW's interest in the joint venture by paying AEW 1.75 times its invested capital, or a 24% per year on its investment, whichever was greater." (Ex 14)

- P6 did **not** address the key data taken in the deposition of Zimbler, wherein Zimbler talked about "choreographing" a marriage of AEW to the "slate of Santa Monica properties" owned Neil (aka "a needle in the haystack.")
    - That Zimbler introduced NMS to AEW because AEW's Samek told him that AEW had a unique JV program under which NMS could "take-out" AEW's interest in the JV. (Ex. 35 [Zimbler Depo.], pp. 68:19-69:18);
    - That Zimbler was the "common denominator between Shekhter and Samek (*Id.*, p 24:19);
    - That AEW was offering a "buy-out right" that was distinctly different then a buy/sell (Id., p. 26:3-14);
    - That Samek, Neil and Zimbler discussed the "buyout provision" (*Id.*, pp. 26:15-18, 40:24-41:2, 42:16-44:7);
    - That **after** January 1, 2011, Zimbler spoke to Samek about the "buyout provision included in the contract between AEW and NMS," and that Samek never "disabused" Zimbler of his perception (*Id*, p. 68:19-69:5);
    - At no time did Samek ever say that the "buyout" right didn't exist or that "that's not the deal with (Shekhter)" (*Id.*, p. 69:11-18);

- That a "couple years later", Zimbler "100% believed, that Neil had this buyout right. Not a buy/sell. A buyout right." (*Id.*, p. 87:24-88:2);
- That "there was **never** one second or one iota of a minute that (Zimbler) ever thought that (Shekhter) did not have the buyout option." (*Id.*, p. 91:3-5);
- That Shekhter would say "AEW is making me put more money in, but it was always the same response: 'doesn't matter. I got the buyout option, so everything is going to be okay.'" (*Id.*, p. 91:9-15);
- Zimbler confirmed that AEW promised NMS the buy-out right and that AEW had engaged in fraud (*Id.*, pp. 26:15-27:16); and
- That Zimbler "was upset with AEW about (things) they did to (Shekhter)." (*Id.*, p. 84:2-91:12)
- That AEW had made a deal to give him 5% interest in AEW's share in the joint venture and all related transactions (Ex. 44; Ex. 35, pp. 82:5-84:1);
- That AEW had reneged on the agreement (*Id.*);
- That AEW's lawyers had drafted a written agreement that did not represent the agreement of Zimbler and AEW, and which according to Zimbler "had ridiculous language in it – that was circular" (Ex. 35, p. 82:17-21);
- That the dispute was "not resolved in a manner consistent with what (Zimbler) understood the deal to be" (*Id.*, p. 83:11-22);
- That "Samek had told (Zimbler) things and Samek didn't come through on his promises" (*Id.*, p. 83:23-84:1);
- That AEW "crammed down … terms and language that was so difficult and so trying" (*Id.*, p. 86:23-87:2); and,

- - o That AEW then sent Zimbler "the legal bill for beating him up." (*Id.*, p. 87:1-2)
- P6 did **not** address the significant admissions in the letter of Zimbler's counsel Friedman, including, but not limited to:
  - o That Zimbler had "engineered a relationship and a set of transactions resulting in (AEW's) marriage to Neil and his slate of Santa Monica developments";
  - o That Zimbler "cemented AEW's opportunity to invest in (Shekhter's) projects";
  - o That Zimbler delivered Shekhter, a "needle in a haystack," to AEW; and
  - o That same had not been "orchestrated casually."[2] (Zelig Decl., ¶7; Ex. 44) Zelig/WLA viewed this evidence as substantial corroboration of AEW's wrongdoing. (Zelig Decl., ¶7)
- P6 did **not** address the findings of the Honorable Michael Johnson, a highly thought of Judge, who found that the evidence was "**sharply divided**" and that NMS "**raised legitimate issues**" about the exercise of the rights to buy out the interests of AEW, per Article 6.1.
- P6 did **not** address the findings of the COA to the effect that the FAC, SAC and TAC were **not** sham pleadings.
- P6 did **not** address the fact that 8 highly experienced lawyers felt the action had merit.
- P6 did **not** address the perjury of Davidson, as noted by Judge Lavin.
- P6 did **not** address the fact that NMS presented 4 highly qualified experts who testified that there was no forgery.

---

[2] Zimbler and AEW never told Shekhter that these issues existed between them. (Ex. 49 [Shekhter Decl. 2017], ¶¶ 28, 68-69)

- P6 did **not** address the fact that probable cause is a "low threshold." (See for example, *Uzyel v. Kadisha*, 188 Cal.App.4th 866, 927 (2010); *Sheldon Appel v. Albert*, 47 Cal.3d 863, 886 (1989).)

- P6 did **not** address that the probable cause threshold is low and lenient and that a court must "construe the claims and allegations in the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. (See *Sangster v. Paetkau*, 68 Cal.App.4th 151, 164-164; *Leonardine v. Shell*, 216 Cal.App.3d 547, 571 (1989).)

- P6 did **not** address clear law to the effect that the client's conduct cannot be imputed to an attorney in a malicious prosecution action. See: (1) *Zeavin v. Lee*, 136 Cal.App.3d 766, 772-773 (1982); *Daniels v. Robbins*, 182 Cal.App.4th 204, 221 (2010) ("courts should not impute malice to attorneys based on the client's misconduct.")

- P6 did **not** address clear authority to the effect that an attorney is entitled to rely on information provided by the client, and may without being guilty of malicious prosecution, vigorously pursue litigation in which he is unsure of whether his client, or his client's adversary, is truthful so long as that issue is in genuine doubt. (See *Morrison v. Rudolf*, 103 Cal.App.4th 506, 512-513 (2002).)

- P6 did **not** present any evidence at all to the effect implicating Zelig or any of the other lawyer defendants relative to the alleged forgery and alleged alteration of evidence.

- Notwithstanding P6's and GD's outrageous request that the court impose millions of dollars of monetary sanctions on the various Defendant lawyers, and that their livelihoods be severely compromised by a report to the State Bar, P6 did **not** address the fact that Judge Bruguera **specifically declined** from finding that any of the lawyers participated in the alleged forgery or alteration of evidence

NOTICE OF MOTION FOR SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

## III. MISCELLANEOUS ARGUMENTS

P6 did not even attempt to prove that Zelig participated in any way in the **alleged** forgery or **alleged** fabrication of documents.

At page 9, line 4, of P6's opposition it claims that there is a "factual dispute." This is an admission that probable cause existed.

At page 9, line 13, P6 proclaims that Zelig knew that NMS's claims were based on an (alleged) forgery and (alleged) obvious lies. There is no evidence to support this absurd and manipulative statement.

In the declaration of Samek, he claims that Steven Zelig tape recorded a settlement conversation, but has no basis whatsoever for this absurd and manipulative statement. Moreover, even if Zelig did tape record a settlement discussion, how does this support P6's argument that Zelig did not have probable cause, and acted with malice in pursuing P6?

## IV. CONCLUSION

Zelig has proven: (1) the absence of favorable termination; (2) the existence of probable cause; and (3) the absence of malice.

Although the attorneys in *Daniels,* had virtually no basis to pursue their claims, as opposed to our situation where there was a massive amount of evidence to support the position of NMS, the *Daniels* opinion is on point and extremely instructive.

**Favorable Termination.** *Daniels* addressed the issue of when a case, terminated for discovery abuse, can be deemed "favorably terminated." The *Daniels* court held that the "favorable termination" element is satisfied for the purposes of avoiding a grant of an anti-SLAPP motion "where the record in the underlying action is **devoid** of any attempt during discovery to substantiate allegations in the complaint, and the court's dismissal was justified by the

(underlying) plaintiffs lack of evidence to submit the case to a jury at trial." (Bold emphasis added.) (*Daniels, supra*, at 218.)

P6's opposition does not meet this test, for several reasons:

A. The record is not devoid of any attempt during discovery to substantiate NMS's claims. In fact, to the contrary, it is beyond meaningful dispute that NMS made every effort to obtain depositions and other discovery and that P6/GD blocked same at every opportunity.

B. It is unrefuted that the record includes substantial evidence supporting the claims of NMS, including, but not limited to the declarations of Lennon, the deposition of Samek, and the following documents:

- May 2010 "Mazel Tov" Email: On May 19, 2010, Samek of AEW sent NMS an email congratulating NMS on the deal and confirming the Monetization Right: "AEW minimum equity multiple [would be] 1.75" and that "[i]f NMS monetizes all of AEW's investment within 5 years then NMS will keep **all** proceedings above AEW's 24% return." (Ex. 2, pp. 33.)

- May 2010 Term Sheet: AEW further confirmed the deal by sending NMS a term sheet that stated that if AEW's investment has been "monetized … **within** five years," then 100% of the JV's proceeds would go to NMS. (Ex. 5.)

- August 2010 AEW Investment Committee Memo: An internal AEW memo showed that AEW understood and based its projections on the assumption that if it received a 24% return on its invested capital, its interest in the JV would go to zero. (Ex. 41, p. 11.)

- Property Transfers by NMS/Shekhter: NMS/Shekhter transferred to the JV **four** properties at below fair market value. NMS only did this because of Samek's assurances that this "would be of no moment because of [NMS's] right and intention to take-out AEW's interest within a few years . . . ." The below market transfers make no sense if NMS did not have a take-out right. (Ex. 2, ¶ 21.vii.)

- April 2013 Meeting: NMS and AEW had a meeting at a restaurant in Culver City where they discussed buying out AEW's interest in the JV per the take-out right. Specifically, they discussed various ways to effectuate the take-out, including bringing in outside money through loans or having NMS sell or use equity in their other properties to buy out AEW; and thereafter exchanged projections to effectuate the take-out. (Ex. 23, ¶ 84; Ex. 37, pp. 6:7-12:12.)

- June 2013 Letter: Per the discussions above, NMS notified AEW that it intended to pay back AEW's interest, as provided for in Section 6.1 of the JVA. NMS stated therein that, under Section 6(b) of the JVA, AEW's interest in the JV would become zero if, within five years of the formation of the JV, AEW had received 1.75 times its invested capital and a 24% IRR. (Ex. 6.)

**Probable Cause.** The court in *Daniels* held that plaintiff established a prima facie case of probable cause because of the "absence of any witnesses, documents or other evidence in support of (the client's) allegations in the prior litigation. *Daniels*, at 224. Here, there were a **large number** of witnesses, documents and other evidence to support NMS's position.

As Zelig read the opposition of P6, it appears that AEW seems to think that it can meet its burden under prong 2 as showing the lack of probable cause really by pointing to a number of so-called facts that allegedly supports its position. But that is not sufficient. As to the probable cause element, the issue is not whether there is some evidence to support AEW's position that NMS's claims lack merit, but whether all the evidence supported AEW's position. In other words, AEW's burden was to show "**the absence** of any witnesses, documents or other evidence in support of (the client's) allegations in the prior litigation." *Daniels* at 224. AEW did not meet that burden. It did not even attempt to meet it because it knew it could not in light of substantial testimonial and documentary evidence that supports NMS's position on the substantive issues and even on the alleged forgery issue. In short, because the evidence on the substantive issues and even on the alleged forgery was in conflict, probable cause existed regardless of how Judge Bruguera resolved the conflict.

**Malice.** In *Daniels*, the court held, in a malicious prosecution case against a lawyer, that malice is not established merely by the absence of probable cause; there must be evidence that the attorney **knew** that the case lacked probable cause. *Daniels*, at 227. P6 has presented **no** evidence that Zelig – or any of the other NMS lawyers for that matter – knew that NMS's claims lacked probable cause or that

anything was (allegedly) forged or spoliated. It merely throws out unsupported speculation that Zelig and the other lawyer Defendants "must have known."

For the foregoing reasons, Zelig/BLS respectfully requests that the Court grant this Motion in its entirety, strike AEW's Complaint, and award Zelig/BLS/WLA their reasonable attorneys' fees and costs pursuant to further motion.

Respectfully submitted.

DATED: May 10, 2019          WLA LEGAL SERVICES, INC.

/s/
STEVEN ZELIG
Attorneys for Defendants Steven Zelig, WLA Legal Services, Inc., and Brentwood Legal Services

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT ON MAY 10, 2019, A COPY OF THE REPLY TO OPPOSITION TO SPECIAL MOTION TO STRIKE COMPLAINT BY DEFENDANTS STEVEN ZELIG , BRENTWOOD LEGAL SERVICES, LLP, AND WLA LEGAL SERVICES, INC. PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16

was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM//ECF System.

DATED: May 10, 2019              WLA LEGAL SERVICES, INC.

/s/
_____
STEVEN ZELIG
Attorneys for Defendants Steven Zelig, WLA Legal Services, Inc., and Brentwood Legal Services