UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| P6 LA MF Holdings SPE, LLC, a limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>NMS CAPITAL PARTNERS I, LLC; BRENTWOOD LEGAL SERVICES; STEVEN ZELIG; GENGA & ASSOCIATES, P.C.; WLA LEGAL SERVICES, INC.; JOHN GENGA; MILLER BARONDESS LLP; LOUIS R. MILLER; JAMES GOLDMAN; ALEXANDER FRID; JASON TOKORO; and DOES 1-10, inclusive,<br><br>Defendants. | Case No. 2:19-cv-01150-AB (AFMx)<br><br>**ORDER DENYING DEFENDANTS' SPECIAL MOTIONS TO STRIKE COMPLAINT** |

Before the Court are Special Motions to Strike filed by Defendants Genga & Associates, P.C. and John Genga (the "Genga Defendants" or "Genga Firm") (Dkt. No 41), Defendants Miller Barondess, LLP, Louis R. Miller, James Goldman, Alexander Frid, and Jason H. Tokoro (the "Miller Defendants" or "Miller Firm") (Dkt. No. 42), Defendant WLA Legal Services, Inc ("WLA") (Dkt. No. 48), and Defendants Steven Zelig ("Zelig") and Brentwood Legal Services, LLP ("Brentwood") (WLA, Zelig, and

1.

Brentwood are referred to collectively as the "Zelig Defendants") (Dkt. No 53). Plaintiff P6 LA Holdings SPE, LLC (hereinafter "AEW") opposes the motions. The Court heard oral argument on May 24, 2019 and took the matter under submission. For the following reasons, Defendants' motions are **DENIED**.

## I. BACKGROUND

The background of this dispute is convoluted and has touched upon both the state and federal court system. Simply put, the lawsuit revolves around a botched joint venture involving a portfolio of nine properties located in the Los Angeles area.

### A. The Parties

AEW is a large hedge fund incorporated in Delaware (Complaint ("Compl.") ¶ 13) and a subsidiary of P6 LA MF Holdings SPE, LLC.

NMS is a limited liability company based in California. *Id.* ¶ 14. NMS's sole member is Neil Shekhter, an individual domiciled in California. *Id.*

The Genga Defendants, Miller Defendants, and Zelig Defendants are all California citizens. Each of the preceding Defendants represented NMS in the action[1] underlying this dispute.

### B. The Joint Venture

On or about September 10, 2010, NMS and AEW entered into a joint venture agreement ("JVA") to develop apartment and mixed-use buildings in West Los Angeles.[2] *Id.* ¶ 48. At the time the parties were negotiating the JVA, the real estate market was volatile and NMS affiliates owned four properties that were losing money, with some already in default on the loans and others rapidly approaching default. *Id.* ¶ 38. Thus, NMS entered the JVA to mitigate its losses; AEW entered the JVA as an opportunity to invest and develop properties in the West Los Angeles marketplace.

---

[1] *See infra* Section I.D.
[2] Except where necessary to draw distinctions, this Order refers to Shekhter and his Defendant entities collectively as "NMS" and to the AEW-related parties collectively as "AEW."

2.

*Id.* The parties negotiated the JVA over the course of several months and spent a significant portion of that time discussing the JVA's potential Buy/Sell provision. *Id.* ¶ 39. A Buy/Sell provision allows either party, at an agreed upon time, to trigger a sale by offering to buy the other party's interest or sell its own interest at a stated price. *Id.*

From the very first edits to the JVA, NMS and its deal counsel made clear that it was paramount the Buy/Sell provision in the JVA not trigger before five years. *Id.* ¶ 48. The importance of this version of the Buy/Sell provision is highlighted in an email from NMS's Chief Operating Officer, Jim Anderson, and forwarded to AEW.[3] AEW incorporated the language NMS's deal counsel proposed for the Buy/Sell provision in Article 11 of the parties' redline circulated on August 11, 2010. *Id.* ¶ 45.

While numerous drafts were circulated during the course of negotiations, each draft contained the 5-year Buy/Sell provision. *Id.* ¶ 46. The parties executed the JVA in September of 2010. *Id.* ¶ 48. Several amendments were made to the JVA over time, but no amendments or requests for amendment ever touched upon the 5-year Buy/Sell provision. *Id.* ¶ 50.

The JVA included two other provisions relevant to the underlying dispute. First, the JVA contained a provision related to each party's capital contribution requirements. The September 2010 JVA provided that AEW would contribute 70% of capital and NMS would contribute 30% of the capital. *Id.* ¶ 49. After the first joint venture property was acquired, NMS informed AEW that it did not have enough money to fund 30% of the capital as required by the JVA. *Id.* ¶ 50. The parties agreed to amend the JVA such that AEW could fund 90% of the required capital, and NMS could fund 10% on future JV properties. *Id.* This agreement was memorialized

---

[3] Which provides in Track Changes the following: "THIS ENTIRE SECTION NEEDS FURTHER DISCUSSION BUT IT SHOULD NOT BE TRIGGERED BEFORE THE EXPIRATION OF THE 5 YEAR PERIOD WHEN THE TARGET DISTRIBUTION IS TO BE ACHIEVED." *Id.* ¶ 44.

by the last of three slip-sheet amendments incorporated throughout the JVA: "Specified Properties". *Id.* The provision permitted the parties to fund capital on a basis other than the originally agreed upon 70/30 split. *Id*.

Second, Article 6 of the JVA provided that the timing of making distributions from the JVA to its members was left to the sole discretion of AEW, as defined in Article 8.1. *Id.* ¶ 49. NMS would later assert that Article 6 provided a right to "buy out" AEW's interest. *Id.* ¶ 79. This claim was dismissed with prejudice by the *Lincoln Studios* court, and on appeal, the trial court's decision was affirmed. *Id.* ¶ 107.

### C. The Forged JVA

By 2013, real estate values had begun to rebound, and the joint venture's properties had skyrocketed in value. In an attempt to maximize their benefit from this reversal of fortune, NMS requested that AEW consider selling its interest and amending the JVA to make such a sale possible. *Id.* ¶ 53. AEW declined the request. *Id.*

Undeterred by the refusal, NMS forged a new version of the JVA. In the doctored document, the Buy/Sell provision in Article 11 included a "3-year" term rather than the agreed-upon "5-year" duration. *Id.* ¶ 54. NMS also altered the "Specified Properties" language which had been incorporated into the JVA, such that NMS would have a right to 30% capital contribution on all properties, rather than only the 10% of capital contributions they had made to certain properties upon NMS' request. *Id.*

On July 12, 2013, Neil Shekhter forwarded his son, Adam Shekhter, a September 10, 2010 email attaching a PDF copy of the September 2010 executed JVA before the "Specified Properties" language had been added. *Id.* ¶ 55. That weekend Neil and Adam used this September 2010 PDF as the template for their forgery. *Id.* On July 15, 2013, NMS created the altered version of the JVA and entitled it "Version

4.

2". Using PDF overwriting software, Neil and Adam deleted the number "5" and the word "five" in Article 11 and replaced them with the number "3" and the word "three". *Id.* On July 19, 2013, Neil sent Steve Williford, NMS's General Counsel, an email discussing the 3-year Buy/Sell provision. *Id.* ¶ 57. Williford kept a genuine JVA on his desk and was familiar with its terms. *Id.* As such, Williford responded to Neil's email stating that "[The 3-year Buy/Sell provision] did not make it into the actual LLC agreement." *Id.* However, just hours after responding to Neil that the 3-year Buy/Sell provision was not included in the executed JVA, Williford emailed AEW's counsel an attached copy of the forged Version 2, describing it as the "last version of the LLC agreement that was approved by Neil Shekhter." *Id.* Williford later testified that Neil "ghost wrote" the email. *Id.*

NMS proceeded to circulate the forged copies to others, both inside and outside of NMS, as to enjoy wide distribution. One recipient of Version 2 was Tom Johnston, who had been NMS's outside deal counsel during the JVA negotiations. *Id.* ¶ 58. Johnston communicated to Williford that he had never seen Version 2 and confirmed "Version 3" was the operative document. *Id.* Months later, when asked to provide his files for the AEW matter, Johnston emailed an attachment of Version 3. *Id.* ¶ 59.

### D. The *Lincoln Studios* Lawsuit

NMS filed the underlying lawsuit in April 2015, when it filed its First Amended Complaint ("FAC") in *Lincoln Studios*, naming AEW, its employees, and affiliates as defendants and alleging that the forged JVA was the operative document. Declaration of Jay Srinivasan ("Srinivasan Decl."), Ex. 9. Prior to the FAC, NMS filed the *Lincoln Studios* litigation against DLA—AEW's former deal counsel—alleging that DLA failed to include a 3-year Buy/Sell provision. *Id.* ¶ 60. Similarly, NMS previously filed a separate lawsuit against their own deal counsel for negligence alleging the same. *Id.* The FAC took a different approach and included allegations that the 5-year Buy/Sell provision was a "typo" that AEW had agreed to fix, and AEW

5.

had delivered Version 2 to NMS in September 2010. *Id.* ¶ 61.

During the course of the *Lincoln Studios* lawsuit, California state courts determined that: (1) NMS forged the JVA containing a 3-year Buy/Sell provision; (2) NMS forged a cover letter that NMS falsely contended accompanied the forged JVA; and (3) NMS forged a property management agreement ("PMA") in an effort to stave off an adverse ruling in a related California action. Compl., Ex. 1 at 72-93. The Superior Court entered a default judgment against NMS, expressly holding that Version 2 of the JVA was "a fabrication and forgery created by NMS and its affiliates," and that NMS "committed a broad variety of fraudulent conduct [and] misrepresentations," including forging Version 2 and other documents and making "misrepresentations and false statements in connection with these forgeries." Compl., Ex. 3 at 328-29. The default judgment entered against NMS was affirmed by the Court of Appeal. *Id.*, Ex. 5.

### E. The Law Firms and Discussions of the Forgery

Each of the named law firm Defendants was an active participant in the *Lincoln Studios* litigation. The Zelig Defendants were responsible for filing the FAC against AEW alleging that the forged JVA was the operative document. The Genga Defendants formally entered the *Lincoln Studios* lawsuit in May 2015. The Miller Defendants also associated into the case in May 2015, however, James Goldman, a partner at Miller, was active in the case months prior to then. Dkt. No. 57 p. 13.

On June 16, 2015, counsel for AEW and NMS met for a court-ordered and court-reported discovery conference. Srinivasan Decl., Ex. 14. Zelig, the Genga Defendants, and the Miller Defendants all attended the conference. *Id.* Counsel for AEW informed each of the Defendants that NMS's lawsuit was based on a forged JVA, that emails from NMS' own deal counsel proved that NMS's "typo" assertion was false, and that Version 2 of the JVA was a forgery. *Id.*, at 139:23-152:25. Additionally, the Defendants received copies of a July 2010 email from NMS's deal

6.

counsel, demanding that the JVA include a 5-year Buy/Sell provision. *Id.*, at 139:23-150:25. Defendants did not provide any counter evidence to support their typo claim or corroborate their assertions that the forgery was genuine. NMS Counsel said they would look into Plaintiff's assertions that the "typo" story was an intentional misrepresentation and that "Version 2" was a forgery. Compl. ¶ 62. NMS Counsel continued representing NMS in *Lincoln Studios* and over the course of the litigation, did not produce a witness to contend that Version 2 was genuine. Compl. ¶ 63. Five days after the discovery conference, Neil drafted a cover letter regarding the alleged 3-year provision, setting back his computer so the letter would appear to have been written on September 21, 2010. *Id.* ¶ 65. The document was not produced nor was it referenced by NMS Counsel until months later when it was relied upon as a primary piece of evidence to substantiate their claim. *Id.*

In Fall 2015, AEW's outside deal counsel, NMS's outside deal counsel, and NMS's former president, among others, were deposed. Srinivasan Decl., Exs. 75-80. All witnesses denied the existence of a "typo" in Article 11, and all witnesses confirmed that NMS had requested the 5-year Buy/Sell provision and that the provision was thereafter included in every draft, every executed version of the JVA, and all amendments to the JVA. *See id.* Each of the Genga, Miller, and Zelig Defendants continued their representation of NMS regarding the purported 3-year Buy/Sell provision after the record established facts contrary to the existence of such a provision.

### F. The Production of Forged Documents and Destruction of Evidence

In Fall 2015, the court in *Lincoln Studios* ordered NMS to, among other things, freeze all its computers and electronic devices, produce a list of every device on which the forged JVA and the two other forgeries had ever appeared, and to produce all electronic versions of such documents. Compl. ¶ 72. A month later, the court ordered NMS to turn over to AEW all devices and documents that had an original or copy of

the JVA, Cover Letter, and PMA for forensic examination. *Id.* NMS Counsel Defendants identified only a single device. *Id.* ¶ 73. Evidence later proved dozens of devices and computers should have been identified and preserved. *Id.* By his own admission, Neil later stated he did not produce his personal computer for examination. Dkt. No. 57 p. 20. Further, before turning over hardcopies of the forgeries, NMS Counsel threatened to cut the original hardcopies of the forgeries in half and wrote that "if [AEW took] the [cover] letter, and it [ended] up being dated at any other time in 2010, it [would be NMS's] position that [AEW] altered the document." Dkt. No. 57 p. 19. No Defendant has properly explained what was meant by this email.

Once the forged documents and devices were produced in state court, AEW's experts presented evidence to support the conclusion that NMS engaged in a coordinated effort to destroy, suppress, and manipulate pertinent evidence. Compl., Ex. 1 at 93-108. Their evidence showed that, as part of the scheme, NMS erased and manipulated documents and devices just minutes before AEW's forensic team arrived. *Id.* Further, the forensic examination showed that Defendant Frid of the Miller Defendants, and Defendant Zelig were on the premises of NMS with Neil Shekhter the evening that the spoliation of evidence occurred. Srinivasan Decl., ¶ 4; Ex. 89 ¶¶ 38-39. The court noted it had "no doubt" NMS was guilty of "widespread" forgery. Compl. ¶ 103. No Defendants ever challenged the findings of misconduct, and Defendant Miller recently apologized to the *Lincoln Studios* court for the unprecedented actions. Srinivasan Decl., Ex. 82 at 6:9-12.

### G. The Amended Complaints

In September 2015, NMS filed a Second Amended Complaint ("SAC"). Srinivasan Decl., Ex. 18. The Genga Defendants were counsel of record on the SAC. The SAC alleges the same claims as the FAC. The Genga Defendants claim they conducted no further research or investigation to validate NMS's claims or allegations in the SAC. Rather than respond to a demurrer filed in the *Lincoln Studios* case,

Defendants voluntarily abandoned 23 of its claims.

In January 2016, the Miller Defendants filed a Third Amended Complaint ("TAC"). Srinivasan Decl., Ex. 38. The TAC falsely alleges Version 2 was the genuine JVA and Version 1 contained a "mistake" AEW supposedly fixed. The TAC alleges Version 3 of the JVA was a forgery created by AEW. Defendants also asserted NMS had a take-out or acquisition right based on Article 6 of the JVA.

### H. The Trial Court's Order and Judgments Against NMS

On November 22, 2016, the court issued an order granting terminating sanctions based on NMS's "shocking, intentional, and pervasive" misconduct. Compl., Ex. 1 at 124. The court found that Version 2, the cover letter, and the PMA were forgeries created by NMS, that NMS knowingly "provided false testimony under oath," and that NMS had engaged in "coordinated, intentional widespread destruction of evidence." *Id.*, at 108, 127. The court concluded NMS "brought this case upon forged documents, committed perjury, and then intentionally and purposefully destroyed a wide swath of evidence relating to the forgeries." *Id.*, at 138.

On December 1, 2016, the trial court entered judgment against NMS on all its claims. Compl., Ex. 2. On December 2, 2016, the trial court entered a default judgment against NMS and in favor of AEW on its cross-complaint. Compl., Ex. 3. The default judgment found Version 2 was a "fabrication and forgery created by NMS and its affiliates". *Id.*, at 328. Specifically, the court determined "NMS and its affiliates changed the Buy/Sell provision in Section 11.1(a)(i) of the JVA from a five-year term to a three-year term that was never agreed upon by the parties." *Id.*

On June 20, 2018, the Court of Appeal affirmed the terminating sanctions order and judgments against NMS. *See* Compl., Ex. 5. The Court of Appeal also sustained AEW's demurrer to NMS's claim for breach of Article 6 of the JVA. *See* Compl., Ex. 4. The Court of Appeal decided Article 6 was "not reasonably susceptible" to NMS's interpretation. *Id.,* at 335. The Court of Appeal denied NMS's petition for rehearing,

and the California Supreme Court denied review on September 12, 2018. All judgments against NMS are final.

### I. This Action

AEW filed a complaint in this Court asserting malicious prosecution claims against both NMS and its counsel. (Dkt. No. 1). In short, AEW asserts that the *Lincoln Studios* litigation lacked merit and NMS's counsel did not have probable cause to file or pursue the action in the state court proceeding. Defendants filed special motions, pursuant to Cal. Civ. P. Code § 425.16, to strike AEW's complaint as a prohibited strategic lawsuit against public participation ("SLAPP").

### II. LEGAL STANDARD

#### A. Anti-SLAPP Motions

Pursuant to California Code of Civil Procedure section 425.16(b)(1), "[a] cause of action against a person arising from any act . . . in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

In deciding anti-SLAPP motions, courts consider the pleadings as well as affidavits. Cal. Code Civ. Proc. § 425.16(b)(2). Courts must "accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004) (citation omitted). "If the plaintiff can show a probability of prevailing on *any part of its claim*, the cause is not meritless and will not be stricken." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011) (internal quotations omitted, emphasis in original). Thus, if a single cause of action asserts "a number of acts of alleged misconduct and theories of recovery . . . *it is sufficient to focus on just one*." *Cuevas-*

*Martinez v. Sun Salt Sand, Inc.*, No. E070843, 2019 WL 2385161, at *12 (Cal. Ct. App. June 6, 2019) (emphasis in original).

### III. DISCUSSION

#### A. Plaintiff's Malicious Prosecution Claim

California law recognizes the common law tort of malicious prosecution, although such claims are "disfavored." *Zamos v. Stroud*, 32 Cal. 4th 958, 966 (2004). To state a claim for malicious prosecution, "a plaintiff must demonstrate that the prior action (1) was initiated by or at the direction of the defendant and legally terminated in the plaintiff's favor, (2) was brought or maintained without probable cause, and (3) was initiated with malice." *Seibel v. Mittlesteadt*, 41 Cal. 4th 735, 740 (2007); *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291. "Probable cause must exist for every cause of action in the underlying action." *Cuevas-Martinez*, 2019 WL 2385161, at *10. Thus, a malicious prosecution action may be brought when some, but not all, of the claims in the underlying action were asserted with malice and without probable cause. *See id.*

Here, AEW asserts a single malicious prosecution cause of action premised on numerous theories. As such, AEW need only show requisite merit as to any one of its theories. Defendants' Anti-SLAPP motion is defeated in its entirety if Plaintiff makes an adequate showing that: (1) Defendants lost their prior lawsuit; (2) Defendants litigated any one of its causes of action without probable cause and; (3) Defendants had malice.

For AEW to overcome Defendants' motions to strike, it must satisfy each of the three elements above. The Court addresses each in turn.

#### 1. *Lincoln Studios* Was Terminated in AEW's Favor

Favorable termination in a malicious prosecution claim requires that the termination of the underlying action "reflect the merits of the action *and the plaintiff's innocence of the misconduct alleged in the lawsuit.*" *Staffpro, Inc. v. Elite Show*

11.

*Servs., Inc.*, 136 Cal. App. 4th 1392, 1399 (2006) (emphasis in original; internal quotation marks and citation omitted). "Termination of the prior proceeding is not necessarily favorable simply because the party prevailed in the prior proceeding; the termination must relate to the merits of the action by reflecting either on the innocence of or lack of responsibility for the misconduct alleged against him." *Sagonowsky v. More*, 64 Cal. App. 4th 122, 128 (1998). To determine whether there was a favorable termination, California courts "look at the judgment as a whole in the prior action." *Casa Herrera, Inc. v. Beydoun*, 32 Cal. App. 4th 336, 341 (2004) (internal quotation marks and citation omitted).

For both the Miller and Zelig Defendants, there is no ambiguity as to whether *Lincoln Studios* was favorably terminated in AEW's favor. The Miller and Zelig Defendants represented NMS throughout the *Lincoln Studios* litigation. At resolution, the state courts determined that both the oft-raised Article 11 forgery argument, and the Article 6 argument were meritless. Thus, there was favorable termination in AEW's favor regarding Miller and Zelig.

The Genga Defendants assert that there was no favorable termination because they had withdrawn or been fired by the time *Lincoln Studios* issued its terminating sanctions order and entered its judgment. However, the Genga Defendants were counsel of record over NMS's now-abandoned causes of action that were voluntarily dismissed. This satisfies the favorable termination requirements under California law. *See Sycamore Ridge Apartments, LLC v. Naumann*, 157 Cal. App. 4th 1385, 1400 (2007) (favorable termination supported by evidence that plaintiff's voluntary dismissal "was motivated by a recognition that most of the claims made . . . were meritless"). The favorable termination prong of a malicious prosecution claim appears to be satisfied as to each Defendant.

### 2. Defendants Lacked Probable Cause

Under California law, in the context of malicious prosecution, "[p]robable

12.

cause exists when a lawsuit is based on facts reasonably believed to be true, and all asserted theories are legally tenable under the known facts." *Cole v. Patricia A Meyer & Associates, APC*, 206 Cal. App. 4th 1095, 1106 (2012). The standard of review is similar to the standard for determining whether a lawsuit is frivolous: whether "any reasonable attorney would have thought the claim tenable." *Zamos*, 32 Cal. 4th 971. "Probable cause exists if the claim is legally sufficient and *can be substantiated by competent evidence*." *Antounian v. Louis Vuitton Malletier*, 189 Cal. App. 4th 438, 448-49 (2010) (emphasis added).

AEW asserts that NMS Counsel lacked probable cause when representing NMS in *Lincoln Studios*. Further, AEW argues that NMS's complaint in *Lincoln Studios* necessarily relies on the authenticity of Version 2 of the JVA and that Defendants should have been aware—or should have become aware during discovery—of the falsity of the document such that prosecution would be improper.

NMS Counsel argues in rebuttal that (1) the *Lincoln Studios* case did *not* revolve around Article 11 of the JVA, and even if it did, there were indicators that Version 2 was authentic, and (2) the Article 6 claim pursued by NMS was legally tenable.

Viewing the evidence in the light most favorable to AEW, the Court finds Plaintiff established that NMS Counsel lacked probable cause in initiating the *Lincoln Studios* lawsuit. First, there is substantial documentation highlighting the discussions between the NMS and AEW deal teams confirming that the 5-year Buy/Sell provision was agreed-upon. AEW's complaint even provides redlines of the language, and a written memo to its investors contemporaneous with the execution of the JVA. In contrast, Defendants have not pointed the Court to anything to support the claim that, at the time of the *Lincoln Studios* lawsuit, or at a minimum, when AEW's counsel alerted Defendants that Version 2 of the JVA was a likely forgery, Defendants had probable cause that their case—based on the exact forgery in question—was legally

tenable.[4] The Miller Defendants suggest the Court should be "loathe to second guess" the "tactical and strategic decisions of counsel at trial". However, at this stage of the litigation, there does not appear to be any competent evidence that could have justified those trial decisions.

Defendants further assert that they cannot be held liable for their client's wrongdoing, and that "AEW may not impute to [Defendants] the knowledge or acts of its client to satisfy AEW's burden to prove a lack of probable cause." The record suggests that at some point Defendants should have realized some, if not all claims raised against AEW lacked probable cause. Whether Neil Shekhter and his attorneys realized the lawsuit's futility at different times is of no moment. "[A]ttorneys may rely on their clients' allegations at the outset of a case, but they may not continue to do so if the evidence developed through discovery indicates the allegations are unfounded or unreliable." *Cuevas-Martinez*, 2019 WL 2385161, at *16.

In light of the lack of support for their first defense, Defendants point the Court to Article 6 of the JVA. The primary focus of the *Lincoln Studios* litigation was Version 2 of the JVA. Nothing in the record before the Court suggests otherwise. Moreover, Defendants have not articulated how Article 6 provided them with a legally tenable theory. Indeed, the Court of Appeal addressed the exact issue in affirming the trial court's demurrer, noting that "Article 6 is not *reasonably susceptible* to an interpretation that it confers an acquisition right." Compl., Ex. 1 at 335 (emphasis added). The existence of a valid contract is essential to an action based on a contract. *Cuevas-Martinez*, 2019 WL 2385161, at *15.

Defendants fail to provide any backing for the argument that their decision to

---

[4] While the Court recognizes the lawyer's role as a client's zealous advocate, viewing the evidence in Plaintiff's light, the Court struggles to see how defense counsel could have failed to see the futility of their lawsuit. The spontaneous origin of a new version of the JVA, never before discussed, and the evidence contrary (including contemporary emails regarding the Agreement) should have signaled that the documents underlying the litigation may have been doctored.

14.

initiate and litigate the *Lincoln Studios* lawsuit was supported by probable cause. Specifically, Defendants fail to provide backing that Version 2 is authentic.

In addition, Defendants do not address AEW's contention that after Version 2, the cover letter, and the PMA were adjudicated as forged, Defendants continued to file copycat lawsuits and send letters to all major title insurance holders, potential buyers, and real estate brokers which caused more injury to AEW.

The prima facie case against Defendants would be satisfied if just one claim in *Lincoln Studios* lacked probable cause. NMS Counsel raised over thirty claims, many of which were questionable from their inception, and none of which resulted favorably for NMS. AEW has provided adequate evidence to establish that a trier of fact could find some of NMS' claims against AEW lacked merit. AEW has established a likelihood it would prevail on the probable cause prong.[5]

### 3. AEW Has Sufficiently Plead Malice

"The 'malice' element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action." *Daniels v. Robbins*, 182 Cal. App. 4th 204, 224 (2010). Accordingly, California law requires a plaintiff to "plead and prove actual ill will *or* some *improper* ulterior motive." *Id.* (emphasis in original). "Suits with the hallmark of an improper purpose are those in which the person initiating them does not believe that his claim may be held valid or the proceedings are begun primarily because of hostility or ill will." *Cuevas-Martinez*, 2019 WL 2385161, at *17. "Since parties rarely admit an improper motive, malice is usually proven by circumstantial evidence and inferences drawn from the evidence." *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 208 (2004). "[M]alice can be inferred when a party continues to prosecute an action after becoming aware that the action lacks probable cause." *Cuevas-Martinez*, 2019 WL 2385161, at *18. "[W]hen a party is put

---

[5] Even if Plaintiff had not established a prima facie showing of probable cause, it would be entitled to discovery as a matter of law. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018).

on notice a fundamental element of its case is disputed, it should not proceed without evidence sufficient to support a favorable judgment on that element or at least information affording an inference such evidence can be obtained." *Arcaro v. Silva and Silva Enterprises Corp.*, 77 Cal. App. 4th 152, 158-59 (1999).

In malicious prosecution actions, malice ranges anywhere from open hostility to indifference. *Medley Capital Corp. v. Security National Guaranty, Inc.*, 17 Cal. App. 5th 33, 48 (2017). Malice is present when proceedings are instituted for an improper purpose like forcing a settlement which has no relation to the merits of the claim. *Id.*

Additionally, attorneys are held liable for associating into cases containing frivolous claims. *Jay v. Mahaffey*, 218 Cal. App. 4th 1522, 1545 (2013); *see Naumann*, 157 Cal. App. 4th at 1410 ("An attorney who associates into a case that is being maliciously prosecuted participates in harming the defendant for the time period that the attorney allows the untenable claims to remain alive.")

AEW alleges that Defendants were motivated by improper purpose. The Court is satisfied by the record before it.

As an initial matter, the Genga Defendants' assert that their representation was short-lived and they removed themselves from litigation as soon as they were aware Version 2 was a forgery. However, the Genga Defendants provide no explanation as to why they failed to conduct additional research into the validity of the claims repeated and realleged in the SAC. Additionally, the Genga firm associated into the case, became the proponent of NMS's frivolous claims, and only disassociated after *Lincoln Studios* had begun. The Genga Defendants can be held liable for the time period they participated in this frivolous lawsuit.

The record demonstrates, among other things, that Defendants engaged in heated litigation despite receiving ample indication that the documents underlying their claims were falsified; that there were discrepancies in the sworn statements provided by NMS; and that NMS engaged in "shocking, intentional, and pervasive" evidence destruction.

*See* Opposition to Miller Defendants' Special Motion to Strike at p. 29; *see also Cuevas-Martinez*, 2019 WL 2385161at *18 (inferring malice based on evidence that respondents pursued their interference with contractual claims for over twenty months despite there not being a valid contract); *Zamos*, 32 Cal. 4th at 970-73 (prevailing against anti-SLAPP motion by presenting evidence Defendant Attorneys continued to prosecute after receiving evidence conclusively establishing the claim was meritless); *Bergman v. Drum*, 129 Cal. App. 4th 11 (2005) (plaintiff made prima facie case of malicious prosecution by submitting evidence that prosecution continued even after she proved she was not liable for the claim).

In addition, AEW submitted a declaration contending that Defendants stated they would "never stop suing AEW," and "[AEW's] best case scenario was years of litigation." Compl. ¶ 113. AEW claim they believed NMS Counsel filed the *Lincoln Studios* lawsuit primarily to force AEW to sell the JVA properties to NMS at an unfair price. *Id*.

In a case similar to the present dispute, the California Court of Appeal found evidence of malice where the defendant instituted and maintained a collection action despite evidence that the plaintiff's signature on a credit application and guarantee was forged. *See Arcaro v. Silva and Silva Enterprises Corp.*, 77 Cal. App. 4th 152 (1999).

In *Arcaro*, the defendant obtained information that a third party forged plaintiff's signature. *Id.*, at 156. Nevertheless, the defendant pursued litigation. *Id.* Shortly after the defendant filed suit, plaintiff's counsel provided the defendant with a handwriting exemplar containing ten signatures by the plaintiff. *Id.*, at 155-56. The defendant rejected the handwriting exemplars as proof of the forgery and continued with the collection action. *Id.*, at 155. Based on these underlying facts, the Court of Appeal determined that defendant's lawsuit was initiated with malice. *Id.*, at 156.

As in *Arcaro*, Defendants ignored AEW's claims that the *Lincoln Studios* litigation was based on a forged JVA. Before filing the SAC, the NMS Counsel was

informed that version 2 of the JVA was a forgery. While NMS Counsel may not have been given a handwritten exemplar to trigger their skepticism, they were provided emails from NMS's own deal counsel that proved NMS's "typo" assertion was false and received documents confirming the import of the 5-year Buy/Sell provision. Despite failing to provide any counter evidence to support their typo claim or assertions that the forgery was genuine, Defendants continued with the action.

Interpreting the foregoing in AEW's favor, the Court is satisfied Plaintiff has provided evidence supporting a prima facie showing of malice. As such, AEW has laid out a plausible malicious prosecution claim that, if believed by the trier of fact, is sufficient to support a judgment in their favor against the Defendants.[6]

## IV.   CONCLUSION

For the foregoing reasons, the motions to strike the Miller, Genga, and Zelig Defendants are **DENIED**.

**IT IS SO ORDERED.**

Dated: September 4, 2019

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

---

[6] The Genga Defendants assert they were only a small part of the litigation against AEW and should be indemnified from this suit. At this early stage, the Court is dubious that the Genga Defendants were reasonable in litigating *Lincoln Studios* up to the point of their withdrawal and Defendants have not provided sufficient evidence to determine otherwise.